# EXHIBIT D

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN JOSE DIVISION

 4

 5   CISCO SYSTEMS, INC.,        )
                                 )
 6               Plaintiff,      )
                                 ) Case No.
 7          vs.                  ) 5:14-cv-05344-BLF (PSG)
                                 )
 8    ARISTA NETWORKS, INC.,     )
                                 )
 9               Defendant.      )
     _____)

10

11

12        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

14

15        VIDEOTAPED DEPOSITION OF KIRK LOUGHEED

16              Palo Alto, California

17             Friday, November 20, 2015

18                   Volume I

19

20

21

22   Reported by:
     CARLA SOARES
23   CSR No. 5908

24   Job No. 2187110

25   Pages 1 - 189
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                   SAN JOSE DIVISION

4

5    CISCO SYSTEMS, INC.,        )

                                 )

6                Plaintiff,      )

                                 ) Case No.

7          vs.                   ) 5:14-cv-05344-BLF (PSG)

                                 )

8    ARISTA NETWORKS, INC.,      )

                                 )

9                Defendant.      )

     _____)

10

11

12

13

14

15

16            VIDEOTAPED DEPOSITION OF KIRK LOUGHEED,

17   Volume I, taken on behalf of Defendant, at

18   650 Page Mill Road, Palo Alto, California, beginning

19   at 9:19 a.m., and ending at 6:15 p.m., on Friday,

20   November 20, 2015, before CARLA SOARES, Certified

21   Shorthand Reporter No. 5908.

22

23

24

25

                                          Page 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    APPEARANCES:

2

3    For the Plaintiff and the Witness:

4              QUINN EMANUEL URQUHART & SULLIVAN, LLP

5              BY:  JOHN (JAY) NEUKOM, Attorney at Law

6              50 California Street, 22nd Floor

7              San Francisco, California 94111

8              415.875.6341

9              johnneukom@quinnemanuel.com

10                    and

11             KIRKLAND & ELLIS LLP

12             BY:  JOSHUA L. SIMMONS, Attorney at Law

13             601 Lexington Avenue

14             New York, New York 10022

15             212-446-4989

16             joshua.simmons@kirkland.com

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    APPEARANCES (Continued):

2

3    For the Defendant:

4              KEKER & VAN NEST LLP

5              BY:  BRIAN L. FERRALL, Attorney at Law

6              BY:  RYAN WONG, Attorney at Law

7              633 Battery Street

8              San Francisco, California 94111

9              415.391.5400

10             bferrall@kvn.com

11             rwong@kvn.com

12

13   ALSO PRESENT:  Sean Grant, Video Operator

14                        --o0o--

15

16

17

18

19

20

21

22

23

24

25

Page  4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                        INDEX

 2   WITNESS

 3   KIRK LOUGHEED                      EXAMINATION

     Volume I

 4

 5            BY MR. FERRALL                    10

 6

 7                      EXHIBITS

 8   NUMBER           DESCRIPTION              PAGE

 9   Exhibit 29   Document headed "Internet       73

10                Protocol,"

11                Bates ARISTANDCA0031553 - 1601

12

13   Exhibit 30   Document headed "DoD Internet    73

14                Host Table Specification"

15

16   Exhibit 31   Document headed "An Ethernet     73

17                Address Resolution Protocol or

18                Converting Network Protocol

19                Addresses to 48.bit Ethernet

20                Address for Transmission on

21                Ethernet Hardware,"

22                Bates ARISTANDCA0003130 - 1639

23

24

25

                                         Page 5
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                          EXHIBITS

 2    NUMBER              DESCRIPTION              PAGE

 3    Exhibit 32   Document headed "Address           85

 4                 Resolution Protocol (ARP) module

 5                 for the Yeager gateway"

 6

 7    Exhibit 33   Email string, top email to Kirk    89

 8                 Lougheed and Paula Labloner from

 9                 Mike Sanchez, dated 11-17-14,

10                 Bates CSI-CLI-01326834 - 6837

11

12    Exhibit 34   Email string, top email to Phillip  93

13                 Remaker from Kirk Lougheed, dated

14                 3-30-10, Bates CSI-CLI-01317865 -

15                 7866

16

17    Exhibit 35   Email string, top email to Joe     100

18                 Hielscher from Kirk Lougheed,

19                 dated 7-23-08,

20                 Bates  CSI-CLI-01134849 - 4850

21

22    Exhibit 36   Document entitled "Stanford        101

23                 Ethertip/Gateway User and

24                 Configuration Guide,"

25                 Bates CSI-CLI-01315523 - 5568
```

Page 6

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
  1                        EXHIBITS

  2    NUMBER             DESCRIPTION              PAGE

  3    Exhibit 37   Document entitled "cisco Systems   106

  4                 AGS User Manual,"

  5                 Bates CSI-CLI-00358166 - 8223

  6

  7    Exhibit 38   Email string, top email to Phillip  122

  8                 Remaker from Kirk Lougheed, dated

  9                 12-11-08, Bates CSI-ANI-00043306 -

 10                 3306.000001

 11

 12    Exhibit 39   Document entitled "Cisco's          152

 13                 Response to Arista's Interrogatory

 14                 No. 16 Amended Exhibit D1 (IOS

 15                 Release 11.0)"

 16

 17    Exhibit 40   Email to Craig Fox from Kirk        160

 18                 Lougheed, dated 3-6-96,

 19                 Bates CSI-CLI-00746398

 20

 21    Exhibit 41   Document described as source        162

 22                 code file

 23

 24    Exhibit 42   Document described as code          177

 25
```

Page 7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                        EXHIBITS

 2    NUMBER              DESCRIPTION              PAGE

 3    Exhibit 43   Document entitled "DECbrouter 90    181

 4                 Products," Bates CSI-ANI-00081683 -

 5                 1683.000344

 6

 7                       --o0o--

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page  8
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                Palo Alto, California                    08:37:04

 2               Friday, November 20, 2015

 3                    9:19 a.m.

 4

 5                P R O C E E D I N G S                     08:37:10

 6           THE VIDEO OPERATOR:  Good morning.  We're

 7   on the record.  The time is 9:19 a.m., and the date

 8   is November 20th, 2015.  This begins the videotaped

 9   deposition of Kirk Lougheed.

10           My name is Sean Grant, here with our court     09:19:25

11   reporter, Carla Soares.  We're here from Veritext

12   Legal Solutions at the request of counsel for

13   defendant.

14           This deposition is being held at Wilson

15   Sonsini in Palo Alto, California.  The caption of      09:19:34

16   this case is Cisco Systems, Inc., versus Arista

17   Networks, Inc., Case No. 5:14-CV-05344-BLF.

18           Please note that audio- and

19   video-recording will take place unless all parties

20   have agreed to go off the record.  Microphones are     09:19:54

21   sensitive and may pick up whispers, private

22   conversations, or cellular interference.

23           At this time, will counsel please identify

24   themselves and state whom they represent.

25           MR. FERRALL:  Brian Ferrall of Keker &         09:20:06
```

Page 9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Van Nest representing the defendant Arista Networks.    09:20:06

2              MR. WONG:  Ryan Wong from Keker & Van Nest

3    representing Arista Networks.

4              MR. NEUKOM:  John Neukom representing

5    Cisco and also the witness.    09:20:16

6              MR. SIMMONS:  Joshua Simmons from Kirkland

7    & Ellis representing Cisco and the witness.

8              THE VIDEO OPERATOR:  Thank you.

9              Will the certified court reporter please

10   swear in the witness.    09:20:23

11                   KIRK LOUGHEED,

12   having been administered an oath, was examined and

13   testified as follows:

14              THE VIDEO OPERATOR:  Thank you.

15              Counsel?    09:20:34

16                   EXAMINATION

17   BY MR. FERRALL:

18        Q    Please state your full name.

19        A    Kirk Stewart Lougheed.

20        Q    What's your address, Mr. Lougheed?    09:20:39

21        A    My personal address?

22        Q    Yes, please.

23        A    18691 Casablanca Lane in Saratoga.

24        Q    Have you ever sat for a deposition before?

25        A    Once.    09:20:55

                                             Page 10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    calls for a conclusion.                              13:03:06

2          THE WITNESS:  Documents whose name I do

3    not recall.

4    BY MR. FERRALL:

5          Q    Can you describe generally what they were?    13:03:16

6          A    They were documents that described a

7    packet format and described an associated state

8    machine.

9          Q    Is the address resolution protocol

10    referred to simply by the acronym ARP?              13:03:59

11          A    There's a general concept of an address

12    resolution protocol, and then there's one, possibly

13    more, that are -- may be described in various

14    documents from the IETF.

15          Q    When did you first hear -- have you ever    13:04:52

16    heard the address resolution protocol abbreviated as

17    ARP?

18          A    Yes.

19          Q    When did you first hear that abbreviation?

20          A    I don't recall -- I don't recall the        13:05:17

21    precise time.

22          Q    Was it while you were still at Stanford?

23          A    It certainly could have been.

24          Q    Did you develop any features for the

25    address resolution protocol yourself?                13:05:52

Page 80

1          MR. NEUKOM:  Objection.  Vague.                13:05:56

2              THE WITNESS:  I do not understand your

3    question.  What do you mean, develop features for

4    the address resolution protocol?

5    BY MR. FERRALL:                                      13:06:12

6          Q    Fair enough.  Let me ask it a different

7    way.

8              Did you contribute to any IETF RFC

9    relating to the address resolution protocol?

10             MR. NEUKOM:  Objection.  Asked and         13:06:27

11   answered.

12             THE WITNESS:  No.

13   BY MR. FERRALL:

14         Q    Did you develop features at -- while at

15   Cisco that relate to ARP, if you don't mind me using  13:06:44

16   the acronym?

17         A    I don't understand the question.

18         Q    Who is Glenn Truitt?

19         A    He's a -- at my time at Stanford, he was a

20   graduate student.                                    13:08:37

21         Q    Did you work with him while at Stanford?

22         A    Briefly.

23         Q    In what capacity?

24         A    I recollect that he may have written a

25   user guide to the software at the time, but that's   13:09:21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    those still saved somewhere?                          13:42:13

 2         A   I had a copy in my Cisco directory.

 3         Q   Do you know, do you still have a copy of

 4    those files somewhere?

 5         A   Yes.                                          13:42:30

 6         Q   Where?

 7         A   I believe they're still on my Cisco

 8    directory.

 9         Q   Do you remember the day that you left

10    Stanford?                                              13:43:13

11         A   Yes.

12         Q   What date was that?

13         A   The Friday before -- whenever Bastille Day

14    was.  I left on a Friday in July of '86.  The

15    following Monday was Bastille Day.                     13:43:44

16         Q   July 11th, by my calculation.

17         A   It could very well be.

18         Q   Okay.  Why do you associate it with

19    Bastille Day, just out of curiosity?

20         A   I thought it was a striking coincidence.      13:44:03

21         Q   How so?

22         A   It's a major event.

23         Q   Why was it a major event?

24         A   I had been working for six years at

25    Stanford, and that was the day I resigned.             13:44:22
```

Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q    Why did you leave Stanford?    13:44:24

2    A    To help get Cisco off the ground.

3    Q    Was it a friendly departure from Stanford?

4    A    No.

5    Q    How so?  In what way was it not friendly?    13:44:54

6    A    My boss asked for a current copy of the

7    sources, and I declined to give him a current copy.

8    Q    Who was your boss?

9    A    Steve Hanson.

10    Q    When you say "a current copy of the    13:45:42

11    sources," you mean the source code that you had

12    worked on?

13    A    Yes.

14    Q    Why did you decline to give him a copy of

15    the source code you were working on?    13:45:51

16    A    I don't recall, because he had the stuff

17    on the backups.  There was stuff on backups.

18    Q    And you don't recall why you wouldn't give

19    him a copy?

20    A    I was probably feeling mulish and    13:46:23

21    irritable.

22    Q    You got paid while you were an employee at

23    Stanford, right?

24    A    Yep.

25    Q    You knew at that time you were going to    13:46:46

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    take that software to help Cisco, right?                          13:46:47

2         A    Yes.

3         Q    Did you actually have the software on you

4    that day when you resigned from Stanford?

5         A    No.                                                      13:47:10

6         Q    Where was your copy of it?

7         A    It was on a UNIX system at Len and Sandy's

8    house.

9         Q    So you had already provided that software

10   to Cisco by then, by the time you resigned from       13:47:32

11   Stanford?

12        A    Yes.

13        Q    Did anyone from Stanford give you

14   permission to take that software and put it on a

15   Cisco computer?                                        13:47:48

16        A    No.

17        Q    Did you think that that was proper to do?

18        A    At the time I thought it was proper.

19        Q    Why was that?

20        A    I had written a good chunk of that          13:48:19

21   software.

22        Q    And that, to you, was reason to be able to

23   take it to Cisco in your mind at the time?

24        A    In my mind at the time.

25        Q    What about the part of that software that   13:48:45

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   was written by others?  Why did you think you could    13:48:49

2   take that?

3          A    I had not considered it.

4          Q    Were you involved at all in the subsequent

5   legal dispute with Stanford?    13:49:13

6          A    No.

7          Q    Who was on behalf of Cisco?

8              MR. NEUKOM:  Objection.  Privilege.

9              MR. FERRALL:  I'm just asking for the

10  name.    13:49:27

11             MR. NEUKOM:  I understand.

12             MR. FERRALL:  Okay.

13             MR. NEUKOM:  You should answer that

14  question to the extent you can do so without

15  disclosing attorney-client communications.    13:49:33

16             THE WITNESS:  My understanding was that

17  Len and Sandy were involved in those discussions.

18  BY MR. FERRALL:

19         Q    Do you know who was involved in the

20  discussions on the Stanford side?    13:50:16

21         A    No, I don't.

22         Q    Was there ultimately a resolution reached

23  between Stanford and Cisco?

24         A    Yes.

25         Q    Do you know the terms of that resolution?    13:50:36

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A    I do not know the precise terms.                    13:50:42

2      Q    What's your understanding of the general

3    terms?

4      A    Cisco obtained a license to the software

5    and perhaps -- and the MEIS in exchange for paying    13:51:05

6    a -- paying a sum of money to Stanford.

7      Q    When you said the software and the MEIS,

8    what's the MEIS?

9      A    You asked that question of me before.  But

10   to refresh your memory, it's the Massbus-Ethernet     13:51:30

11   Interface Subsystem.

12     Q    I didn't know that's how you pronounce it.

13   M-E-I-S?

14     A    Right.

15         MR. FERRALL:  I didn't realize that.            13:51:39

16   Thank you for clarifying that.

17         Actually, we can take a quick break.

18         MR. NEUKOM:  Okay.

19         THE VIDEO OPERATOR:  Going off the record,

20   the time is 1:52 p.m.                                  13:51:57

21         (Recess, 1:52 p.m. - 2:03 p.m.)

22         THE VIDEO OPERATOR:  Back on the record.

23   The time is 2:03 p.m.

24         MR. FERRALL:  Let's mark this as the next

25   exhibit.                                               14:03:07

Page 99

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    address we were referring to.  But we chose "DECnet      15:41:13

 2    address."

 3            It became clear that much more -- that we

 4    were becoming a multi-protocol router.  We were

 5    adding other protocols into the box, into the           15:41:27

 6    software.

 7            And I had -- I value -- I value the

 8    aesthetic of having a symmetric-looking command line

 9    expression, symmetric hierarchy.  It was clear we

10    were heading towards a hierarchy.                       15:41:52

11            So at some point after DECnet and perhaps

12    a few other protocols to make things look very

13    similar, we started prefacing our IP-only commands

14    with "IP."  And that gave a very -- what I thought

15    was a very elegant, symmetric, elegant way of           15:42:16

16    referring to different protocols within a

17    multi-protocol router.

18            So that is the history of the "IP address"

19    command.

20        Q   Okay.  My question was simpler.  I              15:42:36

21    appreciate that answer.  But my question was a

22    little simpler than that, but let me ask it a

23    different way.

24            You had heard of the term "IP address"

25    before you joined Cisco, hadn't you?                    15:42:51
```

Page 130

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        MR. NEUKOM:   Objection.   Vague and asked          15:42:59

2    and answered.

3            THE WITNESS:   I suppose I had.   When one

4    is talking about different networking protocols, one

5    needs to clarify which networking protocol one is          15:43:10

6    talking about.   So it was probably terminology that

7    was in the air.

8    BY MR. FERRALL:

9        Q    Does the same go for "IP host," also?   You

10   had heard that before you joined Cisco?          15:43:29

11           MR. NEUKOM:   Objection.   Misstates prior

12   testimony.

13           THE WITNESS:   The original form of the

14   "host" command was just "host command."   It was

15   another one that had to distinguish, in a          15:43:41

16   multi-protocol world, in a multi-protocol piece of

17   software, what you were talking about.

18           It would have looked very odd in a

19   multi-protocol router that there was one protocol

20   that wasn't prefaced by a -- some descriptive          15:44:03

21   keyword.

22   BY MR. FERRALL:

23       Q    Following up on that, the purpose of your

24   use of "IP" as the first keyword in that command "IP

25   host" was to distinguish the protocol that it's          15:44:33

Page 131

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    referring to?                                              15:44:36

2         A    That was the aesthetic choice I made.

3              MR. NEUKOM:   Objection.  Mischaracterizes

4    prior testimony.

5              THE WITNESS:   There were many possible          15:44:49

6    ways of doing it.  As I indicated, I could perhaps

7    take a look at an address and then infer what it

8    was.  But that was not the choice that I made at the

9    time.

10   BY MR. FERRALL:                                            15:45:07

11        Q    What were the alternative commands that

12   you considered for "IP host"?

13        A    "Name."  "Name" was certainly one of the

14   possible candidates.  "Network system" or

15   "system" -- there are many, many words that one        15:45:51

16   could use to refer to all sorts of different things.

17        Q    Okay.  But now you're talking about

18   alternatives for the word "host," right?

19        A    Um-hum.

20        Q    Okay.  You didn't -- you're not the first    15:46:08

21   one to use the word "host," are you?

22        A    No.

23        Q    I mean, "host" had been used for -- well

24   before you joined Cisco to refer to a computer host.

25   It's a conventional term, right?                        15:46:29

Page 132

1      MR. NEUKOM:  Objection.  Vague, compound,      15:46:31

2  foundation, and calls for opinion testimony.

3      THE WITNESS:  It was one of the

4  possibilities that I had -- that I had.

5  BY MR. FERRALL:      15:46:46

6      Q    And "host" was the term that was used in

7  the commands in the software that came from

8  Stanford; is that right?

9      MR. NEUKOM:  Objection.  Mischaracterizes

10  prior testimony.      15:47:13

11      THE WITNESS:  I had implemented the "host"

12  command while I was at Stanford.

13  BY MR. FERRALL:

14      Q    Okay.  And what did you -- so did you

15  decide to use the word "host" for the command on the      15:47:27

16  software you worked at while you were employed by

17  Stanford?

18      MR. NEUKOM:  Objection.  Vague.

19      THE WITNESS:  Could you restate that

20  question?      15:47:50

21  BY MR. FERRALL:

22      Q    Sure.

23      For the software that -- strike that.

24      For the gateway TIP software that you

25  worked on while you were employed at Stanford, was      15:48:02

Page 133

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    it you who decided to use the word "host" for that                    15:48:06

2    command?

3            A    It was -- it was my decision.

4            Q    Okay.

5            A    I believe it was.  I believe I -- yes, it                15:48:16

6    was my decision.

7            Q    And do you know how you came to choose

8    that word?

9            A    It was -- it was terminology that was in

10   the air at the time.                                                  15:48:42

11           Q    And at some later point -- let me ask you,

12   so when did you decide to append "IP" to the "host"

13   command?

14               MR. NEUKOM:  Objection.  Mischaracterizes

15   prior testimony.                                                      15:49:08

16               THE WITNESS:  Sometime after we had left

17   Stanford and after we had started putting support

18   for other protocols into the system.

19   BY MR. FERRALL:

20           Q    Can you provide a more specific date?                    15:49:37

21           A    Not --

22               MR. NEUKOM:  Objection.  Asked and

23   answered.

24               THE WITNESS:  Sometime within the 1987 to

25   1988 time frame.                                                      15:50:03

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MR. FERRALL:                                              15:50:10

2         Q    Okay.   And the purpose of using the "IP"

3    keyword before "host" was to distinguish this

4    command from a "host" command that might pertain to,

5    for example, the DECnet protocol instead?            15:50:31

6              MR. NEUKOM:   Objection.   Asked and

7    answered and mischaracterizes prior testimony.

8              THE WITNESS:   I felt that symmetry and

9    consistency within the command set was something

10   that would be -- was desirable, and we adopted the   15:50:59

11   convention of finding a -- an initial keyword that

12   would describe the basic protocol that we were

13   configuring.

14   BY MR. FERRALL:

15        Q    So do all of the commands in the Cisco CLI   15:52:22

16   that begin with "IT" -- sorry.   Strike that.

17             Do all of the Cisco CLI commands that

18   begin with the keyword "IP" indicate that those

19   commands are for the IP protocol as opposed to some

20   other protocol?                                      15:52:46

21             MR. NEUKOM:   Objection.   Compound.

22             THE WITNESS:   That is the generally

23   understood convention.

24   BY MR. FERRALL:

25        Q    Are you aware of pre-1986 RFCs that            15:53:38

                                                 Page 135

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1   BY MR. FERRALL:                                    16:08:17

 2        Q    Okay.  Do you have any other recollection

 3   as to who actually received the software from

 4   Mr. Hedrick?

 5        A    No.                                       16:08:22

 6        Q    Tell me how -- strike that.

 7             Do you believe that you created the

 8   command "IP access list"?

 9             MR. NEUKOM:  Objection.  Vague.

10             THE WITNESS:  I -- yes.                   16:10:20

11   BY MR. FERRALL:

12        Q    What functionality does that implement?

13        A    It -- the "access list" command, which I

14   implemented at Stanford, the original form at

15   Stanford was a sequence of addresses and subnet     16:10:51

16   masks or -- in a mask, not a subnet mask but a mask,

17   saying which bits to ignore in the address.

18             And you provide a list of these items and

19   give it a number.  I chose -- I chose 1, 2, 3, 4, up

20   to 99, or something like that.                      16:11:35

21             And then if you assigned it to a terminal

22   line, it could restrict what computers -- what

23   addresses somebody could connect to from that

24   particular terminal line.

25             You could also assign it to a network     16:11:59
```

Page 141

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     the like, or "database lookup" or...                      16:16:59

2     BY MR. FERRALL:

3          Q     Did you coin the term "domain lookup"?

4          A     I decided to use that as a command

5     expression within the software, yes.                      16:17:21

6          Q     I'll ask the question one more time.   I'm

7     asking you if you coined the term "domain lookup."

8               MR. NEUKOM:   Objection.   Asked and

9     answered and vague.

10              THE WITNESS:   I did not.                        16:17:43

11    BY MR. FERRALL:

12         Q     Do you know who did?

13         A     No idea.

14         Q     When was -- to your knowledge, when was

15    the term "routing" ever used in conjunction with the      16:18:41

16    Internet protocol?

17              MR. NEUKOM:   Objection.   Vague and

18    foundation.

19              THE WITNESS:   I don't know when the term

20    "routing" was used.                                       16:19:05

21    BY MR. FERRALL:

22         Q     Were people in the field talking about

23    routing in connection with IP before you joined

24    Cisco?

25              MR. NEUKOM:   Objection.   Vague, compound.     16:19:24

                                                     Page 144

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. FERRALL:                                    17:39:52

 2         Q   Well, you were aware that others in the

 3    computer field used the word "host," right, before

 4    you did?

 5              MR. NEUKOM:  Objection.  Foundation and    17:40:02

 6    vague.

 7              THE WITNESS:  I was not aware of anybody

 8    that was using that term in a command expression in

 9    a router or gateway, as we called it then.

10    BY MR. FERRALL:                                    17:40:25

11         Q   That wasn't my question.  My question was,

12    you were aware of people in the field of computing

13    using the word "host," right, before you used it?

14              MR. NEUKOM:  Same objections and asked and

15    answered.                                          17:40:46

16              THE WITNESS:  I was aware of people using

17    the word "host" in the computer field.

18    BY MR. FERRALL:

19         Q   Before you used it?

20         A   Yes.                                      17:41:04

21         Q   Now, according to your counsel, the

22    command "show host name" was created substantially

23    later; is that -- am I right about that?

24              MR. NEUKOM:  Objection to form.

25              THE WITNESS:  Are you asking me or my      17:41:41
```

Page 170

```
 1         A   It seemed -- it seemed aesthetically        17:49:52

 2   pleasing to me.  It was something that was

 3   descriptive of an action that I wanted to take that

 4   was a fairly generic action, a fairly common action.

 5         Q   What does "banner MOTD" mean?              17:50:47

 6         A   MOTD is message of the day.

 7         Q   Did you make up that acronym?

 8         A   No, I did not.

 9         Q   Who did?

10         A   I don't know.                              17:51:07

11         Q   Did you coin the term "banner" as an

12   operating system command?

13             MR. NEUKOM:  Objection.  Vague.

14             THE WITNESS:  I simply implemented the

15   command.                                             17:51:37

16   BY MR. FERRALL:

17         Q   Are you aware of operating systems in

18   existence before you joined Cisco that used the

19   command "banner"?

20         A   I don't recall any at this point.          17:51:52

21         Q   When did you come up with the command

22   "banner MOTD"?

23         A   The command that came first was just

24   "banner," and its function was to print a vacant

25   terminal message on a terminal and to apply some     17:52:26
```

Page 175

```
 1    administrative distance was the tie-breaker.              18:01:16

 2        Q    Sorry.  I'm going to jump back to ARP.

 3            There's a term you use associated with

 4    ARP, "ARP cache."  We talked about that earlier in

 5    looking at one of the "clear" commands, right?           18:01:52

 6            Where did the term "ARP cache" come from?

 7        A    The cache is a -- logically a list of

 8    items.  An ARP cache would be a list of ARP requests

 9    that have been satisfied, including their MAC

10    addresses and how long since the last time we'd seen    18:02:37

11    a -- the router had seen an ARP request go by for

12    that particular source address.

13            That sort of computer science concept of a

14    cache is found all over.

15        Q    One of the commands that is indicated that     18:03:14

16    you authored is the command "boot system."

17            Had you ever heard someone use the words

18    "boot system" together before you joined Cisco?

19            MR. NEUKOM:  Objection.  Vague.

20            THE WITNESS:  I had heard phrases like          18:03:45

21    "boot the system up," "reboot the system," "reload

22    the system," "start the system," "restart the

23    system."

24            (Exhibit 43 was marked for identification

25            and is attached hereto.)                        16:48:10
```

Page 181

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Mr. Tjong.  If you're okay with it, I'd like to just       18:14:53

2    do a stipulation across the case that both sides

3    have the 30-day review and errata right for all

4    transcripts regardless whether counsel puts it on

5    the record at the depo as a two-way street.                 18:15:04

6             MR. FERRALL:  That's fine.  I thought it

7    existed as a matter of procedure anyway.  So that's

8    fine.

9             MR. NEUKOM:  I hope you're right, but glad

10   to have the stipulation, even if it's unnecessary.          18:15:17

11            MR. FERRALL:  Okay.

12            MR. NEUKOM:  Thanks very much.

13            THE VIDEO OPERATOR:  This concludes

14   today's videotaped deposition of Mr. Kirk Lougheed.

15   We're off the record at 6:15 p.m.  Thank you.               18:15:25

16            (TIME NOTED:  6:15 p.m.)

17                 --o0o--

18

19

20

21

22

23

24

25

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1
 2
 3
 4
 5
 6
 7
 8            I, KIRK LOUGHEED, do hereby declare under
 9   penalty of perjury that I have read the foregoing
10   transcript; that I have made any corrections as
11   appear noted, in ink, initialed by me, or attached
12   hereto; that my testimony as contained herein, as
13   corrected, is true and correct.
14            EXECUTED this _____ day of _____,
15   2015, at _____, _____.
16              (City)                (State)
17
18
19            _____
20                 KIRK LOUGHEED
21
22
23
24
25
                                         Page 188
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4          That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath; that

8    a record of the proceedings was made by me using

9    machine shorthand which was thereafter transcribed

10   under my direction; that the foregoing transcript is

11   a true record of the testimony given.

12          Further, that if the foregoing pertains to

13   the original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [X] was [ ] was not requested.

16          I further certify I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or any party to this action.

19          IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated: 11/25/2015

23

24                    *Carla Soares*

25                    CARLA SOARES

                      CSR No. 5908

                                              Page 189