# EXHIBIT 16

KEKER & VAN NEST LLP
ROBERT A. VAN NEST - # 84065
rvannest@kvn.com
BRIAN L. FERRALL - # 160847
bferrall@kvn.com
DAVID SILBERT - # 173128
dsilbert@kvn.com
MICHAEL S. KWUN - # 198945
mkwun@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Defendant ARISTA NETWORKS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC., | Case No. 5:14-cv-05344-BLF (PSG) |
| Plaintiff, | **DEFENDANT ARISTA NETWORKS, INC.'S NOTICE OF RULE 30(b)(6) DEPOSITION OF PLAINTIFF CISCO SYSTEMS, INC.** |
| v. | |
| ARISTA NETWORKS, INC., | Judge:       Hon. Beth Labson Freeman |
| Defendant. | Date Filed:  December 5, 2014 |
| | Trial Date:  November 21, 2016 |

**PLEASE TAKE NOTICE** that pursuant to Rules 26 and 30(b)(6) of the Federal Rules of Civil Procedure and Civil L.R. 30, the Court's Corrected Case Management Order, and any other applicable orders or standing orders, Defendant Arista Networks, Inc. ("Arista") will take the testimony upon oral deposition of Plaintiff Cisco Systems, Inc. ("Cisco"), through one or more of its officers, directors, managing agents, or other persons designated and consenting to testify on the matters listed in **ATTACHMENT A**.

The deposition will commence on February 15, 2016, or a mutually agreeable date thereafter, at the law offices of **Keker & Van Nest LLP, 633 Battery Street, San Francisco, California 94111** at 9:00 a.m. each day, before a court reporter or other officer authorized to administer oaths. The deposition will continue day to day until completed, will be conducted in accordance with the Federal Rules of Civil Procedure, and will be recorded by stenographic and videographic means, including real-time transcription.

At least seven days before the deposition, Cisco shall produce a list of proposed witnesses designated to testify for each topic identified in **ATTACHMENT A**. Cisco shall also affirmatively describe the scope of testimony that each such witness will be prepared to provide for each of that witness's designated topics.

Arista hereby reserves the right to notice and depose Cisco pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure at a later date on other subject matters, as agreed upon by the parties.

Dated: January 19, 2016

KEKER & VAN NEST LLP


By:    */s/ Brian L. Ferrall*

ROBERT A. VAN NEST
BRIAN L. FERRALL
DAVID SILBERT
MICHAEL S. KWUN

Attorneys for Defendant ARISTA
NETWORKS, INC.

## ATTACHMENT A

### DEFINITIONS AND INSTRUCTIONS

1.     "CISCO," "YOU," and "YOUR" means Cisco Systems, Inc. and all affiliate, parent, predecessor, subsidiary, and successor corporations, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

2.     "ARISTA" means Arista Networks, Inc. and all affiliate, parent, predecessor, subsidiary, and successor corporations, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

3.     "THIS LITIGATION" means the matter captioned *Cisco Systems, Inc. v. Arista Networks, Inc.*, Case No. 5:14-cv-05344-BLF (PSG), pending in the United States District Court for the Northern District of California.

4.     "SECOND AMENDED COMPLAINT" means the document entitled "SECOND AMENDED COMPLAINT FOR COPYRIGHT AND PATENT INFRINGEMENT" filed on July 23, 2015 as Docket Number 64 in THIS LITIGATION, and all exhibits and attachments thereto. If YOU are permitted to file an amended pleading that supersedes the SECOND AMENDED COMPLAINT, then this term shall refer to the version of the complaint that is operative at the time of the deposition.

5.     "'526 PATENT" means United States Patent No. 7,047,526, as well as any and all parents, continuations, continuations-in-part, or divisional relating thereto.

6.     "'886 PATENT" means United States Patent No. 7,953,886, as well as any and all parents, continuations, continuations-in-part, or divisional relating thereto.

7.     "COPYRIGHTED WORKS" means each and every alleged copyrighted work, and each and every asserted aspect thereof, that CISCO contends has been and/or is being infringed by Arista in THIS LITIGATION.

8.    "ASSERTED PATENT(S)" means the '526 PATENT and the '886 PATENT. The term "ASSERTED PATENTS" includes each patent individually and the patents collectively so as to give the associated topics the broadest possible scope.

9.    "NAMED INVENTORS" means Anil Bansal, Prakash Bettadapur, Paul Mustoe, Jung Tjong, Sastry Varanasi, Jeffrey Wheeler, the named inventors of the ASSERTED PATENTS.

10.    "ACCUSED '526 PRODUCTS" means all products, including all versions, features, and functionality thereof, that CISCO contends infringes the '516 PATENT in THIS LITIGATION.

11.    "ACCUSED '886 PRODUCTS" means all products, including all versions, features, and functionality thereof, that CISCO contends infringes the '886 PATENT in THIS LITIGATION.

12.    "ACCUSED PRODUCTS" means the ACCUSED '526 PRODUCTS, the ACCUSED '886 PRODUCTS, and all products, including all versions, features, and functionality thereof, that CISCO contends infringes its COPYRIGHTED WORKS in THIS LITIGATION.

13.    "IETF" means The Internet Engineering Task Force, which is an organized activity of the Internet Society (ISOC).

14.    "RFC" means "Request for Comments," which is a type of publication from the IETF and the Internet Society, the principal technical development and standards-setting bodies for the Internet.

15.    "IEEE" means Institute of Electrical and Electronics Engineers.

16.    "EOS" means any Arista operating system that CISCO contends infringes the ASSERTED PATENTS and/or its COPYRIGHTED WORKS in THIS LITIGATION, including the "Extensible Operating System" software, and all versions, parts, and subparts thereof, including any source code, software applications, application programming interfaces (APIs), and extensions thereof.  "EOS" as defined herein should also include EOS+ to the extent Cisco accuses it of infringing the ASSERTED PATENTS and/or COPYRIGHTED WORKS in THIS LITIGATION.

2

1014440

17.    "IOS" means the Internetwork Operating System provided by Cisco on Cisco products, including IOS, IOS XR, and IOS XE and including all versions, parts and subparts, including any source code, software applications, application programming interfaces (APIs), and extensions thereof.

18.    "NX-OS" means the Nexus Operating System provided by Cisco on Cisco products, including NX-OS and including all versions, parts and subparts, including any source code, software applications, application programming interfaces (APIs), and extensions thereof.

19.    "Cisco IOS" means any Cisco operating system, including any source code, software applications, application programming interfaces (APIs), and extensions thereof, and including both "IOS" and "NX-OS."

20.    "CLI" means command-line interface.

21.    "Cisco CLI" means the command-line interface used with and supported by any version of Cisco IOS.

22.    "Arista CLI" means the command-line interface used with and supported by any version of EOS.

23.    "CLI command" means any word or combination of words that is used or recognized as a command in a command-line interface.

24.    "NETWORK MANAGEMENT PRODUCT" means any product used to monitor, configure, or otherwise manage network devices and/or their associated firmware and software, including without limitation YOUR CiscoWorks Networks Compliance Monitor product and all device drivers that it supports (or has ever supported), the Tail-f Network Control System (NCS) and all network element drivers (NEDs) that it supports (or has ever supported), and the Cisco Network Service Orchestrator (NSO) enabled by Tail-f, and all NEDs that it supports (or has ever supported).

25.    "OPEN SOURCING" means making or denoting source code, or portions thereof, freely available for the use, redistribution, and/or modification by users and/or other developers.

26.    "STANFORD UNIVERSITY" means The Leland Stanford Junior University, which is also known in official documents as The Board of Trustees of the Leland Stanford Junior

3

1014440

1    University, and all affiliate, parent, predecessor, subsidiary, and successor corporations, any joint

2    venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors,

3    employees, and officers thereof, including any person who has served in any such capacity at any

4    time.

5         27.    "STANFORD LICENSE" means the license agreement entered into between

6    STANFORD UNIVERSITY and CISCO, effective as of April 15, 1987, and all attachments and

7    amendments thereto.

         28.    "3COM" means 3Com Corporation and all affiliate, acquired, acquiring (including

8    HP), parent, predecessor, subsidiary, and successor corporations, any joint venture to which it

9    may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and

10   officers thereof, including any person who has served in any such capacity at any time.

11        29.    "ADTRAN" means ADTRAN, Inc. and all affiliate, acquired, acquiring, parent,

12   predecessor, subsidiary, and successor corporations, any joint venture to which it may be a party,

13   and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof,

14   including any person who has served in any such capacity at any time.

15        30.    "ALLIED TELESIS" means Allied Telesis (formerly Allied Telesyn) and all

16   affiliate, acquired, acquiring, parent, predecessor, subsidiary, and successor corporations, any

17   joint venture to which it may be a party, and all agents, attorneys, accountants, consultants,

18   directors, employees, and officers thereof, including any person who has served in any such

19   capacity at any time.

20        31.    "ALU" means Alcatel-Lucent S.A. and all affiliate, acquired, acquiring, parent,

21   predecessor, subsidiary, and successor corporations (including Nokia Corporation), any joint

22   venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors,

23   employees, and officers thereof, including any person who has served in any such capacity at any

24   time.

25        32.    "AVAYA" means Avaya Inc. and all affiliate, acquired (including NORTEL),

26   acquiring, parent, predecessor, subsidiary, and successor corporations, any joint venture to which

it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

33.     "BAY NETWORKS" means Bay Networks and all affiliate, acquired, acquiring (including NORTEL), parent, predecessor (including SynOptics Communications and Wellflett Communications), subsidiary, and successor corporations, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

34.     "BLADE" means BLADE Network Technologies and all affiliate, acquired, acquiring (including IBM), parent, predecessor, subsidiary, and successor corporations, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

35.     "BROCADE" means Brocade Communications Systems and all affiliate, acquired (including FOUNDRY), acquiring, parent, predecessor, subsidiary, and successor corporations, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

36.     "D-LINK" means D-Link Corporation and all affiliate, acquired, acquiring, parent, predecessor, subsidiary, and successor corporations, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

37.     "DEC" means Digital Equipment Corporation and all affiliate, acquired, acquiring, parent, predecessor, subsidiary, and successor corporations, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

38.     "DELL" means Dell Inc. and all affiliate, acquired (including FORCE10), acquiring, parent, predecessor, subsidiary, and successor corporations, any joint venture to which

it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

39.    "ERICSSON" means Telefonaktiebolaget L. M. Ericsson and all affiliate, acquired (including REDBACK), acquiring, parent, predecessor, subsidiary, and successor, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

40.    "EXTREME NETWORKS" means Extreme Networks and all affiliate, acquired, acquiring, parent, predecessor, subsidiary (including Enterasys Networks), and successor, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

41.    "F5" means F5 Networks, Inc. and all affiliate, acquired, acquiring, parent, predecessor, subsidiary, and successor corporations, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

42.    "FORCE10" means Force10 Networks, also known as Dell Force10 and nCore Networks, and all affiliate, acquired, acquiring (including DELL), parent, predecessor, subsidiary, and successor corporations, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

43.    "FOUNDRY" means Foundry Networks, Inc. and all affiliate, acquired, acquiring (including BROCADE), parent, predecessor, subsidiary, and successor corporations, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

44.    "HP" means The Hewlett-Packard Company and all affiliate, acquired (including 3COM), acquiring, parent, predecessor, subsidiary, and successor corporations (including Hewlett

Packard Enterprise), any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

45.    "HUAWEI" means Huawei Technologies Co. Ltd. and all affiliate, acquired, acquiring, parent, predecessor, subsidiary, and successor corporations, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

46.    "IBM" means International Business Machines Corporation and all affiliate, acquired (including BLADE), acquiring (including LENOVO), parent, predecessor, subsidiary, and successor corporations, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

47.    "LENOVO" means Lenovo (United States) Inc. and all affiliate, acquired (including certain IBM business units), acquiring, parent, predecessor, subsidiary, and successor corporations, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

48.    "NEC" means NEC Corporation and all affiliate, acquired, acquiring, parent, predecessor, subsidiary, and successor corporations, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

49.    "NETGEAR" means Netgear, Inc. and all affiliate, acquired, acquiring, parent, predecessor, subsidiary, and successor corporations, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

50.    "NORTEL" means Nortel Networks Corporation, formerly known as Northern Telecom Limited, and all affiliate, acquired (including BAY NETWORKS), acquiring (including AVAYA), parent, predecessor, subsidiary, and successor corporations, any joint venture to which

1014440

it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

51.    "PROCKET" means Procket Networks, Inc. and all affiliate, acquired, acquiring (including CISCO), parent, predecessor, subsidiary, and successor, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

52.    "PROTEON" means Proteon, Inc. and all affiliate, acquired, acquiring, parent, predecessor, subsidiary, and successor corporations, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

53.    "REDBACK" means Redback Networks and all affiliate, acquired, acquiring (including ERICSSON), parent, predecessor, subsidiary, and successor, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

54.    "XKL" means XKL LLC and all affiliate, acquired, acquiring, parent, predecessor, subsidiary, and successor, any joint venture to which it may be a party, and all agents, attorneys, accountants, consultants, directors, employees, and officers thereof, including any person who has served in any such capacity at any time.

55.    "THIRD PARTY VENDORS" mean the following vendors:  3COM, ADTRAN, ALLIED TELESIS, ALU, AVAYA, BAY NETWORKS, BLADE, BROCADE, D-LINK, DEC, DELL, ERICSSON, EXTREME NETWORKS, F5, FORCE10, FOUNDRY, HP, HUAWEI, IBM, LENOVO, NEC, NETGEAR, NORTEL, PROCKET, PROTEON, REDBACK, and XKL.

56.    "ISCLI" means "Industry Standard CLI" and refers to the CLI of the same name supported by certain NEC, HP, BLADE, and IBM networking products.  Examples include the "ISCLI" supported by IBM Networking OS 7.5

57.    "HUAWEI LITIGATION" means the matter captioned *Cisco Systems, Inc., et al. v. Huawei Technologies Co. Ltd., et al.*, Case No. 2:03-cv-00027-TJW, in the United States District Court for the Eastern District of Texas.

58.    "PRIOR ART" means materials that qualify as prior art under 35 U.S.C. § 102 *et seq*.

59.    "DOCUMENT(S)" is used in the broadest possible sense as interpreted under the Federal Rules of Civil Procedure and includes without limitation all originals and copies, duplicates, drafts, and recordings of any written, printed, graphic or otherwise recorded matter, however produced or reproduced, and all "writings" as defined in Federal Rule of Evidence 1001, including without limitation the following:  abstracts, advertisements, agendas, agreements, analyses of any kind, appointment calendars, articles, assignments, blueprints, books, brochures, charts, circulars, compilations, computer programs, runs and printouts, computer data files in machine readable form, contracts, diaries, letters, email, reports (including reports or notes of telephone or other conversations), memoranda, brochures, books, ledgers, drawings, photographs, specifications, drafts, catalogs, instructions, invoices, bills of materials, minutes, orders, publications, purchase orders, proposals, working papers, laboratory notebooks and other writings of whatsoever nature, whether on paper, magnetic tape or other information storage means, including film and computer memory devices; all drafts prepared in connection with any such writings, whether used or not, regardless of whether the document still exists, and regardless of who has maintained custody of such documents; and where any such items contain any marking not appearing on the original or are altered from the original, then such items shall be considered to be separate original documents.

60.    "COMMUNICATION(S)" means every manner or method of disclosure or transfer or exchange of information, whether oral or by document, and whether face-to-face, by telephone, mail, personal delivery or otherwise.

61.    "RELATING TO" means concerning, referring to, summarizing, reflecting, constituting, containing, embodying, pertaining to, involved with, mentioning, discussing, consisting of, comprising, showing, commenting upon, evidencing, describing or otherwise relating to the subject matter.

62.    "CONCERNING" means RELATING TO, referring to, describing, evidencing, or constituting.

63.    "PERSON" or "ENTITY" means any natural person, corporation, partnership, association, or government agency.

64.    The words "and" and "or" shall be construed in the conjunctive or disjunctive, whichever makes the request more inclusive.

65.    The terms "including" and "include" shall be construed in such a way as to suggest or provide an example or examples. The terms "including" and "include" shall not be construed in such a way as to limit or confine the broader term or concept for which the example is being given.

66.    "Any" shall mean one or more; "each" shall mean "each and every."

67.    The singular form of a word shall, where the context permits, be interpreted as plural.

68.    Any pronoun shall be construed to refer to the masculine, feminine, or neuter gender as in each case is most appropriate.

69.    Capitalized terms below have the defined meanings set forth above.  Other terms have their generally understood meaning.

ARISTA'S NOTICE OF RULE 30(B)(6) DEPOSITION OF CISCO
Case No. 5:14-cv-05344-BLF (PSG)

1014440

## **DEPOSITION TOPICS**

1.      Prosecution of the ASSERTED PATENTS, including, but not limited to, statements or submissions made to any Examiner in any country during the prosecution of the ASSERTED PATENTS.

2.      All information RELATING TO the filing or prosecution of the ASSERTED PATENTS known to each individual associated with the filing or prosecution of the ASSERTED PATENTS, including, but not limited to, art or information that was material or was considered to be material to the patentability of any claims pending at any time in the applications for the ASSERTED PATENTS.

3.      The conception, reduction to practice, research, development, design, manufacture, first offer for sale, disclosure, public use, and/or first sale of the inventions disclosed in the ASSERTED PATENTS.

4.      All facts and circumstances, including DOCUMENTS, upon which YOU will rely to prove and corroborate diligence in reducing to practice any of the inventions disclosed in the ASSERTED PATENTS.

5.      Any DOCUMENTS, including references, specifications, or standards, considered or referred to in the course of the conception, reduction to practice, research, development, design, manufacture, first offer for sale, disclosure, public use, and/or first sale of the inventions disclosed in the ASSERTED PATENTS.

6.      YOUR knowledge of any PRIOR ART relevant to the subject matter of the ASSERTED PATENTS.

7.      Any PRIOR ART search regarding the ASSERTED PATENTS and/or any related patents or applications.

8.      Any COMMUNICATIONS from third parties asserting or suggesting that any PRIOR ART reference or subject matter is relevant to the ASSERTED PATENTS

9.      Marking (in the broadest sense with reference to 35 U.S.C. § 287), by any person or entity, of any of the following with the number of the '526 PATENT, or any patent related to

the '526 PATENT: (a) any product, service, system, apparatus, or website; or (b) any DOCUMENT referring or RELATING TO any product, service, system, apparatus, or website.

10.     Marking (in the broadest sense with reference to 35 U.S.C. § 287), by any person or entity, of any of the following with the number of the '886 PATENT, or any patent related to the '886 PATENT: (a) any product, service, system, apparatus, or website; or (b) any DOCUMENT referring or RELATING TO any product, service, system, apparatus, or website.

11.     YOUR first knowledge or awareness of each of the ACCUSED PRODUCTS identified in any version of YOUR Disclosure of Asserted Claims and Infringement Contentions, including without limitation YOUR first knowledge of any feature or functionality that CISCO accuses of infringing the ASSERTED PATENTS in THIS LITIGATION.

12.     Any analyses or evaluation performed by or on behalf of YOU of any version of the ACCUSED PRODUCTS, including any feature or functionality of such products that CISCO accuses of infringing the ASSERTED PATENTS in THIS LITIGATION.

13.     COMMUNICATIONS with ARISTA or any third party RELATING TO infringement of either or both of the ASSERTED PATENTS, including the dates of such COMMUNICATIONS and the identity of the individual(s) making and receiving such COMMUNICATIONS.

14.     The facts and circumstances surrounding any efforts to sell, license, or develop (including by integration or development into industry standards or specifications) the ASSERTED PATENTS and/or technology that YOU contend is covered by or practices the ASSERTED PATENTS.

15.     The development, design, and operation of any CISCO product that you contend practices the ASSERTED PATENTS, and how such products practice the ASSERTED PATENTS on a claim-by-claim, and element-by-element basis.

16.     The facts and circumstances surrounding any decisions regarding whether or not to develop commercial embodiments of the ASSERTED PATENTS, decisions to cut funding or not pursue developing commercial embodiments of the ASSERTED PATENTS, and any commercial implementation of the ASSERTED PATENTS in any country.

17.     The development, evaluation, implementation or knowledge of any alternative(s) to the methods claimed in the ASSERTED PATENTS for achieving the same goals. The facts and circumstances surrounding any commercial success, long felt but unsolved need, unexpected results, expressions of disbelief by experts, copying by others, and/or failure of others RELATING TO the claimed inventions of the ASSERTED PATENTS, including all facts and evidence upon which YOU may rely to prove any secondary indicia of nonobviousness RELATING TO the ASSERTED PATENTS, and the factual basis for any purported nexus between such indicia and the ASSERTED PATENTS.

18.     YOUR knowledge of efforts by CISCO to use and improve the products acquired from Amteva Technologies, Inc., including the UM CLI product.

19.     YOUR policies, practices, and conduct relating to the applications and registration of copyrights of original or derivative works, including YOUR policies, practices, and conduct relating to the registration of works that include preexisting material, whether such preexisting material was authored by YOU or a third party.

20.     YOUR policies, practices, and conduct relating to the OPEN SOURCING of any aspect of your software.

21.     YOUR policies, practices, and conduct relating to YOUR contribution or the contribution of YOUR employees to standard-setting bodies and other membership organizations such as the IETF and the IEEE, as such contributions relate to YOUR intellectual property rights, the OPEN SOURCING of YOUR software, any reservation or failure to reserve intellectual property rights in work created by YOU or YOUR employees, and the grant of licenses to third parties or the public relating to work contributed by YOU or YOUR employees to such organizations.

22.     YOUR policies, practices, and conduct relating to the incorporation of third-party source code into YOUR software, including attribution of third-party contributions and the use of copyright notices.

1014440

23.    YOUR policies, practices, and conduct relating to the incorporation by third parties of your source code into their software, including attribution of YOUR contributions and the use of copyright notices.

24.    The copyright registrations attached to the SECOND AMENDED COMPLAINT, including YOUR decision to apply for them, the identity of the persons involved with the decision to apply for them, the factors YOU considered in deciding to apply for them, and the identity of the persons involved with applying for them.

25.    The OPEN SOURCING of any aspect of the works described in the copyright registrations attached to the SECOND AMENDED COMPLAINT.

26.    YOUR contribution or the contribution of YOUR employees to standard-setting bodies and other membership organizations such as the IETF and the IEEE, as such contributions relate to any aspect of the works described in the copyright registrations attached to the SECOND AMENDED COMPLAINT, including any reservation or failure to reserve intellectual property rights in those aspects of the works, and the grant of licenses to third parties or the public relating to those aspects of the works.

27.    YOUR incorporation of third-party source code into any aspect of the works described in the copyright registrations attached to the SECOND AMENDED COMPLAINT, including any attribution of third-party contributions in the works or the registrations and the use of copyright notices in the works.

28.    The identification and nature of "third-party" material described and/or disclosed in the copyright registrations attached to the SECOND AMENDED COMPLAINT, including the author(s) of the material, when the material was authored, what rights, if any, Cisco obtained for use, duplication, or distribution of that material, and how Cisco obtained such rights.

29.    The identification and nature of "preexisting" material described and/or disclosed in the copyright registrations attached to the SECOND AMENDED COMPLAINT, including the author(s) of the material, when the material was authored, what rights, if any, Cisco obtained for use, duplication, or distribution of that material, and how Cisco obtained such rights.

1014440

30.     The incorporation by third parties of any aspect of the works described in the copyright registrations attached to the SECOND AMENDED COMPLAINT into their software.

31.     Any decision to seek or not to seek permission, advice, or counsel from any third parties relating to the material referred to as third-party material in the copyright registrations attached to the SECOND AMENDED COMPLAINT, YOUR conduct related to such decisions, the factors YOU considered in making the decisions, the identity of all persons involved in such decisions, and the identity of all persons involved in seeking such permission, advice, or counsel.

32.     YOUR COMMUNICATIONS with any third parties relating to the copyright registrations attached to the SECOND AMENDED COMPLAINT, including your communication with any third parties whose source code was incorporated into the works referenced in the copyright registrations.

33.     YOUR agreements with employees and/or contractors relating to works for hire as they relate to the asserted copyrighted works.

34.     The facts and circumstances underlying the dispute between YOU and STANFORD UNIVERSITY that led to the STANFORD LICENSE.

35.     The facts and circumstances that led to the amendments to the STANFORD LICENSE, including but not limited to "Amendment No. 2" to the LICENSE AGREEMENT.

36.     The negotiation of, and Cisco's understanding of the meaning of the terms of the STANFORD LICENSE, including the rights and obligations of the parties to the STANFORD LICENSE.

37.     The material licensed by STANFORD UNIVERSITY to CISCO, including the licensed material developed at STANFORD UNIVERSITY with grant support from the U.S. Government under NIH Contract No. RR00785, the source code and binary files designated Gateway/TIP software, including all related material, documents, information, and other related know-how as described in Attachment 1 to the STANFORD LICENSE, and all licensed material received by CISCO pursuant to the STANFORD LICENSE.

38.     YOUR COMMUNICATIONS with STANFORD UNIVERSITY RELATING TO the assertion of intellectual property rights against any third party (including but not limited to

any THIRD PARTY VENDORS), including but not limited to any notice provided by YOU to STANFORD UNIVERSITY and any approval (or withholding of approval) provided by STANFORD UNIVERSITY to YOU RELATING TO the assertion of intellectual property rights against any third party.

39.    YOUR COMMUNICATIONS with STANFORD UNIVERSITY RELATING TO THE STANFORD LICENSE and/or THIS LITIGATION, including but not limited to any notice provided by YOU to STANFORD UNIVERSITY and any approval (or withholding of approval) provided by STANFORD UNIVERSITY to YOU RELATING TO THIS LITIGATION.

40.    The facts and circumstances surrounding the letter from YOU to STANFORD UNIVERSITY dated December 18, 2002 (*see, e.g.*, CSI-CLI-01326890) regarding potential copyright-infringement against HUAWEI, Spot International, BSA International, ADTRAN, Accton, PROCKET, Netscreen, DELL, JUNIPER, and REDBACK, including all COMMUNICATIONS with STANFORD UNIVERSITY relating to the substance of the foregoing correspondence, and any subsequent decision by CISCO relating to the initiation of copyright-infringement litigation against the foregoing entities.

41.    YOUR knowledge of the CLI used and supported by Arista and/or EOS, from the time of Arista's founding to the present, including Arista CLI commands, hierarchies, modes, prompts, and responses; any similarity between Arista's CLI commands, hierarchies, modes, prompts, and responses and Cisco CLI commands, hierarchies, modes, prompts, and responses; and the identity of all persons with such knowledge.

42.    The facts and circumstances surrounding when and how YOU first became aware that ARISTA and/or EOS used any CLI command, command mode, command hierarchy, and command response that YOU contend is similar or identical to a CLI command, command mode, command hierarchy, and command response supported by Cisco IOS.

43.    For each of the THIRD PARTY VENDORS, YOUR knowledge of each vendor's CLI, from the time of Cisco's founding to the present, including such vendor's CLI commands, hierarchies, modes, prompts, and responses; any similarity between such vendor's CLI

1014440

commands, hierarchies, modes, prompts, and responses and Cisco CLI commands, hierarchies, modes, prompts, and responses; and the identity of all persons with such knowledge.

44.    For each of the THIRD PARTY VENDORS, the facts and circumstances surrounding when and how YOU first became aware that each vendor used any CLI command, command mode, command prompt, command hierarchy, and/or command response that is similar or identical to a CLI command, command mode, command prompt, command hierarchy, and/or command response supported by Cisco IOS.

45.    YOUR knowledge of ISCLI (also called "Industry Standard CLI"), from the time of Cisco's founding to the present, including any ISCLI commands, hierarchies, modes, prompts, and responses; any similarity between ISCLI commands, hierarchies, modes, prompts, and responses and Cisco CLI commands, hierarchies, modes, prompts, and responses; and the identity of all persons with such knowledge.

46.    The facts and circumstances surrounding when and how YOU first became aware that ISCLI (also called "Industry Standard CLI") used any CLI command, command mode, command prompt, command hierarchy, and/or command response that is similar or identical to a CLI command, command mode, command prompt, command hierarchy, and/or command response supported by Cisco IOS.

47.    Any analysis, report, study, or investigation YOU made or commissioned RELATING TO the similarities between the Cisco CLI and the CLI of any of the THIRD PARTY VENDORS, including but not limited to ALU, BROCADE, HP, and JUNIPER, including the results therefrom, and the identity of all persons involved in the creation of the analysis, report, study, or involved in the investigation.

48.    The factual basis of CISCO General Counsel Mark Chandler's statement on his blog post of November 16, 2015 that Arista uses over 500 of Cisco CLI commands while "competitors like Alcatel Lucent, Brocade, HP and Juniper have only a fraction of [the] overlap in their own products."

49.    YOUR decision to sue or not to sue any third parties relating to the COPYRIGHTED WORKS and/or any aspect of CISCO IOS, including its CLI, that YOU

contend is protected by copyright, including when such decisions were made, who participated in making such decisions, the factors considered in making such decisions, and actions taken in furtherance of those decisions, excluding any privileged communications.

50.    YOUR policies, practices, and conduct relating to YOUR decisions to sue or not to sue any competitors, suppliers, or customers relating to intellectual property rights, including the factual basis of CISCO General Counsel Mark Chandler's statement on his blog post of December 5, 2014 that "In the thirteen years I've been General Counsel of Cisco, I can count on one hand the number of times we've initiated suit against a competitor, supplier or customer."

51.    YOUR belief, custom, practice, policy, or culture—if any—of avoiding becoming the plaintiff in a lawsuit over intellectual property rights.

52.    YOUR characterization, or the characterization of any third party, whether externally or internally, whether digital, written, or oral, of any aspect of Cisco CLI as an "industry standard," a "de facto industry standard," an "accepted industry term," or any other similar term, including any decision to characterize it as such or not to characterize it as such, the identity of all persons involved with such decisions, the identity of all persons involved in such characterizations or attempts to remove or terminate such characterizations, the factors considered in making the decisions, and the actions taken in furtherance of the decisions, including but not limited to such characterizations as they appear in the following exemplary documents:

- ARISTANDCA00009488
- ARISTANDCA00010408
- ARISTANDCA00010430
- ARISTANDCA00010513
- ARISTANDCA00010536
- ARISTANDCA00010590
- ARISTANDCA00010591
- ARISTANDCA00010605
- ARISTANDCA00010675
- ARISTANDCA00010689
- ARISTANDCA00010948
- CSI-ANI-00028654
- CSI-ANI-00031041
- CSI-ANI-00038089
- CSI-ANI-00038253
- CSI-ANI-00039523

18

1014440

- CSI-ANI-00040069
- CSI-ANI-00041292
- CSI-ANI-00041773
- CSI-ANI-00042368
- CSI-ANI-00043659
- CSI-ANI-00049235
- CSI-ANI-00056770
- CSI-ANI-00065736
- CSI-ANI-00073381
- CSI-ANI-00073865
- CSI-ANI-00073866
- CSI-ANI-00085278
- CSI-ANI-00095960
- CSI-ANI-00111458
- CSI-ANI-00123088
- CSI-ANI-00123091
- CSI-ANI-00210092
- CSI-ANI-00241504
- CSI-ANI-00252097
- CSI-ANI-00311469
- CSI-ANI-00319839
- CSI-ANI-00320219
- CSI-ANI-00320862
- CSI-ANI-00336059
- CSI-ANI-00427910
- CSI-ANI-00457470
- CSI-ANI-00626035
- CSI-CLI-00660992
- CSI-CLI-00682250
- CSI-CLI-00685076
- CSI-CLI-00807360
- CSI-CLI-00857309
- CSI-CLI-00863902
- CSI-CLI-01130272
- CSI-CLI-01133437

53.    YOUR knowledge of the use of the term "industry standard" or any similar term by others to refer to any aspect of Cisco CLI, including the use of such terms to refer to Cisco CLI commands, and the identity of all persons having such knowledge.

54.    Any decision to use any aspect of Cisco CLI to advance YOUR position in the marketplace for networking hardware, including the factors YOU considered in making the

decisions, the identity of all persons involved in such decisions, and the identity of all persons involved in implementing such decisions.

55.    Any analysis, report, study, or investigation YOU made or commissioned of the value to Cisco of treating or characterizing of any aspect of the Cisco CLI as an "industry standard," a "de facto industry standard," or any other similar term, or the value of it being understood among relevant market participants (customers, vendors, competitors) that the Cisco CLI was an "industry standard," a "de facto industry standard" or had a similar treatment, including the results therefrom and the identity of all persons involved in the creation of the analysis, report, study, or involved in the investigation.

56.    Any analysis, report, study, or investigation YOU made or commissioned regarding barriers to entry in the enterprise networking market related to Cisco's CLI, including the results therefrom and the identity of all persons involved in the creation of the analysis, report, study, or involved in the investigation.

57.    Any analysis, report, study, or investigation YOU made or commissioned regarding investments made by actual or prospective customers in training and/or certifying employees or other types of workers (including consultants) to use Cisco's CLI.

58.    Any analysis, report, study, or investigation YOU made or commissioned regarding hiring practices of actual or prospective customers relating to an employee's, worker's, and/or consultant's familiarity, certification, or expertise with Cisco's CLI.

59.    The content and terms of licenses, potential licenses, assignments or other transactions associated with the subject matter of the ASSERTED PATENTS.

60.    The relationship between demand for the ACCUSED PRODUCTS and the alleged inventions of the ASSERTED PATENTS.

61.    The relationship between demand for the ACCUSED PRODUCTS and features not covered by the ASSERTED PATENTS, including noninfringing components.

62.    The injury, if any, claimed by CISCO as a result of the alleged infringement by ARISTA.

1014440

63.     The resolution of the HUAWEI LITIGATION, including the negotiation of the settlement of the litigation and the terms of such settlement.

64.     The existence, negotiation, content, and terms of all licenses, potential licenses, assignments, or other IP-related transactions RELATING TO the COPYRIGHTED WORKS or any copyrights associated with any version of Cisco IOS, including but not limited to any license agreements, settlement agreements, and any other agreements between YOU and any third party.

65.     The existence, negotiation, content, and terms of all licenses, potential licenses, assignments, or other IP-related transactions RELATING TO any CLI commands, command hierarchies, command modes, command prompts, and command responses supported by any version of Cisco IOS.

66.     The existence, negotiation, content, and terms of all licenses, potential licenses, assignments, or other IP-related transactions RELATING TO any CLI commands, command hierarchies, command modes, command prompts, and command responses supported by any version of any third-party software or operating system, including the CLI supported by the networking products of any THIRD PARTY VENDORS.

67.     The functionality and operation of the CiscoWorks Network Compliance Manager (NCM) product, and any version of that product (including if sold or distributed under a different name) that provides the same or similar functionality.

68.     The functionality and operation of the "Cisco Network Service Orchestrator (NSO) enabled by Tail-f" product, and any version of that product (including if sold or distributed under a different name) that provides the same or similar functionality.

69.     The functionality and operation of the Tail-f Network Control System (NCS) (now owned by CISCO), and any version of that product (including if sold or distributed under a different name) that provides the same or similar functionality.

70.     The generation, use, and/or support of third-party CLI commands, command hierarchies, command modes, command prompts, and command responses in YOUR CiscoWorks Network Compliance Manager (NCM) product, including the development of associated network

21

1014440

element drivers (or similar drivers) that may utilize third-party CLI commands to communicate with and/or manage third-party networking products.

71.     The generation, use, and/or support of third-party CLI commands, command hierarchies, command modes, command prompts, and command responses in YOUR "Cisco Network Service Orchestrator (NSO) enabled by Tail-f" product, including the product's support of a "Juniper-style CLI," and the development of associated network element drivers (or similar drivers) that may utilize third-party CLI commands to communicate with and/or manage third-party networking products.

72.     The generation, use, and/or support of third-party CLI commands, command hierarchies, command modes, command prompts, and command responses in the Tail-f Network Control System (NCS) (now owned by CISCO), including the product's support of a "Juniper-style CLI," and the development of associated network element drivers (or similar drivers) that may utilize third-party CLI commands to communicate with and/or manage third-party networking products.

73.     YOUR use of any third-party CLI commands, command hierarchies, command modes, command prompts, and command responses in any NETWORK MANAGEMENT PRODUCT or conversion tools, including in any tools that YOU may use to convert third-party configuration files, scripts, and commands into Cisco IOS-compatible configuration files, scripts, and commands, and vice versa.

74.     All license agreements, partnership agreements, or any other agreements that govern, permit, and/or authorize YOUR use of any third-party CLI commands, command hierarchies, command modes, command prompts, and command responses in any NETWORK MANAGEMENT PRODUCT or conversion tools, including in any tools that YOU may use to convert third-party configuration files, scripts, and commands into Cisco IOS-compatible configuration files, scripts, and commands, and vice versa.

75.     The factual basis and justification for YOUR use of any third-party CLI commands, command hierarchies, command modes, command prompts, and command responses in any NETWORK MANAGEMENT PRODUCT or conversion tools, including in any tools that

22

1014440

YOU may use to convert third-party configuration files, scripts, and commands into Cisco IOS-compatible configuration files, scripts, and commands, and vice versa.

76.    YOUR relationship with LiveAction, Inc. from the time of YOUR first knowledge of LiveAction, Inc. to the present, including any agreements between YOU and LiveAction, Inc. RELATING TO the use by LiveAction, Inc. of any aspect of the Cisco

77.    CLI in LiveAction, Inc.'s products and services.

78.    The facts and circumstances underlying the selection and creation of each individual CLI command over which you assert copyright protection and allege copyright infringement by ARISTA in THIS LITIGATION, including the identification of the person(s) responsible for authoring such command, the alternative commands actually considered by YOU at the time of the purported creation, the identification, description, ownership, and facts and circumstances underlying the selection and creation of any preexisting or prior works from which each such command was derived or inspired, and the identification and description of all documents that corroborate such facts.

79.    The facts and circumstances underlying the selection and creation of each individual CLI command hierarchy over which you assert copyright protection and allege copyright infringement by ARISTA in THIS LITIGATION, including the identification of the person(s) responsible for authoring such hierarchy, the alternative hierarchies actually considered by YOU at the time of the purported creation, the identification, description, ownership, and facts and circumstances underlying the selection and creation of any preexisting or prior works from which each such hierarchy was derived or inspired, and the identification and description of all documents that corroborate such facts.

80.    The facts and circumstances underlying the selection and creation of each individual CLI command response over which you assert copyright protection and allege copyright infringement by ARISTA in THIS LITIGATION, including the identification of the person(s) responsible for authoring such command response, the alternative command responses actually considered by YOU at the time of the purported creation, the identification, description, ownership, and facts and circumstances underlying the selection and creation of any preexisting

1014440

or prior works from which each such command response was derived or inspired, and the identification and description of all documents that corroborate such facts.

81.     The facts and circumstances underlying the selection and creation of each individual CLI command mode over which you assert copyright protection and allege copyright infringement by ARISTA in THIS LITIGATION, including the identification of the person(s) responsible for authoring such command mode, the alternative command modes actually considered by YOU at the time of the purported creation, the identification, description, ownership, and facts and circumstances underlying the selection and creation of any preexisting or prior works from which each such command mode was derived or inspired, and the identification and description of all documents that corroborate such facts.

82.     The facts and circumstances underlying the selection and creation of each individual CLI command prompt over which you assert copyright protection and allege copyright infringement by ARISTA in THIS LITIGATION, including the identification of the person(s) responsible for authoring such command prompt, the alternative command prompts actually considered by YOU at the time of the purported creation, the identification, description, ownership, and facts and circumstances underlying the selection and creation of any preexisting or prior works from which each such command prompt was derived or inspired, and the identification and description of all documents that corroborate such facts.

83.     YOUR rules, best practices, and/or guidelines RELATING TO the selection, creation, arrangement, and/or syntax of Cisco CLI commands, command hierarchies, command modes, command prompts, and command responses.

84.     YOUR disclosures of intellectual property rights—if any—to standards-setting organizations, including to the IETF and IEEE, for each of the CLI commands that you are asserting in THIS LITIGATION.

85.     YOUR disclosures of intellectual property rights—if any—to standards-setting organizations, including to the IETF and IEEE, for each industry standard (*e.g.*, IP, OSPF, BGP, 802.1x, etc.) to which each CLI command that you are asserting in THIS LITIGATION pertains.

1014440

86.     YOUR efforts to ensure Cisco IOS's compliance, support, and/or compatibility with the IETF and IEEE industry standards associated with the CLI commands that YOU are asserting in THIS LITIGATION.

87.     YOUR commitment to industry standards and vendor interoperability.

88.     YOUR decision to sue, or to defer or postpone suing, ARISTA at any time, including YOUR decision to sue in THIS LITIGATION, including when the decision was made, who participated in making the decision, the factors considered in making the decision, and actions taken in furtherance of that decision, excluding any privileged communications.

89.     For each work you accuse ARISTA of infringing, the total number of commands included in the Cisco CLI.

90.     For each work you accuse ARISTA of infringing, the total number of command responses included in the Cisco CLI.

91.     For each work you accuse ARISTA of infringing, the total number of command hierarchies included in the Cisco CLI.

92.     For each work you accuse ARISTA of infringing, the total number of command modes included in the Cisco CLI.

93.     For each work you accuse ARISTA of infringing, the total number of command prompts included in the Cisco CLI.

94.     Any analysis, report, study, or investigation YOU made or commissioned RELATING TO the commands used most frequently in the Cisco CLI, including the results therefrom, and the identity of all persons involved in the creation of the analysis, report, study, or involved in the investigation.

95.     Any analysis, report, study, or investigation YOU made or commissioned RELATING TO the command modes and/or prompts used most frequently in the Cisco CLI, including the results therefrom, and the identity of all persons involved in the creation of the analysis, report, study, or involved in the investigation.

96.     Any analysis, report, study, or investigation YOU made or commissioned RELATING TO the command hierarchies used most frequently in the Cisco CLI, including the

1014440

results therefrom, and the identity of all persons involved in the creation of the analysis, report, study, or involved in the investigation.

97.    Any analysis, reports, study, or investigation YOU made or commissioned relating to the value of the Cisco CLI, including the value related to any specific command, subset of commands, command response(s), hierarchy(ies), command mode(s), and/or command prompt(s), and the identity of all persons involved in the creation of the analysis, report, study, or involved in the investigation.

98.    For each CLI command that YOU allege was unlawfully copied by Arista, YOUR investment of money and time in all research, development, drafting or composition activities that led to the creation of such CLI command.

99.    For each CLI command response that YOU allege was unlawfully copied by Arista, YOUR investment of money and time in all research, development, drafting or composition activities that led to the creation of such CLI command response.

100.    For each CLI command mode that YOU allege was unlawfully copied by Arista, YOUR investment of money and time in all research, development, drafting or composition activities that led to the creation of such CLI command mode.

101.    For each CLI command prompt that YOU allege was unlawfully copied by Arista, YOUR investment of money and time in all research, development, drafting or composition activities that led to the creation of such CLI command prompt.

102.    For each CLI command hierarchy that YOU allege was unlawfully copied by Arista, YOUR investment of money and time in all research, development, drafting or composition activities that led to the creation of such CLI command hierarchy.

103.    Financial metrics relating to the Cisco CLI commands, including but not limited to YOUR revenues, profits, costs, projections, or other financial analyses relating to the Cisco CLI commands.

104.    Financial metrics relating to the Cisco CLI command hierarchies, including but not limited to YOUR revenues, profits, costs, projections, or other financial analyses relating to the Cisco CLI command hierarchies.

ARISTA'S NOTICE OF RULE 30(B)(6) DEPOSITION OF CISCO
Case No. 5:14-cv-05344-BLF (PSG)

1014440

105.    Financial metrics relating to the Cisco CLI command modes and prompts, including but not limited to YOUR revenues, profits, costs, projections, or other financial analyses relating to the Cisco CLI command modes and prompts.

106.    Any harm to YOU allegedly caused by the sale, offer for sale, or use of any of Arista's products, services, methods, or systems, including any harm to YOUR reputation, loss of market share, loss of customers, lost sales, or lost profits.

107.    The identity of any sale that YOU contend YOU have lost to Arista as a result of Arista's alleged infringement of any one or more Cisco registered works.

108.    YOUR computation, calculation, or estimation of damages, lost profits, or reasonable royalties in this action.

109.    Any analysis, report, study, or investigation YOU made or commissioned RELATING TO the past, current, or potential demand, marketing, marketability, revenues, costs, profits, market share, pricing, distribution, or customer perceptions of the Cisco CLI commands.

110.    Any analysis, report, study, or investigation YOU made or commissioned RELATING TO use by others of any Cisco CLI command.

111.    YOUR knowledge of Arista's products and services.

112.    Any strategy or plan developed by YOU to compete against Arista and/or to harm Arista's business or financial prospects, including the identity of any Cisco team or group formed to compete with Arista and any competitive initiatives involving Arista.

113.    Any communications from YOUR customers, including potential customers, relating to the Cisco CLI commands, including the importance or value of the Cisco CLI commands, or any specific command or subset of commands.

114.    All purchasing-relating factors considered by YOUR actual or prospective customers when such customers are deciding whether to purchase an accused Arista product or service over any Cisco product or service that Cisco contends competes (or competed) with an accused Arista product or service, including any factors mentioned in sales calls reports, sales meeting minutes, competitive market analyses, or customer surveys.

1014440

115.    Historical and projected customer preferences and desired attributes for Cisco products incorporating the Cisco CLI commands.

116.    All marketing efforts that describe the advantages or benefits of Cisco products incorporating the Cisco CLI commands over other alternative products.

117.    YOUR involvement in, contribution or license to, or objection to the development, use or distribution of RANCID (Really Awesome New Cisco conflg Differ), including any COMMUNICATIONS with Shrubbery Networks, Inc. regarding RANCID, and YOUR COMMUNICATIONS with YOUR actual or potential customers regarding RANCID.

118.    All information relating to YOUR efforts to develop features or functionality previously developed or implemented by Arista, including, but not limited to, YOUR efforts to develop NX-API, POAP (Power On Auto Provisioning), VM Tracker, ABM (Active Buffer Monitoring), and Linux subsystem access (i.e., the ability to use BASH CLI in Cisco IOS), including the identity of all persons involved with or responsible for YOUR efforts, any decision(s) made to develop and implement features already developed or implemented by Arista, and the identity of all persons who made the decision(s).

119.    The functionality and operation of NX-API, and any version of that product/feature (including if sold or distributed under a different name) that provides the same or similar functionality.

120.    The functionality and operation of POAP (Power On Auto Provisioning), and any version of that product/feature (including if sold or distributed under a different name) that provides the same or similar functionality.

121.    The functionality and operation of VM Tracker, and any version of that product/feature (including if sold or distributed under a different name) that provides the same or similar functionality.

122.    The functionality and operation of ABM (Active Buffer Monitoring), and any version of that product/feature (including if sold or distributed under a different name) that provides the same or similar functionality.

1014440

123.     The functionality and operation of Linux subsystem access (i.e., the ability to use BASH CLI) in Cisco IOS, and any version of that product/feature (including if sold or distributed under a different name) that provides the same or similar functionality.

124.     All actions YOU have taken to search for, gather, secure, and produce responsive documents, including (a) the locations searched, (b) persons from whom documents were collected, (c) the identity of all persons who have possession, custody or control of responsive documents, and (d) any inquiries made to locate responsive documents and the response to any such inquiries.

125.     The quantity, identity, and location of all responsive documents in YOUR possession, custody, or control, including hard copy files, servers, email systems, backup systems, hard drives, optical disks, databases, cellphones, cloud services, voice mail, third-party storage, and offsite locations.

126.     YOUR policies, practices, and conduct regarding the retention of documents generally and the retention of responsive documents in this case.

127.     YOUR issuance of litigation holds related to this action.

128.     The identity and description of any responsive documents that have been lost, destroyed, deleted, discarded, damaged, or overwritten, whether pursuant to a document retention policy or otherwise, including the circumstances under which they were lost, deleted, destroyed, discarded, damaged or overwritten.

129.     YOUR written policies and enforcement procedures regarding use of YOUR computers and data or personal computers and data, including desktop computers, laptop computers, home-based computers, portable devices (portable digital assistants, telephones, mini computers or tablets, external hard drives, CDs and DVDs, and USB flash drives), or any other computers or devices used for business or communication purposes.

130.     YOUR systems for email, instant messaging, SMS and/or MMS texting, video conferencing, any other electronic communications systems.

131.     YOUR document management, archival and/or backup systems and procedures, including servers, disk, tape, or other media, including the EDCS system.

29

PROOF OF SERVICE

I am employed in the City and County of San Francisco, State of California in the office of a member of the bar of this court at whose direction the following service was made. I am over the age of eighteen years and not a party to the within action. My business address is Keker & Van Nest LLP, 633 Battery Street, San Francisco, CA 94111-1809.

On January 19, 2016, I served the following document(s):

**DEFENDANT ARISTA NETWORKS, INC.'S NOTICE OF
RULE 30(B)(6) DEPOSITION OF PLAINTIFF CISCO SYSTEMS, INC.**

☑ by **E-MAIL VIA PDF FILE**, by transmitting on this date via e-mail a true and correct copy scanned into an electronic file in Adobe "pdf" format. The transmission was reported as complete and without error.

| | |
|---|---|
| Sean Sang-Chul Pak | Adam R. Alper |
| John M. Neukom | Kirkland & Ellis LLP |
| Quinn Emanuel Urquhart & Sullivan LLP | 555 California Street, Suite 2700 |
| 50 California Street, 22nd Floor | San Francisco, CA 94104 |
| San Francisco, CA 94111 | Tel: (415) 439-1476 |
| Tel: (415) 875-6320 | Fax: (415) 439-1500 |
| Fax: (415) 875-6700 | aalper@kirkland.com |
| seanpak@quinnemanuel.com | |
| johnneukom@quinnemanuel.com | |
| Cisco-Arista@quinnemanuel.com | |
| | |
| Kathleen Marie Sullivan | Mark Yeh-Kai Tung |
| Quinn Emanuel Urquhart & Sullivan LLP | Quinn Emanuel Urquhart & Sullivan LLP |
| 51 Madison Avenue, 22nd Floor | 555 Twin Dolphin Drive, 5th Floor |
| New York, NY 10022 | Redwood Shores, CA 94065 |
| Tel: (212) 849-7000 | Tel: (650) 801-5000 |
| Fax: (212) 869-7100 | Fax: (650) 801-5100 |
| kathleensullivan@quinnemanuel.com | marktung@quinnemanuel.com |
| | |
| Michael W. De Vries | Steven C. Cherny |
| Kirkland & Ellis LLP | Kirkland & Ellis LLP |
| 333 South Hope Street, 29th Floor | 601 Lexington Avenue |
| Los Angeles, CA 90071 | New York, NY 10022 |
| Tel: (213) 680-8590 | Tel: (212) 446-4800 |
| Fax: (213) 680-8500 | Fax: (212) 446-6460 |
| michael.devries@kirkland.com | Steven.cherny@kirkland.com |
| Cisco-AristaCopyrightTeam@kirkland.com | |

PROOF OF SERVICE
Case No. 5:14-cv-05344-BLF (PSG)

925937.01

Executed on January 19, 2016, at San Francisco, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_Gloria A. Peterson_

Gloria A. Peterson

PROOF OF SERVICE
Case No. 5:14-cv-05344-BLF (PSG)

925937.01