# EXHIBIT 38

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

### WASHINGTON, D.C. 20549

## FORM 10-K

**(Mark one)**

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
    **For the fiscal year ended July 25, 2015**

or

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
    **For the transition period from \_\_\_\_ to \_\_\_\_**

### Commission file number 0-18225

## CISCO SYSTEMS, INC.

### (Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **California** | **77-0059951** |
| **(State or other jurisdiction of incorporation or organization)** | **(IRS Employer Identification No.)** |
| **170 West Tasman Drive San Jose, California** | **95134-1706** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (408) 526-4000**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of Each Class:** | **Name of Each Exchange on which Registered** |
|---|---|
| Common Stock, par value $0.001 per share | The NASDAQ Stock Market LLC |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. ☒ Yes ☐ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. ☐ Yes ☒ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). ☒ Yes ☐ No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐ Yes ☒ No

Aggregate market value of registrant's common stock held by non-affiliates of the registrant, based upon the closing price of a share of the registrant's common stock on January 23, 2015 as reported by the NASDAQ Global Select Market on that date: $143,712,018,680

Number of shares of the registrant's common stock outstanding as of September 3, 2015 : 5,061,293,291

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's Proxy Statement relating to the registrant's 2015 Annual Meeting of Shareholders, to be held on November 19, 2015, are incorporated by reference into Part III of this Annual Report on Form 10-K where indicated.

## PART I

| | | |
|---|---|---|
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 16 |
| Item 1B. | Unresolved Staff Comments | 31 |
| Item 2. | Properties | 32 |
| Item 3. | Legal Proceedings | 32 |
| Item 4. | Mine Safety Disclosures | 32 |

## PART II

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities | 33 |
| Item 6. | Selected Financial Data | 35 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 36 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 67 |
| Item 8. | Financial Statements and Supplementary Data | 70 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 121 |
| Item 9A. | Controls and Procedures | 121 |
| Item 9B. | Other Information | 122 |

## PART III

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 122 |
| Item 11. | Executive Compensation | 122 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 122 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 122 |
| Item 14. | Principal Accountant Fees and Services | 123 |

## PART IV

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 123 |
| | Signatures | 124 |

*This Annual Report on Form 10-K, including the "Management's Discussion and Analysis of Financial Condition and Results of Operations," contains forward-looking statements regarding future events and our future results that are subject to the safe harbors created under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). All statements other than statements of historical facts are statements that could be deemed forward-looking statements. These statements are based on current expectations, estimates, forecasts, and projections about the industries in which we operate and the beliefs and assumptions of our management. Words such as "expects," "anticipates," "targets," "goals," "projects," "intends," "plans," "believes," "seeks," "estimates," "continues," "endeavors," "strives," "may," variations of such words, and similar expressions are intended to identify such forward-looking statements. In addition, any statements that refer to projections of our future financial performance, our anticipated growth and trends in our businesses, and other characterizations of future events or circumstances are forward-looking statements. Readers are cautioned that these forward-looking statements are only predictions and are subject to risks, uncertainties, and assumptions that are difficult to predict, including those identified below, under "Item 1A. Risk Factors," and elsewhere herein. Therefore, actual results may differ materially and adversely from those expressed in any forward-looking statements. We undertake no obligation to revise or update any forward-looking statements for any reason.*

**PART I**

### Item 1.      Business

**General**

Cisco designs and sells broad lines of products, provides services and delivers integrated solutions to develop and connect networks around the world, building the Internet.  Over the last 30 plus years, we have been the world's leader in connecting people, things and technologies - to each other and to the Internet - realizing our vision of changing the way the world works, lives, plays and learns.

Today, we have over 70,000 employees in over 400 offices worldwide who design, produce, sell, and deliver integrated products, services, and solutions. Over time, we have expanded to new markets that are a natural extension of our core networking business, as the network has become the platform for automating, orchestrating, integrating, and delivering an ever-increasing array of information technology (IT)–based products and services.

We conduct our business globally and manage our business by geography. Our business is organized into the following three geographic segments: The Americas; Europe, Middle East, and Africa (EMEA); and Asia Pacific, Japan, and China (APJC). For revenue and other information regarding these segments, see Note 17 to the Consolidated Financial Statements.

Our products and technologies are grouped into the following categories: Switching; Next-Generation Network (NGN) Routing; Collaboration; Service Provider Video; Data Center; Wireless; Security; and Other Products. In addition to our product offerings, we provide a broad range of service offerings, including technical support services and advanced services. Increasingly, we are delivering our technology and services to our customers as solutions for their priorities including cloud, video, mobility, security, collaboration, and analytics. The network is at the center of these markets and technologies, and we are focused on delivering integrated solutions to help our customers achieve their desired business outcomes. Cisco customers include businesses of all sizes, public institutions, governments and communications service providers. They look to Cisco as a strategic partner to help them use IT to enable, differentiate or fundamentally define their business strategy and drive growth, improve productivity, reduce costs, mitigate risk, and gain a competitive advantage in an increasingly digital world.

We were incorporated in California in December 1984, and our headquarters are in San Jose, California. The mailing address of our headquarters is 170 West Tasman Drive, San Jose, California 95134-1706, and our telephone number at that location is (408) 526-4000. Our website is www.cisco.com. Through a link on the Investor Relations section of our website, we make available the following filings as soon as reasonably practicable after they are electronically filed with or furnished to the Securities and Exchange Commission (SEC): our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and any amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act. All such filings are available free of charge. The information posted on our website is not incorporated into this report.

1

**Strategy and Focus Areas**

We see our customers, in every industry, increasingly using technology—and, specifically, the network—to grow their business, drive efficiencies, and try to gain a competitive advantage. In this increasingly digital world, data is the most strategic asset and is increasingly distributed across every organization and ecosystem—on customer premises, at the edge of the network, and in the cloud. The network also plays an increasingly important role enabling our customers to aggregate, automate, and draw insights from this highly distributed data where there is a premium on security and speed. This is driving them to adopt entirely new IT architectures and organizational structures. We understand how technology can deliver the outcomes our customers want to achieve, and our strategy is to lead our customers in their digital transition with solutions including pervasive, industry-leading security that intelligently connect nearly everything that can be connected.

To deliver on our strategy, we are focused on providing highly secure, automated and intelligent solutions built on infrastructure that connects data that is highly distributed (globally dispersed across organizations). Together with our ecosystem of partners and developers, we aim to provide the technology, services, and solutions that we believe will enable our customers to gain insight and advantage from this distributed data with scale, security and agility.

Over the last few years, we have been transforming our business to move from selling individual products and services to selling products and services integrated into architectures and solutions. As a part of this transformation, we continue to make changes to how we are organized and how we build and deliver our technology. We are focused on how we accelerate what is working and change what is not, simplify our business and our communication, drive operational rigor in everything we do, and invest in our culture and our talent.

We will strive to continue to lead the market transitions in our core markets and enter new markets where the network is foundational, in order to further our strategy. We continue to drive product transitions across many of our businesses, including the introduction of next-generation products that offer, in our view, better price-performance and architectural advantages compared with both our prior generation of products and the product offerings of our competitors. We believe that many of these product transitions are gaining momentum based on the strong year-over-year product revenue growth for certain of the new products. We do continue to manage through the transitions of several of our existing key product platforms, and we continue to see the impact of those transitions on our overall core performance. As we go forward, we plan to continue to deliver innovation across our portfolio, in order to sustain our leadership and strategic position with customers.

*Market Transitions*

We continue to seek to capitalize on market transitions as sources of future revenue opportunities as part of the continued transformation of our business, and we believe market transitions in the IT industry are occurring with greater frequency. Market transitions relating to the network are becoming, in our view, more significant as intelligent networks have moved from being a cost center issue—where the focus is on reducing network operating costs and increasing network-related productivity—to becoming a platform for revenue generation, business agility, and competitive advantage. Some examples of significant market transitions are as follows:

*Digitization/Internet of Everything* Globally, countries, cities, industries and businesses are becoming digital to capitalize on the next wave of the Internet - the Internet of Everything (IoE), which we define as the connection of people, processes, data and things. When people, processes, data and things are connected, we believe it creates an opportunity to deliver better customer experiences, create new revenue streams and operating models to drive efficiency and produce value.

Our goal is to be a strategic partner to our customers by providing the solutions, people, partners and experience as our customers move from traditional to digital businesses. We believe our customers' journey to becoming digital businesses requires security, cloud, mobile, social and analytic technologies with a strong foundation of an intelligent network that is agile, simple and that provides real time business insight.

The move to digital is driving many of our customers to adopt entirely new IT architectures and organization structures. In our view, we are delivering the architectural approach and solution-based results to help them reduce complexity, accelerate and grow, and manage risk in a world that is increasingly virtualized, application centric, cloud-based, analytics-driven, and mobile.

*Virtualization/Application Centricity* We are focusing on a market transition involving the move toward more programmable, flexible, and virtual networks, sometimes called software defined networking (SDN) and network function virtualization (NFV). This transition is focused on moving from a hardware-centric approach for networking to a virtualized network environment that is designed to enable flexible, application-driven customization of network infrastructures. We believe the successful products and solutions in this market will combine application-specific integrated circuits (ASICs) with hardware and software elements together to meet customers' total cost of ownership, quality, security, scalability, and experience requirements. In our view, there is no single architecture that supports all customer requirements in this area.

2

We believe the promise of SDN is to enable more open and programmable network infrastructure. We are addressing this opportunity with a unique strategy and set of solutions that is designed to address the application demands transition and offers a holistic approach to the future of networking that responds automatically to the needs of applications. We introduced and began shipping our Application Centric Infrastructure (ACI), which delivers centralized application-driven policy automation, management, and visibility of both physical and virtual environments as a single system. ACI is comprised of our Nexus 9000 portfolio of switches, enhanced versions of our NX-OS operating system, and the Application Policy Infrastructure Controller (APIC), which provides a central place to configure, automate, and manage an entire network, based on the needs of applications.

*Cloud* Our cloud strategy is to connect private and public clouds working across hypervisors (software programs used to create and manage virtual environments), and utilizing OpenStack (an open source computing platform), to deliver integrated hybrid-cloud solutions. We believe clouds need to be secure and support a rich ecosystem of network-enabled applications to deliver the data and analytics that support the digitization of our customers' environments. As part of our cloud strategy, we are delivering infrastructure, our Intercloud Fabric software, and our cloud services including WebEx and Meraki, among other applications.

We believe that customers and partners view our approach to the cloud as differentiated and unique, recognizing that we offer a solution to different cloud environments including federated, private, hybrid, and public clouds that enables them to move their cloud workloads across heterogeneous private and public clouds with the necessary policy, security, and management features.

For a discussion of the risks associated with our strategy, see "Item 1A. Risk Factors," including the risk factor entitled "We depend upon the development of new products and enhancements to existing products, and if we fail to predict and respond to emerging technological trends and customers' changing needs, our operating results and market share may suffer." For information regarding sales of our major products and services, see Note 17 to the Consolidated Financial Statements.

**Products and Services**

Our current offerings fall into several categories:

*Switching*

Switching is an integral networking technology used in campuses, branch offices, and data centers. Switches are used within buildings in local-area networks (LANs) and across great distances in wide-area networks (WANs). Our switching products offer many forms of connectivity to end users, workstations, IP phones, wireless access points, and servers and also function as aggregators on LANs and WANs. Our switching systems employ several widely used technologies, including Ethernet, Power over Ethernet, Fibre Channel over Ethernet (FCoE), Packet over Synchronous Optical Network, and Multiprotocol Label Switching. Many of our switches are designed to support an integrated set of advanced services, allowing organizations to be more efficient by using one switch for multiple networking functions rather than multiple switches to accomplish the same functions. Key product platforms within our Switching product category, in which we also include storage products, are as follows:

| Fixed-Configuration Switches | Modular Switches | Storage |
|---|---|---|
| Cisco Catalyst Series: | Cisco Catalyst Series: | Cisco MDS Series: |
| • Cisco Catalyst 2960-X Series | • Cisco Catalyst 4500-E Series | • Cisco MDS 9000 |
| • Cisco Catalyst 3650 Series | • Cisco Catalyst 6500-E Series | |
| • Cisco Catalyst 3850 Series | • Cisco Catalyst 6800 Series | |
| • Cisco Catalyst 4500-X Series | | |
| Cisco Nexus Series: | Cisco Nexus Series: | |
| • Cisco Nexus 2000 Series | • Cisco Nexus 7000 Series | |
| • Cisco Nexus 3000 Series | • Cisco Nexus 9000 Series | |
| • Cisco Nexus 5000 Series | | |
| • Cisco Nexus 6000 Series | | |

Fixed-configuration switches are designed to cover a range of deployments in both large enterprises as well as in small and medium-sized businesses, providing a foundation for converged data, voice, and video services. Our fixed-configuration switches range from small, standalone switches to stackable models that function as a single, scalable switching unit.

Modular switches are typically used by enterprise and service provider customers with large-scale network needs. These products are designed to offer customers the flexibility and scalability to deploy numerous, as well as advanced, networking services without degrading overall network performance.

Fixed-configuration and modular switches also include products such as optics modules, which are shared across multiple product platforms. Our switching portfolio also includes virtual switches and related offerings. These products provide switching

functionality for virtual machines and are designed to operate in a complementary fashion with virtual services to optimize security and application behavior.

We announced our ACI solution, Cisco ACI, in fiscal 2014. Cisco ACI consists of the Cisco Nexus 9000 Series Switches, a Cisco APIC and accompanying centralized policy management capability, integrated physical and virtual infrastructure, and an open ecosystem of network, storage, management, and orchestration vendors. During fiscal 2015, we have seen rapid adoption of both the Cisco Nexus 9000 Series Switches and Cisco ACI across all geographies and customer segments. As of the end of fiscal 2015, we have over 4,100 Cisco Nexus 9000 and Cisco ACI customers.

In fiscal 2015, we saw the continued adoption of Cisco's Unified Access architecture based on the Unified Access Data Plane ASIC, which was first made available on the Cisco Catalyst 3850 and then added to the Cisco Catalyst 4500-E and the Cisco Catalyst 3650. The Unified Access platform has been adopted across all geographies and customer segments. During fiscal 2015, we announced an infrastructure initiative focused on bringing "network as a sensor" and "network as an enforcer" capabilities across the portfolio. With security as top of mind for many clients, these capabilities provide analytics and control through the network for threat mitigation before, during, and after an attack.

Individually, our switching suite of products is designed to offer the performance and features required for nearly any deployment, from traditional small workgroups, wiring closets, and network cores to highly virtualized and converged corporate data centers. Working together with our wireless access solutions, these switches are, in our view, the building blocks of an integrated network that delivers scalable and advanced functionality solutions—protecting, optimizing, and growing as a customer's business needs evolve.

### NGN Routing

NGN technology is fundamental to the foundation of the Internet. This category of technologies interconnects public and private wireline and mobile networks for mobile, data, voice, and video applications. Our NGN Routing portfolio of hardware and software solutions consists primarily of physical and virtual routers, and routing and optical systems. Our solutions are designed to meet the scale, reliability, and security needs of our customers. In our view, our portfolio is differentiated from those of our competitors through the advanced capabilities, which we sometimes refer to as "intelligence," that our products provide at each layer of network infrastructure to deliver performance in the transmission of information and media-rich applications.

As to specific products, we offer a broad range of hardware and software solutions, from core network infrastructure and mobile network routing solutions for service providers and enterprises to access routers for branch offices and for telecommuters and consumers at home. Key product areas within our NGN Routing category are as follows:

| High-End Routers | Midrange and Low-End Routers | Other NGN Routing |
|---|---|---|
| Cisco Aggregation Services Routers (ASRs): | Cisco Integrated Services Routers (ISRs): | Optical networking products: |
| • Cisco ASR 901, 902, and 903 Series | • Cisco 800 Series ISR | • Cisco NCS 2000 Series |
| • Cisco ASR 1000 Series | • Cisco 1900 Series ISR | • Cisco NCS 4000 Series |
| • Cisco ASR 5000 and 5500 Series | • Cisco 2900 Series ISR | • Cisco Cloud Services Router 1000V |
| • Cisco ASR 9000 Series | • Cisco 3900 Series ISR | • Other routing products |
| Cisco Carrier Routing Systems (CRS): | Cisco ISR-AX | |
| • Cisco CRS-1 | | |
| • Cisco CRS-3 | | |
| • Cisco CRS-X | | |
| Cisco Network Convergence System (NCS): | | |
| • Cisco NCS 6000 Series | | |
| Cisco 7600 Series | | |
| Cisco 12000 Series | | |
| Cisco Quantum Software Suite | | |
| Small cell access routers | | |

4

During fiscal 2014, we added a new platform in our high-end routers known as the Cisco Network Convergence System (NCS), and we also made several enhancements to our existing platforms such as the CRS-X product line, through our architectural approach, which consists of a programmable network at the foundation and a services platform that connects the network to applications and services. During fiscal 2015, we continued to enhance our routing portfolio, including products pertaining to service provider routing. We aligned our resources around the service provider routing customer market in order to develop solutions focused on the business outcomes and needs of our customers. In fiscal 2015, we started executing on the market transition to the 100 Gigabit Ethernet (100GE) data transfer standard as we continued to deploy products within each of our CRS, NCS and ASR 9000 routing portfolios. We also launched the XRv-9000, which brings the maturity and breadth of the Cisco IOS-XR Software operating system to the SDN/NFV virtual world.  These solutions are examples of our intent to continue to combine ASICs, systems, and software to develop NGN Routing products and services aligned with the needs of our customers.

*Collaboration*

Our Collaboration portfolio integrates voice, video, data, and mobile applications on fixed and mobile networks across a wide range of devices and related IT equipment such as mobile phones, tablets, desktop and laptop computers, and desktop virtualization clients—sometimes collectively referred to as "endpoints"—that people use to access networks. Within our various Collaboration offerings, we strive to create compelling, innovative collaboration technology through the combined power of software, hardware, and the network with delivery in the cloud, on premises, or in a hybrid solution.

Key product areas within our Collaboration category are as follows:

| Unified Communications | Conferencing | Cisco TelePresence Systems | Enterprise Mobile Messaging |
|---|---|---|---|
| • IP phones | • Cisco WebEx Meeting Center | • Collaboration desk endpoints | • Cisco Spark |
| • Call control | • Cisco Collaboration Meeting Rooms | • Collaboration room endpoints | |
| • Call center and messaging | | • Immersive systems | |
| • Software-based IM clients | | • Cisco TelePresence Server | |
| • Communication gateways and unified communication | | • Cisco TelePresence Conductor | |

We include all of our revenue from WebEx within the Collaboration product category. During fiscal 2015, we expanded our Collaboration offerings to incorporate a new product category called Enterprise Mobile Messaging with the launch of the Cisco Spark cloud-based service including a downloadable application, or "app." Additionally, we expanded our conferencing category with the addition of our Collaboration Meeting Rooms solution, which strives to bring high-quality web, video, and audio conferencing together in a single application that can be delivered in the cloud, on premises, or as a hybrid solution. We continued to innovate in Cisco TelePresence Systems, with the introduction of the MX800 Dual and the IX5000, the industry's first three-screen room system to support the H.265 standard. Finally, we extended our Business Edition portfolio of packaged unified communications solutions at both the low end with the BE6000S and at the high end with the BE7000H.

*Service Provider Video*

Our end-to-end, digital video systems and digital interactive, subscriber devices and Data Over Cable System Interface Specification(DOCSIS) headend and access equipment enable service providers and content originators to deliver entertainment, information, and communication services to consumers and businesses around the world.  Key product areas within our Service Provider Video category are as follows:

| Service Provider Video Infrastructure and Cable Access | Service Provider Video Software and Solutions |
| --- | --- |
| Set-top boxes: | • Content security systems |
| • Digital cable and IP set-top boxes | • Digital content management and distribution products |
| • Video gateways | • Digital headend products |
| • Digital transport adapters | • Virtualized video processing systems |
| Cable modems: | • Integration and customization offerings |
| • Data modems | • Cloud-based end-to-end video entertainment solutions |
| • Embedded media terminal adapters | |
| • Wireless gateways | |
| Connected Life platforms | |
| Cable/Telecommunications Access Infrastructure: | |
| • Cable modem termination systems (CMTSs) | |
| • Hybrid fiber coaxial (HFC) access network products | |
| • Quadrature amplitude modulation (QAM) products | |

During fiscal 2015, we began to transform our Service Provider Video portfolio. We began shipping our ultra-fast DOCSIS cable access platform, the cBR-8, which has the capability to scale to multi-gigabit broadband access speeds. We also began the transformation of our video software products to leverage cloud and virtualization technologies and open software. Also, in fiscal 2015, an increasing proportion of our in-home video and data access devices that were sold possessed the capability to run advanced, cloud-based and open software platforms.

On July 22, 2015, we entered into an exclusive agreement to sell the client premises equipment portion of our Service Provider Video connected devices business unit to French-based Technicolor. We will continue to refocus our investments in our Service Provider Video towards cloud, security and software-based services.

6

*Data Center*

Data Center has been our fastest growing major product category for each of the past five fiscal years. The Cisco Unified Computing System (UCS), enables Fast IT by combining computing, networking and storage infrastructure with management and virtualization to offer speed, simplicity and scale. Our architecture provides pools of policy-driven, composable infrastructure that customers can optimize for traditional workloads, data analytics and cloud-native applications, all within a common operating environment with an open application program interface (API) for broad interoperability and automation.

Key product areas within our Data Center product category are as follows:

Cisco Unified Computing System (UCS):
  • Cisco UCS B-Series Blade Servers
  • Cisco UCS C-Series Rack Servers
  • Cisco UCS M-Series Modular Servers
  • Cisco UCS C3160 Storage Optimized Rack Server
  • Cisco UCS Mini branch/remote site computing solution
  • Cisco UCS Fabric Interconnects
  • Cisco UCS Manager and UCS Director Management Software
Private and Hybrid Cloud:
  • Cisco ONE Enterprise Cloud Suite
  • Cisco Intercloud Fabric
Server Access Virtualization:
  • Cisco Nexus 1000V

During fiscal 2015, we significantly expanded the Cisco UCS portfolio into data-intensive, service provider clouds and edge computing environments. At the edge, Cisco UCS Mini is an all in one solution optimized for branch and remote office, point of scale locations and smaller IT environments. Incorporating Cisco System Link technology and policy based management, the Cisco UCS M-Series dense modular servers and Cisco UCS C3160 capacity optimized storage bring the Cisco UCS architecture advantages to highly parallelized workloads, including cloud and scale out applications. Additionally, we continued to invest in data center infrastructure management and automation software within our Cisco UCS Director product offering, and we introduced our Cisco ONE Enterprise Cloud Suite enabling private and hybrid clouds for enterprise customers. We also enabled cloud providers to offer hybrid cloud solutions to their customers with our Intercloud Fabric offering.

Our Data Center product innovations are designed to accelerate execution on our strategy, which is to enable customers to consolidate both physical and virtualized workloads—taking into account the customers' unique application requirements—onto a single scalable, centrally managed, and automated system. We offer a portfolio of solutions designed to preserve customer choice, accelerate business initiatives, reduce risk, lower the cost of IT, and represent a comprehensive solution when deployed.

*Wireless*

Wireless access via wireless fidelity (Wi-Fi) is a fast-growing technology with organizations across the globe investing to provide indoor and outdoor coverage with seamless roaming for voice, video, and data applications. We aim to deliver an optimized user experience over Wi-Fi and leverage the intelligence of the network to solve business problems. Our wireless solutions include wireless access points; standalone, switch-converged, and cloud-managed solutions; and network managed services. Our wireless solutions portfolio is enhanced with security and location-based services via our Mobility Services Engine (MSE) solution. Our offerings provide users with simplified management and mobile device troubleshooting features designed to reduce operational cost and maximize flexibility and reliability. We are also investing in customized chipset development toward the goal of delivering innovative radio frequency (RF) product functionality for our 802.11ac Wi-Fi. Our High Density Experience (HDX) suite of solutions including Cisco CleanAir proactive spectrum intelligence, our ClientLink solution for mobile devices, and our VideoStream video optimization technology are illustrations of ongoing investment activity in this area.

Key product areas within our Wireless category are as follows:

Cisco Aironet Series
Access Point modules for 3700 Series (802.11ac, 3G, WSSI, LTE/4G) and 3600 Series
Controllers (standalone and integrated)
Meraki wireless cloud solutions

In fiscal 2015, we completed our 802.11ac Access Point portfolio with a comprehensive set of indoor and outdoor access points. In addition, we released two new WLAN controllers, WLC 5520 and WLC 8540, designed to deliver higher capacity to customer networks as they move toward implementing 802.11ac wave 2 access points over the coming years. Our Connected Mobile Experience (CMX), a Wi-Fi based mobile engagement platform that we introduced in fiscal 2013, continued to experience positive momentum as customers seek to leverage Wi-Fi networks to deliver a richer customer experience, improve operational efficiencies and uncover new monetization opportunities. In addition, our fiscal 2013 acquisition of Meraki, Inc. ("Meraki"), a cloud-managed networking company, further strengthens our Unified Access platform by providing scalable, easy-to-deploy, on-premise networking solutions that can be centrally managed from the cloud.

*Security*

We believe that security is the top IT priority for many of our customers. We further believe that security solutions, when implemented correctly, not only can help to protect the digital economy but also can be a business enabler that safeguards business interests, protects customer experience and thereby creates competitive advantage. Cisco has invested in security through its build, buy, and partner strategy to embed security throughout the extended network from network to endpoint and data center to cloud.

Our security portfolio of products and services is designed to offer a comprehensive solution that collects and shares intelligence with a coordinated focus on threats across the entire attack continuum-before, during, and after an attack. These solutions include network and data center security, advanced threat protection, web and email security, access and policy, unified threat management, and advisory, integration, and managed services.

During fiscal 2015, we announced the industry's first threat-focused next-generation firewall (NGFW) solution. We integrated our FirePOWER Services solution (Sourcefire's NGIPS) within our Advanced Security Appliances (ASA) portfolio to create the industry's first threat-centric NGFW solutions. Also, we introduced several new hardware platforms that can also be enabled with FirePOWER Services such as ASA 5506-X, 5508-X, 5516-X, 5506H and the high performance FirePOWER 9300.

In fiscal 2015, we continued to accelerate the delivery of solutions with new advanced threat protection capabilities. We integrated our Advanced Malware Protection (AMP) for networks solutions designed to deliver advanced protections as an option to our threat-centric NGFW. We also delivered ThreatGRID appliances based on the Cisco UCS platform. These platforms offer dynamic malware analysis and threat intelligence solutions. We also integrated our Cognitive Threat Analytics offering within our Cloud Web Security solution, which is designed to provide a sophisticated method for detecting advanced threats utilizing machine learning and advanced analytical techniques. We also announced several new offerings designed to embed security throughout the extended network—from the data center out to endpoints, branch offices and the cloud. These solutions include Cisco AnyConnect featuring Cisco AMP for Endpoints, FirePOWER Services solutions for Cisco Integrated Services Routers (ISRs), Ruggedized Cisco ASA with FirePOWER Services, Cloud Hosted Identity Service, and Adaptive Security Virtual Appliance for the Amazon Web Services platform.

In the fourth quarter of fiscal 2015, we announced our intent to acquire OpenDNS, a company whose solutions are designed to deliver security to any device, anytime, anywhere, and thereby help enable our customers to more confidently leverage cloud applications without compromising security or visibility.

*Other Products*

Our Other Products category primarily consists of certain emerging technologies and other networking products.

*Service*

In addition to our product offerings, we provide a broad range of service offerings, including technical support services and advanced services.

Technical support services help our customers ensure their products operate efficiently, remain available, and benefit from the most up-to-date system and application software that we have developed. These services help customers protect their network investments, manage risk, and minimize downtime for systems running mission-critical applications. A key example of this is our Cisco Smart Services offering, which leverages the intelligence from Cisco's millions of devices and customer connections to protect and optimize network investment for our customers and partners.

Advanced services are part of a comprehensive program that is focused on providing responsive, preventive, and consultative support of our technologies for specific networking needs. We are investing in and expanding our advanced services in the areas of cloud, security, consulting and analytics which reflects our strategy of selling customer outcomes.  Further extending our operational capabilities, we announced our intent to acquire MaintenanceNet, a cloud-based software platform that uses data analytics and automation to manage renewals of recurring customer contracts.

The advanced services program supports networking devices, applications, solutions, and complete infrastructures. Our service and support strategy is focused on capitalizing on increased globalization, and we believe this strategy, along with our architectural approach, has the potential to further differentiate us from competitors.

**Customers and Markets**

Many factors influence the IT, collaboration, and networking requirements of our customers. These include the size of the organization, number and types of technology systems, geographic location, and business applications deployed throughout the customer's network. Our customer base is not limited to any specific industry, geography, or market segment. In each of the past three fiscal years, no single customer has accounted for 10% or more of our revenue. Our customers primarily operate in the following markets: enterprise, service provider, commercial, and public sector.

*Enterprise*

Enterprise businesses are large regional, national, or global organizations with multiple locations or branch offices and typically employ 1,000 or more employees. Many enterprise businesses have unique IT, collaboration, and networking needs within a multivendor environment. We strive to take advantage of the network-as-a-platform strategy to integrate business processes with technology architectures to assist customer growth. We offer service and support packages, financing, and managed network services, primarily through our service provider partners. We sell these products through a network of third-party application and technology vendors and channel partners, as well as selling directly to these customers.

*Service Providers*

Service providers offer data, voice, video, and mobile/wireless services to businesses, governments, utilities, and consumers worldwide. This customer market category includes regional, national, and international wireline carriers, as well as Internet, cable, and wireless providers. We also group media, broadcast, and content providers within our service provider market, as the lines in the telecommunications industry continue to blur between traditional network-based services and content-based and application-based services. Service providers use a variety of our routing and switching, optical, security, video, mobility, and network management products, systems, and services for their own networks. In addition, many service providers use Cisco data center, virtualization, and collaboration technologies to offer managed or Internet-based services to their business customers. Compared with other customers, service providers are more likely to require network design, deployment, and support services because of the scale and complexity of their networks, which requirements are addressed, we believe, by our architectural approach.

*Commercial*

We define commercial businesses as companies which typically have fewer than 1,000 employees. The larger, or midmarket, customers within the commercial market are served by a combination of our direct salesforce and our channel partners. These customers typically require the latest advanced technologies that our enterprise customers demand, but with less complexity. Small businesses, or companies with fewer than 100 employees, require information technologies and communication products that are easy to configure, install, and maintain. These smaller companies within the commercial market are primarily served by our channel partners.

*Public Sector*

Public sector entities include federal governments, state and local governments, as well as educational institution customers. Many public sector entities have unique IT, collaboration, and networking needs within a multivendor environment. We sell to public sector entities through a network of third-party application and technology vendors and channel partners, as well as direct sales to these customers.

## Sales Overview

As of the end of fiscal 2015 , our worldwide sales and marketing departments consisted of approximately 25,000 employees, including managers, sales representatives, and technical support personnel. We have field sales offices in 93 countries, and we sell our products and services both directly and through a variety of channels with support from our salesforce. A substantial portion of our products and services is sold through our channel partners, and the remainder is sold through direct sales. Our channel partners include systems integrators, service providers, other resellers, and distributors.

Systems integrators and service providers typically sell directly to end users and often provide system installation, technical support, professional services, and other support services in addition to network equipment sales. Systems integrators also typically integrate our products into an overall solution. Some service providers are also systems integrators.

Distributors hold inventory and typically sell to systems integrators, service providers, and other resellers. We refer to sales through distributors as our two-tier system of sales to the end customer. Revenue from distributors is recognized based on a sell-through method using information provided by them. These distributors are generally given business terms that allow them to return a portion of inventory, receive credits for changes in selling prices, and participate in various cooperative marketing programs.

For information regarding risks related to our channels, see "Item 1A. Risk Factors," including the risk factors entitled "Disruption of or changes in our distribution model could harm our sales and margins" and "Our inventory management relating to our sales to our two-tier distribution channel is complex, and excess inventory may harm our gross margins."

For information regarding risks relating to our international operations, see "Item 1A. Risk Factors," including the risk factors entitled "Our operating results may be adversely affected by unfavorable economic and market conditions and the uncertain geopolitical environment"; "Entrance into new or developing markets exposes us to additional competition and will likely increase demands on our service and support operations"; "Due to the global nature of our operations, political or economic changes or other factors in a specific country or region could harm our operating results and financial condition"; "We are exposed to fluctuations in currency exchange rates that could negatively impact our financial results and cash flows"; and "Man-made problems such as computer viruses or terrorism may disrupt our operations and harm our operating results," among others.

Our service offerings complement our products through a range of consulting, technical, project, quality, and software maintenance services, including 24-hour online and telephone support through technical assistance centers.

## Financing Arrangements

We provide financing arrangements for certain qualified customers to build, maintain, and upgrade their networks. We believe customer financing is a competitive factor in obtaining business, particularly in serving customers involved in significant infrastructure projects. Our financing arrangements include the following:

Leases:
- Sales-type
- Direct financing
- Operating

Loans

Financed service contracts

Channels financing arrangements

End-user financing arrangements

For additional information regarding these financing arrangements, see Note 7 to the Consolidated Financial Statements.

## Product Backlog

Our product backlog at July 25, 2015 , the last day of fiscal 2015 , was approximately $5.1 billion , compared with product backlog of approximately $5.4 billion at July 26, 2014 , the last day of fiscal 2014 . The product backlog includes orders confirmed for products planned to be shipped within 90 days to customers with approved credit status. Because of the generally short cycle between order and shipment and occasional customer changes in delivery schedules or cancellation of orders (which are made without significant penalty), we do not believe that our product backlog, as of any particular date, is necessarily indicative of actual product revenue for any future period.

10

**Acquisitions, Investments, and Alliances**

The markets in which we compete require a wide variety of technologies, products, and capabilities. Our growth strategy is based on the three components of innovation, which we sometimes refer to as our "build, buy, and partner" approach. The foregoing is a way of describing how we strive to innovate: we can internally develop, or build, our own innovative solutions; we can acquire, or buy, companies with innovative technologies; and we can partner with companies to jointly develop and/or resell product technologies and innovations. The combination of technological complexity and rapid change within our markets makes it difficult for a single company to develop all of the technological solutions that it desires to offer within its family of products and services. We work to broaden the range of products and services we deliver to customers in target markets through acquisitions, investments, and alliances. To summarize, we employ the following strategies to address the need for new or enhanced networking and communications products and services:

- Developing new technologies and products internally

- Acquiring all or parts of other companies

- Entering into joint development efforts with other companies

- Reselling other companies' products

*Acquisitions*

We have acquired many companies, and we expect to make future acquisitions. Mergers and acquisitions of high-technology companies are inherently risky, especially if the acquired company has yet to ship a product. No assurance can be given that our previous or future acquisitions will be successful or will not materially adversely affect our financial condition or operating results. Prior acquisitions have resulted in a wide range of outcomes, from successful introduction of new products and technologies to an inability to do so. The risks associated with acquisitions are more fully discussed in "Item 1A. Risk Factors," including the risk factor entitled "We have made and expect to continue to make acquisitions that could disrupt our operations and harm our operating results."

*Investments in Privately Held Companies*

We make investments in privately held companies that develop technology or provide services that are complementary to our products or that provide strategic value. The risks associated with these investments are more fully discussed in "Item 1A. Risk Factors," including the risk factor entitled "We are exposed to fluctuations in the market values of our portfolio investments and in interest rates; impairment of our investments could harm our earnings."

*Strategic Alliances*

We pursue strategic alliances with other companies in areas where collaboration can produce industry advancement and acceleration of new markets. The objectives and goals of a strategic alliance can include one or more of the following: technology exchange, product development, joint sales and marketing, or new market creation. Companies with which we have, or recently had, strategic alliances include the following:

Accenture Ltd; Apple Inc.; AT&T Inc.; Cap Gemini S.A.; Citrix Systems, Inc.; EMC Corporation; Fujitsu Limited; Intel Corporation; International Business Machines Corporation; Italtel SpA; Johnson Controls Inc.; Microsoft Corporation; NetApp, Inc.; Nokia Siemens Networks; Oracle Corporation; Red Hat, Inc.; SAP AG; Sprint Nextel Corporation; Tata Consultancy Services Ltd.; VCE Company, LLC ("VCE"); VMware, Inc.; Wipro Limited; and others.

Companies with which we have strategic alliances in some areas may be competitors in other areas, and in our view this trend may increase. The risks associated with our strategic alliances are more fully discussed in "Item 1A. Risk Factors," including the risk factor entitled "If we do not successfully manage our strategic alliances, we may not realize the expected benefits from such alliances, and we may experience increased competition or delays in product development."

**Competition**

We compete in the networking and communications equipment markets, providing products and services for transporting data, voice, and video traffic across intranets, extranets, and the Internet. These markets are characterized by rapid change, converging technologies, and a migration to networking and communications solutions that offer relative advantages. These market factors represent both an opportunity and a competitive threat to us. We compete with numerous vendors in each product category. The overall number of our competitors providing niche product solutions may increase. Also, the identity and composition of competitors may change as we increase our activity in our new product markets. As we continue to expand globally, we may see new competition in different geographic regions. In particular, we have experienced price-focused competition from competitors in Asia, especially from China, and we anticipate this will continue.

Our competitors include Alcatel-Lucent; Amazon Web Services LLC; Arista Networks, Inc.; ARRIS Group, Inc.; Avaya Inc.; Blue Jeans Networks, Brocade Communications Systems, Inc.; Check Point Software Technologies Ltd.; Citrix Systems, Inc.; Dell Inc.; LM Ericsson Telephone Company; Extreme Networks, Inc.; F5 Networks, Inc.; FireEye, Inc.; Fortinet, Inc.; Hewlett-Packard Company; Huawei Technologies Co., Ltd.; International Business Machines Corporation; Juniper Networks, Inc.; Lenovo Group Limited; Microsoft Corporation; Palo Alto Networks, Inc.; Polycom, Inc.; Riverbed Technology, Inc.; Ruckus Wireless, Inc.; Symantec Corporation; Ubiquiti Networks and VMware, Inc.; among others.

Some of these companies compete across many of our product lines, while others are primarily focused in a specific product area. Barriers to entry are relatively low, and new ventures to create products that do or could compete with our products are regularly formed. In addition, some of our competitors may have greater resources, including technical and engineering resources, than we do. As we expand into new markets, we will face competition not only from our existing competitors but also from other competitors, including existing companies with strong technological, marketing, and sales positions in those markets. We also sometimes face competition from resellers and distributors of our products. Companies with which we have strategic alliances in some areas may be competitors in other areas, and in our view this trend may increase. For example, the enterprise data center is undergoing a fundamental transformation arising from the convergence of technologies, including computing, networking, storage, and software, that previously were segregated within the data center. Due to several factors, including the availability of highly scalable and general purpose microprocessors, application-specific integrated circuits offering advanced services, standards-based protocols, cloud computing, and virtualization, the convergence of technologies within the enterprise data center is spanning multiple, previously independent, technology segments. Also, some of our current and potential competitors for enterprise data center business have made acquisitions, or announced new strategic alliances, designed to position them to provide end-to-end technology solutions for the enterprise data center. As a result of all of these developments, we face greater competition in the development and sale of enterprise data center technologies, including competition from entities that are among our long-term strategic alliance partners. Companies that are strategic alliance partners in some areas of our business may acquire or form alliances with our competitors, thereby reducing their business with us.

The principal competitive factors in the markets in which we presently compete and may compete in the future include:

- The ability to provide a broad range of networking and communications products and services
- Product performance
- Price
- The ability to introduce new products, including products with price-performance advantages
- The ability to reduce production costs
- The ability to provide value-added features such as security, reliability, and investment protection
- Conformance to standards
- Market presence
- The ability to provide financing
- Disruptive technology shifts and new business models

We also face competition from customers to which we license or supply technology and suppliers from which we transfer technology. The inherent nature of networking requires interoperability. Therefore, we must cooperate and at the same time compete with many companies. Any inability to effectively manage these complicated relationships with customers, suppliers, and strategic alliance partners could have a material adverse effect on our business, operating results, and financial condition and accordingly affect our chances of success.

## Research and Development

We regularly seek to introduce new products and features to address the requirements of our markets. We allocate our research and development budget among our product categories, which consist of Switching, NGN Routing, Collaboration, Service Provider Video, Data Center, Wireless, Security, and Other Product technologies, for this purpose. Our research and development expenditures were $ 6.2 billion , $6.3 billion , and $5.9 billion in fiscal 2015 , 2014 , and 2013 , respectively. These expenditures are applied generally to all product areas, with specific areas of focus being identified from time to time. Recent areas of increased focus include, but are not limited to, our core routing and switching products, collaboration, and products related to the data center. Our expenditures for research and development costs were expensed as incurred.

The industry in which we compete is subject to rapid technological developments, evolving standards, changes in customer requirements, and new product introductions and enhancements. As a result, our success depends in part upon our ability, on a cost-effective and timely basis, to continue to enhance our existing products and to develop and introduce new products that improve performance and reduce total cost of ownership. To achieve these objectives, our management and engineering personnel work with customers to identify and respond to customer needs, as well as with other innovators of internetworking products, including universities, laboratories, and corporations. We also expect to continue to make acquisitions and investments, where appropriate, to provide us with access to new technologies. Nonetheless, there can be no assurance that we will be able to successfully develop products to address new customer requirements and technological changes or that those products will achieve market acceptance.

## Manufacturing

We rely on contract manufacturers for all of our manufacturing needs. We presently use a variety of independent third-party companies to provide services related to printed-circuit board assembly, in-circuit test, product repair, and product assembly. Proprietary software on electronically programmable memory chips is used to configure products that meet customer requirements and to maintain quality control and security. The manufacturing process enables us to configure the hardware and software in unique combinations to meet a wide variety of individual customer requirements. The manufacturing process uses automated testing equipment and burn-in procedures, as well as comprehensive inspection, testing, and statistical process controls, which are designed to help ensure the quality and reliability of our products. The manufacturing processes and procedures are generally certified to International Organization for Standardization (ISO) 9001 or ISO 9003 standards.

Our arrangements with contract manufacturers generally provide for quality, cost, and delivery requirements, as well as manufacturing process terms, such as continuity of supply; inventory management; flexibility regarding capacity, quality, and cost management; oversight of manufacturing; and conditions for use of our intellectual property. We have not entered into any significant long-term contracts with any manufacturing service provider. We generally have the option to renew arrangements on an as-needed basis. These arrangements generally do not commit us to purchase any particular amount or any quantities beyond certain amounts covered by orders or forecasts that we submit covering discrete periods of time, defined as less than one year.

## Patents, Intellectual Property, and Licensing

We seek to establish and maintain our proprietary rights in our technology and products through the use of patents, copyrights, trademarks, and trade secret laws. We have a program to file applications for and obtain patents, copyrights, and trademarks in the United States and in selected foreign countries where we believe filing for such protection is appropriate. We also seek to maintain our trade secrets and confidential information by nondisclosure policies and through the use of appropriate confidentiality agreements. We have obtained a substantial number of patents and trademarks in the United States and in other countries. There can be no assurance, however, that the rights obtained can be successfully enforced against infringing products in every jurisdiction. Although we believe the protection afforded by our patents, copyrights, trademarks, and trade secrets has value, the rapidly changing technology in the networking industry and uncertainties in the legal process make our future success dependent primarily on the innovative skills, technological expertise, and management abilities of our employees rather than on the protection afforded by patent, copyright, trademark, and trade secret laws.

Many of our products are designed to include software or other intellectual property licensed from third parties. While it may be necessary in the future to seek or renew licenses relating to various aspects of our products, we believe, based upon past experience and standard industry practice, that such licenses generally could be obtained on commercially reasonable terms. Nonetheless, there can be no assurance that the necessary licenses would be available on acceptable terms, if at all. Our inability to obtain certain licenses or other rights or to obtain such licenses or rights on favorable terms, or the need to engage in litigation regarding these matters, could have a material adverse effect on our business, operating results, and financial condition. Moreover, inclusion in our products of software or other intellectual property licensed from third parties on a nonexclusive basis can limit our ability to protect our proprietary rights in our products.

13

The industry in which we compete is characterized by rapidly changing technology, a large number of patents, and frequent claims and related litigation regarding patent and other intellectual property rights. There can be no assurance that our patents and other proprietary rights will not be challenged, invalidated, or circumvented; that others will not assert intellectual property rights to technologies that are relevant to us; or that our rights will give us a competitive advantage. In addition, the laws of some foreign countries may not protect our proprietary rights to the same extent as the laws of the United States. The risks associated with patents and intellectual property are more fully discussed in "Item 1A. Risk Factors," including the risk factors entitled "Our proprietary rights may prove difficult to enforce," "We may be found to infringe on intellectual property rights of others," and "We rely on the availability of third-party licenses."

**Employees**

Employees are summarized as follows:

|  | July 25, 2015 |
| --- | --- |
| Employees by geography: | |
| United States | 36,222 |
| Rest of world | 35,611 |
| Total | 71,833 |
| Employees by line item on the Consolidated Statements of Operations: | |
| Cost of sales [1] | 17,186 |
| Research and development | 22,542 |
| Sales and marketing | 24,762 |
| General and administrative | 7,343 |
| Total | 71,833 |

[1] Cost of sales includes manufacturing support, services, and training.

We consider the relationships with our employees to be positive. Competition for technical personnel in the industry in which we compete is intense. We believe that our future success depends in part on our continued ability to hire, assimilate, and retain qualified personnel. To date, we believe that we have been successful in recruiting qualified employees, but there is no assurance that we will continue to be successful in the future.

**Executive Officers of the Registrant**

The following table shows the name, age, and position as of August 31, 2015 of each of our executive officers:

| Name | Age | Position with the Company |
| --- | --- | --- |
| Charles H. Robbins | 49 | Chief Executive Officer and Director |
| John T. Chambers | 66 | Executive Chairman |
| Mark Chandler | 59 | Senior Vice President, Legal Services, General Counsel and Secretary, and Chief Compliance Officer |
| Chris Dedicoat | 58 | Executive Vice President, Worldwide Sales |
| Rebecca Jacoby | 53 | Senior Vice President and Chief of Operations |
| Kelly A. Kramer | 48 | Executive Vice President and Chief Financial Officer |
| Pankaj Patel | 61 | Executive Vice President and Chief Development Officer, Global Engineering |
| Karen Walker | 53 | Senior Vice President and Chief Marketing Officer |

*Mr. Robbins* has served as Chief Executive Officer since July 2015 and as a member of the Board of Directors since May 2015. He joined Cisco in December 1997, from which time until March 2002 he held a number of managerial positions within Cisco's sales organization. Mr. Robbins was promoted to Vice President in March 2002, assuming leadership of Cisco's U.S. channel sales organization. Additionally, in July 2005 he assumed leadership of Cisco's Canada channel sales organization. In December 2007, Mr. Robbins was promoted to Senior Vice President, U.S. Commercial, and in August 2009 he was appointed Senior Vice President, U.S. Enterprise, Commercial and Canada. In July 2011, Mr. Robbins was named Senior Vice President, Americas. In October 2012, Mr. Robbins was promoted to Senior Vice President, Worldwide Field Operations, in which position he served until assuming the role of Chief Executive Officer.

**Mr. Chambers** has served as a member of the Board of Directors since November 1993. Mr. Chambers, who was appointed Executive Chairman in July 2015, served as Cisco's Chief Executive Officer from January 1995 until July 2015, and he also served as President from January 1995 to November 2006. He joined Cisco as Senior Vice President in January 1991 and was promoted to Executive Vice President in June 1994, prior to assuming the roles of President and Chief Executive Officer in January 1995. Before joining Cisco, Mr. Chambers was employed by Wang Laboratories, Inc. for eight years, where, in his last role, he was the Senior Vice President of U.S. Operations.

**Mr. Chandler** joined Cisco in July 1996, upon Cisco's acquisition of StrataCom, Inc., where he served as General Counsel. He served as Cisco's Managing Attorney for Europe, the Middle East, and Africa from December 1996 until June 1999; as Director, Worldwide Legal Operations from June 1999 until February 2001; and was promoted to Vice President, Worldwide Legal Services in February 2001. In October 2001, he was promoted to Vice President, Legal Services and General Counsel, and in May 2003, he was also appointed Secretary. In February 2006, he was promoted to Senior Vice President, and in May 2012 was appointed Chief Compliance Officer. Before joining StrataCom, he had served as Vice President, Corporate Development and General Counsel of Maxtor Corporation.

**Mr. Dedicoat** joined Cisco in June 1995 and has held various leadership positions within Cisco's sales organization. From June 1995 through April 1999, he served as a manager and then as a director within the United Kingdom portion of Cisco's Europe sales organization, overseeing both commercial and enterprise accounts. In April 1999, Mr. Dedicoat was appointed Vice President, Europe, and in June 2003 he was promoted to Senior Vice President, Europe, serving as Cisco's lead sales executive for Europe. In July 2011, Mr. Dedicoat was appointed Senior Vice President, EMEA (Europe, Middle East, and Africa). Mr. Dedicoat was appointed to his current position effective July 2015.

**Ms. Jacoby** joined Cisco in March 1995 and has held a number of leadership positions with Cisco. She served, successively, as a manager, director and vice president within Cisco's global supply chain organization from March 1995 until November 2003. In November 2003, Ms. Jacoby assumed the role of Vice President, Customer Service and Operations Systems, serving in this capacity until October 2006 when she was appointed Senior Vice President and Chief Information Officer (CIO) of Cisco. Ms. Jacoby held the SVP/CIO position until being promoted to her current position effective July 2015. She is a member of the board of directors of McGraw Hill Financial, Inc.

**Ms. Kramer** joined Cisco in January 2012 as Senior Vice President, Corporate Finance. She served in that position until October 2014 and served as Cisco's Senior Vice President, Business Technology and Operations Finance from October 2013 until December 2014. She was appointed to her current position effective January 2015. From January 2009 until she joined Cisco, Ms. Kramer served as Vice President and Chief Financial Officer of GE Healthcare Systems. Ms. Kramer served as Vice President and Chief Financial Officer of GE Healthcare Diagnostic Imaging from August 2007 to January 2009 and as Chief Financial Officer of GE Healthcare Biosciences from January 2006 to July 2007. Prior to that, Ms. Kramer held various leadership positions with GE corporate and other GE businesses.

**Mr. Patel** joined Cisco in July 1996 upon Cisco's acquisition of StrataCom, Inc., serving from July 1996 through September 1999 as a Senior Director of Engineering. From November 1999 through January 2003, he served as Senior Vice President of Engineering at Redback Networks Inc., a networking equipment provider later acquired by Ericsson. In January 2003, Mr. Patel rejoined Cisco as Vice President and General Manager, Cable Business Unit, and was promoted to Senior Vice President in July 2005. In January 2006, Mr. Patel was named Senior Vice President and General Manager, Service Provider Business and, additionally, in May 2011 became co-leader of Engineering. In June 2012, Mr. Patel assumed the leadership of Engineering. In August 2012, Mr. Patel was promoted to his current position.

**Ms. Walker** joined Cisco in November 2008 serving from November 2008 through January 2012 as Vice President, Services Marketing. From February 2012 to January 2013, Ms. Walker served as Senior Vice President, Segment, Services and Partner Marketing, and from February 2013 until May 2015 as Senior Vice President, Go To Market. In May 2015, Ms. Walker was promoted to her current position. Ms. Walker joined Cisco from Hewlett-Packard, where she held business and consumer leadership positions including Vice President of Alliances and Marketing for HP Services, and Vice President of Strategy and Marketing for both the Consumer Digital Entertainment and Personal Systems groups.

**Item 1A.**      **Risk Factors**

Set forth below and elsewhere in this report and in other documents we file with the SEC are descriptions of the risks and uncertainties that could cause our actual results to differ materially from the results contemplated by the forward-looking statements contained in this report.

**OUR OPERATING RESULTS MAY FLUCTUATE IN FUTURE PERIODS, WHICH MAY ADVERSELY AFFECT OUR STOCK PRICE**

Our operating results have been in the past, and will continue to be, subject to quarterly and annual fluctuations as a result of numerous factors, some of which may contribute to more pronounced fluctuations in an uncertain global economic environment. These factors include:

- Fluctuations in demand for our products and services, especially with respect to telecommunications service providers and Internet businesses, in part due to changes in the global economic environment

- Changes in sales and implementation cycles for our products and reduced visibility into our customers' spending plans and associated revenue

- Our ability to maintain appropriate inventory levels and purchase commitments

- Price and product competition in the communications and networking industries, which can change rapidly due to technological innovation and different business models from various geographic regions

- The overall movement toward industry consolidation among both our competitors and our customers

- The introduction and market acceptance of new technologies and products and our success in new and evolving markets, including in our newer product categories such as data center and collaboration and in emerging technologies, as well as the adoption of new standards

- New business models for our offerings, such as other-as-a-service (XaaS), where costs are borne up front while revenue is recognized over time

- Variations in sales channels, product costs, or mix of products sold

- The timing, size, and mix of orders from customers

- Manufacturing and customer lead times

- Fluctuations in our gross margins, and the factors that contribute to such fluctuations, as described below

- The ability of our customers, channel partners, contract manufacturers and suppliers to obtain financing or to fund capital expenditures, especially during a period of global credit market disruption or in the event of customer, channel partner, contract manufacturer or supplier financial problems

- Share-based compensation expense

- Actual events, circumstances, outcomes, and amounts differing from judgments, assumptions, and estimates used in determining the values of certain assets (including the amounts of related valuation allowances), liabilities, and other items reflected in our Consolidated Financial Statements

- How well we execute on our strategy and operating plans and the impact of changes in our business model that could result in significant restructuring charges

- Our ability to achieve targeted cost reductions

- Benefits anticipated from our investments in engineering, sales, service, and marketing

- Changes in tax laws or accounting rules, or interpretations thereof

As a consequence, operating results for a particular future period are difficult to predict, and, therefore, prior results are not necessarily indicative of results to be expected in future periods. Any of the foregoing factors, or any other factors discussed elsewhere herein, could have a material adverse effect on our business, results of operations, and financial condition that could adversely affect our stock price.

## OUR OPERATING RESULTS MAY BE ADVERSELY AFFECTED BY UNFAVORABLE ECONOMIC AND MARKET CONDITIONS AND THE UNCERTAIN GEOPOLITICAL ENVIRONMENT

Challenging economic conditions worldwide have from time to time contributed, and may continue to contribute, to slowdowns in the communications and networking industries at large, as well as in specific segments and markets in which we operate, resulting in:

- Reduced demand for our products as a result of continued constraints on IT-related capital spending by our customers, particularly service providers, and other customer markets as well

- Increased price competition for our products, not only from our competitors but also as a consequence of customers disposing of unutilized products

- Risk of excess and obsolete inventories

- Risk of supply constraints

- Risk of excess facilities and manufacturing capacity

- Higher overhead costs as a percentage of revenue and higher interest expense

The global macroeconomic environment has been challenging and inconsistent. Instability in the global credit markets, the impact of uncertainty regarding global central bank monetary policy, the instability in the geopolitical environment in many parts of the world, the current economic challenges in China, including global economic ramifications of Chinese economic difficulties, and other disruptions may continue to put pressure on global economic conditions. If global economic and market conditions, or economic conditions in key markets, remain uncertain or deteriorate further, we may experience material impacts on our business, operating results, and financial condition.

Our operating results in one or more segments may also be affected by uncertain or changing economic conditions particularly germane to that segment or to particular customer markets within that segment. For example, sales in several of our emerging countries decreased in recent periods, including in fiscal 2014 and fiscal 2015, and we expect that this weakness will continue for at least a few quarters.

In addition, reports of certain intelligence gathering methods of the U.S. government could affect customers' perception of the products of IT companies which design and manufacture products in the United States. Trust and confidence in us as an IT supplier is critical to the development and growth of our markets. Impairment of that trust, or foreign regulatory actions taken in response to reports of certain intelligence gathering methods of the U.S. government, could affect the demand for our products from customers outside of the United States and could have an adverse effect on our operating results.

## WE HAVE BEEN INVESTING AND EXPECT TO CONTINUE TO INVEST IN KEY GROWTH AREAS AS WELL AS MAINTAINING LEADERSHIP IN ROUTING, SWITCHING AND SERVICES, AND IF THE RETURN ON THESE INVESTMENTS IS LOWER OR DEVELOPS MORE SLOWLY THAN WE EXPECT, OUR OPERATING RESULTS MAY BE HARMED

We expect to realign and dedicate resources into key growth areas, such as data center virtualization, software, security, and cloud, while also focusing on maintaining leadership in routing, switching and services. However, the return on our investments may be lower, or may develop more slowly, than we expect. If we do not achieve the benefits anticipated from these investments (including if our selection of areas for investment does not play out as we expect), or if the achievement of these benefits is delayed, our operating results may be adversely affected.

## OUR REVENUE FOR A PARTICULAR PERIOD IS DIFFICULT TO PREDICT, AND A SHORTFALL IN REVENUE MAY HARM OUR OPERATING RESULTS

As a result of a variety of factors discussed in this report, our revenue for a particular quarter is difficult to predict, especially in light of a challenging and inconsistent global macroeconomic environment and related market uncertainty.

Our revenue may grow at a slower rate than in past periods or decline as it did in fiscal 2014 on a year-over-year basis. Our ability to meet financial expectations could also be adversely affected if the nonlinear sales pattern seen in some of our past

17

quarters recurs in future periods. We have experienced periods of time during which shipments have exceeded net bookings or manufacturing issues have delayed shipments, leading to nonlinearity in shipping patterns. In addition to making it difficult to predict revenue for a particular period, nonlinearity in shipping can increase costs, because irregular shipment patterns result in periods of underutilized capacity and periods in which overtime expenses may be incurred, as well as in potential additional inventory management-related costs. In addition, to the extent that manufacturing issues and any related component shortages result in delayed shipments in the future, and particularly in periods in which our contract manufacturers are operating at higher levels of capacity, it is possible that revenue for a quarter could be adversely affected if such matters occur and are not remediated within the same quarter.

The timing of large orders can also have a significant effect on our business and operating results from quarter to quarter, primarily in the United States and in emerging countries. From time to time, we receive large orders that have a significant effect on our operating results in the period in which the order is recognized as revenue. The timing of such orders is difficult to predict, and the timing of revenue recognition from such orders may affect period to period changes in revenue. As a result, our operating results could vary materially from quarter to quarter based on the receipt of such orders and their ultimate recognition as revenue.

Inventory management remains an area of focus. We have experienced longer than normal manufacturing lead times in the past which have caused some customers to place the same order multiple times within our various sales channels and to cancel the duplicative orders upon receipt of the product, or to place orders with other vendors with shorter manufacturing lead times. Such multiple ordering (along with other factors) or risk of order cancellation may cause difficulty in predicting our revenue and, as a result, could impair our ability to manage parts inventory effectively. In addition, our efforts to improve manufacturing lead-time performance may result in corresponding reductions in order backlog. A decline in backlog levels could result in more variability and less predictability in our quarter-to-quarter revenue and operating results. In addition, when facing component supply-related challenges, we have increased our efforts in procuring components in order to meet customer expectations which in turn contribute to an increase in purchase commitments. Increases in our purchase commitments to shorten lead times could also lead to excess and obsolete inventory charges if the demand for our products is less than our expectations.

We plan our operating expense levels based primarily on forecasted revenue levels. These expenses and the impact of long-term commitments are relatively fixed in the short term. A shortfall in revenue could lead to operating results being below expectations because we may not be able to quickly reduce these fixed expenses in response to short-term business changes.

Any of the above factors could have a material adverse impact on our operations and financial results.

## WE EXPECT GROSS MARGIN TO VARY OVER TIME, AND OUR LEVEL OF PRODUCT GROSS MARGIN MAY NOT BE SUSTAINABLE

Although our product gross margin increased in the second half of fiscal 2015, our level of product gross margins have declined in recent periods and could decline in future quarters due to adverse impacts from various factors, including:

- Changes in customer, geographic, or product mix, including mix of configurations within each product group

- Introduction of new products, including products with price-performance advantages, and new business models for our offerings such as XaaS

- Our ability to reduce production costs

- Entry into new markets or growth in lower margin markets, including markets with different pricing and cost structures, through acquisitions or internal development

- Sales discounts

- Increases in material, labor or other manufacturing-related costs, which could be significant especially during periods of supply constraints

- Excess inventory and inventory holding charges

- Obsolescence charges

- Changes in shipment volume

- The timing of revenue recognition and revenue deferrals

- Increased cost, loss of cost savings or dilution of savings due to changes in component pricing or charges incurred due to inventory holding periods if parts ordering does not correctly anticipate product demand or if the financial health of either contract manufacturers or suppliers deteriorates

- Lower than expected benefits from value engineering

- Increased price competition, including competitors from Asia, especially from China

- Changes in distribution channels

- Increased warranty costs

- Increased amortization of purchased intangible assets, especially from acquisitions

- How well we execute on our strategy and operating plans

Changes in service gross margin may result from various factors such as changes in the mix between technical support services and advanced services, as well as the timing of technical support service contract initiations and renewals and the addition of personnel and other resources to support higher levels of service business in future periods.

**SALES TO THE SERVICE PROVIDER MARKET ARE ESPECIALLY VOLATILE, AND WEAKNESS IN SALES ORDERS FROM THIS INDUSTRY MAY HARM OUR OPERATING RESULTS AND FINANCIAL CONDITION**

Sales to the service provider market have been characterized by large and sporadic purchases, especially relating to our router sales and sales of certain products in our newer product categories such as Data Center, Collaboration, and Service Provider Video, in addition to longer sales cycles. Although sales to the service provide segment increased in the fourth quarter of fiscal 2015, at various times in the past, including in fiscal 2014 and the first three quarters of fiscal 2015, we experienced significant weakness in sales to service providers. We could again experience declines in sales to the service provide market and, as has been the case in the past, such sales weakness could persist over extended periods of time given fluctuating market conditions. Sales activity in this industry depends upon the stage of completion of expanding network infrastructures; the availability of funding; and the extent to which service providers are affected by regulatory, economic, and business conditions in the country of operations. Weakness in orders from this industry, including as a result of any slowdown in capital expenditures by service providers (which may be more prevalent during a global economic downturn or periods of economic uncertainty), could have a material adverse effect on our business, operating results, and financial condition. Such slowdowns may continue or recur in future periods. Orders from this industry could decline for many reasons other than the competitiveness of our products and services within their respective markets. For example, in the past, many of our service provider customers have been materially and adversely affected by slowdowns in the general economy, by overcapacity, by changes in the service provider market, by regulatory developments, and by constraints on capital availability, resulting in business failures and substantial reductions in spending and expansion plans. These conditions have materially harmed our business and operating results in the past, and some of these or other conditions in the service provider market could affect our business and operating results in any future period. Finally, service provider customers typically have longer implementation cycles; require a broader range of services, including design services; demand that vendors take on a larger share of risks; often require acceptance provisions, which can lead to a delay in revenue recognition; and expect financing from vendors. All these factors can add further risk to business conducted with service providers.

**DISRUPTION OF OR CHANGES IN OUR DISTRIBUTION MODEL COULD HARM OUR SALES AND MARGINS**

If we fail to manage distribution of our products and services properly, or if our distributors' financial condition or operations weaken, our revenue and gross margins could be adversely affected.

A substantial portion of our products and services is sold through our channel partners, and the remainder is sold through direct sales. Our channel partners include systems integrators, service providers, other resellers, and distributors. Systems integrators and service providers typically sell directly to end users and often provide system installation, technical support, professional services, and other support services in addition to network equipment sales. Systems integrators also typically integrate our products into an overall solution, and a number of service providers are also systems integrators. Distributors stock inventory and typically sell to systems integrators, service providers, and other resellers. We refer to sales through distributors as our two-tier system of sales to the end customer. Revenue from distributors is generally recognized based on a sell-through method using information provided by them. These distributors are generally given business terms that allow them to return a portion of inventory, receive credits for changes in selling prices, and participate in various cooperative marketing programs. If sales through indirect channels increase, this may lead to greater difficulty in forecasting the mix of our products and, to a degree, the timing of orders from our customers.

19

Historically, we have seen fluctuations in our gross margins based on changes in the balance of our distribution channels. Although variability to date has not been significant, there can be no assurance that changes in the balance of our distribution model in future periods would not have an adverse effect on our gross margins and profitability.

Some factors could result in disruption of or changes in our distribution model, which could harm our sales and margins, including the following:

- We compete with some of our channel partners, including through our direct sales, which may lead these channel partners to use other suppliers that do not directly sell their own products or otherwise compete with them

- Some of our channel partners may demand that we absorb a greater share of the risks that their customers may ask them to bear

- Some of our channel partners may have insufficient financial resources and may not be able to withstand changes and challenges in business conditions

- Revenue from indirect sales could suffer if our distributors' financial condition or operations weaken

In addition, we depend on our channel partners globally to comply with applicable regulatory requirements. To the extent that they fail to do so, that could have a material adverse effect on our business, operating results, and financial condition. Further, sales of our products outside of agreed territories can result in disruption to our distribution channels.

## THE MARKETS IN WHICH WE COMPETE ARE INTENSELY COMPETITIVE, WHICH COULD ADVERSELY AFFECT OUR ACHIEVEMENT OF REVENUE GROWTH

The markets in which we compete are characterized by rapid change, converging technologies, and a migration to networking and communications solutions that offer relative advantages. These market factors represent a competitive threat to us. We compete with numerous vendors in each product category. The overall number of our competitors providing niche product solutions may increase. Also, the identity and composition of competitors may change as we increase our activity in newer product categories such as data center and collaboration and in key growth areas. For example, as products related to network programmability, such as software-defined-networking products, become more prevalent, we expect to face increased competition from companies that develop networking products based on commoditized hardware, referred to as "white box" hardware, to the extent customers decide to purchase those product offerings instead of ours. In addition, the growth in demand for technology delivered as a service enables new competitors to enter the market.

As we continue to expand globally, we may see new competition in different geographic regions. In particular, we have experienced price-focused competition from competitors in Asia, especially from China, and we anticipate this will continue. For information regarding our competitors, see the section entitled "Competition" contained in *Item 1. Busines* s of this report.

Some of our competitors compete across many of our product lines, while others are primarily focused in a specific product area. Barriers to entry are relatively low, and new ventures to create products that do or could compete with our products are regularly formed. In addition, some of our competitors may have greater resources, including technical and engineering resources, than we do. As we expand into new markets, we will face competition not only from our existing competitors but also from other competitors, including existing companies with strong technological, marketing, and sales positions in those markets. We also sometimes face competition from resellers and distributors of our products. Companies with which we have strategic alliances in some areas may be competitors in other areas, and in our view this trend may increase.

For example, the enterprise data center is undergoing a fundamental transformation arising from the convergence of technologies, including computing, networking, storage, and software, that previously were segregated. Due to several factors, including the availability of highly scalable and general purpose microprocessors, application-specific integrated circuits offering advanced services, standards based protocols, cloud computing and virtualization, the convergence of technologies within the enterprise data center is spanning multiple, previously independent, technology segments. Also, some of our current and potential competitors for enterprise data center business have made acquisitions, or announced new strategic alliances, designed to position them to provide end-to-end technology solutions for the enterprise data center. As a result of all of these developments, we face greater competition in the development and sale of enterprise data center technologies, including competition from entities that are among our long-term strategic alliance partners. Companies that are strategic alliance partners in some areas of our business may acquire or form alliances with our competitors, thereby reducing their business with us.

The principal competitive factors in the markets in which we presently compete and may compete in the future include:

- The ability to provide a broad range of networking and communications products and services

- Product performance

- Price

- The ability to introduce new products, including products with price-performance advantages

- The ability to reduce production costs

- The ability to provide value-added features such as security, reliability, and investment protection

- Conformance to standards

- Market presence

- The ability to provide financing

- Disruptive technology shifts and new business models

We also face competition from customers to which we license or supply technology and suppliers from which we transfer technology. The inherent nature of networking requires interoperability. As such, we must cooperate and at the same time compete with many companies. Any inability to effectively manage these complicated relationships with customers, suppliers, and strategic alliance partners could have a material adverse effect on our business, operating results, and financial condition and accordingly affect our chances of success.

**OUR INVENTORY MANAGEMENT RELATING TO OUR SALES TO OUR TWO-TIER DISTRIBUTION CHANNEL IS COMPLEX, AND EXCESS INVENTORY MAY HARM OUR GROSS MARGINS**

We must manage our inventory relating to sales to our distributors effectively, because inventory held by them could affect our results of operations. Our distributors may increase orders during periods of product shortages, cancel orders if their inventory is too high, or delay orders in anticipation of new products. They also may adjust their orders in response to the supply of our products and the products of our competitors that are available to them, and in response to seasonal fluctuations in end-user demand. Revenue to our distributors generally is recognized based on a sell-through method using information provided by them, and they are generally given business terms that allow them to return a portion of inventory, receive credits for changes in selling price, and participate in various cooperative marketing programs. Inventory management remains an area of focus as we balance the need to maintain strategic inventory levels to ensure competitive lead times against the risk of inventory obsolescence because of rapidly changing technology and customer requirements. When facing component supply-related challenges, we have increased our efforts in procuring components in order to meet customer expectations. If we ultimately determine that we have excess inventory, we may have to reduce our prices and write down inventory, which in turn could result in lower gross margins.

**SUPPLY CHAIN ISSUES, INCLUDING FINANCIAL PROBLEMS OF CONTRACT MANUFACTURERS OR COMPONENT SUPPLIERS, OR A SHORTAGE OF ADEQUATE COMPONENT SUPPLY OR MANUFACTURING CAPACITY THAT INCREASED OUR COSTS OR CAUSED A DELAY IN OUR ABILITY TO FULFILL ORDERS, COULD HAVE AN ADVERSE IMPACT ON OUR BUSINESS AND OPERATING RESULTS, AND OUR FAILURE TO ESTIMATE CUSTOMER DEMAND PROPERLY MAY RESULT IN EXCESS OR OBSOLETE COMPONENT SUPPLY, WHICH COULD ADVERSELY AFFECT OUR GROSS MARGINS**

The fact that we do not own or operate the bulk of our manufacturing facilities and that we are reliant on our extended supply chain could have an adverse impact on the supply of our products and on our business and operating results:

- Any financial problems of either contract manufacturers or component suppliers could either limit supply or increase costs

- Reservation of manufacturing capacity at our contract manufacturers by other companies, inside or outside of our industry, could either limit supply or increase costs

- Industry consolidation occurring within one or more component supplier markets, such as the semiconductor market, could either limit supply or increase costs

A reduction or interruption in supply; a significant increase in the price of one or more components; a failure to adequately authorize procurement of inventory by our contract manufacturers; a failure to appropriately cancel, reschedule, or adjust our

requirements based on our business needs; or a decrease in demand for our products could materially adversely affect our business, operating results, and financial condition and could materially damage customer relationships. Furthermore, as a result of binding price or purchase commitments with suppliers, we may be obligated to purchase components at prices that are higher than those available in the current market. In the event that we become committed to purchase components at prices in excess of the current market price when the components are actually used, our gross margins could decrease. We have experienced longer than normal lead times in the past. Although we have generally secured additional supply or taken other mitigation actions when significant disruptions have occurred, if similar situations occur in the future, they could have a material adverse effect on our business, results of operations, and financial condition. See the risk factor above entitled "Our revenue for a particular period is difficult to predict, and a shortfall in revenue may harm our operating results."

Our growth and ability to meet customer demands depend in part on our ability to obtain timely deliveries of parts from our suppliers and contract manufacturers. We have experienced component shortages in the past, including shortages caused by manufacturing process issues, that have affected our operations. We may in the future experience a shortage of certain component parts as a result of our own manufacturing issues, manufacturing issues at our suppliers or contract manufacturers, capacity problems experienced by our suppliers or contract manufacturers including capacity or cost problems resulting from industry consolidation, or strong demand in the industry for those parts. Growth in the economy is likely to create greater pressures on us and our suppliers to accurately project overall component demand and component demands within specific product categories and to establish optimal component levels and manufacturing capacity, especially for labor-intensive components, components for which we purchase a substantial portion of the supply, or the re-ramping of manufacturing capacity for highly complex products. During periods of shortages or delays the price of components may increase, or the components may not be available at all, and we may also encounter shortages if we do not accurately anticipate our needs. We may not be able to secure enough components at reasonable prices or of acceptable quality to build new products in a timely manner in the quantities or configurations needed. Accordingly, our revenue and gross margins could suffer until other sources can be developed. Our operating results would also be adversely affected if, anticipating greater demand than actually develops, we commit to the purchase of more components than we need, which is more likely to occur in a period of demand uncertainties such as we are currently experiencing. There can be no assurance that we will not encounter these problems in the future. Although in many cases we use standard parts and components for our products, certain components are presently available only from a single source or limited sources, and a global economic downturn and related market uncertainty could negatively impact the availability of components from one or more of these sources, especially during times such as we have recently seen when there are supplier constraints based on labor and other actions taken during economic downturns. We may not be able to diversify sources in a timely manner, which could harm our ability to deliver products to customers and seriously impact present and future sales.

We believe that we may be faced with the following challenges in the future:

- New markets in which we participate may grow quickly, which may make it difficult to quickly obtain significant component capacity

- As we acquire companies and new technologies, we may be dependent, at least initially, on unfamiliar supply chains or relatively small supply partners

- We face competition for certain components that are supply-constrained, from existing competitors, and companies in other markets

Manufacturing capacity and component supply constraints could continue to be significant issues for us. We purchase components from a variety of suppliers and use several contract manufacturers to provide manufacturing services for our products. During the normal course of business, in order to improve manufacturing lead-time performance and to help ensure adequate component supply, we enter into agreements with contract manufacturers and suppliers that either allow them to procure inventory based upon criteria as defined by us or that establish the parameters defining our requirements. In certain instances, these agreements allow us the option to cancel, reschedule, and adjust our requirements based on our business needs prior to firm orders being placed. When facing component supply-related challenges, we have increased our efforts in procuring components in order to meet customer expectations which in turn contributes to an increase in purchase commitments. Increases in our purchase commitments to shorten lead times could also lead to excess and obsolete inventory charges if the demand for our products is less than our expectations. If we fail to anticipate customer demand properly, an oversupply of parts could result in excess or obsolete components that could adversely affect our gross margins. For additional information regarding our purchase commitments with contract manufacturers and suppliers, see Note 12 to the Consolidated Financial Statements.

**WE DEPEND UPON THE DEVELOPMENT OF NEW PRODUCTS AND ENHANCEMENTS TO EXISTING PRODUCTS, AND IF WE FAIL TO PREDICT AND RESPOND TO EMERGING TECHNOLOGICAL TRENDS AND CUSTOMERS' CHANGING NEEDS, OUR OPERATING RESULTS AND MARKET SHARE MAY SUFFER**

The markets for our products are characterized by rapidly changing technology, evolving industry standards, new product introductions, and evolving methods of building and operating networks. Our operating results depend on our ability to develop and introduce new products into existing and emerging markets and to reduce the production costs of existing products. Many of our strategic initiatives and investments are aimed at meeting the requirements that a network capable of multiple-party, collaborative interaction would demand, and the investments we have made and our architectural approach are designed to enable the increased use of the network as the platform for all forms of communications and IT. For example, in fiscal 2009 we launched our Cisco Unified Computing System (UCS), our next-generation enterprise data center platform architected to unite computing, network, storage access and virtualization resources in a single system, which is designed to address the fundamental transformation occurring in the enterprise data center. While our Cisco UCS offering remains a significant focus area for us, several market transitions are also shaping our strategies and investments.

One such market transition we are focusing on is the move towards more programmable, flexible and virtual networks. In our view, this evolution is in its very early stages, and we believe the successful products and solutions in this market will combine ASICs, hardware and software elements together. Other examples include our focus on the IoE market transition, a potentially significant transition in the IT industry, and a transition in cloud where we are architecting the Cisco Intercloud solution.

The process of developing new technology, including technology related to more programmable, flexible and virtual networks and technology related to other market transitions, including IoE and cloud, is complex and uncertain, and if we fail to accurately predict customers' changing needs and emerging technological trends our business could be harmed. We must commit significant resources, including the investments we have been making in our priorities to developing new products before knowing whether our investments will result in products the market will accept. In particular, if our model of the evolution of networking does not emerge as we believe it will, or if the industry does not evolve as we believe it will, or if our strategy for addressing this evolution is not successful, many of our strategic initiatives and investments may be of no or limited value. For example, if we do not introduce products related to network programmability, such as software-defined-networking products, in a timely fashion, or if product offerings in this market that ultimately succeed are based on technology, or an approach to technology, that differs from ours, such as, for example, networking products based on "white box" hardware, our business could be harmed. Similarly, our business could be harmed if we fail to develop, or fail to develop in a timely fashion, offerings to address other transitions, or if the offerings addressing these other transitions that ultimately succeed are based on technology, or an approach to technology, different from ours.

Our strategy is to lead our customers in their digital transition with solutions including pervasive, industry-leading security that intelligently connect nearly everything that can be connected. Over the last few years, we have been transforming our business to move from selling individual products and services to selling products and services integrated into architectures and solutions. As a part of this transformation, we continue to make changes to how we are organized and how we build and deliver our technology. If our strategy for addressing our customer needs, or the architectures and solutions we develop do not meet those needs, or the changes we are making in how we are organized and how we build and deliver or technology is incorrect or ineffective, our business could be harmed.

Furthermore, we may not execute successfully on our vision or strategy because of challenges with regard to product planning and timing, technical hurdles that we fail to overcome in a timely fashion, or a lack of appropriate resources. This could result in competitors, some of which may also be our strategic alliance partners, providing those solutions before we do and loss of market share, revenue, and earnings. In addition, the growth in demand for technology delivered as a service enables new competitors to enter the market. The success of new products depends on several factors, including proper new product definition, component costs, timely completion and introduction of these products, differentiation of new products from those of our competitors, and market acceptance of these products. There can be no assurance that we will successfully identify new product opportunities, develop and bring new products to market in a timely manner, or achieve market acceptance of our products or that products and technologies developed by others will not render our products or technologies obsolete or noncompetitive. The products and technologies in our other product categories and key growth areas may not prove to have the market success we anticipate, and we may not successfully identify and invest in other emerging or new products.

**CHANGES IN INDUSTRY STRUCTURE AND MARKET CONDITIONS COULD LEAD TO CHARGES RELATED TO DISCONTINUANCES OF CERTAIN OF OUR PRODUCTS OR BUSINESSES, ASSET IMPAIRMENTS AND WORKFORCE REDUCTIONS OR RESTRUCTURINGS**

In response to changes in industry and market conditions, we may be required to strategically realign our resources and to consider restructuring, disposing of, or otherwise exiting businesses. Any resource realignment, or decision to limit investment in or dispose of or otherwise exit businesses, may result in the recording of special charges, such as inventory and technology-related write-

23

offs, workforce reduction or restructuring costs, charges relating to consolidation of excess facilities, or claims from third parties who were resellers or users of discontinued products. Our estimates with respect to the useful life or ultimate recoverability of our carrying basis of assets, including purchased intangible assets, could change as a result of such assessments and decisions. Although in certain instances our supply agreements allow us the option to cancel, reschedule, and adjust our requirements based on our business needs prior to firm orders being placed, our loss contingencies may include liabilities for contracts that we cannot cancel with contract manufacturers and suppliers. Further, our estimates relating to the liabilities for excess facilities are affected by changes in real estate market conditions. Additionally, we are required to perform goodwill impairment tests on an annual basis and between annual tests in certain circumstances, and future goodwill impairment tests may result in a charge to earnings.

In August 2014, as part of our strategy of continuing to invest in growth, innovation and talent, while also managing costs and driving efficiencies, we announced a restructuring plan. We began taking action under this plan in the first quarter of fiscal 2015 and expect this plan to be substantially completed during the first half of fiscal 2016. The implementation of this restructuring plan may be disruptive to our business, and following completion of the restructuring plan our business may not be more efficient or effective than prior to implementation of the plan. Our restructuring activities, including any related charges and the impact of the related headcount restructurings, could have a material adverse effect on our business, operating results, and financial condition.

## OVER THE LONG TERM WE INTEND TO INVEST IN ENGINEERING, SALES, SERVICE AND MARKETING ACTIVITIES, AND THESE INVESTMENTS MAY ACHIEVE DELAYED, OR LOWER THAN EXPECTED, BENEFITS WHICH COULD HARM OUR OPERATING RESULTS

While we intend to focus on managing our costs and expenses, over the long term, we also intend to invest in personnel and other resources related to our engineering, sales, service and marketing functions as we realign and dedicate resources on key growth areas, such as data center virtualization, software, security, and cloud, and we also intend to focus on maintaining leadership in routing, switching and services. We are likely to recognize the costs associated with these investments earlier than some of the anticipated benefits, and the return on these investments may be lower, or may develop more slowly, than we expect. If we do not achieve the benefits anticipated from these investments, or if the achievement of these benefits is delayed, our operating results may be adversely affected.

## OUR BUSINESS SUBSTANTIALLY DEPENDS UPON THE CONTINUED GROWTH OF THE INTERNET AND INTERNET-BASED SYSTEMS

A substantial portion of our business and revenue depends on growth and evolution of the Internet, including the continued development of the Internet and the anticipated transition to IoE, and on the deployment of our products by customers who depend on such continued growth and evolution. To the extent that an economic slowdown or uncertainty and related reduction in capital spending adversely affect spending on Internet infrastructure, including spending or investment related to IoE, we could experience material harm to our business, operating results, and financial condition.

Because of the rapid introduction of new products and changing customer requirements related to matters such as cost-effectiveness and security, we believe that there could be performance problems with Internet communications in the future, which could receive a high degree of publicity and visibility. Because we are a large supplier of networking products, our business, operating results, and financial condition may be materially adversely affected, regardless of whether or not these problems are due to the performance of our own products. Such an event could also result in a material adverse effect on the market price of our common stock independent of direct effects on our business.

## WE HAVE MADE AND EXPECT TO CONTINUE TO MAKE ACQUISITIONS THAT COULD DISRUPT OUR OPERATIONS AND HARM OUR OPERATING RESULTS

Our growth depends upon market growth, our ability to enhance our existing products, and our ability to introduce new products on a timely basis. We intend to continue to address the need to develop new products and enhance existing products through acquisitions of other companies, product lines, technologies, and personnel. Acquisitions involve numerous risks, including the following:

- Difficulties in integrating the operations, systems, technologies, products, and personnel of the acquired companies, particularly companies with large and widespread operations and/or complex products, such as Scientific-Atlanta, WebEx, Starent, Tandberg and NDS Group Limited

- Diversion of management's attention from normal daily operations of the business and the challenges of managing larger and more widespread operations resulting from acquisitions

- Potential difficulties in completing projects associated with in-process research and development intangibles

- Difficulties in entering markets in which we have no or limited direct prior experience and where competitors in such markets have stronger market positions

24

- Initial dependence on unfamiliar supply chains or relatively small supply partners

- Insufficient revenue to offset increased expenses associated with acquisitions

- The potential loss of key employees, customers, distributors, vendors and other business partners of the companies we acquire following and continuing after announcement of acquisition plans

Acquisitions may also cause us to:

- Issue common stock that would dilute our current shareholders' percentage ownership

- Use a substantial portion of our cash resources, or incur debt, as we did in fiscal 2006 when we issued and sold $6.5 billion in senior unsecured notes to fund our acquisition of Scientific-Atlanta

- Significantly increase our interest expense, leverage and debt service requirements if we incur additional debt to pay for an acquisition

- Assume liabilities

- Record goodwill and intangible assets that are subject to impairment testing on a regular basis and potential periodic impairment charges

- Incur amortization expenses related to certain intangible assets

- Incur tax expenses related to the effect of acquisitions on our intercompany research and development ("R&D") cost sharing arrangement and legal structure

- Incur large and immediate write-offs and restructuring and other related expenses

- Become subject to intellectual property or other litigation

Mergers and acquisitions of high-technology companies are inherently risky and subject to many factors outside of our control, and no assurance can be given that our previous or future acquisitions will be successful and will not materially adversely affect our business, operating results, or financial condition. Failure to manage and successfully integrate acquisitions could materially harm our business and operating results. Prior acquisitions have resulted in a wide range of outcomes, from successful introduction of new products and technologies to a failure to do so. Even when an acquired company has already developed and marketed products, there can be no assurance that product enhancements will be made in a timely fashion or that pre-acquisition due diligence will have identified all possible issues that might arise with respect to such products.

From time to time, we have made acquisitions that resulted in charges in an individual quarter. These charges may occur in any particular quarter, resulting in variability in our quarterly earnings. In addition, our effective tax rate for future periods is uncertain and could be impacted by mergers and acquisitions. Risks related to new product development also apply to acquisitions. See the risk factors above, including the risk factor entitled "We depend upon the development of new products and enhancements to existing products, and if we fail to predict and respond to emerging technological trends and customers' changing needs, our operating results and market share may suffer" for additional information.

### ENTRANCE INTO NEW OR DEVELOPING MARKETS EXPOSES US TO ADDITIONAL COMPETITION AND WILL LIKELY INCREASE DEMANDS ON OUR SERVICE AND SUPPORT OPERATIONS

As we focus on new market opportunities and key growth areas, we will increasingly compete with large telecommunications equipment suppliers as well as startup companies. Several of our competitors may have greater resources, including technical and engineering resources, than we do. Additionally, as customers in these markets complete infrastructure deployments, they may require greater levels of service, support, and financing than we have provided in the past, especially in emerging countries. Demand for these types of service, support, or financing contracts may increase in the future. There can be no assurance that we can provide products, service, support, and financing to effectively compete for these market opportunities.

Further, provision of greater levels of services, support and financing by us may result in a delay in the timing of revenue recognition. In addition, entry into other markets has subjected and will subject us to additional risks, particularly to those markets, including the effects of general market conditions and reduced consumer confidence. For example, as we add direct selling capabilities globally to meet changing customer demands, we will face increased legal and regulatory requirements.

## INDUSTRY CONSOLIDATION MAY LEAD TO INCREASED COMPETITION AND MAY HARM OUR OPERATING RESULTS

There has been a trend toward industry consolidation in our markets for several years. We expect this trend to continue as companies attempt to strengthen or hold their market positions in an evolving industry and as companies are acquired or are unable to continue operations. For example, some of our current and potential competitors for enterprise data center business have made acquisitions, or announced new strategic alliances, designed to position them with the ability to provide end-to-end technology solutions for the enterprise data center. Companies that are strategic alliance partners in some areas of our business may acquire or form alliances with our competitors, thereby reducing their business with us. We believe that industry consolidation may result in stronger competitors that are better able to compete as sole-source vendors for customers. This could lead to more variability in our operating results and could have a material adverse effect on our business, operating results, and financial condition. Furthermore, particularly in the service provider market, rapid consolidation will lead to fewer customers, with the effect that loss of a major customer could have a material impact on results not anticipated in a customer marketplace composed of more numerous participants.

## PRODUCT QUALITY PROBLEMS COULD LEAD TO REDUCED REVENUE, GROSS MARGINS, AND NET INCOME

We produce highly complex products that incorporate leading-edge technology, including both hardware and software. Software typically contains bugs that can unexpectedly interfere with expected operations. There can be no assurance that our pre-shipment testing programs will be adequate to detect all defects, either ones in individual products or ones that could affect numerous shipments, which might interfere with customer satisfaction, reduce sales opportunities, or affect gross margins. From time to time, we have had to replace certain components and provide remediation in response to the discovery of defects or bugs in products that we had shipped. There can be no assurance that such remediation, depending on the product involved, would not have a material impact. An inability to cure a product defect could result in the failure of a product line, temporary or permanent withdrawal from a product or market, damage to our reputation, inventory costs, or product reengineering expenses, any of which could have a material impact on our revenue, margins, and net income. For example, in the second quarter of fiscal 2014, we recorded a pre-tax charge of $655 million related to the expected remediation costs for certain products sold in prior fiscal years containing memory components manufactured by a single supplier between 2005 and 2010. The corresponding liability was reduced by $164 million related to an adjustment recorded in the third quarter of fiscal 2015.

## DUE TO THE GLOBAL NATURE OF OUR OPERATIONS, POLITICAL OR ECONOMIC CHANGES OR OTHER FACTORS IN A SPECIFIC COUNTRY OR REGION COULD HARM OUR OPERATING RESULTS AND FINANCIAL CONDITION

We conduct significant sales and customer support operations in countries around the world. As such, our growth depends in part on our increasing sales into emerging countries. We also depend on non-U.S. operations of our contract manufacturers, component suppliers and distribution partners. Although sales in several of our emerging countries decreased in recent periods, including in fiscal 2014 and fiscal 2015, several of our emerging countries generally have been relatively fast growing, and we have announced plans to expand our commitments and expectations in certain of those countries. We expect that the weakness we experienced in recent periods in several emerging countries will continue for at least a few quarters. Our future results could be materially adversely affected by a variety of political, economic or other factors relating to our operations inside and outside the United States, including impacts from global central bank monetary policy; issues related to the political relationship between the United States and other countries which can affect the willingness of customers in those countries to purchase products from companies headquartered in the United States; and the challenging and inconsistent global macroeconomic environment, any or all of which could have a material adverse effect on our operating results and financial condition, including, among others, the following:

- Foreign currency exchange rates

- Political or social unrest

- Economic instability or weakness or natural disasters in a specific country or region,   including the current economic challenges in China and global economic ramifications of Chinese economic difficulties; environmental and trade protection measures and other legal and regulatory requirements, some of which may affect our ability to import our products, to export our products from, or sell our products in various countries

- Political considerations that affect service provider and government spending patterns

- Health or similar issues, such as a pandemic or epidemic

- Difficulties in staffing and managing international operations

26

- Adverse tax consequences, including imposition of withholding or other taxes on our global operations

## WE ARE EXPOSED TO THE CREDIT RISK OF SOME OF OUR CUSTOMERS AND TO CREDIT EXPOSURES IN WEAKENED MARKETS, WHICH COULD RESULT IN MATERIAL LOSSES

Most of our sales are on an open credit basis, with typical payment terms of 30 days in the United States and, because of local customs or conditions, longer in some markets outside the United States. We monitor individual customer payment capability in granting such open credit arrangements, seek to limit such open credit to amounts we believe the customers can pay, and maintain reserves we believe are adequate to cover exposure for doubtful accounts. Beyond our open credit arrangements, we have also experienced demands for customer financing and facilitation of leasing arrangements. We expect demand for customer financing to continue, and recently we have been experiencing an increase in this demand as the credit markets have been impacted by the challenging and inconsistent global macroeconomic environment, including increased demand from customers in certain emerging countries.

We believe customer financing is a competitive factor in obtaining business, particularly in serving customers involved in significant infrastructure projects. Our loan financing arrangements may include not only financing the acquisition of our products and services but also providing additional funds for other costs associated with network installation and integration of our products and services.

Our exposure to the credit risks relating to our financing activities described above may increase if our customers are adversely affected by a global economic downturn or periods of economic uncertainty. Although we have programs in place that are designed to monitor and mitigate the associated risk, including monitoring of particular risks in certain geographic areas, there can be no assurance that such programs will be effective in reducing our credit risks.

In the past, there have been significant bankruptcies among customers both on open credit and with loan or lease financing arrangements, particularly among Internet businesses and service providers, causing us to incur economic or financial losses. There can be no assurance that additional losses will not be incurred. Although these losses have not been material to date, future losses, if incurred, could harm our business and have a material adverse effect on our operating results and financial condition. A portion of our sales is derived through our distributors. These distributors are generally given business terms that allow them to return a portion of inventory, receive credits for changes in selling prices, and participate in various cooperative marketing programs. We maintain estimated accruals and allowances for such business terms. However, distributors tend to have more limited financial resources than other resellers and end-user customers and therefore represent potential sources of increased credit risk, because they may be more likely to lack the reserve resources to meet payment obligations. Additionally, to the degree that turmoil in the credit markets makes it more difficult for some customers to obtain financing, those customers' ability to pay could be adversely impacted, which in turn could have a material adverse impact on our business, operating results, and financial condition.

## WE ARE EXPOSED TO FLUCTUATIONS IN THE MARKET VALUES OF OUR PORTFOLIO INVESTMENTS AND IN INTEREST RATES; IMPAIRMENT OF OUR INVESTMENTS COULD HARM OUR EARNINGS

We maintain an investment portfolio of various holdings, types, and maturities. These securities are generally classified as available-for-sale and, consequently, are recorded on our Consolidated Balance Sheets at fair value with unrealized gains or losses reported as a component of accumulated other comprehensive income, net of tax. Our portfolio includes fixed income securities and equity investments in publicly traded companies, the values of which are subject to market price volatility to the extent unhedged. If such investments suffer market price declines, as we experienced with some of our investments in the past, we may recognize in earnings the decline in the fair value of our investments below their cost basis when the decline is judged to be other than temporary. For information regarding the sensitivity of and risks associated with the market value of portfolio investments and interest rates, refer to the section titled "Quantitative and Qualitative Disclosures About Market Risk." Our investments in private companies are subject to risk of loss of investment capital. These investments are inherently risky because the markets for the technologies or products they have under development are typically in the early stages and may never materialize. We could lose our entire investment in these companies.

## WE ARE EXPOSED TO FLUCTUATIONS IN CURRENCY EXCHANGE RATES THAT COULD NEGATIVELY IMPACT OUR FINANCIAL RESULTS AND CASH FLOWS

Because a significant portion of our business is conducted outside the United States, we face exposure to adverse movements in foreign currency exchange rates. These exposures may change over time as business practices evolve, and they could have a material adverse impact on our financial results and cash flows. Historically, our primary exposures have related to nondollar-denominated sales in Japan, Canada, and Australia and certain nondollar-denominated operating expenses and service cost of sales in Europe, Latin America, and Asia, where we sell primarily in U.S. dollars. Additionally, we have exposures to emerging market currencies, which can have extreme currency volatility. An increase in the value of the dollar could increase the real cost to our customers of our products in those markets outside the United States where we sell in dollars, and a weakened dollar could increase the cost of local operating expenses and procurement of raw materials to the extent that we must purchase components in foreign currencies.

27

Currently, we enter into foreign exchange forward contracts and options to reduce the short-term impact of foreign currency fluctuations on certain foreign currency receivables, investments, and payables. In addition, we periodically hedge anticipated foreign currency cash flows. Our attempts to hedge against these risks may result in an adverse impact on our net income.

## OUR PROPRIETARY RIGHTS MAY PROVE DIFFICULT TO ENFORCE

We generally rely on patents, copyrights, trademarks, and trade secret laws to establish and maintain proprietary rights in our technology and products. Although we have been issued numerous patents and other patent applications are currently pending, there can be no assurance that any of these patents or other proprietary rights will not be challenged, invalidated, or circumvented or that our rights will, in fact, provide competitive advantages to us. Furthermore, many key aspects of networking technology are governed by industrywide standards, which are usable by all market entrants. In addition, there can be no assurance that patents will be issued from pending applications or that claims allowed on any patents will be sufficiently broad to protect our technology. In addition, the laws of some foreign countries may not protect our proprietary rights to the same extent as do the laws of the United States. The outcome of any actions taken in these foreign countries may be different than if such actions were determined under the laws of the United States. Although we are not dependent on any individual patents or group of patents for particular segments of the business for which we compete, if we are unable to protect our proprietary rights to the totality of the features (including aspects of products protected other than by patent rights) in a market, we may find ourselves at a competitive disadvantage to others who need not incur the substantial expense, time, and effort required to create innovative products that have enabled us to be successful.

## WE MAY BE FOUND TO INFRINGE ON INTELLECTUAL PROPERTY RIGHTS OF OTHERS

Third parties, including customers, have in the past and may in the future assert claims or initiate litigation related to exclusive patent, copyright, trademark, and other intellectual property rights to technologies and related standards that are relevant to us. These assertions have increased over time as a result of our growth and the general increase in the pace of patent claims assertions, particularly in the United States. Because of the existence of a large number of patents in the networking field, the secrecy of some pending patents, and the rapid rate of issuance of new patents, it is not economically practical or even possible to determine in advance whether a product or any of its components infringes or will infringe on the patent rights of others. The asserted claims and/or initiated litigation can include claims against us or our manufacturers, suppliers, or customers, alleging infringement of their proprietary rights with respect to our existing or future products or components of those products. Regardless of the merit of these claims, they can be time-consuming, result in costly litigation and diversion of technical and management personnel, or require us to develop a non-infringing technology or enter into license agreements. Where claims are made by customers, resistance even to unmeritorious claims could damage customer relationships. There can be no assurance that licenses will be available on acceptable terms and conditions, if at all, or that our indemnification by our suppliers will be adequate to cover our costs if a claim were brought directly against us or our customers. Furthermore, because of the potential for high court awards that are not necessarily predictable, it is not unusual to find even arguably unmeritorious claims settled for significant amounts. If any infringement or other intellectual property claim made against us by any third party is successful, if we are required to indemnify a customer with respect to a claim against the customer, or if we fail to develop non-infringing technology or license the proprietary rights on commercially reasonable terms and conditions, our business, operating results, and financial condition could be materially and adversely affected. For additional information regarding our indemnification obligations, see Note 12(g) to the Consolidated Financial Statements contained in this report.

Our exposure to risks associated with the use of intellectual property may be increased as a result of acquisitions, as we have a lower level of visibility into the development process with respect to such technology or the care taken to safeguard against infringement risks. Further, in the past, third parties have made infringement and similar claims after we have acquired technology that had not been asserted prior to our acquisition.

## WE RELY ON THE AVAILABILITY OF THIRD-PARTY LICENSES

Many of our products are designed to include software or other intellectual property licensed from third parties. It may be necessary in the future to seek or renew licenses relating to various aspects of these products. There can be no assurance that the necessary licenses would be available on acceptable terms, if at all. The inability to obtain certain licenses or other rights or to obtain such licenses or rights on favorable terms, or the need to engage in litigation regarding these matters, could have a material adverse effect on our business, operating results, and financial condition. Moreover, the inclusion in our products of software or other intellectual property licensed from third parties on a nonexclusive basis could limit our ability to protect our proprietary rights in our products.

## OUR OPERATING RESULTS MAY BE ADVERSELY AFFECTED AND DAMAGE TO OUR REPUTATION MAY OCCUR DUE TO PRODUCTION AND SALE OF COUNTERFEIT VERSIONS OF OUR PRODUCTS

As is the case with leading products around the world, our products are subject to efforts by third parties to produce counterfeit versions of our products. While we work diligently with law enforcement authorities in various countries to block the manufacture of counterfeit goods and to interdict their sale, and to detect counterfeit products in customer networks, and have succeeded in prosecuting counterfeiters and their distributors, resulting in fines, imprisonment and restitution to us, there can be no guarantee that such efforts will succeed. While counterfeiters often aim their sales at customers who might not have otherwise purchased our products due to lack of verifiability of origin and service, such counterfeit sales, to the extent they replace otherwise legitimate sales, could adversely affect our operating results.

## OUR OPERATING RESULTS AND FUTURE PROSPECTS COULD BE MATERIALLY HARMED BY UNCERTAINTIES OF REGULATION OF THE INTERNET

Currently, few laws or regulations apply directly to access or commerce on the Internet. We could be materially adversely affected by regulation of the Internet and Internet commerce in any country where we operate. Such regulations could include matters such as voice over the Internet or using IP, encryption technology, sales or other taxes on Internet product or service sales, and access charges for Internet service providers. The adoption of regulation of the Internet and Internet commerce could decrease demand for our products and, at the same time, increase the cost of selling our products, which could have a material adverse effect on our business, operating results, and financial condition.

## CHANGES IN TELECOMMUNICATIONS REGULATION AND TARIFFS COULD HARM OUR PROSPECTS AND FUTURE SALES

Changes in telecommunications requirements, or regulatory requirements in other industries in which we operate, in the United States or other countries could affect the sales of our products. In particular, we believe that there may be future changes in U.S. telecommunications regulations that could slow the expansion of the service providers' network infrastructures and materially adversely affect our business, operating results, and financial condition, including proposed "net neutrality" rules to the extent they impact decisions on investment in network infrastructure.

Future changes in tariffs by regulatory agencies or application of tariff requirements to currently untariffed services could affect the sales of our products for certain classes of customers. Additionally, in the United States, our products must comply with various requirements and regulations of the Federal Communications Commission and other regulatory authorities. In countries outside of the United States, our products must meet various requirements of local telecommunications and other industry authorities. Changes in tariffs or failure by us to obtain timely approval of products could have a material adverse effect on our business, operating results, and financial condition.

## FAILURE TO RETAIN AND RECRUIT KEY PERSONNEL WOULD HARM OUR ABILITY TO MEET KEY OBJECTIVES

Our success has always depended in large part on our ability to attract and retain highly skilled technical, managerial, sales, and marketing personnel. Competition for these personnel is intense, especially in the Silicon Valley area of Northern California. Stock incentive plans are designed to reward employees for their long-term contributions and provide incentives for them to remain with us. Volatility or lack of positive performance in our stock price or equity incentive awards, or changes to our overall compensation program, including our stock incentive program, resulting from the management of share dilution and share-based compensation expense or otherwise, may also adversely affect our ability to retain key employees. As a result of one or more of these factors, we may increase our hiring in geographic areas outside the United States, which could subject us to additional geopolitical and exchange rate risk. The loss of services of any of our key personnel; the inability to retain and attract qualified personnel in the future; or delays in hiring required personnel, particularly engineering and sales personnel, could make it difficult to meet key objectives, such as timely and effective product introductions. In addition, companies in our industry whose employees accept positions with competitors frequently claim that competitors have engaged in improper hiring practices. We have received these claims in the past and may receive additional claims to this effect in the future.

## ADVERSE RESOLUTION OF LITIGATION OR GOVERNMENTAL INVESTIGATIONS MAY HARM OUR OPERATING RESULTS OR FINANCIAL CONDITION

We are a party to lawsuits in the normal course of our business. Litigation can be expensive, lengthy, and disruptive to normal business operations. Moreover, the results of complex legal proceedings are difficult to predict. For example, Brazilian authorities have investigated our Brazilian subsidiary and certain of its current and former employees, as well as a Brazilian importer of our products, and its affiliates and employees, relating to alleged evasion of import taxes and alleged improper transactions involving the subsidiary and the importer. Brazilian tax authorities have assessed claims against our Brazilian subsidiary based on a theory of joint liability with the Brazilian importer for import taxes, interest, and penalties. In the first quarter of fiscal 2013, the Brazilian federal tax authorities asserted an additional claim against our Brazilian subsidiary based on a theory of joint liability with respect

to an alleged underpayment of income taxes, social taxes, interest, and penalties by a Brazilian distributor. The asserted claims by Brazilian federal tax authorities are for calendar years 2003 through 2008 and the related asserted claims by the tax authorities from the state of Sao Paulo are for calendar years 2005 through 2007. The total asserted claims by Brazilian state and federal tax authorities aggregate to approximately $262 million for the alleged evasion of import and other taxes, approximately $1.1 billion for interest, and approximately $1.2 billion for various penalties, all determined using an exchange rate as of July 25, 2015 . We have completed a thorough review of the matters and believe the asserted claims against our Brazilian subsidiary are without merit, and we are defending the claims vigorously. While we believe there is no legal basis for the alleged liability, due to the complexities and uncertainty surrounding the judicial process in Brazil and the nature of the claims asserting joint liability with the importer, we are unable to determine the likelihood of an unfavorable outcome against our Brazilian subsidiary and are unable to reasonably estimate a range of loss, if any. We do not expect a final judicial determination for several years. An unfavorable resolution of lawsuits or governmental investigations could have a material adverse effect on our business, operating results, or financial condition. For additional information regarding certain of the matters in which we are involved, see Item 3, "Legal Proceedings," contained in Part I of this report.

**CHANGES IN OUR PROVISION FOR INCOME TAXES OR ADVERSE OUTCOMES RESULTING FROM EXAMINATION OF OUR INCOME TAX RETURNS COULD ADVERSELY AFFECT OUR RESULTS**

Our provision for income taxes is subject to volatility and could be adversely affected by earnings being lower than anticipated in countries that have lower tax rates and higher than anticipated in countries that have higher tax rates; by changes in the valuation of our deferred tax assets and liabilities; by expiration of or lapses in the R&D tax credit or domestic manufacturing deduction laws; by expiration of or lapses in tax incentives; by transfer pricing adjustments, including the effect of acquisitions on our intercompany R&D cost sharing arrangement and legal structure; by tax effects of nondeductible compensation; by tax costs related to intercompany realignments; by changes in accounting principles; or by changes in tax laws and regulations, treaties, or interpretations thereof, including possible changes to the taxation of earnings of our foreign subsidiaries, the deductibility of expenses attributable to foreign income, or the foreign tax credit rules. Significant judgment is required to determine the recognition and measurement attribute prescribed in the accounting guidance for uncertainty in income taxes. The Organisation for Economic Co-operation and Development (OECD), an international association of 34 countries including the United States, is contemplating changes to numerous long-standing tax principles. These contemplated changes, if finalized and adopted by countries, will increase tax uncertainty and may adversely affect our provision for income taxes. Further, as a result of certain of our ongoing employment and capital investment actions and commitments, our income in certain countries is subject to reduced tax rates and in some cases is wholly exempt from tax. Our failure to meet these commitments could adversely impact our provision for income taxes. In addition, we are subject to the continuous examination of our income tax returns by the Internal Revenue Service and other tax authorities. We regularly assess the likelihood of adverse outcomes resulting from these examinations to determine the adequacy of our provision for income taxes. There can be no assurance that the outcomes from these continuous examinations will not have an adverse effect on our operating results and financial condition.

**OUR BUSINESS AND OPERATIONS ARE ESPECIALLY SUBJECT TO THE RISKS OF EARTHQUAKES, FLOODS, AND OTHER NATURAL CATASTROPHIC EVENTS**

Our corporate headquarters, including certain of our research and development operations are located in the Silicon Valley area of Northern California, a region known for seismic activity. Additionally, a certain number of our facilities are located near rivers that have experienced flooding in the past. Also certain of our suppliers and logistics centers are located in regions that have or may be affected by earthquake, tsunami and flooding activity which in the past has disrupted, and in the future could disrupt, the flow of components and delivery of products. A significant natural disaster, such as an earthquake, a hurricane, volcano, or a flood, could have a material adverse impact on our business, operating results, and financial condition.

**MAN-MADE PROBLEMS SUCH AS COMPUTER VIRUSES OR TERRORISM MAY DISRUPT OUR OPERATIONS AND HARM OUR OPERATING RESULTS**

Despite our implementation of network security measures our servers are vulnerable to computer viruses, break-ins, and similar disruptions from unauthorized tampering with our computer systems. Any such event could have a material adverse effect on our business, operating results, and financial condition. Efforts to limit the ability of malicious third parties to disrupt the operations of the Internet or undermine our own security efforts may meet with resistance. In addition, the continued threat of terrorism and heightened security and military action in response to this threat, or any future acts of terrorism, may cause further disruptions to the economies of the United States and other countries and create further uncertainties or otherwise materially harm our business, operating results, and financial condition. Likewise, events such as widespread blackouts could have similar negative impacts. To the extent that such disruptions or uncertainties result in delays or cancellations of customer orders or the manufacture or shipment of our products, our business, operating results, and financial condition could be materially and adversely affected.

**IF WE DO NOT SUCCESSFULLY MANAGE OUR STRATEGIC ALLIANCES, WE MAY NOT REALIZE THE EXPECTED BENEFITS FROM SUCH ALLIANCES AND WE MAY EXPERIENCE INCREASED COMPETITION OR DELAYS IN PRODUCT DEVELOPMENT**

We have several strategic alliances with large and complex organizations and other companies with which we work to offer complementary products and services and have established a joint venture to market services associated with our Cisco Unified Computing System products. These arrangements are generally limited to specific projects, the goal of which is generally to facilitate product compatibility and adoption of industry standards. There can be no assurance we will realize the expected benefits from these strategic alliances or from the joint venture. If successful, these relationships may be mutually beneficial and result in industry growth. However, alliances carry an element of risk because, in most cases, we must compete in some business areas with a company with which we have a strategic alliance and, at the same time, cooperate with that company in other business areas. Also, if these companies fail to perform or if these relationships fail to materialize as expected, we could suffer delays in product development or other operational difficulties. Joint ventures can be difficult to manage, given the potentially different interests of joint venture partners.

**OUR STOCK PRICE MAY BE VOLATILE**

Historically, our common stock has experienced substantial price volatility, particularly as a result of variations between our actual financial results and the published expectations of analysts and as a result of announcements by our competitors and us. Furthermore, speculation in the press or investment community about our strategic position, financial condition, results of operations, business, security of our products, or significant transactions can cause changes in our stock price. In addition, the stock market has experienced extreme price and volume fluctuations that have affected the market price of many technology companies, in particular, and that have often been unrelated to the operating performance of these companies. These factors, as well as general economic and political conditions and the announcement of proposed and completed acquisitions or other significant transactions, or any difficulties associated with such transactions, by us or our current or potential competitors, may materially adversely affect the market price of our common stock in the future. Additionally, volatility, lack of positive performance in our stock price or changes to our overall compensation program, including our stock incentive program, may adversely affect our ability to retain key employees, virtually all of whom are compensated, in part, based on the performance of our stock price.

**THERE CAN BE NO ASSURANCE THAT OUR OPERATING RESULTS AND FINANCIAL CONDITION WILL NOT BE ADVERSELY AFFECTED BY OUR INCURRENCE OF DEBT**

We had senior unsecured notes outstanding in an aggregate principal amount of $25.3 billion as of July 25, 2015 that mature at specific dates from calendar year 2015 through 2040. We have also established a commercial paper program under which we may issue short-term, unsecured commercial paper notes on a private placement basis up to a maximum aggregate amount outstanding at any time of $3.0 billion , and we had no commercial paper notes outstanding under this program as of July 25, 2015 . The outstanding senior unsecured notes bear fixed-rate interest payable semiannually, except $3.25 billion of the notes which bears interest at a floating rate payable quarterly. The fair value of the long-term debt is subject to market interest rate volatility. The instruments governing the senior unsecured notes contain certain covenants applicable to us and our wholly-owned subsidiaries that may adversely affect our ability to incur certain liens or engage in certain types of sale and leaseback transactions. In addition, we will be required to have available in the United States sufficient cash to service the interest on our debt and repay all of our notes on maturity. There can be no assurance that our incurrence of this debt or any future debt will be a better means of providing liquidity to us than would our use of our existing cash resources, including cash currently held offshore. Further, we cannot be assured that our maintenance of this indebtedness or incurrence of future indebtedness will not adversely affect our operating results or financial condition. In addition, changes by any rating agency to our credit rating can negatively impact the value and liquidity of both our debt and equity securities, as well as the terms upon which we may borrow under our commercial paper program or future debt issuances.

**Item 1B.**    **Unresolved Staff Comments**

Not applicable.

**Item 2.        Properties**

Our corporate headquarters are located at an owned site in San Jose, California, in the United States of America. The locations of our headquarters by geographic segment are as follows:

| Americas | EMEA | APJC |
|----------|------|------|
| San Jose, California, USA | Amsterdam, Netherlands | Singapore |

In addition to our headquarters site, we own additional sites in the United States, which include facilities in the surrounding areas of San Jose, California; Research Triangle Park, North Carolina; Richardson, Texas; Lawrenceville, Georgia; and Boston, Massachusetts. We also own land for expansion in some of these locations. In addition, we lease office space in many U.S. locations.

Outside the United States our operations are conducted primarily in leased sites, such as our Globalisation Centre East campus in Bangalore, India. Other significant sites (in addition to the two non-U.S. headquarters locations) are located in Belgium, Canada, China, France, Germany, India, Israel, Japan, Poland and the United Kingdom .

We believe that our existing facilities, including both owned and leased, are in good condition and suitable for the conduct of our business. For additional information regarding obligations under operating leases, see Note 12 to the Consolidated Financial Statements.

**Item 3.        Legal Proceedings**

*Brazil* Brazilian authorities have investigated our Brazilian subsidiary and certain of its current and former employees, as well as a Brazilian importer of our products, and its affiliates and employees, relating to alleged evasion of import taxes and alleged improper transactions involving the subsidiary and the importer. Brazilian tax authorities have assessed claims against our Brazilian subsidiary based on a theory of joint liability with the Brazilian importer for import taxes, interest, and penalties. In addition to claims asserted by the Brazilian federal tax authorities in prior fiscal years, tax authorities from the Brazilian state of Sao Paulo have asserted similar claims on the same legal basis in prior fiscal years. In the first quarter of fiscal 2013, the Brazilian federal tax authorities asserted an additional claim against our Brazilian subsidiary based on a theory of joint liability with respect to an alleged underpayment of income taxes, social taxes, interest, and penalties by a Brazilian distributor.

The asserted claims by Brazilian federal tax authorities are for calendar years 2003 through 2008, and the asserted claims by the tax authorities from the state of Sao Paulo are for calendar years 2005 through 2007. The total asserted claims by Brazilian state and federal tax authorities aggregate to approximately $262 million for the alleged evasion of import and other taxes, approximately $1.1 billion for interest, and approximately $1.2 billion for various penalties, all determined using an exchange rate as of July 25, 2015 . We have completed a thorough review of the matters and believe the asserted claims against our Brazilian subsidiary are without merit, and we are defending the claims vigorously. While we believe there is no legal basis for the alleged liability, due to the complexities and uncertainty surrounding the judicial process in Brazil and the nature of the claims asserting joint liability with the importer, we are unable to determine the likelihood of an unfavorable outcome against our Brazilian subsidiary and are unable to reasonably estimate a range of loss, if any. We do not expect a final judicial determination for several years.

*Russia and the Commonwealth of Independent States* At the request of the U.S. Securities and Exchange Commission (SEC)and the U.S. Department of Justice, we are conducting an investigation into allegations which we and those agencies received regarding possible violations of the U.S. Foreign Corrupt Practices Act involving business activities of Cisco's operations in Russia and certain of the Commonwealth of Independent States, and by certain resellers of our products in those countries. We take any such allegations very seriously and are fully cooperating with and sharing the results of our investigation with the SEC and the Department of Justice. While the outcome of our investigation is currently not determinable, we do not expect that it will have a material adverse effect on our consolidated financial position, results of operations, or cash flows. The countries that are the subject of the investigation collectively comprise less than 2% of our revenues.

In addition, we are subject to legal proceedings, claims, and litigation arising in the ordinary course of business, including intellectual property litigation. While the outcome of these matters is currently not determinable, we do not expect that the ultimate costs to resolve these matters will have a material adverse effect on our consolidated financial position, results of operations, or cash flows. For additional information regarding intellectual property litigation, see "Part I, Item 1A. Risk Factors-We may be found to infringe on intellectual property rights of others" herein.

**Item 4.        Mine Safety Disclosures**

Not applicable.

## PART II

**Item 5.    Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities**

(a)    Cisco common stock is traded on the NASDAQ Global Select Market under the symbol CSCO. Information regarding quarterly cash dividends declared on Cisco's common stock during fiscal 2015 and 2014 may be found in Supplementary Financial Data on page 121 of this report. There were 45,778 registered shareholders as of September 3, 2015 . The high and low common stock sales prices per share for each period were as follows:

| Fiscal Quarter | FISCAL 2015 | | | | FISCAL 2014 | | | |
|---|---|---|---|---|---|---|---|---|
| | High | | Low | | High | | Low | |
| First quarter | $ | 26.01 | $ | 22.49 | $ | 26.49 | $ | 22.10 |
| Second quarter | $ | 28.70 | $ | 23.60 | $ | 24.00 | $ | 20.22 |
| Third quarter | $ | 30.31 | $ | 25.92 | $ | 23.64 | $ | 21.27 |
| Fourth quarter | $ | 29.90 | $ | 26.84 | $ | 26.08 | $ | 22.43 |

(b)    Not applicable.

(c)    Issuer purchases of equity securities (in millions, except per-share amounts):

| Period | Total Number of Shares Purchased | | Average Price Paid per Share | | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | | Approximate Dollar Value of Shares That May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|---|---|---|
| April 26, 2015 to May 23, 2015 | 13 | $ | 29.24 | | 13 | $ | 4,953 |
| May 24, 2015 to June 20, 2015 | 9 | $ | 28.91 | | 9 | $ | 4,676 |
| June 21, 2015 to July 25, 2015 | 13 | $ | 27.78 | | 13 | $ | 4,321 |
| Total | 35 | $ | 28.62 | | 35 | | |

On September 13, 2001, we announced that our Board of Directors had authorized a stock repurchase program. As of July 25, 2015 , our Board of Directors had authorized the repurchase of up to $97 billion of common stock under this program. During fiscal 2015 , we repurchased and retired 155 million shares of our common stock at an average price of $27.22 per share for an aggregate purchase price of $4.2 billion . As of July 25, 2015 , we had repurchased and retired 4.4 billion shares of our common stock at an average price of $20.86 per share for an aggregate purchase price of $92.7 billion since inception of the stock repurchase program, and the remaining authorized amount for stock repurchases under this program was $4.3 billion with no termination date.

For the majority of restricted stock units granted, the number of shares issued on the date the restricted stock units vest is net of shares withheld to meet applicable tax withholding requirements. Although these withheld shares are not issued or considered common stock repurchases under our stock repurchase program and therefore are not included in the preceding table, they are treated as common stock repurchases in our financial statements as they reduce the number of shares that would have been issued upon vesting (see Note 13 to the Consolidated Financial Statements).

**Stock Performance Graph**

*The information contained in this Stock Performance Graph section shall not be deemed to be "soliciting material" or "filed" or incorporated by reference in future filings with the SEC, or subject to the liabilities of Section 18 of the Securities Exchange Act of 1934, except to the extent that Cisco specifically incorporates it by reference into a document filed under the Securities Act of 1933 or the Securities Exchange Act of 1934.*

The following graph shows a five-year comparison of the cumulative total shareholder return on Cisco common stock with the cumulative total returns of the S&P 500 Index, and the S&P Information Technology Index. The graph tracks the performance of a $100 investment in the Company's common stock and in each of the indexes (with the reinvestment of all dividends) on the date specified. Shareholder returns over the indicated period are based on historical data and should not be considered indicative of future shareholder returns.

**Comparison of 5-Year Cumulative Total Return Among Cisco Systems, Inc.,
the S&P 500 Index, and the S&P Information Technology Index**



|  | July 2010 | July 2011 | July 2012 | July 2013 | July 2014 | July 2015 |
|---|---|---|---|---|---|---|
| Cisco Systems, Inc. | $ 100.00 | $ 69.73 | $ 69.58 | $ 116.48 | $ 122.35 | $ 137.82 |
| S&P 500 | $ 100.00 | $ 119.65 | $ 131.20 | $ 163.75 | $ 195.53 | $ 209.77 |
| S&P Information Technology | $ 100.00 | $ 119.20 | $ 134.33 | $ 149.30 | $ 195.90 | $ 215.76 |

**Item 6.**        **Selected Financial Data**

Five Years Ended July 25, 2015 (in millions, except per-share amounts)

| Years Ended | | July 25, 2015 [3] | | July 26, 2014 [1] [3] | | July 27, 2013 [2] [3] | | July 28, 2012 [3] | | July 30, 2011 [3] |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $ | **49,161** | $ | 47,142 | $ | 48,607 | $ | 46,061 | $ | 43,218 |
| Net income | $ | **8,981** | $ | 7,853 | $ | 9,983 | $ | 8,041 | $ | 6,490 |
| Net income per share—basic | $ | **1.76** | $ | 1.50 | $ | 1.87 | $ | 1.50 | $ | 1.17 |
| Net income per share—diluted | $ | **1.75** | $ | 1.49 | $ | 1.86 | $ | 1.49 | $ | 1.17 |
| Shares used in per-share calculation—basic | | **5,104** | | 5,234 | | 5,329 | | 5,370 | | 5,529 |
| Shares used in per-share calculation—diluted | | **5,146** | | 5,281 | | 5,380 | | 5,404 | | 5,563 |
| Cash dividends declared per common share | $ | **0.80** | $ | 0.72 | $ | 0.62 | $ | 0.28 | $ | 0.12 |
| Net cash provided by operating activities | $ | **12,552** | $ | 12,332 | $ | 12,894 | $ | 11,491 | $ | 10,079 |
| | | July 25, 2015 | | July 26, 2014 | | July 27, 2013 | | July 28, 2012 | | July 30, 2011 |
| Cash and cash equivalents and investments | $ | **60,416** | $ | 52,074 | $ | 50,610 | $ | 48,716 | $ | 44,585 |
| Total assets | $ | **113,481** | $ | 105,070 | $ | 101,138 | $ | 91,697 | $ | 87,026 |
| Debt | $ | **25,354** | $ | 20,845 | $ | 16,158 | $ | 16,266 | $ | 16,753 |
| Deferred revenue | $ | **15,183** | $ | 14,142 | $ | 13,423 | $ | 12,880 | $ | 12,207 |

[1]    In the second quarter of fiscal 2014, Cisco recorded a pre-tax charge of $655 million to product cost of sales, which corresponds to $526 million, net of tax, for the expected remediation cost for certain products sold in prior fiscal years containing memory components manufactured by a single supplier between 2005 and 2010. See Note 12(f) to the Consolidated Financial Statements.

[2]    In the second quarter of fiscal 2013, the Internal Revenue Service (IRS) and Cisco settled all outstanding items related to its federal income tax returns for fiscal 2002 through fiscal 2007. As a result of the settlement, Cisco recorded a net tax benefit of $794 million. Also during the second quarter of fiscal 2013, the American Taxpayer Relief Act of 2012 reinstated the U.S. federal R&D tax credit, retroactive to January 1, 2012. As a result of the credit, Cisco recognized tax benefits of $184 million in fiscal 2013, of which $72 million related to fiscal 2012 R&D expenses.

[3]    Net income for the year ended July 30, 2011 included restructuring and other charges of $694 million, net of tax. Cisco also incurred restructuring charges in fiscal 2012 through fiscal 2015. See Note 5 to the Consolidated Financial Statements.

No other factors materially affected the comparability of the information presented above.

In the fourth quarter of fiscal 2015, Cisco adopted Accounting Standards Update 2015-03 regarding simplifying the presentation of debt issuance costs. Cisco applied this update retrospectively to all periods presented in accordance with the provisions of the update.

**Item 7.    Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Forward-Looking Statements**

This Annual Report on Form 10-K, including this Management's Discussion and Analysis of Financial Condition and Results of Operations, contains forward-looking statements regarding future events and our future results that are subject to the safe harbors created under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). All statements other than statements of historical facts are statements that could be deemed forward-looking statements. These statements are based on current expectations, estimates, forecasts, and projections about the industries in which we operate and the beliefs and assumptions of our management. Words such as "expects," "anticipates," "targets," "goals," "projects," "intends," "plans," "believes," "seeks," "estimates," "continues," "endeavors," "strives," "may," variations of such words, and similar expressions are intended to identify such forward-looking statements. In addition, any statements that refer to projections of our future financial performance, our anticipated growth and trends in our businesses, and other characterizations of future events or circumstances are forward-looking statements. Readers are cautioned that these forward-looking statements are only predictions and are subject to risks, uncertainties, and assumptions that are difficult to predict, including those under "Part I, Item 1A. Risk Factors," and elsewhere herein. Therefore, actual results may differ materially and adversely from those expressed in any forward-looking statements. We undertake no obligation to revise or update any forward-looking statements for any reason.

## OVERVIEW

Cisco designs and sells broad lines of products, provides services and delivers integrated solutions to develop and connect networks around the world, building the Internet.  Over the last 30 plus years, we have been the world's leader in connecting people, things and technologies - to each other and to the Internet - realizing our vision of changing the way the world works, lives, plays and learns.

Today, we have over 70,000 employees in over 400 offices worldwide who design, produce, sell, and deliver integrated products, services, and solutions. Over time, we have expanded to new markets that are a natural extension of our core networking business, as the network has become the platform for automating, orchestrating, integrating, and delivering an ever-increasing array of information technology (IT)–based products and services.

A summary of our results is as follows (in millions, except percentages and per-share amounts):

| | Three Months Ended | | | | Years Ended | | | |
|---|---|---|---|---|---|---|---|---|
| | July 25, 2015 | July 26, 2014 | Variance | | July 25, 2015 | July 26, 2014 | Variance | |
| Revenue | $ 12,843 | $ 12,357 | 3.9 % | | $ 49,161 | $ 47,142 | 4.3 % | |
| Gross margin percentage | 60.2% | 59.9% | 0.3 | pts | 60.4% | 58.9% | 1.5 | pts |
| Research and development | $ 1,548 | $ 1,593 | (2.8)% | | $ 6,207 | $ 6,294 | (1.4)% | |
| Sales and marketing | $ 2,549 | $ 2,473 | 3.1 % | | $ 9,821 | $ 9,503 | 3.3 % | |
| General and administrative | $ 536 | $ 508 | 5.5 % | | $ 2,040 | $ 1,934 | 5.5 % | |
| Total R&D, sales and marketing, general and administrative | $ 4,633 | $ 4,574 | 1.3 % | | $ 18,068 | $ 17,731 | 1.9 % | |
| Total as a percentage of revenue | 36.1% | 37.0% | (0.9) | pts | 36.8% | 37.6% | (0.8) | pts |
| Amortization of purchased intangible assets included in operating expenses | $ 146 | $ 68 | 114.7 % | | $ 359 | $ 275 | 30.5 % | |
| Restructuring and other charges | $ 73 | $ 82 | (11.0)% | | $ 484 | $ 418 | 15.8 % | |
| Operating income as a percentage of revenue | 22.4% | 21.7% | 0.7 | pts | 21.9% | 19.8% | 2.1 | pts |
| Income tax percentage | 20.9% | 19.1% | 1.8 | pts | 19.8% | 19.2% | 0.6 | pts |
| Net income | $ 2,319 | $ 2,247 | 3.2 % | | $ 8,981 | $ 7,853 | 14.4 % | |
| Net income as a percentage of revenue | 18.1% | 18.2% | (0.1) | pts | 18.3% | 16.7% | 1.6 | pts |
| Earnings per share—diluted | $ 0.45 | $ 0.43 | 4.7 % | | $ 1.75 | $ 1.49 | 17.4 % | |

36

**Fiscal 2015 Compared with Fiscal 2014—Financial Performance**

Total revenue increased by 4% as compared with fiscal 2014 , with product and service revenue each increasing by 4% . Total gross margin increased by 1.5 percentage points, as we experienced stable gross margins and the absence in fiscal 2015 of a $655 million supplier component remediation charge recorded in fiscal 2014. As a percentage of revenue, research and development, sales and marketing, and general and administrative expenses, collectively, decreased by 0.8 percentage points, primarily as a result of higher acquisition-related compensation expense in fiscal 2014. Operating income as a percentage of revenue increased by 2.1 percentage points. Diluted earnings per share increased by 17% from the prior year, as a result of both a 14% increase in net income and a decrease in diluted share count by 135 million shares.

In fiscal 2015 , revenue increased by $2.0 billion as compared with fiscal 2014 . Revenue from the Americas increased by $1.9 billion , driven in large part by higher product revenue in the United States. EMEA revenue increased $0.3 billion , led by higher product revenue in the United Kingdom. Revenue in our APJC segment decreased $0.2 billion , led by a product revenue decline in China. We experienced decreased product revenue in the emerging countries of China and Russia and increased revenue in Mexico, India and Brazil, as the "BRICM" countries experienced, in the aggregate, a product revenue decline of 4% . We believe that the product revenue declines we experienced in various emerging countries reflected the impact of economic and geopolitical challenges in those countries.

From a customer market standpoint, in fiscal 2015 we experienced solid product revenue growth in the commercial, public sector and enterprise markets, while the service provider market continued to decline. The decline in service provider market was driven by the product revenue decline in our Service Provider Video category.

From a product category perspective, the product revenue increase of 4% year-over-year was driven in part by product revenue growth in our core Switching and NGN Routing products which grew 5% and 1% , respectively. We also experienced an increase in revenue from Data Center and Security products which grew 22% and 12% , respectively. Our other major product categories experienced revenue growth with the exception of Service Provider Video which decreased by 10% . Our deferred product revenue grew 21% year-over-year driven by subscription and software revenue arrangements, with strength in Collaboration, Security and Wireless. Service revenue increased by 4% year over year.

In summary, during fiscal 2015 , we achieved solid and profitable revenue growth despite encountering challenges similar to those we experienced during fiscal 2014 in the service provider market and certain emerging countries.

**Fourth Quarter Snapshot**

For the fourth quarter of fiscal 2015 , as compared with the corresponding period in fiscal 2014 , total revenue grew 4% , as product and service revenue each increased by 4% . With regard to our geographic segment performance, on a year-over-year basis revenue in the Americas increased by 7% , while EMEA and APJC were both flat. From a product category perspective, product revenue growth was driven by growth from Collaboration and Data Center products, as each grew 14% year over year. Total gross margin increased by 0.3 percentage points. As a percentage of revenue, research and development, sales and marketing, and general and administrative expenses collectively decreased by 0.9 percentage points. Operating income as a percentage of revenue increased by 0.7 percentage points. Diluted earnings per share increased by 5% from the prior year, primarily as a result of both a 3% increase in net income and a decrease in our diluted share count by 41 million shares.

**Strategy and Focus Areas**

We see our customers, in every industry, increasingly using technology—and, specifically, the network—to grow their business, drive efficiencies, and try to gain a competitive advantage. In this increasingly digital world, data is the most strategic asset and is increasingly distributed across every organization and ecosystem—on customer premises, at the edge of the network, and in the cloud. The network also plays an increasingly important role enabling our customers to aggregate, automate, and draw insights from this highly distributed data where there is a premium on security and speed. This is driving them to adopt entirely new IT architectures and organizational structures. We understand how technology can deliver the outcomes our customers want to achieve, and our strategy is to lead our customers in their digital transition with solutions including pervasive, industry-leading security that intelligently connect nearly everything that can be connected.

To deliver on our strategy, we are focused on providing highly secure, automated and intelligent solutions built on infrastructure that connects data that is highly distributed (globally dispersed across organizations). Together with our ecosystem of partners and developers, we aim to provide the technology, services, and solutions that we believe will enable our customers to gain insight and advantage from this distributed data with scale, security and agility.

For a full discussion of our strategy and focus areas, see Item 1. Business.

**Other Key Financial Measures**

The following is a summary of our other key financial measures for fiscal 2015 compared with fiscal 2014 (in millions, except days sales outstanding in accounts receivable (DSO) and annualized inventory turns):

|  | Fiscal 2015 | Fiscal 2014 |
|---|---|---|
| Cash and cash equivalents and investments | $60,416 | $52,074 |
| Cash provided by operating activities | $12,552 | $12,332 |
| Deferred revenue | $15,183 | $14,142 |
| Repurchases of common stock—stock repurchase program | $4,234 | $9,539 |
| Dividends | $4,086 | $3,758 |
| DSO | 38 days | 38 days |
| Inventories | $1,627 | $1,591 |
| Annualized inventory turns | 12.1 | 12.7 |

Our product backlog at the end of fiscal 2015 was $5.1 billion , or 10% of fiscal 2015 total revenue, compared with $5.4 billion at the end of fiscal 2014 , or 12% of fiscal 2014 total revenue.

# CRITICAL ACCOUNTING ESTIMATES

The preparation of financial statements and related disclosures in conformity with accounting principles generally accepted in the United States requires us to make judgments, assumptions, and estimates that affect the amounts reported in the Consolidated Financial Statements and accompanying notes. Note 2 to the Consolidated Financial Statements describes the significant accounting policies and methods used in the preparation of the Consolidated Financial Statements. The accounting policies described below are significantly affected by critical accounting estimates. Such accounting policies require significant judgments, assumptions, and estimates used in the preparation of the Consolidated Financial Statements, and actual results could differ materially from the amounts reported based on these policies.

## Revenue Recognition

Revenue is recognized when all of the following criteria have been met:

- *Persuasive evidence of an arrangement exists.* Contracts, Internet commerce agreements, and customer purchase orders are generally used to determine the existence of an arrangement.

- *Delivery has occurred.* Shipping documents and customer acceptance, when applicable, are used to verify delivery.

- *The fee is fixed or determinable.* We assess whether the fee is fixed or determinable based on the payment terms associated with the transaction and whether the sales price is subject to refund or adjustment.

- *Collectibility is reasonably assured.* We assess collectibility based primarily on the creditworthiness of the customer as determined by credit checks and analysis, as well as the customer's payment history.

In instances where final acceptance of the product, system, or solution is specified by the customer, revenue is deferred until all acceptance criteria have been met. When a sale involves multiple deliverables, such as sales of products that include services, the multiple deliverables are evaluated to determine the unit of accounting, and the entire fee from the arrangement is allocated to each unit of accounting based on the relative selling price. Revenue is recognized when the revenue recognition criteria for each unit of accounting are met. For hosting arrangements, we recognize subscription revenue ratably over the subscription period, while usage revenue is recognized based on utilization. Software subscription revenue is deferred and recognized ratably over the subscription term upon delivery of the first product and commencement of the term.

The amount of product and service revenue recognized in a given period is affected by our judgment as to whether an arrangement includes multiple deliverables and, if so, our valuation of the units of accounting for multiple deliverables. According to the accounting guidance prescribed in Accounting Standards Codification (ASC) 605, *Revenue Recognition* , we use vendor-specific objective evidence of selling price (VSOE) for each of those units, when available. We determine VSOE based on our normal pricing and discounting practices for the specific product or service when sold separately. In determining VSOE, we require that a substantial majority of the historical standalone transactions have the selling prices for a product or service fall within a reasonably narrow pricing range, generally evidenced by approximately 80% of such historical standalone transactions falling within plus or minus 15% of the median rates. When VSOE does not exist, we apply the selling price hierarchy to applicable multiple-deliverable arrangements. Under the selling price hierarchy, third-party evidence of selling price (TPE) will be considered if VSOE does not exist, and estimated selling price (ESP) will be used if neither VSOE nor TPE is available. Generally, we are not able to determine TPE because our go-to-market strategy differs from that of others in our markets, and the extent of our proprietary technology varies among comparable products or services from those of our peers. In determining ESP, we apply significant judgment as we weigh a variety of factors, based on the facts and circumstances of the arrangement. We typically arrive at an ESP for a product or service that is not sold separately by considering company-specific factors such as geographies, competitive landscape, internal costs, profitability objectives, pricing practices used to establish bundled pricing, and existing portfolio pricing and discounting.

Some of our sales arrangements have multiple deliverables containing software and related software support components. Such sales arrangements are subject to the accounting guidance in ASC 985-605, *Software-Revenue Recognition* .

As our business and offerings evolve over time, our pricing practices may be required to be modified accordingly, which could result in changes in selling prices, including both VSOE and ESP, in subsequent periods. There were no material impacts during fiscal 2015 , nor do we currently expect a material impact in the next 12 months on our revenue recognition due to any changes in our VSOE, TPE, or ESP.

Revenue deferrals relate to the timing of revenue recognition for specific transactions based on financing arrangements, service, support, and other factors. Financing arrangements may include sales-type, direct-financing, and operating leases, loans, and guarantees of third-party financing. Our deferred revenue for products was $5.4 billion and $4.5 billion as of July 25, 2015 and July 26, 2014 , respectively. Technical support services revenue is deferred and recognized ratably over the period during which the services are to be performed, which typically is from one to three years. Advanced services revenue is recognized upon delivery or completion of performance milestones. Our deferred revenue for services was $9.8 billion and $9.6 billion as of July 25, 2015 and July 26, 2014 , respectively.

We make sales to distributors which we refer to as two-tier systems of sales to the end customer. Revenue from distributors is recognized based on a sell-through method using information provided by them. Our distributors participate in various cooperative marketing and other programs, and we maintain estimated accruals and allowances for these programs. If actual credits received by our distributors under these programs were to deviate significantly from our estimates, which are based on historical experience, our revenue could be adversely affected.

**Allowances for Receivables and Sales Returns**

The allowances for receivables were as follows (in millions, except percentages):

| | July 25, 2015 | | July 26, 2014 | |
|---|---|---|---|---|
| Allowance for doubtful accounts | $ | **302** | $ | 265 |
| *Percentage of gross accounts receivable* | | **5.4 %** | | 4.9 % |
| Allowance for credit loss—lease receivables | $ | **259** | $ | 233 |
| *Percentage of gross lease receivables* [1] | | **7.2 %** | | 6.2 % |
| Allowance for credit loss—loan receivables | $ | **87** | $ | 98 |
| *Percentage of gross loan receivables* | | **4.9 %** | | 5.8 % |

[1] Calculated as allowance for credit loss on lease receivables as a percentage of gross lease receivables and residual value before unearned income.

The allowance for doubtful accounts is based on our assessment of the collectibility of customer accounts. We regularly review the adequacy of these allowances by considering internal factors such as historical experience, credit quality and age of the receivable balances as well as external factors such as economic conditions that may affect a customer's ability to pay and expected default frequency rates, which are published by major third-party credit-rating agencies and are generally updated on a quarterly basis. We also consider the concentration of receivables outstanding with a particular customer in assessing the adequacy of our allowances for doubtful accounts. If a major customer's creditworthiness deteriorates, if actual defaults are higher than our historical experience, or if other circumstances arise, our estimates of the recoverability of amounts due to us could be overstated, and additional allowances could be required, which could have an adverse impact on our operating results.

The allowance for credit loss on financing receivables is also based on the assessment of collectibility of customer accounts. We regularly review the adequacy of the credit allowances determined either on an individual or a collective basis. When evaluating the financing receivables on an individual basis, we consider historical experience, credit quality and age of receivable balances, and economic conditions that may affect a customer's ability to pay. When evaluating financing receivables on a collective basis, we use expected default frequency rates published by a major third-party credit-rating agency as well as our own historical loss rate in the event of default, while also systematically giving effect to economic conditions, concentration of risk and correlation. Determining expected default frequency rates and loss factors associated with internal credit risk ratings, as well as assessing factors such as economic conditions, concentration of risk, and correlation, are complex and subjective. Our ongoing consideration of all these factors could result in an increase in our allowance for credit loss in the future, which could adversely affect our operating results. Both accounts receivable and financing receivables are charged off at the point when they are considered uncollectible.

A reserve for future sales returns is established based on historical trends in product return rates. The reserve for future sales returns as of July 25, 2015 and July 26, 2014 was $129 million and $135 million , respectively, and was recorded as a reduction of our accounts receivable. If the actual future returns were to deviate from the historical data on which the reserve had been established, our revenue could be adversely affected.

**Inventory Valuation and Liability for Purchase Commitments with Contract Manufacturers and Suppliers**

Our inventory balance was $1.6 billion as of each July 25, 2015 and July 26, 2014 . Inventory is written down based on excess and obsolete inventories, determined primarily by future demand forecasts. Inventory write-downs are measured as the difference between the cost of the inventory and market, based upon assumptions about future demand, and are charged to the provision for inventory, which is a component of our cost of sales. At the point of the loss recognition, a new, lower cost basis for that inventory is established, and subsequent changes in facts and circumstances do not result in the restoration or increase in that newly established cost basis.

We record a liability for firm, noncancelable, and unconditional purchase commitments with contract manufacturers and suppliers for quantities in excess of our future demand forecasts consistent with the valuation of our excess and obsolete inventory. As of July 25, 2015 , the liability for these purchase commitments was $156 million , compared with $162 million as of July 26, 2014 , and was included in other current liabilities.

Our provision for inventory was $54 million , $67 million , and $114 million in fiscal 2015, 2014, and 2013 , respectively. The provision for the liability related to purchase commitments with contract manufacturers and suppliers was $102 million , $124 million , and $106 million in fiscal 2015, 2014, and 2013 , respectively. If there were to be a sudden and significant decrease in demand for our products, or if there were a higher incidence of inventory obsolescence because of rapidly changing technology and customer requirements, we could be required to increase our inventory write-downs, and our liability for purchase commitments with contract manufacturers and suppliers, and accordingly our profitability, could be adversely affected. We regularly evaluate our exposure for inventory write-downs and the adequacy of our liability for purchase commitments. Inventory and supply chain management remain areas of focus as we balance the need to maintain supply chain flexibility to help ensure competitive lead times with the risk of inventory obsolescence, particularly in light of current macroeconomic uncertainties and conditions and the resulting potential for changes in future demand forecast.

**Loss Contingencies and Product Warranties**

We are subject to the possibility of various losses arising in the ordinary course of business. We consider the likelihood of impairment of an asset or the incurrence of a liability, as well as our ability to reasonably estimate the amount of loss, in determining loss contingencies. An estimated loss contingency is accrued when it is probable that an asset has been impaired or a liability has been incurred and the amount of loss can be reasonably estimated. We regularly evaluate information available to us to determine whether such accruals should be made or adjusted and whether new accruals are required.

Third parties, including customers, have in the past and may in the future assert claims or initiate litigation related to exclusive patent, copyright, trademark, and other intellectual property rights to technologies and related standards that are relevant to us. These assertions have increased over time as a result of our growth and the general increase in the pace of patent claims assertions, particularly in the United States. If any infringement or other intellectual property claim made against us by any third party is successful, or if we fail to develop non-infringing technology or license the proprietary rights on commercially reasonable terms and conditions, our business, operating results, and financial condition could be materially and adversely affected.

We have recorded a liability for the expected remediation cost for certain products sold in prior fiscal years containing memory components manufactured by a single supplier between 2005 and 2010. In February 2014, on the basis of the growing number of failures as described in Note 12 (f) to the Consolidated Financial Statements, we decided to expand our approach, which resulted in a charge to product cost of sales of $655 million being recorded for the second quarter of fiscal 2014. During the third quarter of fiscal 2015, we recorded an adjustment to product cost of sales of $164 million to reduce the liability, reflecting net lower than previously estimated future costs to remediate the impacted customer products. Estimating this liability is complex and subjective, and if we experience changes in a number of underlying assumptions and estimates such as a change in claims compared with our expectations, or if the cost of servicing these claims is different than expected, our estimated liability may be impacted.

Our liability for product warranties, included in other current liabilities, was $449 million as of July 25, 2015 , compared with $446 million as of July 26, 2014 . Our products are generally covered by a warranty for periods ranging from 90 days to five years, and for some products we provide a limited lifetime warranty. We accrue for warranty costs as part of our cost of sales based on associated material costs, technical support labor costs, and associated overhead. Material cost is estimated based primarily upon historical trends in the volume of product returns within the warranty period and the cost to repair or replace the equipment. Technical support labor cost is estimated based primarily upon historical trends in the rate of customer cases and the cost to support the customer cases within the warranty period. Overhead cost is applied based on estimated time to support warranty activities.

The provision for product warranties during fiscal 2015, 2014, and 2013 was $696 million , $704 million , and $649 million , respectively. If we experience an increase in warranty claims compared with our historical experience, or if the cost of servicing warranty claims is greater than expected, our profitability could be adversely affected.

**Fair Value Measurements**

Our fixed income and publicly traded equity securities, collectively, are reflected in the Consolidated Balance Sheets at a fair value of $53.5 billion as of July 25, 2015 , compared with $45.3 billion as of July 26, 2014 . Our fixed income investment portfolio, as of July 25, 2015 , consisted primarily of high quality investment-grade securities. See Note 8 to the Consolidated Financial Statements.

As described more fully in Note 2 to the Consolidated Financial Statements, a valuation hierarchy is based on the level of independent, objective evidence available regarding the value of the investments. It encompasses three classes of investments: Level 1 consists of securities for which there are quoted prices in active markets for identical securities; Level 2 consists of securities for which observable inputs other than Level 1 inputs are used, such as quoted prices for similar securities in active markets or quoted prices for identical securities in less active markets and model-derived valuations for which the variables are derived from, or corroborated by, observable market data; and Level 3 consists of securities for which there are unobservable inputs to the valuation methodology that are significant to the measurement of the fair value.

Our Level 2 securities are valued using quoted market prices for similar instruments or nonbinding market prices that are corroborated by observable market data. We use inputs such as actual trade data, benchmark yields, broker/dealer quotes, and other similar data, which are obtained from independent pricing vendors, quoted market prices, or other sources to determine the ultimate fair value of our assets and liabilities. We use such pricing data as the primary input, to which we have not made any material adjustments during fiscal 2015 and 2014 , to make our assessments and determinations as to the ultimate valuation of our investment portfolio. We are ultimately responsible for the financial statements and underlying estimates.

The inputs and fair value are reviewed for reasonableness, may be further validated by comparison to publicly available information, and could be adjusted based on market indices or other information that management deems material to its estimate of fair value. The assessment of fair value can be difficult and subjective. However, given the relative reliability of the inputs we use to value our investment portfolio, and because substantially all of our valuation inputs are obtained using quoted market prices for similar or identical assets, we do not believe that the nature of estimates and assumptions affected by levels of subjectivity and judgment was material to the valuation of the investment portfolio as of July 25, 2015 . Level 3 assets do not represent a significant portion of our total assets measured at fair value on a recurring basis as of July 25, 2015 and July 26, 2014 .

**Other-than-Temporary Impairments**

We recognize an impairment charge when the declines in the fair values of our fixed income or publicly traded equity securities below their cost basis are judged to be other than temporary. The ultimate value realized on these securities, to the extent unhedged, is subject to market price volatility until they are sold.

If the fair value of a debt security is less than its amortized cost, we assess whether the impairment is other than temporary. An impairment is considered other than temporary if (i) we have the intent to sell the security, (ii) it is more likely than not that we will be required to sell the security before recovery of its entire amortized cost basis, or (iii) we do not expect to recover the entire amortized cost of the security. If an impairment is considered other than temporary based on (i) or (ii) described in the prior sentence, the entire difference between the amortized cost and the fair value of the security is recognized in earnings. If an impairment is considered other than temporary based on condition (iii), the amount representing credit loss, defined as the difference between the present value of the cash flows expected to be collected and the amortized cost basis of the debt security, will be recognized in earnings, and the amount relating to all other factors will be recognized in other comprehensive income (OCI). In estimating the amount and timing of cash flows expected to be collected, we consider all available information, including past events, current conditions, the remaining payment terms of the security, the financial condition of the issuer, expected defaults, and the value of underlying collateral.

For publicly traded equity securities, we consider various factors in determining whether we should recognize an impairment charge, including the length of time and extent to which the fair value has been less than our cost basis, the financial condition and near-term prospects of the issuer, and our intent and ability to hold the investment for a period of time sufficient to allow for any anticipated recovery in market value.

There were no impairment charges on our investments in publicly traded equity securities in fiscal 2015 and 2013, and we recognized $11 million of such impairment charges in earnings for fiscal 2014. There were no impairment charges on our investments in fixed income securities in fiscal 2015, 2014, and 2013 . Our ongoing consideration of all the factors described previously could result in additional impairment charges in the future, which could adversely affect our net income.

We also have investments in privately held companies, some of which are in the startup or development stages. As of July 25, 2015 , our investments in privately held companies were $897 million , compared with $899 million as of July 26, 2014 , and were included in other assets. We monitor these investments for events or circumstances indicative of potential impairment, and we make appropriate reductions in carrying values if we determine that an impairment charge is required, based primarily on the financial condition and near-term prospects of these companies. These investments are inherently risky because the markets for the technologies or products these companies are developing are typically in the early stages and may never materialize. Our impairment charges on investments in privately held companies were $41 million, $23 million, and $33 million in fiscal 2015, 2014, and 2013 , respectively.

**Goodwill and Purchased Intangible Asset Impairments**

Our methodology for allocating the purchase price relating to purchase acquisitions is determined through established valuation techniques. Goodwill represents a residual value as of the acquisition date, which in most cases results in measuring goodwill as an excess of the purchase consideration transferred plus the fair value of any noncontrolling interest in the acquired company over the fair value of net assets acquired, including contingent consideration. We perform goodwill impairment tests on an annual basis in the fourth fiscal quarter and between annual tests in certain circumstances for each reporting unit. The assessment of fair value for goodwill and purchased intangible assets is based on factors that market participants would use in an orderly transaction in accordance with the new accounting guidance for the fair value measurement of nonfinancial assets.

The goodwill recorded in the Consolidated Balance Sheets as of July 25, 2015 and July 26, 2014 was $24.5 billion and $24.2 billion , respectively. In response to changes in industry and market conditions, we could be required to strategically realign our resources and consider restructuring, disposing of, or otherwise exiting businesses, which could result in an impairment of goodwill. There was no impairment of goodwill resulting from our annual impairment testing in fiscal 2015, 2014, and 2013 . For the annual impairment testing in fiscal 2015 , the excess of the fair value over the carrying value for each of our reporting units was $40.8 billion for the Americas, $32.6 billion for EMEA, and $12.9 billion for APJC. During the fourth quarter of fiscal 2015 , we performed a sensitivity analysis for goodwill impairment with respect to each of our respective reporting units and determined that a hypothetical 10% decline in the fair value of each reporting unit would not result in an impairment of goodwill for any reporting unit.

We make judgments about the recoverability of purchased intangible assets with finite lives whenever events or changes in circumstances indicate that an impairment may exist. Recoverability of purchased intangible assets with finite lives is measured by comparing the carrying amount of the asset to the future undiscounted cash flows the asset is expected to generate. We review indefinite-lived intangible assets for impairment annually or whenever events or changes in circumstances indicate that the asset might be impaired. If the asset is considered to be impaired, the amount of any impairment is measured as the difference between the carrying value and the fair value of the impaired asset. Assumptions and estimates about future values and remaining useful lives of our purchased intangible assets are complex and subjective. They can be affected by a variety of factors, including external factors such as industry and economic trends, and internal factors such as changes in our business strategy and our internal forecasts. Our impairment charges related to purchased intangible assets were $175 million during fiscal 2015 . There were no impairment charges related to purchased intangible assets during fiscal 2014 and fiscal 2013 . Our ongoing consideration of all the factors described previously could result in additional impairment charges in the future, which could adversely affect our net income.

**Income Taxes**

We are subject to income taxes in the United States and numerous foreign jurisdictions. Our effective tax rates differ from the statutory rate, primarily due to the tax impact of state taxes, foreign operations, R&D tax credits, domestic manufacturing deductions, tax audit settlements, nondeductible compensation, international realignments, and transfer pricing adjustments. Our effective tax rate was 19.8% , 19.2% , and 11.1% in fiscal 2015, 2014, and 2013 , respectively.

Significant judgment is required in evaluating our uncertain tax positions and determining our provision for income taxes. Although we believe our reserves are reasonable, no assurance can be given that the final tax outcome of these matters will not be different from that which is reflected in our historical income tax provisions and accruals. We adjust these reserves in light of changing facts and circumstances, such as the closing of a tax audit or the refinement of an estimate. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences will impact the provision for income taxes in the period in which such determination is made. The provision for income taxes includes the impact of reserve provisions and changes to reserves that are considered appropriate, as well as the related net interest and penalties.

Significant judgment is also required in determining any valuation allowance recorded against deferred tax assets. In assessing the need for a valuation allowance, we consider all available evidence, including past operating results, estimates of future taxable income, and the feasibility of tax planning strategies. In the event that we change our determination as to the amount of deferred tax assets that can be realized, we will adjust our valuation allowance with a corresponding impact to the provision for income taxes in the period in which such determination is made.

Our provision for income taxes is subject to volatility and could be adversely impacted by earnings being lower than anticipated in countries that have lower tax rates and higher than anticipated in countries that have higher tax rates; by changes in the valuation of our deferred tax assets and liabilities; by expiration of or lapses in the R&D tax credit or domestic manufacturing deduction laws; by expiration of or lapses in tax incentives; by transfer pricing adjustments, including the effect of acquisitions on our intercompany R&D cost-sharing arrangement and legal structure; by tax effects of nondeductible compensation; by tax costs related to intercompany realignments; by changes in accounting principles; or by changes in tax laws and regulations, treaties, or interpretations thereof, including possible changes to the taxation of earnings of our foreign subsidiaries, the deductibility of expenses attributable to foreign income, or the foreign tax credit rules. Significant judgment is required to determine the recognition and measurement attributes prescribed in the accounting guidance for uncertainty in income taxes. The Organisation for Economic Co-operation and Development (OECD), an international association comprised of 34 countries, including the United States, is contemplating changes to numerous long-standing tax principles. These contemplated changes, if finalized and adopted by countries, will increase tax uncertainty and may adversely affect our provision for income taxes. As a result of certain of our ongoing employment and capital investment actions and commitments, our income in certain countries is subject to reduced tax rates and in some cases is wholly exempt from tax. Our failure to meet these commitments could adversely impact our provision for income taxes. In addition, we are subject to the continuous examination of our income tax returns by the Internal Revenue Service (IRS) and other tax authorities. We regularly assess the likelihood of adverse outcomes resulting from these examinations to determine the adequacy of our provision for income taxes. There can be no assurance that the outcomes from these continuous examinations will not have an adverse impact on our operating results and financial condition.

## RESULTS OF OPERATIONS

### Revenue

The following table presents the breakdown of revenue between product and service (in millions, except percentages):

| | Years Ended | | | 2015 vs. 2014 | | 2014 vs. 2013 | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | **July 25, 2015** | July 26, 2014 | July 27, 2013 | Variance in Dollars | Variance in Percent | Variance in Dollars | Variance in Percent |
| Revenue: | | | | | | | |
| Product | $ **37,750** | $ 36,172 | $ 38,029 | $ 1,578 | 4.4% | $ (1,857) | (4.9)% |
| Percentage of revenue | **76.8 %** | 76.7 % | 78.2 % | | | | |
| Service | **11,411** | 10,970 | 10,578 | 441 | 4.0% | 392 | 3.7 % |
| Percentage of revenue | **23.2 %** | 23.3 % | 21.8 % | | | | |
| Total | $ **49,161** | $ 47,142 | $ 48,607 | $ 2,019 | 4.3% | $ (1,465) | (3.0)% |

We manage our business primarily on a geographic basis, organized into three geographic segments. Our revenue, which includes product and service for each segment, is summarized in the following table (in millions, except percentages):

| | Years Ended | | | 2015 vs. 2014 | | 2014 vs. 2013 | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | **July 25, 2015** | July 26, 2014 | July 27, 2013 | Variance in Dollars | Variance in Percent | Variance in Dollars | Variance in Percent |
| Revenue: | | | | | | | |
| Americas | $ **29,655** | $ 27,781 | $ 28,639 | $ 1,874 | 6.7 % | $ (858) | (3.0)% |
| Percentage of revenue | **60.3 %** | 58.9 % | 58.9 % | | | | |
| EMEA | **12,322** | 12,006 | 12,210 | 316 | 2.6 % | (204) | (1.7)% |
| Percentage of revenue | **25.1 %** | 25.5 % | 25.1 % | | | | |
| APJC | **7,184** | 7,355 | 7,758 | (171) | (2.3)% | (403) | (5.2)% |
| Percentage of revenue | **14.6 %** | 15.6 % | 16.0 % | | | | |
| Total | $ **49,161** | $ 47,142 | $ 48,607 | $ 2,019 | 4.3 % | $ (1,465) | (3.0)% |

### _Fiscal 2015 Compared with Fiscal 2014_

For fiscal 2015 , as compared with fiscal 2014 , total revenue increased by 4% , as product and service revenue each increased by 4% . Our total revenue grew in our Americas and EMEA geographic segments, while revenue declined in the APJC segment. The emerging countries of BRICM, in the aggregate, experienced a 4% product revenue decline, with declines in China and Russia partially offset by increases in the other three BRICM countries.

We conduct business globally in numerous currencies. The direct effect of foreign currency fluctuations on revenue has not been material because our revenue is primarily denominated in U.S. dollars. However, if the U.S. dollar strengthens relative to other currencies, as was the case during fiscal 2015, such strengthening could have an indirect effect on our revenue to the extent it raises the cost of our products to non-U.S. customers and thereby reduces demand. A weaker U.S. dollar could have the opposite effect. However, the precise indirect effect of currency fluctuations is difficult to measure or predict because our revenue is influenced by many factors in addition to the impact of such currency fluctuations. Our revenue in fiscal 2015 , and in particular our revenue for EMEA and APJC, was adversely affected by the depreciation of certain currencies relative to the U.S. dollar especially in certain emerging countries, although the indirect effects are difficult to measure.

In addition to the impact of macroeconomic factors, including a reduced IT spending environment and reductions in spending by government entities, revenue by segment in a particular period may be significantly impacted by several factors related to revenue recognition, including the complexity of transactions such as multiple-element arrangements; the mix of financing arrangements provided to our channel partners and customers; and final acceptance of the product, system, or solution, among other factors. In addition, certain customers tend to make large and sporadic purchases, and the revenue related to these transactions may also be affected by the timing of revenue recognition, which in turn would impact the revenue of the relevant segment. As has been the case in certain of our emerging countries from time to time, customers require greater levels of financing arrangements, service, and support, and these activities may occur in future periods, which may also impact the timing of the recognition of revenue.

*Fiscal 2014 Compared with Fiscal 2013*

For fiscal 2014 , as compared with fiscal 2013 , total revenue decreased by 3% . Product revenue decreased by 5% , while service revenue increased by 4% . The decrease in product revenue reflected declines across all geographic segments as well as across all customer markets. Service revenues experienced slower growth in our Americas and APJC geographic segments while we experienced slightly faster growth in the EMEA segment.

**Product Revenue by Segment**

The following table presents the breakdown of product revenue by segment (in millions, except percentages):

| | | Years Ended | | 2015 vs. 2014 | | 2014 vs. 2013 | |
| | July 25, 2015 | July 26, 2014 | July 27, 2013 | Variance in Dollars | Variance in Percent | Variance in Dollars | Variance in Percent |
|---|---|---|---|---|---|---|---|
| Product revenue: | | | | | | | |
| Americas | $ 22,261 | $ 20,631 | $ 21,653 | $ 1,630 | 7.9 % | $ (1,022) | (4.7)% |
| *Percentage of product revenue* | *59.0 %* | *57.0 %* | *57.0 %* | | | | |
| EMEA | 9,856 | 9,655 | 10,049 | 201 | 2.1 % | (394) | (3.9)% |
| *Percentage of product revenue* | *26.1 %* | *26.7 %* | *26.4 %* | | | | |
| APJC | 5,633 | 5,886 | 6,327 | (253) | (4.3)% | (441) | (7.0)% |
| *Percentage of product revenue* | *14.9 %* | *16.3 %* | *16.6 %* | | | | |
| Total | $ 37,750 | $ 36,172 | $ 38,029 | $ 1,578 | 4.4 % | $ (1,857) | (4.9)% |

Americas

*Fiscal 2015 Compared with Fiscal 2014*

The increase in product revenue in the Americas segment of 8% was led by solid growth in the public sector, commercial and enterprise markets. The product revenue growth in the public sector market was due primarily to higher sales to the U.S. federal government and, to a lesser extent, higher sales to state and local governments. The product revenue growth in the enterprise and commercial markets was driven by strength in the United States. We experienced a product revenue decline in the service provider market in this segment. From a country perspective, product revenue increased by 8% in the United States, 34% in Mexico, and 2% in Brazil.

*Fiscal 2014 Compared with Fiscal 2013*

Product revenue in the Americas segment decreased by 5% , led by a significant decline in the service provider market and, to a lesser extent, declines in the public sector and commercial markets. Product revenue declined in the U.S. public sector market, led by lower sales to the U.S. federal government. From a country perspective, product revenue decreased by 5% in the United States, 10% in Canada, and 13% in Brazil, partially offset by an increase of 2% in Mexico.

EMEA

*Fiscal 2015 Compared with Fiscal 2014*

Product revenue in the EMEA segment increased by 2% , driven by growth in the commercial, public sector and enterprise markets. Product revenue in the service provider market was flat. Product revenue from emerging countries within EMEA increased by 1% and product revenue for the remainder of EMEA grew by 2% .

*Fiscal 2014 Compared with Fiscal 2013*

Product revenue in the EMEA segment decreased by 4% , led by a decline in the service provider market and, to a lesser extent, declines in the enterprise and public sector markets. Product revenue from emerging countries within EMEA decreased by 11%, led by a 24% decrease in Russia. Product revenue for the remainder of EMEA, which is primarily composed of countries in western Europe, declined by 2%.

<u>APJC</u>

*<u>Fiscal 2015 Compared with Fiscal 2014</u>*

The decrease in product revenue in the APJC segment of 4% was led by a significant decline in the service provider market and, to a lesser degree, in the public sector and enterprise markets. These decreases were partially offset by growth in the commercial market. From a country perspective, product revenue decreased by 21% in China and 5% in Japan. We experienced product revenue growth of 15% in India and 8% in Australia.

*<u>Fiscal 2014 Compared with Fiscal 2013</u>*

Product revenue in the APJC segment decreased by 7% , led by declines in the service provider and enterprise markets and, to a lesser extent, a decline in the commercial market. We continued to experience declines in many of the emerging countries within this segment, most notably in India which experienced a year-over-year product revenue decline of 15%. Other countries that contributed to the weakness in this segment included Japan, Australia, and China, which experienced year-over-year product revenue declines of 11%, 7%, and 6%, respectively.

**Product Revenue by Groups of Similar Products**

In addition to the primary view on a geographic basis, we also prepare financial information related to groups of similar products and customer markets for various purposes. Our product categories consist of the following categories (with subcategories in parentheses): Switching (fixed switching, modular switching, and storage); NGN Routing (high-end routers, mid-range and low-end routers, and other NGN Routing products); Collaboration (unified communications, Cisco TelePresence, and conferencing); Service Provider Video (infrastructure, video software, and solutions and cable access); Data Center; Wireless; Security; and Other Products. The Other Products category consists primarily of emerging technology products and other networking products.

The following table presents revenue for groups of similar products (in millions, except percentages):

| | July 25, 2015 | July 26, 2014 | July 27, 2013 | 2015 vs. 2014 Variance in Dollars | 2015 vs. 2014 Variance in Percent | 2014 vs. 2013 Variance in Dollars | 2014 vs. 2013 Variance in Percent |
|---|---|---|---|---|---|---|---|
| Product revenue: | | | | | | | |
| Switching | $ 14,741 | $ 14,001 | $ 14,711 | $ 740 | 5.3 % | $ (710) | (4.8)% |
| *Percentage of product revenue* | *39.1 %* | *38.7 %* | *38.7 %* | | | | |
| NGN Routing | 7,704 | 7,609 | 8,168 | 95 | 1.2 % | (559) | (6.8)% |
| *Percentage of product revenue* | *20.4 %* | *21.0 %* | *21.5 %* | | | | |
| Collaboration | 4,000 | 3,815 | 4,057 | 185 | 4.8 % | (242) | (6.0)% |
| *Percentage of product revenue* | *10.6 %* | *10.5 %* | *10.7 %* | | | | |
| Service Provider Video | 3,555 | 3,969 | 4,855 | (414) | (10.4)% | (886) | (18.2)% |
| *Percentage of product revenue* | *9.4 %* | *11.0 %* | *12.8 %* | | | | |
| Data Center | 3,220 | 2,640 | 2,074 | 580 | 22.0 % | 566 | 27.3 % |
| *Percentage of product revenue* | *8.5 %* | *7.3 %* | *5.5 %* | | | | |
| Wireless | 2,542 | 2,293 | 2,257 | 249 | 10.9 % | 36 | 1.6 % |
| *Percentage of product revenue* | *6.7 %* | *6.3 %* | *5.9 %* | | | | |
| Security | 1,747 | 1,566 | 1,348 | 181 | 11.6 % | 218 | 16.2 % |
| *Percentage of product revenue* | *4.6 %* | *4.3 %* | *3.5 %* | | | | |
| Other | 241 | 279 | 559 | (38) | (13.6)% | (280) | (50.1)% |
| *Percentage of product revenue* | *0.7 %* | *0.9 %* | *1.4 %* | | | | |
| Total | $ 37,750 | $ 36,172 | $ 38,029 | $ 1,578 | 4.4 % | $ (1,857) | (4.9)% |

Certain reclassifications have been made to the prior period amounts to conform to the current period's presentation.

<u>Switching</u>

*Fiscal 2015 Compared with Fiscal 2014*

The increase in revenue in our Switching product category of 5% , or $740 million , was driven by a 9%, or $826 million, increase in revenue from our LAN fixed-configuration switches and, to a lesser extent, a 24%, or $102 million, increase in sales of storage products. Revenue from LAN fixed-configuration switches increased due to higher sales of most of our Cisco Nexus Series Switches and Cisco Catalyst Series Switches within this category. We experienced a decrease in revenue from our modular switches of 4%, or $188 million, driven by lower sales of Cisco Catalyst 6500-E Series Switches and Cisco Nexus 7000 Series Switches.

*Fiscal 2014 Compared with Fiscal 2013*

Revenue in our Switching product category decreased by 5% , or $710 million driven by a 12%, or $656 million, decrease in revenue from our modular switches. Revenue from our modular switches decreased due to lower sales of Cisco Catalyst 6000 Series Switches. We also experienced a 3% decrease in sales of storage products within this category. Revenue from our LAN fixed-configuration switches was relatively flat year over year, as lower sales of most of our fixed-configuration Cisco Catalyst Series Switches and fixed-configuration Cisco Nexus Series Switches were offset by the continued adoption of Cisco Catalyst 3850 Series Switches and Cisco Nexus 6000 Series Switches.

NGN Routing

*Fiscal 2015 Compared with Fiscal 2014*

Revenue in our NGN Routing product category increased by 1% , or $95 million , driven by a 6%, or $248 million, increase in revenue from our high-end router products and a slight increase in revenue from our midrange and low-end router products, partially offset by 28%, or $171 million, decrease in revenue from other NGN Routing products. Revenue from high-end router products increased due to an increase in revenue from most products within our Cisco ASR category and the adoption of our Cisco NCS platform and CRS-X, partially offset by lower sales of our legacy high-end router products. The slight increase in revenue from our midrange and low-end router products was due to higher sales of our Cisco ISR products, partially offset by lower sales of certain of our access products. Revenue from other NGN Routing products decreased primarily due to lower sales of certain optical networking products.

*Fiscal 2014 Compared with Fiscal 2013*

The decrease in revenue in our NGN Routing product category of 7% , or $559 million , was driven by a 6%, or $278 million, decrease in revenue from high-end router products; an 8%, or $227 million, decrease in revenue from our midrange and low-end router products; and an 8%, or $54 million, decrease in revenue from other NGN Routing products. Revenue from our high-end products decreased d ue to lower sales of Cisco CRS-3 Carrier Routing System products and our legacy high-end router products, partially offset by increased sales of our Cisco ASR edge products. The decrease in revenue from our midrange and low-end router products was driven by lower sales of our Cisco ISR products. Revenue from other NGN Routing products decreased due to lower sales of certain optical networking products.

Collaboration

*Fiscal 2015 Compared with Fiscal 2014*

Revenue in our Collaboration product category increased by 5% , or $185 million , due to increased revenue from our Unified Communications products as a result of higher software revenue and a slight increase in revenue from phones. Higher revenue from our Cisco TelePresence and conferencing products also contributed to the increase. Revenue from Cisco TelePresence products increased due to higher revenue in endpoint products as a result of new product introductions. The increase in conferencing revenue was a result of higher recurring revenue. We continue to increase the amount of deferred revenue and the proportion of recurring revenue related to our Collaboration product category.

*Fiscal 2014 Compared with Fiscal 2013*

We continue to increase the proportion of recurring revenue in our Collaboration product category. Overall, revenue in our Collaboration product category decreased by 6% , or $242 million , primarily due to decreased revenue from our Cisco TelePresence and Unified Communications products, driven by weakness in endpoint products such as phones. These decreases were partially offset by higher revenue from our conferencing products.

Service Provider Video

*Fiscal 2015 Compared with Fiscal 2014*

The decrease in revenue from our Service Provider Video product category of 10% , $414 million , was driven by a 16%, or $332 million, decrease in sales of our Service Provider Video infrastructure products, due primarily to lower sales of set-top boxes. We also experienced a decrease in revenue from cable access products within this product category.

On July 22, 2015, we entered into an exclusive agreement to sell the client premises equipment portion of our Service Provider Video connected devices business unit to French-based Technicolor. We will continue to refocus our investments in Service Provider Video towards cloud, security and software-based services.

*Fiscal 2014 Compared with Fiscal 2013*

Revenue in our Service Provider Video product category decreased by 18% , or $886 million , with the largest driver of the decline being a 21%, or $812 million, decrease in sales of our Service Provider Video infrastructure products. The revenue decline in Service Provider Video infrastructure products, which includes connected devices products, was due primarily to lower sales of set-top boxes.

<u>Data Center</u>

*Fiscal 2015 Compared with Fiscal 2014*

Revenue in our Data Center product category grew by 22% , or $580 million , with sales growth of our Cisco Unified Computing System products across all geographic segments and customer markets. The increase was due in large part to the continued momentum we are experiencing in both data center and cloud environments, as current customers increase their data center build-outs and as new customers deploy these offerings.

To the extent our data center business grows and further penetrates the market, we expect that, in comparison to what we experienced during the initial rapid growth of this business, the growth rates for our data center product sales will experience more normal seasonality consistent with the overall server market.

*Fiscal 2014 Compared with Fiscal 2013*

We continue to experience solid growth in our Data Center product category, which grew by 27% , or $566 million , with sales growth of our Cisco Unified Computing System products across all geographic segments and customer markets. The increase was due in large part to the continued momentum we are experiencing in both data center and cloud environments, as current customers increase their data center build-outs and as new customers deploy these offerings.

<u>Wireless</u>

*Fiscal 2015 Compared with Fiscal 2014*

Revenue in our Wireless product category increased by 11% , or $249 million , driven by continued growth in sales of Meraki products combined with continued strength in our 802.11ac portfolio. We continue to increase the amount of deferred revenue and the proportion of recurring revenue related to our Wireless product category.

*Fiscal 2014 Compared with Fiscal 2013*

We continue to increase the proportion of recurring revenue in our Wireless product category. Revenue in our Wireless product category increased by 2% , or $36 million , due to an increase in sales of Meraki products, which we acquired in the second quarter of fiscal 2013, partially offset by lower sales of other wireless products.

<u>Security</u>

*Fiscal 2015 Compared with Fiscal 2014*

Revenue in our Security product category was up 12% , or $181 million , driven primarily by sales of Sourcefire products and, to a lesser extent, by higher sales of our high-end firewall products within our network security product portfolio. This increase was partially offset by a slight decrease in revenue from our content security products due to lower sales of web and e-mail security products. We continue to increase the amount of deferred revenue and the proportion of recurring revenue related to our Security product category.

*Fiscal 2014 Compared with Fiscal 2013*

We continue to increase the proportion of recurring revenue in our Security product category. Revenue in our Security product category was up 16% , or $218 million , driven primarily by sales of Sourcefire products, which company we acquired in the first quarter of fiscal 2014 and, to a lesser degree, by both higher sales of our high-end firewall products within our network security product portfolio and slightly higher sales of our content security products.

<u>Other Products</u>

We experienced a year-over-year decrease in revenue in our Other Products category for fiscal 2015 due in large part to the decrease in sales of our other networking products. The year-over-year decrease in revenue in our Other Products category for fiscal 2014 was due in large part to the sale of our Linksys product line in the third quarter of fiscal 2013.

**Service Revenue by Segment**

The following table presents the breakdown of service revenue by segment (in millions, except percentages):

| Years Ended | Years Ended | | | 2015 vs. 2014 | | 2014 vs. 2013 | |
|---|---|---|---|---|---|---|---|
| | **July 25, 2015** | July 26, 2014 | July 27, 2013 | Variance in Dollars | Variance in Percent | Variance in Dollars | Variance in Percent |
| Service revenue: | | | | | | | |
| Americas | $ **7,394** | $ 7,150 | $ 6,986 | $ 244 | 3.4% | $ 164 | 2.3% |
| *Percentage of service revenue* | ***64.8 %*** | *65.2 %* | *66.1 %* | | | | |
| EMEA | **2,466** | 2,351 | 2,161 | 115 | 4.9% | 190 | 8.8% |
| *Percentage of service revenue* | ***21.6 %*** | *21.4 %* | *20.4 %* | | | | |
| APJC | **1,551** | 1,469 | 1,431 | 82 | 5.6% | 38 | 2.7% |
| *Percentage of service revenue* | ***13.6 %*** | *13.4 %* | *13.5 %* | | | | |
| Total | $ **11,411** | $ 10,970 | $ 10,578 | $ 441 | 4.0% | $ 392 | 3.7% |

*Fiscal 2015 Compared with Fiscal 2014*

Service revenue increased across all of our geographic segments. Worldwide technical support services revenue increased by 3% and worldwide advanced services revenue increased by 6%, driven by growth in subscription revenues. Technical support services revenue experienced relatively balanced growth across all geographic segments. Renewals and technical support service contract initiations associated with product sales provided an installed base of equipment being serviced which, in concert with new service offerings, were the primary factors driving the revenue increases. Advanced services revenue, which relates to consulting support services for specific customer network needs, grew across all geographic segments.

*Fiscal 2014 Compared with Fiscal 2013*

Service revenue continued to experience slower growth than in prior fiscal years, with varying levels of growth across our geographic segments. Worldwide technical support services revenue increased by 4% while worldwide advanced services revenue experienced 3% growth. Technical support services revenue experienced growth across all geographic segments. Renewals and technical support service contract initiations associated with product sales provided an installed base of equipment being serviced which, in concert with new service offerings, were the primary factors driving the revenue increases. Advanced services revenue, slightly declined in the Americas segment but had solid growth in the EMEA and APJC segments due to growth in subscription revenues.

**Gross Margin**

The following table presents the gross margin for products and services (in millions, except percentages):

| Years Ended | AMOUNT | | | PERCENTAGE | | |
|---|---|---|---|---|---|---|
| | July 25, 2015 | July 26, 2014 | July 27, 2013 | July 25, 2015 | July 26, 2014 | July 27, 2013 |
| Gross margin: | | | | | | |
| Product | $ 22,373 | $ 20,531 | $ 22,488 | 59.3% | 56.8% | 59.1% |
| Service | 7,308 | 7,238 | 6,952 | 64.0% | 66.0% | 65.7% |
| Total | $ 29,681 | $ 27,769 | $ 29,440 | 60.4% | 58.9% | 60.6% |

**Product Gross Margin**

*Fiscal 2015 Compared with Fiscal 2014*

The following table summarizes the key factors that contributed to the change in product gross margin percentage from fiscal 2014 to fiscal 2015 :

| | Product Gross Margin Percentage |
|---|---|
| **Fiscal 2014** | **56.8 %** |
| **Productivity** [1] | **2.8 %** |
| **Supplier component remediation charge/adjustment** | **2.2 %** |
| **Mix of products sold** | **0.3 %** |
| **Product pricing** | **(2.3)%** |
| **Rockstar patent portfolio charge** | **(0.5)%** |
| **Fiscal 2015** | **59.3 %** |

[1] Productivity includes overall manufacturing-related costs, such as component costs, warranty expense, provision for inventory, freight, logistics, shipment volume, and other items not categorized elsewhere.

Product gross margin increased by 2.5 percentage points compared with fiscal 2014 . The increase in product gross margin was due to productivity improvements, which were driven by value engineering efforts; favorable component pricing; continued operational efficiency in manufacturing operations and lower warranty expense. Value engineering is the process by which production costs are reduced through component redesign, board configuration, test processes, and transformation processes. The increase was also due to the $655 million charge to product cost of sales in fiscal 2014 related to the expected cost to remediate issues with a supplier component in certain products sold in prior fiscal years and an associated $164 million favorable adjustment recorded in fiscal 2015.

Additionally, gross margin increased due to the mix of products sold. The favorable product mix impact was due to revenue decreases from our relatively lower margin Service Provider Video products and a revenue increase from certain of our higher margin core products, partially offset by increased revenue from our relatively lower margin Cisco Unified Computing System products. The various factors contributing to the product gross margin increase were partially offset by unfavorable impacts from product pricing, which were driven by typical market factors and impacted each of our geographic segments and customer markets, as well as the unfavorable impact of a $188 million charge to product cost of sales recorded in fiscal 2015 related to the Rockstar patent portfolio, see Note 4(b) to the Consolidated Financial Statements.

Our future gross margins could be impacted by our product mix and could be adversely affected by further growth in sales of products that have lower gross margins, such as Cisco Unified Computing System products. Our gross margins may also be impacted by the geographic mix of our revenue and, as was the case in fiscal 2015 , fiscal 2014 and fiscal 2013 , may be adversely affected by product pricing attributable to competitive factors. Additionally, our manufacturing-related costs may be negatively impacted by constraints in our supply chain, which in turn could negatively affect gross margin. If any of the preceding factors that in the past have negatively impacted our gross margins arise in future periods, our gross margins could continue to decline.

51

*Fiscal 2014 Compared with Fiscal 2013*

The following table summarizes the key factors that contributed to the change in product gross margin percentage from fiscal 2013 to fiscal 2014 :

| | Product Gross Margin Percentage |
|---|---|
| Fiscal 2013 | 59.1 % |
| Product pricing | (3.1)% |
| Supplier component remediation charge | (1.8)% |
| Mix of products sold | (0.5)% |
| Amortization of purchased intangible assets | (0.5)% |
| Productivity [1] | 3.0 % |
| TiVo patent litigation settlement | 0.5 % |
| Acquisition fair value adjustment to inventory and other | 0.1 % |
| Fiscal 2014 | 56.8 % |

Product gross margin decreased by 2.3 percentage points compared with fiscal 2013. The decrease in product gross margin was driven by unfavorable impacts from product pricing, which were driven by typical market factors and impacted each of our geographic segments and customer markets. The decrease was also due, in part, to the supplier component remediation charge of $655 million to product cost of sales recorded in fiscal 2014 discussed above. In addition, the shift in the mix of products sold decreased our product gross margin, primarily as a result of a revenue increase in our Cisco Unified Computing System products and decreased revenue from our higher margin core products, partially offset by decreased revenue from our Service Provider Video products. Our product gross margin for fiscal 2014 was also negatively impacted by higher amortization expense of purchased intangible assets. For further explanation of the increase in amortization of purchased intangible assets, see "Amortization of Purchased Intangible Assets" below.

These amounts were partially offset by productivity benefits and the absence of charges related to the TiVo patent litigation settlement which we incurred in the fourth quarter of fiscal 2013. The productivity benefits we experienced in fiscal 2014 were driven by value engineering efforts; favorable component pricing; and continued operational efficiency in manufacturing operations.

**Service Gross Margin**

*Fiscal 2015 Compared with Fiscal 2014*

Service gross margin percentage decreased by 2.0 percentage points for fiscal 2015 , as compared with fiscal 2014 , driven by increased cost impacts such as partner delivery costs, headcount-related costs and outside services. Headcount-related costs increased due to continued investments in security and cloud managed services and higher variable compensation expense. These cost impacts were partially offset by the resulting benefit to gross margin of higher sales volume in both advanced services and technical support services.

Our service gross margin normally experiences some fluctuations due to various factors such as the timing of contract initiations in our renewals, our strategic investments in headcount, and the resources we deploy to support the overall service business. Other factors include the mix of service offerings, as the gross margin from our advanced services is typically lower than the gross margin from technical support services.

*Fiscal 2014 Compared with Fiscal 2013*

Our service gross margin percentage increased slightly by 0.3 percentage points for fiscal 2014 , as compared with fiscal 2013. The increase was primarily due to higher sales volume in both advanced services and technical support services. The benefits to gross margin of increased sales volume were partially offset by increased cost impacts such as outside service costs, partner delivery costs, and headcount-related costs.

52

**Gross Margin by Segment**

The following table presents the total gross margin for each segment (in millions, except percentages):

| Years Ended | AMOUNT | | | PERCENTAGE | | |
|---|---|---|---|---|---|---|
| | July 25, 2015 | July 26, 2014 | July 27, 2013 | July 25, 2015 | July 26, 2014 | July 27, 2013 |
| Gross margin: | | | | | | |
| Americas | $ **18,670** | $ 17,379 | $ 17,887 | **63.0%** | 62.6% | 62.5% |
| EMEA | **7,705** | 7,700 | 7,876 | **62.5%** | 64.1% | 64.5% |
| APJC | **4,307** | 4,252 | 4,637 | **60.0%** | 57.8% | 59.8% |
| Segment total | **30,682** | 29,331 | 30,400 | **62.4%** | 62.2% | 62.5% |
| Unallocated corporate items [1] | **(1,001)** | (1,562) | (960) | | | |
| Total | $ **29,681** | $ 27,769 | $ 29,440 | **60.4%** | 58.9% | 60.6% |

[1] The unallocated corporate items for the years presented include the effects of amortization and impairments of acquisition-related intangible assets, share-based compensation expense, significant litigation and other contingencies, impacts to cost of sales from purchase accounting adjustments to inventory, charges related to asset impairments and restructurings, and certain other charges. We do not allocate these items to the gross margin for each segment because management does not include such information in measuring the performance of the operating segments.

*Fiscal 2015 Compared with Fiscal 2014*

We experienced a gross margin percentage increase in our Americas segment due to productivity improvements partially offset by unfavorable impacts from pricing. The product mix is flat in this geographic segment as the impact of decreased revenue from our relatively lower margin Service Provider Video products offset the increase in revenue from our relatively lower margin Cisco Unified Computing System products.

The gross margin percentage decrease in our EMEA segment was due primarily to unfavorable impacts from pricing and mix. The unfavorable mix impact was driven by an increase in revenue from our relatively lower margin Cisco Unified Computing System products. Lower service gross margin also contributed to the decrease in the overall gross margin in this segment.

The APJC segment gross margin percentage increased due to productivity improvements and a favorable mix impact, partially offset by unfavorable impacts from pricing. The favorable mix impact was driven by a decrease in revenue from our relatively lower margin Service Provider Video products and an increase in revenue from certain of our higher margin core products.

The gross margin percentage for a particular segment may fluctuate, and period-to-period changes in such percentages may or may not be indicative of a trend for that segment. Our product and service gross margins may be impacted by economic downturns or uncertain economic conditions as well as our movement into new market opportunities, and could decline if any of the factors that impact our gross margins are adversely affected in future periods.

*Fiscal 2014 Compared with Fiscal 2013*

The Americas segment experienced a slight gross margin percentage increase due to the impact of productivity improvements in this geographic segment. Partially offsetting this favorable impact to gross margin were negative impacts from pricing and an unfavorable mix. The unfavorable mix impact was driven by revenue increases in our Cisco Unified Computing System products and lower sales of our higher margin core products, partially offset by decreased revenue from our Service Provider Video products.

The gross margin percentage decrease in our EMEA segment was due primarily to the unfavorable impacts from pricing, as well as an unfavorable mix impact, partially offset by productivity improvements in this geographic segment. The unfavorable mix impact was driven by an increase in revenue from our Cisco Unified Computing System products.

Our APJC segment gross margin percentage decreased primarily as a result of unfavorable impacts from pricing, and also as a result of an unfavorable mix. The unfavorable mix impact was driven by an increase in revenue from our Cisco Unified Computing System products. Partially offsetting these factors were impacts from productivity improvements and higher service gross margin in this geographic segment.

**Factors That May Impact Revenue and Gross Margin**

Product revenue may continue to be affected by factors, including global economic downturns and related market uncertainty, that have resulted in reduced IT-related capital spending in certain segments within our enterprise, service provider, public sector, and commercial markets; changes in the geopolitical environment and global economic conditions; competition, including price-focused competitors from Asia, especially from China; new product introductions; sales cycles and product implementation cycles; changes in the mix of our customers between service provider and enterprise markets; changes in the mix of direct sales and indirect sales; variations in sales channels; and final acceptance criteria of the product, system, or solution as specified by the customer. Sales to the service provider market have been and may be in the future characterized by large and sporadic purchases, especially relating to our NGN Routing sales and sales of certain products within our Collaboration, Service Provider Video and Data Center product categories. In addition, service provider customers typically have longer implementation cycles; require a broader range of services, including network design services; and often have acceptance provisions that can lead to a delay in revenue recognition. Certain of our customers in certain emerging countries also tend to make large and sporadic purchases, and the revenue related to these transactions may similarly be affected by the timing of revenue recognition. As we focus on new market opportunities, customers may require greater levels of financing arrangements, service, and support, especially in certain emerging countries, which in turn may result in a delay in the timing of revenue recognition. To improve customer satisfaction, we continue to focus on managing our manufacturing lead-time performance, which may result in corresponding reductions in order backlog. A decline in backlog levels could result in more variability and less predictability in our quarter-to-quarter revenue and operating results.

Product revenue may also be adversely affected by fluctuations in demand for our products, especially with respect to telecommunications service providers and Internet businesses, whether or not driven by any slowdown in capital expenditures in the service provider market; price and product competition in the communications and information technology industry; introduction and market acceptance of new technologies and products; adoption of new networking standards; and financial difficulties experienced by our customers. We may, from time to time, experience manufacturing issues that create a delay in our suppliers' ability to provide specific components, resulting in delayed shipments. To the extent that manufacturing issues and any related component shortages result in delayed shipments in the future, and particularly in periods when we and our suppliers are operating at higher levels of capacity, it is possible that revenue for a quarter could be adversely affected if such matters are not remediated within the same quarter. For additional factors that may impact product revenue, see "Part I, Item 1A. Risk Factors."

Our distributors participate in various cooperative marketing and other programs. Increased sales to our distributors generally result in greater difficulty in forecasting the mix of our products and, to a certain degree, the timing of orders from our customers. We recognize revenue for sales to our distributors generally based on a sell-through method using information provided by them, and we maintain estimated accruals and allowances for all cooperative marketing and other programs.

Product gross margin may be adversely affected in the future by changes in the mix of products sold, including periods of increased growth of some of our lower margin products; introduction of new products, including products with price-performance advantages and new business models for our offerings such as XaaS; our ability to reduce production costs; entry into new markets, including markets with different pricing structures and cost structures, as a result of internal development or through acquisitions; changes in distribution channels; price competition, including competitors from Asia, especially those from China; changes in geographic mix of our product revenue; the timing of revenue recognition and revenue deferrals; sales discounts; increases in material or labor costs, including share-based compensation expense; excess inventory and obsolescence charges; warranty costs; changes in shipment volume; loss of cost savings due to changes in component pricing; effects of value engineering; inventory holding charges; and the extent to which we successfully execute on our strategy and operating plans. Additionally, our manufacturing-related costs may be negatively impacted by constraints in our supply chain. Service gross margin may be impacted by various factors such as the change in mix between technical support services and advanced services; the timing of technical support service contract initiations and renewals; share-based compensation expense; and the timing of our strategic investments in headcount and resources to support this business.

**Research and Development ("R&D"), Sales and Marketing, and General and Administrative ("G&A") Expenses**

R&D, sales and marketing, and G&A expenses are summarized in the following table (in millions, except percentages):

| | Years Ended | | | 2015 vs. 2014 | | 2014 vs. 2013 | |
| | July 25, 2015 | July 26, 2014 | July 27, 2013 | Variance in Dollars | Variance in Percent | Variance in Dollars | Variance in Percent |
|---|---|---|---|---|---|---|---|
| Research and development | $ 6,207 | $ 6,294 | $ 5,942 | $ (87) | (1.4)% | $ 352 | 5.9 % |
| *Percentage of revenue* | *12.6 %* | *13.4 %* | *12.2 %* | | | | |
| Sales and marketing | 9,821 | 9,503 | 9,538 | 318 | 3.3 % | (35) | (0.4)% |
| *Percentage of revenue* | *20.0 %* | *20.2 %* | *19.6 %* | | | | |
| General and administrative | 2,040 | 1,934 | 2,264 | 106 | 5.5 % | (330) | (14.6)% |
| *Percentage of revenue* | *4.1 %* | *4.1 %* | *4.7 %* | | | | |
| Total | $ 18,068 | $ 17,731 | $ 17,744 | $ 337 | 1.9 % | $ (13) | (0.1)% |
| *Percentage of revenue* | *36.8 %* | *37.6 %* | *36.5 %* | | | | |

## R&D Expenses

### *Fiscal 2015 Compared with Fiscal 2014*

The decrease in R&D expenses for fiscal 2015 , as compared with fiscal 2014 , was primarily due to higher compensation expense recorded in fiscal 2014 in connection with our acquisition of the remaining interest in Insieme. See Note 12 to the Consolidated Financial Statements. Efficiencies arising from our restructuring action announced in August 2014 also contributed to the decrease. These decreases were partially offset by higher contracted services and higher share-based compensation expense.

We continue to invest in R&D in order to bring a broad range of products to market in a timely fashion. If we believe that we are unable to enter a particular market in a timely manner with internally developed products, we may purchase or license technology from other businesses, or we may partner with or acquire businesses as an alternative to internal R&D.

### *Fiscal 2014 Compared with Fiscal 2013*

R&D expenses increased for fiscal 2014 , as compared with fiscal 2013 , primarily due to compensation expense recorded in fiscal 2014 in connection with our acquisition of the remaining interest in Insieme. Higher share-based compensation expense and higher contracted services also contributed to the increase. These increases were partially offset by reduced variable compensation expense as a result of our financial performance and efficiencies related to our workforce reduction plan announced in August 2013.

## Sales and Marketing Expenses

### *Fiscal 2015 Compared with Fiscal 2014*

Sales and marketing expenses increased for fiscal 2015 , as compared with fiscal 2014 , due to higher headcount-related expenses, driven by increased variable compensation expense and higher discretionary spending, partially offset by lower compensation expense from acquisitions.

### *Fiscal 2014 Compared with Fiscal 2013*

Sales and marketing expenses for fiscal 2014 , as compared with fiscal 2013 , decreased slightly due to lower advertising expenses, reductions in other discretionary spending, and lower expenses in other areas such as depreciation expense. These decreases were substantially offset by higher share based compensation expense and higher acquisition- related costs.

## G&A Expenses

### *Fiscal 2015 Compared with Fiscal 2014*

G&A expenses increased in fiscal 2015 , as compared with fiscal 2014 , primarily due to increased variable compensation expense as a result of our financial performance, higher share-based compensation expense and the timing of corporate-level expenses. Corporate-level expenses, which tend to vary from period to period, included operational infrastructure activities such as IT project implementations, which included investments in our global data center infrastructure, and investments related to operational and financial systems.

### *Fiscal 2014 Compared with Fiscal 2013*

G&A expenses decreased in fiscal 2014 , as compared with fiscal 2013 , due to lower contracted services, lower corporate-level expenses, and lower headcount-related expenses. The lower headcount-related expenses were due to efficiencies related to our workforce reduction plan announced in August 2013, and also due to reduced variable compensation expense as a result of our lower financial performance.

Effect of Foreign Currency

In fiscal 2015 , foreign currency fluctuations, net of hedging, decreased the combined R&D, sales and marketing, and G&A expenses by approximately $278 million , or 1.6% , compared with fiscal 2014 . In fiscal 2014 , foreign currency fluctuations, net of hedging, decreased the combined R&D, sales and marketing, and G&A expenses by approximately $153 million , or 0.9% , compared with fiscal 2013 .

**Headcount**

*Fiscal 2015 Compared with Fiscal 2014*

The decrease in headcount of approximately 2,200 employees in fiscal 2015 was due to headcount reductions from attrition and from our restructuring plan announced in August 2014. These headcount reductions were partially offset by headcount additions from targeted hiring in engineering and services, and also by headcount additions from our recent acquisitions.

*Fiscal 2014 Compared with Fiscal 2013*

Our headcount decreased by approximately 1,000 employees in fiscal 2014 . The decrease was due to headcount reductions from attrition and from our workforce reduction plan announced in August 2013. These headcount reductions were partially offset by the increase in headcount from targeted hiring in engineering, services, and also by increased headcount from our recent acquisitions.

**Share-Based Compensation Expense**

The following table presents share-based compensation expense (in millions):

| Years Ended | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| Cost of sales—product | $ 50 | $ 45 | $ 40 |
| Cost of sales—service | 157 | 150 | 138 |
| Share-based compensation expense in cost of sales | 207 | 195 | 178 |
| Research and development | 448 | 411 | 286 |
| Sales and marketing | 559 | 549 | 484 |
| General and administrative | 228 | 198 | 175 |
| Restructuring and other charges | (2) | (5) | (3) |
| Share-based compensation expense in operating expenses | 1,233 | 1,153 | 942 |
| Total share-based compensation expense | $ 1,440 | $ 1,348 | $ 1,120 |

The increase in share-based compensation expense for fiscal 2015 , as compared with fiscal 2014 , was due primarily to higher expense associated with performance-based restricted stock units and charges associated with severance arrangements with certain executives, partially offset by lower expense related to equity awards assumed with respect to our recent acquisitions.

The increase in share-based compensation expense for fiscal 2014 , as compared with fiscal 2013 , was due primarily to share-based compensation expense attributable to equity awards assumed with respect to our recent acquisitions and higher forfeiture credits in fiscal 2013.

**Amortization of Purchased Intangible Assets**

The following table presents the amortization of purchased intangible assets (in millions):

| Years Ended | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| Amortization of purchased intangible assets: | | | |
| Cost of sales | $ 814 | $ 742 | $ 606 |
| Operating expenses | 359 | 275 | 395 |
| Total | $ 1,173 | $ 1,017 | $ 1,001 |

Amortization of purchased intangible assets increased in fiscal 2015 , compared with fiscal 2014 , primarily due to the impairment charges of approximately $175 million recorded in fiscal 2015. The impairment charges were primarily due to declines in estimated fair value resulting from reductions in or the elimination of expected future cash flows associated with certain of our technology and IPR&D intangible assets.

Amortization of purchased intangible assets increased in fiscal 2014 as compared with fiscal 2013 , primarily due to amortization of purchased intangible assets from our recent acquisitions partially offset by certain purchased intangible assets having become fully amortized.

The fair value of acquired technology and patents, as well as acquired technology under development, is determined at acquisition date primarily using the income approach, which discounts expected future cash flows to present value. The discount rates used in the present value calculations are typically derived from a weighted-average cost of capital analysis and then adjusted to reflect risks inherent in the development lifecycle as appropriate. We consider the pricing model for products related to these acquisitions to be standard within the high-technology communications industry, and the applicable discount rates represent the rates that market participants would use for valuation of such intangible assets.

**Restructuring and Other Charges**

Fiscal 2015 Plan

In connection with a restructuring action announced in August 2014 ("Fiscal 2015 Plan"), we incurred restructuring and other charges of $489 million during fiscal 2015, which were related primarily to severance and other one-time termination benefits and other associated costs. We expect this plan to be substantially completed during the first half of fiscal 2016. We plan to reinvest substantially all of the cost savings from the restructuring actions in key growth areas of our business such as data center, software, security, and cloud. The overall cost savings from these restructuring actions were not material for the periods presented and are not expected to be material for future periods.

Fiscal 2014 Plan and Fiscal 2011 Plans

In connection with a restructuring action announced in August 2013 ("Fiscal 2014 Plan"), we incurred restructuring and other charges of approximately $418 million during fiscal 2014 which were related primarily to employee severance charges for employees impacted by our workforce reduction under the Fiscal 2014 Plan. We completed the Fiscal 2014 Plan at the end of fiscal 2014. With regard to the Fiscal 2011 Plans (see Note 5 to the Consolidated Financial Statements), we incurred restructuring and other charges of $105 million during fiscal 2013, which were related primarily to employee severance charges for employees impacted by our workforce reduction under these plans.

**Operating Income**

The following table presents our operating income and our operating income as a percentage of revenue (in millions, except percentages):

| Years Ended | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| Operating income | $ 10,770 | $ 9,345 | $ 11,196 |
| Operating income as a percentage of revenue | 21.9% | 19.8% | 23.0% |

For fiscal 2015 , as compared with fiscal 2014 , operating income increased by 15% , and as a percentage of revenue operating income increased by 2.1 percentage points. The increase resulted from the following: an increase in revenue; a gross margin percentage increase, driven in part by the $655 million supplier component remediation charge (or 1.4 percentage points of fiscal 2014 revenue) recorded in fiscal 2014 ; and higher compensation expense recorded in fiscal 2014 in connection with our acquisition of the remaining interest in Insieme.

57

For fiscal 2014, as compared with fiscal 2013, operating income decreased by 17%, and as a percentage of revenue operating income decreased by 3.2 percentage points. The decrease resulted from the following: a decrease in revenue; a gross margin percentage decline, driven in part by the $655 million supplier component remediation charge (or 1.4 percentage points of fiscal 2014 revenue); the $416 million compensation expense recorded in fiscal 2014 in connection with our acquisition of the remaining interest in Insieme; and an increase in restructuring and other charges related to the workforce reduction under the Fiscal 2014 Plan.

**Interest and Other Income (Loss), Net**

<u>Interest Income (Expense), Net</u>  The following table summarizes interest income and interest expense (in millions):

| | Years Ended | | | 2015 vs. 2014 | 2014 vs. 2013 |
| | July 25, 2015 | July 26, 2014 | July 27, 2013 | Variance in Dollars | Variance in Dollars |
|---|---|---|---|---|---|
| Interest income | $ 769 | $ 691 | $ 654 | $ 78 | $ 37 |
| Interest expense | (566) | (564) | (583) | (2) | 19 |
| Interest income (expense), net | $ 203 | $ 127 | $ 71 | $ 76 | $ 56 |

<u>*Fiscal 2015 Compared with Fiscal 2014*</u>

Interest income increased in fiscal 2015 as compared with fiscal 2014, driven by an increase in our portfolio of cash, cash equivalents, and fixed income investments. Interest expense in fiscal 2015 as compared with the prior fiscal year increased slightly, driven by additional interest expense due to the net increase in long-term debt in fiscal 2015 .

<u>*Fiscal 2014 Compared with Fiscal 2013*</u>

Interest income increased in fiscal 2014 as compared with fiscal 2013 due to the increase in our portfolio of cash, cash equivalents, and fixed income investments. The decrease in interest expense in fiscal 2014 as compared with the prior fiscal year was primarily attributable to the favorable impact of incremental interest rate swaps entered into during fiscal 2014 and the fourth quarter of fiscal 2013. This decrease was partially offset by additional interest expense due to the increase in long-term debt in fiscal 2014.

<u>Other Income (Loss), Net</u> The components of other income (loss), net, are summarized as follows (in millions):

| | Years Ended | | | 2015 vs. 2014 | 2014 vs. 2013 |
| | July 25, 2015 | July 26, 2014 | July 27, 2013 | Variance in Dollars | Variance in Dollars |
|---|---|---|---|---|---|
| Gains (losses) on investments, net: | | | | | |
| Publicly traded equity securities | $ 116 | $ 253 | $ 17 | $ (137) | $ 236 |
| Fixed income securities | 41 | 47 | 31 | (6) | 16 |
| Total available-for-sale investments | 157 | 300 | 48 | (143) | 252 |
| Privately held companies | 82 | (60) | (57) | 142 | (3) |
| Net gains (losses) on investments | 239 | 240 | (9) | (1) | 249 |
| Other gains (losses), net | (11) | 3 | (31) | (14) | 34 |
| Other income (loss), net | $ 228 | $ 243 | $ (40) | $ (15) | $ 283 |

<u>*Fiscal 2015 Compared with Fiscal 2014*</u>

The decrease in total net gains on available-for-sale investments in fiscal 2015 compared with fiscal 2014 was primarily attributable to lower gains on publicly traded equity securities in the current period as a result of market conditions and the timing of sales of these securities.

The change in net gains (losses) on investments in privately held companies for the fiscal 2015 as compared with fiscal 2014 was primarily due to a $126 million gain recorded in fiscal 2015 related to the reorganization of our investments in VCE and lower losses related to this investment under the equity method. We ceased accounting for VCE under the equity method in October 2014. These favorable items were partially offset by higher impairment charges and lower realized gains from sales of various investments in privately held companies.

The change in other gains (losses), net in fiscal 2015 as compared with fiscal 2014 was driven by equity derivative impacts and higher donation expenses, partially offset by net favorable foreign exchange impacts in fiscal 2015 .

*Fiscal 2014 Compared with Fiscal 2013*

The increase in total net gains on available-for-sale investments in fiscal 2014 compared with fiscal 2013 was primarily attributable to higher gains on publicly traded equity securities in the current period as a result of market conditions and the timing of sales of these securities.

The change in net losses on investments in privately held companies for the fiscal 2014 as compared with fiscal 2013 was primarily due to an increase of $40 million in our proportional share of losses from our VCE joint venture, partially offset by higher realized gains from various investments in privately held companies.

The change in other gains (losses), net in fiscal 2014 as compared with fiscal 2013 was primarily due to higher gains on equity derivative instruments and lower donation expenses, partially offset by unfavorable foreign exchange impacts in fiscal 2014.

## Provision for Income Taxes

Our provision for income taxes is subject to volatility and could be adversely impacted by earnings being lower than anticipated in countries that have lower tax rates, higher than anticipated in countries that have higher tax rates, and expiration of or lapses in tax incentives. Our provision for income taxes does not include provisions for U.S. income taxes and foreign withholding taxes associated with the repatriation of undistributed earnings of certain foreign subsidiaries that we intend to reinvest indefinitely in our foreign subsidiaries. If these earnings were distributed from the foreign subsidiaries to the United States in the form of dividends or otherwise, or if the shares of the relevant foreign subsidiaries were sold or otherwise transferred, we would be subject to additional U.S. income taxes (subject to an adjustment for foreign tax credits) and foreign withholding taxes. Further, as a result of certain of our ongoing employment and capital investment actions and commitments, our income in certain countries is subject to reduced tax rates and in some cases is wholly exempt from tax. Our failure to meet these commitments could adversely impact our provision for income taxes.

*Fiscal 2015 Compared with Fiscal 2014*

The provision for income taxes resulted in an effective tax rate of 19.8% for fiscal 2015 , compared with 19.2% for fiscal 2014 . The net 0.6 percentage point increase in the effective tax rate between fiscal years was primarily due to a decrease in foreign income taxed at lower than U.S. rates, partially offset by an increase in U.S. federal R&D tax credit.

For a full reconciliation of our effective tax rate to the U.S. federal statutory rate of 35% and for further explanation of our provision for income taxes, see Note 16 to the Consolidated Financial Statements.

*Fiscal 2014 Compared with Fiscal 2013*

The provision for income taxes resulted in an effective tax rate of 19.2% for fiscal 2014 , compared with 11.1% for fiscal 2013. The net 8.1 percentage point increase in the effective tax rate between fiscal years was primarily attributable to a non-recurring net tax benefit of $794 million, or 7.1 percentage points, due to a tax settlement with the IRS in fiscal 2013.

## LIQUIDITY AND CAPITAL RESOURCES

The following sections discuss the effects of changes in our balance sheet, our capital allocation strategy including stock repurchase program and dividends, our contractual obligations, and certain other commitments and activities on our liquidity and capital resources.

### Balance Sheet and Cash Flows

<u>Cash and Cash Equivalents and Investments</u>  The following table summarizes our cash and cash equivalents and investments (in millions):

|  | July 25, 2015 | July 26, 2014 | Increase (Decrease) |
|---|---|---|---|
| Cash and cash equivalents | $ 6,877 | $ 6,726 | $ 151 |
| Fixed income securities | 51,974 | 43,396 | 8,578 |
| Publicly traded equity securities | 1,565 | 1,952 | (387) |
| Total | $ 60,416 | $ 52,074 | $ 8,342 |

The net increase in cash and cash equivalents and investments from fiscal 2014 to fiscal 2015 was primarily the result of cash provided by operating activities of $12.6 billion , a net increase in debt of $4.5 billion and the net issuance of common stock of $1.5 billion pursuant to employee stock incentive and purchase plans. These sources of cash were partially offset by the repurchase of common stock of $4.3 billion under the stock repurchase program, cash dividends paid of $4.1 billion , capital expenditures of $1.2 billion and net cash paid for acquisitions of $0.3 billion .

Our total in cash and cash equivalents and investments held by various foreign subsidiaries was $53.4 billion and $47.4 billion as of July 25, 2015 and July 26, 2014 , respectively. Under current tax laws and regulations, if these assets were to be distributed from the foreign subsidiaries to the United States in the form of dividends or otherwise, we would be subject to additional U.S. income taxes (subject to an adjustment for foreign tax credits) and foreign withholding taxes. The balance of cash and cash equivalents and investments available in the United States as of July 25, 2015 and July 26, 2014 was $7.0 billion and $4.7 billion , respectively.

We maintain an investment portfolio of various holdings, types, and maturities. We classify our investments as short-term investments based on their nature and their availability for use in current operations. We believe the overall credit quality of our portfolio is strong, with our cash equivalents and our fixed income investment portfolio consisting primarily of high quality investment-grade securities. We believe that our strong cash and cash equivalents and investments position allows us to use our cash resources for strategic investments to gain access to new technologies, for acquisitions, for customer financing activities, for working capital needs, and for the repurchase of shares of common stock and payment of dividends as discussed below.

<u>Free Cash Flow and Capital Allocation</u>  As part of our capital allocation strategy, we intend to return a minimum of 50% of our free cash flow annually to our shareholders through cash dividends and repurchases of common stock.

We define free cash flow as net cash provided by operating activities less cash used to acquire property and equipment. The following table reconciles our net cash provided by operating activities to free cash flow (in millions):

| Years Ended | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| Net cash provided by operating activities | $ 12,552 | $ 12,332 | $ 12,894 |
| Acquisition of property and equipment | (1,227) | (1,275) | (1,160) |
| Free cash flow | $ 11,325 | $ 11,057 | $ 11,734 |

We expect that cash provided by operating activities may fluctuate in future periods as a result of a number of factors, including fluctuations in our operating results, the rate at which products are shipped during the quarter (which we refer to as shipment linearity), the timing and collection of accounts receivable and financing receivables, inventory and supply chain management, deferred revenue, excess tax benefits resulting from share-based compensation, and the timing and amount of tax and other payments. For additional discussion, see "Part I, Item 1A. Risk Factors" in this report.

We consider free cash flow to be a liquidity measure that provides useful information to management and investors because of our intent to return a stated percentage of free cash flow to shareholders in the form of dividends and stock repurchases. We further regard free cash flow as a useful measure because it reflects cash that can be used to, among other things, invest in our business, make strategic acquisitions, repurchase common stock, and pay dividends on our common stock, after deducting capital investments. A limitation of the utility of free cash flow as a measure of financial performance and liquidity is that the free cash flow does not represent the total increase or decrease in our cash balance for the period. In addition, we have other required uses of cash, including repaying the principal of our outstanding indebtedness. Free cash flow is not a measure calculated in

60

accordance with U.S. generally accepted accounting principles and should not be regarded in isolation or as an alternative for net income provided by operating activities or any other measure calculated in accordance with such principles, and other companies may calculate free cash flow in a different manner than we do.

The following table summarizes the dividends paid and stock repurchases (in millions, except per-share amounts):

| Years Ended | DIVIDENDS | | | STOCK REPURCHASE PROGRAM | | | TOTAL | |
| | Per Share | | Amount | Shares | Weighted-Average Price per Share | | Amount | Amount |
|---|---|---|---|---|---|---|---|---|
| July 25, 2015 | $ | 0.80 | $ | 4,086 | 155 | $ | 27.22 | $ | 4,234 | $ | 8,320 |
| July 26, 2014 | $ | 0.72 | $ | 3,758 | 420 | $ | 22.71 | $ | 9,539 | $ | 13,297 |
| July 27, 2013 | $ | 0.62 | $ | 3,310 | 128 | $ | 21.63 | $ | 2,773 | $ | 6,083 |

Any future dividends will be subject to the approval of our Board of Directors.

<u>Accounts Receivable, Net</u>  The following table summarizes our accounts receivable, net (in millions), and DSO:

| | July 25, 2015 | July 26, 2014 | Increase (Decrease) |
|---|---|---|---|
| Accounts receivable, net | $ 5,344 | $ 5,157 | $ 187 |
| DSO | 38 | 38 | — |

Our accounts receivable net, as of July 25, 2015 increased by approximately 4% compared with the end of fiscal 2014 . Our DSO as of July 25, 2015 was flat compared with the end of fiscal 2014 , as factors that drive DSO such as shipment linearity and collections were similar for the periods presented.

<u>Inventory Supply Chain</u>  The following table summarizes our inventories and purchase commitments with contract manufacturers and suppliers (in millions, except annualized inventory turns):

| | July 25, 2015 | July 26, 2014 | Increase (Decrease) |
|---|---|---|---|
| Inventories | $ 1,627 | $ 1,591 | $ 36 |
| Annualized inventory turns | 12.1 | 12.7 | (0.6) |
| Purchase commitments with contract manufacturers and suppliers | $ 4,078 | $ 4,169 | $ (91) |

Inventory as of July 25, 2015 increased by 2% from our inventory balance at the end of fiscal 2014 , and for the same period purchase commitments with contract manufacturers and suppliers decreased by approximately 2% . On a combined basis, inventories and purchase commitments with contract manufacturers and suppliers decreased by 1% compared with the end of fiscal 2014 . We believe our inventory and purchase commitments levels are in line with our current demand forecasts.

Our finished goods consist of distributor inventory and deferred cost of sales and manufactured finished goods. Distributor inventory and deferred cost of sales are related to unrecognized revenue on shipments to distributors and retail partners as well as shipments to customers. Manufactured finished goods consist primarily of build-to-order and build-to-stock products.

We purchase components from a variety of suppliers and use several contract manufacturers to provide manufacturing services for our products. During the normal course of business, in order to manage manufacturing lead times and help ensure adequate component supply, we enter into agreements with contract manufacturers and suppliers that allow them to procure inventory based upon criteria as defined by us or that establish the parameters defining our requirements and our commitment to securing manufacturing capacity. A significant portion of our reported purchase commitments arising from these agreements are firm, noncancelable, and unconditional commitments. In certain instances, these agreements allow us the option to cancel, reschedule, and adjust our requirements based on our business needs prior to firm orders being placed. Our purchase commitments are for short-term product manufacturing requirements as well as for commitments to suppliers to secure manufacturing capacity.

Inventory and supply chain management remain areas of focus as we balance the need to maintain supply chain flexibility to help ensure competitive lead times with the risk of inventory obsolescence because of rapidly changing technology and customer requirements. We believe the amount of our inventory and purchase commitments is appropriate for our revenue levels.

<u>Financing Receivables and Guarantees</u> We measure our net balance sheet exposure position related to our financing receivables and financing guarantees by reducing the total of gross financing receivables and financing guarantees by the associated allowances for credit loss and deferred revenue. As of July 25, 2015 , our net balance sheet exposure position related to financing receivables and financing guarantees was as follows (in millions):

| July 25, 2015 | FINANCING RECEIVABLES | | | | FINANCING GUARANTEES | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Lease Receivables | Loan Receivables | Financed Service Contracts and Other | Total | Channel Partner | End-User Customers | Total | TOTAL |
| Financing receivables and guarantees | $ 3,395 | $ 1,763 | $ 3,573 | $ 8,731 | $ 288 | $ 129 | $ 417 | $ 9,148 |
| Allowance for credit loss | (259) | (87) | (36) | (382) | — | — | — | (382) |
| Deferred revenue | (5) | (13) | (1,853) | (1,871) | (127) | (107) | (234) | (2,105) |
| Net balance sheet exposure | $ 3,131 | $ 1,663 | $ 1,684 | $ 6,478 | $ 161 | $ 22 | $ 183 | $ 6,661 |

<u>*Financing Receivables*</u>  Financing receivables less unearned income increased by 4% compared with the end of fiscal 2014 . The change was primarily due to an 11% increase in financed service contracts and other, and a 5% increase in loan receivables, partially offset by a 4% decrease in lease receivables. We provide financing to certain end-user customers and channel partners to enable sales of our products, services, and networking solutions. These financing arrangements include leases, financed service contracts, and loans. Arrangements related to leases are generally collateralized by a security interest in the underlying assets. Lease receivables include sales-type and direct-financing leases. We also provide certain qualified customers financing for long-term service contracts, which primarily relate to technical support services. Our loan financing arrangements may include not only financing the acquisition of our products and services but also providing additional funds for other costs associated with network installation and integration of our products and services. We expect to continue to expand the use of our financing programs in the near term.

<u>*Financing Guarantees*</u>  In the normal course of business, third parties may provide financing arrangements to our customers and channel partners under financing programs. The financing arrangements to customers provided by third parties are related to leases and loans and typically have terms of up to three years. In some cases, we provide guarantees to third parties for these lease and loan arrangements. The financing arrangements to channel partners consist of revolving short-term financing provided by third parties, generally with payment terms ranging from 60 to 90 days. In certain instances, these financing arrangements result in a transfer of our receivables to the third party. The receivables are derecognized upon transfer, as these transfers qualify as true sales, and we receive payments for the receivables from the third party based on our standard payment terms. The volume of channel partner financing was $25.9 billion , $24.6 billion , and $23.8 billion in fiscal 2015, 2014, and 2013 , respectively. These financing arrangements facilitate the working capital requirements of the channel partners, and in some cases, we guarantee a portion of these arrangements. The balance of the channel partner financing subject to guarantees was $1.2 billion as of each of July 25, 2015 and July 26, 2014 . We could be called upon to make payments under these guarantees in the event of nonpayment by the channel partners or end-user customers. Historically, our payments under these arrangements have been immaterial. Where we provide a guarantee, we defer the revenue associated with the channel partner and end-user financing arrangement in accordance with revenue recognition policies, or we record a liability for the fair value of the guarantees. In either case, the deferred revenue is recognized as revenue when the guarantee is removed.

<u>*Deferred Revenue Related to Financing Receivables and Guarantees*</u> The majority of the deferred revenue in the preceding table is related to financed service contracts. The majority of the revenue related to financed service contracts, which primarily relates to technical support services, is deferred as the revenue related to financed service contracts is recognized ratably over the period during which the related services are to be performed. A portion of the revenue related to lease and loan receivables is also deferred and included in deferred product revenue based on revenue recognition criteria not currently having been met.

Borrowings

*Senior Notes*  The following table summarizes the principal amount of our senior notes (in millions):

| | Maturity Date | | July 25, 2015 | | July 26, 2014 |
|---|---|---|---|---|---|
| Senior notes: | | | | | |
| Floating-rate notes: | | | | | |
| Three-month LIBOR plus 0.05% | September 3, 2015 | | $ 850 | $ | 850 |
| Three-month LIBOR plus 0.28% | March 3, 2017 | | 1,000 | | 1,000 |
| Three-month LIBOR plus 0.31% | June 15, 2018 | (1) | 900 | | — |
| Three-month LIBOR plus 0.50% | March 1, 2019 | | 500 | | 500 |
| Fixed-rate notes: | | | | | |
| 2.90% | November 17, 2014 | | — | | 500 |
| 5.50% | February 22, 2016 | | 3,000 | | 3,000 |
| 1.10% | March 3, 2017 | | 2,400 | | 2,400 |
| 3.15% | March 14, 2017 | | 750 | | 750 |
| 1.65% | June 15, 2018 | (1) | 1,600 | | — |
| 4.95% | February 15, 2019 | | 2,000 | | 2,000 |
| 2.125% | March 1, 2019 | | 1,750 | | 1,750 |
| 4.45% | January 15, 2020 | | 2,500 | | 2,500 |
| 2.45% | June 15, 2020 | (1) | 1,500 | | — |
| 2.90% | March 4, 2021 | | 500 | | 500 |
| 3.00% | June 15, 2022 | (1) | 500 | | — |
| 3.625% | March 4, 2024 | | 1,000 | | 1,000 |
| 3.50% | June 15, 2025 | (1) | 500 | | — |
| 5.90% | February 15, 2039 | | 2,000 | | 2,000 |
| 5.50% | January 15, 2040 | | 2,000 | | 2,000 |
| Total | | | $ 25,250 | $ | 20,750 |

(1) In June 2015, we issued senior notes with an aggregate principal amount of $5.0 billion .

Interest is payable semiannually on each class of the senior fixed-rate notes, each of which is redeemable by us at any time, subject to a make-whole premium. Interest is payable quarterly on the floating-rate notes. We were in compliance with all debt covenants as of July 25, 2015 .

We repaid the fixed-rate notes (2.90%) due on November 17, 2014, for an aggregate principal amount of $500 million upon maturity.

We repaid the floating-rate notes due on September 3, 2015 for an aggregate principal amount of $850 million upon maturity.

*Other Debt* Other debt as of July 25, 2015 and July 26, 2014 includes secured borrowings associated with customer financing arrangements. The amount of borrowings outstanding under these arrangements was $4 million and $12 million as of July 25, 2015 and July 26, 2014 , respectively.

*Commercial Paper* In fiscal 2011, we established a short-term debt financing program of up to $3.0 billion through the issuance of commercial paper notes. We use the proceeds from the issuance of commercial paper notes for general corporate purposes. We had no commercial paper notes outstanding as of each of July 25, 2015 and July 26, 2014 .

*Credit Facility* On May 15, 2015, we entered into a credit agreement with certain institutional lenders that provides for a $3.0 billion unsecured revolving credit facility that is scheduled to expire on May 15, 2020. Any advances under the credit agreement will accrue interest at rates that are equal to, based on certain conditions, either (i) the highest of (a) the Federal Funds rate plus 0.50%, (b) Bank of America's "prime rate" as announced from time to time, or (c) LIBOR, or a comparable or successor rate that is approved by the Administrative Agent ("Eurocurrency Rate"), for an interest period of one month plus 1.00%, or (ii) the Eurocurrency Rate, plus a margin that is based on our senior debt credit ratings as published by Standard & Poor's Financial Services, LLC and Moody's Investors Service, Inc., provided that in no event will the Eurocurrency Rate be less than zero. The credit agreement requires that we comply with certain covenants, including that it maintains an interest coverage ratio as defined in the agreement.

We may also, upon the agreement of either the then-existing lenders or additional lenders not currently parties to the agreement, increase the commitments under the credit facility by up to an additional $2.0 billion and/or extend the expiration date of the credit facility up to May 15, 2022. We were in compliance with the required interest coverage ratio and the other covenants, and we had not borrowed any funds under the credit facility.

This credit facility replaces our prior credit facility that was entered into on February 17, 2012, which was terminated in connection with its entering into the new credit facility.

_Deferred Revenue_  The following table presents the breakdown of deferred revenue (in millions):

|  | July 25, 2015 | July 26, 2014 | Increase (Decrease) |
|---|---|---|---|
| Service | $ 9,757 | $ 9,640 | $ 117 |
| Product | 5,426 | 4,502 | 924 |
| Total | $ 15,183 | $ 14,142 | $ 1,041 |
| Reported as: |  |  |  |
| Current | $ 9,824 | $ 9,478 | $ 346 |
| Noncurrent | 5,359 | 4,664 | 695 |
| Total | $ 15,183 | $ 14,142 | $ 1,041 |

Deferred product revenue increased 21% primarily due to increased deferrals related to subscription and software revenue arrangements and also, to a lesser extent, to an increase in shipments not having met revenue recognition criteria as of July 25, 2015 . The product categories of Collaboration, Security, and Wireless were the key contributors to the increase. The increase in deferred service revenue in fiscal 2015 was driven by the timing of multiyear arrangements, an increase in customers paying technical support service contracts over time and the impact of ongoing amortization of deferred service revenue.

**Contractual Obligations**

The impact of contractual obligations on our liquidity and capital resources in future periods should be analyzed in conjunction with the factors that impact our cash flows from operations discussed previously. In addition, we plan for and measure our liquidity and capital resources through an annual budgeting process. The following table summarizes our contractual obligations at July 25, 2015 (in millions):

|  |  | PAYMENTS DUE BY PERIOD |  |  |  |
|---|---|---|---|---|---|
| July 25, 2015 | Total | Less than 1 Year | 1 to 3 Years | 3 to 5 Years | More than 5 Years |
| Operating leases | $ 1,142 | $ 346 | $ 435 | $ 178 | $ 183 |
| Purchase commitments with contract manufacturers and suppliers | 4,078 | 4,078 | — | — | — |
| Other purchase obligations | 2,012 | 604 | 815 | 536 | 57 |
| Long-term debt including the current portion | 25,251 | 3,850 | 6,651 | 8,250 | 6,500 |
| Other long-term liabilities | 1,213 | — | 350 | 72 | 791 |
| Total by period | $ 33,696 | $ 8,878 | $ 8,251 | $ 9,036 | $ 7,531 |
| Other long-term liabilities (uncertainty in the timing of future payments) | 2,122 |  |  |  |  |
| Total | $ 35,818 |  |  |  |  |

_Operating Leases_  For more information on our operating leases, see Note 12 to the Consolidated Financial Statements.

_Purchase Commitments with Contract Manufacturers and Suppliers_  We purchase components from a variety of suppliers and use several contract manufacturers to provide manufacturing services for our products. A significant portion of our reported estimated purchase commitments arising from these agreements are firm, noncancelable, and unconditional commitments. We record a liability for firm, noncancelable, and unconditional purchase commitments for quantities in excess of our future demand forecasts consistent with the valuation of our excess and obsolete inventory. See further discussion in "Inventory Supply Chain." As of July 25, 2015 , the liability for these purchase commitments was $156 million and is recorded in other current liabilities and is not included in the preceding table.

*Other Purchase Obligations*   Other purchase obligations represent an estimate of all contractual obligations in the ordinary course of business, other than operating leases and commitments with contract manufacturers and suppliers, for which we have not received the goods or services. Purchase orders are not included in the preceding table as they typically represent our authorization to purchase rather than binding contractual purchase obligations.

*Long-Term Debt*   The amount of long-term debt in the preceding table represents the principal amount of the respective debt instruments. See Note 10 to the Consolidated Financial Statements.

*Other Long-Term Liabilities*   Other long-term liabilities primarily include noncurrent income taxes payable, accrued liabilities for deferred compensation, noncurrent deferred tax liabilities, and certain other long-term liabilities. Due to the uncertainty in the timing of future payments, our noncurrent income taxes payable of approximately $1,876 million and noncurrent deferred tax liabilities of $246 million were presented as one aggregated amount in the total column on a separate line in the preceding table. Noncurrent income taxes payable include uncertain tax positions (see Note 16 to the Consolidated Financial Statements).

**Other Commitments**

In connection with our business combinations and asset purchases, we have agreed to pay certain additional amounts contingent upon the achievement of certain agreed-upon technology, development, product, or other milestones or the continued employment with us of certain employees of the acquired entities. See Note 12 to the Consolidated Financial Statements.

*Insieme Networks, Inc.*   In the third quarter of fiscal 2012, we made an investment in Insieme, an early stage company focused on research and development in the data center market. As set forth in the agreement between Cisco and Insieme, this investment included $100 million of funding and a license to certain of our technology. Immediately prior to the call option exercise and acquisition described below, we owned approximately 83% of Insieme as a result of these investments and have consolidated the results of Insieme in our Consolidated Financial Statements. In connection with this investment, we entered into a put/call option agreement that provided us with the right to purchase the remaining interests in Insieme. In addition, the noncontrolling interest holders could require us to purchase their shares upon the occurrence of certain events.

During the first quarter of fiscal 2014, we exercised our call option and entered into an agreement to purchase the remaining interests in Insieme. The acquisition closed in the second quarter of fiscal 2014, at which time the former noncontrolling interest holders became eligible to receive up to two milestone payments, which will be determined using agreed-upon formulas based primarily on revenue for certain of Insieme's products. During fiscal 2015 and 2014 , we recorded compensation expense of $207 million and $416 million , respectively, related to the fair value of the vested portion of amounts that were earned or expected to be earned by the former noncontrolling interest holders. Continued vesting and changes to the fair value of the amounts probable of being earned will result in adjustments to the recorded compensation expense in future periods. Based on the terms of the agreement, we have determined that the maximum amount that could be recorded as compensation expense by us is approximately $843 million (which includes the $623 million that has been expensed to date), net of forfeitures. The milestone payments, to the extent earned, are expected to be paid primarily during the first half of each of fiscal 2016 and fiscal 2017.

*Other Funding Commitments*   We also have certain funding commitments primarily related to our investments in privately held companies and venture funds, some of which are based on the achievement of certain agreed-upon milestones, and some of which are required to be funded on demand. The funding commitments were $205 million as of July 25, 2015 , compared with $255 million as of July 26, 2014 .

**Off-Balance Sheet Arrangements**

We consider our investments in unconsolidated variable interest entities to be off-balance sheet arrangements. In the ordinary course of business, we have investments in privately held companies and provide financing to certain customers. These privately held companies and customers may be considered to be variable interest entities. We evaluate on an ongoing basis our investments in these privately held companies and customer financings, and we have determined that as of July 25, 2015 there were no material unconsolidated variable interest entities.

On an ongoing basis, we reassess our investments in privately held companies and customer financings to determine if they are variable interest entities and if we would be regarded as the primary beneficiary pursuant to the applicable accounting guidance. As a result of this ongoing assessment, we may be required to make additional disclosures or consolidate these entities. Because we may not control these entities, we may not have the ability to influence these events.

We provide financing guarantees, which are generally for various third-party financing arrangements extended to our channel partners and end-user customers. We could be called upon to make payments under these guarantees in the event of nonpayment by the channel partners or end-user customers. See the previous discussion of these financing guarantees under "Financing Receivables and Guarantees."

**Securities Lending**

We periodically engage in securities lending activities with certain of our available-for-sale investments. These transactions are accounted for as a secured lending of the securities, and the securities are typically loaned only on an overnight basis. The average daily balance of securities lending for fiscal 2015 and 2014 was $0.4 billion and $1.5 billion , respectively. We require collateral equal to at least 102% of the fair market value of the loaned security and that the collateral be in the form of cash or liquid, high-quality assets. We engage in these secured lending transactions only with highly creditworthy counterparties, and the associated portfolio custodian has agreed to indemnify us against collateral losses. As of July 25, 2015 and July 26, 2014 , we had no outstanding securities lending transactions. We believe these arrangements do not present a material risk or impact to our liquidity requirements.

**Liquidity and Capital Resource Requirements**

Based on past performance and current expectations, we believe our cash and cash equivalents, investments, cash generated from operations, and ability to access capital markets and committed credit lines will satisfy, through at least the next 12 months, our liquidity requirements, both in total and domestically, including the following: working capital needs, capital expenditures, investment requirements, stock repurchases, cash dividends, contractual obligations, commitments, principal and interest payments on debt, future customer financings, and other liquidity requirements associated with our operations. There are no other transactions, arrangements, or relationships with unconsolidated entities or other persons that are reasonably likely to materially affect the liquidity and the availability of, as well as our requirements for, capital resources.

66

**Item 7A.        Quantitative and Qualitative Disclosures About Market Risk**

Our financial position is exposed to a variety of risks, including interest rate risk, equity price risk, and foreign currency exchange risk.

**Interest Rate Risk**

Fixed Income Securities We maintain an investment portfolio of various holdings, types, and maturities. Our primary objective for holding fixed income securities is to achieve an appropriate investment return consistent with preserving principal and managing risk. At any time, a sharp rise in market interest rates could have a material adverse impact on the fair value of our fixed income investment portfolio. Conversely, declines in interest rates, including the impact from lower credit spreads, could have a material adverse impact on interest income for our investment portfolio. We may utilize derivative instruments designated as hedging instruments to achieve our investment objectives. We had no outstanding hedging instruments for our fixed income securities as of July 25, 2015 . Our fixed income investments are held for purposes other than trading. Our fixed income investments are not leveraged as of July 25, 2015 . We monitor our interest rate and credit risks, including our credit exposures to specific rating categories and to individual issuers. As of July 25, 2015 , approximately 65% of our fixed income securities balance consisted of U.S. government and U.S. government agency securities. We believe the overall credit quality of our portfolio is strong.

The following tables present the hypothetical fair values of our fixed income securities, including the hedging effects when applicable, as a result of selected potential market decreases and increases in interest rates. The market changes reflect immediate hypothetical parallel shifts in the yield curve of plus or minus 50 basis points ("BPS"), plus 100 BPS, and plus 150 BPS. Due to the low interest rate environment at the end of each of fiscal 2015 and fiscal 2014 , we did not believe a parallel shift of minus 100 BPS or minus 150 BPS was relevant. The hypothetical fair values as of July 25, 2015 and July 26, 2014 are as follows (in millions):

| | VALUATION OF SECURITIES GIVEN AN INTEREST RATE DECREASE OF X BASIS POINTS | | | FAIR VALUE AS OF JULY 25, 2015 | VALUATION OF SECURITIES GIVEN AN INTEREST RATE INCREASE OF X BASIS POINTS | | |
|---|---|---|---|---|---|---|---|
| | (150 BPS) | (100 BPS) | (50 BPS) | | 50 BPS | 100 BPS | 150 BPS |
| Fixed income securities | N/A | N/A | $52,366 | **$51,974** | $51,582 | $51,189 | $50,797 |

| | VALUATION OF SECURITIES GIVEN AN INTEREST RATE DECREASE OF X BASIS POINTS | | | FAIR VALUE AS OF JULY 26, 2014 | VALUATION OF SECURITIES GIVEN AN INTEREST RATE INCREASE OF X BASIS POINTS | | |
|---|---|---|---|---|---|---|---|
| | (150 BPS) | (100 BPS) | (50 BPS) | | 50 BPS | 100 BPS | 150 BPS |
| Fixed income securities | N/A | N/A | $43,721 | $43,396 | $43,071 | $42,747 | $42,422 |

Financing Receivables As of July 25, 2015 , our financing receivables had a carrying value of $8.3 billion , compared with $8.1 billion as of July 26, 2014 . As of July 25, 2015 , a hypothetical 50 BPS increase or decrease in market interest rates would change the fair value of our financing receivables by a decrease or increase of approximately $0.1 billion, respectively.

Debt As of July 25, 2015 , we had $25.3 billion in principal amount of senior notes outstanding, which consisted of $3.3 billion floating-rate notes and $22.0 billion fixed-rate notes. The carrying amount of the senior notes was $25.4 billion , and the related fair value based on market prices was $26.6 billion . As of July 25, 2015 , a hypothetical 50 BPS increase or decrease in market interest rates would change the fair value of the fixed-rate debt, excluding the $11.4 billion of hedged debt, by a decrease or increase of approximately $0.4 billion, respectively. However, this hypothetical change in interest rates would not impact the interest expense on the fixed-rate debt that is not hedged.

**Equity Price Risk**

The fair value of our equity investments in publicly traded companies is subject to market price volatility. We may hold equity securities for strategic purposes or to diversify our overall investment portfolio. Our equity portfolio consists of securities with characteristics that most closely match the Standard & Poor's 500 Index or NASDAQ Composite Index. These equity securities are held for purposes other than trading. To manage our exposure to changes in the fair value of certain equity securities, we may enter into equity derivatives designated as hedging instruments.

<u>Publicly Traded Equity Securities</u> The following tables present the hypothetical fair values of publicly traded equity securities as a result of selected potential decreases and increases in the price of each equity security in the portfolio, excluding hedged equity securities, if any. Potential fluctuations in the price of each equity security in the portfolio of plus or minus 10%, 20%, and 30% were selected based on potential near-term changes in those security prices. The hypothetical fair values as of July 25, 2015 and July 26, 2014 are as follows (in millions):

|  | VALUATION OF SECURITIES GIVEN AN X% DECREASE IN EACH STOCK'S PRICE | | | FAIR VALUE AS OF JULY 25, 2015 | VALUATION OF SECURITIES GIVEN AN X% INCREASE IN EACH STOCK'S PRICE | | |
|---|---|---|---|---|---|---|---|
|  | (30)% | (20)% | (10)% |  | 10% | 20% | 30% |
| Publicly traded equity securities | $1,096 | $1,252 | $1,409 | **$1,565** | $1,722 | $1,878 | $2,035 |

|  | VALUATION OF SECURITIES GIVEN AN X% DECREASE IN EACH STOCK'S PRICE | | | FAIR VALUE AS OF JULY 26, 2014 | VALUATION OF SECURITIES GIVEN AN X% INCREASE IN EACH STOCK'S PRICE | | |
|---|---|---|---|---|---|---|---|
|  | (30)% | (20)% | (10)% |  | 10% | 20% | 30% |
| Publicly traded equity securities | $1,144 | $1,307 | $1,471 | $1,634 | $1,797 | $1,961 | $2,124 |

<u>Investments in Privately Held Companies</u> We have also invested in privately held companies. These investments are recorded in other assets in our Consolidated Balance Sheets and are accounted for using primarily either the cost or the equity method. As of July 25, 2015 , the total carrying amount of our investments in privately held companies was $897 million , compared with $899 million at July 26, 2014 . Some of the privately held companies in which we invested are in the startup or development stages. These investments are inherently risky because the markets for the technologies or products these companies are developing are typically in the early stages and may never materialize. We could lose our entire investment in these companies. Our evaluation of investments in privately held companies is based on the fundamentals of the businesses invested in, including, among other factors, the nature of their technologies and potential for financial return.

**Foreign Currency Exchange Risk**

Our foreign exchange forward and option contracts outstanding at fiscal year-end are summarized in U.S. dollar equivalents as follows (in millions):

| | July 25, 2015 | | July 26, 2014 | |
| --- | --- | --- | --- | --- |
| | Notional Amount | Fair Value | Notional Amount | Fair Value |
| Forward contracts: | | | | |
|    Purchased | $ 1,988 | $ (5) | $ 2,635 | $ (3) |
|    Sold | $ 614 | $ 2 | $ 896 | $ 2 |
| Option contracts: | | | | |
|    Purchased | $ 422 | $ 6 | $ 494 | $ 5 |
|    Sold | $ 392 | $ (3) | $ 466 | $ (2) |

We conduct business globally in numerous currencies. The direct effect of foreign currency fluctuations on revenue has not been material because our revenue is primarily denominated in U.S. dollars. However, if the U.S. dollar strengthens relative to other currencies, as was the case during fiscal 2015, such strengthening could have an indirect effect on our revenue to the extent it raises the cost of our products to non-U.S. customers and thereby reduces demand. A weaker U.S. dollar could have the opposite effect. However, the precise indirect effect of currency fluctuations is difficult to measure or predict because our revenue is influenced by many factors in addition to the impact of such currency fluctuations.

Approximately 70% of our operating expenses are U.S.-dollar denominated. In fiscal 2015 , foreign currency fluctuations, net of hedging, decreased our combined R&D, sales and marketing, and G&A expenses by approximately $278 million , or 1.6% , compared with fiscal 2014 . In fiscal 2014 , foreign currency fluctuations, net of hedging, decreased our combined R&D, sales and marketing, and G&A expenses by approximately $153 million , or 0.9% as compared with fiscal 2013 . To reduce variability in operating expenses and service cost of sales caused by non-U.S.-dollar denominated operating expenses and costs, we hedge certain forecasted foreign currency transactions with currency options and forward contracts. These hedging programs are not designed to provide foreign currency protection over long time horizons. In designing a specific hedging approach, we consider several factors, including offsetting exposures, significance of exposures, costs associated with entering into a particular hedge instrument, and potential effectiveness of the hedge. The gains and losses on foreign exchange contracts mitigate the effect of currency movements on our operating expenses and service cost of sales.

We also enter into foreign exchange forward and option contracts to reduce the short-term effects of foreign currency fluctuations on receivables and payables that are denominated in currencies other than the functional currencies of the entities. The market risks associated with these foreign currency receivables, investments, and payables relate primarily to variances from our forecasted foreign currency transactions and balances. Our forward and option contracts generally have the following maturities:

| | Maturities |
| --- | --- |
| Forward and option contracts—forecasted transactions related to operating expenses and service cost of sales | Up to 18 months |
| Forward contracts—current assets and liabilities | Up to 3 months |
| Forward contracts—net investments in foreign subsidiaries | Up to 6 months |
| Forward contracts—long-term customer financings | Up to 2 years |

We do not enter into foreign exchange forward or option contracts for trading purposes.

**Item 8.**         **Financial Statements and Supplementary Data**

### Index to Consolidated Financial Statements

Report of Independent Registered Public Accounting Firm                71

Management's Report on Internal Control over Financial Reporting       72

Consolidated Balance Sheets                                            73

Consolidated Statements of Operations                                  74

Consolidated Statements of Comprehensive Income                        75

Consolidated Statements of Cash Flows                                  76

Consolidated Statements of Equity                                      77

Notes to Consolidated Financial Statements                             78

    Note 1: Basis of Presentation                  78

    Note 2: Summary of Significant Accounting Policies   78

    Note 3: Acquisitions and Divestitures           85

    Note 4: Goodwill and Purchased Intangible Assets    88

    Note 5: Restructuring and Other Charges         90

    Note 6: Balance Sheet Details                   91

    Note 7: Financing Receivables and Operating Leases   92

    Note 8: Investments                             95

    Note 9: Fair Value                              98

    Note 10: Borrowings                             99

    Note 11: Derivative Instruments                 101

    Note 12: Commitments and Contingencies          105

    Note 13: Shareholders' Equity                   109

    Note 14: Employee Benefit Plans                 110

    Note 15: Comprehensive Income                   115

    Note 16: Income Taxes                           116

    Note 17: Segment Information and Major Customers    119

    Note 18: Net Income per Share                   120

Supplementary Financial Data                                           121

Report of Independent Registered Public Accounting Firm

**To the Board of Directors and Shareholders of Cisco Systems, Inc.:**

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations, of comprehensive income, of cash flows and of equity present fairly, in all material respects, the financial position of Cisco Systems, Inc. and its subsidiaries at July 25, 2015 and July 26, 2014 , and the results of their operations and their cash flows for each of the three years in the period ended July 25, 2015 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule appearing under Item 15(a)(2) presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of July 25, 2015 , based on criteria established in *Internal Control—Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements and financial statement schedule, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements, on the financial statement schedule, and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP

San Jose, California

September 8, 2015

71

Reports of Management

## Statement of Management's Responsibility

Cisco's management has always assumed full accountability for maintaining compliance with our established financial accounting policies and for reporting our results with objectivity and the highest degree of integrity. It is critical for investors and other users of the Consolidated Financial Statements to have confidence that the financial information that we provide is timely, complete, relevant, and accurate. Management is responsible for the fair presentation of Cisco's Consolidated Financial Statements, prepared in accordance with accounting principles generally accepted in the United States of America, and has full responsibility for their integrity and accuracy.

Management, with oversight by Cisco's Board of Directors, has established and maintains a strong ethical climate so that our affairs are conducted to the highest standards of personal and corporate conduct. Management also has established an effective system of internal controls. Cisco's policies and practices reflect corporate governance initiatives that are compliant with the listing requirements of NASDAQ and the corporate governance requirements of the Sarbanes-Oxley Act of 2002.

We are committed to enhancing shareholder value and fully understand and embrace our fiduciary oversight responsibilities. We are dedicated to ensuring that our high standards of financial accounting and reporting, as well as our underlying system of internal controls, are maintained. Our culture demands integrity, and we have the highest confidence in our processes, our internal controls and our people, who are objective in their responsibilities and who operate under the highest level of ethical standards.

## Management's Report on Internal Control over Financial Reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting for Cisco. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

Management (with the participation of the principal executive officer and principal financial officer) conducted an evaluation of the effectiveness of Cisco's internal control over financial reporting based on the framework in *Internal Control—Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, management concluded that Cisco's internal control over financial reporting was effective as of July 25, 2015 . PricewaterhouseCoopers LLP, an independent registered public accounting firm, has audited the effectiveness of Cisco's internal control over financial reporting and has issued a report on Cisco's internal control over financial reporting, which is included in their report on the preceding page.


/S/ C HARLES H . R OBBINS                    /S/ K ELLY A . K RAMER

Charles H. Robbins                                  Kelly A. Kramer
Chief Executive Officer and Director            Executive Vice President and Chief Financial Officer
September 8, 2015                                  September 8, 2015

**CISCO SYSTEMS, INC.**
**Consolidated Balance Sheets**
(in millions, except par value)

| | July 25, 2015 | July 26, 2014 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 6,877 | $ 6,726 |
| Investments | 53,539 | 45,348 |
| Accounts receivable, net of allowance for doubtful accounts of $302 at July 25, 2015 and $265 at July 26, 2014 | 5,344 | 5,157 |
| Inventories | 1,627 | 1,591 |
| Financing receivables, net | 4,491 | 4,153 |
| Deferred tax assets | 2,915 | 2,808 |
| Other current assets | 1,490 | 1,331 |
| Total current assets | 76,283 | 67,114 |
| Property and equipment, net | 3,332 | 3,252 |
| Financing receivables, net | 3,858 | 3,918 |
| Goodwill | 24,469 | 24,239 |
| Purchased intangible assets, net | 2,376 | 3,280 |
| Other assets | 3,163 | 3,267 |
| **TOTAL ASSETS** | $ 113,481 | $ 105,070 |
| **LIABILITIES AND EQUITY** | | |
| Current liabilities: | | |
| Short-term debt | $ 3,897 | $ 508 |
| Accounts payable | 1,104 | 1,032 |
| Income taxes payable | 62 | 159 |
| Accrued compensation | 3,049 | 3,181 |
| Deferred revenue | 9,824 | 9,478 |
| Other current liabilities | 5,687 | 5,451 |
| Total current liabilities | 23,623 | 19,809 |
| Long-term debt | 21,457 | 20,337 |
| Income taxes payable | 1,876 | 1,851 |
| Deferred revenue | 5,359 | 4,664 |
| Other long-term liabilities | 1,459 | 1,748 |
| Total liabilities | 53,774 | 48,409 |
| Commitments and contingencies (Note 12) | | |
| Equity: | | |
| Cisco shareholders' equity: | | |
| Preferred stock, no par value: 5 shares authorized; none issued and outstanding | — | — |
| Common stock and additional paid-in capital, $0.001 par value: 20,000 shares authorized; 5,085 and 5,107 shares issued and outstanding at July 25, 2015 and July 26, 2014, respectively | 43,592 | 41,884 |
| Retained earnings | 16,045 | 14,093 |
| Accumulated other comprehensive income | 61 | 677 |
| Total Cisco shareholders' equity | 59,698 | 56,654 |
| Noncontrolling interests | 9 | 7 |
| Total equity | 59,707 | 56,661 |
| **TOTAL LIABILITIES AND EQUITY** | $ 113,481 | $ 105,070 |

See Notes to Consolidated Financial Statements.

**CISCO SYSTEMS, INC.**
**Consolidated Statements of Operations**
(in millions, except per-share amounts)

| Years Ended | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| **REVENUE:** | | | |
| Product | $ 37,750 | $ 36,172 | $ 38,029 |
| Service | 11,411 | 10,970 | 10,578 |
| Total revenue | 49,161 | 47,142 | 48,607 |
| **COST OF SALES:** | | | |
| Product | 15,377 | 15,641 | 15,541 |
| Service | 4,103 | 3,732 | 3,626 |
| Total cost of sales | 19,480 | 19,373 | 19,167 |
| **GROSS MARGIN** | 29,681 | 27,769 | 29,440 |
| **OPERATING EXPENSES:** | | | |
| Research and development | 6,207 | 6,294 | 5,942 |
| Sales and marketing | 9,821 | 9,503 | 9,538 |
| General and administrative | 2,040 | 1,934 | 2,264 |
| Amortization of purchased intangible assets | 359 | 275 | 395 |
| Restructuring and other charges | 484 | 418 | 105 |
| Total operating expenses | 18,911 | 18,424 | 18,244 |
| **OPERATING INCOME** | 10,770 | 9,345 | 11,196 |
| Interest income | 769 | 691 | 654 |
| Interest expense | (566) | (564) | (583) |
| Other income (loss), net | 228 | 243 | (40) |
| Interest and other income (loss), net | 431 | 370 | 31 |
| **INCOME BEFORE PROVISION FOR INCOME TAXES** | 11,201 | 9,715 | 11,227 |
| Provision for income taxes | 2,220 | 1,862 | 1,244 |
| **NET INCOME** | $ 8,981 | $ 7,853 | $ 9,983 |
| | | | |
| Net income per share: | | | |
| Basic | $ 1.76 | $ 1.50 | $ 1.87 |
| Diluted | $ 1.75 | $ 1.49 | $ 1.86 |
| Shares used in per-share calculation: | | | |
| Basic | 5,104 | 5,234 | 5,329 |
| Diluted | 5,146 | 5,281 | 5,380 |
| | | | |
| Cash dividends declared per common share | $ 0.80 | $ 0.72 | $ 0.62 |

See Notes to Consolidated Financial Statements.

**CISCO SYSTEMS, INC.**
**Consolidated Statements of Comprehensive Income**
(in millions)

| Years Ended | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| Net income | $    8,981 | $    7,853 | $    9,983 |
| Available-for-sale investments: | | | |
| Change in net unrealized gains, net of tax benefit (expense) of $14, $(146), and $(2) for fiscal 2015, 2014, and 2013, respectively | (12) | 233 | (6) |
| Net gains reclassified into earnings, net of tax expense (benefit) $57, $111, and $17 for fiscal 2015, 2014, and 2013, respectively | (100) | (189) | (31) |
| | (112) | 44 | (37) |
| Cash flow hedging instruments: | | | |
| Change in unrealized gains and losses, net of tax benefit (expense) of $1, $0, and $(1) for fiscal 2015, 2014, and 2013, respectively | (158) | 48 | 73 |
| Net (gains) losses reclassified into earnings | 154 | (68) | (12) |
| | (4) | (20) | 61 |
| Net change in cumulative translation adjustment and actuarial gains and losses, net of tax benefit (expense) of $63, $(5), and $(1) for fiscal 2015, 2014, and 2013, respectively | (498) | 44 | (84) |
| Other comprehensive income (loss) | (614) | 68 | (60) |
| Comprehensive income | 8,367 | 7,921 | 9,923 |
| Comprehensive (income) loss attributable to noncontrolling interests | (2) | 1 | 7 |
| Comprehensive income attributable to Cisco Systems, Inc. | $    8,365 | $    7,922 | $    9,930 |

See Notes to Consolidated Financial Statements.

**CISCO SYSTEMS, INC.**
**Consolidated Statements of Cash Flows**
(in millions)

| Years Ended | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net income | $ 8,981 | $ 7,853 | $ 9,983 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation, amortization, and other | 2,442 | 2,439 | 2,460 |
| Share-based compensation expense | 1,440 | 1,348 | 1,120 |
| Provision for receivables | 134 | 79 | 44 |
| Deferred income taxes | (23) | (678) | (37) |
| Excess tax benefits from share-based compensation | (128) | (118) | (92) |
| (Gains) losses on investments and other, net | (258) | (299) | (91) |
| Change in operating assets and liabilities, net of effects of acquisitions and divestitures: | | | |
| Accounts receivable | (413) | 340 | (1,001) |
| Inventories | (116) | (109) | 218 |
| Financing receivables | (634) | (119) | (723) |
| Other assets | (370) | 26 | (36) |
| Accounts payable | 87 | (23) | 164 |
| Income taxes, net | 53 | 191 | (239) |
| Accrued compensation | 7 | (42) | 134 |
| Deferred revenue | 1,275 | 659 | 598 |
| Other liabilities | 75 | 785 | 392 |
| Net cash provided by operating activities | 12,552 | 12,332 | 12,894 |
| Cash flows from investing activities: | | | |
| Purchases of investments | (43,975) | (36,317) | (36,608) |
| Proceeds from sales of investments | 20,237 | 18,193 | 14,799 |
| Proceeds from maturities of investments | 15,293 | 15,660 | 17,909 |
| Acquisition of businesses, net of cash and cash equivalents acquired | (326) | (2,989) | (6,766) |
| Purchases of investments in privately held companies | (222) | (384) | (225) |
| Return of investments in privately held companies | 288 | 213 | 209 |
| Acquisition of property and equipment | (1,227) | (1,275) | (1,160) |
| Proceeds from sales of property and equipment | 22 | 232 | 141 |
| Other | (178) | 24 | (67) |
| Net cash used in investing activities | (10,088) | (6,643) | (11,768) |
| Cash flows from financing activities: | | | |
| Issuances of common stock | 2,016 | 1,907 | 3,338 |
| Repurchases of common stock - repurchase program | (4,324) | (9,413) | (2,773) |
| Shares repurchased for tax withholdings on vesting of restricted stock units | (502) | (430) | (330) |
| Short-term borrowings, original maturities less than 90 days, net | (4) | (2) | (20) |
| Issuances of debt | 4,981 | 7,981 | 24 |
| Repayments of debt | (508) | (3,276) | (16) |
| Excess tax benefits from share-based compensation | 128 | 118 | 92 |
| Dividends paid | (4,086) | (3,758) | (3,310) |
| Other | (14) | (15) | (5) |
| Net cash used in financing activities | (2,313) | (6,888) | (3,000) |
| Net increase (decrease) in cash and cash equivalents | 151 | (1,199) | (1,874) |
| Cash and cash equivalents, beginning of fiscal year | 6,726 | 7,925 | 9,799 |
| Cash and cash equivalents, end of fiscal year | $ 6,877 | $ 6,726 | $ 7,925 |
| | | | |
| Supplemental cash flow information: | | | |
| Cash paid for interest | $ 760 | $ 682 | $ 682 |

| Cash paid for income taxes, net | $ | **2,190** | $ | 2,349 | $ | 1,519 |
|---|---|---|---|---|---|---|

See Notes to Consolidated Financial Statements.

**CISCO SYSTEMS, INC.**
**Consolidated Statements of Equity**
(in millions, except per-share amounts)

| | Shares of Common Stock | Common Stock and Additional Paid-In Capital | Retained Earnings | Accumulated Other Comprehensive Income | Total Cisco Shareholders' Equity | Non-controlling Interests | Total Equity |
|---|---|---|---|---|---|---|---|
| BALANCE AT JULY 28, 2012 | 5,298 | $ 39,271 | $ 11,354 | $ 661 | $ 51,286 | $ 15 | $ 51,301 |
| Net income | | | 9,983 | | 9,983 | | 9,983 |
| Other comprehensive income (loss) | | | | (53) | (53) | (7) | (60) |
| Issuance of common stock | 235 | 3,338 | | | 3,338 | | 3,338 |
| Repurchase of common stock | (128) | (961) | (1,812) | | (2,773) | | (2,773) |
| Shares repurchased for tax withholdings on vesting of restricted stock units | (16) | (330) | | | (330) | | (330) |
| Cash dividends declared ($0.62 per common share) | | | (3,310) | | (3,310) | | (3,310) |
| Tax effects from employee stock incentive plans | | (204) | | | (204) | | (204) |
| Share-based compensation expense | | 1,120 | | | 1,120 | | 1,120 |
| Purchase acquisitions and other | | 63 | | | 63 | | 63 |
| BALANCE AT JULY 27, 2013 | 5,389 | $ 42,297 | $ 16,215 | $ 608 | $ 59,120 | $ 8 | $ 59,128 |
| Net income | | | 7,853 | | 7,853 | | 7,853 |
| Other comprehensive income (loss) | | | | 69 | 69 | (1) | 68 |
| Issuance of common stock | 156 | 1,907 | | | 1,907 | | 1,907 |
| Repurchase of common stock | (420) | (3,322) | (6,217) | | (9,539) | | (9,539) |
| Shares repurchased for tax withholdings on vesting of restricted stock units | (18) | (430) | | | (430) | | (430) |
| Cash dividends declared ($0.72 per common share) | | | (3,758) | | (3,758) | | (3,758) |
| Tax effects from employee stock incentive plans | | 35 | | | 35 | | 35 |
| Share-based compensation expense | | 1,348 | | | 1,348 | | 1,348 |
| Purchase acquisitions and other | | 49 | | | 49 | | 49 |
| BALANCE AT JULY 26, 2014 | 5,107 | $ 41,884 | $ 14,093 | $ 677 | $ 56,654 | $ 7 | $ 56,661 |
| Net income | | | 8,981 | | 8,981 | | 8,981 |
| Other comprehensive income (loss) | | | | (616) | (616) | 2 | (614) |
| Issuance of common stock | 153 | 2,016 | | | 2,016 | | 2,016 |
| Repurchase of common stock | (155) | (1,291) | (2,943) | | (4,234) | | (4,234) |
| Shares repurchased for tax withholdings on vesting of restricted stock units | (20) | (502) | | | (502) | | (502) |
| Cash dividends declared ($0.80 per common share) | | | (4,086) | | (4,086) | | (4,086) |
| Tax effects from employee stock incentive plans | | 41 | | | 41 | | 41 |
| Share-based compensation expense | | 1,440 | | | 1,440 | | 1,440 |
| Purchase acquisitions and other | | 4 | | | 4 | | 4 |
| BALANCE AT JULY 25, 2015 | 5,085 | $ 43,592 | $ 16,045 | $ 61 | $ 59,698 | $ 9 | $ 59,707 |

**Supplemental Information**

In September 2001, the Company's Board of Directors authorized a stock repurchase program. As of July 25, 2015 , the Company's Board of Directors had authorized an aggregate repurchase of up to $97 billion of common stock under this program with no termination date. The stock repurchases since the inception of this program and the related impacts on Cisco shareholders' equity are summarized in the following table (in millions):

| | Shares of Common Stock | Common Stock and Additional Paid-In Capital | Retained Earnings | Total Cisco Shareholders' Equity |
|---|---|---|---|---|
| Repurchases of common stock under the repurchase program | 4,443 | $ 22,615 | $ 70,064 | $ 92,679 |

See Notes to Consolidated Financial Statements.

**Notes to Consolidated Financial Statements**

### 1. Basis of Presentation

The fiscal year for Cisco Systems, Inc. (the "Company" or "Cisco") is the 52 or 53 weeks ending on the last Saturday in July. Fiscal 2015 , fiscal 2014 , and fiscal 2013 are each 52-week fiscal years. The Consolidated Financial Statements include the accounts of Cisco and its subsidiaries. All intercompany accounts and transactions have been eliminated. The Company conducts business globally and is primarily managed on a geographic basis in the following three geographic segments: the Americas; Europe, Middle East, and Africa (EMEA); and Asia Pacific, Japan, and China (APJC).

The Company consolidates its investments in a venture fund managed by SOFTBANK Corp. and its affiliates ("SOFTBANK") as this is a variable interest entity and the Company is the primary beneficiary. The noncontrolling interests attributed to SOFTBANK are presented as a separate component from the Company's equity in the equity section of the Consolidated Balance Sheets. SOFTBANK's share of the earnings in the venture fund are not presented separately in the Consolidated Statements of Operations as these amounts are not material for any of the fiscal periods presented.

Certain reclassifications have been made to the amounts for prior years in order to conform to the current year's presentation. The Company has evaluated subsequent events through the date that the financial statements were issued.

### 2. Summary of Significant Accounting Policies

(a) Cash and Cash Equivalents   The Company considers all highly liquid investments purchased with an original or remaining maturity of three months or less at the date of purchase to be cash equivalents. Cash and cash equivalents are maintained with various financial institutions.

(b) Available-for-Sale Investments   The Company classifies its investments in both fixed income securities and publicly traded equity securities as available-for-sale investments. Fixed income securities primarily consist of U.S. government securities, U.S. government agency securities, non-U.S. government and agency securities, corporate debt securities, and U.S. agency mortgage-backed securities. These available-for-sale investments are primarily held in the custody of a major financial institution. A specific identification method is used to determine the cost basis of fixed income and public equity securities sold. These investments are recorded in the Consolidated Balance Sheets at fair value. Unrealized gains and losses on these investments, to the extent the investments are unhedged, are included as a separate component of accumulated other comprehensive income (AOCI), net of tax. The Company classifies its investments as current based on the nature of the investments and their availability for use in current operations.

(c) Other-than-Temporary Impairments on Investments   When the fair value of a debt security is less than its amortized cost, it is deemed impaired, and the Company will assess whether the impairment is other than temporary. An impairment is considered other than temporary if (i) the Company has the intent to sell the security, (ii) it is more likely than not that the Company will be required to sell the security before recovery of the entire amortized cost basis, or (iii) the Company does not expect to recover the entire amortized cost basis of the security. If impairment is considered other than temporary based on condition (i) or (ii) described earlier, the entire difference between the amortized cost and the fair value of the debt security is recognized in earnings. If an impairment is considered other than temporary based on condition (iii), the amount representing credit losses (defined as the difference between the present value of the cash flows expected to be collected and the amortized cost basis of the debt security) will be recognized in earnings, and the amount relating to all other factors will be recognized in other comprehensive income (OCI).

The Company recognizes an impairment charge on publicly traded equity securities when a decline in the fair value of a security below the respective cost basis is judged to be other than temporary. The Company considers various factors in determining whether a decline in the fair value of these investments is other than temporary, including the length of time and extent to which the fair value of the security has been less than the Company's cost basis, the financial condition and near-term prospects of the issuer, and the Company's intent and ability to hold the investment for a period of time sufficient to allow for any anticipated recovery in market value.

Investments in privately held companies are included in other assets in the Consolidated Balance Sheets and are primarily accounted for using either the cost or equity method. The Company monitors these investments for impairments and makes reductions in carrying values if the Company determines that an impairment charge is required based primarily on the financial condition and near-term prospects of these companies.

(d) Inventories   Inventories are stated at the lower of cost or market. Cost is computed using standard cost, which approximates actual cost, on a first-in, first-out basis. The Company provides inventory write-downs based on excess and obsolete inventories determined primarily by future demand forecasts. The write-down is measured as the difference between the cost of the inventory and market based upon assumptions about future demand and charged to the provision for inventory, which is a component of cost of sales. At the point of the loss recognition, a new, lower cost basis for that inventory is established, and subsequent changes in

facts and circumstances do not result in the restoration or increase in that newly established cost basis. In addition, the Company records a liability for firm, noncancelable, and unconditional purchase commitments with contract manufacturers and suppliers for quantities in excess of the Company's future demand forecasts consistent with its valuation of excess and obsolete inventory.

(e) Allowance for Doubtful Accounts  The allowance for doubtful accounts is based on the Company's assessment of the collectibility of customer accounts. The Company regularly reviews the allowance by considering factors such as historical experience, credit quality, age of the accounts receivable balances, economic conditions that may affect a customer's ability to pay, and expected default frequency rates. Trade receivables are written off at the point when they are considered uncollectible.

(f) Financing Receivables and Guarantees  The Company provides financing arrangements, including leases, financed service contracts, and loans, for certain qualified end-user customers to build, maintain, and upgrade their networks. Lease receivables primarily represent sales-type and direct-financing leases. Leases have on average a four -year term and are usually collateralized by a security interest in the underlying assets, while loan receivables generally have terms of up to three years. Financed service contracts typically have terms of one to three years and primarily relate to technical support services.

The Company determines the adequacy of its allowance for credit loss by assessing the risks and losses inherent in its financing receivables by portfolio segment. The portfolio segment is based on the types of financing offered by the Company to its customers: lease receivables, loan receivables, and financed service contracts and other.

The Company assesses the allowance for credit loss related to financing receivables on either an individual or a collective basis. The Company considers various factors in evaluating lease and loan receivables and the earned portion of financed service contracts for possible impairment on an individual basis. These factors include the Company's historical experience, credit quality and age of the receivable balances, and economic conditions that may affect a customer's ability to pay. When the evaluation indicates that it is probable that all amounts due pursuant to the contractual terms of the financing agreement, including scheduled interest payments, are unable to be collected, the financing receivable is considered impaired. All such outstanding amounts, including any accrued interest, will be assessed and fully reserved at the customer level. The Company's internal credit risk ratings are categorized as 1 through 10 , with the lowest credit risk rating representing the highest quality financing receivables. Typically, the Company also considers receivables with a risk rating of 8 or higher to be impaired and will include them in the individual assessment for allowance. The Company evaluates the remainder of its financing receivables portfolio for impairment on a collective basis and records an allowance for credit loss at the portfolio segment level. When evaluating the financing receivables on a collective basis, the Company uses expected default frequency rates published by a major third-party credit-rating agency as well as its own historical loss rate in the event of default, while also systematically giving effect to economic conditions, concentration of risk, and correlation.

Expected default frequency rates are published quarterly by a major third-party credit-rating agency, and the internal credit risk rating is derived by taking into consideration various customer-specific factors and macroeconomic conditions. These factors, which include the strength of the customer's business and financial performance, the quality of the customer's banking relationships, the Company's specific historical experience with the customer, the performance and outlook of the customer's industry, the customer's legal and regulatory environment, the potential sovereign risk of the geographic locations in which the customer is operating, and independent third-party evaluations, are updated regularly or when facts and circumstances indicate that an update is deemed necessary.

Financing receivables are written off at the point when they are considered uncollectible, and all outstanding balances, including any previously earned but uncollected interest income, will be reversed and charged against the allowance for credit loss. The Company does not typically have any partially written-off financing receivables.

Outstanding financing receivables that are aged 31 days or more from the contractual payment date are considered past due. The Company does not accrue interest on financing receivables that are considered impaired or more than 90 days past due unless either the receivable has not been collected due to administrative reasons or the receivable is well secured and in the process of collection. Financing receivables may be placed on nonaccrual status earlier if, in management's opinion, a timely collection of the full principal and interest becomes uncertain. After a financing receivable has been categorized as nonaccrual, interest will be recognized when cash is received. A financing receivable may be returned to accrual status after all of the customer's delinquent balances of principal and interest have been settled, and the customer remains current for an appropriate period.

The Company facilitates arrangements for third-party financing extended to channel partners, consisting of revolving short-term financing, generally with payment terms ranging from 60 to 90 days. In certain instances, these financing arrangements result in a transfer of the Company's receivables to the third party. The receivables are derecognized upon transfer, as these transfers qualify as true sales, and the Company receives a payment for the receivables from the third party based on the Company's standard payment terms. These financing arrangements facilitate the working capital requirements of the channel partners, and, in some cases, the Company guarantees a portion of these arrangements. The Company also provides financing guarantees for third-party financing arrangements extended to end-user customers related to leases and loans, which typically have terms of up to three years. The Company could be called upon to make payments under these guarantees in the event of nonpayment by the channel partners

or end-user customers. Deferred revenue relating to these financing arrangements is recorded in accordance with revenue recognition policies or for the fair value of the financing guarantees.

(g)  Depreciation and Amortization   Property and equipment are stated at cost, less accumulated depreciation or amortization, whenever applicable. Depreciation and amortization expenses for property and equipment were approximately $1.1 billion , $1.2 billion , and $1.2 billion for fiscal 2015 , 2014 , and 2013 , respectively. Depreciation and amortization are computed using the straight-line method, generally over the following periods:

| Asset Category | Period |
|---|---|
| Buildings | 25 years |
| Building improvements | 10 years |
| Leasehold improvements | Shorter of remaining lease term or up to 10 years |
| Computer equipment and related software | 30 to 36 months |
| Production, engineering, and other equipment | Up to 5 years |
| Operating lease assets | Based on lease term |
| Furniture and fixtures | 5 years |

(h)  Business Combinations   The Company allocates the fair value of the purchase consideration of its acquisitions to the tangible assets, liabilities, and intangible assets acquired, including in-process research and development (IPR&D), based on their estimated fair values. The excess of the fair value of purchase consideration over the fair values of these identifiable assets and liabilities is recorded as goodwill. IPR&D is initially capitalized at fair value as an intangible asset with an indefinite life and assessed for impairment thereafter. When an IPR&D project is completed, the IPR&D is reclassified as an amortizable purchased intangible asset and amortized over the asset's estimated useful life. Acquisition-related expenses and related restructuring costs are recognized separately from the business combination and are expensed as incurred.

(i)  Goodwill and Purchased Intangible Assets   Goodwill is tested for impairment on an annual basis in the fourth fiscal quarter and, when specific circumstances dictate, between annual tests. When impaired, the carrying value of goodwill is written down to fair value. The goodwill impairment test involves a two-step process. The first step, identifying a potential impairment, compares the fair value of a reporting unit with its carrying amount, including goodwill. If the carrying value of the reporting unit exceeds its fair value, the second step would need to be conducted; otherwise, no further steps are necessary as no potential impairment exists. If necessary, the second step to measure the impairment loss would be to compare the implied fair value of the reporting unit goodwill with the carrying amount of that goodwill. Any excess of the reporting unit goodwill carrying value over the respective implied fair value is recognized as an impairment loss. Purchased intangible assets with finite lives are carried at cost, less accumulated amortization. Amortization is computed over the estimated useful lives of the respective assets. See "Long-Lived Assets" for the Company's policy regarding impairment testing of purchased intangible assets with finite lives. Purchased intangible assets with indefinite lives are assessed for potential impairment annually or when events or circumstances indicate that their carrying amounts might be impaired.

(j)  Long-Lived Assets   Long-lived assets that are held and used by the Company are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of such assets may not be recoverable. Determination of recoverability of long-lived assets is based on an estimate of the undiscounted future cash flows resulting from the use of the asset and its eventual disposition. Measurement of an impairment loss for long-lived assets that management expects to hold and use is based on the difference between the fair value of the asset and its carrying value. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell.

(k)  Fair Value   Fair value is defined as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required or permitted to be either recorded or disclosed at fair value, the Company considers the principal or most advantageous market in which it would transact, and it also considers assumptions that market participants would use when pricing the asset or liability.

The accounting guidance for fair value measurement requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. The standard establishes a fair value hierarchy based on the level of independent, objective evidence surrounding the inputs used to measure fair value. A financial instrument's categorization within the fair value hierarchy is based upon the lowest level of input that is significant to the fair value measurement. The fair value hierarchy is as follows:

Level 1 applies to assets or liabilities for which there are quoted prices in active markets for identical assets or liabilities.

Level 2 applies to assets or liabilities for which there are inputs other than quoted prices that are observable for the asset or liability such as quoted prices for similar assets or liabilities in active markets; quoted prices for identical assets or liabilities in

markets with insufficient volume or infrequent transactions (less active markets); or model-derived valuations in which significant inputs are observable or can be derived principally from, or corroborated by, observable market data.

<u>Level 3</u> applies to assets or liabilities for which there are unobservable inputs to the valuation methodology that are significant to the measurement of the fair value of the assets or liabilities.

<u>(l) Derivative Instruments</u>   The Company recognizes derivative instruments as either assets or liabilities and measures those instruments at fair value. The accounting for changes in the fair value of a derivative depends on the intended use of the derivative and the resulting designation. For a derivative instrument designated as a fair value hedge, the gain or loss is recognized in earnings in the period of change together with the offsetting loss or gain on the hedged item attributed to the risk being hedged. For a derivative instrument designated as a cash flow hedge, the effective portion of the derivative's gain or loss is initially reported as a component of AOCI and subsequently reclassified into earnings when the hedged exposure affects earnings. The ineffective portion of the gain or loss is reported in earnings immediately. For a derivative instrument designated as a net investment hedge of the Company's foreign operations, the gain or loss is recorded in the cumulative translation adjustment within AOCI together with the offsetting loss or gain of the hedged exposure of the underlying foreign operations. Any ineffective portion of the net investment hedges is reported in earnings during the period of change. For derivative instruments that are not designated as accounting hedges, changes in fair value are recognized in earnings in the period of change. The Company records derivative instruments in the statements of cash flows to operating, investing, or financing activities consistent with the cash flows of the hedged item.

Hedge effectiveness for foreign exchange forward contracts used as cash flow hedges is assessed by comparing the change in the fair value of the hedge contract with the change in the fair value of the forecasted cash flows of the hedged item. Hedge effectiveness for equity forward contracts and foreign exchange net investment hedge forward contracts is assessed by comparing changes in fair value due to changes in spot rates for both the derivative and the hedged item. For foreign exchange option contracts, hedge effectiveness is assessed based on the hedging instrument's entire change in fair value. Hedge effectiveness for interest rate swaps is assessed by comparing the change in fair value of the swap with the change in the fair value of the hedged item due to changes in the benchmark interest rate.

<u>(m) Foreign Currency Translation</u>   Assets and liabilities of non-U.S. subsidiaries that operate in a local currency environment, where that local currency is the functional currency, are translated to U.S. dollars at exchange rates in effect at the balance sheet date, with the resulting translation adjustments directly recorded to a separate component of AOCI. Income and expense accounts are translated at average exchange rates during the year. Remeasurement adjustments are recorded in other income (loss), net. The effect of foreign currency exchange rates on cash and cash equivalents was not material for any of the fiscal years presented.

<u>(n) Concentrations of Risk</u>   Cash and cash equivalents are maintained with several financial institutions. Deposits held with banks may exceed the amount of insurance provided on such deposits. Generally, these deposits may be redeemed upon demand and are maintained with financial institutions with reputable credit and therefore bear minimal credit risk. The Company seeks to mitigate its credit risks by spreading such risks across multiple counterparties and monitoring the risk profiles of these counterparties.

The Company performs ongoing credit evaluations of its customers and, with the exception of certain financing transactions, does not require collateral from its customers. The Company receives certain of its components from sole suppliers. Additionally, the Company relies on a limited number of contract manufacturers and suppliers to provide manufacturing services for its products. The inability of a contract manufacturer or supplier to fulfill supply requirements of the Company could materially impact future operating results.

<u>(o) Revenue Recognition</u>   The Company recognizes revenue when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectibility is reasonably assured. In instances where final acceptance of the product, system, or solution is specified by the customer, revenue is deferred until all acceptance criteria have been met. For hosting arrangements, the Company recognizes subscription revenue ratably over the subscription period, while usage revenue is recognized based on utilization. Software subscription revenue is deferred and recognized ratably over the subscription term upon delivery of the first product and commencement of the term. Technical support services revenue is deferred and recognized ratably over the period during which the services are to be performed, which is typically from one to three years. Advanced services revenue is recognized upon delivery or completion of performance milestones.

The Company uses distributors that stock inventory and typically sell to systems integrators, service providers, and other resellers. The Company refers to this as its two-tier system of sales to the end customer. Revenue from distributors is recognized based on a sell-through method using information provided by them. Distributors and other partners participate in various rebate, cooperative marketing, and other programs, and the Company maintains estimated accruals and allowances for these programs. The ending liability for these programs was included in other current liabilities, and the balance as of each of July 25, 2015 and July 26, 2014 was $1.3 billion . The Company accrues for warranty costs, sales returns, and other allowances based on its historical experience. Shipping and handling fees billed to customers are included in revenue, with the associated costs included in cost of sales.

Many of the Company's products have both software and non-software components that function together to deliver the products' essential functionality. The Company's product offerings fall into the following categories: Switching, Next-Generation Network (NGN) Routing, Collaboration, Service Provider Video, Data Center, Wireless, Security, and Other Products. The Company also provides technical support and advanced services. The Company has a broad customer base that encompasses virtually all types of public and private entities, including enterprise businesses, service providers, and commercial customers. The Company and its salesforce are not organized by product divisions, and the Company's products and services can be sold standalone or together in various combinations across the Company's geographic segments or customer markets. For example, service provider arrangements are typically larger in scale with longer deployment schedules and involve the delivery of a variety of product technologies, including high-end routing, video and network management software, and other product technologies along with technical support and advanced services. The Company's enterprise and commercial arrangements are unique for each customer and smaller in scale and may include network infrastructure products such as routers and switches or collaboration technologies such as Unified Communications and Cisco TelePresence systems products along with technical support services.

The Company enters into revenue arrangements that may consist of multiple deliverables of its product and service offerings due to the needs of its customers. For example, a customer may purchase routing products along with a contract for technical support services. This arrangement would consist of multiple elements, with the products delivered in one reporting period and the technical support services delivered across multiple reporting periods. Another customer may purchase networking products along with advanced service offerings, in which all the elements are delivered within the same reporting period. In addition, distributors purchase products or technical support services on a standalone basis for resale to an end user or for purposes of stocking certain products, and these transactions would not result in a multiple-element arrangement. The Company considers several factors when reviewing multiple purchases made by the same customer within a short time frame in order to identify multiple-element arrangements, including whether the deliverables are closely interrelated, whether the deliverables are essential to each other's functionality, whether payment terms are linked, whether the customer is entitled to a refund or concession if another purchase is not completed satisfactorily, and/or whether the purchases were negotiated together as one overall arrangement.

In many instances, products are sold separately in standalone arrangements as customers may support the products themselves or purchase support on a time-and-materials basis. Advanced services are sometimes sold in standalone engagements such as general consulting, network management, or security advisory projects, and technical support services are sold separately through renewals of annual contracts. The Company determines its vendor-specific objective evidence (VSOE) based on its normal pricing and discounting practices for products or services when sold separately. VSOE determination requires that a substantial majority of the historical standalone transactions has the selling prices for a product or service that fall within a reasonably narrow pricing range, generally evidenced by approximately 80% of such historical standalone transactions falling within plus or minus 15% of the median rates. In addition, the Company considers the geographies in which the products or services are sold, major product and service groups and customer classifications, and other environmental or marketing variables in determining VSOE.

When the Company is not able to establish VSOE for all deliverables in an arrangement with multiple elements, which may be due to the Company infrequently selling each element separately, not pricing products within a narrow range, or only having a limited sales history, such as in the case of certain newly introduced product categories, the Company attempts to determine the selling price of each element based on third-party evidence of selling price (TPE). TPE is determined based on competitor prices for similar deliverables when sold separately. Generally, the Company's go-to-market strategy differs from that of its peers, and its offerings contain a significant level of differentiation such that the comparable pricing of products with similar functionality cannot be obtained. Furthermore, the Company is unable to reliably determine what similar competitor products' selling prices are on a standalone basis. Therefore, the Company is typically not able to determine TPE.

When the Company is unable to establish fair value using VSOE or TPE, the Company uses estimated selling prices (ESP) in its allocation of arrangement consideration. The objective of ESP is to determine the price at which the Company would transact a sale if the product or service were regularly sold on a standalone basis. ESP is generally used for new or highly proprietary offerings and solutions or for offerings not priced within a reasonably narrow range. The Company determines ESP for a product or service by considering multiple factors, including, but not limited to, geographies, market conditions, competitive landscape, internal costs, gross margin objectives, and pricing practices. The determination of ESP is made through consultation with and formal approval by the Company's management, taking into consideration the go-to-market strategy.

The Company regularly reviews VSOE, TPE, and ESP and maintains internal controls over the establishment and updates of these estimates. There were no material impacts during the fiscal year, nor does the Company currently expect a material impact in the near term from changes in VSOE, TPE, or ESP.

The Company's arrangements with multiple deliverables may include one or more software deliverables that are subject to the software revenue recognition guidance. In these cases, revenue for the software is generally recognized upon shipment or electronic delivery and granting of the license. The revenue for these multiple-element arrangements is allocated to the software deliverables and the non-software deliverables based on the relative selling prices of all of the deliverables in the arrangement using the hierarchy in the applicable accounting guidance. In the circumstances where the Company cannot determine VSOE or

TPE of the selling price for all of the deliverables in the arrangement, including the software deliverables, ESP is used for the purposes of performing this allocation. VSOE is required to allocate the revenue between multiple software deliverables. If VSOE is available for the undelivered software elements, the Company applies the residual method; where VSOE is not available, software revenue is either recognized when all software elements have been delivered or recognized ratably when post-contract support is the only undelivered software element remaining.

(p) Advertising Costs   The Company expenses all advertising costs as incurred. Advertising costs included within sales and marketing expenses were approximately $202 million , $196 million , and $218 million for fiscal 2015 , 2014 , and 2013 , respectively.

(q) Share-Based Compensation Expense   The Company measures and recognizes the compensation expense for all share-based awards made to employees and directors, including employee stock options, restricted stock units (RSUs), performance-based restricted stock units (PRSUs), and employee stock purchases related to the Employee Stock Purchase Plan ("Employee Stock Purchase Rights") based on estimated fair values. The fair value of employee stock options is estimated on the date of grant using a lattice-binomial option-pricing model ("Lattice-Binomial Model") or the Black-Scholes model, and for employee stock purchase rights the Company estimates the fair value using the Black-Scholes model. The fair value for time-based stock awards and stock awards that are contingent upon the achievement of financial performance metrics is based on the grant date share price reduced by the present value of the expected dividend yield prior to vesting. The fair value of market-based stock awards is estimated using an option-pricing model on the date of grant. Share-based compensation expense is reduced for forfeitures.

(r) Software Development Costs   Software development costs, including costs to develop software sold, leased, or otherwise marketed, that are incurred subsequent to the establishment of technological feasibility are capitalized if significant. Costs incurred during the application development stage for internal-use software are capitalized if significant. Capitalized software development costs are amortized using the straight-line amortization method over the estimated useful life of the applicable software. Such software development costs required to be capitalized have not been material to date.

(s) Income Taxes   Income tax expense is based on pretax financial accounting income. Deferred tax assets and liabilities are recognized for the expected tax consequences of temporary differences between the tax bases of assets and liabilities and their reported amounts. Valuation allowances are recorded to reduce deferred tax assets to the amount that will more likely than not be realized.

The Company accounts for uncertainty in income taxes using a two-step approach to recognizing and measuring uncertain tax positions. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates that it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount that is more than 50% likely of being realized upon settlement. The Company classifies the liability for unrecognized tax benefits as current to the extent that the Company anticipates payment (or receipt) of cash within one year. Interest and penalties related to uncertain tax positions are recognized in the provision for income taxes.

(t) Computation of Net Income per Share   Basic net income per share is computed using the weighted-average number of common shares outstanding during the period. Diluted net income per share is computed using the weighted-average number of common shares and dilutive potential common shares outstanding during the period. Diluted shares outstanding includes the dilutive effect of in-the-money options, unvested restricted stock, and restricted stock units. The dilutive effect of such equity awards is calculated based on the average share price for each fiscal period using the treasury stock method. Under the treasury stock method, the amount the employee must pay for exercising stock options, the amount of compensation cost for future service that the Company has not yet recognized, and the amount of tax benefits that would be recorded in additional paid-in capital when the award becomes deductible are collectively assumed to be used to repurchase shares.

(u) Consolidation of Variable Interest Entities   The Company uses a qualitative approach in assessing the consolidation requirement for variable interest entities. The approach focuses on identifying which enterprise has the power to direct the activities that most significantly impact the variable interest entity's economic performance and which enterprise has the obligation to absorb losses or the right to receive benefits from the variable interest entity. In the event that the Company is the primary beneficiary of a variable interest entity, the assets, liabilities, and results of operations of the variable interest entity will be included in the Company's Consolidated Financial Statements.

(v) Use of Estimates   The preparation of financial statements and related disclosures in conformity with accounting principles generally accepted in the United States requires management to make estimates and judgments that affect the amounts reported in the Consolidated Financial Statements and accompanying notes. Estimates are used for the following, among others:

- Revenue recognition

- Allowances for accounts receivable, sales returns, and financing receivables

- Inventory valuation and liability for purchase commitments with contract manufacturers and suppliers

- Loss contingencies and product warranties

- Fair value measurements and other-than-temporary impairments

- Goodwill and purchased intangible asset impairments

- Income taxes

The actual results experienced by the Company may differ materially from management's estimates.

<u>(w) New Accounting Updates Recently Adopted</u>

In March 2013, the Financial Accounting Standards Board (FASB) issued an accounting standard update requiring an entity to release into net income the entire amount of a cumulative translation adjustment related to its investment in a foreign entity when as a parent it sells either a part or all of its investment in the foreign entity or no longer holds a controlling financial interest in a subsidiary or group of assets within the foreign entity. This accounting standard update became effective for the Company beginning in the first quarter of fiscal 2015. The application of this accounting standard update did not have any impact to the Company's Consolidated Financial Statements.

In July 2013, the FASB issued an accounting standard update that provides explicit guidance on the financial statement presentation of an unrecognized tax benefit when a net operating loss carryforward or a tax credit carryforward exists. Under the new standard update, an unrecognized tax benefit, or a portion of an unrecognized tax benefit, is to be presented in the financial statements as a reduction to a deferred tax asset for a net operating loss carryforward or a tax credit carryforward. This accounting standard update became effective for the Company beginning in the first quarter of fiscal 2015 and applied prospectively. The application of this accounting standard update did not have a material impact to the Company's Consolidated Financial Statements.

In April 2014, the FASB issued an accounting standard update that changes the criteria for reporting discontinued operations. This accounting standard update raises the threshold for a disposal transaction to qualify as a discontinued operation and requires additional disclosures about discontinued operations and disposals of individually significant components that do not qualify as discontinued operations. The Company adopted this accounting standard update in the second quarter of fiscal 2015, and applied the revised criteria for reporting discontinued operations with respect to transactions subsequent to this date.

In April 2015, the FASB issued an accounting standard update requiring debt issuance costs related to a recognized debt liability to be presented in the balance sheet as a direct deduction from the carrying amount of that debt, consistent with debt discounts. In the fourth quarter of 2015, we adopted the accounting standard update, which was reflected in the balance sheet and cash flow statement. The change was applied to all periods presented, and it did not have a material impact on the Company's Consolidated Financial Statements.

<u>(x) Recent Accounting Standards or Updates Not Yet Effective</u>

In May 2014, the FASB issued an accounting standard update related to revenue from contracts with customers, which will supersede nearly all current U.S. GAAP guidance on this topic and eliminate industry-specific guidance. The underlying principle is to recognize revenue when promised goods or services are transferred to customers in an amount that reflects the consideration that is expected to be received for those goods or services. This accounting standard update, as amended, will be effective for the Company beginning in the first quarter of fiscal 2019. The new revenue standard may be applied retrospectively to each prior period presented or retrospectively with the cumulative effect recognized as of the date of adoption. Early adoption is permitted, but no earlier than fiscal 2018. The Company is currently evaluating the impact of this accounting standard update on its Consolidated Financial Statements.

In February 2015, the FASB issued an accounting standard update that changes the analysis that a reporting entity must perform to determine whether it should consolidate certain types of legal entities. The accounting standard update will be effective for the Company beginning in the first quarter of fiscal 2017, and early adoption is permitted. The Company is currently evaluating the impact of this accounting standard update on its Consolidated Financial Statements.

**3.    Acquisitions and Divestitures**

**(a)  Acquisition Summary**

The Company completed six business combinations during fiscal 2015 . A summary of the allocation of the total purchase consideration is presented as follows (in millions):

| Fiscal 2015 | Purchase Consideration | | Net Liabilities Assumed | | Purchased Intangible Assets | | Goodwill | |
|---|---|---|---|---|---|---|---|---|
| Metacloud | $ | 149 | $ | (7) | $ | 29 | $ | 127 |
| All others (five in total) | | 185 | | (13) | | 70 | | 128 |
| Total acquisitions | $ | 334 | $ | (20) | $ | 99 | $ | 255 |

On September 29, 2014, the Company completed its acquisition of Metacloud, Inc. ("Metacloud"), a provider of private clouds for global organizations. With its acquisition of Metacloud, the Company aims to advance its Intercloud strategy to deliver a globally distributed, highly secure cloud platform. Revenue from the Metacloud acquisition has been included in the Company's Service category.

The total purchase consideration related to the Company's business combinations completed during fiscal 2015 consisted of cash consideration and vested share-based awards assumed. The total cash and cash equivalents acquired from these business combinations was approximately $5 million .

<u>Fiscal 2014 and 2013 Business Combinations</u>

Allocation of the purchase consideration for business combinations completed in fiscal 2014 is summarized as follows (in millions):

| Fiscal 2014 | Purchase Consideration | | Net Tangible Assets Acquired (Liabilities Assumed) | | Purchased Intangible Assets | | Goodwill | |
|---|---|---|---|---|---|---|---|---|
| Composite Software | $ | 160 | $ | (10) | $ | 75 | $ | 95 |
| Sourcefire | | 2,449 | | 81 | | 577 | | 1,791 |
| WhipTail | | 351 | | (34) | | 105 | | 280 |
| Tail-f | | 167 | | (7) | | 61 | | 113 |
| All others (four in total) | | 54 | | (5) | | 20 | | 39 |
| Total acquisitions | $ | 3,181 | $ | 25 | $ | 838 | $ | 2,318 |

The Company acquired privately held Composite Software, Inc. ("Composite Software") in the first quarter of fiscal 2014. Prior to its acquisition, Composite Software provided data virtualization software and services that connect many types of data from across the network and make it appear as if the data is in one place. With its acquisition of Composite Software, the Company intends to extend its next-generation services platform by connecting data and infrastructure. The Company has included revenue from the Composite Software acquisition, subsequent to the acquisition date, in the Company's Service category.

The Company acquired Sourcefire, Inc. ("Sourcefire") in the first quarter of fiscal 2014. Prior to its acquisition, Sourcefire delivered innovative, highly automated security through continuous awareness, threat detection, and protection across its portfolio, including next-generation intrusion prevention systems, next-generation firewalls, and advanced malware protection. With its acquisition of Sourcefire, the Company aims to accelerate its security strategy of defending, discovering, and remediating advanced threats to provide continuous security solutions to the Company's customers in more places across the network. The Company has included revenue from the Sourcefire acquisition in its Security product category.

The Company acquired privately held WhipTail Technologies, Inc. ("WhipTail") in the second quarter of fiscal 2014. Prior to its acquisition, WhipTail was a provider of high-performance, scalable solid state memory systems. In the fourth quarter of fiscal 2015, the Company announced the end-of-sale and end-of-life dates for the Cisco UCS Invicta Series in connection with the decision to shut down the WhipTail unit.

The Company acquired privately held Tail-f Systems AB ("Tail-f") in the fourth quarter of fiscal 2014. Prior to its acquisitions, Tail-f was a provider of multi-vendor network service orchestration solutions for traditional and virtualized networks. With its acquisition of Tail-f, the Company intends to advance its cloud virtualization strategy. The Company has included revenue from the Tail-f acquisition in the Company's cloud and virtualization offerings within the Other products.

The total purchase consideration related to the Company's business combinations completed during fiscal 2014 consisted of cash consideration and vested share-based awards assumed. The total cash and cash equivalents acquired from these business combinations was approximately $134 million .

Allocation of the purchase consideration for business combinations completed in fiscal 2013 is summarized as follows (in millions):

| Fiscal 2013 | Purchase Consideration | | Net Liabilities Assumed | | Purchased Intangible Assets | | Goodwill | |
|---|---|---|---|---|---|---|---|---|
| NDS | $ | 5,005 | $ | (185) | $ | 1,746 | $ | 3,444 |
| Meraki | | 974 | | (59) | | 289 | | 744 |
| Intucell | | 360 | | (23) | | 106 | | 277 |
| Ubiquisys | | 280 | | (30) | | 123 | | 187 |
| All others (nine in total) | | 363 | | (25) | | 127 | | 261 |
| Total acquisitions | $ | 6,982 | $ | (322) | $ | 2,391 | $ | 4,913 |

The Company completed its acquisition of NDS Group Limited ("NDS") in the first quarter of fiscal 2013. Prior to its acquisition, NDS was a provider of video software and content security solutions that enable service providers and media companies to securely deliver and monetize new video entertainment experiences. With the acquisition of NDS, the Company enhances its comprehensive content delivery platform that enables service providers and media companies to deliver next-generation entertainment experiences. The Company has included revenue from the NDS acquisition, subsequent to the acquisition date, in its Service Provider Video product category.

The Company acquired privately held Meraki, Inc. ("Meraki") in the second quarter of fiscal 2013. Prior to its acquisition, Meraki offered mid-market customers on-premise networking solutions centrally managed from the cloud. With its acquisition of Meraki, the Company addresses the shift to cloud networking as a key part of the Company's overall strategy to accelerate the adoption of software-based business models that provide new consumption options for customers and revenue opportunities for partners. The Company has included revenue from the Meraki acquisition, subsequent to the acquisition date, in its Wireless product category.

The Company acquired privately held Intucell, Ltd. ("Intucell") in the third quarter of fiscal 2013. Prior to its acquisition, Intucell provided advanced self-optimizing network software for mobile carriers. With its acquisition of Intucell, the Company enhances its commitment to global service providers by adding a critical network intelligence layer to manage and optimize spectrum, coverage, and capacity, and ultimately the quality of the mobile experience. The Company has included revenue from the Intucell acquisition, subsequent to the acquisition date, in its NGN Routing product category.

The Company acquired privately held Ubiquisys Limited ("Ubiquisys") in the fourth quarter of fiscal 2013. Prior to its acquisition, Ubiquisys offered service providers intelligent 3G and long-term evolution (LTE) small-cell technologies for seamless connectivity across mobile networks. With its acquisition of Ubiquisys, the Company strengthens its commitment to global service providers by enabling a comprehensive small-cell solution that supports the transition to next-generation radio access networks. The Company has included revenue from the Ubiquisys acquisition, subsequent to the acquisition date, in its NGN Routing product category.

The total purchase consideration related to the Company's business combinations completed during fiscal 2013 consisted of cash consideration and vested share-based awards assumed. The total cash and cash equivalents acquired from these business combinations was approximately $156 million .

## (b)  Pending Acquisitions and Divestitures

Acquisition of OpenDNS  On August 26, 2015, the Company completed its acquisition of privately held OpenDNS, Inc. ("OpenDNS"). Under the terms of the agreement, the Company paid approximately $635 million in cash and share-based awards assumed to acquire OpenDNS. OpenDNS provides advanced threat protection for endpoint devices. With the OpenDNS acquisition, the Company aims to strengthen its security offerings by adding broad visibility and threat intelligence delivered through a software-as-a-service platform. Revenue from the OpenDNS acquisition will be included in the Company's Security product category. The Company expects that most of the purchase price will be allocated to goodwill and purchased intangible assets.

<u>Pending Divestiture</u> On July 22, 2015, the Company entered into an exclusive agreement to sell the client premises equipment portion of its Service Provider Video connected devices business unit to French-based Technicolor for approximately $600 million in cash and stock subject to certain adjustments provided for in the agreement. In connection with this transaction, the Company had tangible assets of approximately $190 million which were held for sale (of which the most significant component is inventories of approximately $160 million ), and current liabilities of approximately $125 million (primarily comprised of supply chain-related liabilities, warranties, rebates and other accrued liabilities), which were held for sale. The Company estimates that approximately $150 million of goodwill is attributable to this business, based on its relative fair value. The Company expects the transaction to close at the end of the second quarter of fiscal 2016, subject to customary closing conditions, including regulatory approvals.

### (c)  Other Acquisition and Divestiture Information

Total transaction costs related to the Company's acquisitions during fiscal 2015, 2014, and 2013 were $10 million , $7 million , and $40 million , respectively. These transaction costs were expensed as incurred in general and administrative (G&A) expenses in the Consolidated Statements of Operations.

The Company's purchase price allocation for acquisitions completed during recent periods are preliminary and subject to revision as additional information about fair value of assets and liabilities becomes available. Additional information, which existed as of the acquisition date but at that time was unknown to the Company, may become known to the Company during the remainder of the measurement period, a period not to exceed 12 months from the acquisition date. Adjustments in the purchase price allocation may require a recasting of the amounts allocated to goodwill retroactive to the period in which the acquisition occurred.

The goodwill generated from the Company's acquisitions completed during fiscal 2015 is primarily related to expected synergies. The goodwill is generally not deductible for income tax purposes.

The Consolidated Financial Statements include the operating results of each acquisition from the date of acquisition. Pro forma results of operations for the acquisitions completed during the fiscal years presented have not been presented because the effects of the acquisitions, individually and in the aggregate, were not material to the Company's financial results.

During the third quarter of fiscal 2013 , the Company completed the sale of its Linksys product line to a third party. The financial statement impact of the Company's Linksys product line and its resulting sale were not material for any of the fiscal years presented.

**4.  Goodwill and Purchased Intangible Assets**

**(a)  Goodwill**

The following tables present the goodwill allocated to the Company's reportable segments as of July 25, 2015 and July 26, 2014 , as well as the changes to goodwill during fiscal 2015 and 2014 (in millions):

| | Balance at July 26, 2014 | Acquisitions | Other | Balance at July 25, 2015 |
|---|---|---|---|---|
| Americas | $ 15,080 | $ 145 | $ (13) | $ 15,212 |
| EMEA | 5,715 | 84 | (8) | 5,791 |
| APJC | 3,444 | 26 | (4) | 3,466 |
| Total | $ 24,239 | $ 255 | $ (25) | $ 24,469 |

| | Balance at July 27, 2013 | Acquisitions | Other | Balance at July 26, 2014 |
|---|---|---|---|---|
| Americas | $ 13,800 | $ 1,275 | $ 5 | $ 15,080 |
| EMEA | 5,037 | 681 | (3) | 5,715 |
| APJC | 3,082 | 362 | — | 3,444 |
| Total | $ 21,919 | $ 2,318 | $ 2 | $ 24,239 |

"Other" in the tables above primarily consists of purchase accounting adjustments.

**(b)  Purchased Intangible Assets**

The following tables present details of the Company's intangible assets acquired through business combinations completed during fiscal 2015 and 2014 (in millions, except years):

| | FINITE LIVES | | | | | | INDEFINITE LIVES | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | TECHNOLOGY | | CUSTOMER RELATIONSHIPS | | OTHER | | IPR&D | |
| Fiscal 2015 | Weighted-Average Useful Life (in Years) | Amount | Weighted-Average Useful Life (in Years) | Amount | Weighted-Average Useful Life (in Years) | Amount | Amount | Amount |
| Metacloud | 3.0 | $ 24 | 5.0 | $ 3 | 0.0 | $ — | $ 2 | $ 29 |
| All others (five in total) | 4.7 | 48 | 7.8 | 12 | 5.8 | 6 | 4 | 70 |
| Total | | $ 72 | | $ 15 | | $ 6 | $ 6 | $ 99 |

| | FINITE LIVES | | | | | | INDEFINITE LIVES | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | TECHNOLOGY | | CUSTOMER RELATIONSHIPS | | OTHER | | IPR&D | |
| Fiscal 2014 | Weighted-Average Useful Life (in Years) | Amount | Weighted-Average Useful Life (in Years) | Amount | Weighted-Average Useful Life (in Years) | Amount | Amount | Amount |
| Composite Software | 6.0 | $ 60 | 3.9 | $ 14 | 0.0 | $ — | $ 1 | $ 75 |
| Sourcefire | 7.0 | 400 | 5.0 | 129 | 3.0 | 26 | 22 | 577 |
| WhipTail | 5.0 | 63 | 5.0 | 1 | 2.7 | 3 | 38 | 105 |
| Tail-f | 7.0 | 55 | 6.8 | 6 | 0.0 | — | — | 61 |
| All others (four in total) | 3.6 | 18 | 4.0 | 2 | 0.0 | — | — | 20 |
| Total | | $ 596 | | $ 152 | | $ 29 | $ 61 | $ 838 |

88

The following tables present details of the Company's purchased intangible assets (in millions):

| July 25, 2015 | Gross | | Accumulated Amortization | | Net | |
|---|---|---|---|---|---|---|
| **Purchased intangible assets with finite lives:** | | | | | | |
| Technology | $ | **3,418** | $ | **(1,818)** | $ | **1,600** |
| Customer relationships | | **1,699** | | **(971)** | | **728** |
| Other | | **55** | | **(24)** | | **31** |
| Total purchased intangible assets with finite lives | | **5,172** | | **(2,813)** | | **2,359** |
| In-process research and development, with indefinite lives | | **17** | | **—** | | **17** |
| Total | $ | **5,189** | $ | **(2,813)** | $ | **2,376** |

| July 26, 2014 | Gross | | Accumulated Amortization | | Net | |
|---|---|---|---|---|---|---|
| Purchased intangible assets with finite lives: | | | | | | |
| Technology | $ | 4,100 | $ | (1,976) | $ | 2,124 |
| Customer relationships | | 1,706 | | (720) | | 986 |
| Other | | 51 | | (13) | | 38 |
| Total purchased intangible assets with finite lives | | 5,857 | | (2,709) | | 3,148 |
| In-process research and development, with indefinite lives | | 132 | | — | | 132 |
| Total | $ | 5,989 | $ | (2,709) | $ | 3,280 |

Purchased intangible assets include intangible assets acquired through business combinations as well as through direct purchases or licenses. In fiscal 2015, the Company, along with a number of other companies, entered into an agreement to obtain a license to the patents owned by the Rockstar Consortium, and the Company paid approximately $300 million , of which $188 million was expensed to product cost of sales related to the settlement of patent infringement claims, and the remainder was capitalized as an intangible asset to be amortized over its estimated useful life.

The following table presents the amortization of purchased intangible assets (in millions):

| Years Ended | July 25, 2015 | | July 26, 2014 | | July 27, 2013 | |
|---|---|---|---|---|---|---|
| Amortization of purchased intangible assets: | | | | | | |
| Cost of sales | $ | **814** | $ | 742 | $ | 606 |
| Operating expenses | | **359** | | 275 | | 395 |
| Total | $ | **1,173** | $ | 1,017 | $ | 1,001 |

Amortization of purchased intangible assets for fiscal 2015 included impairment charges of approximately $175 million as a result of declines in estimated fair value resulting from the reduction or elimination of expected future cash flows associated with certain of the Company's technology and IPR&D intangible assets. There were no impairment charges related to purchased intangible assets during fiscal 2014 and 2013 .

The estimated future amortization expense of purchased intangible assets with finite lives as of July 25, 2015 is as follows (in millions):

| Fiscal Year | Amount | |
|---|---|---|
| 2016 | $ | 770 |
| 2017 | | 596 |
| 2018 | | 453 |
| 2019 | | 357 |
| 2020 | | 140 |
| Thereafter | | 43 |
| Total | $ | 2,359 |

## 5. Restructuring and Other Charges

<u>Fiscal 2015 Plan</u> The Company announced a restructuring action in August 2014 (the "Fiscal 2015 Plan"), in order to realign its workforce towards key growth areas of its business such as data center, software, security, and cloud. In connection with the Fiscal 2015 Plan, the Company incurred charges of $489 million during fiscal 2015 . The Company estimates that it will recognize aggregate pretax charges pursuant to the restructuring of approximately $700 million , consisting of severance and other one-time termination benefits and other associated costs. These charges are primarily cash-based, and the Company expects the Fiscal 2015 Plan to be substantially completed during the first half of fiscal 2016.

<u>Fiscal 2014 Plan and Fiscal 2011 Plans</u> In connection with a restructuring action announced in August 2013 (the "Fiscal 2014 Plan"), the Company incurred cumulative charges of approximately $418 million . The Company completed the Fiscal 2014 Plan at the end of fiscal 2014.

The Fiscal 2011 Plans consist primarily of the realignment and restructuring of the Company's business announced in July 2011 and of certain consumer product lines as announced during April 2011. The Company completed the Fiscal 2011 Plans at the end of fiscal 2013, with a total $105 million of charges having been incurred in fiscal 2013. The Company incurred cumulative charges of approximately $1.1 billion in connection with these plans.

The following table summarizes the activities related to the restructuring and other charges, as discussed above (in millions):

| | FISCAL 2014 AND FISCAL 2011 PLANS | | FISCAL 2015 PLAN | | |
| --- | --- | --- | --- | --- | --- |
| | Employee Severance | Other | Employee Severance | Other | Total |
| Liability as of July 28, 2012 | $ 83 | $ 27 | $ — | $ — | $ 110 |
| Charges | 111 | (6) | — | — | 105 |
| Cash payments | (173) | (11) | — | — | (184) |
| Non-cash items | — | (3) | — | — | (3) |
| Liability as of July 27, 2013 | 21 | 7 | — | — | 28 |
| Charges | 366 | 52 | — | — | 418 |
| Cash payments | (345) | (7) | — | — | (352) |
| Non-cash items | (2) | (23) | — | — | (25) |
| **Liability as of July 26, 2014** | **40** | **29** | **—** | **—** | **69** |
| **Charges** | **—** | **—** | **464** | **20** | **484** |
| **Cash payments** | **(29)** | **(14)** | **(413)** | **(3)** | **(459)** |
| **Non-cash items** | **—** | **(1)** | **(2)** | **(2)** | **(5)** |
| **Liability as of July 25, 2015** | **$ 11** | **$ 14** | **$ 49** | **$ 15** | **$ 89** |

During fiscal 2015 , in addition to the above amounts, the Company incurred $5 million of restructuring and other charges within cost of sales.

**6.  Balance Sheet Details**

The following tables provide details of selected balance sheet items (in millions):

| | | July 25, 2015 | | July 26, 2014 |
|---|---|---|---|---|
| Inventories: | | | | |
| Raw materials | $ | 114 | $ | 77 |
| Work in process | | 2 | | 5 |
| Finished goods: | | | | |
| Distributor inventory and deferred cost of sales | | 610 | | 595 |
| Manufactured finished goods | | 593 | | 606 |
| Total finished goods | | 1,203 | | 1,201 |
| Service-related spares | | 258 | | 273 |
| Demonstration systems | | 50 | | 35 |
| Total | $ | 1,627 | $ | 1,591 |
| | | | | |
| Property and equipment, net: | | | | |
| Gross property and equipment: | | | | |
| Land, buildings, and building and leasehold improvements | $ | 4,495 | $ | 4,468 |
| Computer equipment and related software | | 1,310 | | 1,425 |
| Production, engineering, and other equipment | | 5,753 | | 5,756 |
| Operating lease assets | | 372 | | 362 |
| Furniture and fixtures | | 497 | | 509 |
| Total gross property and equipment | | 12,427 | | 12,520 |
| Less: accumulated depreciation and amortization | | (9,095) | | (9,268) |
| Total | $ | 3,332 | $ | 3,252 |
| | | | | |
| Other assets: | | | | |
| Deferred tax assets | $ | 1,648 | $ | 1,700 |
| Investments in privately held companies | | 897 | | 899 |
| Other | | 618 | | 668 |
| Total | $ | 3,163 | $ | 3,267 |
| | | | | |
| Deferred revenue: | | | | |
| Service | $ | 9,757 | $ | 9,640 |
| Product: | | | | |
| Unrecognized revenue on product shipments and other deferred revenue | | 4,766 | | 3,924 |
| Cash receipts related to unrecognized revenue from two-tier distributors | | 660 | | 578 |
| Total product deferred revenue | | 5,426 | | 4,502 |
| Total | $ | 15,183 | $ | 14,142 |
| Reported as: | | | | |
| Current | $ | 9,824 | $ | 9,478 |
| Noncurrent | | 5,359 | | 4,664 |
| Total | $ | 15,183 | $ | 14,142 |

**7.  Financing Receivables and Operating Leases**

**(a)  Financing Receivables**

Financing receivables primarily consist of lease receivables, loan receivables, and financed service contracts and other. Lease receivables represent sales-type and direct-financing leases resulting from the sale of the Company's and complementary third-party products and are typically collateralized by a security interest in the underlying assets. Loan receivables represent financing arrangements related to the sale of the Company's products and services, which may include additional funding for other costs associated with network installation and integration of the Company's products and services. Lease receivables consist of arrangements with terms of four years on average, while loan receivables generally have terms of up to three years . The financed service contracts and other category includes financing receivables related to technical support and advanced services, as well as receivables related to financing of certain indirect costs associated with leases. Revenue related to the technical support services is typically deferred and included in deferred service revenue and is recognized ratably over the period during which the related services are to be performed, which typically ranges from one to three years.

A summary of the Company's financing receivables is presented as follows (in millions):

| July 25, 2015 | Lease Receivables | | Loan Receivables | | Financed Service Contracts and Other | | Total | |
|---|---|---|---|---|---|---|---|---|
| Gross | $ | 3,361 | $ | 1,763 | $ | 3,573 | $ | 8,697 |
| Residual value | | 224 | | — | | — | | 224 |
| Unearned income | | (190) | | — | | — | | (190) |
| Allowance for credit loss | | (259) | | (87) | | (36) | | (382) |
| Total, net | $ | 3,136 | $ | 1,676 | $ | 3,537 | $ | 8,349 |
| Reported as: | | | | | | | | |
| Current | $ | 1,468 | $ | 856 | $ | 2,167 | $ | 4,491 |
| Noncurrent | | 1,668 | | 820 | | 1,370 | | 3,858 |
| Total, net | $ | 3,136 | $ | 1,676 | $ | 3,537 | $ | 8,349 |

| July 26, 2014 | Lease Receivables | | Loan Receivables | | Financed Service Contracts and Other | | Total | |
|---|---|---|---|---|---|---|---|---|
| Gross | $ | 3,532 | $ | 1,683 | $ | 3,210 | $ | 8,425 |
| Residual value | | 233 | | — | | — | | 233 |
| Unearned income | | (238) | | — | | — | | (238) |
| Allowance for credit loss | | (233) | | (98) | | (18) | | (349) |
| Total, net | $ | 3,294 | $ | 1,585 | $ | 3,192 | $ | 8,071 |
| Reported as: | | | | | | | | |
| Current | $ | 1,476 | $ | 728 | $ | 1,949 | $ | 4,153 |
| Noncurrent | | 1,818 | | 857 | | 1,243 | | 3,918 |
| Total, net | $ | 3,294 | $ | 1,585 | $ | 3,192 | $ | 8,071 |

As of July 25, 2015 and July 26, 2014 , the deferred service revenue related to "Financed Service Contracts and Other" was $1,853 million and $1,843 million , respectively.

Future minimum lease payments to be received as of July 25, 2015 are summarized as follows (in millions):

| Fiscal Year | | Amount |
|---|---|---|
| 2016 | $ | 1,613 |
| 2017 | | 999 |
| 2018 | | 503 |
| 2019 | | 202 |
| 2020 | | 44 |
| Total | $ | 3,361 |

Actual cash collections may differ from the contractual maturities due to early customer buyouts, refinancings, or defaults.

92

**(b) Credit Quality of Financing Receivables**

Gross receivables less unearned income categorized by the Company's internal credit risk rating as of July 25, 2015 and July 26, 2014 are summarized as follows (in millions):

|  | INTERNAL CREDIT RISK RATING | | | |
| --- | --- | --- | --- | --- |
| July 25, 2015 | 1 to 4 | 5 to 6 | 7 and Higher | Total |
| Lease receivables | $ 1,688 | $ 1,342 | $ 141 | $ 3,171 |
| Loan receivables | 788 | 823 | 152 | 1,763 |
| Financed service contracts and other | 2,133 | 1,389 | 51 | 3,573 |
| Total | $ 4,609 | $ 3,554 | $ 344 | $ 8,507 |

|  | INTERNAL CREDIT RISK RATING | | | |
| --- | --- | --- | --- | --- |
| July 26, 2014 | 1 to 4 | 5 to 6 | 7 and Higher | Total |
| Lease receivables | $ 1,615 | $ 1,538 | $ 141 | $ 3,294 |
| Loan receivables | 953 | 593 | 137 | 1,683 |
| Financed service contracts and other | 1,744 | 1,367 | 99 | 3,210 |
| Total | $ 4,312 | $ 3,498 | $ 377 | $ 8,187 |

The Company determines the adequacy of its allowance for credit loss by assessing the risks and losses inherent in its financing receivables by portfolio segment. The portfolio segment is based on the types of financing offered by the Company to its customers, which consist of the following: lease receivables, loan receivables, and financed service contracts and other.

The Company's internal credit risk ratings of 1 through 4 correspond to investment-grade ratings, while credit risk ratings of 5 and 6 correspond to non-investment grade ratings. Credit risk ratings of 7 and higher correspond to substandard ratings.

In circumstances when collectibility is not deemed reasonably assured, the associated revenue is deferred in accordance with the Company's revenue recognition policies, and the related allowance for credit loss, if any, is included in deferred revenue. The Company also records deferred revenue associated with financing receivables when there are remaining performance obligations, as it does for financed service contracts. Total allowances for credit loss and deferred revenue as of July 25, 2015 and July 26, 2014 were $2,253 million and $2,220 million , respectively, and they were associated with total financing receivables before allowance for credit loss of $8,731 million and $8,420 million as of their respective period ends.

The following tables present the aging analysis of gross receivables less unearned income as of July 25, 2015 and July 26, 2014 (in millions):

|  | DAYS PAST DUE (INCLUDES BILLED AND UNBILLED) | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| July 25, 2015 | 31 - 60 | 61 - 90 | 91+ | Total Past Due | Current | Total | Nonaccrual Financing Receivables | Impaired Financing Receivables |
| Lease receivables | $ 90 | $ 27 | $ 185 | $ 302 | $ 2,869 | $ 3,171 | $ 73 | $ 73 |
| Loan receivables | 21 | 3 | 25 | 49 | 1,714 | 1,763 | 32 | 32 |
| Financed service contracts and other | 396 | 152 | 414 | 962 | 2,611 | 3,573 | 29 | 9 |
| Total | $ 507 | $ 182 | $ 624 | $ 1,313 | $ 7,194 | $ 8,507 | $ 134 | $ 114 |

|  | DAYS PAST DUE (INCLUDES BILLED AND UNBILLED) | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| July 26, 2014 | 31 - 60 | 61 - 90 | 91+ | Total Past Due | Current | Total | Nonaccrual Financing Receivables | Impaired Financing Receivables |
| Lease receivables | $ 63 | $ 46 | $ 202 | $ 311 | $ 2,983 | $ 3,294 | $ 48 | $ 41 |
| Loan receivables | 3 | 21 | 27 | 51 | 1,632 | 1,683 | 19 | 19 |
| Financed service contracts and other | 268 | 230 | 220 | 718 | 2,492 | 3,210 | 12 | 9 |
| Total | $ 334 | $ 297 | $ 449 | $ 1,080 | $ 7,107 | $ 8,187 | $ 79 | $ 69 |

Past due financing receivables are those that are 31 days or more past due according to their contractual payment terms. The data in the preceding tables is presented by contract, and the aging classification of each contract is based on the oldest outstanding receivable, and therefore past due amounts also include unbilled and current receivables within the same contract. The balances

of either unbilled or current financing receivables included in the category of 91 days plus past due for financing receivables were $496 million and $334 million as of July 25, 2015 and July 26, 2014 , respectively.

As of July 25, 2015 , the Company had financing receivables of $70 million , net of unbilled or current receivables from the same contract, that were in the category of 91 days plus past due but remained on accrual status as they are well secured and in the process of collection. Such balance was $78 million as of July 26, 2014 .

**(c)  Allowance for Credit Loss Rollforward**

The allowances for credit loss and the related financing receivables are summarized as follows (in millions):

| | CREDIT LOSS ALLOWANCES | | | |
|---|---|---|---|---|
| | Lease Receivables | Loan Receivables | Financed Service Contracts and Other | Total |
| **Allowance for credit loss as of July 26, 2014** | $ 233 | $ 98 | $ 18 | $ 349 |
| **Provisions** | 45 | (8) | 20 | 57 |
| **Recoveries (write-offs), net** | (7) | 1 | (1) | (7) |
| **Foreign exchange and other** | (12) | (4) | (1) | (17) |
| **Allowance for credit loss as of July 25, 2015** | $ 259 | $ 87 | $ 36 | $ 382 |
| **Financing receivables as of July 25, 2015** [1] | $ 3,395 | $ 1,763 | $ 3,573 | $ 8,731 |

| | CREDIT LOSS ALLOWANCES | | | |
|---|---|---|---|---|
| | Lease Receivables | Loan Receivables | Financed Service Contracts and Other | Total |
| Allowance for credit loss as of July 27, 2013 | $ 238 | $ 86 | $ 20 | $ 344 |
| Provisions | 4 | 9 | 1 | 14 |
| Recoveries (write-offs), net | (11) | 5 | (3) | (9) |
| Foreign exchange and other | 2 | (2) | — | — |
| Allowance for credit loss as of July 26, 2014 | $ 233 | $ 98 | $ 18 | $ 349 |
| Financing receivables as of July 26, 2014 [1] | $ 3,527 | $ 1,683 | $ 3,210 | $ 8,420 |

| | CREDIT LOSS ALLOWANCES | | | |
|---|---|---|---|---|
| | Lease Receivables | Loan Receivables | Financed Service Contracts and Other | Total |
| Allowance for credit loss as of July 28, 2012 | $ 247 | $ 122 | $ 11 | $ 380 |
| Provisions | 21 | (20) | 10 | 11 |
| Recoveries (write-offs), net | (30) | (15) | (1) | (46) |
| Foreign exchange and other | — | (1) | — | (1) |
| Allowance for credit loss as of July 27, 2013 | $ 238 | $ 86 | $ 20 | $ 344 |
| Financing receivables as of July 27, 2013 [1] | $ 3,507 | $ 1,649 | $ 3,136 | $ 8,292 |

[1] Total financing receivables before allowance for credit loss.

**(d)  Operating Leases**

The Company provides financing of certain equipment through operating leases, and the amounts are included in property and equipment in the Consolidated Balance Sheets. Amounts relating to equipment on operating lease assets and the associated accumulated depreciation are summarized as follows (in millions):

| | July 25, 2015 | July 26, 2014 |
|---|---|---|
| Operating lease assets | $ 372 | $ 362 |
| Accumulated depreciation | (205) | (202) |
| Operating lease assets, net | $ 167 | $ 160 |

Minimum future rentals on non-cancelable operating leases at July 25, 2015 are approximately $0.2 billion for fiscal 2016 , $0.1 billion for fiscal 2017 , and less than $0.1 billion per year for each of fiscal 2018 through fiscal 2020 .

94

**8.    Investments**

**(a)  Summary of Available-for-Sale Investments**

The following tables summarize the Company's available-for-sale investments (in millions):

| July 25, 2015 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| **Fixed income securities:** | | | | |
| U.S. government securities | $ 29,904 | $ 41 | $ (6) | $ 29,939 |
| U.S. government agency securities | 3,662 | 2 | (1) | 3,663 |
| Non-U.S. government and agency securities | 1,128 | 1 | (1) | 1,128 |
| Corporate debt securities | 15,802 | 34 | (53) | 15,783 |
| U.S. agency mortgage-backed securities | 1,456 | 8 | (3) | 1,461 |
| Total fixed income securities | 51,952 | 86 | (64) | 51,974 |
| **Publicly traded equity securities** | 1,092 | 480 | (7) | 1,565 |
| Total | $ 53,044 | $ 566 | $ (71) | $ 53,539 |

| July 26, 2014 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| Fixed income securities: | | | | |
| U.S. government securities | $ 31,717 | $ 29 | $ (12) | $ 31,734 |
| U.S. government agency securities | 1,062 | 1 | — | 1,063 |
| Non-U.S. government and agency securities | 860 | 2 | (1) | 861 |
| Corporate debt securities | 9,092 | 74 | (7) | 9,159 |
| U.S. agency mortgage-backed securities | 574 | 5 | — | 579 |
| Total fixed income securities | 43,305 | 111 | (20) | 43,396 |
| Publicly traded equity securities | 1,314 | 648 | (10) | 1,952 |
| Total | $ 44,619 | $ 759 | $ (30) | $ 45,348 |

Non-U.S. government and agency securities include agency and corporate debt securities that are guaranteed by non-U.S. governments.

**(b)  Gains and Losses on Available-for-Sale Investments**

The following table presents the gross realized gains and gross realized losses related to the Company's available-for-sale investments (in millions):

| Years Ended | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| Gross realized gains | $ 221 | $ 341 | $ 264 |
| Gross realized losses | (64) | (41) | (216) |
| Total | $ 157 | $ 300 | $ 48 |

The following table presents the realized net gains related to the Company's available-for-sale investments by security type (in millions):

| Years Ended | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| Net gains on investments in publicly traded equity securities | $ 116 | $ 253 | $ 17 |
| Net gains on investments in fixed income securities | 41 | 47 | 31 |
| Total | $ 157 | $ 300 | $ 48 |

There were no impairment charges on available-for-sale investments for fiscal 2015 . For fiscal 2014 , the realized net gains related to the Company's available-for-sale investments included impairment charges of $11 million . These impairment charges related to publicly traded equity securities and were due to a decline in the fair value of those securities below their cost basis that were determined to be other than temporary. There were no impairment charges on available-for-sale investments for fiscal 2013 .

The following tables present the breakdown of the available-for-sale investments with gross unrealized losses and the duration that those losses had been unrealized at July 25, 2015 and July 26, 2014 (in millions):

| July 25, 2015 | UNREALIZED LOSSES LESS THAN 12 MONTHS | | UNREALIZED LOSSES 12 MONTHS OR GREATER | | TOTAL | |
|---|---|---|---|---|---|---|
| | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses |
| Fixed income securities: | | | | | | |
| U.S. government securities | $ 6,412 | $ (6) | $ — | $ — | $ 6,412 | $ (6) |
| U.S. government agency securities | 1,433 | (1) | — | — | 1,433 | (1) |
| Non-U.S. government and agency securities | 515 | (1) | 4 | — | 519 | (1) |
| Corporate debt securities | 9,552 | (49) | 312 | (4) | 9,864 | (53) |
| U.S. agency mortgage-backed securities | 579 | (3) | — | — | 579 | (3) |
| Total fixed income securities | 18,491 | (60) | 316 | (4) | 18,807 | (64) |
| Publicly traded equity securities | 108 | (7) | 2 | — | 110 | (7) |
| Total | $ 18,599 | $ (67) | $ 318 | $ (4) | $ 18,917 | $ (71) |

| July 26, 2014 | UNREALIZED LOSSES LESS THAN 12 MONTHS | | UNREALIZED LOSSES 12 MONTHS OR GREATER | | TOTAL | |
|---|---|---|---|---|---|---|
| | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses |
| Fixed income securities: | | | | | | |
| U.S. government securities | $ 7,676 | $ (12) | $ 45 | $ — | $ 7,721 | $ (12) |
| Non-U.S. government and agency securities | 361 | (1) | 22 | — | 383 | (1) |
| Corporate debt securities | 1,875 | (3) | 491 | (4) | 2,366 | (7) |
| Total fixed income securities | 9,912 | (16) | 558 | (4) | 10,470 | (20) |
| Publicly traded equity securities | 132 | (10) | — | — | 132 | (10) |
| Total | $ 10,044 | $ (26) | $ 558 | $ (4) | $ 10,602 | $ (30) |

As of July 25, 2015 , for fixed income securities that were in unrealized loss positions, the Company has determined that (i) it does not have the intent to sell any of these investments, and (ii) it is not more likely than not that it will be required to sell any of these investments before recovery of the entire amortized cost basis. In addition, as of July 25, 2015 , the Company anticipates that it will recover the entire amortized cost basis of such fixed income securities and has determined that no other-than-temporary impairments associated with credit losses were required to be recognized during the year ended July 25, 2015 .

The Company has evaluated its publicly traded equity securities as of July 25, 2015 and has determined that there was no indication of other-than-temporary impairments in the respective categories of unrealized losses. This determination was based on several factors, which include the length of time and extent to which fair value has been less than the cost basis, the financial condition and near-term prospects of the issuer, and the Company's intent and ability to hold the publicly traded equity securities for a period of time sufficient to allow for any anticipated recovery in market value.

**(c)  Maturities of Fixed Income Securities**

The following table summarizes the maturities of the Company's fixed income securities at July 25, 2015 (in millions):

| | Amortized Cost | Fair Value |
|---|---|---|
| Less than 1 year | $ 16,534 | $ 16,540 |
| Due in 1 to 2 years | 15,264 | 15,279 |
| Due in 2 to 5 years | 18,501 | 18,499 |
| Due after 5 years | 1,653 | 1,656 |
| Total | $ 51,952 | $ 51,974 |

Actual maturities may differ from the contractual maturities because borrowers may have the right to call or prepay certain obligations. The remaining contractual principal maturities for mortgage-backed securities were allocated assuming no prepayments.

96

**(d)  Securities Lending**

The Company periodically engages in securities lending activities with certain of its available-for-sale investments. These transactions are accounted for as a secured lending of the securities, and the securities are typically loaned only on an overnight basis. The average daily balance of securities lending for fiscal 2015 and 2014 was $0.4 billion and $1.5 billion , respectively. The Company requires collateral equal to at least 102% of the fair market value of the loaned security and that the collateral be in the form of cash or liquid, high-quality assets. The Company engages in these secured lending transactions only with highly creditworthy counterparties, and the associated portfolio custodian has agreed to indemnify the Company against collateral losses. The Company did not experience any losses in connection with the secured lending of securities during the periods presented. As of July 25, 2015 and July 26, 2014 , the Company had no outstanding securities lending transactions.

**(e)  Investments in Privately Held Companies**

The carrying value of the Company's investments in privately held companies was included in other assets. For such investments that were accounted for under the equity and cost method as of July 25, 2015 and July 26, 2014 , the amounts are summarized in the following table (in millions):

|  | July 25, 2015 | July 26, 2014 |
|---|---|---|
| Equity method investments | $ 578 | $ 630 |
| Cost method investments | 319 | 269 |
| Total | $ 897 | $ 899 |

Variable Interest Entities

*VCE Joint Venture* VCE is a joint venture formed in fiscal 2010 between the Company and EMC Corporation ("EMC"), with investments from VMware, Inc. ("VMware") and Intel Capital Corporation ("Intel"). In October 2014, the Company, EMC, VMware, and Intel agreed to restructure VCE, and this transaction was completed in the second quarter of fiscal 2015. Prior to the restructuring, the Company's cumulative gross investment in VCE was approximately $716 million , inclusive of convertible notes and accrued interest on convertible notes. The Company recorded cumulative losses from VCE under the equity method of $691 million since inception. The Company ceased accounting for the VCE investment under the equity method in October 2014, and losses of $47 million , $223 million and $183 million were recorded for the fiscal years ended July 25, 2015 , July 26, 2014 , and July 27, 2013 , respectively. Under the terms of the restructuring, VCE paid $152 million to the Company for a portion of the outstanding principal balance of the convertible notes held by it and accrued interest on such notes, and the remaining principal balance of the other such notes, and the accrued interest thereon, was cancelled. Pursuant to the restructuring, VCE also redeemed a portion of the Company's equity interest in VCE, reducing the Company's ownership interest in VCE from 35% prior to the restructuring to 10% . In connection with this transaction, the Company has written this investment down to a book value of zero and has recognized a gain in other income (loss), net of $126 million for the fiscal year ended July 25, 2015 .

*Other Variable Interest Entities* In the ordinary course of business, the Company has investments in other privately held companies and provides financing to certain customers. These other privately held companies and customers may be considered to be variable interest entities. The Company evaluates on an ongoing basis its investments in these other privately held companies and its customer financings and has determined that as of July 25, 2015 there were no other variable interest entities required to be consolidated in the Company's Consolidated Financial Statements.

## 9.   Fair Value

### (a)   Assets and Liabilities Measured at Fair Value on a Recurring Basis

Assets and liabilities measured at fair value on a recurring basis as of July 25, 2015 and July 26, 2014 were as follows (in millions):

| | JULY 25, 2015 FAIR VALUE MEASUREMENTS | | | | JULY 26, 2014 FAIR VALUE MEASUREMENTS | | | |
|---|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total Balance | Level 1 | Level 2 | Level 3 | Total Balance |
| **Assets:** | | | | | | | | |
| Cash equivalents: | | | | | | | | |
| Money market funds | $ 5,336 | $ — | $ — | $ 5,336 | $ 4,935 | $ — | $ — | $ 4,935 |
| Corporate debt securities | — | 14 | — | 14 | — | — | — | — |
| Available-for-sale investments: | | | | | | | | |
| U.S. government securities | — | 29,939 | — | 29,939 | — | 31,734 | — | 31,734 |
| U.S. government agency securities | — | 3,663 | — | 3,663 | — | 1,063 | — | 1,063 |
| Non-U.S. government and agency securities | — | 1,128 | — | 1,128 | — | 861 | — | 861 |
| Corporate debt securities | — | 15,783 | — | 15,783 | — | 9,159 | — | 9,159 |
| U.S. agency mortgage-backed securities | — | 1,461 | — | 1,461 | — | 579 | — | 579 |
| Publicly traded equity securities | 1,565 | — | — | 1,565 | 1,952 | — | — | 1,952 |
| Derivative assets | — | 214 | 4 | 218 | — | 158 | 2 | 160 |
| Total | $ 6,901 | $ 52,202 | $ 4 | $ 59,107 | $ 6,887 | $ 43,554 | $ 2 | $ 50,443 |
| **Liabilities:** | | | | | | | | |
| Derivative liabilities | $ — | $ 12 | $ — | $ 12 | $ — | $ 67 | $ — | $ 67 |
| Total | $ — | $ 12 | $ — | $ 12 | $ — | $ 67 | $ — | $ 67 |

Level 1 publicly traded equity securities are determined by using quoted prices in active markets for identical assets. Level 2 fixed income securities are priced using quoted market prices for similar instruments or nonbinding market prices that are corroborated by observable market data. The Company uses inputs such as actual trade data, benchmark yields, broker/dealer quotes, and other similar data, which are obtained from quoted market prices, independent pricing vendors, or other sources, to determine the ultimate fair value of these assets and liabilities. The Company uses such pricing data as the primary input to make its assessments and determinations as to the ultimate valuation of its investment portfolio and has not made, during the periods presented, any material adjustments to such inputs. The Company is ultimately responsible for the financial statements and underlying estimates. The Company's derivative instruments are primarily classified as Level 2, as they are not actively traded and are valued using pricing models that use observable market inputs. The Company did not have any transfers between Level 1 and Level 2 fair value measurements during the periods presented.

Level 3 assets include certain derivative instruments, the values of which are determined based on discounted cash flow models using inputs that the Company could not corroborate with market data.

### (b)   Assets Measured at Fair Value on a Nonrecurring Basis

The following table presents the Company's assets that were measured at fair value on a nonrecurring basis during the indicated periods and the related recognized gains and losses for the periods indicated (in millions):

| | TOTAL GAINS (LOSSES) FOR THE YEARS ENDED | | |
|---|---|---|---|
| | July 25, 2015 | July 26, 2014 | July 27, 2013 |
| Investments in privately held companies (impaired) | $ (38) | $ (21) | $ (31) |
| Purchased intangible assets (impaired) | (175) | — | — |
| Property held for sale—land and buildings | — | — | (1) |
| Gains (losses) on assets no longer held at end of fiscal year | (8) | (2) | 75 |
| Total gains (losses) for nonrecurring measurements | $ (221) | $ (23) | $ 43 |

These assets were measured at fair value due to events or circumstances the Company identified as having significant impact on their fair value during the respective periods. To arrive at the valuation of these assets, the Company considers any significant changes in the financial metrics and economic variables and also uses third-party valuation reports to assist in the valuation as necessary.

The fair value measurement of the impaired investments was classified as Level 3 because significant unobservable inputs were used in the valuation due to the absence of quoted market prices and inherent lack of liquidity. Significant unobservable inputs, which included financial metrics of comparable private and public companies, financial condition and near-term prospects of the investees, recent financing activities of the investees, and the investees' capital structure as well as other economic variables, reflected the assumptions market participants would use in pricing these assets. The impairment charges, representing the difference between the net book value and the fair value as a result of the evaluation, were recorded to other income (loss), net. The remaining carrying value of the investments that were impaired was $36 million as of July 25, 2015 .

The fair value for purchased intangibles assets measured at fair value on a nonrecurring basis was categorized as Level 3 due to the use of significant unobservable inputs in the valuation. Significant unobservable inputs that were used included expected revenues and net income related to the assets and the expected life of the assets. The difference between the estimated fair value and the carrying value of the assets was recorded as an impairment charge, which was included in product cost of sales and operating expenses as applicable. See Note 4. The remaining carrying value of the specific purchased intangible assets that were impaired was $5 million as of July 25, 2015 .

The fair value of property held for sale was measured with the assistance of third-party valuation models, which used discounted cash flow techniques as part of their analysis. The fair value measurement was categorized as Level 3, as significant unobservable inputs were used in the valuation report. The impairment charges as a result of the valuations, which represented the difference between the fair value less cost to sell and the carrying amount of the assets held for sale, were included in G&A expenses.

### (c)   Other Fair Value Disclosures

The carrying value of the Company's investments in privately held companies that were accounted for under the cost method was $319 million and $269 million as of July 25, 2015 and July 26, 2014 , respectively. It was not practicable to estimate the fair value of this portfolio.

The fair value of the Company's short-term loan receivables and financed service contracts approximates their carrying value due to their short duration. The aggregate carrying value of the Company's long-term loan receivables and financed service contracts and other as of July 25, 2015 and July 26, 2014 was $2.2 billion and $2.1 billion , respectively. The estimated fair value of the Company's long-term loan receivables and financed service contracts and other approximates their carrying value. The Company uses significant unobservable inputs in determining discounted cash flows to estimate the fair value of its long-term loan receivables and financed service contracts, and therefore they are categorized as Level 3.

As of July 25, 2015 and July 26, 2014 , the estimated fair value of the short-term debt approximates its carrying value due to the short maturities. As of July 25, 2015 , the fair value of the Company's senior notes and other long-term debt was $26.6 billion , with a carrying amount of $25.4 billion . This compares to a fair value of $22.4 billion and a carrying amount of $20.8 billion as of July 26, 2014 . The fair value of the senior notes and other long-term debt was determined based on observable market prices in a less active market and was categorized as Level 2 in the fair value hierarchy.

### 10.   Borrowings

### (a)   Short-Term Debt

The following table summarizes the Company's short-term debt (in millions, except percentages):

| | July 25, 2015 | | July 26, 2014 | |
| --- | --- | --- | --- | --- |
| | Amount | Effective Rate | Amount | Effective Rate |
| Current portion of long-term debt | $ 3,894 | 2.48% | $ 500 | 3.11% |
| Other notes and borrowings | 3 | 2.44% | 8 | 2.67% |
| Total short-term debt | $ 3,897 | | $ 508 | |

The effective interest rate on the current portion of long-term debt includes the impact of interest rate swaps, as discussed further in "(b) Long-Term Debt." Other notes and borrowings consist of the short-term portion of secured borrowings associated with customer financing arrangements. These notes and credit facilities were subject to various terms and foreign currency market interest rates pursuant to individual financial arrangements between the financing institution and the applicable foreign subsidiary.

The Company repaid the fixed-rate notes (2.90%) due on November 17, 2014 for an aggregate principal amount of $500 million upon maturity.

99

The Company repaid the floating-rate notes due on September 3, 2015 for an aggregate principal amount of $850 million upon maturity.

In fiscal 2011, the Company established a short-term debt financing program of up to $3.0 billion through the issuance of commercial paper notes. The Company uses the proceeds from the issuance of commercial paper notes for general corporate purposes. The Company did not have any commercial paper notes outstanding as of each of July 25, 2015 and July 26, 2014 .

**(b)  Long-Term Debt**

The following table summarizes the Company's long-term debt (in millions, except percentages):

| | Maturity Date | | July 25, 2015 | | July 26, 2014 | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Amount | Effective Rate | Amount | Effective Rate |
| Senior notes: | | | | | | |
| Floating-rate notes: | | | | | | |
| Three-month LIBOR plus 0.05% | September 3, 2015 | | $    850 | 0.43% | $    850 | 0.35% |
| Three-month LIBOR plus 0.28% | March 3, 2017 | | 1,000 | 0.63% | 1,000 | 0.56% |
| Three-month LIBOR plus 0.31% | June 15, 2018 | (1) | 900 | 0.65% | — | — |
| Three-month LIBOR plus 0.50% | March 1, 2019 | | 500 | 0.84% | 500 | 0.78% |
| Fixed-rate notes: | | | | | | |
| 2.90% | November 17, 2014 | | — | — | 500 | 3.11% |
| 5.50% | February 22, 2016 | | 3,000 | 3.07% | 3,000 | 3.04% |
| 1.10% | March 3, 2017 | | 2,400 | 0.59% | 2,400 | 0.56% |
| 3.15% | March 14, 2017 | | 750 | 0.85% | 750 | 0.79% |
| 1.65% | June 15, 2018 | (1) | 1,600 | 1.72% | — | — |
| 4.95% | February 15, 2019 | | 2,000 | 4.70% | 2,000 | 4.69% |
| 2.125% | March 1, 2019 | | 1,750 | 0.80% | 1,750 | 0.77% |
| 4.45% | January 15, 2020 | | 2,500 | 3.01% | 2,500 | 2.98% |
| 2.45% | June 15, 2020 | (1) | 1,500 | 2.54% | — | — |
| 2.90% | March 4, 2021 | | 500 | 0.96% | 500 | 0.93% |
| 3.00% | June 15, 2022 | (1) | 500 | 1.21% | — | — |
| 3.625% | March 4, 2024 | | 1,000 | 1.08% | 1,000 | 1.05% |
| 3.50% | June 15, 2025 | (1) | 500 | 1.37% | — | — |
| 5.90% | February 15, 2039 | | 2,000 | 6.11% | 2,000 | 6.11% |
| 5.50% | January 15, 2040 | | 2,000 | 5.67% | 2,000 | 5.67% |
| Other long-term debt | | | 1 | 2.08% | 4 | 2.39% |
| Total | | | 25,251 | | 20,754 | |
| Unaccreted discount/issuance costs | | | (131) | | (127) | |
| Hedge accounting fair value adjustments | | | 231 | | 210 | |
| Total | | | $   25,351 | | $   20,837 | |
| | | | | | | |
| Reported as: | | | | | | |
| Current portion of long-term debt | | | $    3,894 | | $    500 | |
| Long-term debt | | | 21,457 | | 20,337 | |
| Total | | | $   25,351 | | $   20,837 | |

(1) In June 2015, the Company issued senior notes for an aggregate principal amount of $5.0 billion .

To achieve its interest rate risk management objectives, the Company entered into interest rate swaps in prior periods with an aggregate notional amount of $11.4 billion designated as fair value hedges of certain of its fixed-rate senior notes. In effect, these swaps convert the fixed interest rates of the fixed-rate notes to floating interest rates based on the London InterBank Offered Rate (LIBOR). The gains and losses related to changes in the fair value of the interest rate swaps substantially offset changes in the fair value of the hedged portion of the underlying debt that are attributable to the changes in market interest rates. For additional information, see Note 11.

The effective rates for the fixed-rate debt include the interest on the notes, the accretion of the discount, and, if applicable, adjustments related to hedging. Interest is payable semiannually on each class of the senior fixed-rate notes and payable quarterly

on the floating-rate notes. Each of the senior fixed-rate notes is redeemable by the Company at any time, subject to a make-whole premium.

The senior notes rank at par with the commercial paper notes that may be issued in the future pursuant to the Company's short-term debt financing program, as discussed above under "(a) Short-Term Debt." As of July 25, 2015 , the Company was in compliance with all debt covenants.

As of July 25, 2015 , future principal payments for long-term debt, including the current portion, are summarized as follows (in millions):

| Fiscal Year | | Amount |
|---|---|---|
| 2016 | $ | 3,850 |
| 2017 | | 4,151 |
| 2018 | | 2,500 |
| 2019 | | 4,250 |
| 2020 | | 4,000 |
| Thereafter | | 6,500 |
| Total | $ | 25,251 |

### (c) Credit Facility

On May 15, 2015, the Company entered into a credit agreement with certain institutional lenders that provides for a $3.0 billion unsecured revolving credit facility that is scheduled to expire on May 15, 2020 . Any advances under the credit agreement will accrue interest at rates that are equal to, based on certain conditions, either (i) the highest of (a) the Federal Funds rate plus 0.50% , (b) Bank of America's "prime rate" as announced from time to time, or (c) LIBOR, or a comparable or successor rate that is approved by the Administrative Agent ("Eurocurrency Rate"), for an interest period of one-month plus 1.00% , or (ii) the Eurocurrency Rate, plus a margin that is based on the Company's senior debt credit ratings as published by Standard & Poor's Financial Services, LLC and Moody's Investors Service, Inc., provided that in no event will the Eurocurrency Rate be less than zero. The credit agreement requires the Company to comply with certain covenants, including that it maintain an interest coverage ratio as defined in the agreement.

The Company may also, upon the agreement of either the then-existing lenders or additional lenders not currently parties to the agreement, increase the commitments under the credit facility by up to an additional $2.0 billion and/or extend the expiration date of the credit facility up to May 15, 2022 . As of July 25, 2015 , the Company was in compliance with the required interest coverage ratio and the other covenants, and the Company had not borrowed any funds under the credit facility.

This credit facility replaces the Company's prior credit facility that was entered into on February 17, 2012, which was terminated in connection with its entering into the new credit facility.

## 11. Derivative Instruments

### (a) Summary of Derivative Instruments

The Company uses derivative instruments primarily to manage exposures to foreign currency exchange rate, interest rate, and equity price risks. The Company's primary objective in holding derivatives is to reduce the volatility of earnings and cash flows associated with changes in foreign currency exchange rates, interest rates, and equity prices. The Company's derivatives expose it to credit risk to the extent that the counterparties may be unable to meet the terms of the agreement. The Company does, however, seek to mitigate such risks by limiting its counterparties to major financial institutions. In addition, the potential risk of loss with any one counterparty resulting from this type of credit risk is monitored. Management does not expect material losses as a result of defaults by counterparties.

The fair values of the Company's derivative instruments and the line items on the Consolidated Balance Sheets to which they were recorded are summarized as follows (in millions):

| | | DERIVATIVE ASSETS | | | DERIVATIVE LIABILITIES | | |
|---|---|---|---|---|---|---|---|
| | Balance Sheet Line Item | July 25, 2015 | July 26, 2014 | Balance Sheet Line Item | July 25, 2015 | July 26, 2014 |
| Derivatives designated as hedging instruments: | | | | | | | |
| Foreign currency derivatives | Other current assets | $ 10 | $ 7 | Other current liabilities | $ 11 | $ 6 |
| Interest rate derivatives | Other assets | 202 | 148 | Other long-term liabilities | — | 3 |
| Equity derivatives | Other current assets | — | — | Other current liabilities | — | 56 |
| Total | | 212 | 155 | | 11 | 65 |
| Derivatives not designated as hedging instruments: | | | | | | | |
| Foreign currency derivatives | Other current assets | 2 | 3 | Other current liabilities | 1 | 2 |
| Equity derivatives | Other assets | 4 | 2 | Other long-term liabilities | — | — |
| Total | | 6 | 5 | | 1 | 2 |
| Total | | $ 218 | $ 160 | | $ 12 | $ 67 |

The effects of the Company's cash flow and net investment hedging instruments on other comprehensive income (OCI) and the Consolidated Statements of Operations are summarized as follows (in millions):

| | GAINS (LOSSES) RECOGNIZED IN OCI ON DERIVATIVES FOR THE YEARS ENDED (EFFECTIVE PORTION) | | | | GAINS (LOSSES) RECLASSIFIED FROM AOCI INTO INCOME FOR THE YEARS ENDED (EFFECTIVE PORTION) | | |
|---|---|---|---|---|---|---|---|
| | July 25, 2015 | July 26, 2014 | July 27, 2013 | Line Item in Statements of Operations | July 25, 2015 | July 26, 2014 | July 27, 2013 |
| Derivatives designated as cash flow hedging instruments: | | | | | | | |
| Foreign currency derivatives | $ (159) | $ 48 | $ 73 | Operating expenses | $ (121) | $ 55 | $ 10 |
| | | | | Cost of sales — service | (33) | 13 | 2 |
| Total | $ (159) | $ 48 | $ 73 | Total | $ (154) | $ 68 | $ 12 |
| | | | | | | | |
| Derivatives designated as net investment hedging instruments: | | | | | | | |
| Foreign currency derivatives | $ 42 | $ (15) | $ (1) | Other income (loss), net | $ — | $ — | $ — |

As of July 25, 2015 , the Company estimates that approximately $5 million of net derivative losses related to its cash flow hedges included in accumulated other comprehensive income (AOCI) will be reclassified into earnings within the next 12 months when the underlying hedged item impacts earnings.

The effect on the Consolidated Statements of Operations of derivative instruments designated as fair value hedges and the underlying hedged items is summarized as follows (in millions):

| | | GAINS (LOSSES) ON DERIVATIVE INSTRUMENTS FOR THE YEARS ENDED | | | GAINS (LOSSES) RELATED TO HEDGED ITEMS FOR THE YEARS ENDED | | |
|---|---|---|---|---|---|---|---|
| Derivatives Designated as Fair Value Hedging Instruments | Line Item in Statements of Operations | July 25, 2015 | July 26, 2014 | July 27, 2013 | July 25, 2015 | July 26, 2014 | July 27, 2013 |
| Equity derivatives | Other income (loss), net | $ 56 | $ (72) | $ (155) | $ (56) | $ 72 | $ 155 |
| Interest rate derivatives | Interest expense | 54 | (2) | (78) | (57) | — | 78 |
| Total | | $ 110 | $ (74) | $ (233) | $ (113) | $ 72 | $ 233 |

The effect on the Consolidated Statements of Operations of derivative instruments not designated as hedges is summarized as follows (in millions):

| Derivatives Not Designated as Hedging Instruments | Line Item in Statements of Operations | GAINS (LOSSES) FOR THE YEARS ENDED | | |
|---|---|---|---|---|
| | | July 25, 2015 | July 26, 2014 | July 27, 2013 |
| Foreign currency derivatives | Other income (loss), net | $ (173) | $ 23 | $ (74) |
| Total return swaps—deferred compensation | Operating expenses | 19 | 47 | 61 |
| Equity derivatives | Other income (loss), net | 27 | 34 | — |
| Total | | $ (127) | $ 104 | $ (13) |

The notional amounts of the Company's outstanding derivatives are summarized as follows (in millions):

| | July 25, 2015 | July 26, 2014 |
|---|---|---|
| Derivatives designated as hedging instruments: | | |
| Foreign currency derivatives—cash flow hedges | $ 1,201 | $ 1,618 |
| Interest rate derivatives | 11,400 | 10,400 |
| Net investment hedging instruments | 192 | 345 |
| Equity derivatives | — | 238 |
| Derivatives not designated as hedging instruments: | | |
| Foreign currency derivatives | 2,023 | 2,528 |
| Total return swaps—deferred compensation | 462 | 428 |
| Total | $ 15,278 | $ 15,557 |

### (b) Offsetting of Derivative Instruments

The Company presents its derivative instruments at gross fair values in the Consolidated Balance Sheets. However, the Company's master netting and other similar arrangements with the respective counterparties allow for net settlement under certain conditions, which are designed to reduce credit risk by permitting net settlement with the same counterparty. To further limit credit risk, the Company also enters into collateral security arrangements related to certain derivative instruments whereby cash is posted as collateral between the counterparties based on the fair market value of the derivative instrument. Information related to these offsetting arrangements is summarized as follows (in millions):

| July 25, 2015 | GROSS AMOUNTS OFFSET IN THE CONSOLIDATED BALANCE SHEET | | | GROSS AMOUNTS NOT OFFSET IN THE CONSOLIDATED BALANCE SHEET BUT WITH LEGAL RIGHTS TO OFFSET | | |
|---|---|---|---|---|---|---|
| | Gross Amounts Recognized | Gross Amounts Offset | Net Amounts Presented | Gross Derivative Amounts | Cash Collateral | Net Amount |
| Derivatives assets | $ 218 | $ — | $ 218 | $ (12) | $ (124) | $ 82 |
| Derivatives liabilities | $ 12 | $ — | $ 12 | $ (12) | $ — | $ — |

| July 26, 2014 | GROSS AMOUNTS OFFSET IN THE CONSOLIDATED BALANCE SHEET | | | GROSS AMOUNTS NOT OFFSET IN THE CONSOLIDATED BALANCE SHEET BUT WITH LEGAL RIGHTS TO OFFSET | | |
|---|---|---|---|---|---|---|
| | Gross Amounts Recognized | Gross Amounts Offset | Net Amounts Presented | Gross Derivative Amounts | Cash Collateral | Net Amount |
| Derivatives assets | $ 160 | $ — | $ 160 | $ (39) | $ (60) | $ 61 |
| Derivatives liabilities | $ 67 | $ — | $ 67 | $ (39) | $ (1) | $ 27 |

103

**(c) Foreign Currency Exchange Risk**

The Company conducts business globally in numerous currencies. Therefore, it is exposed to adverse movements in foreign currency exchange rates. To limit the exposure related to foreign currency changes, the Company enters into foreign currency contracts. The Company does not enter into such contracts for trading purposes.

The Company hedges forecasted foreign currency transactions related to certain operating expenses and service cost of sales with currency options and forward contracts. These currency options and forward contracts, designated as cash flow hedges, generally have maturities of less than 18 months . The Company assesses effectiveness based on changes in total fair value of the derivatives. The effective portion of the derivative instrument's gain or loss is initially reported as a component of AOCI and subsequently reclassified into earnings when the hedged exposure affects earnings. The ineffective portion, if any, of the gain or loss is reported in earnings immediately. During the fiscal years presented, the Company did not discontinue any cash flow hedges for which it was probable that a forecasted transaction would not occur.

The Company enters into foreign exchange forward and option contracts to reduce the short-term effects of foreign currency fluctuations on assets and liabilities such as foreign currency receivables, including long-term customer financings, investments, and payables. These derivatives are not designated as hedging instruments. Gains and losses on the contracts are included in other income (loss), net, and substantially offset foreign exchange gains and losses from the remeasurement of intercompany balances or other current assets, investments, or liabilities denominated in currencies other than the functional currency of the reporting entity.

The Company hedges certain net investments in its foreign operations with forward contracts to reduce the effects of foreign currency fluctuations on the Company's net investment in those foreign subsidiaries. These derivative instruments generally have maturities of up to six months .

**(d) Interest Rate Risk**

<u>Interest Rate Derivatives, Investments</u>    The Company's primary objective for holding fixed income securities is to achieve an appropriate investment return consistent with preserving principal and managing risk. To realize these objectives, the Company may utilize interest rate swaps or other derivatives designated as fair value or cash flow hedges. As of July 25, 2015 and July 26, 2014 , the Company did not have any outstanding interest rate derivatives related to its fixed income securities.

<u>Interest Rate Derivatives Designated as Fair Value Hedges, Long-Term Debt</u>    In fiscal 2015 and 2014, the Company entered into interest rate swaps designated as fair value hedges related to fixed-rate senior notes that are due on various dates from 2017 through 2025. In the periods prior to fiscal 2013, the Company entered into interest rate swaps designated as fair value hedges related to fixed-rate senior notes that are due in 2016 and 2017. Under these interest rate swaps, the Company receives fixed-rate interest payments and makes interest payments based on LIBOR plus a fixed number of basis points. The effect of such swaps is to convert the fixed interest rates of the senior fixed-rate notes to floating interest rates based on LIBOR. The gains and losses related to changes in the fair value of the interest rate swaps are included in interest expense and substantially offset changes in the fair value of the hedged portion of the underlying debt that are attributable to the changes in market interest rates. The fair value of the interest rate swaps was reflected in other assets and other long-term liabilities.

**(e) Equity Price Risk**

The Company may hold equity securities for strategic purposes or to diversify its overall investment portfolio. The publicly traded equity securities in the Company's portfolio are subject to price risk. To manage its exposure to changes in the fair value of certain equity securities, the Company has entered into equity derivatives that are designated as fair value hedges. The changes in the value of the hedging instruments are included in other income (loss), net, and offset the change in the fair value of the underlying hedged investment. In addition, the Company periodically enters into equity derivatives that are not designated as accounting hedges. The changes in the fair value of these derivatives are also included in other income (loss), net.

The Company is also exposed to variability in compensation charges related to certain deferred compensation obligations to employees. Although not designated as accounting hedges, the Company utilizes derivatives such as total return swaps to economically hedge this exposure.

**(f) Hedge Effectiveness**

For the fiscal years presented, amounts excluded from the assessment of hedge effectiveness were not material for fair value, cash flow, and net investment hedges. In addition, hedge ineffectiveness for fair value, cash flow, and net investment hedges was not material for any of the fiscal years presented.

104

**(g)  Collateral and Credit-Risk-Related Contingent Features**

For certain derivative instruments, the Company and its counterparties have entered into arrangements requiring the party that is in a liability position from a mark-to-market standpoint to post cash collateral to the other party. See further discussion under "(b) Offsetting of Derivative Instruments" above.

In addition, certain derivative instruments are executed under agreements that have provisions requiring the Company and the counterparty to maintain a specified credit rating from certain credit-rating agencies. Under such agreements, if the Company's or the counterparty's credit rating falls below a specified credit rating, either party has the right to request collateral on the derivatives' net liability position. The fair market value of these derivatives that are in a net liability position as of July 25, 2015 and July 26, 2014 were $0 million and $3 million , respectively.

## 12.  Commitments and Contingencies

### (a)  Operating Leases

The Company leases office space in many U.S. locations. Outside the United States, larger leased sites include sites in Belgium, Canada, China, France, Germany, India, Israel, Japan, Poland and the United Kingdom . The Company also leases equipment and vehicles. Future minimum lease payments under all noncancelable operating leases with an initial term in excess of one year as of July 25, 2015 are as follows (in millions):

| Fiscal Year | Amount |
|-------------|-------:|
| 2016 | $ 346 |
| 2017 | 254 |
| 2018 | 181 |
| 2019 | 99 |
| 2020 | 79 |
| Thereafter | 183 |
| Total | $ 1,142 |

Rent expense for office space and equipment totaled $394 million , $413 million , and $416 million in fiscal 2015, 2014, and 2013 , respectively.

### (b)  Purchase Commitments with Contract Manufacturers and Suppliers

The Company purchases components from a variety of suppliers and uses several contract manufacturers to provide manufacturing services for its products. During the normal course of business, in order to manage manufacturing lead times and help ensure adequate component supply, the Company enters into agreements with contract manufacturers and suppliers that either allow them to procure inventory based upon criteria as defined by the Company or establish the parameters defining the Company's requirements. A significant portion of the Company's reported purchase commitments arising from these agreements consists of firm, noncancelable, and unconditional commitments. In certain instances, these agreements allow the Company the option to cancel, reschedule, and adjust the Company's requirements based on its business needs prior to firm orders being placed. As of July 25, 2015 and July 26, 2014 , the Company had total purchase commitments for inventory of $4,078 million and $4,169 million , respectively.

The Company records a liability for firm, noncancelable, and unconditional purchase commitments for quantities in excess of its future demand forecasts consistent with the valuation of the Company's excess and obsolete inventory. As of July 25, 2015 and July 26, 2014 , the liability for these purchase commitments was $156 million and $162 million , respectively, and was included in other current liabilities.

### (c)  Other Commitments

In connection with the Company's business combinations, the Company has agreed to pay certain additional amounts contingent upon the achievement of certain agreed-upon technology, development, product, or other milestones or upon the continued employment with the Company of certain employees of the acquired entities.

The following table summarizes the compensation expense related to acquisitions (in millions):

| | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---:|---:|---:|
| Compensation expense related to acquisitions | $ 334 | $ 607 | $ 123 |

As of July 25, 2015 , the Company estimated that future cash compensation expense of up to $296 million may be required to be recognized pursuant to the applicable business combination agreements, which included the remaining potential compensation expense related to Insieme Networks, Inc., as more fully discussed immediately below.

<u>Insieme Networks, Inc.</u> In the third quarter of fiscal 2012, the Company made an investment in Insieme Networks, Inc. ("Insieme"), an early stage company focused on research and development in the data center market. As set forth in the agreement between the Company and Insieme, this investment included $100 million of funding and a license to certain of the Company's technology. Immediately prior to the call option exercise and acquisition described below, the Company owned approximately 83% of Insieme as a result of these investments and consolidated the results of Insieme in its Consolidated Financial Statements. In connection with this investment, the Company and Insieme entered into a put/call option agreement that provided the Company with the right to purchase the remaining interests in Insieme. In addition, the noncontrolling interest holders could require the Company to purchase their shares upon the occurrence of certain events.

During the first quarter of fiscal 2014, the Company exercised its call option and entered into an agreement to purchase the remaining interests in Insieme. The acquisition closed in the second quarter of fiscal 2014, at which time the former noncontrolling interest holders became eligible to receive up to two milestone payments, which will be determined using agreed-upon formulas based primarily on revenue for certain of Insieme's products. The Company recorded compensation expense of $207 million and $416 million during fiscal 2015 and 2014 , respectively, related to the fair value of the vested portion of amounts that were earned or expected to be earned by the former noncontrolling interest holders. Continued vesting and changes to the fair value of the amounts probable of being earned will result in adjustments to the recorded compensation expense in future periods. Based on the terms of the agreement, the Company has determined that the maximum amount that could be recorded as compensation expense by the Company is approximately $843 million (which includes the $623 million that has been expensed to date), net of forfeitures. The milestone payments, to the extent earned, are expected to be paid primarily during the first half of each of fiscal 2016 and fiscal 2017.

The Company also has certain funding commitments, primarily related to its investments in privately held companies and venture funds, some of which are based on the achievement of certain agreed-upon milestones, and some of which are required to be funded on demand. The funding commitments were $205 million and $255 million as of July 25, 2015 and July 26, 2014 , respectively.

**(d)  Product Warranties**

The following table summarizes the activity related to the product warranty liability (in millions):

|  | **July 25, 2015** | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| Balance at beginning of fiscal year | $ **446** | $ 402 | $ 373 |
| Provision for warranties issued | **696** | 704 | 649 |
| Payments | **(693)** | (660) | (620) |
| Balance at end of fiscal year | $ **449** | $ 446 | $ 402 |

The Company accrues for warranty costs as part of its cost of sales based on associated material product costs, labor costs for technical support staff, and associated overhead. The Company's products are generally covered by a warranty for periods ranging from 90 days to five years , and for some products the Company provides a limited lifetime warranty.

**(e)  Financing and Other Guarantees**

In the ordinary course of business, the Company provides financing guarantees for various third-party financing arrangements extended to channel partners and end-user customers. Payments under these financing guarantee arrangements were not material for the periods presented.

<u>Channel Partner Financing Guarantees</u>  The Company facilitates arrangements for third-party financing extended to channel partners, consisting of revolving short-term financing, generally with payment terms ranging from 60 to 90 days . These financing arrangements facilitate the working capital requirements of the channel partners, and, in some cases, the Company guarantees a portion of these arrangements. The volume of channel partner financing was $25.9 billion , $24.6 billion , and $23.8 billion in fiscal 2015, 2014, and 2013 , respectively. The balance of the channel partner financing subject to guarantees was $1.2 billion as of each of July 25, 2015 and July 26, 2014 .

<u>End-User Financing Guarantees</u>  The Company also provides financing guarantees for third-party financing arrangements extended to end-user customers related to leases and loans, which typically have terms of up to three years . The volume of financing provided by third parties for leases and loans as to which the Company had provided guarantees was $107 million , $129 million , and $185 million in fiscal 2015, 2014, and 2013 , respectively.

<u>Financing Guarantee Summary</u>  The aggregate amounts of financing guarantees outstanding at July 25, 2015 and July 26, 2014 , representing the total maximum potential future payments under financing arrangements with third parties along with the related deferred revenue, are summarized in the following table (in millions):

|  | July 25, 2015 | July 26, 2014 |
|---|---|---|
| Maximum potential future payments relating to financing guarantees: | | |
|    Channel partner | $ 288 | $ 263 |
|    End user | 129 | 202 |
|      Total | $ 417 | $ 465 |
| Deferred revenue associated with financing guarantees: | | |
|    Channel partner | $ (127) | $ (127) |
|    End user | (107) | (166) |
|      Total | $ (234) | $ (293) |
| Maximum potential future payments relating to financing guarantees, net of associated deferred revenue | $ 183 | $ 172 |

<u>Other Guarantees</u> The Company's other guarantee arrangements as of July 25, 2015 and July 26, 2014 that were subject to recognition and disclosure requirements were not material.

**(f)  Supplier Component Remediation Liability**

The Company has recorded in other current liabilities a liability for the expected remediation cost for certain products sold in prior fiscal years containing memory components manufactured by a single supplier between 2005 and 2010. These components were widely used across the industry and are included in a number of the Company's products. Defects in some of these components have caused products to fail after a power cycle event.  Defect rates due to this issue have been and are expected to be low. However, the Company has seen a small number of its customers experience a growing number of failures in their networks as a result of this component problem. Although the majority of these products was beyond the Company's warranty terms, the Company has been proactively working with customers on mitigation. Prior to the second quarter of fiscal 2014, the Company had a liability of $63 million related to this issue for expected remediation costs based on the intended approach at that time. In February 2014, on the basis of the growing number of failures described above, the Company decided to expand its approach, which resulted in a charge to product cost of sales of $655 million being recorded for the second quarter of fiscal 2014. During the third quarter of fiscal 2015, an adjustment to product cost of sales of $164 million was recorded to reduce the liability, reflecting net lower than previously estimated future costs to remediate the impacted customer products. The supplier component remediation liability was $408 million and $670 million as of July 25, 2015 and July 26, 2014 , respectively.

**(g)  Indemnifications**

In the normal course of business, the Company indemnifies other parties, including customers, lessors, and parties to other transactions with the Company, with respect to certain matters. The Company has agreed to hold such parties harmless against losses arising from a breach of representations or covenants or out of intellectual property infringement or other claims made against certain parties. These agreements may limit the time within which an indemnification claim can be made and the amount of the claim.

The Company has an obligation to indemnify certain expenses pursuant to such an agreement in, among other cases, cases involving certain of the Company's service provider customers that are subject to patent infringement claims asserted by Sprint Communications Company, L.P. ("Sprint") in the U.S. District Court for the District of Kansas filed on December 19, 2011 (including one case that was later transferred to the District of Delaware). Sprint alleges that the service provider customers infringe Sprint's patents by offering Voice over Internet Protocol-based telephone services utilizing products provided by the Company and other manufacturers. Sprint seeks monetary damages. Sprint's cases in Kansas include claims against Comcast and Time Warner Cable, service provider customers of the Company. Although trial dates were originally set for the first half of calendar year 2016 in the case proceeding in the District of Kansas, at the request of Sprint and Comcast, the judge in Sprint's Kansas action ordered a six-month stay of the patent litigation between those parties for them to pursue a resolution of their dispute. In addition, on May 15, 2015 the judge in Sprint's Delaware action against the Company's service provider customer Cox Communications ("Cox") granted defendant Cox's motion for partial summary judgment that six patents owned by Sprint are invalid. Cox then asked the judge to enter a final judgment on those six patents in order to conclude the district court proceedings on those patents and to allow the parties to pursue any appeals. In May 2015, the Company filed two declaratory judgment actions against Sprint seeking declarations that the patents Sprint asserted against the Company's customers are invalid and/or not infringed. On August 27, 2015 the judge in Delaware granted Cox's request and entered a final judgment of invalidity on those six patents; the Company expects Sprint to pursue an appeal.

The Company believes that the service providers have strong defenses and that its products do not infringe the patents subject to the claims and/or that the remaining patents are invalid. Due to the uncertainty surrounding the litigation process, which involves numerous defendants, the Company is unable to reasonably estimate the ultimate outcome of this litigation at this time. Should the plaintiff prevail in litigation, mediation, or settlement, the Company, in accordance with its agreement, may have an obligation to indemnify its service provider customers for damages, mediation awards, or settlement amounts arising from their use of Cisco products.

In addition, the Company has entered into indemnification agreements with its officers and directors, and the Company's Amended and Restated Bylaws contain similar indemnification obligations to the Company's agents.

It is not possible to determine the maximum potential amount under these indemnification agreements due to the Company's limited history with prior indemnification claims and the unique facts and circumstances involved in each particular agreement. Historically, payments made by the Company under these agreements have not had a material effect on the Company's operating results, financial position, or cash flows.

### (h) Legal Proceedings

<u>Brazil</u> Brazilian authorities have investigated the Company's Brazilian subsidiary and certain of its current and former employees, as well as a Brazilian importer of the Company's products, and its affiliates and employees, relating to alleged evasion of import taxes and alleged improper transactions involving the subsidiary and the importer. Brazilian tax authorities have assessed claims against the Company's Brazilian subsidiary based on a theory of joint liability with the Brazilian importer for import taxes, interest, and penalties. In addition to claims asserted by the Brazilian federal tax authorities in prior fiscal years, tax authorities from the Brazilian state of Sao Paulo have asserted similar claims on the same legal basis in prior fiscal years. In the first quarter of fiscal 2013, the Brazilian federal tax authorities asserted an additional claim against the Company's Brazilian subsidiary based on a theory of joint liability with respect to an alleged underpayment of income taxes, social taxes, interest, and penalties by a Brazilian distributor.

The asserted claims by Brazilian federal tax authorities are for calendar years 2003 through 2008, and the asserted claims by the tax authorities from the state of Sao Paulo are for calendar years 2005 through 2007. The total asserted claims by Brazilian state and federal tax authorities aggregate to approximately $262 million for the alleged evasion of import and other taxes, approximately $1.1 billion for interest, and approximately $1.2 billion for various penalties, all determined using an exchange rate as of July 25, 2015 . The Company has completed a thorough review of the matters and believes the asserted claims against the Company's Brazilian subsidiary are without merit, and the Company is defending the claims vigorously. While the Company believes there is no legal basis for the alleged liability, due to the complexities and uncertainty surrounding the judicial process in Brazil and the nature of the claims asserting joint liability with the importer, the Company is unable to determine the likelihood of an unfavorable outcome against its Brazilian subsidiary and is unable to reasonably estimate a range of loss, if any. The Company does not expect a final judicial determination for several years.

<u>Russia and the Commonwealth of Independent States</u> At the request of the U.S. Securities and Exchange Commission (SEC) and the U.S. Department of Justice, the Company is conducting an investigation into allegations that the Company and those agencies received regarding possible violations of the U.S. Foreign Corrupt Practices Act involving business activities of the Company's operations in Russia and certain of the Commonwealth of Independent States, and by certain resellers of the Company's products in those countries. The Company takes any such allegations very seriously and is fully cooperating with and sharing the results of its investigation with the SEC and the Department of Justice. While the outcome of the Company's investigation is currently not determinable, the Company does not expect that it will have a material adverse effect on its consolidated financial position, results of operations, or cash flows. The countries that are the subject of the investigation collectively comprise less than 2% of the Company's revenues.

In addition, the Company is subject to legal proceedings, claims, and litigation arising in the ordinary course of business, including intellectual property litigation. While the outcome of these matters is currently not determinable, the Company does not expect that the ultimate costs to resolve these matters will have a material adverse effect on its consolidated financial position, results of operations, or cash flows.

**13.  Shareholders' Equity**

**(a)  Cash Dividends on Shares of Common Stock**

During fiscal 2015 , the Company declared and paid cash dividends of $0.80 per common share, or $4.1 billion , on the Company's outstanding common stock. During fiscal 2014 , the Company declared and paid cash dividends of $0.72 per common share, or $3.8 billion , on the Company's outstanding common stock.

Any future dividends will be subject to the approval of the Company's Board of Directors.

**(b)  Stock Repurchase Program**

In September 2001, the Company's Board of Directors authorized a stock repurchase program. As of July 25, 2015 , the Company's Board of Directors had authorized an aggregate repurchase of up to $97 billion of common stock under this program, and the remaining authorized repurchase amount was $4.3 billion , with no termination date. A summary of the stock repurchase activity under the stock repurchase program, reported based on the trade date, is summarized as follows (in millions, except per-share amounts):

| | Shares Repurchased | | Weighted-Average Price per Share | | Amount Repurchased |
|---|---|---|---|---|---|
| Cumulative balance at July 27, 2013 | 3,868 | $ | 20.40 | $ | 78,906 |
| Repurchase of common stock under the stock repurchase program [1] | 420 | | 22.71 | | 9,539 |
| **Cumulative balance at July 26, 2014** | **4,288** | | **20.63** | | **88,445** |
| **Repurchase of common stock under the stock repurchase program [2]** | **155** | | **27.22** | | **4,234** |
| **Cumulative balance at July 25, 2015** | **4,443** | **$** | **20.86** | **$** | **92,679** |

[1] Includes stock repurchases of $126 million , which were pending settlement as of July 26, 2014 .
[2] Includes stock repurchases of $36 million , which were pending settlement as of July 25, 2015 .

The purchase price for the shares of the Company's stock repurchased is reflected as a reduction to shareholders' equity. The Company is required to allocate the purchase price of the repurchased shares as (i) a reduction to retained earnings and (ii) a reduction of common stock and additional paid-in capital. Issuance of common stock and the tax benefit related to employee stock incentive plans are recorded as an increase to common stock and additional paid-in capital.

**(c)  Restricted Stock Unit Withholdings**

For the years ended July 25, 2015 and July 26, 2014 , the Company repurchased approximately 20 million and 18 million shares, or $502 million and $430 million , of common stock, respectively, in settlement of employee tax withholding obligations due upon the vesting of restricted stock or stock units.

**(d)  Preferred Stock**

Under the terms of the Company's Articles of Incorporation, the Board of Directors may determine the rights, preferences, and terms of the Company's authorized but unissued shares of preferred stock.

**14. Employee Benefit Plans**

**(a)  Employee Stock Incentive Plans**

<u>Stock Incentive Plan Program Description</u>    As of July 25, 2015 , the Company had four stock incentive plans: the 2005 Stock Incentive Plan (the "2005 Plan"); the 1996 Stock Incentive Plan (the "1996 Plan"); the Cisco Systems, Inc. SA Acquisition Long-Term Incentive Plan (the "SA Acquisition Plan"); and the Cisco Systems, Inc. WebEx Acquisition Long-Term Incentive Plan (the "WebEx Acquisition Plan"). In addition, the Company has, in connection with the acquisitions of various companies, assumed the share-based awards granted under stock incentive plans of the acquired companies or issued share-based awards in replacement thereof. Share-based awards are designed to reward employees for their long-term contributions to the Company and provide incentives for them to remain with the Company. The number and frequency of share-based awards are based on competitive practices, operating results of the Company, government regulations, and other factors. Since the inception of the stock incentive plans, the Company has granted share-based awards to a significant percentage of its employees, and the majority has been granted to employees below the vice president level. The Company's primary stock incentive plans are summarized as follows:

<u>2005 Plan</u>    As of July 25, 2015 , the maximum number of shares issuable under the 2005 Plan over its term was 694 million shares, plus the number of any shares underlying awards outstanding on November 15, 2007 under the 1996 Plan, the SA Acquisition Plan, and the WebEx Acquisition Plan that are forfeited or are terminated for any other reason before being exercised or settled. If any awards granted under the 2005 Plan are forfeited or are terminated for any other reason before being exercised or settled, the unexercised or unsettled shares underlying the awards will again be available under the 2005 Plan. Starting November 19, 2013, shares withheld by the Company from an award other than a stock option or stock appreciation right to satisfy withholding tax liabilities resulting from such award will again be available for issuance, based on the fungible share ratio in effect on the date of grant.

Pursuant to an amendment approved by the Company's shareholders on November 12, 2009, the number of shares available for issuance under the 2005 Plan is reduced by 1.5 shares for each share awarded as a stock grant or a stock unit, and any shares underlying awards outstanding under the 1996 Plan, the SA Acquisition Plan, and the WebEx Acquisition Plan that expire unexercised at the end of their maximum terms become available for reissuance under the 2005 Plan. The 2005 Plan permits the granting of stock options, restricted stock, and RSUs, the vesting of which may be performance-based or market-based along with the requisite service requirement, and stock appreciation rights to employees (including employee directors and officers), consultants of the Company and its subsidiaries and affiliates, and non-employee directors of the Company. Stock options and stock appreciation rights granted under the 2005 Plan have an exercise price of at least 100% of the fair market value of the underlying stock on the grant date and prior to November 12, 2009 have an expiration date no later than nine years from the grant date. The expiration date for stock options and stock appreciation rights granted subsequent to the amendment approved on November 12, 2009 shall be no later than 10 years from the grant date.

The stock options will generally become exercisable for 20% or 25% of the option shares one year from the date of grant and then ratably over the following 48 months or 36 months , respectively. Time-based stock grants and time-based RSUs will generally vest with respect to 20% or 25% of the shares or share units covered by the grant on each of the first through fifth or fourth anniversaries of the date of the grant, respectively. The majority of the performance-based and market-based RSUs vests at the end of the three -year requisite service period or earlier if the award recipient meets certain retirement eligibility conditions. Other performance-based RSUs, that are based on the achievement of financial and/or non-financial operating goals typically award RSUs upon the achievement of milestones (and may require subsequent service periods), with overall vesting of the shares underlying the award ranging from six months to three years. The Compensation and Management Development Committee of the Board of Directors has the discretion to use different vesting schedules. Stock appreciation rights may be awarded in combination with stock options or stock grants, and such awards shall provide that the stock appreciation rights will not be exercisable unless the related stock options or stock grants are forfeited. Stock grants may be awarded in combination with non-statutory stock options, and such awards may provide that the stock grants will be forfeited in the event that the related non-statutory stock options are exercised.

<u>1996 Plan</u>    The 1996 Plan expired on December 31, 2006, and the Company can no longer make equity awards under the 1996 Plan. The maximum number of shares issuable over the term of the 1996 Plan was 2.5 billion shares. Stock options granted under the 1996 Plan have an exercise price of at least 100% of the fair market value of the underlying stock on the grant date and expire no later than nine years from the grant date. The stock options generally became exercisable for 20% or 25% of the option shares one year from the date of grant and then ratably over the following 48 months or 36 months , respectively. Certain other grants utilized a 60-month ratable vesting schedule. In addition, the Board of Directors, or other committees administering the 1996 Plan, had the discretion to use a different vesting schedule and did so from time to time.

Acquisition Plans In connection with the Company's acquisitions of Scientific-Atlanta, Inc. ("Scientific-Atlanta") and WebEx Communications, Inc. ("WebEx"), the Company adopted the SA Acquisition Plan and the WebEx Acquisition Plan, respectively, each effective upon completion of the applicable acquisition. These plans constitute assumptions, amendments, restatements, and renamings of the 2003 Long-Term Incentive Plan of Scientific-Atlanta and the WebEx Communications, Inc. Amended and Restated 2000 Stock Incentive Plan, respectively. The plans permit the grant of stock options, stock, stock units, and stock appreciation rights to certain employees of the Company and its subsidiaries and affiliates who had been employed by Scientific-Atlanta or its subsidiaries or WebEx or its subsidiaries, as applicable. As a result of the shareholder approval of the amendment and extension of the 2005 Plan, as of November 15, 2007, the Company will no longer make stock option grants or direct share issuances under either the SA Acquisition Plan or the WebEx Acquisition Plan.

**(b) Employee Stock Purchase Plan**

The Company has an Employee Stock Purchase Plan, which includes its subplan named the International Employee Stock Purchase Plan (together, the "Purchase Plan"), under which 621 million shares of the Company's common stock have been reserved for issuance as of July 25, 2015 . Eligible employees are offered shares through a 24-month offering period, which consists of four consecutive 6-month purchase periods. Employees may purchase a limited number of shares of the Company's stock at a discount of up to 15% of the lesser of the market value at the beginning of the offering period or the end of each 6-month purchase period. The Purchase Plan is scheduled to terminate on January 3, 2020 . The Company issued 27 million , 27 million , and 36 million shares under the Purchase Plan in fiscal 2015, 2014, and 2013 , respectively. As of July 25, 2015 , 148 million shares were available for issuance under the Purchase Plan.

**(c) Summary of Share-Based Compensation Expense**

Share-based compensation expense consists primarily of expenses for stock options, stock purchase rights, restricted stock, and restricted stock units granted to employees. The following table summarizes share-based compensation expense (in millions):

| Years Ended | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| Cost of sales—product | $ 50 | $ 45 | $ 40 |
| Cost of sales—service | 157 | 150 | 138 |
| Share-based compensation expense in cost of sales | 207 | 195 | 178 |
| Research and development | 448 | 411 | 286 |
| Sales and marketing | 559 | 549 | 484 |
| General and administrative | 228 | 198 | 175 |
| Restructuring and other charges | (2) | (5) | (3) |
| Share-based compensation expense in operating expenses | 1,233 | 1,153 | 942 |
| Total share-based compensation expense | $ 1,440 | $ 1,348 | $ 1,120 |
| Income tax benefit for share-based compensation | $ 373 | $ 324 | $ 285 |

As of July 25, 2015 , the total compensation cost related to unvested share-based awards not yet recognized was $2.4 billion , which is expected to be recognized over approximately 2.6 years on a weighted-average basis.

**(d) Share-Based Awards Available for Grant**

A summary of share-based awards available for grant is as follows (in millions):

| Years Ended | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| Balance at beginning of fiscal year | 310 | 228 | 218 |
| Restricted stock, stock units, and other share-based awards granted | (101) | (98) | (102) |
| Share-based awards canceled/forfeited/expired | 40 | 36 | 115 |
| Additional shares reserved | — | 135 | — |
| Shares withheld for taxes and not issued | 27 | 6 | — |
| Other | — | 3 | (3) |
| Balance at end of fiscal year | 276 | 310 | 228 |

As reflected in the preceding table, for each share awarded as restricted stock or subject to a restricted stock unit award under the 2005 Plan, an equivalent of 1.5 shares was deducted from the available share-based award balance. For restricted stock units that were awarded with vesting contingent upon the achievement of future financial performance or market-based metrics, the maximum awards that can be achieved upon full vesting of such awards were reflected in the preceding table.

111

**(e)   Restricted Stock and Stock Unit Awards**

A summary of the restricted stock and stock unit activity, which includes time-based and performance-based or market-based restricted stock units, is as follows (in millions, except per-share amounts):

| | Restricted Stock/ Stock Units | Weighted-Average Grant Date Fair Value per Share | Aggregate Fair Value |
|---|---:|---:|---:|
| UNVESTED BALANCE AT JULY 28, 2012 | 128 | $ 19.46 | |
| Granted and assumed | 72 | 18.52 | |
| Vested | (46) | 20.17 | $ 932 |
| Canceled/forfeited | (11) | 18.91 | |
| UNVESTED BALANCE AT JULY 27, 2013 | 143 | 18.80 | |
| Granted and assumed | 72 | 20.85 | |
| Vested | (53) | 19.55 | $ 1,229 |
| Canceled/forfeited | (13) | 18.61 | |
| **UNVESTED BALANCE AT JULY 26, 2014** | **149** | **19.54** | |
| **Granted and assumed** | **67** | **25.29** | |
| **Vested** | **(57)** | **19.82** | **$ 1,517** |
| **Canceled/forfeited** | **(16)** | **20.17** | |
| **UNVESTED BALANCE AT JULY 25, 2015** | **143** | **$ 22.08** | |

**(f)   Stock Option Awards**

A summary of the stock option activity is as follows (in millions, except per-share amounts):

| | STOCK OPTIONS OUTSTANDING | |
|---|---:|---:|
| | Number Outstanding | Weighted-Average Exercise Price per Share |
| BALANCE AT JULY 28, 2012 | 520 | $ 22.68 |
| Assumed from acquisitions | 10 | 0.77 |
| Exercised | (154) | 18.51 |
| Canceled/forfeited/expired | (100) | 22.18 |
| BALANCE AT JULY 27, 2013 | 276 | 24.44 |
| Assumed from acquisitions | 6 | 3.60 |
| Exercised | (78) | 18.30 |
| Canceled/forfeited/expired | (17) | 27.53 |
| **BALANCE AT JULY 26, 2014** | **187** | **26.03** |
| **Assumed from acquisitions** | **1** | **2.60** |
| **Exercised** | **(71)** | **21.15** |
| **Canceled/forfeited/expired** | **(14)** | **29.68** |
| **BALANCE AT JULY 25, 2015** | **103** | **$ 28.68** |

The total pretax intrinsic value of stock options exercised during fiscal 2015, 2014, and 2013 was $434 million , $458 million , and $661 million , respectively.

The following table summarizes significant ranges of outstanding and exercisable stock options as of July 25, 2015 (in millions, except years and share prices):

| Range of Exercise Prices | STOCK OPTIONS OUTSTANDING | | | | STOCK OPTIONS EXERCISABLE | | |
|---|---|---|---|---|---|---|---|
| | Number Outstanding | Weighted-Average Remaining Contractual Life (in Years) | Weighted-Average Exercise Price per Share | Aggregate Intrinsic Value | Number Exercisable | Weighted-Average Exercise Price per Share | Aggregate Intrinsic Value |
| $  0.01 – 20.00 | 4 | 5.0 | $   4.96 | $     97 | 3 | $   6.15 | $    63 |
| $ 20.01 – 25.00 | 19 | 0.3 | 23.03 | 101 | 19 | 23.03 | 101 |
| $ 25.01 – 30.00 | 14 | 1.0 | 26.83 | 24 | 14 | 26.82 | 24 |
| $ 30.01 – 35.00 | 66 | 1.1 | 32.16 | — | 66 | 32.16 | — |
| Total | 103 | 1.1 | $ 28.68 | $   222 | 102 | $ 29.02 | $   188 |

The aggregate intrinsic value in the preceding table represents the total pretax intrinsic value, based on the Company's closing stock price of $28.40 as of July 24, 2015, that would have been received by the option holders had those option holders exercised their stock options as of that date. The total number of in-the-money stock options exercisable as of July 25, 2015 was 34 million . As of July 26, 2014 , 183 million outstanding stock options were exercisable and the weighted-average exercise price was $26.50 .

### (g)  Valuation of Employee Share-Based Awards

Time-based restricted stock units and PRSUs that are based on the Company's financial performance metrics or non-financial operating goals are valued using the market value of the Company's common stock on the date of grant, discounted for the present value of expected dividends. On the date of grant, the Company estimated the fair value of the total shareholder return (TSR) component of the PRSUs using a Monte Carlo simulation model. The assumptions for the valuation of time-based RSUs and PRSUs are summarized as follows:

| Years Ended | RESTRICTED STOCK UNITS | | |
|---|---|---|---|
| | July 25, 2015 | July 26, 2014 | July 27, 2013 |
| Number of shares granted (in millions) | 55 | 56 | 64 |
| Grant date fair value per share | $   25.30 | $   20.61 | $   18.39 |
| Weighted-average assumptions/inputs: | | | |
| Expected dividend yield | 2.9% | 3.1% | 3.0% |
| Range of risk-free interest rates | 0.0% − 1.8% | 0.0% – 1.7% | 0.0% – 1.1% |

| Years Ended | PERFORMANCE RESTRICTED STOCK UNITS | | |
|---|---|---|---|
| | July 25, 2015 | July 26, 2014 | July 27, 2013 |
| Number of shares granted (in millions) | 11 | 7 | 4 |
| Grant date fair value per share | $   24.85 | $   21.90 | $   19.73 |
| Weighted-average assumptions/inputs: | | | |
| Expected dividend yield | 3.0% | 3.0% | 2.9% |
| Range of risk-free interest rates | 0.0% − 1.8% | 0.0% – 1.7% | 0.1% – 0.7% |
| Range of expected volatilities for index | 14.3% – 70.0% | 14.2% – 70.5% | 18.3% – 78.3% |

The PRSUs granted during fiscal 2015, 2014, and 2013 are contingent on the achievement of the Company's financial performance metrics, its comparative market-based returns, or the achievement of financial and non-financial operating goals. For the awards based on financial performance metrics or comparative market-based returns, generally 50% of the PRSUs are earned based on the average of annual operating cash flow and earnings per share goals established at the beginning of each fiscal year over a three-year performance period. Generally, the remaining 50% of the PRSUs are earned based on the Company's TSR measured against the benchmark TSR of a peer group over the same period. Each PRSU recipient could vest in 0% to 150% of the target shares granted contingent on the achievement of the Company's financial performance metrics or its comparative market-based returns, and 0% to 100% of the target shares granted contingent on the achievement of non-financial operating goals.

113

The assumptions for the valuation of employee stock purchase rights are summarized as follows:

| | EMPLOYEE STOCK PURCHASE RIGHTS | | |
|---|---|---|---|
| Years Ended | July 25, 2015 | July 26, 2014 | July 27, 2013 |
| Weighted-average assumptions: | | | |
| Expected volatility | 26.0% | 25.1% | 28.7% |
| Risk-free interest rate | 0.3% | 0.1% | 0.4% |
| Expected dividend | 2.8% | 2.8% | 1.5% |
| Expected life (in years) | 1.8 | 0.8 | 1.8 |
| Weighted-average estimated grant date fair value per share | $ 6.54 | $ 5.54 | $ 4.68 |

The valuation of employee stock purchase rights and the related assumptions are for the employee stock purchases made during the respective fiscal years.

The Company uses third-party analyses to assist in developing the assumptions used in, as well as calibrating, its lattice-binomial and Black-Scholes models. The Company is responsible for determining the assumptions used in estimating the fair value of its share-based payment awards.

The Company used the implied volatility for traded options (with contract terms corresponding to the expected life of the employee stock purchase rights) on the Company's stock as the expected volatility assumption required in the Black-Scholes model. The implied volatility is more representative of future stock price trends than historical volatility. The risk-free interest rate assumption is based upon observed interest rates appropriate for the term of the Company's employee stock purchase rights. The dividend yield assumption is based on the history and expectation of dividend payouts at the grant date.

**(h)  Employee 401(k) Plans**

The Company sponsors the Cisco Systems, Inc. 401(k) Plan (the "Plan") to provide retirement benefits for its employees. As allowed under Section 401(k) of the Internal Revenue Code, the Plan provides for tax-deferred salary contributions and after-tax contributions for eligible employees. The Plan allows employees to contribute up to 75% of their annual eligible earnings to the Plan on a pretax and after-tax basis, including Roth contributions. Employee contributions are limited to a maximum annual amount as set periodically by the Internal Revenue Code. The Company matches pretax and Roth employee contributions up to 100% of the first 4.5% of eligible earnings that are contributed by employees. Therefore, the maximum matching contribution that the Company may allocate to each participant's account will not exceed $11,925 for the 2015 calendar year due to the $265,000 annual limit on eligible earnings imposed by the Internal Revenue Code. All matching contributions vest immediately. The Company's matching contributions to the Plan totaled $244 million , $236 million , and $234 million in fiscal 2015, 2014, and 2013 , respectively.

The Plan allows employees who meet the age requirements and reach the Plan contribution limits to make catch-up contributions (pretax or Roth) not to exceed the lesser of 75% of their annual eligible earnings or the limit set forth in the Internal Revenue Code. Catch-up contributions are not eligible for matching contributions. In addition, the Plan provides for discretionary profit-sharing contributions as determined by the Board of Directors. Such contributions to the Plan are allocated among eligible participants in the proportion of their salaries to the total salaries of all participants. There were no discretionary profit-sharing contributions made in fiscal 2015, 2014, and 2013 .

The Company also sponsors other 401(k) plans as a result of acquisitions of other companies. The Company's contributions to these plans were not material to the Company on either an individual or aggregate basis for any of the fiscal years presented.

**(i)  Deferred Compensation Plans**

The Cisco Systems, Inc. Deferred Compensation Plan (the "Deferred Compensation Plan"), a nonqualified deferred compensation plan, became effective in 2007. As required by applicable law, participation in the Deferred Compensation Plan is limited to a select group of the Company's management employees. Under the Deferred Compensation Plan, which is an unfunded and unsecured deferred compensation arrangement, a participant may elect to defer base salary, bonus, and/or commissions, pursuant to such rules as may be established by the Company, up to the maximum percentages for each deferral election as described in the plan. The Company may also, at its discretion, make a matching contribution to the employee under the Deferred Compensation Plan. A matching contribution equal to 4.5% of eligible compensation in excess of the Internal Revenue Code limit for qualified plans for calendar year 2015 that is deferred by participants under the Deferred Compensation Plan (with a $1.5 million cap on eligible compensation) will be made to eligible participants' accounts at the end of calendar year 2015. The deferred compensation liability under the Deferred Compensation Plan, together with a deferred compensation plan assumed from Scientific-Atlanta, was approximately $536 million and $509 million as of July 25, 2015 and July 26, 2014 , respectively, and was recorded primarily in other long-term liabilities.

114

Table of Contents

## 15. Comprehensive Income

The components of AOCI, net of tax, and the other comprehensive income (loss), excluding noncontrolling interest, are summarized as follows (in millions):

| | Net Unrealized Gains on Available-for-Sale Investments | Net Unrealized Gains (Losses) Cash Flow Hedging Instruments | Cumulative Translation Adjustment and Actuarial Gains and Losses | Accumulated Other Comprehensive Income |
|---|---|---|---|---|
| BALANCE AT JULY 28, 2012 | $ 409 | $ (53) | $ 305 | $ 661 |
| Other comprehensive income (loss) before reclassifications attributable to Cisco Systems, Inc. | 3 | 74 | (83) | (6) |
| (Gains) losses reclassified out of AOCI | (48) | (12) | — | (60) |
| Tax benefit (expense) | 15 | (1) | (1) | 13 |
| BALANCE AT JULY 27, 2013 | 379 | 8 | 221 | 608 |
| Other comprehensive income (loss) before reclassifications attributable to Cisco Systems, Inc. | 380 | 48 | 49 | 477 |
| (Gains) losses reclassified out of AOCI | (300) | (68) | — | (368) |
| Tax benefit (expense) | (35) | — | (5) | (40) |
| **BALANCE AT JULY 26, 2014** | **424** | **(12)** | **265** | **677** |
| **Other comprehensive income (loss) before reclassifications attributable to Cisco Systems, Inc.** | **(28)** | **(159)** | **(563)** | **(750)** |
| **(Gains) losses reclassified out of AOCI** | **(157)** | **154** | **2** | **(1)** |
| **Tax benefit (expense)** | **71** | **1** | **63** | **135** |
| **BALANCE AT JULY 25, 2015** | **$ 310** | **$ (16)** | **$ (233)** | **$ 61** |

The net gains (losses) reclassified out of AOCI into the Consolidated Statements of Operations, with line item location, during each period were as follows (in millions):

| Comprehensive Income Components | July 25, 2015 | July 26, 2014 | July 27, 2013 | Line Item in Statements of Operations |
|---|---|---|---|---|
| | | Income Before Taxes | | |
| Net unrealized gains on available-for-sale investments | | | | |
| | $ 157 | $ 300 | $ 48 | Other income (loss), net |
| Net unrealized gains and losses on cash flow hedging instruments | | | | |
| Foreign currency derivatives | (121) | 55 | 10 | Operating expenses |
| Foreign currency derivatives | (33) | 13 | 2 | Cost of sales—service |
| | (154) | 68 | 12 | |
| Cumulative translation adjustment and actuarial gains and losses | | | | |
| | (2) | — | — | Operating expenses |
| Total amounts reclassified out of AOCI | $ 1 | $ 368 | $ 60 | |

## 16. Income Taxes

### (a)  Provision for Income Taxes

The provision for income taxes consists of the following (in millions):

| Years Ended | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| Federal: | | | |
|     Current | $ 1,583 | $ 1,672 | $ 601 |
|     Deferred | 43 | (383) | 152 |
| | 1,626 | 1,289 | 753 |
| State: | | | |
|     Current | 130 | 176 | 81 |
|     Deferred | (20) | (64) | 48 |
| | 110 | 112 | 129 |
| Foreign: | | | |
|     Current | 530 | 692 | 599 |
|     Deferred | (46) | (231) | (237) |
| | 484 | 461 | 362 |
|     Total | $ 2,220 | $ 1,862 | $ 1,244 |

Income before provision for income taxes consists of the following (in millions):

| Years Ended | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| United States | $ 3,570 | $ 2,734 | $ 3,716 |
| International | 7,631 | 6,981 | 7,511 |
|     Total | $ 11,201 | $ 9,715 | $ 11,227 |

The items accounting for the difference between income taxes computed at the federal statutory rate and the provision for income taxes consist of the following:

| Years Ended | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| Federal statutory rate | 35.0 % | 35.0 % | 35.0 % |
| Effect of: | | | |
|     State taxes, net of federal tax benefit | 0.8 | 0.5 | 0.8 |
|     Foreign income at other than U.S. rates | (15.2) | (16.4) | (16.4) |
|     Tax credits | (1.2) | (0.7) | (1.6) |
|     Domestic manufacturing deduction | (0.7) | (0.9) | (1.0) |
|     Nondeductible compensation | 2.0 | 3.3 | 1.3 |
|     Tax audit settlement | — | — | (7.1) |
|     Other, net | (0.9) | (1.6) | 0.1 |
|     Total | 19.8 % | 19.2 % | 11.1 % |

During fiscal 2015, the Tax Increase Prevention Act of 2014 reinstated the U.S. federal R&D tax credit for calendar year 2014 R&D expenses. As a result, the tax provision in fiscal 2015 included a tax benefit of $138 million related to the U.S. R&D tax credit, of which $78 million was attributable to fiscal 2014.

During fiscal 2013, the Internal Revenue Service (IRS) and the Company settled all outstanding items related to the audit of the Company's federal income tax returns for the fiscal years ended July 27, 2002 through July 28, 2007. As a result of the settlement, the Company recognized a net benefit to the provision for income taxes of $794 million . In addition, the American Taxpayer Relief Act reinstated the U.S. federal R&D credit through December 2013, retroactive to January 1, 2012. As a result, the tax provision in fiscal 2013 included a tax benefit of $184 million related to the U.S. federal R&D tax credit, of which $72 million was attributable to fiscal 2012.

U.S. income taxes and foreign withholding taxes associated with the repatriation of earnings of foreign subsidiaries were not provided for on a cumulative total of $58.0 billion of undistributed earnings for certain foreign subsidiaries as of the end of fiscal 2015 . The Company intends to reinvest these earnings indefinitely in its foreign subsidiaries. If these earnings were distributed to the United States in the form of dividends or otherwise, or if the shares of the relevant foreign subsidiaries were sold or otherwise transferred, the Company would be subject to additional U.S. income taxes (subject to an adjustment for foreign tax credits) and foreign withholding taxes. Determination of the amount of unrecognized deferred income tax liability related to these earnings is not practicable.

As a result of certain employment and capital investment actions, the Company's income in certain foreign countries is subject to reduced tax rates and in some cases is wholly exempt from taxes. A portion of these incentives expired at the end of fiscal 2015. The majority of the remaining tax incentives will expire at the end of fiscal 2025. The gross income tax benefit attributable to tax incentives was estimated to be $1.4 billion ( $0.28 per diluted share) in fiscal 2015 , of which approximately $0.5 billion ( $0.10 per diluted share) is based on tax incentives that expired at the end of fiscal 2015. As of the end of fiscal 2014 and fiscal 2013, the gross income tax benefits attributable to tax incentives were estimated to be $1.3 billion and $1.4 billion ( $0.25 and $0.26 per diluted share) for the respective years. The gross income tax benefits were partially offset by accruals of U.S. income taxes on undistributed earnings.

<u>Unrecognized Tax Benefits</u>

The aggregate changes in the balance of gross unrecognized tax benefits were as follows (in millions):

| Years Ended | July 25, 2015 | | July 26, 2014 | | July 27, 2013 |
|---|---|---|---|---|---|
| Beginning balance | $ | 1,938 | $ 1,775 | $ | 2,819 |
| Additions based on tax positions related to the current year | | 276 | 262 | | 138 |
| Additions for tax positions of prior years | | 137 | 64 | | 187 |
| Reductions for tax positions of prior years | | (30) | (13) | | (1,027) |
| Settlements | | (165) | (17) | | (199) |
| Lapse of statute of limitations | | (127) | (133) | | (143) |
| Ending balance | $ | 2,029 | $ 1,938 | $ | 1,775 |

As of July 25, 2015 , $1.7 billion of the unrecognized tax benefits would affect the effective tax rate if realized. During fiscal 2015 the Company recognized $27 million of net interest expense and $3 million of penalties. During fiscal 2014 , the Company recognized $29 million of net interest expense and $8 million of penalties. During fiscal 2013 , the Company recognized $115 million of net interest expense and $2 million of penalties. The Company's total accrual for interest and penalties was $274 million , $304 million , and $268 million as of the end of fiscal 2015, 2014, and 2013 , respectively. The Company is no longer subject to U.S. federal income tax audit for returns covering tax years through fiscal 2007. With limited exceptions, the Company is no longer subject to foreign, state, or local income tax audits for returns covering tax years through fiscal 2002.

The Company regularly engages in discussions and negotiations with tax authorities regarding tax matters in various jurisdictions. The Company believes it is reasonably possible that certain federal, foreign, and state tax matters may be concluded in the next 12 months. Specific positions that may be resolved include issues involving transfer pricing and various other matters. The Company estimates that the unrecognized tax benefits at July 25, 2015 could be reduced by approximately $900 million in the next 12 months, a portion of which could increase earnings.

**(b) Deferred Tax Assets and Liabilities**

The following table presents the breakdown between current and noncurrent net deferred tax assets (in millions):

| | July 25, 2015 | | July 26, 2014 |
|---|---|---|---|
| Deferred tax assets—current | $ | 2,915 | $ 2,808 |
| Deferred tax liabilities—current | | (212) | (134) |
| Deferred tax assets—noncurrent | | 1,648 | 1,700 |
| Deferred tax liabilities—noncurrent | | (246) | (369) |
| Total net deferred tax assets | $ | 4,105 | $ 4,005 |

The components of the deferred tax assets and liabilities are as follows (in millions):

| | July 25, 2015 | July 26, 2014 |
|---|---|---|
| **ASSETS** | | |
| Allowance for doubtful accounts and returns | $ 417 | $ 464 |
| Sales-type and direct-financing leases | 266 | 231 |
| Inventory write-downs and capitalization | 345 | 307 |
| Investment provisions | 112 | 212 |
| IPR&D, goodwill, and purchased intangible assets | 134 | 135 |
| Deferred revenue | 1,795 | 1,689 |
| Credits and net operating loss carryforwards | 746 | 796 |
| Share-based compensation expense | 520 | 661 |
| Accrued compensation | 467 | 496 |
| Other | 670 | 676 |
| Gross deferred tax assets | 5,472 | 5,667 |
| Valuation allowance | (84) | (114) |
| Total deferred tax assets | 5,388 | 5,553 |
| **LIABILITIES** | | |
| Purchased intangible assets | (950) | (1,229) |
| Depreciation | (143) | (48) |
| Unrealized gains on investments | (175) | (245) |
| Other | (15) | (26) |
| Total deferred tax liabilities | (1,283) | (1,548) |
| Total net deferred tax assets | $ 4,105 | $ 4,005 |

As of July 25, 2015 , the Company's federal, state, and foreign net operating loss carryforwards for income tax purposes were $204 million , $536 million , and $697 million , respectively. A significant amount of the federal net operating loss carryforwards relates to acquisitions and, as a result, is limited in the amount that can be recognized in any one year. If not utilized, the federal net operating loss will begin to expire in fiscal 2018 , and the state and foreign net operating loss carryforwards will begin to expire in fiscal 2018 and 2016 , respectively. The Company has provided a valuation allowance of $68 million for deferred tax assets related to foreign net operating losses that are not expected to be realized.

As of July 25, 2015 , the Company's federal, state, and foreign tax credit carryforwards for income tax purposes were approximately $7 million , $700 million , and $26 million , respectively. The federal and foreign tax credit carryforwards will begin to expire in fiscal 2017 and 2018 , respectively. The majority of state and foreign tax credits can be carried forward indefinitely. The Company has provided a valuation allowance of $16 million for deferred tax assets related to state and foreign tax credits that are not expected to be realized.

118

## 17. Segment Information and Major Customers

### (a)  Revenue and Gross Margin by Segment

The Company conducts business globally and is primarily managed on a geographic basis consisting of three segments: the Americas, EMEA, and APJC. The Company's management makes financial decisions and allocates resources based on the information it receives from its internal management system. Sales are attributed to a segment based on the ordering location of the customer. The Company does not allocate research and development, sales and marketing, or general and administrative expenses to its segments in this internal management system because management does not include the information in its measurement of the performance of the operating segments. In addition, the Company does not allocate amortization and impairment of acquisition-related intangible assets, share-based compensation expense, significant litigation and other contingencies, impacts to cost of sales from purchase accounting adjustments to inventory, charges related to asset impairments and restructurings, and certain other charges to the gross margin for each segment because management does not include this information in its measurement of the performance of the operating segments.

Summarized financial information by segment for fiscal 2015, 2014, and 2013 , based on the Company's internal management system and as utilized by the Company's Chief Operating Decision Maker ("CODM"), is as follows (in millions):

| Years Ended | July 25, 2015 | | July 26, 2014 | | July 27, 2013 |
|---|---|---|---|---|---|
| Revenue: | | | | | |
| Americas | $ | 29,655 | $ | 27,781 | $ | 28,639 |
| EMEA | | 12,322 | | 12,006 | | 12,210 |
| APJC | | 7,184 | | 7,355 | | 7,758 |
| Total | $ | 49,161 | $ | 47,142 | $ | 48,607 |
| Gross margin: | | | | | |
| Americas | $ | 18,670 | $ | 17,379 | $ | 17,887 |
| EMEA | | 7,705 | | 7,700 | | 7,876 |
| APJC | | 4,307 | | 4,252 | | 4,637 |
| Segment total | | 30,682 | | 29,331 | | 30,400 |
| Unallocated corporate items | | (1,001) | | (1,562) | | (960) |
| Total | $ | 29,681 | $ | 27,769 | $ | 29,440 |

Revenue in the United States was $26.0 billion , $24.3 billion , and $24.6 billion for fiscal 2015, 2014, and 2013 , respectively.

### (b)  Revenue for Groups of Similar Products and Services

The Company designs, manufactures, and sells Internet Protocol (IP)-based networking and other products related to the communications and IT industry and provides services associated with these products and their use. The Company groups its products and technologies into the following categories: Switching, NGN Routing, Collaboration, Service Provider Video, Data Center, Wireless, Security, and Other Products. These products, primarily integrated by Cisco IOS Software, link geographically dispersed local-area networks (LANs), metropolitan-area networks (MANs), and wide-area networks (WANs).

The following table presents revenue for groups of similar products and services (in millions):

| Years Ended | July 25, 2015 | | July 26, 2014 | | July 27, 2013 |
|---|---|---|---|---|---|
| Revenue: | | | | | |
| Switching | $ | 14,741 | $ | 14,001 | $ | 14,711 |
| NGN Routing | | 7,704 | | 7,609 | | 8,168 |
| Collaboration | | 4,000 | | 3,815 | | 4,057 |
| Service Provider Video | | 3,555 | | 3,969 | | 4,855 |
| Data Center | | 3,220 | | 2,640 | | 2,074 |
| Wireless | | 2,542 | | 2,293 | | 2,257 |
| Security | | 1,747 | | 1,566 | | 1,348 |
| Other | | 241 | | 279 | | 559 |
| Product | | 37,750 | | 36,172 | | 38,029 |
| Service | | 11,411 | | 10,970 | | 10,578 |
| Total | $ | 49,161 | $ | 47,142 | $ | 48,607 |

The Company has made certain reclassifications to the product revenue amounts for prior years to conform to the current year's presentation.

**(c)  Additional Segment Information**

The majority of the Company's assets, excluding cash and cash equivalents and investments, as of July 25, 2015 and July 26, 2014 was attributable to its U.S. operations. The Company's total cash and cash equivalents and investments held by various foreign subsidiaries were $53.4 billion and $47.4 billion as of July 25, 2015 and July 26, 2014 , respectively, and the remaining $7.0 billion and $4.7 billion at the respective fiscal year ends were available in the United States. In fiscal 2015, 2014, and 2013 , no single customer accounted for 10% or more of the Company's revenue.

Property and equipment information is based on the physical location of the assets. The following table presents property and equipment information for geographic areas (in millions):

|  | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| Property and equipment, net: |  |  |  |
| United States | $ 2,733 | $ 2,697 | $ 2,780 |
| International | 599 | 555 | 542 |
| Total | $ 3,332 | $ 3,252 | $ 3,322 |

**18.  Net Income per Share**

The following table presents the calculation of basic and diluted net income per share (in millions, except per-share amounts):

| Years Ended | July 25, 2015 | July 26, 2014 | July 27, 2013 |
|---|---|---|---|
| Net income | $ 8,981 | $ 7,853 | $ 9,983 |
| Weighted-average shares—basic | 5,104 | 5,234 | 5,329 |
| Effect of dilutive potential common shares | 42 | 47 | 51 |
| Weighted-average shares—diluted | 5,146 | 5,281 | 5,380 |
| Net income per share—basic | $ 1.76 | $ 1.50 | $ 1.87 |
| Net income per share—diluted | $ 1.75 | $ 1.49 | $ 1.86 |
| Antidilutive employee share-based awards, excluded | 183 | 254 | 407 |

Employee equity share options, unvested shares, and similar equity instruments granted by the Company are treated as potential common shares outstanding in computing diluted earnings per share. Diluted shares outstanding include the dilutive effect of in-the-money options, unvested restricted stock, and restricted stock units. The dilutive effect of such equity awards is calculated based on the average share price for each fiscal period using the treasury stock method. Under the treasury stock method, the amount the employee must pay for exercising stock options, the amount of compensation cost for future service that the Company has not yet recognized, and the amount of tax benefits that would be recorded in additional paid-in capital when the award becomes deductible are collectively assumed to be used to repurchase shares.

120

**Supplementary Financial Data (Unaudited)**
(in millions, except per-share amounts)

| Quarters Ended | | July 25, 2015 | | April 25, 2015 | | January 24, 2015 | | October 25, 2014 |
|---|---|---|---|---|---|---|---|---|
| Revenue | $ | 12,843 | $ | 12,137 | $ | 11,936 | $ | 12,245 |
| Gross margin | $ | 7,733 | $ | 7,525 | $ | 7,090 | $ | 7,333 |
| Operating income | $ | 2,881 | $ | 2,925 | $ | 2,622 | $ | 2,342 |
| Net income | $ | 2,319 | $ | 2,437 | $ | 2,397 | $ | 1,828 |
| Net income per share - basic | $ | 0.46 | $ | 0.48 | $ | 0.47 | $ | 0.36 |
| Net income per share - diluted | $ | 0.45 | $ | 0.47 | $ | 0.46 | $ | 0.35 |
| Cash dividends declared per common share | $ | 0.21 | $ | 0.21 | $ | 0.19 | $ | 0.19 |
| Cash and cash equivalents and investments | $ | 60,416 | $ | 54,419 | $ | 53,022 | $ | 52,107 |

| Quarters Ended | | July 26, 2014 | | April 26, 2014 | | January 25, 2014 [1] | | October 26, 2013 |
|---|---|---|---|---|---|---|---|---|
| Revenue | $ | 12,357 | $ | 11,545 | $ | 11,155 | $ | 12,085 |
| Gross margin | $ | 7,405 | $ | 7,006 | $ | 5,951 | $ | 7,407 |
| Operating income | $ | 2,681 | $ | 2,542 | $ | 1,667 | $ | 2,455 |
| Net income | $ | 2,247 | $ | 2,181 | $ | 1,429 | $ | 1,996 |
| Net income per share - basic | $ | 0.44 | $ | 0.42 | $ | 0.27 | $ | 0.37 |
| Net income per share - diluted | $ | 0.43 | $ | 0.42 | $ | 0.27 | $ | 0.37 |
| Cash dividends declared per common share | $ | 0.19 | $ | 0.19 | $ | 0.17 | $ | 0.17 |
| Cash and cash equivalents and investments | $ | 52,074 | $ | 50,469 | $ | 47,065 | $ | 48,201 |

[1]   In the second quarter of fiscal 2014, the Company recorded a pre-tax charge of $655 million to product cost of sales, which corresponds to $526 million , net of tax, for the expected remediation cost for certain products sold in prior fiscal years containing memory components manufactured by a single supplier between 2005 and 2010. See Note 12(f) to the Consolidated Financial Statements.

**Item 9.          Changes in and Disagreements with Accountants on Accounting and Financial Disclosures**

None.

**Item 9A.          Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Based on our management's evaluation (with the participation of our principal executive officer and principal financial officer), as of the end of the period covered by this report, our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, (the "Exchange Act")) are effective to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

**Internal Control over Financial Reporting**

Management's report on our internal control over financial reporting and the report of our independent registered public accounting firm on our internal control over financial reporting are set forth, respectively, on page 72 under the caption "Management's Report on Internal Control Over Financial Reporting" and on page 71 of this report.

There was no change in our internal control over financial reporting during our fourth quarter of fiscal 2015 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B.**    **Other Information**

None.

# PART III

**Item 10.**    **Directors, Executive Officers and Corporate Governance**

The information required by this item relating to our directors and nominees is included under the captions "Proposal No. 1: Election of Directors—General," "—Business Experience and Qualifications of Nominees," and "—Board Meetings and Committees—Nomination and Governance Committee" in our Proxy Statement related to the 2015 Annual Meeting of Shareholders and is incorporated herein by reference.

The information required by this item regarding our Audit Committee is included under the caption "Proposal No. 1: Election of Directors—Board Meetings and Committees" in our Proxy Statement related to the 2015 Annual Meeting of Shareholders and is incorporated herein by reference.

Pursuant to General Instruction G(3) of Form 10-K, the information required by this item relating to our executive officers is included under the caption "Executive Officers of the Registrant" in Part I of this report.

The information required by this item regarding compliance with Section 16(a) of the Securities Act of 1934 is included under the caption "Ownership of Securities—Section 16(a) Beneficial Ownership Reporting Compliance" in our Proxy Statement related to the 2015 Annual Meeting of Shareholders and is incorporated herein by reference.

We have adopted a code of ethics that applies to our principal executive officer and all members of our finance department, including the principal financial officer and principal accounting officer. This code of ethics is entitled "Special Ethics Obligations for Employees with Financial Reporting Responsibilities: Financial Officer Code of Ethics" and is posted on our website. The Internet address for our website is www.cisco.com , and this code of ethics may be found from our main webpage by clicking first on "About Cisco" and then on "Corporate Governance" under "Investor Relations," and finally on "Financial Officer Code of Ethics".

We intend to satisfy any disclosure requirement under Item 5.05 of Form 8-K regarding an amendment to, or waiver from, a provision of this code of ethics by posting such information on our website, on the webpage found by clicking through to "Code of Business Conduct" as specified above.

**Item 11.**    **Executive Compensation**

The information appearing under the headings "Proposal No. 1: Election of Directors—Director Compensation" and "Executive Compensation and Related Information" in our Proxy Statement related to the 2015 Annual Meeting of Shareholders is incorporated herein by reference.

**Item 12.**    **Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this item relating to security ownership of certain beneficial owners and management is included under the caption "Ownership of Securities," and the information required by this item relating to securities authorized for issuance under equity compensation plans is included under the caption "Ownership of Securities— Equity Compensation Plan Information," in each case in our Proxy Statement related to the 2015 Annual Meeting of Shareholders, and is incorporated herein by reference.

**Item 13.**    **Certain Relationships and Related Transactions, and Director Independence**

The information required by this item relating to review, approval or ratification of transactions with related persons is included under the caption "Certain Relationships and Related Transactions," and the information required by this item relating to director independence is included under the caption "Proposal No. 1: Election of Directors—Independent Directors," in each case in our Proxy Statement related to the 2015 Annual Meeting of Shareholders, and is incorporated herein by reference.

**Item 14.**        **Principal Accountant Fees and Services**

The information required by this item is included under the captions "Proposal No. 3: Ratification of Independent Registered Public Accounting Firm—Principal Accountant Fees and Services" and "Policy on Audit Committee Pre-Approval of Audit and Permissible Non-Audit Services of Independent Registered Public Accounting Firm" in our Proxy Statement related to the 2015 Annual Meeting of Shareholders, and is incorporated herein by reference.

## PART IV

**Item 15.**        **Exhibits and Financial Statement Schedules**

(a)  1.  Financial Statements
       See the "Index to Consolidated Financial Statements" on page 70 of this report.

     2.  Financial Statement Schedule
       See "Schedule II—Valuation and Qualifying Accounts" (below) within Item 15 of this report.

     3.  Exhibits
       See the "Index to Exhibits" immediately following the signature page of this report.

## SCHEDULE II

## VALUATION AND QUALIFYING ACCOUNTS
### (in millions)

|  | Allowances For | | |
|---|---|---|---|
|  | Financing Receivables | | Accounts Receivable |
| **Year ended July 27, 2013:** |  |  |  |
| Balance at beginning of fiscal year | $ | 380 | $ | 207 |
| Provisions |  | 11 |  | 33 |
| (Write-offs) recoveries, net |  | (46) |  | (12) |
| Foreign exchange and other |  | (1) |  | — |
| Balance at end of fiscal year | $ | 344 | $ | 228 |
| **Year ended July 26, 2014:** |  |  |  |
| Balance at beginning of fiscal year | $ | 344 | $ | 228 |
| Provisions |  | 14 |  | 65 |
| (Write-offs) recoveries, net |  | (9) |  | (28) |
| Balance at end of fiscal year | $ | 349 | $ | 265 |
| **Year ended July 25, 2015:** |  |  |  |
| **Balance at beginning of fiscal year** | **$** | **349** | **$** | **265** |
| **Provisions** |  | **57** |  | **77** |
| **(Write-offs) recoveries, net** |  | **(7)** |  | **(40)** |
| **Foreign exchange and other** |  | **(17)** |  | **—** |
| **Balance at end of fiscal year** | **$** | **382** | **$** | **302** |

Foreign exchange and other includes the impact of foreign exchange and certain immaterial reclassifications.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

September 8, 2015                                                    CISCO SYSTEMS, INC.


                                                                    /S/  CHARLES H . ROBBINS
                                                                    _____
                                                                    **Charles H. Robbins**
                                                                    **Chief Executive Officer**

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Charles H. Robbins and Kelly A. Kramer , jointly and severally, his attorney-in-fact, each with the full power of substitution, for such person, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney-in-fact and agent full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he might do or could do in person hereby ratifying and confirming all that each of said attorneys-in-fact and agents, or his substitute, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report on Form 10-K has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /S/  CHARLES H . ROBBINS<br>**Charles H. Robbins** | Chief Executive Officer and Director<br>(Principal Executive Officer) | September 8, 2015 |
| /S/  KELLY  A . KRAMER<br>**Kelly A. Kramer** | Executive Vice President and Chief Financial Officer<br>(Principal Financial Officer) | September 8, 2015 |
| /S/  PRAT S . BHATT<br>**Prat S. Bhatt** | Senior Vice President, Corporate Controller and<br>Chief Accounting Officer<br>(Principal Accounting Officer) | September 8, 2015 |
| /S/  JOHN  T . CHAMBERS<br>**John T. Chambers** | Executive Chairman | September 8, 2015 |
| /S/  CAROL A . BARTZ<br>**Carol A. Bartz** | Lead Independent Director | September 8, 2015 |

124

| Signature | Title | Date |
|---|---|---|
| /S/ M. MICHELE BURNS<br>**M. Michele Burns** | Director | September 8, 2015 |
| /S/ MICHAEL D. CAPELLAS<br>**Michael D. Capellas** | Director | September 8, 2015 |
| /S/ BRIAN L. HALLA<br>**Brian L. Halla** | Director | September 8, 2015 |
| /S/ JOHN L. HENNESSY<br>**Dr. John L. Hennessy** | Director | September 8, 2015 |
| /S/ KRISTINA M. JOHNSON<br>**Dr. Kristina M. Johnson** | Director | September 8, 2015 |
| /S/ RODERICK C. MCGEARY<br>**Roderick C. McGeary** | Director | September 8, 2015 |
| /S/ ARUN SARIN<br>**Arun Sarin** | Director | September 8, 2015 |
| /S/ STEVEN M. WEST<br>**Steven M. West** | Director | September 8, 2015 |

125

**INDEX TO EXHIBITS**

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 3.1 | Restated Articles of Incorporation of Cisco Systems, Inc., as currently in effect | S-3 | 333-56004 | 4.1 | 2/21/2001 | |
| 3.2 | Amended and Restated Bylaws of Cisco Systems, Inc., as currently in effect | 8-K | 000-18225 | 3.1 | 10/4/2012 | |
| 4.1 | Indenture, dated February 22, 2006, between Cisco Systems, Inc. and Deutsche Bank Trust Company Americas, as trustee | 8-K | 000-18225 | 4.1 | 2/22/2006 | |
| 4.2 | Indenture, dated February 17, 2009, between Cisco Systems, Inc. and the Bank of New York Mellon Trust Company, N.A., as trustee | 8-K | 000-18225 | 4.1 | 2/17/2009 | |
| 4.3 | Indenture, dated November 17, 2009, between Cisco Systems, Inc. and the Bank of New York Mellon Trust Company, N.A., as trustee | 8-K | 000-18225 | 4.1 | 11/17/2009 | |
| 4.4 | Indenture, dated March 16, 2011, between Cisco Systems, Inc. and the Bank of New York Mellon Trust Company, N.A., as trustee | 8-K | 000-18225 | 4.1 | 3/16/2011 | |
| 4.5 | Indenture, dated March 3, 2014, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee | 8-K | 000-18225 | 4.1 | 3/3/2014 | |
| 4.6 | Forms of Global Note for the registrant's 5.50% Senior Notes due 2016 | 8-K | 000-18225 | 4.1 | 2/22/2006 | |
| 4.7 | Forms of Global Note for the registrant's 4.95% Senior Notes due 2019 and 5.90% Senior Notes due 2039 | 8-K | 000-18225 | 4.1 | 2/17/2009 | |
| 4.8 | Forms of Global Note for the registrant's 4.45% Senior Notes due 2020 and 5.50% Senior Notes due 2040 | 8-K | 000-18225 | 4.1 | 11/17/2009 | |
| 4.9 | Forms of Global Note for the Company's 3.150% Senior Notes due 2017 | 8-K | 000-18225 | 4.1 | 3/16/2011 | |
| 4.10 | Form of Officer's Certificate setting forth the terms of the Fixed and Floating Rate Notes issued in March 2014 | 8-K | 000-18225 | 4.2 | 3/3/2014 | |
| 4.11 | Form of Officer's Certificate setting forth the terms of the Fixed and Floating Notes issued in June 2015 | 8-K | 000-18225 | 4.1 | 6/18/2015 | |
| 10.1* | Cisco Systems, Inc. 2005 Stock Incentive Plan (including related form agreements) | | | | | X |
| 10.2* | Cisco Systems, Inc. Amended and Restated 1996 Stock Incentive Plan (including related form agreements) | 10-K | 000-18225 | 10.2 | 9/21/2010 | |
| 10.3* | Cisco Systems, Inc. SA Acquisition Long-Term Incentive Plan (amends and restates the 2003 Long-Term Incentive Plan of Scientific-Atlanta) (including related form agreements) | 10-K | 000-18225 | 10.4 | 9/18/2007 | |
| 10.4* | Cisco Systems, Inc. WebEx Acquisition Long-Term Incentive Plan. (amends and restates the WebEx Communications, Inc. Amended and Restated 2000 Stock Incentive Plan) (including related form agreements) | 10-K | 000-18225 | 10.5 | 9/18/2007 | |
| 10.5* | Cisco Systems, Inc. Employee Stock Purchase Plan | 8-K | 000-18225 | 10.1 | 11/24/2014 | |
| 10.6* | Cisco Systems, Inc. Deferred Compensation Plan, as amended | 10-Q | 000-18225 | 10.5 | 2/18/2015 | |
| 10.7* | Cisco Systems, Inc. Executive Incentive Plan | 8-K | 000-18225 | 10.1 | 11/16/2012 | |

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 10.8* | Form of Executive Officer Indemnification Agreement | 10-K | 000-18225 | 10.7 | 9/20/2004 | |
| 10.9* | Form of Director Indemnification Agreement | 10-K | 000-18225 | 10.8 | 9/20/2004 | |
| 10.10* | Relocation Agreement between Cisco Systems, Inc. and Charles Robbins | 10-Q | 000-18225 | 10.2 | 11/22/2013 | |
| 10.11* | Letter Agreement by and between Cisco Systems, Inc. and Kelly A. Kramer | 8-K | 000-18225 | 10.2 | 11/24/2014 | |
| 10.12* | Transition and Separation Agreement by and between Cisco Systems, Inc. and Frank A. Calderoni | 8-K | 000-18225 | 10.3 | 11/24/2014 | |
| 10.13* | Separation Agreement by and between Cisco Systems, Inc. and Robert W. Lloyd | 8-K | 000-18225 | 10.1 | 6/1/2015 | |
| 10.14* | Separation Agreement by and between Cisco Systems, Inc. and Gary B. Moore | 8-K | 000-18225 | 10.2 | 6/1/2015 | |
| 10.15 | Credit Agreement dated as of May 15, 2015, by and among Cisco Systems, Inc. and Lenders party thereto, and Bank of America, N.A., as administration agent, swing line lender and an L/C issuer | 10-Q | 000-18225 | 10.1 | 5/20/2015 | |
| 10.16 | Form of Commercial Paper Dealer Agreement | 10-Q | 000-18225 | 10.1 | 2/23/2011 | |
| 10.17 | Commercial Paper Issuing and Paying Agent Agreement dated January 31, 2011 between the Registrant and Bank of America, N.A. | 10-Q | 000-18225 | 10.2 | 2/23/2011 | |
| 21.1 | Subsidiaries of the Registrant | | | | | X |
| 23.1 | Consent of Independent Registered Public Accounting Firm | | | | | X |
| 24.1 | Power of Attorney (included on page 124 of this Annual Report on Form 10-K) | | | | | X |
| 31.1 | Rule 13a–14(a)/15d–14(a) Certification of Principal Executive Officer | | | | | X |
| 31.2 | Rule 13a–14(a)/15d–14(a) Certification of Principal Financial Officer | | | | | X |
| 32.1 | Section 1350 Certification of Principal Executive Officer | | | | | X |
| 32.2 | Section 1350 Certification of Principal Financial Officer | | | | | X |
| 101.INS | XBRL Instance Document | | | | | X |
| 101.SCH | XBRL Taxonomy Extension Schema Document | | | | | X |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | | | | | X |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | | | | | X |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | | | | | X |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | | | | | X |

\*   Indicates a management contract or compensatory plan or arrangement.

Exhibit 10.1

# CISCO SYSTEMS, INC.

## 2005 STOCK INCENTIVE PLAN

## AS AMENDED AND RESTATED

## Effective as of November 19, 2013

SECTION 1.          <u>INTRODUCTION</u>                                          1

SECTION 2.          <u>DEFINITIONS</u>                                           1

            (a)     <u>"Affiliate"</u>                                          1

            (b)     <u>"Award"</u>                                              1

            (c)     <u>"Board"</u>                                              1

            (d)     <u>"Cashless Exercise"</u>                                  1

            (e)     <u>"Cause"</u>                                              1

            (f)     <u>"Change In Control"</u>                                  1

            (g)     <u>"Code"</u>                                               1

            (h)     <u>"Committee"</u>                                          1

            (i)     <u>"Common Stock"</u>                                       1

            (j)     <u>"Company"</u>                                            1

            (k)     <u>"Consultant"</u>                                         1

            (l)     <u>"Corporate Transaction"</u>                              2

            (m)     <u>"Covered Employees"</u>                                  2

            (n)     <u>"Director"</u>                                           2

            (o)     <u>"Disability"</u>                                         2

            (p)     <u>"Employee"</u>                                           2

(q)     "Exchange Act"                                                                 2


(r)     "Exercise Price"                                                              2

i

(s)     "Fair Market Value"                              2

(t)     "Fiscal Year"                                    2

(u)     "Grant"                                          2

(v)     "Incentive Stock Option" or "ISO"               2

(w)     "Key Employee"                                   2

(x)     "Non-Employee Director"                          2

(y)     "Nonstatutory Stock Option" or "NSO"            2

(z)     "Option"                                         2

(aa)    "Optionee"                                       2

(bb)    "Parent"                                         2

(cc)    "Participant"                                    2

(dd)    "Performance Goal"                               3

(ee)    "Performance Period"                             3

(ff)    "Plan"                                              3

(gg)    "Previous Plan Award"                               3

(hh)    "Re-Price"                                          3

(ii)    "SAR Agreement"                                     3

(jj)    "SEC"                                               3

(kk)    "Section 16 Persons"                                3

(ll)    "Securities Act"                                    3

(mm)    "Service"                                           3

(nn)    "Share"                                             3

(oo)    "Stock Appreciation Right" or "SAR"                 3

(pp)    "Stock Grant"                                       3

(qq)    "Stock Grant Agreement"                             3

(rr)    "Stock Option Agreement"                            3

(ss)    "Stock Unit"                                        3

(tt)    "Stock Unit Agreement"                              3

(uu)    "Subsidiary"                                        3

(vv)    "10-Percent Shareholder"                            3

SECTION 3.          ADMINISTRATION                          3

(a)    Committee Composition                                3

(b)    Authority of the Committee                           4

(c)    Indemnification                                      4

SECTION 4.          GENERAL                                 4

(a)    <u>General Eligibility</u>    4

iii

(b)    <u>Incentive Stock Options</u>                                                4

(c)    <u>Restrictions on Shares</u>                                                4

(d)    <u>Beneficiaries</u>                                                          4

(e)    <u>Performance Conditions</u>                                                4

(f)    <u>No Rights as a Shareholder</u>                                            5

(g)    <u>Termination of Service</u>                                                5

(h)    <u>Director Fees</u>                                                          5

SECTION 5.          <u>SHARES SUBJECT TO PLAN AND SHARE LIMITS</u>                  5

(a)    <u>Basic Limitations</u>                                                      5

(b)    Additional Shares                                                            6

(c)    Dividend Equivalents                                                        6

(d)    Share Limits                                                                6

iv

SECTION 6.          TERMS AND CONDITIONS OF OPTIONS                              6

     (a)   Stock Option Agreement                                                6

     (b)   Number of Shares                                                      6

     (c)   Exercise Price                                                        6

     (d)   Exercisability and Term                                               6

     (e)   Modifications or Assumption of Options                                6

     (f)   Assignment or Transfer of Options                                     7

SECTION 7.          PAYMENT FOR OPTION SHARES                                    7

SECTION 8.          TERMS AND CONDITIONS OF STOCK APPRECIATION RIGHTS            7

     (a)   SAR Agreement                                                         7

     (b)   Number of Shares                                                      7

     (c)   Exercise Price                                                        7

     (d)   Exercisability and Term                                               7

     (e)   Exercise of SARs                                                      7

     (f)   Modification or Assumption of SARs                                    7

     (g)   Assignment or Transfer of SARs                                        8

SECTION 9.          TERMS AND CONDITIONS FOR STOCK GRANTS                        8

     (a)   Amount and Form of Awards                                            8

(b)     <u>Stock Grant Agreement</u>      8

(c)     <u>Payment for Stock Grants</u>      8

(d)     <u>Vesting Conditions</u>      8

(e)     <u>Assignment or Transfer of Stock Grants</u>      8

(f)     <u>Voting and Dividend Rights</u>      8

(g)     <u>Modification or Assumption of Stock Grants</u>      8

SECTION 10.     <u>TERMS AND CONDITIONS OF STOCK UNITS</u>      9

(a)     <u>Stock Unit Agreement</u>      9

(b)     <u>Number of Shares</u>      9

(c)     <u>Payment for Stock Units</u>      9

(d)     <u>Vesting Conditions</u>      9

(e)     <u>Voting and Dividend Rights</u>      9

(f)     <u>Form and Time of Settlement of Stock Units</u>      9

(g)     <u>Creditors' Rights</u>      9

(h)     <u>Modification or Assumption of Stock Units</u>      9

(i)     <u>Assignment or Transfer of Stock Units</u>      9

SECTION 11.    PROTECTION AGAINST DILUTION                                    9

    (a)    Adjustments                                                       9

    (b)    Participant Rights                                               10

    (c)    Fractional Shares                                                10

SECTION 12.    EFFECT OF A CORPORATE TRANSACTION                             10

    (a)    Corporate Transaction                                            10

    (b)    Acceleration                                                     10

    (c)    Dissolution                                                      10

SECTION 13.    LIMITATIONS ON RIGHTS                                         10

    (a)    No Entitlements                                                  10

    (b)    Shareholders' Rights                                             10

    (c)    Regulatory Requirements                                          10

SECTION 14.    WITHHOLDING TAXES                                             10

    (a)    General                                                          10

    (b)    Share Withholding                                                11

SECTION 15.    DURATION AND AMENDMENTS                                       11

    (a)    Term of the Plan                                                 11

    (b)    Right to Amend or Terminate the Plan                             11

**CISCO SYSTEMS, INC.**

2005 STOCK INCENTIVE PLAN

AS AMENDED AND RESTATED

(Effective as of November 19, 2013 )

## SECTION 1. INTRODUCTION .

The Company's shareholders approved the Cisco Systems, Inc. 2005 Stock Incentive Plan, as amended and restated and effective on December 7, 2011. The Company's Board of Directors approved an amendment and restatement of the Plan; provided that, the amendment and restatement of the Plan shall become effective upon its approval by Company shareholders. If the Company's shareholders do not approve the amendment and restatement of the Plan, Awards will be made under the Plan as approved by shareholders on December 7, 2011.

The purpose of the Plan is to promote the long-term success of the Company and the creation of shareholder value by offering Key Employees an opportunity to share in such long-term success by acquiring a proprietary interest in the Company.

The Plan seeks to achieve this purpose by providing for discretionary long-term incentive Awards in the form of Options (which may constitute Incentive Stock Options or Nonstatutory Stock Options), Stock Appreciation Rights, Stock Grants, and Stock Units.

The Plan shall be governed by, and construed in accordance with, the laws of the State of California (except its choice-of-law provisions).

Capitalized terms shall have the meaning provided in Section 2 unless otherwise provided in this Plan or any related Stock Option Agreement, SAR Agreement, Stock Grant Agreement or Stock Unit Agreement.

## SECTION 2. DEFINITIONS .

(a) "Affiliate" means any entity other than a Subsidiary, if the Company and/or one or more Subsidiaries own not less than 50% of such entity.

(b) "Award" means any award of an Option, SAR, Stock Grant or Stock Unit under the Plan.

(c) "Board" means the Board of Directors of the Company, as constituted from time to time.

(d) "Cashless Exercise" means, to the extent that a Stock Option Agreement so provides and as permitted by applicable law, a program approved by the Committee in which payment may be made all or in part by delivery (on a form prescribed by the Committee) of an irrevocable direction to a securities broker to sell Shares and to deliver all or part of the sale proceeds to the Company in payment of the aggregate Exercise Price and, if applicable, the amount necessary to satisfy the Company's withholding obligations at the minimum statutory withholding rates, including, but not limited to, U.S. federal and state income taxes, payroll taxes, and foreign taxes, if applicable.

(e) "Cause" means, except as may otherwise be provided in a Participant's employment agreement or Award agreement, a conviction of a Participant for a felony crime or the failure of a Participant to contest prosecution for a felony crime, or a Participant's misconduct, fraud or dishonesty (as such terms are defined by the Committee in its sole discretion), or any unauthorized use or disclosure of confidential information or trade secrets, in each case as determined by the Committee, and the Committee's determination shall be conclusive and binding.

(f) "Change In Control" except as may otherwise be provided in a Participant's employment agreement or Award agreement, means the occurrence of any of the following:

(i) A change in the composition of the Board over a period of thirty-six consecutive months or less such that a majority of the Board members ceases, by reason of one or more contested elections for Board membership, to be comprised of individuals who either (A) have been Board members continuously since the beginning of such period or (B) have been elected or nominated for election as Board members during such period by at least a majority of the Board members described in clause (A) who were still in office at the time the Board approved such election or nomination; or

(ii) The acquisition, directly or indirectly, by any person or related group of persons (other than the Company or a person that directly or indirectly controls, is controlled by, or is under common control with, the Company) of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act) of securities of the Company representing more than 35% of the total combined voting power of the Company's then outstanding securities pursuant to a tender or exchange offer made directly to the Company's shareholders which the Board does not recommend such shareholders accept.

(g) "Code" means the Internal Revenue Code of 1986, as amended, and the regulations and interpretations promulgated thereunder.

(h) "Committee" means a committee described in Section 3.

(i) "Common Stock" means the Company's common stock.

(j) "Company" means Cisco Systems, Inc., a California corporation.

(k) "Consultant" means an individual who performs bona fide services to the Company, a Parent, a Subsidiary or an Affiliate, other than as an Employee or Director or Non-Employee Director.

(l) "Corporate Transaction" except as may otherwise be provided in a Participant's employment agreement or Award agreement, means the occurrence of any of the following shareholder approved transactions:

(i) The consummation of a merger or consolidation of the Company with or into another entity or any other corporate reorganization, if more than 50% of the combined voting power of the continuing or surviving entity's securities outstanding immediately after such merger, consolidation or other reorganization is owned by persons who were not shareholders of the Company immediately prior to such merger, consolidation or other reorganization; or

(ii) The sale, transfer or other disposition of all or substantially all of the Company's assets.

A transaction shall not constitute a Corporate Transaction if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transactions.

(m) "Covered Employees" means those persons who are subject to the limitations of Code Section 162(m).

(n) "Director" means a member of the Board who is also an Employee.

(o) "Disability" means that the Key Employee is classified as disabled under a long-term disability policy of the Company or, if no such policy applies, the Key Employee is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

(p) "Employee" means an individual who is a common-law employee of the Company, a Parent, a Subsidiary or an Affiliate.

(q) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(r) "Exercise Price" means, in the case of an Option, the amount for which a Share may be purchased upon exercise of such Option, as specified in the applicable Stock Option Agreement. "Exercise Price," in the case of a SAR, means an amount, as specified in the applicable SAR Agreement, which is subtracted from the Fair Market Value in determining the amount payable upon exercise of such SAR.

(s) "Fair Market Value" means the market price of a Share as determined in good faith by the Committee. The Fair Market Value shall be determined by the following:

(i) If the Shares were traded over-the-counter or listed with NASDAQ on the date in question, then the Fair Market Value shall be equal to the last transaction price quoted by the NASDAQ system for the date in question or (ii) if the Common Stock is listed on the New York Stock Exchange or the American Stock Exchange on the date in question, the Fair Market Value is the closing selling price for the Common Stock as such price is officially quoted in the composite tape of transactions on the exchange determined by the Committee to be the primary market for the Common Stock for the date in question; provided, however, that if there is no such reported price for the Common Stock for the date in question under (i) or (ii), then such price on the last preceding date for which such price exists shall be determinative of Fair Market Value.

If neither (i) or (ii) are applicable, then the Fair Market Value shall be determined by the Committee in good faith on such basis as it deems appropriate.

Whenever possible, the determination of Fair Market Value by the Committee shall be based on the prices reported in the Western Edition of The Wall Street Journal . Such determination shall be conclusive and binding on all persons.

(t) "Fiscal Year" means the Company's fiscal year.

(u) "Grant" means any grant of an Award under the Plan.

(v) "Incentive Stock Option" or "ISO" means an incentive stock option described in Code Section 422.

(w) "Key Employee" means an Employee, Director, Non-Employee Director or Consultant who has been selected by the Committee to receive an Award under the Plan.

(x) "Non-Employee Director" means a member of the Board who is not an Employee.

(y) "Nonstatutory Stock Option" or "NSO" means a stock option that is not an ISO.

(z) "Option" means an ISO or NSO granted under the Plan entitling the Optionee to purchase Shares.

(aa) "Optionee" means an individual, estate or other entity that holds an Option.

(bb) "Parent" means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company, if each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain. A corporation that attains the status of a Parent on a date after the adoption of the Plan shall be considered a Parent commencing as of such date.

(cc) "Participant" means an individual or estate or other entity that holds an Award.

(dd) "Performance Goal" means an objective formula or standard determined by the Committee with respect to each Performance Period utilizing one or more of the following factors and any objectively verifiable adjustment(s) thereto permitted and preestablished by the Committee in accordance with Code Section 162(m): (i) operating income, operating cash flow and operating expense; (ii) earnings before interest, taxes, depreciation and amortization; (iii) earnings; (iv) cash flow; (v) market share; (vi) sales; (vii) revenue; (viii) profits before interest and taxes; (ix) expenses; (x) cost of goods sold; (xi) profit/loss or profit margin; (xii) working capital; (xiii) return on capital, equity or assets; (xiv) earnings per share; (xv) economic value added; (xvi) stock price; (xvii) price/earnings ratio; (xviii) debt or debt-to-equity; (xix) accounts receivable; (xx) writeoffs; (xxi) cash; (xxii) assets; (xxiii) liquidity; (xxiv) operations; (xxv) intellectual property (e.g., patents); (xxvi) product development; (xxvii) regulatory activity; (xxviii) manufacturing, production or inventory; (xxix) mergers and acquisitions or divestitures; (xxx) financings; (xxxi) customer satisfaction; and/or (xxxii) total shareholder return, each with respect to the Company and/or one or more of its affiliates or operating units. Awards issued to persons who are not Covered Employees may take into account other factors (including subjective factors).

(ee) "Performance Period" means any period not exceeding 36 months as determined by the Committee, in its sole discretion. The Committee may establish different Performance Periods for different Participants, and the Committee may establish concurrent or overlapping Performance Periods.

(ff) "Plan" means this Cisco Systems, Inc. 2005 Stock Incentive Plan as amended and restated, and as it may be further amended from time to time.

(gg) "Previous Plan Award" means any award of an Option, SAR, Stock Grant or Stock Unit under the Cisco Systems, Inc. 1996 Stock Incentive Plan, the Cisco Systems, Inc. SA Acquisition Long-Term Incentive Plan or the Cisco Systems, Inc. WebEx Acquisition Long-Term Incentive Plan.

(hh) "Re-Price" means that the Company has lowered or reduced the Exercise Price of outstanding Options and/or outstanding SARs for any Participant(s), whether through amendment, cancellation, or replacement grants, or any other means.

(ii) "SAR Agreement" means the agreement described in Section 8 evidencing each Award of a Stock Appreciation Right.

(jj) "SEC" means the Securities and Exchange Commission.

(kk) "Section 16 Persons" means those officers, directors or other persons who are subject to Section 16 of the Exchange Act.

(ll) "Securities Act" means the Securities Act of 1933, as amended.

(mm) "Service" means service as an Employee, Director, Non-Employee Director or Consultant. A Participant's Service does not terminate when continued service crediting is required by applicable law. However, for purposes of determining whether an Option is entitled to continuing ISO status, a common-law employee's Service will be treated as terminating ninety (90) days after such Employee went on leave, unless such Employee's right to return to active work is guaranteed by law or by a contract. Service terminates in any event when the approved leave ends, unless such Employee immediately returns to active work. The Committee determines which leaves count toward Service, and when Service terminates for all purposes under the Plan. Further, unless otherwise determined by the Committee, a Participant's Service shall not be deemed to have terminated merely because of a change in the capacity in which the Participant provides service to the Company, a Parent, Subsidiary or Affiliate, or a transfer between entities (the Company or any Parent, Subsidiary, or Affiliate); provided that there is no interruption or other termination of Service.

(nn) "Share" means one share of Common Stock.

(oo) "Stock Appreciation Right" or "SAR" means a stock appreciation right awarded under the Plan.

(pp) "Stock Grant" means Shares awarded under the Plan.

(qq) "Stock Grant Agreement" means the agreement described in Section 9 evidencing each Award of a Stock Grant.

(rr) "Stock Option Agreement" means the agreement described in Section 6 evidencing each Award of an Option.

(ss) "Stock Unit" means a bookkeeping entry representing the equivalent of one Share, as awarded under the Plan.

(tt) "Stock Unit Agreement" means the agreement described in Section 10 evidencing each Award of a Stock Unit.

(uu) "Subsidiary" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company, if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain. A corporation that attains the status of a Subsidiary on a date after the adoption of the Plan shall be considered a Subsidiary commencing as of such date.

(vv) "10-Percent Shareholder" means an individual who owns more than 10% of the total combined voting power of all classes of outstanding stock of the Company, its Parent or any of its Subsidiaries. In determining stock ownership, the attribution rules of Section 424 (d) of the Code shall be applied.

## SECTION 3. ADMINISTRATION .

(a) Committee Composition. The Board or a Committee appointed by the Board shall administer the Plan. Unless the Board provides otherwise, the Company's Compensation & Management Development Committee shall be the Committee. Members of the Committee

shall serve for such period of time as the Board may determine and shall be subject to removal by the Board at any time. The Board may also at any time terminate the functions of the Committee and reassume all powers and authority previously delegated to the Committee.

The Committee shall have membership composition which enables (i) Awards to Section 16 Persons to qualify as exempt from liability under Section 16(b) of the Exchange Act and (ii) Awards to Covered Employees to qualify as performance-based compensation as provided under Code Section 162(m).

The Board may also appoint one or more separate committees of the Board, each composed of two or more directors of the Company who need not qualify under Rule 16b-3 or Code Section 162(m), that may administer the Plan with respect to Key Employees who are not Section 16 Persons or Covered Employees, respectively, may grant Awards under the Plan to such Key Employees and may determine all terms of such Awards.

Notwithstanding the foregoing, the Board shall constitute the Committee and shall administer the Plan with respect to Non-Employee Directors, shall grant Awards under the Plan to such Non-Employee Directors, and shall determine all terms of such Awards.

(b) Authority of the Committee. Subject to the provisions of the Plan, the Committee shall have full authority and sole discretion to take any actions it deems necessary or advisable for the administration of the Plan. Such actions shall include:

(i) selecting Key Employees who are to receive Awards under the Plan;

(ii) determining the type, number, vesting requirements and other features and conditions of such Awards and amending such Awards;

(iii) correcting any defect, supplying any omission, or reconciling any inconsistency in the Plan or any Award agreement;

(iv) accelerating the vesting, or extending the post-termination exercise term, of Awards at any time and under such terms and conditions as it deems appropriate;

(v) interpreting the Plan;

(vi) making all other decisions relating to the operation of the Plan; and

(vii) adopting such plans or subplans as may be deemed necessary or appropriate to provide for the participation by Key Employees of the Company and its Subsidiaries and Affiliates who reside outside the U.S., which plans and/or subplans shall be attached hereto as Appendices.

The Committee may adopt such rules or guidelines as it deems appropriate to implement the Plan. The Committee's determinations under the Plan shall be final and binding on all persons.

(c) Indemnification. To the maximum extent permitted by applicable law, each member of the Committee, or of the Board, shall be indemnified and held harmless by the Company against and from (i) any loss, cost, liability, or expense that may be imposed upon or reasonably incurred by him or her in connection with or resulting from any claim, action, suit, or proceeding to which he or she may be a party or in which he or she may be involved by reason of any action taken or failure to act under the Plan or any Stock Option Agreement, SAR Agreement, Stock Grant Agreement or Stock Unit Agreement, and (ii) from any and all amounts paid by him or her in settlement thereof, with the Company's approval, or paid by him or her in satisfaction of any judgment in any such claim, action, suit, or proceeding against him or her, provided he or she shall give the Company an opportunity, at its own expense, to handle and defend the same before he or she undertakes to handle and defend it on his or her own behalf. The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such persons may be entitled under the Company's Articles of Incorporation or Bylaws, by contract, as a matter of law, or otherwise, or under any power that the Company may have to indemnify them or hold them harmless.

## SECTION 4. GENERAL .

(a) General Eligibility. Only Employees, Directors, Non-Employee Directors and Consultants shall be eligible for designation as Key Employees by the Committee, in its sole discretion.

(b) Incentive Stock Options. Only Key Employees who are common-law employees of the Company, a Parent or a Subsidiary shall be eligible for the grant of ISOs. In addition, a Key Employee who is a 10-Percent Shareholder shall not be eligible for the grant of an ISO unless the requirements set forth in Section 422(c)(5) of the Code are satisfied.

(c) Restrictions on Shares. Any Shares issued pursuant to an Award shall be subject to such rights of repurchase, rights of first refusal and other transfer restrictions as the Committee may determine, in its sole discretion. Such restrictions shall apply in addition to any restrictions that may apply to holders of Shares generally and shall also comply to the extent necessary with applicable law. In no event shall the Company be required to issue fractional Shares under this Plan.

(d) Beneficiaries. Unless stated otherwise in an Award agreement, a Participant may designate one or more beneficiaries with respect to an Award by timely filing the prescribed form with the Company. A beneficiary designation may be changed by filing the prescribed form with the Company at any time before the Participant's death. If no beneficiary was designated or if no designated beneficiary survives the Participant, then after a Participant's death any vested Award(s) shall be transferred or distributed to the Participant's estate.

(e) Performance Conditions. The Committee may, in its discretion, include performance conditions in an Award or grant an Award upon the satisfaction of performance conditions. If performance conditions are included in Awards to Covered Employees, then such Awards may be subject to the achievement of Performance Goals established by the Committee. Such Performance Goals shall be established and

administered pursuant to the requirements of Code Section 162(m). Before any Shares underlying an Award or any Award payments subject to Performance Goals are released to a Covered Employee with respect to a Performance Period, the Committee shall certify in writing that the Performance Goals for such Performance Period have been satisfied. Awards with performance conditions that are granted to Key Employees who are not Covered Employees need not comply with the requirements of Code Section 162(m).

(f) No Rights as a Shareholder. A Participant, or a transferee of a Participant, shall have no rights as a shareholder with respect to any Common Stock covered by an Award until such person has satisfied all of the terms and conditions to receive such Common Stock, has satisfied any applicable withholding or tax obligations relating to the Award and the Shares have been issued (as evidenced by an appropriate entry on the books of the Company or a duly authorized transfer agent of the Company).

(g) Termination of Service. Unless the applicable Award agreement or, with respect to Participants who reside in the U.S., the applicable employment agreement provides otherwise, the following rules shall govern the vesting, exercisability and term of outstanding Awards held by a Participant in the event of termination of such Participant's Service (in all cases subject to the expiration term of the Option or SAR as applicable): (i) upon termination of Service for any reason, all unvested portions of any outstanding Awards shall be immediately forfeited without consideration and the vested portions of any outstanding Stock Units shall be settled upon termination; (ii) if the Service of a Participant is terminated for Cause, then all unexercised Options and SARs, unvested portions of Stock Units and unvested portions of Stock Grants shall terminate and be forfeited immediately without consideration; (iii) if the Service of a Participant is terminated for any reason other than for Cause, death, or Disability, then the vested portion of his or her then-outstanding Options and/or SARs may be exercised by such Participant or his or her personal representative within three months after the date of such termination; or (iv) if the Service of a Participant is terminated due to death or Disability, the vested portion of his or her then-outstanding Options and/or SARs may be exercised within eighteen months after the date of termination of Service.

(h) Director Fees. Each Non-Employee Director may elect to receive a Stock Grant or Stock Unit under the Plan in lieu of payment of a portion of his or her regular annual retainer based on the Fair Market Value of the Shares on the date any regular annual retainer would otherwise be paid. For purposes of the Plan, a Non-Employee Director's regular annual retainer shall not include any additional retainer paid in connection with service on any committee of the Board or paid for any other reason. Such an election may be for any dollar or percentage amount equal to at least 25% of the Non-Employee Director's regular annual retainer (up to a limit of 100% of the Non-Employee Director's regular annual retainer). The election must be made prior to the beginning of the annual board of directors cycle which shall be any twelve month continuous period designated by the Board. Any amount of the regular annual retainer not elected to be received as a Stock Grant or Stock Unit shall be payable in cash in accordance with the Company's standard payment procedures. Shares granted under this Section 4(h) shall otherwise be subject to the terms of the Plan applicable to Non-Employee Directors or to Participants generally (other than provisions specifically applying only to Employees).

**SECTION 5.** <u>SHARES SUBJECT TO PLAN AND SHARE LIMITS</u> .

(a) Basic Limitations. The stock issuable under the Plan shall be authorized but unissued Shares. The aggregate number of Shares reserved for Awards under the Plan shall not exceed 694,000,000 Shares, subject to adjustment pursuant to Section 11. Shares issued as Stock Grants, pursuant to Stock Units or pursuant to the settlement of dividend equivalents will count against the Shares available for issuance under the Plan as 1.5 Shares for every 1 Share issued in connection with the Award or dividend equivalent.

(b) Additional Shares. If Awards are forfeited or are terminated for any other reason before being exercised or settled, then the Shares underlying such Awards, plus the number of additional Shares, if any, that counted against Shares available for issuance under the Plan in respect thereof at the time of Grant, shall again become available for Awards under the Plan. If a Previous Plan Award is forfeited or is terminated for any other reason before being exercised or settled, then the Shares underlying such Previous Plan Award shall again become available for Awards under this Plan. SARs shall be counted in full against the number of Shares available for issuance under the Plan, regardless of the number of Shares issued upon settlement of the SARs. In the event that withholding tax liabilities arising from an Award other than an Option or SAR are satisfied by the withholding of Shares by the Company, then the Shares so withheld, plus the number of additional Shares, if any, that counted against Shares available for issuance under the Plan in respect thereof at the time of Grant, shall again become available for Awards under the Plan. In the event that withholding tax liabilities arising from an Option or SAR are satisfied by the withholding of Shares by the Company, then the Shares so withheld shall not be added to the Shares available for Awards under the Plan. In addition, Shares that are exchanged by a Participant or withheld by the Company as full or partial payment in connection with the exercise or settlement of an Option or SAR shall not be available for subsequent Awards under the Plan and Shares repurchased on the open market with the proceeds of an Option exercise shall not again be made available for issuance under the Plan.

(c) Dividend Equivalents. Any dividend equivalents settled in Shares under the Plan shall be applied against the number of Shares available for Awards.

(d) Share Limits.

(i) Limits on Options . Subject to adjustment pursuant to Section 11, no Key Employee shall receive Options to purchase Shares during any Fiscal Year covering in excess of 5,000,000 Shares and the aggregate maximum number of Shares that may be issued in connection with ISOs shall be 694,000,000 Shares.

(ii) Limits on SARs. Subject to adjustment pursuant to Section 11, no Key Employee shall receive Awards of SARs during any Fiscal Year covering in excess of 5,000,000 Shares and the aggregate maximum number of Shares that may be issued in connection with SARs shall be 694,000,000 Shares.

(iii) Limits on Stock Grants and Stock Units. Subject to adjustment pursuant to Section 11, no Key Employee shall receive Stock Grants or Stock Units during any Fiscal Year covering, in the aggregate, in excess of 5,000,000 Shares.

(iv) Limits on Awards to Non-Employee Directors. Subject to adjustment pursuant to Section 11, no Non-Employee Director shall receive Awards during any Fiscal Year covering, in the aggregate, in excess of 50,000 Shares; provided that any Shares received pursuant to an election under Section 4(h) shall not count against such limit.

## SECTION 6. <u>TERMS AND CONDITIONS OF OPTIONS</u> .

(a) Stock Option Agreement. Each Grant of an Option under the Plan shall be evidenced and governed exclusively by a Stock Option Agreement between the Optionee and the Company. Such Option shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions that are not inconsistent with the Plan and that the Committee deems appropriate for inclusion in a Stock Option Agreement (including without limitation any performance conditions). The provisions of the various Stock Option Agreements entered into under the Plan need not be identical. The Stock Option Agreement shall also specify whether the Option is an ISO or an NSO.

(b) Number of Shares. Each Stock Option Agreement shall specify the number of Shares that are subject to the Option and shall be subject to adjustment of such number in accordance with Section 11.

(c) Exercise Price. An Option's Exercise Price shall be established by the Committee and set forth in a Stock Option Agreement. The Exercise Price of an Option shall not be less than 100% of the Fair Market Value (110% for ISO grants to 10-Percent Shareholders) on the date of Grant.

(d) Exercisability and Term. Each Stock Option Agreement shall specify the date when all or any installment of the Option is to become exercisable. The Stock Option Agreement shall also specify the term of the Option; provided that the term of an Option shall in no event exceed ten years from the date of Grant. Unless the applicable Stock Option Agreement provides otherwise, each Option shall vest and become exercisable with respect to 20% of the Shares subject to the Option upon completion of one year of Service measured from the vesting commencement date, the balance of the Shares subject to the Option shall vest and become exercisable in forty-eight equal installments upon completion of each month of Service thereafter, and the term of the Option shall be ten years from the date of Grant. A Stock Option Agreement may provide for accelerated vesting in the event of the Participant's death, Disability, or other events. Notwithstanding any other provision of the Plan, no Option can be exercised after the expiration date provided in the applicable Stock Option Agreement and no Option may provide that, upon exercise of the Option, a new Option will automatically be granted.

(e) Modifications or Assumption of Options. Within the limitations of the Plan, the Committee may modify, extend or assume outstanding options or may accept the cancellation of outstanding options (whether granted by the Company or by another issuer) in return for the grant of new Options for the same or a different number of Shares, at the same or a different Exercise Price, and with the same or different vesting provisions. Notwithstanding the preceding sentence or anything to the contrary herein, the Committee may not Re-Price outstanding Options unless there is approval by the Company shareholders and, unless a modification is necessary or desirable

to comply with any applicable law, regulation or rule, such modification of an Option shall not, without the consent of the Optionee, impair his or her rights or obligations under such Option.

(f) Assignment or Transfer of Options. Except as otherwise provided in the applicable Stock Option Agreement and then only to the extent permitted by applicable law, no Option shall be transferable by the Optionee other than by will or by the laws of descent and distribution. Except as otherwise provided in the applicable Stock Option Agreement, an Option may be exercised during the lifetime

of the Optionee only by the Optionee or by the guardian or legal representative of the Optionee. No Option or interest therein may be assigned, pledged or hypothecated by the Optionee during his or her lifetime, whether by operation of law or otherwise, or be made subject to execution, attachment or similar process.

## SECTION 7. <u>PAYMENT FOR OPTION SHARES</u> .

The entire Exercise Price of Shares issued upon exercise of Options shall be payable in cash at the time when such Shares are purchased, except as follows and if so provided for in an applicable Stock Option Agreement:

(i) Surrender of Stock. Payment for all or any part of the Exercise Price or Options may be made with Shares which have already been owned by the Optionee; provided that the Committee may, in its sole discretion, require that Shares tendered for payment be previously held by the Optionee for a minimum duration. Such Shares shall be valued at their Fair Market Value.

(ii) Cashless Exercise. Payment for all or any part of the Exercise Price may be made through Cashless Exercise at the Committee's sole discretion.

(iii) Other Forms of Payment. Payment for all or any part of the Exercise Price may be made in any other form that is consistent with applicable laws, regulations and rules and approved by the Committee.

In the case of an ISO granted under the Plan, payment shall be made only pursuant to the express provisions of the applicable Stock Option Agreement. The Stock Option Agreement may specify that payment may be made in any form(s) described in this Section 7. In the case of an NSO granted under the Plan, the Committee may, in its discretion at any time, accept payment in any form(s) described in this Section 7.

## SECTION 8. <u>TERMS AND CONDITIONS OF STOCK APPRECIATION RIGHTS</u> .

(a) SAR Agreement. Each Grant of a SAR under the Plan shall be evidenced and governed exclusively by a SAR Agreement between the Participant and the Company. Such SAR shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions that are not inconsistent with the Plan and that the Committee deems appropriate for inclusion in a SAR Agreement (including without limitation any performance conditions). A SAR Agreement may provide for a maximum limit on the amount of any payout notwithstanding the Fair Market Value on the date of exercise of the SAR. The provisions of the various SAR Agreements entered into under the Plan need not be identical. SARs may be granted in consideration of a reduction in the Participant's compensation.

(b) Number of Shares. Each SAR Agreement shall specify the number of Shares to which the SAR pertains and shall be subject to adjustment of such number in accordance with Section 11.

(c) Exercise Price. Each SAR Agreement shall specify the Exercise Price which shall be established by the Committee. The Exercise Price of a SAR shall not be less than 100% of the Fair Market Value on the date of Grant.

(d) Exercisability and Term. Each SAR Agreement shall specify the date when all or any installment of the SAR is to become exercisable. The SAR Agreement shall also specify the term of the SAR which shall not exceed ten years from the date of Grant. Unless the applicable SAR Agreement provides otherwise, each SAR shall vest and become exercisable with respect to 20% of the Shares subject to the SAR upon completion of one year of Service measured from the vesting commencement date, the balance of the Shares subject to the SAR shall vest and become exercisable in forty-eight equal installments upon completion of each month of Service thereafter, and the term of the SAR shall be ten years from the date of Grant. A SAR Agreement may provide for accelerated vesting in the event of the Participant's death, Disability, or other events. SARs may be awarded in combination with Options or Stock Grants, and such an Award shall provide that the SARs will not be exercisable unless the related Options or Stock Grants are forfeited. A SAR may be included in an ISO only at the time of Grant but may be included in an NSO at the time of Grant or at any subsequent time, but not later than six months before the expiration of such NSO. No SAR may provide that, upon exercise of the SAR, a new SAR will automatically be granted.

(e) Exercise of SARs. If, on the date when a SAR expires, the Exercise Price under such SAR is less than the Fair Market Value on such date but any portion of such SAR has not been exercised or surrendered, then such SAR shall automatically be deemed to be exercised as of such date with respect to such portion. Upon exercise of a SAR, the Participant (or any person having the right to exercise the SAR) shall receive from the Company (i) Shares, (ii) cash or (iii) any combination of Shares and cash, as the Committee shall determine at the time of Grant of the SAR, in its sole discretion. The amount of cash and/or the Fair Market Value of Shares received upon exercise of SARs shall, in the aggregate, be equal to the amount by which the Fair Market Value (on the date of exercise) of the Shares subject to the SARs exceeds the Exercise Price of those Shares.

(f) Modification or Assumption of SARs. Within the limitations of the Plan, the Committee may modify, extend or assume outstanding stock appreciation rights or may accept the cancellation of outstanding stock appreciation rights (including stock appreciation rights

granted by another issuer) in return for the grant of new SARs for the same or a different number of Shares, at the same or a different Exercise Price, and with the same or different vesting provisions. Notwithstanding the preceding sentence or anything to the contrary herein, the Committee may not Re-Price outstanding SARs unless there is approval by the Company shareholders and, unless a modification is necessary or desirable to comply with any applicable law, regulation or rule, such modification of a SAR shall not **,** without the consent of the Participant, impair his or her rights or obligations under such SAR.

(g) Assignment or Transfer of SARs. Except as otherwise provided in the applicable SAR Agreement and then only to the extent permitted by applicable law, no SAR shall be transferable by the Participant other than by will or by the laws of descent and distribution. Except as otherwise provided in the applicable SAR Agreement, a SAR may be exercised during the lifetime of the Participant only by the Participant or by the guardian or legal representative of the Participant. No SAR or interest therein may be assigned, pledged or hypothecated by the Participant during his or her lifetime, whether by operation of law or otherwise, or be made subject to execution, attachment or similar process.

**SECTION 9.** <u>TERMS AND CONDITIONS FOR STOCK GRANTS</u> .

(a) Amount and Form of Awards. Awards under this Section 9 may be granted in the form of a Stock Grant. Each Stock Grant Agreement shall specify the number of Shares to which the Stock Grant pertains and shall be subject to adjustment of such number in accordance with Section 11. A Stock Grant may also be awarded in combination with NSOs, and such an Award may provide that the Stock Grant will be forfeited in the event that the related NSOs are exercised.

(b) Stock Grant Agreement. Each Stock Grant awarded under the Plan shall be evidenced and governed exclusively by a Stock Grant Agreement between the Participant and the Company. Each Stock Grant shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions that are not inconsistent with the Plan and that the Committee deems appropriate for inclusion in the applicable Stock Grant Agreement (including without limitation any performance conditions). The provisions of the various Stock Grant Agreements entered into under the Plan need not be identical.

(c) Payment for Stock Grants. Stock Grants may be issued with or without cash consideration or any other form of legally permissible consideration approved by the Committee.

(d) Vesting Conditions. Each Stock Grant may or may not be subject to vesting. Any such vesting provision may provide that Shares shall vest based on Service over time or shall vest, in full or in installments, upon satisfaction of performance conditions specified in the Stock Grant Agreement which may include Performance Goals pursuant to Section 4(e). Unless the applicable Stock Grant Agreement provides otherwise, each Stock Grant shall vest with respect to 20% of the Shares subject to the Stock Grant upon completion of each year of Service on each of the first through fifth annual anniversaries of the vesting commencement date. A Stock Grant Agreement may provide for accelerated vesting in the event of the Participant's death, Disability, or other events.

(e) Assignment or Transfer of Stock Grants. Except as provided in the applicable Stock Grant Agreement, and then only to the extent permitted by applicable law, a Stock Grant awarded under the Plan shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily, involuntarily or by operation of law. Any act in violation of this Section 9(e) shall be void. However, this Section 9(e) shall not preclude a Participant from designating a beneficiary who will receive any vested outstanding Stock Grant Awards in the event of the Participant's death, nor shall it preclude a transfer of vested Stock Grant Awards by will or by the laws of descent and distribution.

(f) Voting and Dividend Rights. The holder of a Stock Grant awarded under the Plan shall have the same voting, dividend and other rights as the Company's other shareholders. A Stock Grant Agreement, however, may require that the holder of such Stock Grant invest any cash dividends received in additional Shares subject to the Stock Grant. Such additional Shares subject to the Stock Grant shall be subject to the same conditions and restrictions as the Stock Grant with respect to which the dividends were paid. Such additional Shares subject to the Stock Grant shall not reduce the number of Shares available for issuance under Section 5.

(g) Modification or Assumption of Stock Grants. Within the limitations of the Plan, the Committee may modify or assume outstanding stock grants or may accept the cancellation of outstanding stock grants (including stock granted by another issuer) in return for the grant of new Stock Grants for the same or a different number of Shares and with the same or different vesting provisions. Notwithstanding the preceding sentence or anything to the contrary herein, the Committee may not modify an outstanding Stock Grant such that the modification shall, without the consent of the Participant, impair his or her rights or obligations under such Stock Grant, unless such modification is necessary or desirable to comply with any applicable law, regulation or rule.

**SECTION 10.** <u>TERMS AND CONDITIONS OF STOCK UNITS</u> .

(a) Stock Unit Agreement. Each grant of Stock Units under the Plan shall be evidenced and governed exclusively by a Stock Unit Agreement between the Participant and the Company. Such Stock Units shall be subject to all applicable terms and conditions of the Plan and may be subject to any other terms and conditions that are not inconsistent with the Plan and that the Committee deems appropriate for inclusion in the applicable Stock Unit Agreement (including without limitation any performance conditions). The provisions of the various Stock Unit Agreements entered into under the Plan need not be identical. Stock Units may be granted in consideration of a reduction in the Participant's other compensation.

(b) Number of Shares. Each Stock Unit Agreement shall specify the number of Shares to which the Stock Unit Grant pertains and shall be subject to adjustment of such number in accordance with Section 11.

(c) Payment for Stock Units. Stock Units shall be issued without consideration.

(d) Vesting Conditions. Each Award of Stock Units may or may not be subject to vesting. Any such vesting provision may provide that Shares shall vest based on Service over time or shall vest, in full or in installments, upon satisfaction of performance conditions specified in the Stock Unit Agreement which may include Performance Goals pursuant to Section 4(e). Unless the applicable Stock Unit Agreement provides otherwise, each Stock Unit shall vest with respect to 20% of the Shares subject to the Stock Unit upon completion of each year of Service on each of the first through fifth annual anniversaries of the vesting commencement date. A Stock Unit Agreement may provide for accelerated vesting in the event of the Participant's death, Disability, or other events.

(e) Voting and Dividend Rights. The holders of Stock Units shall have no voting rights. Prior to settlement or forfeiture, any Stock Unit awarded under the Plan may, at the Committee's discretion, carry with it a right to dividend equivalents. Such right entitles the holder to be credited with an amount equal to all cash dividends paid on one Share while the Stock Unit is outstanding. Dividend equivalents may be converted into additional Stock Units. Settlement of dividend equivalents may be made in the form of cash, in the form of Shares, or in a combination of both. Prior to distribution, any dividend equivalents shall be subject to the same conditions and restrictions as the Stock Units to which they attach and may not be paid until the applicable conditions and restrictions, including any performance conditions, are satisfied.

(f) Form and Time of Settlement of Stock Units. Settlement of vested Stock Units may be made in the form of (a) cash, (b) Shares or (c) any combination of both, as determined by the Committee at the time of the grant of the Stock Units, in its sole discretion. Methods of converting Stock Units into cash may include (without limitation) a method based on the average Fair Market Value of Shares over a series of trading days. Vested Stock Units may be settled in a lump sum or in installments. The distribution may occur or commence when the vesting conditions applicable to the Stock Units have been satisfied or have lapsed, or it may be deferred, in accordance with applicable law, to any later date. The amount of a deferred distribution may be increased by an interest factor or by dividend equivalents. Until an Award of Stock Units is settled, the number of such Stock Units shall be subject to adjustment pursuant to Section 11.

(g) Creditors' Rights. A holder of Stock Units shall have no rights other than those of a general creditor of the Company. Stock Units represent an unfunded and unsecured obligation of the Company, subject to the terms and conditions of the applicable Stock Unit Agreement.

(h) Modification or Assumption of Stock Units. Within the limitations of the Plan, the Committee may modify or assume outstanding stock units or may accept the cancellation of outstanding stock units (including stock units granted by another issuer) in return for the grant of new Stock Units for the same or a different number of Shares and with the same or different vesting provisions. Notwithstanding the preceding sentence or anything to the contrary herein, the Committee may not modify an outstanding Stock Unit such that the modification shall, without the consent of the Participant, impair his or her rights or obligations under such Stock Unit, unless such modification is necessary or desirable to comply with any applicable law, regulation or rule.

(i) Assignment or Transfer of Stock Units. Except as provided in the applicable Stock Unit Agreement, and then only to the extent permitted by applicable law, Stock Units shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily, involuntarily or by operation of law. Any act in violation of this Section 10(i) shall be void. However, this Section 10(i) shall not preclude a Participant from designating a beneficiary who will receive any outstanding vested Stock Units in the event of the Participant's death, nor shall it preclude a transfer of vested Stock Units by will or by the laws of descent and distribution.

**SECTION 11.** <u>PROTECTION AGAINST DILUTION</u> .

(a) Adjustments. In the event of a subdivision of the outstanding Shares, a declaration of a dividend payable in Shares, a declaration of a dividend payable in a form other than Shares in an amount that has a material effect on the price of Shares, a combination or consolidation of the outstanding Shares (by reclassification or otherwise) into a lesser number of Shares, a recapitalization, a spin-off or a similar occurrence, the Committee shall make appropriate adjustments to the following:

(i) the number of Shares and the kind of shares or securities available for future Awards under Section 5;

(ii) the limits on Awards specified in Section 5;

(iii) the number of Shares and the kind of shares or securities covered by each outstanding Award; or

(iv) the Exercise Price under each outstanding SAR or Option.

(b) Participant Rights. Except as provided in this Section 11, a Participant shall have no rights by reason of any issue by the Company of stock of any class or securities convertible into stock of any class, any subdivision or consolidation of shares of stock of any class, the payment of any stock dividend or any other increase or decrease in the number of shares of stock of any class. If by reason of an adjustment pursuant to this Section 11 a Participant's Award covers additional or different shares of stock or securities, then such additional or different shares and the Award in respect thereof shall be subject to all of the terms, conditions and restrictions which were applicable to the Award and the Shares subject to the Award prior to such adjustment.

(c) Fractional Shares. Any adjustment of Shares pursuant to this Section 11 shall be rounded down to the nearest whole number of Shares. Under no circumstances shall the Company be required to authorize or issue fractional shares and no consideration shall be provided as a result of any fractional shares not being issued or authorized.

## SECTION 12. EFFECT OF A CORPORATE TRANSACTION .

(a) Corporate Transaction. In the event that the Company is a party to a Corporate Transaction, outstanding Awards shall be subject to the applicable agreement of merger, reorganization, or sale of assets. Such agreement may provide, without limitation, for the assumption or substitution of outstanding Options, SARs, or Stock Units by the surviving corporation or its parent, for the assumption of outstanding Stock Grant Agreements by the surviving corporation or its parent, for the replacement of outstanding Options, SARs, and Stock Units with a cash incentive program of the surviving corporation which preserves the spread existing on the unvested portions of such outstanding Awards at the time of the transaction and provides for subsequent payout in accordance with the same vesting provisions applicable to those Awards, for accelerated vesting of outstanding Awards, or for the cancellation of outstanding Options, SARs, and Stock Units, with or without consideration, in all cases without the consent of the Participant.

(b) Acceleration. The Committee may determine, at the time of grant of an Award or thereafter, that such Award shall become fully vested as to all Shares subject to such Award in the event that a Corporate Transaction or a Change in Control occurs. Unless otherwise provided in the applicable Award agreement, in the event that a Corporate Transaction occurs and any outstanding Options, SARs or Stock Units are not assumed, substituted, or replaced with a cash incentive program pursuant to Section 12(a) or any outstanding Stock Grant Agreements are not assumed pursuant to Section 12(a), then such Awards shall fully vest and be fully exercisable immediately prior to such Corporate Transaction. Immediately following the consummation of a Corporate Transaction, all outstanding Options, SARs and Stock Units shall terminate and cease to be outstanding, except to the extent that they are assumed by the surviving corporation or its parent.

(c) Dissolution. To the extent not previously exercised or settled, Options, SARs and Stock Units shall terminate immediately prior to the dissolution or liquidation of the Company.

## SECTION 13. LIMITATIONS ON RIGHTS .

(a) No Entitlements. A Participant's rights, if any, in respect of or in connection with any Award is derived solely from the discretionary decision of the Company to permit the individual to participate in the Plan and to benefit from a discretionary Award. By accepting an Award under the Plan, a Participant expressly acknowledges that there is no obligation on the part of the Company to continue the Plan and/or grant any additional Awards. Any Award granted hereunder is not intended to be compensation of a continuing or recurring nature, or part of a Participant's normal or expected compensation, and in no way represents any portion of a Participant's salary, compensation, or other remuneration for purposes of pension benefits, severance, redundancy, resignation or any other purpose.

Neither the Plan nor any Award granted under the Plan shall be deemed to give any individual a right to remain an employee, consultant or director of the Company, a Parent, a Subsidiary or an Affiliate. The Company and its Parents and Subsidiaries and Affiliates reserve the right to terminate the Service of any person at any time, and for any reason, subject to applicable laws, the Company's Articles of Incorporation and Bylaws and a written employment agreement (if any), and such terminated person shall be deemed irrevocably to have waived any claim to damages or specific performance for breach of contract or dismissal, compensation for loss of office, tort or otherwise with respect to the Plan or any outstanding Award that is forfeited and/or is terminated by its terms or to any future Award.

(b) Shareholders' Rights. A Participant shall have no dividend rights, voting rights or other rights as a shareholder with respect to any Shares covered by his or her Award prior to the issuance of such Shares (as evidenced by an appropriate entry on the books of the Company or a duly authorized transfer agent of the Company). No adjustment shall be made for cash dividends or other rights for which the record date is prior to the date when such Shares are issued, except as expressly provided in Section 11.

(c) Regulatory Requirements. Any other provision of the Plan notwithstanding, the obligation of the Company to issue Shares or other securities under the Plan shall be subject to all applicable laws, rules and regulations and such approval by any regulatory body as may be required. The Company reserves the right to restrict, in whole or in part, the delivery of Shares or other securities pursuant to any Award prior to the satisfaction of all legal requirements relating to the issuance of such Shares or other securities, to  their registration, qualification or listing or to an exemption from registration, qualification or listing.

## SECTION 14. WITHHOLDING TAXES .

(a) General. A Participant shall make arrangements satisfactory to the Company for the satisfaction of any withholding tax obligations that arise in connection with his or her Award. The Company shall not be required to issue any Shares or make any cash payment under the Plan until such obligations are satisfied.

(b) Share Withholding. If a public market for the Company's Shares exists, the Committee may permit a Participant to satisfy all or part of his or her withholding or income tax obligations by having the Company withhold all or a portion of any Shares that otherwise would be issued to him or her or by surrendering or attesting to all or a portion of any Shares that he or she previously acquired. Such Shares shall be valued based on the value of the actual trade or, if there is none, the Fair Market Value as of the previous day. Any payment of taxes by assigning Shares to the Company may be subject to restrictions, including, but not limited to, any restrictions required by rules of the SEC. The Committee may, in its discretion, also permit a Participant to satisfy withholding or income tax obligations related to an Award through Cashless Exercise or through a sale of Shares underlying the Award.

## SECTION 15. <u>DURATION AND AMENDMENTS</u> .

(a) Term of the Plan. The Plan shall become effective upon its approval by Company shareholders. The Plan shall terminate at the Company's 2021 Annual Meeting of Shareholders and may be terminated on any earlier date pursuant to this Section 15.

(b) Right to Amend or Terminate the Plan. The Board may amend or terminate the Plan at any time and for any reason. The termination of the Plan, or any amendment thereof, shall not impair the rights or obligations of any Participant under any Award previously granted under the Plan without the Participant's consent, unless such modification is necessary or desirable to comply with any applicable law, regulation or rule. No Awards shall be granted under the Plan after the Plan's termination. An amendment of the Plan shall be subject to the approval of the Company's shareholders only to the extent such approval is otherwise required by applicable laws, regulations or rules.

**(For Grants Prior to September 2008)**

**CISCO SYSTEMS, INC.**
**<u>NOTICE OF GRANT OF STOCK OPTION</u>**

Notice is hereby given of the following option grant (the "Option") made to purchase shares of Cisco Systems, Inc. (the "Company") common stock:

Optionee: _____

Grant Date: _____


Type of Option:     _____ Incentive Stock Option

                    _____ Nonstatutory Stock Option

Grant Number: _____

Number of Option Shares: _____ shares

Exercise Price: $ _____ per share

Vesting Commencement Date: _____

Expiration Date: _____

**<u>Exercise Schedule</u>**

The Option shall vest and become exercisable with respect to (i) twenty percent (20%) of the Option Shares upon Optionee's completion of one (1) year of Service measured from the Vesting Commencement Date and (ii) the balance of the Option Shares in a series of forty-eight (48) successive equal monthly installments upon Optionee's completion of each additional month of Service over the forty-eight (48)-month period measured from the first annual anniversary of the Vesting Commencement Date. In no event shall the Option vest and become exercisable for any additional Option Shares after Optionee's cessation of Service.

Should Optionee request a reduction to his or her work commitment to less than thirty (30) hours per week, then the Committee shall have the right, to extend the period over which the Option shall thereafter vest and become exercisable for the Option Shares during the remainder of the Option term. The decision whether or not to approve Optionee's request for any reduced work commitment shall be at the sole discretion of the Company. In no event shall any extension of the Exercise Schedule for the Option Shares result in the extension of the Expiration Date of the Option.

Optionee understands and agrees that the Option is offered subject to and in accordance with the terms of the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). Optionee further agrees to be bound by the terms of the Plan and the terms of the Option as set forth in the Stock Option Agreement attached hereto.

**<u>No Employment or Service Contract</u>** . Nothing in this Notice or in the attached Stock Option Agreement or in the Plan shall confer upon Optionee any right to continue in Service for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company (or any Parent or Subsidiary employing or retaining Optionee) or of Optionee, which rights are hereby expressly reserved by each, to terminate Optionee's Service at any time for any reason, with or without cause.

**<u>Definitions</u>** . All capitalized terms in this Notice shall have the meaning assigned to them in this Notice, the attached Stock Option Agreement or the Plan.

## STOCK OPTION AGREEMENT

**Recitals**

A. The Board has adopted the Plan for the purpose of retaining the services of selected Employees, non-employee members of the Board or of the board of directors of any Parent or Subsidiary and Consultants and other independent advisors who provide services to the Company (or any Parent or Subsidiary).

B. Optionee is to render valuable services to the Company (or a Parent or Subsidiary), and this Agreement is executed pursuant to, and is intended to carry out the purposes of, the Plan in connection with the Company's grant of an option to Optionee.

C. All capitalized terms in this Agreement shall have the meaning assigned to them in this Agreement, the attached Notice of Grant of Stock Option (the " Notice"), or the Plan.

**NOW, THEREFORE** , it is hereby agreed as follows:

**1. Grant of Option** . The Company hereby grants to Optionee, as of the Grant Date, an option to purchase up to the number of Option Shares specified in the Notice. The Option Shares shall be purchasable from time to time during the Option term specified in Paragraph 2 at the Exercise Price specified in the Notice.

**2. Option Term** . This Option shall have a maximum term of nine (9) years measured from the Grant Date and shall accordingly expire at the close of business on the Expiration Date, unless sooner terminated in accordance with Paragraph 4, 5 or 6.

**3. Non-Transferability** . This Option shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law. Notwithstanding the foregoing, should the Optionee die while holding this Option, then this Option shall be transferred in accordance with Optionee's will or the laws of descent and distribution.

**4. Dates of Exercise** . This Option shall vest and become exercisable for the Option Shares in one or more installments as specified in the Notice. As the Option becomes exercisable for such installments, those installments shall accumulate and the Option shall remain exercisable for the accumulated installments until the Expiration Date or sooner termination of the Option term under Paragraph 5 or 6. As an administrative matter, the exercisable portion of this Option may only be exercised until the close of the Nasdaq Global Select Market on the Expiration Date or the earlier termination date under Paragraph 5 or 6 or, if such date is not a trading day on the Nasdaq Global Select Market, the last trading day before such date. Any later attempt to exercise this Option will not be honored. For example, if Optionee ceases to remain in Service as provided in Paragraph 5(i) and the date three (3) months from the date of cessation is Monday, July 4 (a holiday on which the Nasdaq Global Select Market is closed), Optionee must exercise the exercisable portion of this Option by 4 pm Eastern Daylight Time on Friday, July 1.

**5. Cessation of Service** . The Option term specified in Paragraph 2 shall terminate (and this Option shall cease to be outstanding) prior to the Expiration Date should any of the following provisions become applicable:

(i) Should Optionee cease to remain in Service for any reason (other than death, Disability or Cause) while this Option is outstanding, then Optionee shall have a period of three (3) months (commencing with the date of such cessation of Service) during which to exercise this Option, but in no event shall this Option be exercisable at any time after the Expiration Date.

(ii) If Optionee dies while this Option is outstanding, then the personal representative of Optionee's estate or the person or persons to whom the Option is transferred pursuant to Optionee's will or in accordance with the laws of descent and distribution shall have the right to exercise this Option. Such right shall lapse, and this Option shall cease to be outstanding, upon the earlier of (A) the expiration of the eighteen (18)- month period measured from the date of Optionee's death or (B) the Expiration Date.

(iii) Should Optionee cease Service by reason of Disability while this Option is outstanding, then Optionee shall have a period of eighteen (18) months (commencing with the date of such cessation of Service) during which to exercise this Option, but in no event shall this Option be exercisable at any time after the Expiration Date.

(iv) Optionee's date of cessation of Service shall mean the date upon which Optionee ceases active performance of services for the Company following the provision of such notification of termination or resignation from Service and shall be determined solely by this Agreement and without reference to any other agreement, written or oral, including Optionee's contract of employment, and shall not otherwise include any period of notice of termination of employment, whether expressed or implied.

(v) During the limited period of post-Service exercisability, this Option may not be exercised in the aggregate for more than the number of vested Option Shares for which the Option is exercisable at the time of Optionee's cessation of Service. Upon the expiration of such limited exercise period or (if earlier) upon the Expiration Date, this Option shall terminate and cease to be outstanding for any vested Option Shares for which the Option has not been exercised. However, this Option shall, immediately upon Optionee's cessation of Service for any reason, terminate and cease to be outstanding with respect to any Option Shares in which Optionee is not otherwise at that time vested or for which this Option is not otherwise at that time exercisable.

(vi) Should Optionee's Service be terminated for Cause or should Optionee otherwise engage in activities constituting Cause while this Option is outstanding, then this Option shall terminate immediately and cease to remain outstanding. In the event Optionee's Service with the Company is suspended pending an investigation of whether Optionee's Service will be terminated for Cause, all Optionee's rights under the Option, including the right to exercise the Option, shall be suspended during the investigation period.

## 6. <u>Special Acceleration of Option</u>

(a) This Option, to the extent outstanding at the time of a Corporate Transaction but not otherwise fully vested and exercisable, shall automatically accelerate so that this Option shall, immediately prior to the effective date of the Corporate Transaction, become vested and exercisable for all of the Option Shares at the time subject to this Option and may be exercised for any or all of those Option Shares as fully-vested Shares. No such acceleration of this Option, however, shall occur if and to the extent: (i) this Option is, in connection with the Corporate Transaction, either assumed by the successor corporation (or parent thereof) or replaced with a comparable option to purchase shares of the capital stock of the successor corporation (or parent thereof) or (ii) this Option is replaced with a cash incentive program of the successor corporation which preserves the spread existing on the unvested Option Shares at the time of the Corporate Transaction (the excess of the Fair Market Value of those Option Shares over the aggregate Exercise Price payable for such Shares) and provides for subsequent pay-out in accordance with the same Exercise Schedule set forth in the Notice. The determination of option comparability under clause (i) shall be made by the Committee, and such determination shall be final, binding and conclusive.

(b) Immediately following the effective date of the Corporate Transaction, this Option shall terminate and cease to be outstanding, except to the extent assumed by the successor corporation (or parent thereof) in connection with the Corporate Transaction.

(c) If this Option is assumed in connection with a Corporate Transaction, then the Committee shall appropriately adjust the number of shares and the kind of shares or securities covered by the Option and the Exercise Price immediately after such Corporate Transaction, provided the aggregate Exercise Price shall remain the same.

(d) This Option, to the extent outstanding at the time of a Change in Control but not otherwise fully vested and exercisable, shall automatically accelerate so that this Option shall, immediately prior to the effective date of the Change in Control, become vested and exercisable for all of the Option Shares at the time subject to this Option and may be exercised for any or all of those Option Shares as fully-vested Shares. This Option shall remain so exercisable until the Expiration Date or sooner termination of the Option term.

(e) This Agreement shall not in any way affect the right of the Company to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate or sell or transfer all or any part of its business or assets.

## 7. <u>Adjustment in Option Shares</u> . In the event of a subdivision of the outstanding Shares, a declaration of a dividend payable in Shares, a declaration of a dividend payable in a form other than Shares in an amount that has a material effect on the price of Shares, a combination or consolidation of the outstanding Shares (by reclassification or otherwise) into a lesser number of Shares, a recapitalization, a spin-off or a similar occurrence, appropriate adjustments shall be made to (i) the total number and/or kind of shares or securities subject to this Option and (ii) the Exercise Price in order to reflect such change and thereby preclude a dilution or enlargement of benefits hereunder.

## 8. <u>Shareholder Rights</u> . The holder of this Option shall not have any shareholder rights with respect to the Option Shares until such person shall have exercised the Option, paid the Exercise Price and become a holder of record of the purchased Shares.

## 9. <u>Manner of Exercising Option</u> .

(a) In order to exercise this Option with respect to all or any part of the Option Shares for which this Option is at the time exercisable, Optionee (or any other person or persons exercising the Option) must take the following actions:

(i) Pay the aggregate Exercise Price for the purchased Shares in one or more of the following forms:

(A) cash or check which, in the Company's sole discretion, shall be made payable to a Company-designated brokerage firm or the Company;

(B) as permitted by applicable law, through a special sale and remittance procedure pursuant to which Optionee (or any other person or persons exercising the Option) shall concurrently provide irrevocable written instructions (I) to a Company-designated brokerage firm (or in the case of an executive officer or Board member of the Company, an Optionee-designated brokerage firm) to effect the immediate sale of the purchased Shares and remit to the Company, out of the sale proceeds available on the settlement date, sufficient funds to cover the aggregate Exercise Price payable for the purchased Shares plus, if applicable, the amount necessary to satisfy the Company's withholding obligations at the minimum statutory withholding rates and (II) to the Company to deliver the certificates for the purchased Shares directly to such brokerage firm in order to complete the sale transaction; and

(C) a promissory note payable to the Company, but only to the extent authorized by the Committee in accordance with Paragraph 13.

(ii) Furnish to the Company appropriate documentation that the person or persons exercising the Option (if other than Optionee) have the right to exercise this Option.

(iii) Make appropriate arrangements with the Company (or Parent or Subsidiary employing or retaining Optionee) for the satisfaction of all tax withholding requirements applicable to the Option exercise.

(b) As soon as practical after the exercise date, the Company shall issue to or on behalf of Optionee (or any other person or persons exercising this Option) the purchased Option Shares (as evidenced by an appropriate entry on the books of the Company or a duly authorized transfer agent of the Company), subject to the appropriate legends and/or stop transfer instructions.

(c) In no event may this Option be exercised for any fractional Shares.

(d) Notwithstanding any other provisions of the Plan, this Agreement or any other agreement to the contrary, if at the time this Option is exercised, Optionee is indebted to the Company (or any Parent or Subsidiary) for any reason, the following actions shall be taken, as deemed appropriate by the Committee:

(i) any Shares to be issued upon such exercise shall automatically be pledged against Optionee's outstanding indebtedness; and

(ii) if this Option is exercised in accordance with subparagraph 9(a)(i)(B) above, the after tax proceeds of the sale of Optionee's Shares shall automatically be applied to the outstanding balance of Optionee's indebtedness.

**10. Compliance with Laws and Regulations** .

(a) The exercise of this Option and the issuance of the Option Shares upon such exercise shall be subject to compliance by the Company and Optionee with all applicable laws, regulations and rules relating thereto, including all applicable regulations of any stock exchange (or the Nasdaq Global Select Market, if applicable) on which the Shares may be listed for trading at the time of such exercise and issuance.

(b) The inability of the Company to obtain approval from any regulatory body having authority deemed by the Company to be necessary to the lawful issuance and sale of any Shares pursuant to this Option shall relieve the Company of any liability with respect to the non-issuance or sale of the Shares as to which such approval shall not have been obtained. The Company, however, shall use its best efforts to obtain all such approvals.

**11. Successors and Assigns** . Except to the extent otherwise provided in Paragraphs 3 and 6, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Company and its successors and assigns and Optionee, Optionee's assigns and the legal representatives, heirs and legatees of Optionee's estate.

**12. Notices** . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to the Optionee at the address maintained for the Optionee in the Company's records or, in either case, as subsequently modified by written notice to the other party.

**13. Financing** . The Committee may, in its absolute discretion and without any obligation to do so, permit Optionee to pay the Exercise Price for the purchased Option Shares by delivering a full-recourse promissory note payable to the Company. The terms of any such promissory note (including the interest rate, the requirements for collateral and the terms of repayment) shall be established by the Committee in its sole discretion.

**14. Construction** . The Notice, this Agreement, and the Option evidenced hereby (a) are made and granted pursuant to the Plan and are in all respects limited by and subject to the terms of the Plan, and (b) constitute the entire agreement between Optionee and the Company on the subject matter hereof and supercede all proposals, written or oral, and all other communications between the parties related to the subject matter. All decisions of the Committee with respect to any question or issue arising under the Notice, this Agreement or the Plan shall be conclusive and binding on all persons having an interest in this Option.

**15. Governing Law** . The interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of California without resort to the conflict of laws principles thereof.

**16. Excess Shares** . If the Option Shares covered by this Agreement exceed, as of the Grant Date, the number of Shares which may without shareholder approval be issued under the Plan, then this Option shall be void with respect to those excess shares, unless shareholder approval of an amendment sufficiently increasing the number of Shares issuable under the Plan is obtained in accordance with the provisions of the Plan and all applicable laws, regulations and rules.

**17. Additional Terms Applicable to an Incentive Stock Options** . In the event this Option is designated an Incentive Stock Option in the Notice, the following terms and conditions shall also apply to the Option:

(a) This Option shall cease to qualify for favorable tax treatment as an Incentive Stock Option if (and to the extent) this Option is exercised for one or more Option Shares: (A) more than three (3) months after the date Optionee ceases to be an Employee for any reason other than death or Disability or (B) more than twelve (12) months after the date Optionee ceases to be an Employee by reason of Disability.

(b) Even if this Option is designated as an Incentive Stock Option, if the Shares subject to this Option (and all other Incentive Stock Options granted to Optionee by the Company or any Parent or Subsidiary, including under other plans of the Company) that first become exercisable in any calendar year have an aggregate Fair Market Value (determined for each Share as of the date of grant of the option covering such Share) in excess of $100,000, the Shares in excess of $100,000 shall be treated as subject to a Nonstatutory Stock Option in accordance all applicable laws, regulations and rules.

**18. Leave of Absence .** Unless otherwise determined by the Committee, the following provisions shall apply upon the Optionee's commencement of an authorized leave of absence:

(a) The Exercise Schedule in effect under the Notice shall be frozen as of the first day of the authorized leave, and this Option shall not become exercisable for any additional installments of the Option Shares during the period Optionee remains on such leave.

(b) If the Option is designated as an Incentive Stock Option in the Notice and if the leave of absence continues for more than ninety (90) days, then this Option shall automatically convert to a Nonstatutory Stock Option at the end of the three (3)-month period measured from the ninety-first (91st) day of such leave, unless the Optionee's right to return to active work is guaranteed by law or by a contract.

(c) In no event shall this Option become exercisable for any additional Option Shares or otherwise remain outstanding if Optionee does not resume Service prior to the Expiration Date of the Option term.

**19. Further Instruments .** The parties agree to execute such further instruments and to take such further action as may be reasonably necessary to carry out the purposes and intent of this Agreement.

**20. Authorization to Release Necessary Personal Information .**

(a) Optionee hereby authorizes and directs Optionee's employer to collect, use and transfer in electronic or other form, any personal information (the "Data") regarding Optionee's employment, the nature and amount of Optionee's compensation and the fact and conditions of Optionee's participation in the Plan (including, but not limited to, Optionee's name, home address, telephone number, date of birth, social security number (or any other social or national identification number), salary, nationality, job title, number of Shares held and the details of all options or any other entitlement to Shares awarded, cancelled, exercised, vested, unvested or outstanding) for the purpose of implementing, administering and managing Optionee's participation in the Plan. Optionee understands that the Data may be transferred to the Company or any of its Subsidiaries, or to any third parties assisting in the implementation, administration and management of the Plan, including any requisite transfer to a broker or other third party assisting with the exercise of Options under the Plan or with whom Shares acquired upon exercise of this Option or cash from the sale of such shares may be deposited. Optionee acknowledges that recipients of the Data may be located in different countries, and those countries may have data privacy laws and protections different from those in the country of Optionee's residence. Furthermore, Optionee acknowledges and understands that the transfer of the Data to the Company or any of its Subsidiaries, or to any third parties is necessary for Optionee's participation in the Plan.

(b) Optionee may at any time withdraw the consents herein, by contacting Optionee's local human resources representative in writing. Optionee further acknowledges that withdrawal of consent may affect Optionee's ability to exercise or realize benefits from the Option, and Optionee's ability to participate in the Plan.

**21. No Entitlement or Claims for Compensation .**

(a) Optionee's rights, if any, in respect of or in connection with this Option or any other Award is derived solely from the discretionary decision of the Company to permit Optionee to participate in the Plan and to benefit from a discretionary Award. By accepting this Option, Optionee expressly acknowledges that there is no obligation on the part of the Company to continue the Plan and/or grant any additional Awards to Optionee. This Option is not intended to be compensation of a continuing or recurring nature, or part of Optionee's normal or expected compensation, and in no way represents any portion of a Optionee's salary, compensation, or other remuneration for purposes of pension benefits, severance, redundancy, resignation or any other purpose.

(b) Neither the Plan nor this Option or any other Award granted under the Plan shall be deemed to give Optionee a right to remain an Employee, Consultant or director of the Company, a Parent or a Subsidiary or an Affiliate. The Company and its Parents and Subsidiaries and Affiliates reserve the right to terminate the Service of Optionee at any time, with or without cause, and for any reason, subject to applicable laws, the Company's Articles of Incorporation and Bylaws and a written employment agreement (if any), and Optionee shall be deemed irrevocably to have waived any claim to damages or specific performance for breach of contract or dismissal, compensation for loss of office, tort or otherwise with respect to the Plan, this Option or any outstanding Award that is forfeited and/or is terminated by its terms or to any future Award.

(c) Optionee agrees that the Company may require Options granted hereunder be exercised with, and the Option Shares held by, a broker designated by the Company. In addition, Optionee agrees that his or her rights hereunder shall be subject to set-off by the Company for any valid debts the Optionee owes to the Company.

**(For Grants Beginning in September 2008)**

**CISCO SYSTEMS, INC.**
**NOTICE OF GRANT OF STOCK OPTION**

Notice is hereby given of the following option grant (the "Option") made to purchase shares of Cisco Systems, Inc. (the "Company") common stock:

Optionee: _____

Grant Date: _____

Type of Option: U.S. Nonstatutory Stock Option

Grant Number: _____

Number of Option Shares: _____shares

Exercise Price: $ _____per share

First Vest Date: _____

Expiration Date: _____

**Exercise Schedule** . So long as Optionee's Service continues, the Option shall vest and become exercisable with respect to (i) _____ percent ( ___%) of the option shares, as set forth above (the "Option Shares") on the First Vest Date as set forth above and (ii) the balance of the Option Shares in _____installments upon Optionee's completion of each additional _____of Service over the _____period measured from the _____First Vest Date. In no event shall the Option vest and become exercisable for any additional Option Shares after Optionee's cessation of Service.

Should Optionee request a reduction to his or her work commitment to less than thirty (30) hours per week, then the Company shall have the right to extend the period over which the Option shall thereafter vest and become exercisable for the Option Shares during the remainder of the Option term to the extent permitted under local law. In no event shall any extension of the exercise schedule, as set forth above ("Exercise Schedule") for the Option Shares result in the extension of the expiration date, as set forth above, ("Expiration Date") of the Option.

Optionee understands and agrees that the Option is offered subject to and in accordance with the terms of the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). Optionee further agrees to be bound by the terms of the Plan and the terms of the Option as set forth in the Stock Option Agreement (the "Agreement") attached hereto.

**No Employment or Service Contract** . Nothing in this Notice or in the attached Agreement or in the Plan shall confer upon Optionee any right to continue in Service for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company (or any Parent, Subsidiary or Affiliate employing or retaining Optionee) or of Optionee, which rights are hereby expressly reserved by each, to terminate Optionee's Service at any time for any reason, with or without cause to the extent permissible under local law.

**Definitions** . All capitalized terms in this Notice shall have the meaning assigned to them in this Notice, the attached Agreement or the Plan.

**STOCK OPTION AGREEMENT**

**Recitals**

A. The Board has adopted the Plan for the purpose of retaining the services of selected Employees, non-employee members of the Board and Consultants.

B. Optionee is to render valuable services to the Company (or a Parent, Subsidiary or Affiliate), and this Agreement is executed pursuant to, and is intended to carry out the purposes of, the Plan in connection with the Company's grant of an option to Optionee.

C. All capitalized terms in this Agreement shall have the meaning assigned to them in this Agreement, the attached Notice of Grant of Stock Option (the "Notice"), or the Plan.

**NOW, THEREFORE** , it is hereby agreed as follows:

**1. Grant of Option** . The Company hereby grants to Optionee, as of the grant date, as set forth in the Notice, (the "Grant Date") an option to purchase up to the number of Option Shares specified in the Notice. The Option Shares shall be purchasable from time to time during the Option term specified in Paragraph 2 at the Exercise Price specified in the Notice.

**2. Option Term** . This Option shall have a maximum term of _____ years [not to exceed ten (10) years] measured from the Grant Date and shall accordingly expire at the close of business on the Expiration Date, unless sooner terminated in accordance with Paragraph 4, 5 or 6.

**3. Non-Transferability** . This Option shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law. Notwithstanding the foregoing, should the Optionee die while holding this Option, then this Option shall be transferred in accordance with Optionee's will or the laws of descent and distribution.

**4. Dates of Exercise** . This Option shall vest and become exercisable for the Option Shares in one or more installments as specified in the Notice. As the Option becomes exercisable for such installments, those installments shall accumulate and the Option shall remain exercisable for the accumulated installments until the Expiration Date or sooner termination of the Option term under Paragraph 5 or 6. As an administrative matter, the exercisable portion of this Option may only be exercised until the close of the Nasdaq Global Select Market on the Expiration Date or the earlier termination date under Paragraph 5 or 6, or, if such date is not a trading day on the Nasdaq Global Select Market, the last trading day before such date. Any later attempt to exercise this Option will not be honored. For example, if Optionee ceases to remain in Service as provided in Paragraph 5(i) and the date three (3) months from the date of cessation is Monday, July 4 (a holiday on which the Nasdaq Global Select Market is closed), Optionee must exercise the exercisable portion of this Option by 4:00 p.m. Eastern Daylight Time on Friday, July 1.

**5. Cessation of Service** . The Option term specified in Paragraph 2 shall terminate (and this Option shall cease to be outstanding) prior to the Expiration Date should any of the following provisions become applicable:

(i) Should Optionee cease to remain in Service for any reason (other than death, Disability or Cause and whether or not in breach of local labor laws) while this Option is outstanding, then Optionee shall have a period of three (3) months (commencing with the date of such cessation of Service) during which to exercise this Option, but in no event shall this Option be exercisable at any time after the Expiration Date.

(ii) If Optionee dies while this Option is outstanding, then the Optionee's designated beneficiary or, if no beneficiary was designated or properly designated or, if no designated beneficiary survives the Optionee, the Optionee's estate (to the extent reasonably determinable) or other individual or entity entitled to receive the Option under applicable local law shall have the right to exercise this Option. Such right shall lapse, and this Option shall cease to be outstanding, upon the earlier of (A) the expiration of the eighteen (18) month period measured from the date of Optionee's death or (B) the Expiration Date. Optionee may only make a beneficiary designation with respect to this Option if the Company has approved a process or procedure for such beneficiary designation for the local jurisdiction within which Optionee performs services for the Company or a Parent, Subsidiary or Affiliate. If no such beneficiary designation process or procedure has been approved by the Company, then, in the event of Optionee's death, this Option may only be exercised by the Optionee's estate (to the extent reasonably determinable) or other individual or entity entitled to receive the Option under applicable local law.

(iii) Should Optionee cease Service by reason of Disability while this Option is outstanding, then Optionee shall have a period of eighteen (18) months (commencing with the date of such cessation of Service) during which to exercise this Option, but in no event shall this Option be exercisable at any time after the Expiration Date.

(iv) During the limited period of post-Service exercisability, this Option may not be exercised in the aggregate for more than the number of vested Option Shares for which the Option is exercisable at the date the Optionee ceases to actively provide Service (not extended by any notice period mandated under local law). Upon the expiration of such limited exercise period or (if earlier) upon the Expiration Date, this Option shall terminate and cease to be outstanding for any vested Option Shares for which the Option has not been exercised. However, this Option shall, immediately as of the date the Optionee ceases to actively provide Service for any reason, terminate and cease to be outstanding with respect to any Option Shares in which Optionee is not otherwise at that time vested or for which this Option is not otherwise at that time exercisable.

(v) Should Optionee's Service be terminated for Cause or should Optionee otherwise engage in activities constituting Cause while this Option is outstanding, then this Option shall terminate immediately and cease to remain outstanding. In the event Optionee's Service is suspended pending an investigation of whether Optionee's Service will be terminated for Cause, all Optionee's rights under the Option, including the right to exercise the Option, shall be suspended during the investigation period.

(vi) For purposes of this Paragraph 5, in the event of Optionee's cessation of Service, Optionee's right to receive additional options or to vest in the Option will end as of the date the Optionee is no longer actively providing Service and will not be extended by any notice period mandated under local law ( *e.g* ., active Service would not include any period of "garden leave" or similar period pursuant to local law); the Company shall have the exclusive discretion to determine when an Optionee is no longer actively providing Service for purposes of this Option.

6. **Special Acceleration of Option** .

(a) This Option, to the extent outstanding at the time of a Corporate Transaction but not otherwise fully vested and exercisable, shall automatically accelerate so that this Option shall, immediately prior to the effective date of the Corporate Transaction, become vested and exercisable for all of the Option Shares at the time subject to this Option and may be exercised for any or all of those Option Shares as fully-vested Shares. No such acceleration of this Option, however, shall occur if and to the extent: (i) this Option is, in connection with the Corporate Transaction, either assumed by the successor corporation (or parent thereof) or replaced with a comparable option to purchase shares of the capital stock of the successor corporation (or parent thereof) or (ii) this Option is replaced with a cash incentive program of the successor corporation which preserves the spread existing on the unvested Option Shares at the time of the Corporate Transaction (the excess of the Fair Market Value of those Option Shares over the aggregate Exercise Price payable for such Shares) and provides for subsequent pay-out in accordance with the same Exercise Schedule set forth in the Notice. The determination of option comparability under clause (i) shall be made by the Committee, and such determination shall be final, binding and conclusive.

(b) Immediately following the effective date of the Corporate Transaction, this Option shall terminate and cease to be outstanding, except to the extent assumed by the successor corporation (or parent thereof) in connection with the Corporate Transaction.

(c) If this Option is assumed in connection with a Corporate Transaction, then the Committee shall appropriately adjust the number of shares and the kind of shares or securities covered by the Option and the Exercise Price immediately after such Corporate Transaction, provided the aggregate Exercise Price shall remain the same.

(d) This Option, to the extent outstanding at the time of a Change in Control but not otherwise fully vested and exercisable, shall automatically accelerate so that this Option shall, immediately prior to the effective date of the Change in Control, become vested and exercisable for all of the Option Shares at the time subject to this Option and may be exercised for any or all of those Option Shares as fully-vested Shares. This Option shall remain so exercisable until the Expiration Date or sooner termination of the Option term.

(e) This Agreement shall not in any way affect the right of the Company to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate or sell or transfer all or any part of its business or assets.

7. **Adjustment in Option Shares** . In the event of a subdivision of the outstanding Shares, a declaration of a dividend payable in Shares, a declaration of a dividend payable in a form other than Shares in an amount that has a material effect on the price of Shares, a combination or consolidation of the outstanding Shares (by reclassification or otherwise) into a lesser number of Shares, a recapitalization, a spin-off or a similar occurrence, appropriate adjustments shall be made to (i) the total number and/or kind of shares or securities subject to this Option and (ii) the Exercise Price in order to reflect such change and thereby preclude a dilution or enlargement of benefits hereunder.

8. **Shareholder Rights** . The holder of this Option shall not have any shareholder rights with respect to the Option Shares until such person shall have exercised the Option, paid the Exercise Price and become a holder of record of the purchased Shares.

9. **Manner of Exercising Option** .

(a) In order to exercise this Option with respect to all or any part of the Option Shares for which this Option is at the time exercisable, Optionee (or any other person or persons exercising the Option) must take the following actions:

(i) Pay the aggregate Exercise Price for the purchased Shares in one or more of the following forms:

(A) cash or check which, in the Company's sole discretion, shall be made payable to a Company-designated brokerage firm or the Company; and

(B) as permitted by applicable law, through a special sale and remittance procedure pursuant to which Optionee (or any other person or persons exercising the Option) shall concurrently provide irrevocable written instructions (I) to a Company-designated brokerage firm (or in the case of an executive officer or Board member of the Company, an Optionee-designated brokerage firm) to effect the immediate sale of the purchased Shares and remit to the Company, out of the sale proceeds available on the settlement date, sufficient funds to cover the aggregate Exercise Price payable for the purchased Shares plus, if applicable, the amount necessary to satisfy the Company's (or a Parent's, Subsidiary's or Affiliate's) withholding obligations (including income tax, social taxes or insurance contributions, payroll tax, payment on account or other tax items

related to Optionee's participation in the Plan and legally applicable to Optionee ("Tax-Related Items")) and (II) to the Company to deliver the purchased Shares directly to such brokerage firm in order to complete the sale transaction.

(ii) Furnish to the Company appropriate documentation that the person or persons exercising the Option (if other than Optionee) have the right to exercise this Option.

(iii) Make appropriate arrangements with the Company (or a Parent, Subsidiary or Affiliate employing or retaining Optionee) for the satisfaction of all withholding or other obligations related to Tax-Related Items applicable to the Option grant, vesting, exercise or the sale of Shares, as applicable.

(b) As soon as practical after the exercise date, the Company shall issue to or on behalf of Optionee (or any other person or persons exercising this Option) the purchased Option Shares, (as evidenced by an appropriate entry on the books of the Company or a duly authorized transfer agent of the Company), subject to the appropriate legends and/or stop transfer instructions.

(c) In no event may this Option be exercised for any fractional Shares.

(d) Notwithstanding any other provisions of the Plan, this Agreement or any other agreement to the contrary, if at the time this Option is exercised, Optionee is indebted to the Company (or any Parent, Subsidiary or Affiliate) for any reason, the following actions shall be taken, as deemed appropriate by the Committee:

(i) any Shares to be issued upon such exercise shall automatically be pledged against Optionee's outstanding indebtedness; and

(ii) if this Option is exercised in accordance with subparagraph 9(a)(i)(B) above, the after tax proceeds of the sale of Optionee's Shares shall automatically be applied to the outstanding balance of Optionee's indebtedness.

**10. Responsibility for Taxes** .

(a) Optionee authorizes the Company and/or the Optionee's employer (the "Employer") or their respective agents, at their discretion, to satisfy any obligations related to Tax-Related Items by one or a combination of the following: (1) withholding all applicable Tax-Related Items from Optionee's wages or other cash compensation paid to Optionee by the Company and/or the Employer; (2) withholding from proceeds of the sale of Shares acquired upon exercise of the Option either through a voluntary sale (specifically including where this Option is exercised in accordance with subparagraph 9(a)(i)(B) above) or through a mandatory sale arranged by the Company (on Optionee's behalf pursuant to this authorization); or (3) withholding of Shares that would otherwise be issued upon exercise of the Option. To avoid financial accounting charges under applicable accounting guidance, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding rates or may take any other action required to avoid financial accounting charges under applicable accounting guidance. Finally, Optionee must pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold or account for as a result of Optionee's participation in the Plan or Optionee's purchase of Shares that cannot be satisfied by the means previously described. The Company may refuse to honor the exercise and refuse to issue or deliver the Shares or the proceeds of the sale of the Shares if Optionee fails to comply with Optionee's obligations in connection with the Tax-Related Items as described in this Paragraph.

(b) Regardless of any action the Company or the Employer takes with respect to any or all Tax-Related Items, Optionee acknowledges that the ultimate liability for all Tax-Related Items is and remains Optionee's responsibility and may exceed the amount actually withheld by the Company or the Employer. Optionee further acknowledges that the Company and/or the Employer (1) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Option, including the grant, vesting or exercise of the Option, the subsequent sale of Shares acquired pursuant to such exercise and the receipt of any dividends; and (2) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the Option to reduce or eliminate Optionee's liability for Tax-Related Items or achieve any particular tax result. Further, if Optionee becomes subject to taxation in more than one jurisdiction between the Grant Date and the date of any relevant taxable event, Optionee acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

**11. Compliance with Laws and Regulations** .

(a) The exercise of this Option and the issuance of the Option Shares upon such exercise shall be subject to compliance by the Company and Optionee with all applicable laws, regulations and rules relating thereto, including all applicable regulations of any stock exchange (or the Nasdaq Global Select Market, if applicable) on which the Shares may be listed for trading at the time of such exercise and issuance and all applicable foreign laws.

(b) The inability of the Company to obtain approval from any regulatory body having authority deemed by the Company to be necessary to the lawful issuance and sale of any Shares pursuant to this Option shall relieve the Company of any liability with respect to the non-issuance or sale of the Shares as to which such approval shall not have been obtained.

**12. Successors and Assigns** . Except to the extent otherwise provided in Paragraphs 3, 5 and 6, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Company and its successors and assigns and Optionee, Optionee's assigns and the legal representatives, heirs and legatees of Optionee's estate.

**13. <u>Notices</u>** . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to the Optionee at the address maintained for the Optionee in the Company's records or, in either case, as subsequently modified by written notice to the other party.

**14. <u>Construction</u>** . The Notice, this Agreement, and the Option evidenced hereby (a) are made and granted pursuant to the Plan and are in all respects limited by and subject to the terms of the Plan, and (b) constitute the entire agreement between Optionee and the Company on the subject matter hereof and supercede all proposals, written or oral, and all other communications between the parties related to the subject matter. All decisions of the Committee with respect to any question or issue arising under the Notice, this Agreement or the Plan shall be conclusive and binding on all persons having an interest in this Option. The provisions of this Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

**15. <u>Governing Law and Forum</u>** . This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflict of laws principles thereof. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to litigation in the exclusive jurisdiction of the State of California and agree that any such litigation shall be conducted only in the courts of California or the federal courts for the United States for the Northern District of California and no other courts.

**16. <u>Excess Shares</u>** . If the Option Shares covered by this Agreement exceed, as of the Grant Date, the number of Shares which may without shareholder approval be issued under the Plan, then this Option shall be void with respect to those excess shares, unless shareholder approval of an amendment sufficiently increasing the number of Shares issuable under the Plan is obtained in accordance with the provisions of the Plan and all applicable laws, regulations and rules.

**17. <u>Leave of Absence</u>** . Unless otherwise determined by the Committee, to the extent permitted by local law, the following provisions shall apply upon the Optionee's commencement of an authorized leave of absence:

(a) The Exercise Schedule in effect under the Notice shall be frozen as of the first day of the authorized leave, and this Option shall not become exercisable for any additional installments of the Option Shares during the period Optionee remains on such leave.

(b) In no event shall this Option become exercisable for any additional Option Shares or otherwise remain outstanding if Optionee does not resume Service prior to the Expiration Date of the Option term.

**18. <u>Further Instruments</u>** . The parties agree to execute such further instruments and to take such further action as may be reasonably necessary to carry out the purposes and intent of this Agreement.

**19. <u>Authorization to Release and Transfer Necessary Personal Information</u>** .

*(a) Optionee hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of Optionee's personal information as described in this Agreement by and among, as applicable, the Employer, and the Company and its Parent, Subsidiaries and Affiliates for the exclusive purpose of implementing, administering and managing Optionee's participation in the Plan.*

*(b) Optionee understands that the Company and the Employer may hold certain personal information about Optionee, including, but not limited to, Optionee's name, home address and telephone number, date of birth, social insurance number (or any other social or national identification number), salary, nationality, job title, residency status, any Shares or directorships held in the Company, details of all options or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding (the "Data") for the purpose of implementing, administering and managing the Optionee's participation in the Plan. Optionee understands that Data may be transferred to the Company or any of its Parent, Subsidiaries or Affiliates, or to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in Optionee's country or elsewhere, including outside the European Economic Area, and that the recipient's country (e.g., the United States) may have different data privacy laws and protections than Optionee's country. Optionee understands that Optionee may request a list with the names and addresses of any potential recipients of the Data by contacting Optionee's local human resources representative. Optionee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purposes of implementing, administering and managing Optionee's participation in the Plan, including any requisite transfer of such Data to a broker or other third party assisting with the administration of the Option under the Plan or with whom Shares acquired pursuant to these Options or cash from the sale of such Shares may be deposited. Furthermore, you acknowledge and understand that the transfer of the Data to the Company or any of its Parent, Subsidiaries or Affiliates, or to any third parties is necessary for your participation in the Plan.*

*(c) Optionee understands that Data will be held only as long as is necessary to implement, administer and manage Optionee's participation in the Plan. Optionee understands that Optionee may, at any time, view the Data, request additional information about the storage and processing of the Data, require any necessary amendments to the Data or refuse or withdraw the consents herein by contacting Optionee's local human resources representative in writing. Optionee further acknowledges that withdrawal of consent may affect Optionee's ability to vest in or realize benefits from the Options, and Optionee's ability to participate in the Plan. For more*

*information on the consequences of Optionee's refusal to consent or withdrawal of consent, Optionee understands that Optionee may contact Optionee's local human resources representative.*

20. <u>**No Entitlement or Claims for Compensation**</u> .

(a) Optionee's rights, if any, in respect of or in connection with this Option or any other Award are derived solely from the discretionary decision of the Company to permit Optionee to participate in the Plan and to benefit from a discretionary Award. The Plan may be amended, suspended or terminated by the Company at any time, unless otherwise provided in the Plan and this Agreement. By accepting this Option, Optionee expressly acknowledges that there is no obligation on the part of the Company to continue the Plan and/or grant any additional Awards to Optionee or benefits in lieu of Options or any other Awards even if Options have been granted repeatedly in the past. All decisions with respect to future Option grants, if any, will be at the sole discretion of the Committee.

(b) This Option and the Shares subject to the Option are not intended to replace any pension rights or compensation and are not to be considered compensation of a continuing or recurring nature, or part of Optionee's normal or expected compensation, and in no way represent any portion of Optionee's salary, compensation or other remuneration for any purpose, including but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end of service payments, bonuses, long-service awards, pension or retirement benefits or similar payments, and in no event should be considered as compensation for, or relating in any way to, past services for the Company, the Employer or any Parent, Subsidiary or Affiliate. The value of the Option and the Shares subject to the Option are an extraordinary item that do not constitute compensation of any kind for services of any kind rendered to the Company, the Employer or any Parent, Subsidiary or Affiliate and which are outside the scope of Optionee's written employment agreement (if any).

(c) Optionee acknowledges that he or she is voluntarily participating in the Plan.

(d) Neither the Plan nor this Option or any other Award granted under the Plan shall be deemed to give Optionee a right to remain an Employee, Consultant or director of the Company, a Parent, Subsidiary or an Affiliate. The Employer reserves the right to terminate the Service of Optionee at any time, with or without cause, and for any reason, subject to applicable laws, the Company's Articles of Incorporation and Bylaws and a written employment agreement (if any).

(e) The grant of the Option and Optionee's participation in the Plan will not be interpreted to form an employment contract or relationship with the Company, the Employer or any Parent, Subsidiary or Affiliate.

(f) The future value of the underlying Shares is unknown and cannot be predicted with certainty. If the underlying Shares do not increase in value, the Option will have no value. If Optionee exercises the Option and obtains Shares, the value of the Shares acquired upon exercise may increase or decrease in value, even below the Exercise Price. Optionee also understands that neither the Company, nor the Employer or any Parent, Subsidiary or Affiliate is responsible for any foreign exchange fluctuation between the Employer's local currency and the United States Dollar that may affect the value of this Option.

(g) In consideration of the grant of the Option, no claim or entitlement to compensation or damages shall arise from forfeiture of the Option resulting from termination of Optionee's Service by the Company or the Employer (for any reason whatsoever and whether or not in breach of local labor laws) and Optionee irrevocably releases the Company and the Employer from any such claim that may arise; if, notwithstanding the foregoing, any such claim is found by a court of competent jurisdiction to have arisen, Optionee shall be deemed irrevocably to have waived Optionee's entitlement to pursue such claim.

(h) Optionee agrees that the Company may require Options granted hereunder be exercised with, and the Option Shares held by, a broker designated by the Company.

(i) Optionee agrees that his or her rights hereunder (if any) shall be subject to set-off by the Company for any valid debts the Optionee owes to the Company.

(j) The Option and the benefits under the Plan, if any, will not automatically transfer to another company in the case of a merger, take-over or transfer of liability.

21. <u>**No Advice Regarding Grant**</u> . The Company and the Employer have not provided any tax, legal or financial advice, nor has the Company or the Employer made any recommendations regarding Optionee's participation in the Plan, or Optionee's acquisition or sale of the underlying Shares. Optionee is hereby advised to consult with Optionee's own personal tax, legal and financial advisors regarding Optionee's participation in the Plan before taking any action related to the Plan.

22. <u>**Electronic Delivery**</u> . The Company may, in its sole discretion, decide to deliver any documents related to Optionee's current or future participation in the Plan by electronic means or to request Optionee's consent to participate in the Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

23. <u>**Language**</u> . If this Agreement or any other document related to the Plan is translated into a language other then English and the meaning of the translated version is different from the English version, the English version will take precedence.

**24. <u>Appendix</u>** . Notwithstanding any provisions in this Agreement, the Option shall be subject to any special terms and conditions set forth in any Appendix to this Agreement for Optionee's country of residence. Moreover, if Optionee relocates to one of the countries included in the Appendix, the special terms and conditions for such country will apply to Optionee, to the extent the Company determines that the application of such terms and conditions is necessary or advisable in order to comply with local law or facilitate the administration of the Plan. The Appendix constitutes part of this Agreement.

**25. <u>Imposition of Other Requirements</u>** . The Company reserves the right to impose other requirements on Optionee's participation in the Plan, on the Option and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or facilitate the administration of the Plan. Optionee agrees to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. Furthermore, Optionee acknowledges that the laws of the country in which Optionee is working at the time of grant, vesting and exercise of the Option or the sale of Shares received pursuant to this Agreement (including any rules or regulations governing securities, foreign exchange, tax, labor, or other matters) may subject Optionee to additional procedural or regulatory requirements that Optionee is and will be solely responsible for and must fulfill.

**CISCO SYSTEMS, INC.**
**STOCK GRANT AGREEMENT**

This Stock Grant Agreement (the "Agreement") is made and entered into as of the Grant Date (as defined below) by and between Cisco Systems, Inc., a California corporation (the "Company"), and you pursuant to the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). The material terms of this Stock Grant Award are as follows:

Employee ID: _____

Grant Date: _____

Grant Number: _____

Restricted Shares: _____

First Vest Date: _____ , 20 ___ (the first annual anniversary of the vesting commencement date)

To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Plan. In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of this Agreement, the Plan terms and provisions shall prevail.

In consideration of the mutual agreements herein contained and intending to be legally bound hereby, the parties agree as follows:

**1. <u>Restricted Shares</u>** . Pursuant to the Plan, the Company hereby transfers to you, and you hereby accept from the Company, a Stock Grant Award consisting of the Restricted Shares, on the terms and conditions set forth herein and in the Plan.

**2. <u>Vesting of Restricted Shares</u>** . So long as your Service continues, the Restricted Shares shall vest in accordance with the following schedule: _____percent ( ___%) of the total number of Restricted Shares issued pursuant to this Agreement shall vest on the First Vest Date and on each annual anniversary thereafter, unless otherwise provided by the Plan or Section 3 below. In the event of the termination of your Service for any reason, all unvested Restricted Shares shall be immediately forfeited without consideration. For purposes of facilitating the enforcement of the provisions of this Section 2, the Company may issue stop-transfer instructions on the Restricted Shares to the Company's transfer agent, or otherwise hold the Restricted Shares in escrow, until the Restricted Shares have vested and you have satisfied all applicable obligations with respect to the Restricted Shares, including any applicable tax withholding obligations set forth in Section 5 below. Any new, substituted or additional securities or other property which is issued or distributed with respect to the unvested Restricted Shares shall be subject to the same terms and conditions as are applicable to the unvested Restricted Shares under this Agreement and the Plan.

**3. <u>Special Acceleration</u>** .

(a) To the extent the Restricted Shares are outstanding at the time of a Corporate Transaction, but not otherwise fully vested, such Restricted Shares shall automatically accelerate immediately prior to the effective date of the Corporate Transaction and shall become vested in full at that time. No such acceleration, however, shall occur if and to the extent: (i) this Stock Grant Agreement is, in connection with the Corporate Transaction, assumed by the successor corporation (or parent thereof), or (ii) the Restricted Shares are replaced with a cash incentive program of the successor corporation which preserves the Fair Market Value of the Restricted Shares at the time of the Corporate Transaction and provides for subsequent pay-out in accordance with the vesting schedule set forth in Section 2 above.

(b) Immediately following the effective date of the Corporate Transaction, this Stock Grant Agreement shall terminate and cease to be outstanding, except to the extent assumed by the successor corporation (or parent thereof) in connection with the Corporate Transaction.

(c) If this Stock Grant Agreement is assumed in connection with a Corporate Transaction, then the Committee shall appropriately adjust the number of shares and the kind of shares or securities covered by this Stock Grant Agreement immediately after such Corporate Transaction.

(d) To the extent the Restricted Shares are outstanding at the time of a Change in Control but not otherwise fully vested, such Restricted Shares shall automatically accelerate immediately prior to the effective date of the Change in Control and shall become vested in full at that time.

(e) This Stock Grant Agreement shall not in any way affect the right of the Company to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate, sell or transfer all or any part of its business or assets.

**4. <u>Restriction on Election to Recognize Income in the Year of Grant</u>** . Under Section 83 of the Code, the Fair Market Value of the Restricted Shares on the date the Restricted Shares vest will be taxable as ordinary income at that time. You understand, acknowledge and agree that, as a

condition to the grant of this Award, you may not elect to be taxed at the time the Restricted Shares are acquired by filing an election under Section 83(b) of the Code with the Internal Revenue Service.

**5. Withholding Taxes** .  You agree to make arrangements satisfactory to the Company for the satisfaction of any applicable withholding tax obligations that arise in connection with the Restricted Shares which, at the sole discretion of the Company, may include (i) having the Company withhold Shares from the Restricted Shares held in escrow, or (ii) any other arrangement approved by the Company, in any case, equal in value to the amount necessary to satisfy any such withholding tax obligation. Such Shares shall be valued based on the Fair Market Value as of the day prior to the date that the amount of tax to be withheld is to be determined under applicable law. The Company shall not be required to release the Restricted Shares from the stop-transfer instructions or escrow unless and until such obligations are satisfied.

**6. Tax Advice** .  You represent, warrant and acknowledge that the Company has made no warranties or representations to you with respect to the income tax consequences of the transactions contemplated by this Agreement, and you are in no manner relying on the Company or the Company's representatives for an assessment of such tax consequences.

YOU UNDERSTAND THAT THE TAX LAWS AND REGULATIONS ARE SUBJECT TO CHANGE. YOU SHOULD CONSULT YOUR OWN TAX ADVISOR REGARDING ANY STOCK GRANT AWARD. NOTHING STATED HEREIN IS INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAXPAYER PENALTIES.

**7. Non-Transferability of Restricted Shares** .  Restricted Shares which have not vested pursuant to Section 2 above shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by the operation of law. However, this Section 7 shall not preclude you from designating a beneficiary who will receive any vested Restricted Shares in the event of the your death, nor shall it preclude a transfer of vested Restricted Shares by will or by the laws of descent and distribution.

**8. Restriction on Transfer** .  Regardless of whether the transfer or issuance of the Restricted Shares has been registered under the Securities Act or has been registered or qualified under the securities laws of any state, the Company may impose additional restrictions upon the sale, pledge, or other transfer of the Restricted Shares (including the placement of appropriate legends on stock certificates and the issuance of stop-transfer instructions to the Company's transfer agent) if, in the judgment of the Company and the Company's counsel, such restrictions are necessary in order to achieve compliance with the provisions of the Securities Act, the securities laws of any state, or any other law.

**9. Stock Certificate Restrictive Legends** .  Stock certificates evidencing the Restricted Shares may bear such restrictive legends as the Company and the Company's counsel deem necessary under applicable law or pursuant to this Agreement.

**10. Representations, Warranties, Covenants, and Acknowledgments** .  You hereby agree that in the event the Company and the Company's counsel deem it necessary or advisable in the exercise of their discretion, the transfer or issuance of the Restricted Shares may be conditioned upon you making certain representations, warranties, and acknowledgments relating to compliance with applicable securities laws.

**11. Voting and Other Rights** .  Subject to the terms of this Agreement, you shall have all the rights and privileges of a shareholder of the Company while the Restricted Shares are subject to stop-transfer instructions, or otherwise held in escrow, including the right to vote and to receive dividends (if any).

**12. Authorization to Release Necessary Personal Information** .

(a) You hereby authorize and direct your employer to collect, use and transfer in electronic or other form, any personal information (the "Data") regarding your employment, the nature and amount of your compensation and the facts and conditions of your participation in the Plan (including, but not limited to, your name, home address, telephone number, date of birth, social security number (or any other social or national identification number), salary, nationality, job title, number of Shares held and the details of all Awards or any other entitlement to Shares awarded, cancelled, exercised, vested, unvested or outstanding) for the purpose of implementing, administering and managing your participation in the Plan. You understand that the Data may be transferred to the Company or any of its Subsidiaries, or to any third parties assisting in the implementation, administration and management of the Plan, including any requisite transfer to a broker or other third party assisting with the administration of this Stock Grant Award under the Plan or with whom Shares acquired pursuant to this Stock Grant Award or cash from the sale of such shares may be deposited. You acknowledge that recipients of the Data may be located in different countries, and those countries may have data privacy laws and protections different from those in the country of your residence. Furthermore, you acknowledge and understand that the transfer of the Data to the Company or any of its Subsidiaries, or to any third parties is necessary for your participation in the Plan.

(b) You may at any time withdraw the consents herein by contacting your local human resources representative in writing. You further acknowledge that withdrawal of consent may affect your ability to exercise or realize benefits from this Stock Grant Award, and your ability to participate in the Plan.

13. **<u>No Entitlement or Claims for Compensation</u>** .

(a) Your rights, if any, in respect of or in connection with this Stock Grant Award or any other Award is derived solely from the discretionary decision of the Company to permit you to participate in the Plan and to benefit from a discretionary Award. By accepting this Stock Grant Award, you expressly acknowledge that there is no obligation on the part of the Company to continue the Plan and/or grant any additional Awards to you. This Stock Grant Award is not intended to be compensation of a continuing or recurring nature, or part of your normal or expected compensation, and in no way represents any portion of a your salary, compensation, or other remuneration for purposes of pension benefits, severance, redundancy, resignation or any other purpose.

(b) Neither the Plan nor this Stock Grant Award or any other Award granted under the Plan shall be deemed to give you a right to remain an Employee, Consultant or director of the Company, a Parent, a Subsidiary or an Affiliate. The Company and its Parents and Subsidiaries and Affiliates reserve the right to terminate your Service at any time, with or without cause, and for any reason, subject to applicable laws, the Company's Articles of Incorporation and Bylaws and a written employment agreement (if any), and you shall be deemed irrevocably to have waived any claim to damages or specific performance for breach of contract or dismissal, compensation for loss of office, tort or otherwise with respect to the Plan, this Stock Grant Award or any outstanding Award that is forfeited and/or is terminated by its terms or to any future Award.

(c) You agree that the Company may require that Restricted Shares be held by a broker designated by the Company. In addition, you agree that your rights hereunder shall be subject to set-off by the Company for any valid debts you owe the Company.

14. **<u>Governing Law</u>** . This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflict of laws principles thereof.

15. **<u>Notices</u>** . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to you at the address maintained for you in the Company's records or, in either case, as subsequently modified by written notice to the other party.

16. **<u>Binding Effect</u>** . Subject to the limitations set forth in this Agreement, this Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, legal representatives, successors, and assigns of the parties hereto.

17. **<u>Severability</u>** . If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the full extent possible.

**(For Grants Beginning September 2015)**

# CISCO SYSTEMS, INC.
## PERFORMANCE-BASED STOCK UNIT AGREEMENT

This Performance-Based Stock Unit Agreement (the "Agreement") is made and entered into as of the Grant Date (as defined below) by and between Cisco Systems, Inc., a California corporation (the "Company"), and you pursuant to the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). The material terms of this Stock Unit Award are as follows:

Employee ID:     __

Grant Date:     __

Grant Number:     __

Target Amount of
Performance-Based Stock Units:     __

Vest Date:     __

To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Plan. In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of this Agreement, the Plan terms and provisions shall prevail.

In consideration of the mutual agreements herein contained and intending to be legally bound hereby, the parties agree as follows:

1. **Performance-Based Stock Units** . Pursuant to the Plan, the Company hereby grants to you and you hereby accept from the Company, Performance-Based Stock Units, each of which is a bookkeeping entry representing the equivalent in value of one (1) Share, on the terms and conditions set forth herein and in the Plan. The Target Amount of Performance-Based Stock Units stated above reflects the target number of Performance-Based Stock Units (the "Target Amount"). The number of Performance-Based Stock Units ultimately paid out to you will range from ___% to ___% of the Target Amount as determined based upon the Company's performance during the performance period against the performance goals as set forth in Exhibit A .

2. **Vesting of Performance-Based Stock Units** . So long as your Service continues and subject to, and to the extent of, the satisfaction of the performance goals as set forth in Exhibit A , the Performance-Based Stock Units shall vest in accordance with the following schedule: _____ (___%) of the total number of Performance-Based Stock Units earned, if any, pursuant to the satisfaction of the performance goals in Exhibit A shall vest on the Vest Date, unless otherwise provided by the Plan or Sections 3(b) or 4 below. If you take a leave of absence, the Company may, at its discretion and to the extent permitted under applicable local law, either suspend vesting during the period of leave or pro-rate the Performance-Based Stock Units, notwithstanding the Company's Vesting Policy for Leaves of Absence.

3. **Termination of Service** .

    (a)    Except as otherwise provided in Section 3(b) below or Section 4, in the event of the termination of your Service for any reason (whether or not in breach of local labor laws), all unvested Performance-Based Stock Units shall be immediately forfeited without consideration. For purposes of the preceding sentence, your right to vest

in the Performance-Based Stock Units will terminate effective as of the date that you are no longer actively providing Service (or earlier upon your "Separation from Service" within the meaning of Code Section 409A) and will not be extended by any notice period mandated under local law ( *e.g.* , active Service would not include a period of "garden leave" or similar period pursuant to local law); the Company shall have the exclusive discretion to determine when you are no longer actively providing Service for purposes of the Performance-Based Stock Units.

(b)    In the event that you resign or your Service is terminated for any reason other than Cause on or after the date that (x) you have attained at least _____ (____) years of age and (y) your age plus your years of Service is at least equal to _____ (____), and so long as such resignation or the termination of your Service occurs no earlier than the _____ anniversary of the Grant Date (the satisfaction of the aforementioned conditions is referred to herein as "Retirement"), all unvested Performance-Based Stock Units may be earned pursuant to the satisfaction of the performance goals in <u>Exhibit A</u> , and shall vest in accordance with the vesting schedule set forth in Section 2 above, determined as if your Service had continued after your resignation or termination of Service, and shall be settled in accordance with Section 5(a); provided that any unsettled or unvested Performance-Based Stock Units shall be forfeited without consideration immediately upon the breach of any of the following conditions:

(i)    Unless prohibited by applicable law, you shall render, as an independent advisor or consultant and not as an Employee, such advisory or consulting services to the Company (or any Parent, Subsidiary or Affiliate) as shall reasonably be requested by the Company (or any Parent, Subsidiary or Affiliate), and such services shall not be terminated for Cause (for purposes of clarity, any request to provide such advisory or consulting services to the Company (or any Parent, Subsidiary or Affiliate) shall not be considered a continuation of "Service" unless the Company specifically provides that the continuation of services is a continuation of "Service" for purposes of this Section 3(b)).

(ii)    For a period of ___ (__) beginning on the date of your termination of Service or during any period in which you provide independent advisory or consulting services to the Company (or any Parent, Subsidiary or Affiliate), you shall not directly or indirectly, individually or on behalf of other persons or entities, intentionally solicit or induce (a) any employee of the Company (or any Parent, Subsidiary or Affiliate) to leave the employee's employment in order to accept employment with another person or entity or (b) any customer of the Company (or any Parent, Subsidiary or Affiliate) with whom you have worked in your capacity as an Employee prior to your termination of Service whose identity and/or any related information constitutes protected trade secrets (with such customers determined as of the date of the termination of your Service, to retain or use any other person or entity for the purpose of rendering services in competition with the Company (or any Parent, Subsidiary or Affiliate) or to purchase products from any business which, in the opinion of the Company (or any Parent, Subsidiary or Affiliate), competes with or is in conflict with the interests of the Company (or any Parent, Subsidiary or Affiliate), in either case, unless these restrictions are prohibited (whether in whole or in part) by applicable law.

(iii)    For a period of ___ (__) beginning on the date of your termination of Service or during any period in which you provide independent advisory or consulting services to the Company (or any Parent, Subsidiary or Affiliate), you shall not render services for any organization or engage directly or indirectly in any business which, in the opinion of the Company, competes with or is in conflict with the interests of the Company (or any Parent, Subsidiary or Affiliate), unless this restriction is prohibited by applicable law.

(iv)    You shall not, without prior written authorization from the Company, use or disclose any confidential information or trade secrets concerning the Company (or any Parent, Subsidiary or Affiliate), in each case as determined by the Committee, and the Committee's determination shall be conclusive and binding.

(c)    Notwithstanding any provisions to the contrary in this Agreement, in the event of the termination of your Service for Cause or in the event of the termination for Cause of any independent advisory or consulting services you may be providing as described in Section 3(b)(i), any unsettled or unvested Performance-Based Stock Units shall terminate and be forfeited immediately without consideration.

4.  **Special Acceleration** .

(a)  To the extent the Performance-Based Stock Units are outstanding at the time of a Corporate Transaction, such Performance-Based Stock Units shall automatically become vested in full at the Target Amount immediately prior to the effective date of the Corporate Transaction and settled in accordance with Section 5 below. No such accelerated vesting, however, shall occur if and to the extent: (i) these Performance-Based Stock Units are, in connection with the Corporate Transaction, either assumed by the successor corporation (or parent thereof) or replaced with comparable performance-based stock units of the successor corporation (or parent thereof), in each case, having a minimum payout equal to the Target Amount and preserving the settlement provisions set forth in Section 5 below or (ii) these Performance-Based Stock Units are replaced with a cash incentive program of the successor corporation which complies with Code Section 409A and, at a minimum, preserves the fair market value of the Performance-Based Stock Units at the time of the Corporate Transaction (based on the Target Amount) and provides for subsequent pay-out in accordance with the settlement provisions set forth in Section 5 below. The determination of the comparability of performance-based stock units under clause (i) shall be made by the Committee, and such determination shall be final, binding and conclusive.

(b)  Immediately following the effective date of the Corporate Transaction, this Agreement shall terminate and cease to be outstanding, except as set forth in Section 5 below with respect to the settlement of Performance-Based Stock Units or to the extent assumed by the successor corporation (or parent thereof) in connection with the Corporate Transaction.

(c)  If this Agreement is assumed in connection with a Corporate Transaction, then the Committee shall appropriately adjust the number of units and the kind of shares or securities to be issued pursuant to this Agreement immediately after such Corporate Transaction.

(d)  To the extent the Performance-Based Stock Units are outstanding at the time of a Change in Control, such Performance-Based Stock Units shall automatically accelerate immediately prior to the effective date of the Change in Control and shall become vested in full at the Target Amount at that time and settled in accordance with Section 5 below.

(e)  This Agreement shall not in any way affect the right of the Company to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate, sell or transfer all or any part of its business or assets.

5.  **Settlement of Performance-Based Stock Units** .

(a)  **General Settlement Terms** . The Performance-Based Stock Units, to the extent earned and vested hereunder (including, without limitation by reason of Retirement), shall be automatically settled in Shares on the Vest Date (which constitutes a fixed payment date for purposes of Code Section 409A) or, if earlier, upon the earliest to occur of the settlement events set forth below or in the Company's Vesting Acceleration Policy for Death and Terminal Illness; it being understood that nothing herein shall limit the Company's ability to amend or terminate such policy in its sole discretion and without your consent.

(b)  **Corporate Transaction** . If, as of the Grant Date, you have not satisfied and it is not possible for you to satisfy the age and Service Retirement conditions with respect to this Performance-Based Stock Unit award and this Performance-Based Stock Unit award is not assumed or replaced as described in Section 4(a) in connection with a Corporate Transaction, then the Performance-Based Stock Units shall be automatically settled in Shares immediately prior to the effective date of the Corporate Transaction instead of on the Vest Date.

(c)  **Change in Control** . In the event a Change in Control is consummated prior to the Vest Date and such Change in Control is a permissible distribution event under Code Section 409A, the Performance-Based Stock

Units shall be automatically settled in Shares immediately prior to the effective date of the Change in Control. In the event such Change in Control is not a permissible distribution event under Code Section 409A, the Performance-Based Stock Units shall be automatically settled in Shares upon the earlier of (i) the Vest Date or (ii) your Separation from Service that occurs immediately prior to or at any time after such Change in Control. Notwithstanding the foregoing, if, as of the Grant Date, you have not satisfied and it is not possible for you to satisfy the age and Service Retirement conditions with respect to this Performance-Based Stock Unit award, then such settlement shall in all cases occur immediately prior the effective date of the Change in Control.

(d)    The Company shall have no obligation to issue Shares pursuant to this Agreement unless and until you have satisfied any applicable tax and/or other obligations pursuant to Section 6 below and such issuance otherwise complies with all applicable law.

(e)    Notwithstanding anything in this Section 5 or in this Agreement, to the extent your Performance-Based Stock Units would otherwise be settled upon your Separation from Service, such settlement shall instead occur upon the Company's first business day following the six-month anniversary of your Separation from Service.

(f)    Prior to the time that the Performance-Based Stock Units are settled, you shall have no rights other than those of a general creditor of the Company. The Performance-Based Stock Units represent an unfunded and unsecured obligation of the Company.

6.    **Taxes** .

(a)    Regardless of any action the Company or your employer (the "Employer") takes with respect to any and all income tax, social taxes or insurance contributions, payroll tax, payment on account or other tax-related items related to your participation in the Plan and legally applicable to you ("Tax-Related Items"), you acknowledge that the ultimate liability for all Tax-Related Items with respect to the Performance-Based Stock Units is and remains your responsibility and may exceed the amount actually withheld by the Company or the Employer. You further acknowledge that the Company and/or the Employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Performance-Based Stock Units, including the grant, vesting or settlement of the Performance-Based Stock Units, or the subsequent sale of any Shares acquired at vesting or the receipt of any dividends with respect to such Shares; and (ii) do not commit to and are under no obligation to structure the terms or any aspect of the Performance-Based Stock Units to reduce or eliminate your liability for Tax-Related Items or achieve any particular tax result. Further, if you become subject to taxation in more than one jurisdiction between the Grant Date and the date of any relevant taxable event, you acknowledge that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

(b)    Prior to any relevant tax, withholding or required deduction event, as applicable, you agree to make arrangements satisfactory to the Company for the satisfaction of any applicable tax, withholding, required deduction and payment on account of any obligations of the Company and/or the Employer that arise in connection with the Performance-Based Stock Units. In this regard, you authorize the Company and/or the Employer, or their respective agents, at their discretion, to satisfy any obligations related to Tax-Related Items by one or a combination of the following: (1) withholding from your wages or other cash compensation payable to you by the Company or the Employer; (2) withholding from proceeds of the sale of Shares acquired upon settlement of the Performance-Based Stock Units either through a voluntary sale or through a mandatory sale arranged by the Company (on your behalf pursuant to this authorization); (3) withholding of Shares that would otherwise be issued upon settlement of the Performance-Based Stock Units; or (4) requiring you to satisfy the liability for Tax-Related Items by means of any other arrangement approved by the Company. If the obligation for Tax-Related Items is satisfied by withholding Shares, for tax purposes, you are deemed to have been issued the full number of Shares subject to the vested Performance-Based Stock Units, notwithstanding that a number of the Shares are held back solely for the purpose of paying the Tax-Related Items due as a result of any aspect of your participation in the Plan. To avoid financial

accounting charges under applicable accounting guidance, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory rates or may take any other action required to avoid financial accounting charges under applicable accounting guidance.

(c)     Finally, you will pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold or account for as a result of your participation in the Plan or your acquisition of Shares that cannot be satisfied by the means previously described. The Company shall not be required to issue or deliver Shares pursuant to this Agreement unless and until such obligations are satisfied.

7.     **Tax and Legal Advice** . You represent, warrant and acknowledge that neither the Company nor your Employer have made any warranties or representations to you with respect to any Tax-Related Items, legal or financial consequences of the transactions contemplated by this Agreement, and you are in no manner relying on the Company, your Employer or the Company's or the Employer's representatives for an assessment of such consequences. YOU UNDERSTAND THAT THE LAWS GOVERNING THIS AWARD ARE SUBJECT TO CHANGE. YOU SHOULD CONSULT YOUR OWN PROFESSIONAL TAX, LEGAL AND FINANCIAL ADVISOR REGARDING ANY PERFORMANCE-BASED STOCK UNITS. YOU UNDERSTAND THAT THE COMPANY AND YOUR EMPLOYER ARE NOT PROVIDING ANY TAX, LEGAL, OR FINANCIAL ADVICE, NOR IS THE COMPANY OR YOUR EMPLOYER MAKING ANY RECOMMENDATION REGARDING YOUR ACCEPTANCE OF THIS AWARD. NOTHING STATED HEREIN IS INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAXPAYER OR OTHER PENALTIES.

8.     **Non-Transferability of Performance-Based Stock Units** . Performance-Based Stock Units shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law.

9.     **Restriction on Transfer** . Regardless of whether the transfer or issuance of the Shares to be issued pursuant to the Performance-Based Stock Units has been registered under the Securities Act or has been registered or qualified under the securities laws of any state, the Company may impose additional restrictions upon the sale, pledge, or other transfer of the Shares (including the placement of appropriate legends on stock certificates and the issuance of stop-transfer instructions to the Company's transfer agent) if, in the judgment of the Company and the Company's counsel, such restrictions are necessary in order to achieve compliance with the provisions of the Securities Act, the securities laws of any state, or any other law including all applicable foreign laws.

10.     **Restrictive Legends and Stop-Transfer Instructions** . Stock certificates evidencing the Shares issued pursuant to the Performance-Based Stock Units may bear such restrictive legends and/or appropriate stop-transfer instructions may be issued to the Company's transfer agent as the Company and the Company's counsel deem necessary under applicable law or pursuant to this Agreement.

11.     **Representations, Warranties, Covenants, and Acknowledgments** . You hereby agree that in the event the Company and the Company's counsel deem it necessary or advisable in the exercise of their discretion, the transfer or issuance of the Shares issued pursuant to the Performance-Based Stock Units may be conditioned upon you making certain representations, warranties, and acknowledgments relating to compliance with applicable laws.

12.     **Voting and Other Rights** . Subject to the terms of this Agreement, you shall not have any voting rights or any other rights and privileges of a stockholder of the Company unless and until the Performance-Based Stock Units are settled in Shares. In addition, you shall not have any rights to dividend equivalent payments with respect to Performance-Based Stock Units.

13.     **Authorization to Release and Transfer Necessary Personal Information** .

(a)    *You hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal information as described in this Agreement by and among, as applicable, the Employer, and the Company and its Parent, Subsidiaries and Affiliates for the exclusive purpose of implementing, administering and managing your participation in the Plan.*

(b)    *You understand that the Company and the Employer may hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance number (or any other social or national identification number), salary, nationality, job title, residency status, any Shares or directorships held in the Company, details of all Performance-Based Stock Units or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding (the "Data") for the purpose of implementing, administering and managing your participation in the Plan. You understand that Data may be transferred to the Company or any of its Parent, Subsidiaries or Affiliates, or to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in your country or elsewhere, including outside the European Economic Area, and that the recipient's country (e.g., the United States) may have different data privacy laws and protections than your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data to a broker or other third party assisting with the administration of these Performance-Based Stock Units under the Plan or with whom Shares acquired pursuant to these Performance-Based Stock Units or cash from the sale of such Shares may be deposited. Furthermore, you acknowledge and understand that the transfer of the Data to the Company or any of its Parent, Subsidiaries or Affiliates, or to any third parties is necessary for your participation in the Plan.*

(c)    *You understand that Data will be held only as long as is necessary to implement, administer and manage your participation in the Plan. You understand that you may, at any time, view the Data, request additional information about the storage and processing of the Data, require any necessary amendments to the Data or refuse or withdraw the consents herein by contacting your local human resources representative in writing. You further acknowledge that withdrawal of consent may affect your ability to vest in or realize benefits from these Performance-Based Stock Units, and your ability to participate in the Plan. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative.*

14.    **No Entitlement or Claims for Compensation** .

(a)    Your rights, if any, in respect of or in connection with these Performance-Based Stock Units or any other Award are derived solely from the discretionary decision of the Company to permit you to participate in the Plan and to benefit from a discretionary Award. The Plan may be amended, suspended or terminated by the Company at any time, unless otherwise provided in the Plan and this Agreement. By accepting these Performance-Based Stock Units, you expressly acknowledge that there is no obligation on the part of the Company to continue the Plan and/or grant any additional Performance-Based Stock Units to you or benefits in lieu of Restricted Stock Units, even if Performance-Based Stock Units have been granted repeatedly in the past. All decisions with respect to future grants of Performance-Based Stock Units, if any, will be at the sole discretion of the Committee.

(b)    The Performance-Based Stock Units and the Shares subject to the Performance-Based Stock Units are not intended to replace any pension rights or compensation and are not to be considered compensation of a continuing or recurring nature, or part of your normal or expected compensation, and in no way represent any portion of your salary, compensation or other remuneration for any purpose, including but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end of service payments, bonuses, long-service awards, pension or retirement benefits or similar payments, and in no event should be considered as compensation for, or relating in any way to, past services for the Company, the Employer or any Parent, Subsidiary or Affiliate. The value of

the Performance-Based Stock Units is an extraordinary item that does not constitute compensation of any kind for services of any kind rendered to the Company, the Employer or any Parent, Subsidiary or Affiliate and which is outside the scope of your written employment agreement (if any).

(c)    You acknowledge that you are voluntarily participating in the Plan.

(d)    Neither the Plan nor these Performance-Based Stock Units or any other Award granted under the Plan shall be deemed to give you a right to remain an Employee, Consultant or director of the Company, a Parent, Subsidiary or an Affiliate. The Employer reserves the right to terminate your Service at any time, with or without cause, and for any reason, subject to applicable laws, the Company's Articles of Incorporation and Bylaws, and a written employment agreement (if any).

(e)    The grant of the Performance-Based Stock Units and your participation in the Plan will not be interpreted to form an employment contract or relationship with the Company, the Employer or any Parent, Subsidiary or Affiliate.

(f)    The future value of the underlying Shares is unknown and cannot be predicted with certainty and if you vest in the Performance-Based Stock Units and are issued Shares, the value of those Shares may increase or decrease. You also understand that neither the Company, nor the Employer or any Parent, Subsidiary or Affiliate is responsible for any foreign exchange fluctuation between your Employer's local currency and the United States Dollar that may affect the value of this Award.

(g)    In consideration of the grant of the Performance-Based Stock Units, no claim or entitlement to compensation or damages shall arise from forfeiture of the Performance-Based Stock Units resulting from termination of your Service by the Company or the Employer (for any reason whatsoever and whether or not in breach of local labor laws) or from the Company's determination that performance goals have not been satisfied in whole or in part and you irrevocably release the Company and the Employer from any such claim that may arise; if, notwithstanding the foregoing, any such claim is found by a court of competent jurisdiction to have arisen, you shall be deemed irrevocably to have waived your entitlement to pursue such claim.

(h)    You agree that the Company may require Shares received pursuant to the Performance-Based Stock Units to be held by a broker designated by the Company.

(i)    You agree that your rights hereunder (if any) shall be subject to set-off by the Company for any valid debts you owe the Company.

(j)    The Performance-Based Stock Units and the benefits under the Plan, if any, will not automatically transfer to another company in the case of a merger, take-over or transfer of liability.

15.    **Governing Law and Forum** . This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflict of laws principles thereof. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to litigation in the exclusive jurisdiction of the State of California and agree that any such litigation shall be conducted only in the courts of California or the federal courts for the United States for the Northern District of California and no other courts.

16.    **Notices** . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to you at the address maintained for you in the Company's records or, in either case, as subsequently modified by written notice to the other party.

17.    **Binding Effect** . Subject to the limitations set forth in this Agreement, this Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, legal representatives, successors, and assigns of the parties hereto.

18.    **Severability** . If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the full extent possible.

19.    **Electronic Delivery** . The Company may, in its sole discretion, decide to deliver any documents related to your current or future participation in the Plan by electronic means or to request your consent to participate in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and agree to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

20.    **Language** . If this Agreement or any other document related to the Plan is translated into a language other than English and the meaning of the translated version is different from the English version, the English version will take precedence.

21.    **Appendix** . Notwithstanding any provisions in this Agreement, the Performance-Based Stock Units shall be subject to any special terms and conditions set forth in any Appendix to this Agreement for your country of residence. Moreover, if you relocate to one of the countries included in the Appendix, the special terms and conditions for such country will apply to you, to the extent the Company determines that the application of such terms and conditions is necessary or advisable in order to comply with local law or facilitate the administration of the Plan. The Appendix constitutes part of this Agreement.

22.    **Imposition of Other Requirements** .    The Company reserves the right to impose other requirements on your participation in the Plan, on the Performance-Based Stock Units and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or facilitate the administration of the Plan. You agree to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. Furthermore, you acknowledge that the laws of the country in which you are working at the time of grant, vesting and settlement of the Performance-Based Stock Units or the sale of Shares received pursuant to this Agreement (including any rules or regulations governing securities, foreign exchange, tax, labor, or other matters) may subject you to additional procedural or regulatory requirements that you are and will be solely responsible for and must fulfill.

23.    **Acceptance of Agreement** . You must expressly accept the terms and conditions of your Performance-Based Stock Units as set forth in this Agreement by electronically accepting this Agreement within 300 days after the Company sends this Agreement to you. If you do not accept your Performance-Based Stock Units in the manner instructed by the Company, your Performance-Based Stock Units will be subject to cancellation.

*    *    *    *

You acknowledge that by clicking on the *I agree* button below, you agree to be bound by the terms of this Agreement.

**PLEASE PRINT AND KEEP A COPY FOR YOUR RECORDS**

**(For Grants Prior to September 2015)**

# CISCO SYSTEMS, INC.
## PERFORMANCE-BASED STOCK UNIT AGREEMENT

This Performance-Based Stock Unit Agreement (the "Agreement") is made and entered into as of the Grant Date (as defined below) by and between Cisco Systems, Inc., a California corporation (the "Company"), and you pursuant to the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). The material terms of this Stock Unit Award are as follows:

Employee ID: _____

Grant Date: _____

Grant Number: _____

Target Amount of
Performance-Based
Stock Units: _____

Vest Date: _____

To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Plan. In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of this Agreement, the Plan terms and provisions shall prevail.

In consideration of the mutual agreements herein contained and intending to be legally bound hereby, the parties agree as follows:

1. **Performance-Based Stock Units** . Pursuant to the Plan, the Company hereby grants to you, [subject to the approval by the stockholders of the Company of the amendment and restatement of the Plan,] and you hereby accept from the Company, Performance-Based Stock Units, each of which is a bookkeeping entry representing the equivalent in value of one (1) Share, on the terms and conditions set forth herein and in the Plan. The Target Amount of Performance-Based Stock Units stated above reflects the target number of Performance-Based Stock Units (the "Target Amount"). The number of Performance-Based Stock Units ultimately paid out to you will range from _____% to _____% of the Target Amount as determined based upon the Company's performance during the performance period against the performance goals as set forth in Exhibit A .

2. **Vesting of Performance-Based Stock Units** . So long as your Service continues and subject to, and to the extent of, the satisfaction of the performance goals as set forth in Exhibit A , the Performance-Based Stock Units shall vest in accordance with the following schedule: _____( _____% ) of the total number of Performance-Based Stock Units earned, if any, pursuant to the satisfaction of the performance goals in Exhibit A shall vest on the Vest Date, unless otherwise provided by the Plan or Sections 3(b) or 4 below. If you take a leave of absence, the Company may, at its discretion and to the extent permitted under applicable local law, either suspend vesting during the period of leave or pro-rate the Performance-Based Stock Units, notwithstanding the Company's Vesting Policy for Leaves of Absence. Prior to the time that the Performance-Based Stock Units are settled, you shall have no rights other than those of a general creditor of the Company. The Performance-Based Stock Units represent an unfunded and unsecured obligation of the Company.

3. **Termination of Service** .

(a) Except as otherwise provided in Section 3(b) below or Section 4, in the event of the termination of your Service for any reason (whether or not in breach of local labor laws), all unvested Performance-Based Stock Units shall be immediately forfeited without consideration. For purposes of the preceding sentence, your right to vest in the Performance-Based Stock Units will terminate effective as of the date that you are no longer actively providing Service (or earlier upon your "Separation from Service" within the meaning of Code Section 409A) and will not be extended by any notice period mandated under local law ( e.g. , active Service would not include a period of "garden leave" or similar period pursuant to local law); the Company shall have the exclusive discretion to determine when you are no longer actively providing Service for purposes of the Performance-Based Stock Units.

(b) In the event that you resign or your Service is terminated for any reason other than Cause on or after the date that (x) you have attained at least _____( _____ ) years of age and (y) your age plus your years of Service is at least equal to _____( _____ ), and so long as such resignation or the termination of your Service occurs no earlier than the _____anniversary of the Grant Date (the satisfaction of the aforementioned conditions is referred to herein as "Retirement" [1] ), all unvested Performance-Based Stock Units may be

earned pursuant to the satisfaction of the performance goals in <u>Exhibit A</u>.

and shall vest in accordance with the vesting schedule set forth in Section 2 above, determined as if your Service had continued after your resignation or termination of Service, and shall be settled in accordance with Section 5(a); provided that any unsettled or unvested Performance-Based Stock Units shall be forfeited without consideration immediately upon the breach of any of the following conditions:

(i) Unless prohibited by applicable law, you shall render, as an independent advisor or consultant and not as an Employee, such advisory or consulting services to the Company (or any Parent, Subsidiary or Affiliate) as shall reasonably be requested by the Company (or any Parent, Subsidiary or Affiliate), and such services shall not be terminated for Cause (for purposes of clarity, any request to provide such advisory or consulting services to the Company (or any Parent, Subsidiary or Affiliate) shall not be considered a continuation of "Service" unless the Company specifically provides that the continuation of services is a continuation of "Service" for purposes of this Section 3(b)).

(ii) For a period of _____( _____) beginning on the date of your termination of Service or during any period in which you provide independent advisory or consulting services to the Company (or any Parent, Subsidiary or Affiliate), you shall not directly or indirectly, individually or on behalf of other persons or entities, intentionally solicit or induce (a) any employee of the Company (or any Parent, Subsidiary or Affiliate) to leave the employee's employment in order to accept employment with another person or entity or (b) any customer of the Company (or any Parent, Subsidiary or Affiliate) with whom you have worked in your capacity as an Employee prior to your termination of Service whose identity and/or any related information constitutes protected trade secrets (with such customers determined as of the date of the termination of your Service, to retain or use any other person or entity for the purpose of rendering services in competition with the Company (or any Parent, Subsidiary or Affiliate) or to purchase products from any business which, in the opinion of the Company (or any Parent, Subsidiary or Affiliate), competes with or is in conflict with the interests of the Company (or any Parent, Subsidiary or Affiliate), in either case, unless these restrictions are prohibited (whether in whole or in part) by applicable law.

(iii) For a period of _____( _____) beginning on the date of your termination of Service or during any period in which you provide independent advisory or consulting services to the Company (or any Parent, Subsidiary or Affiliate), you shall not render services for any organization or engage directly or indirectly in any business which, in the opinion of the Company, competes with or is in conflict with the interests of the Company (or any Parent, Subsidiary or Affiliate), unless this restriction is prohibited by applicable law.

(iv) You shall not, without prior written authorization from the Company, use or disclose any confidential information or trade secrets concerning the Company (or any Parent, Subsidiary or Affiliate), in each case as determined by the Committee, and the Committee's determination shall be conclusive and binding.

(c) Notwithstanding any provisions to the contrary in this Agreement, in the event of the termination of your Service for Cause or in the event of the termination for Cause of any independent advisory or consulting services you may be providing as described in Section 3(b)(i), any unsettled or unvested Performance-Based Stock Units shall terminate and be forfeited immediately without consideration.

---

[1] If you are subject to the employment protections of a country within the European Economic Area because you reside in such country or are otherwise subject thereto, "Retirement" shall mean your years of Service is at least equal to _____ ( _____ ), regardless of your age, and the provisions concerning Retirement shall apply to you so long as the termination of your Service occurs no earlier than the one-year anniversary of the Grant Date. In all cases, years of Service shall be determined based on the date you originally provided Service. If you previously terminated Service, but subsequently returned to Service prior to the Grant Date, you will receive credit for your prior Service.

4. **Special Acceleration** .

(a) To the extent the Performance-Based Stock Units are outstanding at the time of a Corporate Transaction, such Performance-Based Stock Units shall automatically become vested in full at the Target Amount immediately prior to the effective date of the Corporate Transaction and settled in accordance with Section 5 below. No such accelerated vesting, however, shall occur if and to the extent: (i) these Performance-Based Stock Units are, in connection with the Corporate Transaction, either assumed by the successor corporation (or parent thereof) or replaced with comparable performance-based stock units of the successor corporation (or parent thereof), in each case, having a minimum payout equal to the Target Amount and preserving the settlement provisions set forth in Section 5 below or (ii) these Performance-Based Stock Units are replaced with a cash incentive program of the successor corporation which complies with Code Section 409A and, at a minimum, preserves the fair market value of the Performance-Based Stock Units at the time of the Corporate Transaction (based on the Target Amount) and provides for subsequent pay-out in accordance with the settlement provisions set forth in Section 5 below. The determination of the comparability of performance-based stock units under clause (i) shall be made by the Committee, and such determination shall be final, binding and conclusive.

(b) Immediately following the effective date of the Corporate Transaction, this Agreement shall terminate and cease to be outstanding, except as set forth in Section 5 below with respect to the settlement of Performance-Based Stock Units or to the extent assumed by the successor corporation (or parent thereof) in connection with the Corporate Transaction.

(c) If this Agreement is assumed in connection with a Corporate Transaction, then the Committee shall appropriately adjust the number of units and the kind of shares or securities to be issued pursuant to this Agreement immediately after such Corporate Transaction.

(d) To the extent the Performance-Based Stock Units are outstanding at the time of a Change in Control, such Performance-Based Stock Units shall automatically accelerate immediately prior to the effective date of the Change in Control and shall become vested in full at the Target Amount at that time and settled in accordance with Section 5 below.

(e) This Agreement shall not in any way affect the right of the Company to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate, sell or transfer all or any part of its business or assets.

5. **Settlement of Performance-Based Stock Units** .

(a) **General Settlement Terms** . The Performance-Based Stock Units, to the extent earned and vested hereunder (including, without limitation by reason of Retirement), shall be automatically settled in Shares on the Vest Date (which constitutes a fixed payment date for purposes of Code Section 409A) or, if earlier, upon the earliest to occur of the settlement events set forth below or in the Company's Vesting Acceleration Policy for Death and Terminal Illness; it being understood that nothing herein shall limit the Company's ability to amend or terminate such policy in its sole discretion and without your consent.

(b) **Corporate Transaction** . If, as of the Grant Date, you have not satisfied and it is not possible for you to satisfy the age and Service Retirement conditions with respect to this Performance-Based Stock Unit award and this Performance-Based Stock Unit award is not assumed or replaced as described in Section 4(a) in connection with a Corporate Transaction, then the Performance-Based Stock Units shall be automatically settled in Shares immediately prior to the effective date of the Corporate Transaction instead of on the Vest Date.

(c) **Change in Control** . In the event a Change in Control is consummated prior to the Vest Date and such Change in Control is a permissible distribution event under Code Section 409A, the Performance-Based Stock Units shall be automatically settled in Shares immediately prior to the effective date of the Change in Control. In the event such Change in Control is not a permissible distribution event under Code Section 409A, the Performance-Based Stock Units shall be automatically settled in Shares upon the earlier of (i) the Vest Date or (ii) your Separation from Service that occurs immediately prior to or at any time after such Change in Control. Notwithstanding the foregoing, if, as of the Grant Date, you have not satisfied and it is not possible for you to satisfy the age and Service Retirement conditions with respect to this Performance-Based Stock Unit award, then such settlement shall in all cases occur immediately prior the effective date of the Change in Control.

(d) The Company shall have no obligation to issue Shares pursuant to this Agreement unless and until you have satisfied any applicable tax and/or other obligations pursuant to Section 6 below and such issuance otherwise complies with all applicable law.

(e) Notwithstanding anything in this Section 5 or in this Agreement, to the extent your Performance-Based Stock Units would otherwise be settled upon your Separation from Service, such settlement shall instead occur upon the Company's first business day following the six-month anniversary of your Separation from Service.

6. **Taxes** .

(a) Regardless of any action the Company or your employer (the "Employer") takes with respect to any and all income tax, social taxes or insurance contributions, payroll tax, payment on account or other tax-related items related to your participation in the Plan and legally applicable to you ("Tax-Related Items"), you acknowledge that the ultimate liability for all Tax-Related Items with respect to the Performance-Based Stock Units is and remains your responsibility and may exceed the amount actually withheld by the Company or the Employer. You further acknowledge that the Company and/or the Employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Performance-Based Stock Units, including the grant, vesting or settlement of the Performance-Based Stock Units, or the subsequent sale of any Shares acquired at vesting or the receipt of any dividends with respect to such

Shares; and (ii) do not commit to and are under no obligation to structure the terms or any aspect of the Performance-Based Stock Units to reduce or eliminate your liability for Tax-Related Items or achieve any particular tax result. Further, if you become subject to taxation in more than one jurisdiction between the Grant Date and the date of any relevant taxable event, you acknowledge that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

(b) Prior to any relevant tax, withholding or required deduction event, as applicable, you agree to make arrangements satisfactory to the Company for the satisfaction of any applicable tax, withholding, required deduction and payment on account obligations of the Company and/or the Employer that arise in connection with the Performance-Based Stock Units. In this regard, you authorize the Company and/or the Employer, or their respective agents, at their discretion, to satisfy any obligations related to Tax-Related Items by one or a combination of the following: (1) withholding from your wages or other cash compensation payable to you by the Company or the Employer; (2) withholding from proceeds of the sale of Shares acquired upon settlement of the Performance-Based Stock Units either through a voluntary sale or through a mandatory sale arranged by the Company (on your behalf pursuant to this authorization); (3) withholding of Shares that would otherwise be issued upon settlement of the Performance-Based Stock Units; or (4) requiring you to satisfy the liability for Tax-Related Items by means of any other arrangement approved by the Company. If the obligation for Tax-Related Items is satisfied by withholding of Shares, for tax purposes, you are deemed to have been issued the full number of Shares subject to the vested Performance-Based Stock Units, notwithstanding that a number of the Shares are held back solely for the purpose of paying the Tax-Related Items due as a result of any aspect of your participation in the Plan. To avoid financial accounting charges under applicable accounting guidance, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory rates or may take any other action required to avoid financial accounting charges under applicable accounting guidance.

(c) Finally, you will pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold or account for as a result of your participation in the Plan or your acquisition of Shares that cannot be satisfied by the means previously described. The Company shall not be required to issue or deliver Shares pursuant to this Agreement unless and until such obligations are satisfied.

7. **Tax and Legal Advice** . You represent, warrant and acknowledge that neither the Company nor your Employer have made any warranties or representations to you with respect to any Tax-Related Items, legal or financial consequences of the transactions contemplated by this Agreement, and you are in no manner relying on the Company, your Employer's or the Company's or the Employer's representatives for an assessment of such consequences. YOU UNDERSTAND THAT THE LAWS GOVERNING THIS AWARD ARE SUBJECT TO CHANGE. YOU SHOULD CONSULT YOUR OWN PROFESSIONAL TAX, LEGAL AND FINANCIAL ADVISOR REGARDING ANY PERFORMANCE-BASED STOCK UNITS. YOU UNDERSTAND THAT THE COMPANY AND YOUR EMPLOYER ARE NOT PROVIDING ANY TAX, LEGAL, OR FINANCIAL ADVICE, NOR IS THE COMPANY OR YOUR EMPLOYER MAKING ANY RECOMMENDATION REGARDING YOUR ACCEPTANCE OF THIS AWARD. NOTHING STATED HEREIN IS INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAXPAYER OR OTHER PENALTIES.

8. **Non-Transferability of Performance-Based Stock Units** . Performance-Based Stock Units shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law.

9. **Restriction on Transfer** . Regardless of whether the transfer or issuance of the Shares to be issued pursuant to the Performance-Based Stock Units has been registered under the Securities Act or has been registered or qualified under the securities laws of any state, the Company may impose additional restrictions upon the sale, pledge, or other transfer of the Shares (including the placement of appropriate legends on stock certificates and the issuance of stop-transfer instructions to the Company's transfer agent) if, in the judgment of the Company and the Company's counsel, such restrictions are necessary in order to achieve compliance with the provisions of the Securities Act, the securities laws of any state, or any other law including all applicable foreign laws.

10. **Restrictive Legends and Stop-Transfer Instructions** . Stock certificates evidencing the Shares issued pursuant to the Performance-Based Stock Units may bear such restrictive legends and/or appropriate stop-transfer instructions may be issued to the Company's transfer agent as the Company and the Company's counsel deem necessary under applicable law or pursuant to this Agreement.

11. **Representations, Warranties, Covenants, and Acknowledgments** . You hereby agree that in the event the Company and the Company's counsel deem it necessary or advisable in the exercise of their discretion, the transfer or issuance of the Shares issued pursuant to the Performance-Based Stock Units may be conditioned upon you making certain representations, warranties, and acknowledgments relating to compliance with applicable laws.

12. **Voting and Other Rights** . Subject to the terms of this Agreement, you shall not have any voting rights or any other rights and privileges of a stockholder of the Company unless and until the Performance-Based Stock Units are settled in Shares. In addition, you shall not have any rights to dividend equivalent payments with respect to Performance-Based Stock Units.

13. **Authorization to Release and Transfer Necessary Personal Information** .

(a) *You hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal information as described in this Agreement by and among, as applicable, the Employer, and the Company and its Parent, Subsidiaries and Affiliates for the exclusive purpose of implementing, administering and managing your participation in the Plan.*

(b) *You understand that the Company and the Employer may hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance number (or any other social or national identification number), salary, nationality, job title, residency status, any Shares or directorships held in the Company, details of all Performance-Based Stock Units or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding (the "Data") for the purpose of implementing, administering and managing your participation in the Plan. You understand that Data may be transferred to the Company or any of its Parent, Subsidiaries or Affiliates, or to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in your country or elsewhere, including outside the European Economic Area, and that the recipient's country (e.g., the United States) may have different data privacy laws and protections than your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data to a broker or other third party assisting with the administration of these Performance-Based Stock Units under the Plan or with whom Shares acquired pursuant to these Performance-Based Stock Units or cash from the sale of such Shares may be deposited. Furthermore, you acknowledge and understand that the transfer of the Data to the Company or any of its Parent, Subsidiaries or Affiliates, or to any third parties is necessary for your participation in the Plan.*

(c) *You understand that Data will be held only as long as is necessary to implement, administer and manage your participation in the Plan. You understand that you may, at any time, view the Data, request additional information about the storage and processing of the Data, require any necessary amendments to the Data or refuse or withdraw the consents herein by contacting your local human resources representative in writing. You further acknowledge that withdrawal of consent may affect your ability to vest in or realize benefits from these Performance-Based Stock Units, and your ability to participate in the Plan. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative.*

14. **No Entitlement or Claims for Compensation** .

(a) Your rights, if any, in respect of or in connection with these Performance-Based Stock Units or any other Award are derived solely from the discretionary decision of the Company to permit you to participate in the Plan and to benefit from a discretionary Award. The Plan may be amended, suspended or terminated by the Company at any time, unless otherwise provided in the Plan and this Agreement. By accepting these Performance-Based Stock Units, you expressly acknowledge that there is no obligation on the part of the Company to continue the Plan and/or grant any additional Performance-Based Stock Units to you or benefits in lieu of Restricted Stock Units, even if Performance-Based Stock Units have been granted repeatedly in the past. All decisions with respect to future grants of Performance-Based Stock Units, if any, will be at the sole discretion of the Committee.

(b) The Performance-Based Stock Units and the Shares subject to the Performance-Based Stock Units are not intended to replace any pension rights or compensation and are not to be considered compensation of a continuing or recurring nature, or part of your normal or expected compensation, and in no way represent any portion of your salary, compensation or other remuneration for any purpose, including but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end of service payments, bonuses, long-service awards, pension or retirement benefits or similar payments, and in no event should be considered as compensation for, or relating in any way to, past services for the Company, the Employer or any Parent, Subsidiary or Affiliate. The value of the Performance-Based Stock Units is an extraordinary item that does not constitute compensation of any kind for services of any kind rendered to the Company, the Employer or any Parent, Subsidiary or Affiliate and which is outside the scope of your written employment agreement (if any).

(c) You acknowledge that you are voluntarily participating in the Plan.

(d) Neither the Plan nor these Performance-Based Stock Units or any other Award granted under the Plan shall be deemed to give you a right to remain an Employee, Consultant or director of the Company, a Parent, Subsidiary or an Affiliate. The Employer reserves the right to terminate your Service at any time, with or without cause, and for any reason, subject to applicable laws, the Company's Articles of Incorporation and Bylaws, and a written employment agreement (if any).

(e) The grant of the Performance-Based Stock Units and your participation in the Plan will not be interpreted to form an employment contract or relationship with the Company, the Employer or any Parent, Subsidiary or Affiliate.

(f) The future value of the underlying Shares is unknown and cannot be predicted with certainty and if you vest in the Performance-Based Stock Units and are issued Shares, the value of those Shares may increase or decrease. You also understand that neither the

Company, nor the Employer or any Parent, Subsidiary or Affiliate is responsible for any foreign exchange fluctuation between your Employer's local currency and the United States Dollar that may affect the value of this Award.

(g) In consideration of the grant of the Performance-Based Stock Units, no claim or entitlement to compensation or damages shall arise from forfeiture of the Performance-Based Stock Units resulting from termination of your Service by the Company or the Employer (for any reason whatsoever and whether or not in breach of local labor laws) or from the Company's determination that performance goals have not been satisfied in whole or in part and you irrevocably release the Company and the Employer from any such claim that may arise; if, notwithstanding the foregoing, any such claim is found by a court of competent jurisdiction to have arisen, you shall be deemed irrevocably to have waived your entitlement to pursue such claim.

(h) You agree that the Company may require Shares received pursuant to the Performance-Based Stock Units to be held by a broker designated by the Company.

(i) You agree that your rights hereunder (if any) shall be subject to set-off by the Company for any valid debts you owe the Company.

(j) The Performance-Based Stock Units and the benefits under the Plan, if any, will not automatically transfer to another company in the case of a merger, take-over or transfer of liability.

15. **Governing Law and Forum** . This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflict of laws principles thereof. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to litigation in the exclusive jurisdiction of the State of California and agree that any such litigation shall be conducted only in the courts of California or the federal courts for the United States for the Northern District of California and no other courts.

16. **Notices** . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to you at the address maintained for you in the Company's records or, in either case, as subsequently modified by written notice to the other party.

17. **Binding Effect** . Subject to the limitations set forth in this Agreement, this Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, legal representatives, successors, and assigns of the parties hereto.

18. **Severability** . If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the full extent possible.

19. **Electronic Delivery** . The Company may, in its sole discretion, decide to deliver any documents related to your current or future participation in the Plan by electronic means or to request your consent to participate in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and agree to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

20. **Language** . If this Agreement or any other document related to the Plan is translated into a language other than English and the meaning of the translated version is different from the English version, the English version will take precedence.

21. **Appendix** . Notwithstanding any provisions in this Agreement, the Performance-Based Stock Units shall be subject to any special terms and conditions set forth in any Appendix to this Agreement for your country of residence. Moreover, if you relocate to one of the countries included in the Appendix, the special terms and conditions for such country will apply to you, to the extent the Company determines that the application of such terms and conditions is necessary or advisable in order to comply with local law or facilitate the administration of the Plan. The Appendix constitutes part of this Agreement.

22. **Imposition of Other Requirements** . The Company reserves the right to impose other requirements on your participation in the Plan, on the Performance-Based Stock Units and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or facilitate the administration of the Plan. You agree to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. Furthermore, you acknowledge that the laws of the country in which you are working at the time of grant, vesting and settlement of the Performance-Based Stock Units or the sale of Shares received pursuant to this Agreement (including any rules or regulations governing securities, foreign exchange, tax, labor, or other matters) may subject you to additional procedural or regulatory requirements that you are and will be solely responsible for and must fulfill.

23. **Acceptance of Agreement** . You must expressly accept the terms and conditions of your Performance-Based Stock Units as set forth in this Agreement by electronically accepting this Agreement within 300 days after the Company sends this Agreement to you. If you do not accept your Performance-Based Stock Units in the manner instructed by the Company, your Performance-Based Stock Units will be subject to cancellation.

*   *   *   *

You acknowledge that by clicking on the ***I agree*** button below, you agree to be bound by the terms of this Agreement.

**PLEASE PRINT AND KEEP A COPY FOR YOUR RECORDS**

**(For Grants Beginning September 2015)**

# CISCO SYSTEMS, INC.
## STOCK UNIT AGREEMENT

This Stock Unit Agreement (the "Agreement") is made and entered into as of the Grant Date (as defined below) by and between Cisco Systems, Inc., a California corporation (the "Company"), and you pursuant to the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). The material terms of this Stock Unit Award are as follows:

Employee ID:     __

Grant Date:     __

Grant Number:     __

Restricted Stock Units:     __

First Vest Date:     __

To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Plan. In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of this Agreement, the Plan terms and provisions shall prevail.

In consideration of the mutual agreements herein contained and intending to be legally bound hereby, the parties agree as follows:

1.    **Restricted Stock Units** . Pursuant to the Plan, the Company hereby grants to you, and you hereby accept from the Company, Restricted Stock Units, each of which is a bookkeeping entry representing the equivalent in value of one (1) Share, on the terms and conditions set forth herein and in the Plan.

2.    **Vesting of Restricted Stock Units** . So long as your Service continues, the Restricted Stock Units shall vest in accordance with the following schedule: _____ percent ( ___%) of the total number of Restricted Stock Units granted pursuant to this Agreement shall vest on the First Vest Date and on each ____ anniversary thereafter, unless otherwise provided by the Plan or Section 4 below. If you take a leave of absence, the Company may, at its discretion, suspend vesting during the period of leave to the extent permitted under the employment laws in the jurisdiction where you are providing Service or under the terms of your employment or service agreement, if any.

3.    **Termination of Service** . In the event of the termination of your Service for any reason (whether or not later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or providing Service, or the terms of your employment or service agreement, if any), all unvested Restricted Stock Units shall be immediately forfeited without consideration. For purposes of the preceding sentence, your right to vest in the Restricted Stock Units will terminate effective as of the date that you are no longer providing Service, and the Company shall have the exclusive discretion to determine when you are no longer providing Service for purposes of the Restricted Stock Units.

4.    **Special Acceleration** .

(a)    To the extent the Restricted Stock Units are outstanding at the time of a Corporate Transaction, such Restricted Stock Units shall automatically become vested in full immediately prior to the effective date of the Corporate Transaction. No such accelerated vesting, however, shall occur if and to the extent: (i) these Restricted Stock Units are, in connection with the Corporate Transaction, either assumed by the successor corporation (or parent thereof) or replaced with comparable restricted stock units of the successor corporation (or parent thereof) or (ii) these Restricted Stock Units are replaced with a cash incentive program of the successor corporation which complies with Code Section 409A and preserves the fair market value of the Restricted Stock Units at the time of the Corporate Transaction and provides for subsequent pay-out in accordance with the settlement provisions set forth in Section 5 below. The determination of the comparability of restricted stock units under clause (i) shall be made by the Committee, and such determination shall be final, binding and conclusive.

(b)    Immediately following the effective date of the Corporate Transaction, this Agreement shall terminate and cease to be outstanding, except as set forth in Section 5 below with respect to the deferred settlement of Restricted Stock Units or to the extent assumed by the successor corporation (or parent thereof) in connection with the Corporate Transaction.

(c)    If this Agreement is assumed in connection with a Corporate Transaction, then the Committee shall appropriately adjust the number of units and the kind of shares or securities to be issued pursuant to this Agreement immediately after such Corporate Transaction.

(d)    To the extent the Restricted Stock Units are outstanding at the time of a Change in Control, such Restricted Stock Units shall automatically accelerate immediately prior to the effective date of the Change in Control and shall become vested in full at that time and settled in accordance with Section 5 below.

(e)    This Agreement shall not in any way affect the right of the Company to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate, sell or transfer all or any part of its business or assets.

5.    **Settlement of Restricted Stock Units** .  To the extent you are eligible but have not elected to defer settlement of the Restricted Stock Units, the Restricted Stock Units shall be automatically settled in Shares upon vesting of such Restricted Stock Units, provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless and until you have satisfied any applicable Tax-Related Items, as described and defined in Section 6 below, and such issuance otherwise complies with all applicable laws. To the extent you are eligible but have elected to defer settlement of the Restricted Stock Units, the vested portion of the Restricted Stock Units shall be settled in Shares upon the earlier of: (a) your separation from service within the meaning of Code Section 409A ("Separation from Service") and (b) the fixed payment date elected by you, if any, at the time of such deferral (which shall be the first business day of a year no earlier than six years after the year of the Grant Date in accordance with procedures approved by the Committee), provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless such issuance complies with all applicable law. Notwithstanding the foregoing, to the extent your Restricted Stock Units would otherwise be settled upon your Separation from Service, such settlement shall instead occur upon the Company's first business day following the six-month anniversary of your Separation from Service. Prior to the time that the Restricted Stock Units are settled, you shall have no rights other than those of a general creditor of the Company. The Restricted Stock Units represent an unfunded and unsecured obligation of the Company.

6.    **Taxes** .

(a)    Regardless of any action the Company or your employer (the "Employer") takes with respect to any and all income tax, social taxes or insurance contributions, payroll tax, payment on account or other tax-related items related to your participation in the Plan and legally applicable to you ("Tax-Related Items"), you acknowledge that the ultimate liability for all Tax-Related Items with respect to the Restricted Stock Units is and remains your responsibility and may exceed the amount actually withheld by the Company or the Employer. You further acknowledge that the Company and/or the Employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Restricted Stock Units, including the grant, vesting or settlement of the Restricted Stock Units, or the subsequent sale of any Shares acquired at vesting or the receipt of any dividends with respect to such Shares, and (ii) do not commit to and are under no obligation to structure the terms or any aspect of the Restricted Stock Units to reduce or eliminate your liability for Tax-Related Items or achieve any particular tax result. Further, if you become subject to taxation in more than one jurisdiction between the Grant Date and the date of any relevant taxable event, you acknowledge that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

(b)    Prior to any relevant tax, withholding or required deduction event, as applicable, you agree to make arrangements satisfactory to the Company for the satisfaction of any applicable tax, withholding, required deduction and payment on account of any obligations of the Company and/or the Employer that arise in connection with the Restricted Stock Units. In this regard, you authorize the Company and/or the Employer, or their respective agents, at their discretion, to satisfy any obligations related to Tax-Related Items by one or a combination of the following: (1) withholding from your wages or other cash compensation payable to you by the Company or the Employer; (2) withholding from proceeds of the sale of Shares acquired upon settlement of the Restricted Stock Units either through a voluntary sale or through a mandatory sale arranged by the Company (on your behalf pursuant to this authorization); (3) withholding of Shares that would otherwise be issued upon settlement of the Restricted Stock Units; or (4) requiring you to satisfy the liability for Tax-Related Items by means of any other arrangement approved by the Company. If the obligation for Tax-Related Items is satisfied by withholding Shares, for tax

purposes, you are deemed to have been issued the full number of Shares subject to the vested Restricted Stock Units, notwithstanding that a number of the Shares are held back solely for the purpose of paying the Tax-Related Items due as a result of any aspect of your participation in the Plan. You agree to provide the Company and/or its stock plan broker/administrator with the information necessary to manage your Tax-Related Item withholding and acknowledge that should you fail to provide such information on a timely basis, the Company and/or its stock plan broker/administrator may be obligated to withhold amounts from you and it may be necessary for you to seek a refund directly from the tax authorities. To avoid financial accounting charges under applicable accounting guidance, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory rates or may take any other action required to avoid financial accounting charges under applicable accounting guidance. If the Company does not satisfy the obligation for Tax-Related Items by the withholding of Shares and instead withholds proceeds from the sale of Shares acquired upon settlement of the Restricted Stock Units, the Company may withhold or account for Tax-Related Items by considering maximum applicable rates, in which case you will receive a refund of any over-withheld amount in cash to the extent that any over-withheld amount has not otherwise been remitted to the applicable tax authority and will have no entitlement to the Common Stock equivalent.

(c)    Finally, you will pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold or account for as a result of your participation in the Plan or your acquisition of Shares that cannot be satisfied by the means previously described. The Company shall not be required to issue or deliver Shares pursuant to this Agreement unless and until such obligations are satisfied.

7.    **Tax and Legal Advice** . You represent, warrant and acknowledge that neither the Company nor your Employer have made any warranties or representations to you with respect to any Tax-Related Items, legal or financial consequences of the transactions contemplated by this Agreement, and you are in no manner relying on the Company, the Employer's or the Company's or the Employer's representatives for an assessment of such consequences. YOU UNDERSTAND THAT THE LAWS GOVERNING THIS AWARD ARE SUBJECT TO CHANGE. YOU SHOULD CONSULT YOUR OWN PROFESSIONAL TAX, LEGAL AND FINANCIAL ADVISOR REGARDING ANY RESTRICTED STOCK UNITS. YOU UNDERSTAND THAT THE COMPANY AND THE EMPLOYER ARE NOT PROVIDING ANY TAX, LEGAL, OR FINANCIAL ADVICE, NOR IS THE COMPANY OR THE EMPLOYER MAKING ANY RECOMMENDATION REGARDING YOUR ACCEPTANCE OF THIS AWARD. NOTHING STATED HEREIN IS INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAXPAYER OR OTHER PENALTIES.

8.    **Non-Transferability of Restricted Stock Units** . Restricted Stock Units shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law.

9.    **Restriction on Transfer** . Regardless of whether the transfer or issuance of the Shares to be issued pursuant to the Restricted Stock Units has been registered under the Securities Act or has been registered or qualified under the securities laws of any state, the Company may impose additional restrictions upon the sale, pledge, or other transfer of the Shares (including the placement of appropriate legends on stock certificates and the issuance of stop-transfer instructions to the Company's transfer agent) if, in the judgment of the Company and the Company's counsel, such restrictions are necessary in order to achieve compliance with the provisions of the Securities Act, the securities laws of any state, or any other law, including all applicable foreign laws.

10.    **Restrictive Legends and Stop-Transfer Instructions** . Stock certificates evidencing the Shares issued pursuant to the Restricted Stock Units may bear such restrictive legends and/or appropriate stop-transfer instructions may be issued to the Company's transfer agent as the Company and the Company's counsel deem necessary under applicable law or pursuant to this Agreement.

11.    **Representations, Warranties, Covenants, and Acknowledgments** . You hereby agree that in the event the Company and the Company's counsel deem it necessary or advisable in the exercise of their discretion, the transfer or issuance of the Shares issued pursuant to the Restricted Stock Units may be conditioned upon you making certain representations, warranties, and acknowledgments relating to compliance with applicable laws.

12.    **Voting, Dividend and Other Rights** . Subject to the terms of this Agreement and except as set forth below, you shall not have any voting rights or any other rights and privileges of a shareholder of the Company unless and until the Restricted Stock Units are settled in Shares. To the extent you have elected to defer settlement of the Restricted Stock Units with a First Vest Date on or after September 11, 2016, dividend equivalents shall only accrue after the vesting of the Restricted Stock Units and

will be subject to the same conditions and restrictions as the Restricted Stock Units to which they attach as set forth in the Plan or this Agreement and will be settled in additional Shares upon the settlement of the Restricted Stock Units as set forth in Section 5 above.

13.    **Authorization to Release and Transfer Necessary Personal Information** .

(a)    *You hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal information as described in this Agreement by and among, as applicable, the Employer, and the Company and its Parent, Subsidiaries and Affiliates for the exclusive purpose of implementing, administering and managing your participation in the Plan.*

(b)    *You understand that the Company and the Employer may hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance number (or any other social or national identification number), salary, nationality, job title, residency status, any Shares or directorships held in the Company, details of all Restricted Stock Units or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding (the "Data") for the purpose of implementing, administering and managing your participation in the Plan. You understand that the Data may be transferred to the Company or any of its Parent, Subsidiaries or Affiliates, or to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in your country or elsewhere, including outside the European Economic Area, and that the recipient's country (e.g., the United States) may have different data privacy laws and protections than your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data to a broker or other third party assisting with the administration of these Restricted Stock Units under the Plan or with whom Shares acquired pursuant to these Restricted Stock Units or cash from the sale of such Shares may be deposited. Furthermore, you acknowledge and understand that the transfer of the Data to the Company or any of its Parent, Subsidiaries or Affiliates, or to any third parties is necessary for your participation in the Plan.*

(c)    *You understand that the Data will be held only as long as is necessary to implement, administer and manage your participation in the Plan. You understand that you may, at any time, view the Data, request additional information about the storage and processing of the Data, require any necessary amendments to the Data or refuse or withdraw the consents herein by contacting your local human resources representative in writing. Further, you understand that you are providing the consents herein on a purely voluntary basis. If you do not consent, or if you later seek to revoke your consent, your employment status or service and career with the Employer will not be adversely affected; the only adverse consequence of refusing or withdrawing your consent is that the Company would not be able to grant you Restricted Stock Units or other equity awards, or administer or maintain such awards. Therefore, you understand that refusing or withdrawing your consent may affect your ability to vest in or realize benefits from these Restricted Stock Units and your ability to participate in the Plan. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative.*

14.    **No Entitlement or Claims for Compensation** .

(a)    Your rights, if any, in respect of or in connection with these Restricted Stock Units or any other Award are derived solely from the discretionary decision of the Company to permit you to participate in the Plan and to benefit from a discretionary Award. The Plan may be amended, suspended or terminated by the Company at any time, unless otherwise provided in the Plan and this Agreement. By accepting these Restricted Stock Units, you expressly acknowledge that there is no obligation on the part of the Company to continue the Plan and/or grant any additional Restricted Stock Units to you or benefits in lieu of Restricted Stock Units, even if Restricted Stock Units have been granted in the past. All decisions with respect to future grants of Restricted Stock Units, if any, will be at the sole discretion of the Committee.

(b)    The Restricted Stock Units and the Shares subject to the Restricted Stock Units are not intended to replace any pension rights or compensation and are not to be considered compensation of a continuing or recurring nature, or part of your normal or expected compensation, and in no way represent any portion of your salary, compensation or other remuneration for any purpose, including, but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end of service payments, bonuses, long-service awards, pension or retirement benefits or similar payments, and in no event should be considered as compensation for, or relating in any way to, past services for the Company, the Employer or any Parent, Subsidiary

or Affiliate. The value of the Restricted Stock Units is an extraordinary item that does not constitute compensation of any kind for services of any kind rendered to the Company, the Employer or any Parent, Subsidiary or Affiliate and which is outside the scope of your written employment or service agreement (if any).

(c)    You acknowledge that you are voluntarily participating in the Plan.

(d)    Neither the Plan nor these Restricted Stock Units or any other Award granted under the Plan shall be deemed to give you a right to remain an Employee, Consultant or director of the Company, a Parent, Subsidiary or an Affiliate. The Employer reserves the right to terminate your Service at any time, with or without cause, and for any reason.

(e)    The grant of the Restricted Stock Units and your participation in the Plan will not be interpreted to form an employment contract or service relationship with the Company, the Employer or any Parent, Subsidiary or Affiliate.

(f)    The future value of the underlying Shares is unknown, indeterminable and cannot be predicted with certainty and if you vest in the Restricted Stock Units and are issued Shares, the value of those Shares may increase or decrease. You also understand that none of the Company, the Employer or any Parent, Subsidiary or Affiliate is responsible for any foreign exchange fluctuation between the Employer's local currency and the United States Dollar that may affect the value of this Award.

(g)    No claim or entitlement to compensation or damages shall arise from forfeiture of the Restricted Stock Units resulting from the termination of your Service by the Company or the Employer (for any reason whatsoever and whether or not later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or providing Service, or the terms of your employment or service agreement, if any) and, in consideration of the grant of the Award to which you are not otherwise entitled, you irrevocably agree never to institute any claim against the Employer, the Company or its Parent, Subsidiaries or Affiliates, waive your ability, if any, to bring any such claim, and release the Company and its Parent, Subsidiaries and Affiliates from any such claim; if notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by accepting the Award, you shall be deemed irrevocably to have agreed to not pursue such claim and agree to execute any and all documents necessary to request the withdrawal of such claim.

(h)    You agree that the Company may require Shares received pursuant to the Restricted Stock Units to be held by a broker designated by the Company.

(i)    You agree that your rights hereunder (if any) shall be subject to set-off by the Company for any valid debts you owe the Company.

(j)    Unless otherwise provided in the Plan or this Agreement, or by the Company in its discretion, the Restricted Stock Units and the benefits evidenced by this Agreement do not create any entitlement to have the Restricted Stock Units transferred to, or assumed by, another company, nor to be exchanged, cashed out or substituted for in connection with any Corporate Transaction affecting the Common Stock.

15.    **Governing Law and Forum** . This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflict of laws principles thereof. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to litigation in the exclusive jurisdiction of the State of California and agree that any such litigation shall be conducted only in the courts of California or the federal courts for the United States for the Northern District of California and no other courts.

16.    **Notices** . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to you at the address maintained for you in the Company's records or, in either case, as subsequently modified by written notice to the other party.

17.    **Binding Effect** . Subject to the limitations set forth in this Agreement, this Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, legal representatives, successors, and assigns of the parties hereto.

18.    **Severability** . If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the full extent possible.

19. **Waiver** . You agree that a waiver by the Company of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement, or of any subsequent breach by you or any other participant.

20. **Electronic Delivery** . The Company may, in its sole discretion, decide to deliver any documents related to your current or future participation in the Plan by electronic means or to request your consent to participate in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and agree to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

21. **Language** . If this Agreement or any other document related to the Plan is translated into a language other than English and the meaning of the translated version is different from the English version, the English version will take precedence.

22. **Appendix** . Notwithstanding any provisions in this Agreement, the Restricted Stock Units shall be subject to any special terms and conditions set forth in any Appendix to this Agreement for your country of residence. Moreover, if you relocate to one of the countries included in the Appendix, the special terms and conditions for such country will apply to you, to the extent the Company determines that the application of such terms and conditions is necessary or advisable in order to comply with local law or facilitate the administration of the Plan. The Appendix constitutes part of this Agreement.

23. **Imposition of Other Requirements** . The Company reserves the right to impose other requirements on your participation in the Plan, on the Restricted Stock Units and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or facilitate the administration of the Plan. You agree to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. Furthermore, you acknowledge that the laws of the country in which you are working at the time of grant, vesting and settlement of the Restricted Stock Units or the sale of Shares received pursuant to this Agreement (including any rules or regulations governing securities, foreign exchange, tax, labor, or other matters) may subject you to additional procedural or regulatory requirements that you are and will be solely responsible for and must fulfill.

24. **Acceptance of Agreement** . You must expressly accept the terms and conditions of your Restricted Stock Units as set forth in this Agreement by electronically accepting this Agreement within 300 days after the Company sends this Agreement to you. If you do not accept your Restricted Stock Units in the manner instructed by the Company, your Restricted Stock Units will be subject to cancellation.

\*   \*   \*   \*

You acknowledge that by clicking on the ***I agree*** button below, you agree to be bound by the terms of this Agreement.

**PLEASE PRINT AND KEEP A COPY FOR YOUR RECORDS**

**(For Grants Beginning September 2013 and Prior to September 2015)**

## CISCO SYSTEMS, INC.
## STOCK UNIT AGREEMENT

This Stock Unit Agreement (the "Agreement") is made and entered into as of the Grant Date (as defined below) by and between Cisco Systems, Inc., a California corporation (the "Company"), and you pursuant to the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). The material terms of this Stock Unit Award are as follows:

Employee ID: ___

Grant Date: ___

Grant Number: ___

Restricted Stock Units: ___

First Vest Date: ___

To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Plan. In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of this Agreement, the Plan terms and provisions shall prevail.

In consideration of the mutual agreements herein contained and intending to be legally bound hereby, the parties agree as follows:

1.        **Restricted Stock Units** . Pursuant to the Plan, the Company hereby grants to you, and you hereby accept from the Company, Restricted Stock Units, each of which is a bookkeeping entry representing the equivalent in value of one (1) Share, on the terms and conditions set forth herein and in the Plan.

2.        **Vesting of Restricted Stock Units** . So long as your Service continues, the Restricted Stock Units shall vest in accordance with the following schedule: _____ percent ( ___%) of the total number of Restricted Stock Units granted pursuant to this Agreement shall vest on the First Vest Date and on each _____ anniversary thereafter, unless otherwise provided by the Plan or Section 4 below. If you take a leave of absence, the Company may, at its discretion, suspend vesting during the period of leave to the extent permitted under the employment laws in the jurisdiction where you are providing Service or the terms your employment or service agreement, if any. Prior to the time that the Restricted Stock Units are settled, you shall have no rights other than those of a general creditor of the Company. The Restricted Stock Units represent an unfunded and unsecured obligation of the Company.

3.        **Termination of Service** . In the event of the termination of your Service for any reason (whether or not later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or providing Service, or the terms your employment or service agreement, if any), all unvested Restricted Stock Units shall be immediately forfeited without consideration. For purposes of the preceding sentence, your right to vest in the Restricted Stock Units will terminate effective as of the date that you are no longer providing Service; the Company shall have the exclusive discretion to determine when you are no longer providing Service for purposes of the Restricted Stock Units.

4.        **Special Acceleration** .

(a)        To the extent the Restricted Stock Units are outstanding at the time of a Corporate Transaction, such Restricted Stock Units shall automatically become vested in full immediately prior to the effective date of the Corporate Transaction. No such accelerated vesting, however, shall occur if and to the extent: (i) these Restricted Stock Units are, in connection with the Corporate Transaction, either assumed by the successor corporation (or parent thereof) or replaced with comparable restricted stock units of the successor corporation (or parent thereof) or (ii) these Restricted Stock Units are replaced with a cash incentive program of the successor corporation which complies with Code Section 409A and preserves the fair market value of the Restricted Stock Units at the time of the Corporate Transaction and provides for subsequent pay-out in accordance with the settlement provisions set forth in Section 5 below. The determination of the comparability of restricted stock units under clause (i) shall be made by the Committee, and such determination shall be final, binding and conclusive.

(b)        Immediately following the effective date of the Corporate Transaction, this Agreement shall terminate and cease to be outstanding, except as set forth in Section 5 below with respect to the deferred settlement of Restricted Stock Units or to the extent assumed by the successor corporation (or parent thereof) in connection with the Corporate Transaction.

(c)        If this Agreement is assumed in connection with a Corporate Transaction, then the Committee shall appropriately adjust the number of units and the kind of shares or securities to be issued pursuant to this Agreement immediately after such Corporate Transaction.

(d)        To the extent the Restricted Stock Units are outstanding at the time of a Change in Control, such Restricted Stock Units shall automatically accelerate immediately prior to the effective date of the Change in Control and shall become vested in full at that time and settled in accordance with Section 5 below.

(e)        This Agreement shall not in any way affect the right of the Company to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate, sell or transfer all or any part of its business or assets.

5.        **Settlement of Restricted Stock Units** . To the extent you are eligible but have not elected to defer settlement of the Restricted Stock Units, the Restricted Stock Units shall be automatically settled in Shares upon vesting of such Restricted Stock Units, provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless and until you have satisfied any applicable Tax-Related Items, as described an defined in Section 6 below, and such issuance otherwise complies with all applicable laws. To the extent you are eligible but have elected to defer settlement of the Restricted Stock Units, the vested portion of the Restricted Stock Units shall be settled in Shares upon the earlier of: (a) your separation from service within the meaning of Code Section 409A ("Separation from Service") and (b) the fixed payment date elected by you, if any, at the time of such deferral (which shall be the first business day of a year no earlier than six years after the year of the Grant Date in accordance with procedures approved by the Committee), provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless such issuance complies with all applicable law. Notwithstanding the

foregoing, to the extent your Restricted Stock Units would otherwise be settled upon your Separation from Service, such settlement shall instead occur upon the Company's first business day following the six-month anniversary of your Separation from Service.

6.    **Taxes** .

(a)    Regardless of any action the Company or your employer (the "Employer") takes with respect to any and all income tax, social taxes or insurance contributions, payroll tax, payment on account or other tax-related items related to your participation in the Plan and legally applicable to you ("Tax-Related Items"), you acknowledge that the ultimate liability for all Tax-Related Items with respect to the Restricted Stock Units is and remains your responsibility and may exceed the amount actually withheld by the Company or the Employer. You further acknowledge that the Company and/or the Employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Restricted Stock Units, including the grant, vesting or settlement of the Restricted Stock Units, or the subsequent sale of any Shares acquired at vesting or the receipt of any dividends with respect to such Shares, and (ii) do not commit to and are under no obligation to structure the terms or any aspect of the Restricted Stock Units to reduce or eliminate your liability for Tax-Related Items or achieve any particular tax result. Further, if you become subject to taxation in more than one jurisdiction between the Grant Date and the date of any relevant taxable event, you acknowledge that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

(b)    Prior to any relevant tax, withholding or required deduction event, as applicable, you agree to make arrangements satisfactory to the Company for the satisfaction of any applicable tax, withholding, required deduction and payment on account obligations of the Company and/or the Employer that arise in connection with the Restricted Stock Units. In this regard, you authorize the Company and/or the Employer, or their respective agents, at their discretion, to satisfy any obligations related to Tax-Related Items by one or a combination of the following: (1) withholding from your wages or other cash compensation payable to you by the Company or the Employer; (2) withholding from proceeds of the sale of Shares acquired upon settlement of the Restricted Stock Units either through a voluntary sale or through a mandatory sale arranged by the Company (on your behalf pursuant to this authorization); (3) withholding of Shares that would otherwise be issued upon settlement of the Restricted Stock Units; or (4) requiring you to satisfy the liability for Tax-Related Items by means of any other arrangement approved by the Company. If the obligation for Tax-Related Items is satisfied by withholding of Shares, for tax purposes, you are deemed to have been issued the full number of Shares subject to the vested Restricted Stock Units, notwithstanding that a number of the Shares are held back solely for the purpose of paying the Tax-Related Items due as a result of any aspect of your participation in the Plan. You agree to provide the Company and/or its stock plan broker/administrator with the information necessary to manage your Tax-Related Item withholding and acknowledge that should you fail to provide such information on a timely basis, the Company and/or its stock plan broker / administrator may be obligated to withhold amounts from you and it may be necessary for you to seek a refund directly from the tax authorities. To avoid financial accounting charges under applicable accounting guidance, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory rates or may take any other action required to avoid financial accounting charges under applicable accounting guidance. If the Company does not satisfy the obligation for Tax-Related Items by the withholding of Shares and instead withholds proceeds from the sale of Shares acquired upon settlement of the Restricted Stock Units, the Company may withhold or account for Tax-Related Items by considering maximum applicable rates, in which case you will receive a refund of any over-withheld amount in cash to the extent that any over-withheld amount has not otherwise been remitted to the applicable tax authority and will have no entitlement to the Common Stock equivalent.

(c)    Finally, you will pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold or account for as a result of your participation in the Plan or your acquisition of Shares that cannot be satisfied by the means previously described. The Company shall not be required to issue or deliver Shares pursuant to this Agreement unless and until such obligations are satisfied.

7.    **Tax and Legal Advice** . You represent, warrant and acknowledge that neither the Company nor your Employer have made any warranties or representations to you with respect to any Tax-Related Items, legal or financial consequences of the transactions contemplated by this Agreement, and you are in no manner relying on the Company, the Employer's or the Company's or the Employer's representatives for an assessment of such consequences. YOU UNDERSTAND THAT THE LAWS GOVERNING THIS AWARD ARE SUBJECT TO CHANGE. YOU SHOULD CONSULT YOUR OWN PROFESSIONAL TAX, LEGAL AND FINANCIAL ADVISOR REGARDING ANY RESTRICTED STOCK UNITS. YOU UNDERSTAND THAT THE COMPANY AND THE EMPLOYER ARE NOT PROVIDING ANY TAX, LEGAL, OR FINANCIAL ADVICE, NOR IS THE COMPANY OR THE EMPLOYER MAKING ANY RECOMMENDATION REGARDING YOUR ACCEPTANCE OF THIS AWARD. NOTHING STATED HEREIN IS INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAXPAYER OR OTHER PENALTIES.

8.    **Non-Transferability of Restricted Stock Units** . Restricted Stock Units shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law.

9.    **Restriction on Transfer** . Regardless of whether the transfer or issuance of the Shares to be issued pursuant to the Restricted Stock Units has been registered under the Securities Act or has been registered or qualified under the securities laws of any state, the Company may impose additional restrictions upon the sale, pledge, or other transfer of the Shares (including the placement of appropriate legends on stock certificates and the issuance of stop-transfer instructions to the Company's transfer agent) if, in the judgment of the Company and the

Company's counsel, such restrictions are necessary in order to achieve compliance with the provisions of the Securities Act, the securities laws of any state, or any other law, including all applicable foreign laws.

10.    **Restrictive Legends and Stop-Transfer Instructions** . Stock certificates evidencing the Shares issued pursuant to the Restricted Stock Units may bear such restrictive legends and/or appropriate stop-transfer instructions may be issued to the Company's transfer agent as the Company and the Company's counsel deem necessary under applicable law or pursuant to this Agreement.

11.    **Representations, Warranties, Covenants, and Acknowledgments** . You hereby agree that in the event the Company and the Company's counsel deem it necessary or advisable in the exercise of their discretion, the transfer or issuance of the Shares issued pursuant to the Restricted Stock Units may be conditioned upon you making certain representations, warranties, and acknowledgments relating to compliance with applicable laws.

12.    **Voting and Other Rights** . Subject to the terms of this Agreement, you shall not have any voting rights or any other rights and privileges of a stockholder of the Company unless and until the Restricted Stock Units are settled in Shares. In addition, you shall not have any rights to dividend equivalent payments with respect to Restricted Stock Units.

13.        **Authorization to Release and Transfer Necessary Personal Information** .

*(a)        You hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal information as described in this Agreement by and among, as applicable, the Employer, and the Company and its Parent, Subsidiaries and Affiliates for the exclusive purpose of implementing, administering and managing your participation in the Plan.*

*(b)        You understand that the Company and the Employer may hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance number (or any other social or national identification number), salary, nationality, job title, residency status, any Shares or directorships held in the Company, details of all Restricted Stock Units or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding (the "Data") for the purpose of implementing, administering and managing your participation in the Plan. You understand that the Data may be transferred to the Company or any of its Parent, Subsidiaries or Affiliates, or to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in your country or elsewhere, including outside the European Economic Area, and that the recipient's country (e.g., the United States) may have different data privacy laws and protections than your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data to a broker or other third party assisting with the administration of these Restricted Stock Units under the Plan or with whom Shares acquired pursuant to these Restricted Stock Units or cash from the sale of such Shares may be deposited. Furthermore, you acknowledge and understand that the transfer of the Data to the Company or any of its Parent, Subsidiaries or Affiliates, or to any third parties is necessary for your participation in the Plan.*

*(c)        You understand that the Data will be held only as long as is necessary to implement, administer and manage your participation in the Plan. You understand that you may, at any time, view the Data, request additional information about the storage and processing of the Data, require any necessary amendments to the Data or refuse or withdraw the consents herein by contacting your local human resources representative in writing. Further, you understand that you are providing the consents herein on a purely voluntary basis. If you do not consent, or if you later seek to revoke your consent, your employment status or service and career with the Employer will not be adversely affected; the only adverse consequence of refusing or withdrawing your consent is that the Company would not be able to grant you Restricted Stock Units or other equity awards, or administer or maintain such awards.  Therefore, you understand that refusing or withdrawing your consent may affect your ability to vest in or realize benefits from these Restricted Stock Units and your ability to participate in the Plan. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative.*

14.        **No Entitlement or Claims for Compensation** .

(a)        Your rights, if any, in respect of or in connection with these Restricted Stock Units or any other Award are derived solely from the discretionary decision of the Company to permit you to participate in the Plan and to benefit from a discretionary Award. The Plan may be amended, suspended or terminated by the Company at any time, unless otherwise provided in the Plan and this Agreement. By accepting these Restricted Stock Units, you expressly acknowledge that there is no obligation on the part of the Company to continue the Plan and/or grant any additional Restricted Stock Units to you or benefits in lieu of Restricted Stock Units, even if Restricted Stock Units have been granted in the past. All decisions with respect to future grants of Restricted Stock Units, if any, will be at the sole discretion of the Committee.

(b)        The Restricted Stock Units and the Shares subject to the Restricted Stock Units are not intended to replace any pension rights or compensation and are not to be considered compensation of a continuing or recurring nature, or part of your normal or expected compensation, and in no way represent any portion of your salary, compensation or other remuneration for any purpose, including, but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end of service payments, bonuses, long-service awards, pension or retirement benefits or similar payments, and in no event should be considered as compensation for, or relating in any way to, past services for the Company, the Employer or any Parent, Subsidiary or Affiliate. The value of the Restricted Stock Units is an extraordinary item that does not constitute compensation of any kind for services of any kind rendered to the Company, the Employer or any Parent, Subsidiary or Affiliate and which is outside the scope of your written employment or service agreement (if any).

(c)        You acknowledge that you are voluntarily participating in the Plan.

(d)        Neither the Plan nor these Restricted Stock Units or any other Award granted under the Plan shall be deemed to give you a right to remain an Employee, Consultant or director of the Company, a Parent, Subsidiary or an Affiliate. The Employer reserves the right to terminate your Service at any time, with or without cause, and for any reason.

(e)        The grant of the Restricted Stock Units and your participation in the Plan will not be interpreted to form an employment contract or service relationship with the Company, the Employer or any Parent, Subsidiary or Affiliate.

(f)        The future value of the underlying Shares is unknown, indeterminable and cannot be predicted with certainty and if you vest in the Restricted Stock Units and are issued Shares, the value of those Shares may increase or decrease. You also understand that none of the Company, the Employer or any Parent, Subsidiary or Affiliate is responsible for any foreign exchange fluctuation between the Employer's local currency and the United States Dollar that may affect the value of this Award.

(g)        No claim or entitlement to compensation or damages shall arise from forfeiture of the Restricted Stock Units resulting from the termination of your Service by the Company or the Employer (for any reason whatsoever and whether or not later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or providing Service, or the terms your employment or service agreement, if any) and, in consideration of the grant of the Award to which you are not otherwise entitled, you irrevocably agree never to institute any claim against the Employer, the Company or its Parent, Subsidiaries or Affiliates, waive your ability, if any, to bring any such claim, and release the Company and its Parent, Subsidiaries and Affiliates from any such claim; if notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by accepting the Award, you shall be deemed irrevocably to have agreed to not pursue such claim and agree to execute any and all documents necessary to request the withdrawal of such claim.

(h)        You agree that the Company may require Shares received pursuant to the Restricted Stock Units to be held by a broker designated by the Company.

(i)        You agree that your rights hereunder (if any) shall be subject to set-off by the Company for any valid debts you owe the Company.

(j)        Unless otherwise provided in the Plan or this Agreement, or by the Company in its discretion, the Restricted Stock Units and the benefits evidenced by this Agreement do not create any entitlement to have the Restricted Stock Units transferred to, or assumed by, another company, nor to be exchanged, cashed out or substituted for in connection with any Corporate Transaction affecting the Common Stock.

15.        **Governing Law and Forum** . This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflict of laws principles thereof. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to litigation in the exclusive jurisdiction of the State of California and agree that any such litigation shall be conducted only in the courts of California or the federal courts for the United States for the Northern District of California and no other courts.

16.        **Notices** . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to you at the address maintained for you in the Company's records or, in either case, as subsequently modified by written notice to the other party.

17.        **Binding Effect** . Subject to the limitations set forth in this Agreement, this Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, legal representatives, successors, and assigns of the parties hereto.

18.        **Severability** . If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the full extent possible.

19.        **Waiver** . You agree that a waiver by the Company of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement, or of any subsequent breach by you or any other participant.

20.        **Electronic Delivery** . The Company may, in its sole discretion, decide to deliver any documents related to your current or future participation in the Plan by electronic means or to request your consent to participate in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and agree to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

21.        **Language** . If this Agreement or any other document related to the Plan is translated into a language other than English and the meaning of the translated version is different from the English version, the English version will take precedence.

22.        **Appendix** . Notwithstanding any provisions in this Agreement, the Restricted Stock Units shall be subject to any special terms and conditions set forth in any Appendix to this Agreement for your country of residence. Moreover, if you relocate to one of the countries included in the Appendix, the special terms and conditions for such country will apply to you, to the extent the Company determines that the application of such terms and conditions is necessary or advisable in order to comply with local law or facilitate the administration of the Plan. The Appendix constitutes part of this Agreement.

23.        **<u>Imposition of Other Requirements</u>** . The Company reserves the right to impose other requirements on your participation in the Plan, on the Restricted Stock Units and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or facilitate the administration of the Plan. You agree to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. Furthermore, you acknowledge that the laws of the country in which you are working at the time of grant, vesting and settlement of the Restricted Stock Units or the sale of Shares received pursuant to this Agreement (including any rules or regulations governing securities, foreign exchange, tax, labor, or other matters) may subject you to additional procedural or regulatory requirements that you are and will be solely responsible for and must fulfill.

24.        **<u>Acceptance of Agreement</u>** . You must expressly accept the terms and conditions of your Restricted Stock Units as set forth in this Agreement by electronically accepting this Agreement within 300 days after the Company sends this Agreement to you. If you do not accept your Restricted Stock Units in the manner instructed by the Company, your Restricted Stock Units will be subject to cancellation.

*    *    *    *

You acknowledge that by clicking on the ***I agree*** button below, you agree to be bound by the terms of this Agreement.

**PLEASE PRINT AND KEEP A COPY FOR YOUR RECORDS**

**(For Grants Beginning September 2012 and Prior to September 2013)**

## CISCO SYSTEMS, INC.
## STOCK UNIT AGREEMENT

This Stock Unit Agreement (the "Agreement") is made and entered into as of the Grant Date (as defined below) by and between Cisco Systems, Inc., a California corporation (the "Company"), and you pursuant to the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). The material terms of this Stock Unit Award are as follows:

Employee ID: _____

Grant Date: _____

Grant Number: _____

Restricted Stock Units: _____

First Vest Date: _____

To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Plan. In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of this Agreement, the Plan terms and provisions shall prevail.

In consideration of the mutual agreements herein contained and intending to be legally bound hereby, the parties agree as follows:

1. **Restricted Stock Units** . Pursuant to the Plan, the Company hereby grants to you, and you hereby accept from the Company, Restricted Stock Units, each of which is a bookkeeping entry representing the equivalent in value of one (1) Share, on the terms and conditions set forth herein and in the Plan.

2. **Vesting of Restricted Stock Units** . So long as your Service continues, the Restricted Stock Units shall vest in accordance with the following schedule: _____ percent (__%) of the total number of Restricted Stock Units granted pursuant to this Agreement shall vest on the First Vest Date and on each _____ anniversary thereafter, unless otherwise provided by the Plan or Section 4 below. If you take a leave of absence, the Company may, at its discretion, suspend vesting during the period of leave to the extent permitted under applicable local law. Prior to the time that the Restricted Stock Units are settled, you shall have no rights other than those of a general creditor of the Company. The Restricted Stock Units represent an unfunded and unsecured obligation of the Company.

3. **Termination of Service** . In the event of the termination of your Service for any reason (whether or not in breach of local labor laws), all unvested Restricted Stock Units shall be immediately forfeited without consideration. For purposes of the preceding sentence, your right to vest in the Restricted Stock Units will terminate effective as of the date that you are no longer actively providing Service and will not be extended by any notice period mandated under local law ( *e.g.* , active Service would not include a period of "garden leave" or similar period pursuant to local law); the Company shall have the exclusive discretion to determine when you are no longer actively providing Service for purposes of the Restricted Stock Units.

4. **Special Acceleration** .

(a) To the extent the Restricted Stock Units are outstanding at the time of a Corporate Transaction, such Restricted Stock Units shall automatically become vested in full immediately prior to the effective date of the Corporate Transaction. No such accelerated vesting, however, shall occur if and to the extent: (i) these Restricted Stock Units are, in connection with the Corporate Transaction, either assumed by the successor corporation (or parent thereof) or replaced with comparable restricted stock units of the successor corporation (or parent thereof) or (ii) these Restricted Stock Units are replaced with a cash incentive program of the successor corporation which complies with Code Section 409A and preserves the fair market value of the Restricted Stock Units at the time of the Corporate Transaction and provides for subsequent pay-out in accordance with the settlement provisions set forth in Section 5 below. The determination of the comparability of restricted stock units under clause (i) shall be made by the Committee, and such determination shall be final, binding and conclusive.

(b) Immediately following the effective date of the Corporate Transaction, this Agreement shall terminate and cease to be outstanding, except as set forth in Section 5 below with respect to the deferred settlement of Restricted Stock Units or to the extent assumed by the successor corporation (or parent thereof) in connection with the Corporate Transaction.

(c) If this Agreement is assumed in connection with a Corporate Transaction, then the Committee shall appropriately adjust the number of units and the kind of shares or securities to be issued pursuant to this Agreement immediately after such Corporate Transaction.

(d) To the extent the Restricted Stock Units are outstanding at the time of a Change in Control, such Restricted Stock Units shall automatically accelerate immediately prior to the effective date of the Change in Control and shall become vested in full at that time and settled in accordance with Section 5 below.

(e) This Agreement shall not in any way affect the right of the Company to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate, sell or transfer all or any part of its business or assets.

5. **Settlement of Restricted Stock Units** . To the extent you are eligible but have not elected to defer settlement of the Restricted Stock Units, the Restricted Stock Units shall be automatically settled in Shares upon vesting of such Restricted Stock Units, provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless and until you have satisfied any applicable tax and/or other obligations pursuant to Section 6 below and such issuance otherwise complies with all applicable law. To the extent you are eligible but have elected to defer settlement of the Restricted Stock Units, the vested portion of the Restricted Stock Units shall be settled in Shares upon the earlier of: (a) your separation from service within the meaning of Code Section 409A ("Separation from Service") and (b) the fixed payment date elected by you, if any, at the time of such deferral (which shall be the first business day of a year no earlier than six years after the year of the Grant Date in accordance with procedures approved by the Committee), provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless such issuance complies with all applicable law. Notwithstanding the foregoing, to the extent your Restricted Stock Units would otherwise be settled upon your Separation from Service, such settlement shall instead occur upon the Company's first business day following the six-month anniversary of your Separation from Service.

6. **Taxes** .

(a) Regardless of any action the Company or your employer (the "Employer") takes with respect to any and all income tax, social taxes or insurance contributions, payroll tax, payment on account or other tax-related items related to your participation in the Plan and legally applicable to you ("Tax-Related Items"), you acknowledge that the ultimate liability for all Tax-Related Items with respect to the Restricted Stock Units is and remains your responsibility and may exceed the amount actually withheld by the Company or the Employer. You further acknowledge that the Company and/or the Employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Restricted Stock Units, including the grant, vesting or settlement of the Restricted Stock Units, or the subsequent sale of any Shares acquired at vesting or the receipt of any dividends with respect to such Shares; and (ii) do not commit to and are under no obligation to structure the terms or any aspect of the Restricted Stock Units to reduce or eliminate your liability for Tax-Related Items or achieve any particular tax result. Further, if you become subject to taxation in more than one jurisdiction between the Grant Date and the date of any relevant taxable event, you acknowledge that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

(b) Prior to any relevant tax, withholding or required deduction event, as applicable, you agree to make arrangements satisfactory to the Company for the satisfaction of any applicable tax, withholding, required deduction and payment on account obligations of the Company and/or the Employer that arise in connection with the Restricted Stock Units. In this regard, you authorize the Company and/or the Employer, or their respective agents, at their discretion, to satisfy any obligations related to Tax-Related Items by one or a combination of the following: (1) withholding from your wages or other cash compensation payable to you by the Company or the Employer; (2) withholding from proceeds of the sale of Shares acquired upon settlement of the Restricted Stock Units either through a voluntary sale or through a mandatory sale arranged by the Company (on your behalf pursuant to this authorization); (3) withholding of Shares that would otherwise be issued upon settlement of the Restricted Stock Units; or (4) requiring you to satisfy the liability for Tax-Related Items by means of any other arrangement approved by the Company. If the obligation for Tax-Related Items is satisfied by withholding of Shares, for tax purposes, you are deemed to have been issued the full number of Shares subject to the vested Restricted Stock Units, notwithstanding that a number of the Shares are held back solely for the purpose of paying the Tax-Related Items due as a result of any aspect of your participation in the Plan. To avoid financial accounting charges under applicable accounting guidance, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory rates or may take any other action required to avoid financial accounting charges under applicable accounting guidance.

(c) Finally, you will pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold or account for as a result of your participation in the Plan or your acquisition of Shares that cannot be satisfied by the means previously described. The Company shall not be required to issue or deliver Shares pursuant to this Agreement unless and until such obligations are satisfied.

7. **Tax and Legal Advice** . You represent, warrant and acknowledge that neither the Company nor your Employer have made any warranties or representations to you with respect to any Tax-Related Items, legal or financial consequences of the transactions contemplated by this Agreement, and you are in no manner relying on the Company, your Employer's or the Company's or the Employer's representatives for an assessment of such consequences. YOU UNDERSTAND THAT THE LAWS GOVERNING THIS AWARD ARE SUBJECT TO CHANGE. YOU SHOULD CONSULT YOUR OWN PROFESSIONAL TAX, LEGAL AND FINANCIAL ADVISOR REGARDING ANY RESTRICTED STOCK UNITS. YOU UNDERSTAND THAT THE COMPANY AND YOUR EMPLOYER ARE NOT PROVIDING ANY TAX, LEGAL, OR FINANCIAL ADVICE, NOR IS THE COMPANY OR YOUR EMPLOYER MAKING ANY RECOMMENDATION REGARDING YOUR ACCEPTANCE OF THIS AWARD. NOTHING STATED HEREIN IS INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAXPAYER OR OTHER PENALTIES.

8. **Non-Transferability of Restricted Stock Units** . Restricted Stock Units shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law.

9. **Restriction on Transfer** . Regardless of whether the transfer or issuance of the Shares to be issued pursuant to the Restricted Stock Units has been registered under the Securities Act or has been registered or qualified under the securities laws of any state, the Company may impose additional restrictions upon the sale, pledge, or other transfer of the Shares (including the placement of appropriate legends on stock certificates and the issuance of stop-transfer instructions to the Company's transfer agent) if, in the judgment of the Company and the Company's counsel, such restrictions are necessary in order to achieve compliance with the provisions of the Securities Act, the securities laws of any state, or any other law including all applicable foreign laws.

10. **Restrictive Legends and Stop-Transfer Instructions** . Stock certificates evidencing the Shares issued pursuant to the Restricted Stock Units may bear such restrictive legends and/or appropriate stop-transfer instructions may be issued to the Company's transfer agent as the Company and the Company's counsel deem necessary under applicable law or pursuant to this Agreement.

11. **Representations, Warranties, Covenants, and Acknowledgments** . You hereby agree that in the event the Company and the Company's counsel deem it necessary or advisable in the exercise of their discretion, the transfer or issuance of the Shares issued pursuant to the Restricted Stock Units may be conditioned upon you making certain representations, warranties, and acknowledgments relating to compliance with applicable laws.

12. **Voting and Other Rights** . Subject to the terms of this Agreement, you shall not have any voting rights or any other rights and privileges of a stockholder of the Company unless and until the Restricted Stock Units are settled in Shares. In addition, you shall not have any rights to dividend equivalent payments with respect to Restricted Stock Units.

13. **Authorization to Release and Transfer Necessary Personal Information** .

(a) *You hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal information as described in this Agreement by and among, as applicable, the Employer, and the Company and its Parent, Subsidiaries and Affiliates for the exclusive purpose of implementing, administering and managing your participation in the Plan* .

(b) *You understand that the Company and the Employer may hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance number (or any other social or national identification number), salary, nationality, job title, residency status, any Shares or directorships held in the Company, details of all Restricted Stock Units or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding (the "Data") for the purpose of implementing, administering and managing your participation in the Plan. You understand that Data may be transferred to the Company or any of its Parent, Subsidiaries or Affiliates, or to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in your country or elsewhere, including outside the European Economic Area, and that the recipient's country (e.g., the United States) may have different data privacy laws and protections than your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data to a broker or other third party assisting with the administration of these Restricted Stock Units under the Plan or with whom Shares acquired pursuant to these Restricted Stock Units or cash from the sale of such Shares may be deposited. Furthermore, you acknowledge and understand that the transfer of the Data to the Company or any of its Parent, Subsidiaries or Affiliates, or to any third parties is necessary for your participation in the Plan* .

(c) *You understand that Data will be held only as long as is necessary to implement, administer and manage your participation in the Plan. You understand that you may, at any time, view the Data, request additional information about the storage and processing of the Data, require any necessary amendments to the Data or refuse or withdraw the consents herein by contacting your local human resources representative in writing. You further acknowledge that withdrawal of consent may affect your ability to vest in or realize benefits from these Restricted Stock Units, and your ability to participate in the Plan. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative* .

14. **No Entitlement or Claims for Compensation** .

(a) Your rights, if any, in respect of or in connection with these Restricted Stock Units or any other Award are derived solely from the discretionary decision of the Company to permit you to participate in the Plan and to benefit from a discretionary Award. The Plan may be amended, suspended or terminated by the Company at any time, unless otherwise provided in the Plan and this Agreement. By accepting these Restricted Stock Units, you expressly acknowledge that there is no obligation on the part of the Company to continue the Plan and/or grant any additional Restricted Stock Units to you or benefits in lieu of Restricted Stock Units, even if Restricted Stock Units have been granted repeatedly in the past. All decisions with respect to future grants of Restricted Stock Units, if any, will be at the sole discretion of the Committee.

(b) The Restricted Stock Units and the Shares subject to the Restricted Stock Units are not intended to replace any pension rights or compensation and are not to be considered compensation of a continuing or recurring nature, or part of your normal or expected compensation, and in no way represent any portion of your salary, compensation or other remuneration for any purpose, including but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end of service payments, bonuses, long-service awards, pension or retirement benefits or similar payments, and in no event should be considered as compensation for, or relating in any way to, past services for the Company, the Employer or any Parent, Subsidiary or Affiliate. The value of the Restricted Stock Units is an extraordinary item that does not constitute compensation of any kind for services of any kind rendered to the Company, the Employer or any Parent, Subsidiary or Affiliate and which is outside the scope of your written employment agreement (if any).

(c) You acknowledge that you are voluntarily participating in the Plan.

(d) Neither the Plan nor these Restricted Stock Units or any other Award granted under the Plan shall be deemed to give you a right to remain an Employee, Consultant or director of the Company, a Parent, Subsidiary or an Affiliate. The Employer reserves the right to terminate your Service at any time, with or without cause, and for any reason, subject to applicable laws, the Company's Articles of Incorporation and Bylaws, and a written employment agreement (if any).

(e) The grant of the Restricted Stock Units and your participation in the Plan will not be interpreted to form an employment contract or relationship with the Company, the Employer or any Parent, Subsidiary or Affiliate.

(f) The future value of the underlying Shares is unknown and cannot be predicted with certainty and if you vest in the Restricted Stock Units and are issued Shares, the value of those Shares may increase or decrease. You also understand that neither the Company, nor the Employer or any Parent, Subsidiary or Affiliate is responsible for any foreign exchange fluctuation between your Employer's local currency and the United States Dollar that may affect the value of this Award.

(g) In consideration of the grant of the Restricted Stock Units, no claim or entitlement to compensation or damages shall arise from forfeiture of the Restricted Stock Units resulting from termination of your Service by the Company or the Employer (for any reason whatsoever and whether or not in breach of local labor laws) and you irrevocably release the Company and the Employer from any such claim that may arise; if, notwithstanding the foregoing, any such claim is found by a court of competent jurisdiction to have arisen, you shall be deemed irrevocably to have waived your entitlement to pursue such claim.

(h) You agree that the Company may require Shares received pursuant to the Restricted Stock Units to be held by a broker designated by the Company.

(i) You agree that your rights hereunder (if any) shall be subject to set-off by the Company for any valid debts you owe the Company.

(j) The Restricted Stock Units and the benefits under the Plan, if any, will not automatically transfer to another company in the case of a merger, take-over or transfer of liability.

15. **Governing Law and Forum** . This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflict of laws principles thereof. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to litigation in the exclusive jurisdiction of the State of California and agree that any such litigation shall be conducted only in the courts of California or the federal courts for the United States for the Northern District of California and no other courts.

16. **Notices** . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to you at the address maintained for you in the Company's records or, in either case, as subsequently modified by written notice to the other party.

17. **Binding Effect** . Subject to the limitations set forth in this Agreement, this Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, legal representatives, successors, and assigns of the parties hereto.

18. **Severability** . If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the full extent possible.

19. **Electronic Delivery** . The Company may, in its sole discretion, decide to deliver any documents related to your current or future participation in the Plan by electronic means or to request your consent to participate in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and agree to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

20. **Language** . If this Agreement or any other document related to the Plan is translated into a language other than English and the meaning of the translated version is different from the English version, the English version will take precedence.

21. **Appendix** . Notwithstanding any provisions in this Agreement, the Restricted Stock Units shall be subject to any special terms and conditions set forth in any Appendix to this Agreement for your country of residence. Moreover, if you relocate to one of the countries included in the Appendix, the special terms and conditions for such country will apply to you, to the extent the Company determines that the application of such terms and conditions is necessary or advisable in order to comply with local law or facilitate the administration of the Plan. The Appendix constitutes part of this Agreement.

22. **Imposition of Other Requirements** . The Company reserves the right to impose other requirements on your participation in the Plan, on the Restricted Stock Units and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or facilitate the administration of the Plan. You agree to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. Furthermore, you acknowledge that the laws of the country in which you are working at the time of grant, vesting and settlement of the Restricted Stock Units or the sale of Shares received pursuant to this Agreement (including any rules or regulations governing securities, foreign exchange, tax, labor, or other matters) may subject you to additional procedural or regulatory requirements that you are and will be solely responsible for and must fulfill.

23. **Acceptance of Agreement** . You must expressly accept the terms and conditions of your Restricted Stock Units as set forth in this Agreement by electronically accepting this Agreement within 300 days after the Company sends this Agreement to you. If you do not accept your Restricted Stock Units in the manner instructed by the Company, your Restricted Stock Units will be subject to cancellation.

\*   \*   \*   \*

You acknowledge that by clicking on the *I agree* button below, you agree to be bound by the terms of this Agreement.

**PLEASE PRINT AND KEEP A COPY FOR YOUR RECORDS**

**(For Grants Beginning September 2010 and
Prior to September 2012)**

**CISCO SYSTEMS, INC.**
**STOCK UNIT AGREEMENT**

This Stock Unit Agreement (the "Agreement") is made and entered into as of the Grant Date (as defined below) by and between Cisco Systems, Inc., a California corporation (the "Company"), and you pursuant to the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). The material terms of this Stock Unit Award are as follows:

Employee ID:  _____

Grant Date:  _____

Grant Number:  _____

Restricted Stock Units:  _____

First Vest Date:  _____

To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Plan. In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of this Agreement, the Plan terms and provisions shall prevail.

In consideration of the mutual agreements herein contained and intending to be legally bound hereby, the parties agree as follows:

1. **Restricted Stock Units** . Pursuant to the Plan, the Company hereby grants to you, and you hereby accept from the Company, Restricted Stock Units, each of which is a bookkeeping entry representing the equivalent in value of one (1) Share, on the terms and conditions set forth herein and in the Plan.

2. **Vesting of Restricted Stock Units** . So long as your Service continues, the Restricted Stock Units shall vest in accordance with the following schedule: _____(___%) of the total number of Restricted Stock Units granted pursuant to this Agreement shall vest on the First Vest Date and on each _____anniversary thereafter, unless otherwise provided by the Plan or Section 4 below. If you take a leave of absence, the Company may, at its discretion, suspend vesting during the period of leave to the extent permitted under applicable local law. Prior to the time that the Restricted Stock Units are settled, you shall have no rights other than those of a general creditor of the Company. The Restricted Stock Units represent an unfunded and unsecured obligation of the Company.

3. **Termination of Service** . In the event of the termination of your Service for any reason (whether or not in breach of local labor laws), all unvested Restricted Stock Units shall be immediately forfeited without consideration. For purposes of the preceding sentence, your right to vest in the Restricted Stock Units will terminate effective as of the date that you are no longer actively providing Service and will not be extended by any notice period mandated under local law ( *e.g.* , active Service would not include a period of "garden leave" or similar period pursuant to local law); the Company shall have the exclusive discretion to determine when you are no longer actively providing Service for purposes of the Restricted Stock Units.

4. **Special Acceleration** .

(a) To the extent the Restricted Stock Units are outstanding at the time of a Corporate Transaction, such Restricted Stock Units shall automatically become vested in full immediately prior to the effective date of the Corporate Transaction. No such accelerated vesting, however, shall occur if and to the extent: (i) these Restricted Stock Units are, in connection with the Corporate Transaction, either assumed by the successor corporation (or parent thereof) or replaced with comparable restricted stock units of the successor corporation (or parent thereof) or (ii) these Restricted Stock Units are replaced with a cash incentive program of the successor corporation which complies with Code Section 409A and preserves the fair market value of the Restricted Stock Units at the time of the Corporate Transaction and provides for subsequent pay-out in accordance with the settlement provisions set forth in Section 5 below. The determination of the comparability of restricted stock units under clause (i) shall be made by the Committee, and such determination shall be final, binding and conclusive.

(b) Immediately following the effective date of the Corporate Transaction, this Agreement shall terminate and cease to be outstanding, except as set forth in Section 5 below with respect to the deferred settlement of Restricted Stock Units or to the extent assumed by the successor corporation (or parent thereof) in connection with the Corporate Transaction.

(c) If this Agreement is assumed in connection with a Corporate Transaction, then the Committee shall appropriately adjust the number of units and the kind of shares or securities to be issued pursuant to this Agreement immediately after such Corporate Transaction.

(d) To the extent the Restricted Stock Units are outstanding at the time of a Change in Control, such Restricted Stock Units shall automatically accelerate immediately prior to the effective date of the Change in Control and shall become vested in full at that time and settled in accordance with Section 5 below.

(e) This Agreement shall not in any way affect the right of the Company to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate, sell or transfer all or any part of its business or assets.

5. **Settlement of Restricted Stock Units** . To the extent you are eligible but have not elected to defer settlement of the Restricted Stock Units, the Restricted Stock Units shall be automatically settled in Shares upon vesting of such Restricted Stock Units, provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless and until you have satisfied any applicable tax and/or other obligations pursuant to Section 6 below and such issuance otherwise complies with all applicable law. To the extent you are eligible but have elected to defer settlement of the Restricted Stock Units, the vested portion of the Restricted Stock Units shall be settled in Shares upon the earlier of: (a) your separation from service within the meaning of Code Section 409A ("Separation from Service") and (b) the fixed payment date elected by you, if any, at the time of such deferral (which shall be the first business day of a year no earlier than five years after the year of the Grant Date in accordance with procedures approved by the Committee), provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless such issuance complies with all applicable law. Notwithstanding the foregoing, to the extent your Restricted Stock Units would otherwise be settled upon your Separation from Service, such settlement shall instead occur upon the Company's first business day following the six-month anniversary of your Separation from Service.

6. **Taxes** .

(a) Regardless of any action the Company or your employer (the "Employer") takes with respect to any and all income tax, social taxes or insurance contributions, payroll tax, payment on account or other tax-related items related to your participation in the Plan and legally applicable to you ("Tax-Related Items"), you acknowledge that the ultimate liability for all Tax-Related Items with respect to the Restricted Stock Units is and remains your responsibility and may exceed the amount actually withheld by the Company or the Employer. You further acknowledge that the Company and/or the Employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Restricted Stock Units, including the grant, vesting or settlement of the Restricted Stock Units, or the subsequent sale of any Shares acquired at vesting or the receipt of any dividends with respect to such Shares; and (ii) do not commit to and are under no obligation to structure the terms or any aspect of the Restricted Stock Units to reduce or eliminate your liability for Tax-Related Items or achieve any particular tax result. Further, if you become subject to taxation in more than one jurisdiction between the Grant Date and the date of any relevant taxable event, you acknowledge that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

(b) Prior to any relevant tax, withholding or required deduction event, as applicable, you agree to make arrangements satisfactory to the Company for the satisfaction of any applicable tax, withholding, required deduction and payment on account obligations of the Company and/or the Employer that arise in connection with the Restricted Stock Units. In this regard, you authorize the Company and/or the Employer, or their respective agents, at their discretion, to satisfy any obligations related to Tax-Related Items by one or a combination of the following: (1) withholding from your wages or other cash compensation payable to you by the Company or the Employer; (2) withholding from proceeds of the sale of Shares acquired upon settlement of the Restricted Stock Units either through a voluntary sale or through a mandatory sale arranged by the Company (on your behalf pursuant to this authorization); (3) withholding of Shares that would otherwise be issued upon settlement of the Restricted Stock Units; or (4) requiring you to satisfy the liability for Tax-Related Items by means of any other arrangement approved by the Company. If the obligation for Tax-Related Items is satisfied by withholding of Shares, for tax purposes, you are deemed to have been issued the full number of Shares subject to the vested Restricted Stock Units, notwithstanding that a number of the Shares are held back solely for the purpose of paying the Tax-Related Items due as a result of any aspect of your participation in the Plan. To avoid financial accounting charges under applicable accounting guidance, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory rates or may take any other action required to avoid financial accounting charges under applicable accounting guidance.

(c) Finally, you will pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold or account for as a result of your participation in the Plan or your acquisition of Shares that cannot be satisfied by the means previously described. The Company shall not be required to issue or deliver Shares pursuant to this Agreement unless and until such obligations are satisfied.

7. **Tax and Legal Advice** . You represent, warrant and acknowledge that neither the Company nor your Employer have made any warranties or representations to you with respect to any Tax-Related Items, legal or financial consequences of the transactions contemplated by this Agreement, and you are in no manner relying on the Company, your Employer's or the Company's or the Employer's representatives for an assessment of such consequences. YOU UNDERSTAND THAT THE LAWS GOVERNING THIS AWARD ARE SUBJECT TO CHANGE. YOU SHOULD CONSULT YOUR OWN PROFESSIONAL TAX, LEGAL AND FINANCIAL ADVISOR REGARDING ANY RESTRICTED STOCK UNITS. YOU UNDERSTAND THAT THE COMPANY AND YOUR EMPLOYER ARE NOT PROVIDING ANY TAX, LEGAL, OR FINANCIAL ADVICE, NOR IS THE COMPANY OR YOUR EMPLOYER MAKING ANY RECOMMENDATION REGARDING YOUR ACCEPTANCE OF THIS AWARD. NOTHING STATED HEREIN IS INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAXPAYER OR OTHER PENALTIES.

8. **Non-Transferability of Restricted Stock Units** . Restricted Stock Units shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law.

9. **Restriction on Transfer** . Regardless of whether the transfer or issuance of the Shares to be issued pursuant to the Restricted Stock Units has been registered under the Securities Act or has been registered or qualified under the securities laws of any state, the Company may impose additional restrictions upon the sale, pledge, or other transfer of the Shares (including the placement of appropriate legends on stock certificates and the issuance of stop-transfer instructions to the Company's transfer agent) if, in the judgment of the Company and the Company's counsel, such restrictions are necessary in order to achieve compliance with the provisions of the Securities Act, the securities laws of any state, or any other law including all applicable foreign laws.

10. **Restrictive Legends and Stop-Transfer Instructions** . Stock certificates evidencing the Shares issued pursuant to the Restricted Stock Units may bear such restrictive legends and/or appropriate stop-transfer instructions may be issued to the Company's transfer agent as the Company and the Company's counsel deem necessary under applicable law or pursuant to this Agreement.

11. **Representations, Warranties, Covenants, and Acknowledgments** . You hereby agree that in the event the Company and the Company's counsel deem it necessary or advisable in the exercise of their discretion, the transfer or issuance of the Shares issued pursuant to the Restricted Stock Units may be conditioned upon you making certain representations, warranties, and acknowledgments relating to compliance with applicable laws.

12. **Voting and Other Rights** . Subject to the terms of this Agreement, you shall not have any voting rights or any other rights and privileges of a stockholder of the Company unless and until the Restricted Stock Units are settled in Shares. In addition, you shall not have any rights to dividend equivalent payments with respect to Restricted Stock Units.

13. **Authorization to Release and Transfer Necessary Personal Information** .

(a) *You hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal information as described in this Agreement by and among, as applicable, the Employer, and the Company and its Parent, Subsidiaries and Affiliates for the exclusive purpose of implementing, administering and managing your participation in the Plan.*

(b) *You understand that the Company and the Employer may hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance number (or any other social or national identification number), salary, nationality, job title, residency status, any Shares or directorships held in the Company, details of all Restricted Stock Units or any other entitlement to Shares awarded, canceled, exercised, vested, unvested or outstanding (the "Data") for the purpose of implementing, administering and managing your participation in the Plan. You understand that Data may be transferred to the Company or any of its Parent, Subsidiaries or Affiliates, or to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in your country or elsewhere, including outside the European Economic Area, and that the recipient's country (e.g., the United States) may have different data privacy laws and protections than your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purposes of implementing, administering and managing your participation in the Plan, including any requisite transfer of such Data to a broker or other third party assisting with the administration of these Restricted Stock Units under the Plan or with whom Shares acquired pursuant to these Restricted Stock Units or cash from the sale of such Shares may be deposited. Furthermore, you acknowledge and understand that the transfer of the Data to the Company or any of its Parent, Subsidiaries or Affiliates, or to any third parties is necessary for your participation in the Plan.*

(c) *You understand that Data will be held only as long as is necessary to implement, administer and manage your participation in the Plan. You understand that you may, at any time, view the Data, request additional information about the storage and processing of the Data, require any necessary amendments to the Data or refuse or withdraw the consents herein by contacting your local human resources representative in writing. You further acknowledge that withdrawal of consent may affect your ability to vest in or realize benefits from these Restricted Stock Units, and your ability to participate in the Plan. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative.*

14. **No Entitlement or Claims for Compensation** .

(a) Your rights, if any, in respect of or in connection with these Restricted Stock Units or any other Award are derived solely from the discretionary decision of the Company to permit you to participate in the Plan and to benefit from a discretionary Award. The Plan may be amended, suspended or terminated by the Company at any time, unless otherwise provided in the Plan and this Agreement. By accepting these Restricted Stock Units, you expressly acknowledge that there is no obligation on the part of the Company to continue the Plan and/or grant any additional Restricted Stock Units to you or benefits in lieu of Restricted Stock Units, even if Restricted Stock Units have been granted repeatedly in the past. All decisions with respect to future grants of Restricted Stock Units, if any, will be at the sole discretion of the Committee.

(b) The Restricted Stock Units and the Shares subject to the Restricted Stock Units are not intended to replace any pension rights or compensation and are not to be considered compensation of a continuing or recurring nature, or part of your normal or expected compensation, and in no way represent any portion of your salary, compensation or other remuneration for any purpose, including but not limited to,

calculating any severance, resignation, termination, redundancy, dismissal, end of service payments, bonuses, long-service awards, pension or retirement benefits or similar payments, and in no event should be considered as compensation for, or relating in any way to, past services for the Company, the Employer or any Parent, Subsidiary or Affiliate. The value of the Restricted Stock Units is an extraordinary item that does not constitute compensation of any kind for services of any kind rendered to the Company, the Employer or any Parent, Subsidiary or Affiliate and which is outside the scope of your written employment agreement (if any).

(c) You acknowledge that you are voluntarily participating in the Plan.

(d) Neither the Plan nor these Restricted Stock Units or any other Award granted under the Plan shall be deemed to give you a right to remain an Employee, Consultant or director of the Company, a Parent, Subsidiary or an Affiliate. The Employer reserves the right to terminate your Service at any time, with or without cause, and for any reason, subject to applicable laws, the Company's Articles of Incorporation and Bylaws, and a written employment agreement (if any).

(e) The grant of the Restricted Stock Units and your participation in the Plan will not be interpreted to form an employment contract or relationship with the Company, the Employer or any Parent, Subsidiary or Affiliate.

(f) The future value of the underlying Shares is unknown and cannot be predicted with certainty and if you vest in the Restricted Stock Units and are issued Shares, the value of those Shares may increase or decrease. You also understand that neither the Company, nor the Employer or any Parent, Subsidiary or Affiliate is responsible for any foreign exchange fluctuation between your Employer's local currency and the United States Dollar that may affect the value of this Award.

(g) In consideration of the grant of the Restricted Stock Units, no claim or entitlement to compensation or damages shall arise from forfeiture of the Restricted Stock Units resulting from termination of your Service by the Company or the Employer (for any reason whatsoever and whether or not in breach of local labor laws) and you irrevocably release the Company and the Employer from any such claim that may arise; if, notwithstanding the foregoing, any such claim is found by a court of competent jurisdiction to have arisen, you shall be deemed irrevocably to have waived your entitlement to pursue such claim.

(h) You agree that the Company may require Shares received pursuant to the Restricted Stock Units to be held by a broker designated by the Company.

(i) You agree that your rights hereunder (if any) shall be subject to set-off by the Company for any valid debts you owe the Company.

(j) The Restricted Stock Units and the benefits under the Plan, if any, will not automatically transfer to another company in the case of a merger, take-over or transfer of liability.

15. **Governing Law and Forum** . This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflict of laws principles thereof. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to litigation in the exclusive jurisdiction of the State of California and agree that any such litigation shall be conducted only in the courts of California or the federal courts for the United States for the Northern District of California and no other courts.

16. **Notices** . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to you at the address maintained for you in the Company's records or, in either case, as subsequently modified by written notice to the other party.

17. **Binding Effect** . Subject to the limitations set forth in this Agreement, this Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, legal representatives, successors, and assigns of the parties hereto.

18. **Severability** . If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the full extent possible.

19. **Electronic Delivery** . The Company may, in its sole discretion, decide to deliver any documents related to your current or future participation in the Plan by electronic means or to request your consent to participate in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and agree to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

20. **Language** . If this Agreement or any other document related to the Plan is translated into a language other than English and the meaning of the translated version is different from the English version, the English version will take precedence.

21. **Appendix** . Notwithstanding any provisions in this Agreement, the Restricted Stock Units shall be subject to any special terms and conditions set forth in any Appendix to this Agreement for your country of residence. Moreover, if you relocate to one of the countries included in the Appendix, the special terms and conditions for such country will apply to you, to the extent the Company determines that the application

of such terms and conditions is necessary or advisable in order to comply with local law or facilitate the administration of the Plan. The Appendix constitutes part of this Agreement.

22. **<u>Imposition of Other Requirements</u>** . The Company reserves the right to impose other requirements on your participation in the Plan, on the Restricted Stock Units and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with local law or facilitate the administration of the Plan. You agree to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. Furthermore, you acknowledge that the laws of the country in which you are working at the time of grant, vesting and settlement of the Restricted Stock Units or the sale of Shares received pursuant to this Agreement (including any rules or regulations governing securities, foreign exchange, tax, labor, or other matters) may subject you to additional procedural or regulatory requirements that you are and will be solely responsible for and must fulfill.

23. **<u>Acceptance of Agreement</u>** . You must expressly accept the terms and conditions of your Restricted Stock Units as set forth in this Agreement by electronically accepting this Agreement within 300 days after the Company sends this Agreement to you. If you do not accept your Restricted Stock Units in the manner instructed by the Company, your Restricted Stock Units will be subject to cancellation.

*   *   *   *

You acknowledge that by clicking on the ***I agree*** button below, you agree to be bound by the terms of this Agreement.

**PLEASE PRINT AND KEEP A COPY FOR YOUR RECORDS**

PERFORMANCE RSU LETTER

[Date]

[Name]
[Address]
[Address]

Dear _____:

[introductory text]

Your leadership team has recommended that you receive a performance-based restricted stock unit (PRSU) right with a target of [ _____ ]. RSUs will be granted after the end of FY[ ___ ] based upon the satisfaction of an FY[ ___ ] performance condition.

The right to receive a grant of a restricted stock unit depends on Cisco's satisfaction of certain [ _____ ] targets for FY[ ___ ]. Assuming those targets are met or exceeded, the restricted stock units that you are granted will vest [ _____ ] percent on the date of grant and [ _____ ] percent on each of the next [ _____ ] anniversaries of the date of grant thereafter, subject to your continued employment with Cisco or an affiliate on the applicable vesting date. On each vesting date, the vested units will be settled in Cisco common stock. In addition, in the unlikely event that a corporate transaction or change in control (each as defined in Cisco's 2005 Stock Incentive Plan) is consummated during FY[ ___ ] or prior to the Compensation and Management Development Committee's Certification regarding satisfaction of the FY[ ___ ] performance conditions, the performance-based restricted stock unit right will be deemed fully earned at target (100%) immediately prior to the effective date of the corporate transaction or the change in control, as the case may be, and will be settled in fully vested Cisco common stock at that time.

Lastly, please note that, if you are employed outside the United States, the Compensation and Management Development Committee can grant the PRSU Right to you, in its sole discretion, only if and as long as it is permitted and feasible to grant restricted stock units under the laws of the country in which you are employed. If local laws make the grant of restricted stock units illegal or impractical, Cisco will let you know as soon as possible. You are under no obligation to accept the PRSU Right or any restricted stock units that may subsequently be granted to you.

[concluding text]

Sincerely,

_____

**A** CTION **R** EQUIRED : **M** UST BE RETURNED BY **[INSERT APPROPRIATE DATE]**

**Deferral Election for**
**Annual Equity Award**
*2005 Stock Incentive Plan*
**(For Elections Prior to January 2011)**

Name (Last, First, Middle Initial) _____    Employee Number _____

You may use this form to:

- Indicate the percentage of your annual restricted stock unit grant under the 2005 Stock Incentive Plan that you wish to defer. Your elected percentage will apply to each vesting installment of such grant.

- Designate the settlement timing of the deferred portion of your vested annual restricted stock unit grant.

**PLEASE REMEMBER THAT ONCE YOU MAKE AN ELECTION TO DEFER A RESTRICTED STOCK UNIT GRANT, YOU CANNOT REVOKE THAT ELECTION.**

| **D** EFERRAL **E** LECTION | Please select if you wish to defer restricted stock units; fill in the appropriate blanks. |
|---|---|

↙       **Restricted Stock Unit Grant**       I elect to defer _____ % (you may only insert 25%, 50%, 75%, or 100%) of my annual restricted stock unit award anticipated to be granted under the 2005 Stock Incentive Plan (the "Plan") on _____ , 201 ___ (subject to my continued employment with the Company or the Employer). I understand that this elected percentage will apply to each vesting installment of this grant.

| **S** ETTLEMENT **D** ATE * | Please complete this section to indicate settlement timing for the deferred portion of your vested annual restricted stock unit grant. You may only choose one alternative. |
|---|---|

↙       **Separation of Service**       I elect to defer the settlement of the deferred portion of my vested annual restricted stock unit grant to my Separation of Service (as defined in Section 409A of the Internal Revenue Code).

**OR**

↙       **Date Specific (subject to earlier settlement upon separation from service)**       I elect to defer the settlement of the deferred portion of my vested annual restricted stock unit grant to the earlier of (i) my Separation from Service; or (ii) the first business day of 20 _____ (insert a year no earlier than 5 years after the year of grant and no later than 15 years after the year of grant).

*       Any vested portion of the deferred portion of my restricted stock unit grant will be settled in shares of the Company's common stock.

**A CTION R EQUIRED : M UST BE RETURNED BY [INSERT APPROPRIATE DATE]**

**Deferral Election for**
**Annual Equity Award**
*2005 Stock Incentive Plan*

I understand:

- To the extent I do not elect to defer the settlement of my restricted stock unit grant, such portion of the restricted stock unit grant will be automatically settled in shares of the Company's common stock upon the vesting of the restricted stock unit grant (subject to acceleration in certain cases), as more fully set forth in the Stock Unit Agreement.

- Any vested portion of the deferred restricted stock unit grant will be settled in shares of the Company's common stock as elected by me above.

- If my Separation from Service occurs before my restricted stock unit grant vests, any unvested restricted stock units will be forfeited as of the date my Separation from Service occurs.

- Any employment taxes that are due upon the vesting of my restricted stock unit grant (including the deferred portion of my grant) shall be deducted at the time of vesting by one or a combination of the following:

    (1)  withholding from my wages or other cash compensation payable to me by the Company or the Employer;

    (2)  withholding from proceeds of the sale of shares acquired upon settlement of the restricted stock units either through a voluntary sale or through a mandatory sale arranged by the Company (on my behalf pursuant to this authorization);

    (3)  withholding of shares that would otherwise be issued upon settlement of the restricted stock units; or

    (4)  requiring me to satisfy the liability for any employment taxes by means of any other arrangement approved by the Company.

- The receipt of shares of the Company's common stock pursuant to any restricted stock unit grant will be taxed as ordinary income to me based on the value of the shares on the date the stock unit grant is settled and I receive shares of the Company's common stock. This is true whether or not I elect to defer settlement of my restricted stock units.

- The settlement of the deferred portion of my annual restricted stock unit grant upon my Separation from Service will be delayed for 6 months.

**ACKNOWLEDGED AND AGREED:**


Signature of Participant                    Date

**A** CTION **R** EQUIRED : **M** UST BE RETURNED BY **[INSERT APPROPRIATE DATE]**

**Deferral Election for**
**Annual Equity Award**
*2005 Stock Incentive Plan*

_____        _____
Name (Last, First, Middle Initial)                                          Employee Number

You may use this form to:

- Indicate the percentage of your annual restricted stock unit grant under the 2005 Stock Incentive Plan that you wish to defer. Your elected percentage will apply to each vesting installment of such grant.

- Designate the settlement timing of the deferred portion of your vested annual restricted stock unit grant.

**PLEASE REMEMBER THAT ONCE YOU MAKE AN ELECTION TO DEFER A RESTRICTED STOCK UNIT GRANT, YOU CANNOT REVOKE THAT ELECTION.**

| **D** EFERRAL  **E** LECTION | Please select if you wish to defer restricted stock units; fill in the appropriate blanks. |
|---|---|

| ↙ | **Restricted Stock Unit Grant** | I elect to defer _____ % (you may only insert 25%, 50%, 75%, or 100%) of my annual restricted stock unit award anticipated to be granted under the 2005 Stock Incentive Plan (the "Plan") on _____ , 201 ___ (subject to my continued employment with the Company or the Employer). I understand that this elected percentage will apply to each vesting installment of this grant. |
|---|---|---|

| **S** ETTLEMENT  **D** ATE  * | Please complete this section to indicate settlement timing for the deferred portion of your vested annual restricted stock unit grant. You may only choose one alternative. |
|---|---|

| ↙ OR | **Separation of Service** | I elect to defer the settlement of the deferred portion of my vested annual restricted stock unit grant to my Separation of Service (as defined in Section 409A of the Internal Revenue Code). |
|---|---|---|
| ↙ | **Date Specific (subject to earlier settlement upon separation from service)** | I elect to defer the settlement of the deferred portion of my vested annual restricted stock unit grant to the earlier of (i) my Separation from Service; or (ii) the first business day of 20 _____ (insert a year no earlier than 6 years after the year of grant and no later than 15 years after the year of grant). |

*      Any vested portion of the deferred portion of my restricted stock unit grant will be settled in shares of the Company's common stock.

**A CTION R EQUIRED : M UST BE RETURNED BY [INSERT APPROPRIATE DATE]**

**Deferral Election for
Annual Equity Award**
*2005 Stock Incentive Plan*

I understand:

- To the extent I do not elect to defer the settlement of my restricted stock unit grant, such portion of the restricted stock unit grant will be automatically settled in shares of the Company's common stock upon the vesting of the restricted stock unit grant (subject to acceleration in certain cases), as more fully set forth in the Stock Unit Agreement.

- Any vested portion of the deferred restricted stock unit grant will be settled in shares of the Company's common stock as elected by me above.

- If my Separation from Service occurs before my restricted stock unit grant vests, any unvested restricted stock units will be forfeited as of the date my Separation from Service occurs.

- "Separation from Service" is defined in Treasury Regulation Section 1.409A-1(h). While separation from service generally means termination of employment, a Separation from Service can also occur in the case of certain leaves of absence or upon a significant reduction in my work schedule. These events can trigger a "Separation from Service" resulting in the forfeiture of my unvested restricted stock units.

- Certain leaves of absence can result in the suspension of vesting of my unvested restricted stock units. If I take a leave of absence that suspends the vesting of my restricted stock units such that they are unvested as of the applicable distribution event (whether that is Separation from Service or a date specific I elected), my restricted stock units that are unvested at the time of such distribution event shall be forfeited.

- Any employment taxes that are due upon the vesting of my restricted stock unit grant (including the deferred portion of my grant) shall be deducted at the time of vesting by one or a combination of the following:

  (1) withholding from my wages or other cash compensation payable to me by the Company or the Employer;

  (2) withholding from proceeds of the sale of shares acquired upon settlement of the restricted stock units either through a voluntary sale or through a mandatory sale arranged by the Company (on my behalf pursuant to this authorization);

  (3) withholding of shares that would otherwise be issued upon settlement of the restricted stock units; or

  (4) requiring me to satisfy the liability for any employment taxes by means of any other arrangement approved by the Company.

- The receipt of shares of the Company's common stock pursuant to any restricted stock unit grant will be taxed as ordinary income to me based on the value of the shares on the date the stock unit grant is settled and I receive shares of the Company's common stock. This is true whether or not I elect to defer settlement of my restricted stock units.

- The settlement of the deferred portion of my annual restricted stock unit grant upon my Separation from Service will be delayed for 6 months.

**ACKNOWLEDGED AND AGREED:**

Signature of Participant                    Date

**Non-Employee Director Initial RSU Grant**
**(For Grants Effective on and after the Date of the**
**Company's 2015 Annual Meeting of Shareholders)**

# CISCO SYSTEMS, INC.
## STOCK UNIT AGREEMENT

This Stock Unit Agreement (the "Agreement") is made and entered into as of the Grant Date (as defined below) by and between Cisco Systems, Inc., a California corporation (the "Company"), and you pursuant to the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). The material terms of this Stock Unit Award are as follows:

Grantee: _____

Grant Date: _____

Grant Number: _____

Restricted Stock Units: _____

Vest Date: _____ (the date of the Annual Meeting of Shareholders following the initial election or appointment date)

To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Plan. In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of this Agreement, the Plan terms and provisions shall prevail.

In consideration of the mutual agreements herein contained and intending to be legally bound hereby, the parties agree as follows:

1. **Restricted Stock Units** . Pursuant to the Plan, the Company hereby grants to you, and you hereby accept from the Company, Restricted Stock Units, each of which is a bookkeeping entry representing the equivalent in value of one (1) Share, on the terms and conditions set forth herein and in the Plan.

2. **Vesting of Restricted Stock Units** . So long as your service on the Board continues, the Restricted Stock Units shall vest in accordance with the following schedule: one-hundred percent (100%) of the total number of Restricted Stock Units granted pursuant to this Agreement shall vest on the Vest Date, unless otherwise provided by the Plan or Section 4 below.

3. **Termination of Service** . Except as provided in Section 4 below, in the event of the termination of your Board service for any reason, all unvested Restricted Stock Units shall be immediately forfeited without consideration.

4. **Special Acceleration** .

(a) To the extent the Restricted Stock Units are outstanding at the time of a Corporate Transaction or a Change in Control, such Restricted Stock Units shall automatically accelerate immediately prior to the effective date of the Corporate Transaction or the Change in Control, as the case may be, and shall become vested in full at that time.

(b) If your service on the Board ceases as a result of your death or Disability, to the extent the Restricted Stock Units are outstanding, such Restricted Stock Units shall automatically accelerate and shall become vested in full at that time.

(c)    This Agreement shall not in any way affect the right of the Company to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate, sell or transfer all or any part of its business or assets.

5.    **Settlement of Restricted Stock Units** . To the extent you have not elected to defer settlement of the Restricted Stock Units, the Restricted Stock Units shall be automatically settled in Shares upon vesting of such Restricted Stock Units, provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless such issuance complies with all applicable law. To the extent you have elected to defer settlement of the Restricted Stock Units, the vested portion of the Restricted Stock Units shall be settled in Shares upon your separation from service within the meaning of Code Section 409A ("Separation from Service"), provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless such issuance complies with all applicable law. Prior to the time that the Restricted Stock Units are settled, you shall have no rights other than those of a general creditor of the Company. The Restricted Stock Units represent an unfunded and unsecured obligation of the Company.

6.    **Tax Advice** . You represent, warrant and acknowledge that the Company has made no warranties or representations to you with respect to the income tax consequences of the transactions contemplated by this Agreement, and you are in no manner relying on the Company or the Company's representatives for an assessment of such tax consequences. YOU UNDERSTAND THAT THE TAX LAWS AND REGULATIONS ARE SUBJECT TO CHANGE. YOU SHOULD CONSULT YOUR OWN TAX ADVISOR REGARDING ANY RESTRICTED STOCK UNITS. NOTHING STATED HEREIN IS INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAXPAYER PENALTIES.

7.    **Non-Transferability of Restricted Stock Units** . Restricted Stock Units shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law.

8.    **Restriction on Transfer** . Regardless of whether the transfer or issuance of the Shares to be issued pursuant to the Restricted Stock Units has been registered under the Securities Act or has been registered or qualified under the securities laws of any state, the Company may impose additional restrictions upon the sale, pledge, or other transfer of the Shares (including the placement of appropriate legends on stock certificates and the issuance of stop-transfer instructions to the Company's transfer agent) if, in the judgment of the Company and the Company's counsel, such restrictions are necessary in order to achieve compliance with the provisions of the Securities Act, the securities laws of any state, or any other law.

9.    **Stock Certificate Restrictive Legends** . Stock certificates evidencing the Shares issued pursuant to the Restricted Stock Units may bear such restrictive legends as the Company and the Company's counsel deem necessary under applicable law or pursuant to this Agreement.

10.    **Representations, Warranties, Covenants, and Acknowledgments** . You hereby agree that in the event the Company and the Company's counsel deem it necessary or advisable in the exercise of their discretion, the transfer or issuance of the Shares issued pursuant to the Restricted Stock Units may be conditioned upon you making certain representations, warranties, and acknowledgments relating to compliance with applicable securities laws.

11.    **Voting, Dividend and Other Rights** . Subject to the terms of this Agreement and except as set forth below, you shall not have any voting rights or any other rights and privileges of a shareholder of the Company unless and until the Restricted Stock Units are settled in Shares. To the extent you have elected to defer settlement of Restricted Stock Units with a Grant Date on or after the Company's 2015 Annual Meeting of Shareholders, dividend equivalents shall accrue after the vesting of the Restricted Stock Units and will be subject to the same conditions and restrictions as the Restricted Stock Units to which they attach as set forth in the Plan or this Agreement and will be settled in additional Shares upon your Separation from Service.

12.    **Authorization to Release Necessary Personal Information** .

(a)     You hereby authorize and direct the Company to collect, use and transfer in electronic or other form, any personal information (the "Data") regarding your service, the nature and amount of your compensation and the facts and conditions of your participation in the Plan (including, but not limited to, your name, home address, telephone number, date of birth, social security number (or any other social or national identification number), compensation, nationality, job title, number of Shares held and the details of all Awards or any other entitlement to Shares awarded, cancelled, exercised, vested, unvested or outstanding) for the purpose of implementing, administering and managing your participation in the Plan. You understand that the Data may be transferred to the Company or any of its Subsidiaries, or to any third parties assisting in the implementation, administration and management of the Plan, including any requisite transfer to a broker or other third party assisting with the administration of these Restricted Stock Units under the Plan or with whom Shares acquired pursuant to these Restricted Stock Units or cash from the sale of such shares may be deposited. You acknowledge that recipients of the Data may be located in different countries, and those countries may have data privacy laws and protections different from those in the country of your residence. Furthermore, you acknowledge and understand that the transfer of the Data to the Company or any of its Subsidiaries, or to any third parties is necessary for your participation in the Plan.

(b)     You may at any time withdraw the consents herein by contacting the Company's local human resources representative in writing. You further acknowledge that withdrawal of consent may affect your ability to exercise or realize benefits from these Restricted Stock Units and your ability to participate in the Plan.

13.     __No Entitlement or Claims for Compensation__ .

(a)     Your rights, if any, in respect of or in connection with these Restricted Stock Units or any other Award are derived solely from the discretionary decision of the Company to permit you to participate in the Plan and to benefit from a discretionary Award. By accepting these Restricted Stock Units, you expressly acknowledge that there is no obligation on the part of the Company to continue the Plan and/or grant any additional Awards to you. These Restricted Stock Units are not intended to be compensation of a continuing or recurring nature, or part of your normal or expected compensation, and in no way represents any portion of your compensation or other remuneration for purposes of pension benefits, severance, redundancy, resignation or any other purpose.

(b)     Neither the Plan nor these Restricted Stock Units or any other Award granted under the Plan shall be deemed to give you a right to continue to serve on the Board of the Company for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company or the Company's shareholders, which rights are hereby expressly reserved by each, to terminate your service on the Board at any time, for any reason, with or without cause, in accordance with the provisions of applicable law, the Company's Articles of Incorporation and Bylaws. You shall be deemed irrevocably to have waived any claim to damages or specific performance for breach of contract or dismissal, compensation for loss of office, tort or otherwise with respect to the Plan, these Restricted Stock Units or any outstanding Award that is forfeited and/or is terminated by its terms or to any future Award.

(c)     You agree that your rights hereunder shall be subject to set-off by the Company for any valid debts you owe the Company.

14.     __Governing Law__ . This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflict of laws principles thereof.

15.     __Notices__ . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to you at the address maintained for you in the Company's records or, in either case, as subsequently modified by written notice to the other party.

16.    **<u>Binding Effect</u>** . Subject to the limitations set forth in this Agreement, this Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, legal representatives, successors, and assigns of the parties hereto.

17.    **<u>Severability</u>** . If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the full extent possible.

**Non-Employee Director Initial RSU Grant
(For Grants Beginning November 2012 Through the Date that is
One Day Prior to the Date of the Company's 2015 Annual Meeting of Shareholders)**

# CISCO SYSTEMS, INC.
## STOCK UNIT AGREEMENT

This Stock Unit Agreement (the "Agreement") is made and entered into as of the Grant Date (as defined below) by and between Cisco Systems, Inc., a California corporation (the "Company"), and you pursuant to the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). The material terms of this Stock Unit Award are as follows:

Grantee: _____

Grant Date: _____

Grant Number: _____

Restricted Stock Units: _____


Vest Date: _____ (the date of the Annual Meeting of Shareholders following the initial election or appointment
        date)

To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Plan. In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of this Agreement, the Plan terms and provisions shall prevail.

In consideration of the mutual agreements herein contained and intending to be legally bound hereby, the parties agree as follows:

1. **Restricted Stock Units** . Pursuant to the Plan, the Company hereby grants to you, and you hereby accept from the Company, Restricted Stock Units, each of which is a bookkeeping entry representing the equivalent in value of one (1) Share, on the terms and conditions set forth herein and in the Plan.

2. **Vesting of Restricted Stock Units** . So long as your service on the Board continues, the Restricted Stock Units shall vest in accordance with the following schedule: one-hundred percent (100%) of the total number of Restricted Stock Units granted pursuant to this Agreement shall vest on the Vest Date, unless otherwise provided by the Plan or Section 4 below.

3. **Termination of Service** . Except as provided in Section 4 below, in the event of the termination of your Board service for any reason, all unvested Restricted Stock Units shall be immediately forfeited without consideration.

4. **Special Acceleration** .

(a) To the extent the Restricted Stock Units are outstanding at the time of a Corporate Transaction or a Change in Control, such Restricted Stock Units shall automatically accelerate immediately prior to the effective date of the Corporate Transaction or the Change in Control, as the case may be, and shall become vested in full at that time.

(b) If your service on the Board ceases as a result of your death or Disability, to the extent the Restricted Stock Units are outstanding, such Restricted Stock Units shall automatically accelerate and shall become vested in full at that time.

(c) This Agreement shall not in any way affect the right of the Company to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate, sell or transfer all or any part of its business or assets.

5. **Settlement of Restricted Stock Units** . To the extent you have not elected to defer settlement of the Restricted Stock Units, the Restricted Stock Units shall be automatically settled in Shares upon vesting of such Restricted Stock Units, provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless such issuance complies with all applicable law. To the extent you have elected to defer settlement of the Restricted Stock Units, the vested portion of the Restricted Stock Units shall be settled in Shares upon your separation from service within the meaning of Code Section 409A ("Separation from Service"), provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless such issuance complies with all applicable law.

6. **Tax Advice** . You represent, warrant and acknowledge that the Company has made no warranties or representations to you with respect to the income tax consequences of the transactions contemplated by this Agreement, and you are in no manner relying on the Company or the Company's representatives for an assessment of such tax consequences. YOU UNDERSTAND THAT THE TAX LAWS AND REGULATIONS ARE SUBJECT TO CHANGE. YOU SHOULD CONSULT YOUR OWN TAX ADVISOR REGARDING ANY RESTRICTED STOCK UNITS. NOTHING STATED HEREIN IS INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAXPAYER PENALTIES.

7. **Non-Transferability of Restricted Stock Units** . Restricted Stock Units shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law.

8. **Restriction on Transfer** . Regardless of whether the transfer or issuance of the Shares to be issued pursuant to the Restricted Stock Units has been registered under the Securities Act or has been registered or qualified under the securities laws of any state, the Company may impose additional restrictions upon the sale, pledge, or other transfer of the Shares (including the placement of appropriate legends on stock certificates and the issuance of stop-transfer instructions to the Company's transfer agent) if, in the judgment of the Company and the Company's counsel, such restrictions are necessary in order to achieve compliance with the provisions of the Securities Act, the securities laws of any state, or any other law.

9. **Stock Certificate Restrictive Legends** . Stock certificates evidencing the Shares issued pursuant to the Restricted Stock Units may bear such restrictive legends as the Company and the Company's counsel deem necessary under applicable law or pursuant to this Agreement.

10. **Representations, Warranties, Covenants, and Acknowledgments** . You hereby agree that in the event the Company and the Company's counsel deem it necessary or advisable in the exercise of their discretion, the transfer or issuance of the Shares issued pursuant to the Restricted Stock Units may be conditioned upon you making certain representations, warranties, and acknowledgments relating to compliance with applicable securities laws.

11. **Voting and Other Rights** . Subject to the terms of this Agreement, you shall not have any voting rights or any other rights and privileges of a shareholder of the Company unless and until the Restricted Stock Units are settled upon vesting.

12. **Authorization to Release Necessary Personal Information** .

(a) You hereby authorize and direct the Company to collect, use and transfer in electronic or other form, any personal information (the "Data") regarding your service, the nature and amount of your compensation and the facts and conditions of your participation in the Plan (including, but not limited to, your name, home address, telephone number, date of birth, social security number (or any other social or national identification number), compensation, nationality, job title, number of Shares held and the details of all Awards or any other entitlement to Shares awarded, cancelled, exercised, vested, unvested or outstanding) for the purpose of implementing, administering and managing your participation in the Plan. You understand that the Data may be transferred to the Company or any of its Subsidiaries, or to any third parties assisting in the implementation, administration and management of the Plan, including any requisite transfer to a broker or other third party assisting with the administration of these Restricted Stock Units under the Plan or with whom Shares acquired pursuant to these Restricted Stock Units or cash from the sale of such shares may be deposited. You acknowledge that recipients of the Data may be located in different countries, and those countries may have data privacy laws and protections different from those in the country of your residence. Furthermore, you acknowledge and understand that the transfer of the Data to the Company or any of its Subsidiaries, or to any third parties is necessary for your participation in the Plan.

(b) Prior to the time that the Restricted Stock Units are settled upon vesting, you shall have no rights other than those of a general creditor of the Company. The Restricted Stock Units represent an unfunded and unsecured obligation of the Company.

(c) You may at any time withdraw the consents herein by contacting the Company's local human resources representative in writing. You further acknowledge that withdrawal of consent may affect your ability to exercise or realize benefits from these Restricted Stock Units, and your ability to participate in the Plan.

13. **No Entitlement or Claims for Compensation** .

(a) Your rights, if any, in respect of or in connection with these Restricted Stock Units or any other Award are derived solely from the discretionary decision of the Company to permit you to participate in the Plan and to benefit from a discretionary Award. By accepting these Restricted Stock Units, you expressly acknowledge that there is no obligation on the part of the Company to continue the Plan and/or grant any additional Awards to you. These Restricted Stock Units are not intended to be compensation of a continuing or recurring nature, or part of your normal or expected compensation, and in no way represents any portion of a your compensation or other remuneration for purposes of pension benefits, severance, redundancy, resignation or any other purpose.

(b) Neither the Plan nor these Restricted Stock Units or any other Award granted under the Plan shall be deemed to give you a right to continue to serve on the Board of the Company for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company or the Company's shareholders, which rights are hereby expressly reserved by each, to terminate your service on the Board at any time, for any reason, with or without cause, in accordance with the provisions of applicable law, the Company's Articles of Incorporation and Bylaws. You shall be deemed irrevocably to have waived any claim to damages or specific performance for breach of contract or dismissal, compensation for loss of office, tort or otherwise with respect to the Plan, these Restricted Stock Units or any outstanding Award that is forfeited and/or is terminated by its terms or to any future Award.

(c) You agree that your rights hereunder shall be subject to set-off by the Company for any valid debts you owe the Company.

14. **Governing Law** . This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflict of laws principles thereof.

15. **Notices** . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to you at the address maintained for you in the Company's records or, in either case, as subsequently modified by written notice to the other party.

16. **Binding Effect** . Subject to the limitations set forth in this Agreement, this Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, legal representatives, successors, and assigns of the parties hereto.

17. **Severability** . If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the full extent possible.

**Non-Employee Director Annual RSU Grant**
**(For Grants Effective on and after the Date of the**
**Company's 2015 Annual Meeting of Shareholders)**

# CISCO SYSTEMS, INC.
## STOCK UNIT AGREEMENT

This Stock Unit Agreement (the "Agreement") is made and entered into as of the Grant Date (as defined below) by and between Cisco Systems, Inc., a California corporation (the "Company"), and you pursuant to the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). The material terms of this Stock Unit Award are as follows:

Grantee: _____

Grant Date: _____

Grant Number: _____

Restricted Stock Units: _____

Vest Date:    The completion of one (1) year of Board service measured from the Grant Date.

To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Plan. In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of this Agreement, the Plan terms and provisions shall prevail.

In consideration of the mutual agreements herein contained and intending to be legally bound hereby, the parties agree as follows:

1.    **Restricted Stock Units** . Pursuant to the Plan, the Company hereby grants to you, and you hereby accept from the Company, Restricted Stock Units, each of which is a bookkeeping entry representing the equivalent in value of one (1) Share, on the terms and conditions set forth herein and in the Plan.

2.    **Vesting of Restricted Stock Units** . So long as your service on the Board continues, the Restricted Stock Units shall vest in accordance with the following schedule: one-hundred percent (100%) of the total number of Restricted Stock Units granted pursuant to this Agreement shall vest on the Vest Date, unless otherwise provided by the Plan or Section 4 below.

3.    **Termination of Service** . Except as provided in Section 4 below, in the event of the termination of your Board service for any reason, all unvested Restricted Stock Units shall be immediately forfeited without consideration.

4.    **Special Acceleration** .

(a)    To the extent the Restricted Stock Units are outstanding at the time of a Corporate Transaction or a Change in Control, such Restricted Stock Units shall automatically accelerate immediately prior to the effective date of the Corporate Transaction or the Change in Control, as the case may be, and shall become vested in full at that time.

(b)    If your service on the Board ceases as a result of your death or Disability, to the extent the Restricted Stock Units are outstanding, such Restricted Stock Units shall automatically accelerate and shall become vested in full at that time.

(c)    This Agreement shall not in any way affect the right of the Company to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate, sell or transfer all or any part of its business or assets.

5.    **Settlement of Restricted Stock Units** . To the extent you have not elected to defer settlement of the Restricted Stock Units, the Restricted Stock Units shall be automatically settled in Shares upon vesting of such Restricted Stock Units, provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless such issuance complies with all applicable law. To the extent you have elected to defer settlement of the Restricted Stock Units, the vested portion of the Restricted Stock Units shall be settled in Shares upon your separation from service within the meaning of Code Section 409A ("Separation from Service"), provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless such issuance complies with all applicable law. Prior to the time that the Restricted Stock Units are settled, you shall have no rights other than those of a general creditor of the Company. The Restricted Stock Units represent an unfunded and unsecured obligation of the Company.

6.    **Tax Advice** . You represent, warrant and acknowledge that the Company has made no warranties or representations to you with respect to the income tax consequences of the transactions contemplated by this Agreement, and you are in no manner relying on the Company or the Company's representatives for an assessment of such tax consequences. YOU UNDERSTAND THAT THE TAX LAWS AND REGULATIONS ARE SUBJECT TO CHANGE. YOU SHOULD CONSULT YOUR OWN TAX ADVISOR REGARDING ANY RESTRICTED STOCK UNITS. NOTHING STATED HEREIN IS INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAXPAYER PENALTIES.

7.    **Non-Transferability of Restricted Stock Units** . Restricted Stock Units shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law.

8.    **Restriction on Transfer** . Regardless of whether the transfer or issuance of the Shares to be issued pursuant to the Restricted Stock Units has been registered under the Securities Act or has been registered or qualified under the securities laws of any state, the Company may impose additional restrictions upon the sale, pledge, or other transfer of the Shares (including the placement of appropriate legends on stock certificates and the issuance of stop-transfer instructions to the Company's transfer agent) if, in the judgment of the Company and the Company's counsel, such restrictions are necessary in order to achieve compliance with the provisions of the Securities Act, the securities laws of any state, or any other law.

9.    **Stock Certificate Restrictive Legends** . Stock certificates evidencing the Shares issued pursuant to the Restricted Stock Units may bear such restrictive legends as the Company and the Company's counsel deem necessary under applicable law or pursuant to this Agreement.

10.    **Representations, Warranties, Covenants, and Acknowledgments** . You hereby agree that in the event the Company and the Company's counsel deem it necessary or advisable in the exercise of their discretion, the transfer or issuance of the Shares issued pursuant to the Restricted Stock Units may be conditioned upon you making certain representations, warranties, and acknowledgments relating to compliance with applicable securities laws.

11.    **Voting, Dividend and Other Rights** . Subject to the terms of this Agreement and except as set forth below, you shall not have any voting rights or any other rights and privileges of a shareholder of the Company unless and until the Restricted Stock Units are settled in Shares. To the extent you have elected to defer settlement of Restricted Stock Units with a Grant Date on or after the Company's 2015 Annual Meeting of Shareholders, dividend equivalents shall accrue after the vesting of the Restricted Stock Units and will be subject to the same conditions and restrictions as the Restricted Stock Units to which they attach as set forth in the Plan or this Agreement and will be settled in additional Shares upon your Separation from Service.

12.    **Authorization to Release Necessary Personal Information** .

(a)    You hereby authorize and direct the Company to collect, use and transfer in electronic or other form, any personal information (the "Data") regarding your service, the nature and amount of your

compensation and the facts and conditions of your participation in the Plan (including, but not limited to, your name, home address, telephone number, date of birth, social security number (or any other social or national identification number), compensation, nationality, job title, number of Shares held and the details of all Awards or any other entitlement to Shares awarded, cancelled, exercised, vested, unvested or outstanding) for the purpose of implementing, administering and managing your participation in the Plan. You understand that the Data may be transferred to the Company or any of its Subsidiaries, or to any third parties assisting in the implementation, administration and management of the Plan, including any requisite transfer to a broker or other third party assisting with the administration of these Restricted Stock Units under the Plan or with whom Shares acquired pursuant to these Restricted Stock Units or cash from the sale of such shares may be deposited. You acknowledge that recipients of the Data may be located in different countries, and those countries may have data privacy laws and protections different from those in the country of your residence. Furthermore, you acknowledge and understand that the transfer of the Data to the Company or any of its Subsidiaries, or to any third parties is necessary for your participation in the Plan.

(b)    You may at any time withdraw the consents herein by contacting the Company's local human resources representative in writing. You further acknowledge that withdrawal of consent may affect your ability to exercise or realize benefits from these Restricted Stock Units and your ability to participate in the Plan.

13.    **No Entitlement or Claims for Compensation** .

(a)    Your rights, if any, in respect of or in connection with these Restricted Stock Units or any other Award are derived solely from the discretionary decision of the Company to permit you to participate in the Plan and to benefit from a discretionary Award. By accepting these Restricted Stock Units, you expressly acknowledge that there is no obligation on the part of the Company to continue the Plan and/or grant any additional Awards to you. These Restricted Stock Units are not intended to be compensation of a continuing or recurring nature, or part of your normal or expected compensation, and in no way represents any portion of your compensation or other remuneration for purposes of pension benefits, severance, redundancy, resignation or any other purpose.

(b)    Neither the Plan nor these Restricted Stock Units or any other Award granted under the Plan shall be deemed to give you a right to continue to serve on the Board of the Company for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company or the Company's shareholders, which rights are hereby expressly reserved by each, to terminate your service on the Board at any time, for any reason, with or without cause, in accordance with the provisions of applicable law, the Company's Articles of Incorporation and Bylaws. You shall be deemed irrevocably to have waived any claim to damages or specific performance for breach of contract or dismissal, compensation for loss of office, tort or otherwise with respect to the Plan, these Restricted Stock Units or any outstanding Award that is forfeited and/or is terminated by its terms or to any future Award.

(c)    You agree that your rights hereunder shall be subject to set-off by the Company for any valid debts you owe the Company.

14.    **Governing Law** . This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflict of laws principles thereof.

15.    **Notices** . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to you at the address maintained for you in the Company's records or, in either case, as subsequently modified by written notice to the other party.

16. **Binding Effect** . Subject to the limitations set forth in this Agreement, this Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, legal representatives, successors, and assigns of the parties hereto.

(a)        17. **Severability** . If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the full extent possible.

**NON-EMPLOYEE DIRECTOR ANNUAL RSU GRANT**
**(For Grants Beginning Fiscal 2009 Through the Date that is**
**One Day Prior to the Date of the Company's 2015 Annual Meeting of Shareholders)**

# CISCO SYSTEMS, INC.
# STOCK UNIT AGREEMENT

This Stock Unit Agreement (the "Agreement") is made and entered into as of the Grant Date (as defined below) by and between Cisco Systems, Inc., a California corporation (the "Company"), and you pursuant to the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). The material terms of this Stock Unit Award are as follows:

Grantee: _____

Grant Date: _____

Grant Number: _____

Restricted Stock Units: _____

Vest Date: The completion of one (1) year of Board service measured from the Grant Date.

To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Plan. In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of this Agreement, the Plan terms and provisions shall prevail.

In consideration of the mutual agreements herein contained and intending to be legally bound hereby, the parties agree as follows:

**1. Restricted Stock Units** . Pursuant to the Plan, the Company hereby grants to you, and you hereby accept from the Company, Restricted Stock Units, each of which is a bookkeeping entry representing the equivalent in value of one (1) Share, on the terms and conditions set forth herein and in the Plan.

**2. Vesting of Restricted Stock Units** . So long as your service on the Board continues, the Restricted Stock Units shall vest in accordance with the following schedule: one-hundred percent (100%) of the total number of Restricted Stock Units granted pursuant to this Agreement shall vest on the Vest Date, unless otherwise provided by the Plan or Section 4 below.

**3. Termination of Service** . Except as provided in Section 4 below, in the event of the termination of your Board service for any reason, all unvested Restricted Stock Units shall be immediately forfeited without consideration.

**4. Special Acceleration** .

(a) To the extent the Restricted Stock Units are outstanding at the time of a Corporate Transaction or a Change in Control, such Restricted Stock Units shall automatically accelerate immediately prior to the effective date of the Corporate Transaction or the Change in Control, as the case may be, and shall become vested in full at that time.

(b) If your service on the Board ceases as a result of your death or Disability, to the extent the Restricted Stock Units are outstanding, such Restricted Stock Units shall automatically accelerate and shall become vested in full at that time.

(c) This Agreement shall not in any way affect the right of the Company to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate, sell or transfer all or any part of its business or assets.

**5. Settlement of Restricted Stock Units** . To the extent you have not elected to defer settlement of the Restricted Stock Units, the Restricted Stock Units shall be automatically settled in Shares upon vesting of such Restricted Stock Units, provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless such issuance complies with all applicable law. To the extent you have elected to defer settlement of the Restricted Stock Units, the vested portion of the Restricted Stock Units shall be settled in Shares upon your separation from service within the meaning of Code Section 409A ("Separation from Service"), provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless such issuance complies with all applicable law.

**6. Tax Advice** . You represent, warrant and acknowledge that the Company has made no warranties or representations to you with respect to the income tax consequences of the transactions contemplated by this Agreement, and you are in no manner relying on the Company or the Company's representatives for an assessment of such tax consequences. YOU UNDERSTAND THAT THE TAX LAWS AND REGULATIONS ARE SUBJECT TO CHANGE. YOU SHOULD CONSULT YOUR OWN TAX ADVISOR REGARDING ANY RESTRICTED STOCK UNITS. NOTHING STATED HEREIN IS INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAXPAYER PENALTIES.

**7. Non-Transferability of Restricted Stock Units** . Restricted Stock Units shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law.

**8. Restriction on Transfer** . Regardless of whether the transfer or issuance of the Shares to be issued pursuant to the Restricted Stock Units has been registered under the Securities Act or has been registered or qualified under the securities laws of any state, the Company may impose additional restrictions upon the sale, pledge, or other transfer of the Shares (including the placement of appropriate legends on stock certificates and the issuance of stop-transfer instructions to the Company's transfer agent) if, in the judgment of the Company and the Company's counsel, such restrictions are necessary in order to achieve compliance with the provisions of the Securities Act, the securities laws of any state, or any other law.

**9. Stock Certificate Restrictive Legends** . Stock certificates evidencing the Shares issued pursuant to the Restricted Stock Units may bear such restrictive legends as the Company and the Company's counsel deem necessary under applicable law or pursuant to this Agreement.

**10. Representations, Warranties, Covenants, and Acknowledgments** . You hereby agree that in the event the Company and the Company's counsel deem it necessary or advisable in the exercise of their discretion, the transfer or issuance of the Shares issued pursuant to the Restricted Stock Units may be conditioned upon you making certain representations, warranties, and acknowledgments relating to compliance with applicable securities laws.

**11. Voting and Other Rights** . Subject to the terms of this Agreement, you shall not have any voting rights or any other rights and privileges of a shareholder of the Company unless and until the Restricted Stock Units are settled upon vesting.

**12. Authorization to Release Necessary Personal Information** .

(a) You hereby authorize and direct the Company to collect, use and transfer in electronic or other form, any personal information (the "Data") regarding your service, the nature and amount of your compensation and the facts and conditions of your participation in the Plan (including, but not limited to, your name, home address, telephone number, date of birth, social security number (or any other social or national identification number), compensation, nationality, job title, number of Shares held and the details of all Awards or any other entitlement to Shares awarded, cancelled, exercised, vested, unvested or outstanding) for the purpose of implementing, administering and managing your participation in the Plan. You understand that the Data may be transferred to the Company or any of its Subsidiaries, or to any third parties assisting in the implementation, administration and management of the Plan, including any requisite transfer to a broker or other third party assisting with the administration of these Restricted Stock Units under the Plan or with whom Shares acquired pursuant to these Restricted Stock Units or cash from the sale of such shares may be deposited. You acknowledge that recipients of the Data may be located in different countries, and those countries may have data privacy laws and protections different from those in the country of your residence. Furthermore, you acknowledge and understand that the transfer of the Data to the Company or any of its Subsidiaries, or to any third parties is necessary for your participation in the Plan.

(b) Prior to the time that the Restricted Stock Units are settled upon vesting, you shall have no rights other than those of a general creditor of the Company. The Restricted Stock Units represent an unfunded and unsecured obligation of the Company.

(c) You may at any time withdraw the consents herein by contacting the Company's local human resources representative in writing. You further acknowledge that withdrawal of consent may affect your ability to exercise or realize benefits from these Restricted Stock Units, and your ability to participate in the Plan.

**13. No Entitlement or Claims for Compensation** .

(a) Your rights, if any, in respect of or in connection with these Restricted Stock Units or any other Award are derived solely from the discretionary decision of the Company to permit you to participate in the Plan and to benefit from a discretionary Award. By accepting these Restricted Stock Units, you expressly acknowledge that there is no obligation on the part of the Company to continue the Plan and/or grant any additional Awards to you. These Restricted Stock Units are not intended to be compensation of a continuing or recurring nature, or part of your normal or expected compensation, and in no way represents any portion of a your compensation or other remuneration for purposes of pension benefits, severance, redundancy, resignation or any other purpose.

(b) Neither the Plan nor these Restricted Stock Units or any other Award granted under the Plan shall be deemed to give you a right to continue to serve on the Board of the Company for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company or the Company's shareholders, which rights are hereby expressly reserved by each, to terminate your service on the Board at any time, for any reason, with or without cause, in accordance with the provisions of applicable law, the Company's Articles of Incorporation and Bylaws. You shall be deemed irrevocably to have waived any claim to damages or specific performance for breach of contract or dismissal, compensation for loss of office, tort or otherwise with respect to the Plan, these Restricted Stock Units or any outstanding Award that is forfeited and/or is terminated by its terms or to any future Award.

(c) You agree that your rights hereunder shall be subject to set-off by the Company for any valid debts you owe the Company.

**14. Governing Law** . This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflict of laws principles thereof.

**15. Notices** . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the U.S. mail, as certified or

registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to you at the address maintained for you in the Company's records or, in either case, as subsequently modified by written notice to the other party.

**16. <u>Binding Effect</u>** . Subject to the limitations set forth in this Agreement, this Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, legal representatives, successors, and assigns of the parties hereto.

**17. <u>Severability</u>** . If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the full extent possible.

**NON-EMPLOYEE DIRECTOR INITIAL GRANT**
**(For Grants Prior to Fiscal 2009)**

**CISCO SYSTEMS, INC.**
**NOTICE OF GRANT OF STOCK OPTION**

Notice is hereby given of the following option grant (the "Option") made to purchase shares of Cisco Systems, Inc. (the "Company") common stock:

Optionee: _____

Grant Date: _____

Type of Option: Nonstatutory Stock Option

Grant Number: _____

Number of Option Shares: _____shares

Exercise Price: $ _____per share

Expiration Date: _____

Date Exercisable: Immediately Exercisable

**Vesting Schedule**

The Option Shares shall initially be unvested and subject to repurchase by the Company at the Exercise Price paid per share. Optionee shall acquire a vested interest in, and the Company's repurchase right shall accordingly lapse, with respect to, the Option Shares in a series of four (4) successive equal annual installments upon Optionee's completion of each year of service as a member of the Board over the four (4) year period measured from the Grant Date. In no event shall any additional Option Shares vest after Optionee's cessation of Board service.

**REPURCHASE RIGHT . OPTIONEE HEREBY AGREES THAT ALL UNVESTED OPTION SHARES ACQUIRED UPON THE EXERCISE OF THE OPTION SHALL NOT BE TRANSFERABLE AND SHALL BE SUBJECT TO REPURCHASE BY THE COMPANY, AT THE EXERCISE PRICE PAID PER SHARE, UPON OPTIONEE'S TERMINATION OF SERVICE AS A MEMBER OF THE BOARD PRIOR TO VESTING IN THOSE SHARES. THE TERMS AND CONDITIONS OF SUCH REPURCHASE RIGHT SHALL BE SPECIFIED IN A STOCK PURCHASE AGREEMENT, IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY, EXECUTED BY OPTIONEE AT THE TIME OF THE OPTION EXERCISE.**

Optionee understands and agrees that the Option is offered subject to and in accordance with the terms of the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). Optionee further agrees to be bound by the terms of the Plan and the terms of the Option as set forth in the Stock Option Agreement attached hereto.

**No Service Contract** . Nothing in this Notice or in the attached Stock Option Agreement or in the Plan shall confer upon Optionee any right to continue to serve on the Board for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company or the Company's shareholders, which rights are hereby expressly reserved by each, to terminate Optionee's service on the Board at any time, for any reason, with or without cause, and in accordance with the provisions of applicable law.

**Definitions** . All capitalized terms in this Notice shall have the meaning assigned to them in this Notice, the attached Stock Option Agreement or the Plan.

**DATED: _____, ____**

**CISCO SYSTEMS, INC.**

By: _____

Title: _____

**OPTIONEE** _____

**STOCK OPTION AGREEMENT**

<u>Recitals</u>

A. The Board has adopted the Plan for the purpose of retaining the services of selected Employees, non-employee members of the Board or of the board of directors of any Parent or Subsidiary and Consultants and other independent advisors who provide services to the Company (or any Parent or Subsidiary).

B. Optionee is to render valuable services to the Company (or a Parent or Subsidiary), and this Agreement is executed pursuant to, and is intended to carry out the purposes of, the Plan in connection with the Company's grant of an option to Optionee.

C. All capitalized terms in this Agreement shall have the meaning assigned to them in this Agreement, the attached Notice of Grant of Stock Option (the " Notice"), or the Plan.

**NOW, THEREFORE** , it is hereby agreed as follows:

**1.** <u>Grant of Option</u> . The Company hereby grants to Optionee, as of the Grant Date, a Nonstatutory Stock Option to purchase up to the number of Option Shares specified in the Notice. The Option Shares shall be purchasable from time to time during the Option term specified in Paragraph 2 at the Exercise Price specified in the Notice.

**2.** <u>Option Term</u> . This Option shall have a maximum term of nine (9) years measured from the Grant Date and shall accordingly expire at the close of business on the Expiration Date, unless sooner terminated in accordance with Paragraph 4, 5, 6 or 7.

**3.** <u>Non-Transferability</u> . This Option shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law. Notwithstanding the foregoing, should the Optionee die while holding this Option, then this Option shall be transferred in accordance with Optionee's will or the laws of descent and distribution.

**4.** <u>Exercisability/Vesting</u> .

(a) This Option shall be immediately exercisable for any or all of the Option Shares, whether or not the Option Shares are vested in accordance with the Vesting Schedule set forth in the Notice, and shall remain so exercisable until the Expiration Date or the sooner termination of the Option term under this Paragraph 4 or Paragraph 5, 6 or 7.

(b) Optionee shall, in accordance with the Vesting Schedule set forth in the Notice, vest in the Option Shares in a series of installments over his or her period of Board service. Vesting in the Option Shares may be accelerated pursuant to the provisions of Paragraph 5, 6 or 7. In no event, however, shall any additional Option Shares vest following Optionee's cessation of service as a Board member.

(c) As an administrative matter, the exercisable portion of this Option may only be exercised until the close of the Nasdaq Global Select Market on the Expiration Date or the earlier termination date under Paragraph 5, 6 or 7 or, if such date is not a trading day on the Nasdaq Global Select Market, the last trading day before such date. Any later attempt to exercise this Option will not be honored. For example, if Optionee ceases to remain in service as provided in Paragraph 5(a) and the date twelve (12) months from the date of cessation is Monday, July 4 (a holiday on which the Nasdaq Global Select Market is closed), Optionee must exercise the exercisable portion of this Option by 4 pm Eastern Daylight Time on Friday, July 1.

**5.** <u>Cessation of Board Service</u> . Should Optionee's service as a Board member cease while this Option remains outstanding, then the Option term specified in Paragraph 2 shall terminate (and this Option shall cease to be outstanding) prior to the Expiration Date in accordance with the following provisions:

(a) Should Optionee cease to serve as a Board member for any reason (other than death or Disability) while this Option is outstanding, then the period for exercising this Option shall be reduced to a twelve (12)-month period commencing with the date of such cessation of Board service, but in no event shall this Option be exercisable at any time after the Expiration Date. During such limited period of exercisability, this Option may not be exercised in the aggregate for more than the number of Option Shares (if any) in which Optionee is vested on the date of his or her cessation of Board service. Upon the <u>earlier of</u> (i) the expiration of such twelve (12)-month period or (ii) the specified Expiration Date, the Option shall terminate and cease to be exercisable with respect to any vested Option Shares for which the Option has not been exercised.

(b) Should Optionee die during the twelve (12)-month period following his or her cessation of Board service and hold this Option at the time of his or her death, then the personal representative of Optionee's estate or the person or persons to whom the Option is transferred pursuant to Optionee's will or in accordance with the laws of descent and distribution shall have the right to exercise this Option for any or all of the Option Shares in which Optionee is vested at the time of Optionee's cessation of Board service (less any Option Shares purchased by Optionee after such cessation of Board service but prior to death). Such right of exercise shall terminate, and this Option shall accordingly cease to be exercisable for such vested Option Shares, upon the <u>earlier of</u> (i) the expiration of the twelve (12)-month period measured from the date of Optionee's cessation of Board service or (ii) the specified Expiration Date.

(c) Should Optionee cease service as a Board member by reason of death or Disability, then all Option Shares at the time subject to this Option but not otherwise vested shall immediately vest in full so that Optionee (or the personal representative of Optionee's estate or the person or persons to whom the Option is transferred upon Optionee's death) shall have the right to exercise this Option for any or all of

the Option Shares as fully-vested shares of Common Stock at any time prior to the <u>earlier</u> of (i) the expiration of the twelve (12)-month period measured from the date of Optionee's cessation of Board service or (ii) the specified Expiration Date.

(d) Upon Optionee's cessation of Board service for any reason other than death or Disability, this Option shall immediately terminate and cease to be outstanding with respect to any and all Option Shares in which Optionee is not otherwise at that time vested in accordance with the normal Vesting Schedule set forth in the Notice or the special vesting acceleration provisions of Paragraph 6 or 7 below.

## 6. <u>Corporate Transaction</u> .

(a) In the event of a Corporate Transaction, all Option Shares at the time subject to this Option but not otherwise vested shall automatically vest so that this Option shall, immediately prior to the specified effective date for the Corporate Transaction, become fully exercisable for all of the Option Shares at the time subject to this Option and may be exercised for all or any portion of such shares as fully-vested shares of Common Stock. Immediately following the consummation of the Corporate Transaction, this Option shall terminate and cease to be outstanding, except to the extent assumed by the successor corporation or its parent company.

(b) If this Option is assumed in connection with a Corporate Transaction, then this Option shall be appropriately adjusted, immediately after such Corporate Transaction, to apply to the number and class of securities which would have been issuable to Optionee in consummation of such Corporate Transaction had the Option been exercised immediately prior to such Corporate Transaction, and appropriate adjustments shall also be made to the Exercise Price, <u>provided</u> the aggregate Exercise Price shall remain the same.

## 7. <u>Change In Control/Hostile Take-Over</u> .

(a) All Option Shares subject to this Option at the time of a Change In Control but not otherwise vested shall automatically vest so that this Option shall, immediately prior to the effective date of such Change In Control, become fully exercisable for all of the Option Shares at the time subject to this Option and may be exercised for all or any portion of such shares as fully-vested shares of Common Stock. This Option shall remain exercisable for such fully-vested Option Shares until the <u>earliest</u> to occur of (i) the specified Expiration Date, (ii) the sooner termination of this Option in accordance with Paragraph 4, 5 or 6 or (iii) the surrender of this Option under Paragraph 7(b).

(b) Optionee shall have an unconditional right (exercisable during the thirty (30)-day period immediately following the consummation of a "Hostile Take-Over" (as defined below)) to surrender this Option to the Company in exchange for a cash distribution from the Company in an amount equal to the excess of (i) the "Take-Over Price" (as defined below) of the Option Shares at the time subject to the surrendered Option (whether or not those Option Shares are otherwise at the time vested) over (ii) the aggregate Exercise Price payable for such shares. This Paragraph 7(b) limited stock appreciation right shall in all events terminate upon the expiration or sooner termination of the Option term and may not be assigned or transferred by Optionee. For purposes of this Option, "Hostile Take-Over" shall mean the acquisition, directly or indirectly, by any person or related group of persons (other than the Company or a person that directly or indirectly controls, is controlled by, or is under common control with, the Company) of beneficial ownership (within the meaning of Rule 13d-3 of the Exchange Act) of securities possessing more than thirty five percent (35%) of the total combined voting power of the Company's outstanding securities pursuant to a tender or exchange offer made directly to the Company's shareholders which the Board does not recommend such shareholders to accept. Further, for purposes of this Option, "Take-Over Price" shall mean the greater of (i) the Fair Market Value on the date the Option is surrendered to the Company in connection with a Hostile Take-Over, or (ii) the highest reported price per share of Common Stock paid by the tender offeror in effecting the Hostile Take-Over.

(c) To exercise the Paragraph 7(b) limited stock appreciation right, Optionee must, during the applicable thirty (30)-day exercise period, provide the Company with written notice of the option surrender in which there is specified the number of Option Shares as to which the Option is being surrendered. Such notice must be accompanied by the return of Optionee's copy of this Agreement, together with any written amendments to such Agreement. The cash distribution shall be paid to Optionee within five (5) business days following such delivery date. Upon receipt of such cash distribution, this Option shall be cancelled with respect to the shares subject to the surrendered Option (or the surrendered portion), and Optionee shall cease to have any further right to acquire those Option Shares under this Agreement. The Option shall, however, remain outstanding for the balance of the Option Shares (if any) in accordance with the terms and provisions of this Agreement, and the Company shall accordingly issue a new stock option agreement (substantially in the same form as this Agreement) for those remaining Option Shares.

## 8. <u>Adjustment in Option Shares</u> . In the event of a subdivision of the outstanding Shares, a declaration of a dividend payable in Shares, a declaration of a dividend payable in a form other than Shares in an amount that has a material effect on the price of Shares, a combination or consolidation of the outstanding Shares (by reclassification or otherwise) into a lesser number of Shares, a recapitalization, a spin-off or a similar occurrence, appropriate adjustments shall be made to (i) the total number and/or kind of shares or securities subject to this Option and (ii) the Exercise Price in order to reflect such change and thereby preclude a dilution or enlargement of benefits hereunder.

## 9. <u>Shareholder Rights</u> . The holder of this Option shall not have any shareholder rights with respect to the Option Shares until such person shall have exercised the Option, paid the Exercise Price and become a holder of record of the purchased Shares.

## 10. <u>Manner of Exercising Option</u> .

(a) In order to exercise this Option with respect to all or any part of the Option Shares for which this Option is at the time exercisable, Optionee (or any other person or persons exercising the Option) must take the following actions:

(i) Pay the aggregate Exercise Price for the purchased Shares in one or more of the following forms:

(A) cash or check which, in the Company's sole discretion, shall be made payable to a Company-designated brokerage firm or the Company; and

(B) as permitted by applicable law, through a special sale and remittance procedure pursuant to which Optionee (or any other person or persons exercising the Option) shall concurrently provide irrevocable written instructions (I) to a Company-designated brokerage firm (or in the case of an executive officer or Board member of the Company, an Optionee-designated brokerage firm) to effect the immediate sale of the purchased Shares and remit to the Company, out of the sale proceeds available on the settlement date, sufficient funds to cover the aggregate Exercise Price payable for the purchased Shares plus, if applicable, the amount necessary to satisfy the Company's withholding obligations at the minimum statutory withholding rates and (II) to the Company to deliver the certificates for the purchased Shares directly to such brokerage firm in order to complete the sale transaction.

(ii) Furnish to the Company appropriate documentation that the person or persons exercising the Option (if other than Optionee) have the right to exercise this Option.

(iii) Make appropriate arrangements with the Company (or Parent or Subsidiary employing or retaining Optionee) for the satisfaction of all tax withholding requirements applicable to the Option exercise.

(iv) To the extent that the option is exercised for one or more unvested Option Shares, Optionee (or other person exercising the option) shall deliver to the Secretary of the Company a purchase agreement for those unvested Option Shares.

(b) As soon as practical after the exercise date, the Company shall issue to or on behalf of Optionee (or any other person or persons exercising this Option) the purchased Option Shares (as evidenced by an appropriate entry on the books of the Company or a duly authorized transfer agent of the Company), subject to the appropriate legends and/or stop transfer instructions.

(c) In no event may this Option be exercised for any fractional Shares.

**11. No Impairment of Rights** . This Agreement shall not in any way affect the right of the Company to adjust, reclassify, reorganize or otherwise make changes in its capital or business structure or to merge, consolidate, dissolve, liquidate or sell or transfer all or any part of its business or assets. In addition, nothing in this Agreement shall in any way be construed or interpreted so as to affect adversely or otherwise impair the right of the Company or the shareholders to remove Optionee from the Board at any time in accordance with the provisions of applicable law.

**12. Compliance with Laws and Regulations** .

(a) The exercise of this Option and the issuance of the Option Shares upon such exercise shall be subject to compliance by the Company and Optionee with all applicable laws, regulations and rules relating thereto, including all applicable regulations of any stock exchange (or the Nasdaq Global Select Market, if applicable) on which the Shares may be listed for trading at the time of such exercise and issuance.

(b) The inability of the Company to obtain approval from any regulatory body having authority deemed by the Company to be necessary to the lawful issuance and sale of any Shares pursuant to this Option shall relieve the Company of any liability with respect to the non-issuance or sale of the Shares as to which such approval shall not have been obtained. The Company, however, shall use its best efforts to obtain all such approvals.

**13. Successors and Assigns** . Except to the extent otherwise provided in Paragraphs 3, 5, 6 and 7, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Company and its successors and assigns and Optionee, Optionee's assigns and the legal representatives, heirs and legatees of Optionee's estate.

**14. Notices** . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to the Optionee at the address maintained for the Optionee in the Company's records or, in either case, as subsequently modified by written notice to the other party.

**15. Construction** . The Notice, this Agreement, and the Option evidenced hereby (a) are made and granted pursuant to the Plan and are in all respects limited by and subject to the terms of the Plan, and (b) constitute the entire agreement between Optionee and the Company on the subject matter hereof and supercede all proposals, written or oral, and all other communications between the parties related to the subject matter. All decisions of the Committee with respect to any question or issue arising under the Notice, this Agreement or the Plan shall be conclusive and binding on all persons having an interest in this Option.

**16. Governing Law** . The interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of California without resort to the conflict of laws principles thereof.

17. **<u>Excess Shares</u>** . If the Option Shares covered by this Agreement exceed, as of the Grant Date, the number of Shares which may without shareholder approval be issued under the Plan, then this Option shall be void with respect to those excess shares, unless shareholder approval of an amendment sufficiently increasing the number of Shares issuable under the Plan is obtained in accordance with the provisions of the Plan and all applicable laws, regulations and rules.

18. **<u>Further Instruments</u>** . The parties agree to execute such further instruments and to take such further action as may be reasonably necessary to carry out the purposes and intent of this Agreement.

**NON-EMPLOYEE DIRECTOR ANNUAL GRANT**
**(For Grants Prior to Fiscal 2009)**

**CISCO SYSTEMS, INC.**
**NOTICE OF GRANT OF STOCK OPTION**

Notice is hereby given of the following option grant (the "Option") made to purchase shares of Cisco Systems, Inc. (the "Company") common stock:

Optionee: _____

Grant Date: _____

Type of Option: Nonstatutory Stock Option

Grant  Number: _____

Number of Option Shares: _____shares

Exercise Price: $ _____per share

Expiration Date: _____

Date Exercisable: Immediately Exercisable

**Vesting Schedule**

The Option Shares shall initially be unvested and subject to repurchase by the Company at the Exercise Price paid per share. Optionee shall acquire a vested interest in, and the Company's repurchase right shall accordingly lapse, with respect to, the Option Shares in a series of two (2) successive equal annual installments upon Optionee's completion of each year of service as a member of the Board over the two (2) year period measured from the Grant Date. In no event shall any additional Option Shares vest after Optionee's cessation of Board service.

**REPURCHASE RIGHT . OPTIONEE HEREBY AGREES THAT ALL UNVESTED OPTION SHARES ACQUIRED UPON THE EXERCISE OF THE OPTION SHALL NOT BE TRANSFERABLE AND SHALL BE SUBJECT TO REPURCHASE BY THE COMPANY, AT THE EXERCISE PRICE PAID PER SHARE, UPON OPTIONEE'S TERMINATION OF SERVICE AS A MEMBER OF THE BOARD PRIOR TO VESTING IN THOSE SHARES. THE TERMS AND CONDITIONS OF SUCH REPURCHASE RIGHT SHALL BE SPECIFIED IN A STOCK PURCHASE AGREEMENT, IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY, EXECUTED BY OPTIONEE AT THE TIME OF THE OPTION EXERCISE.**

Optionee understands and agrees that the Option is offered subject to and in accordance with the terms of the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). Optionee further agrees to be bound by the terms of the Plan and the terms of the Option as set forth in the Stock Option Agreement attached hereto.

**No Service Contract** . Nothing in this Notice or in the attached Stock Option Agreement or in the Plan shall confer upon Optionee any right to continue to serve on the Board for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company or the Company's shareholders, which rights are hereby expressly reserved by each, to terminate Optionee's service on the Board at any time, for any reason, with or without cause, and in accordance with the provisions of applicable law.

**Definitions .** All capitalized terms in this Notice shall have the meaning assigned to them in this Notice, the attached Stock Option Agreement or the Plan.

**DATED: _____, ____**

**CISCO SYSTEMS, INC.**

By: _____

Title: _____

**OPTIONEE** _____

**STOCK OPTION AGREEMENT**

<u>Recitals</u>

A. The Board has adopted the Plan for the purpose of retaining the services of selected Employees, non-employee members of the Board or of the board of directors of any Parent or Subsidiary and Consultants and other independent advisors who provide services to the Company (or any Parent or Subsidiary).

B. Optionee is to render valuable services to the Company (or a Parent or Subsidiary), and this Agreement is executed pursuant to, and is intended to carry out the purposes of, the Plan in connection with the Company's grant of an option to Optionee.

C. All capitalized terms in this Agreement shall have the meaning assigned to them in this Agreement, the attached Notice of Grant of Stock Option (the " Notice"), or the Plan.

**NOW, THEREFORE** , it is hereby agreed as follows:

**1. <u>Grant of Option</u>** . The Company hereby grants to Optionee, as of the Grant Date, a Nonstatutory Stock Option to purchase up to the number of Option Shares specified in the Notice. The Option Shares shall be purchasable from time to time during the Option term specified in Paragraph 2 at the Exercise Price specified in the Notice.

**2. <u>Option Term</u>** . This Option shall have a maximum term of nine (9) years measured from the Grant Date and shall accordingly expire at the close of business on the Expiration Date, unless sooner terminated in accordance with Paragraph 4, 5, or 7.

**3. <u>Non-Transferability</u>** . This Option shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law. Notwithstanding the foregoing, should the Optionee die while holding this Option, then this Option shall be transferred in accordance with Optionee's will or the laws of descent and distribution.

**4. <u>Exercisability/Vesting</u>** .

(a) This Option shall be immediately exercisable for any or all of the Option Shares, whether or not the Option Shares are vested in accordance with the Vesting Schedule set forth in the Notice, and shall remain so exercisable until the Expiration Date or the sooner termination of the Option term under this Paragraph 4 or Paragraph 5, 6 or 7.

(b) Optionee shall, in accordance with the Vesting Schedule set forth in the Notice, vest in the Option Shares in a series of installments over his or her period of Board service. Vesting in the Option Shares may be accelerated pursuant to the provisions of Paragraph 5, 6 or 7. In no event, however, shall any additional Option Shares vest following Optionee's cessation of service as a Board member.

(c) As an administrative matter, the exercisable portion of this Option may only be exercised until the close of the Nasdaq Global Select Market on the Expiration Date or the earlier termination date under Paragraph 5, 6 or 7 or, if such date is not a trading day on the Nasdaq Global Select Market, the last trading day before such date. Any later attempt to exercise this Option will not be honored. For example, if Optionee ceases to remain in service as provided in Paragraph 5(a) and the date twelve (12) months from the date of cessation is Monday, July 4 (a holiday on which the Nasdaq Global Select Market is closed), Optionee must exercise the exercisable portion of this Option by 4 pm Eastern Daylight Time on Friday, July 1.

**5. <u>Cessation of Board Service</u>** . Should Optionee's service as a Board member cease while this Option remains outstanding, then the Option term specified in Paragraph 2 shall terminate (and this Option shall cease to be outstanding) prior to the Expiration Date in accordance with the following provisions:

(a) Should Optionee cease to serve as a Board member for any reason (other than death or Disability) while this Option is outstanding, then the period for exercising this Option shall be reduced to a twelve (12)-month period commencing with the date of such cessation of Board service, but in no event shall this Option be exercisable at any time after the Expiration Date. During such limited period of exercisability, this Option may not be exercised in the aggregate for more than the number of Option Shares (if any) in which Optionee is vested on the date of his or her cessation of Board service. Upon the <u>earlier</u> of (i) the expiration of such twelve (12)-month period or (ii) the specified Expiration Date, the Option shall terminate and cease to be exercisable with respect to any vested Option Shares for which the Option has not been exercised.

(b) Should Optionee die during the twelve (12)-month period following his or her cessation of Board service and hold this Option at the time of his or her death, then the personal representative of Optionee's estate or the person or persons to whom this Option is transferred pursuant to Optionee's will or in accordance with the laws of descent and distribution shall have the right to exercise this Option for any or all of the Option Shares in which Optionee is vested at the time of Optionee's cessation of Board service (less any Option Shares purchased by Optionee after such cessation of Board service but prior to death). Such right of exercise shall terminate, and this Option shall accordingly cease to be exercisable for such vested Option Shares, upon the <u>earlier</u> of (i) the expiration of the twelve (12)-month period measured from the date of Optionee's cessation of Board service or (ii) the specified Expiration Date.

(c) Should Optionee cease service as a Board member by reason of death or Disability, then all Option Shares at the time subject to this Option but not otherwise vested shall immediately vest in full so that Optionee (or the personal representative of Optionee's estate or the

person or persons to whom the Option is transferred upon Optionee's death) shall have the right to exercise this Option for any or all of the Option Shares as fully-vested shares of Common Stock at any time prior to the earlier of (i) the expiration of the twelve (12)-month period measured from the date of Optionee's cessation of Board service or (ii) the specified Expiration Date.

(d) Upon Optionee's cessation of Board service for any reason other than death or Disability, this Option shall immediately terminate and cease to be outstanding with respect to any and all Option Shares in which Optionee is not otherwise at that time vested in accordance with the normal Vesting Schedule set forth in the Notice or the special vesting acceleration provisions of Paragraph 6 or 7 below.

6. **Corporate Transaction** .

(a) In the event of a Corporate Transaction, all Option Shares at the time subject to this Option but not otherwise vested shall automatically vest so that this Option shall, immediately prior to the specified effective date for the Corporate Transaction, become fully exercisable for all of the Option Shares at the time subject to this Option and may be exercised for all or any portion of such shares as fully-vested shares of Common Stock. Immediately following the consummation of the Corporate Transaction, this Option shall terminate and cease to be outstanding, except to the extent assumed by the successor corporation or its parent company.

(b) If this Option is assumed in connection with a Corporate Transaction, then this Option shall be appropriately adjusted, immediately after such Corporate Transaction, to apply to the number and class of securities which would have been issuable to Optionee in consummation of such Corporate Transaction had the Option been exercised immediately prior to such Corporate Transaction, and appropriate adjustments shall also be made to the Exercise Price, provided the aggregate Exercise Price shall remain the same.

7. **Change In Control/Hostile Take-Over** .

(a) All Option Shares subject to this Option at the time of a Change In Control but not otherwise vested shall automatically vest so that this Option shall, immediately prior to the effective date of such Change In Control, become fully exercisable for all of the Option Shares at the time subject to this Option and may be exercised for all or any portion of such shares as fully-vested shares of Common Stock. This Option shall remain exercisable for such fully-vested Option Shares until the earliest to occur of (i) the specified Expiration Date, (ii) the sooner termination of this Option in accordance with Paragraph 4, 5 or 6 or (iii) the surrender of this Option under Paragraph 7(b).

(b) Optionee shall have an unconditional right (exercisable during the thirty (30)-day period immediately following the consummation of a "Hostile Take-Over" (as defined below)) to surrender this Option to the Company in exchange for a cash distribution from the Company in an amount equal to the excess of (i) the "Take-Over Price" (as defined below) of the Option Shares at the time subject to the surrendered Option (whether or not those Option Shares are otherwise at the time vested) over (ii) the aggregate Exercise Price payable for such shares. This Paragraph 7(b) limited stock appreciation right shall in all events terminate upon the expiration or sooner termination of the Option term and may not be assigned or transferred by Optionee. For purposes of this Option, "Hostile Take-Over" shall mean the acquisition, directly or indirectly, by any person or related group of persons (other than the Company or a person that directly or indirectly controls, is controlled by, or is under common control with, the Company) of beneficial ownership (within the meaning of Rule 13d-3 of the Exchange Act) of securities possessing more than thirty five percent (35%) of the total combined voting power of the Company's outstanding securities pursuant to a tender or exchange offer made directly to the Company's shareholders which the Board does not recommend such shareholders to accept. Further, for purposes of this Option, "Take-Over Price" shall mean the greater of (i) the Fair Market Value on the date the Option is surrendered to the Company in connection with a Hostile Take-Over, or (ii) the highest reported price per share of Common Stock paid by the tender offeror in effecting the Hostile Take-Over.

(c) To exercise the Paragraph 7(b) limited stock appreciation right, Optionee must, during the applicable thirty (30)-day exercise period, provide the Company with written notice of the option surrender in which there is specified the number of Option Shares as to which the Option is being surrendered. Such notice must be accompanied by the return of Optionee's copy of this Agreement, together with any written amendments to such Agreement. The cash distribution shall be paid to Optionee within five (5) business days following such delivery date. Upon receipt of such cash distribution, this Option shall be cancelled with respect to the shares subject to the surrendered Option (or the surrendered portion), and Optionee shall cease to have any further right to acquire those Option Shares under this Agreement. The Option shall, however, remain outstanding for the balance of the Option Shares (if any) in accordance with the terms and provisions of this Agreement, and the Company shall accordingly issue a new stock option agreement (substantially in the same form as this Agreement) for those remaining Option Shares.

8. **Adjustment in Option Shares** . In the event of a subdivision of the outstanding Shares, a declaration of a dividend payable in Shares, a declaration of a dividend payable in a form other than Shares in an amount that has a material effect on the price of Shares, a combination or consolidation of the outstanding Shares (by reclassification or otherwise) into a lesser number of Shares, a recapitalization, a spin-off or a similar occurrence, appropriate adjustments shall be made to (i) the total number and/or kind of shares or securities subject to this Option and (ii) the Exercise Price in order to reflect such change and thereby preclude a dilution or enlargement of benefits hereunder.

9. **Shareholder Rights** . The holder of this Option shall not have any shareholder rights with respect to the Option Shares until such person shall have exercised the Option, paid the Exercise Price and become a holder of record of the purchased Shares.

10. **Manner of Exercising Option** .

(a) In order to exercise this Option with respect to all or any part of the Option Shares for which this Option is at the time exercisable, Optionee (or any other person or persons exercising the Option) must take the following actions:

    (i) Pay the aggregate Exercise Price for the purchased Shares in one or more of the following forms:

        (A) cash or check which, in the Company's sole discretion, shall be made payable to a Company-designated brokerage firm or the Company; and

        (B) as permitted by applicable law, through a special sale and remittance procedure pursuant to which Optionee (or any other person or persons exercising the Option) shall concurrently provide irrevocable written instructions (I) to a Company-designated brokerage firm (or in the case of an executive officer or Board member of the Company, an Optionee-designated brokerage firm) to effect the immediate sale of the purchased Shares and remit to the Company, out of the sale proceeds available on the settlement date, sufficient funds to cover the aggregate Exercise Price payable for the purchased Shares plus, if applicable, the amount necessary to satisfy the Company's withholding obligations at the minimum statutory withholding rates and (II) to the Company to deliver the certificates for the purchased Shares directly to such brokerage firm in order to complete the sale transaction.

    (ii) Furnish to the Company appropriate documentation that the person or persons exercising the Option (if other than Optionee) have the right to exercise this Option.

    (iii) Make appropriate arrangements with the Company (or Parent or Subsidiary employing or retaining Optionee) for the satisfaction of all tax withholding requirements applicable to the Option exercise.

    (iv) To the extent that the option is exercised for one or more unvested Option Shares, Optionee (or other person exercising the option) shall deliver to the Secretary of the Company a purchase agreement for those unvested Option Shares.

(b) As soon as practical after the exercise date, the Company shall issue to or on behalf of Optionee (or any other person or persons exercising this Option) the purchased Option Shares (as evidenced by an appropriate entry on the books of the Company or a duly authorized transfer agent of the Company), subject to the appropriate legends and/or stop transfer instructions.

(c) In no event may this Option be exercised for any fractional Shares.

**11. No Impairment of Rights** . This Agreement shall not in any way affect the right of the Company to adjust, reclassify, reorganize or otherwise make changes in its capital or business structure or to merge, consolidate, dissolve, liquidate or sell or transfer all or any part of its business or assets. In addition, nothing in this Agreement shall in any way be construed or interpreted so as to affect adversely or otherwise impair the right of the Company or the shareholders to remove Optionee from the Board at any time in accordance with the provisions of applicable law.

**12. Compliance with Laws and Regulations** .

(a) The exercise of this Option and the issuance of the Option Shares upon such exercise shall be subject to compliance by the Company and Optionee with all applicable laws, regulations and rules relating thereto, including all applicable regulations of any stock exchange (or the Nasdaq Global Select Market, if applicable) on which the Shares may be listed for trading at the time of such exercise and issuance.

(b) The inability of the Company to obtain approval from any regulatory body having authority deemed by the Company to be necessary to the lawful issuance and sale of any Shares pursuant to this Option shall relieve the Company of any liability with respect to the non-issuance or sale of the Shares as to which such approval shall not have been obtained. The Company, however, shall use its best efforts to obtain all such approvals.

**13. Successors and Assigns** . Except to the extent otherwise provided in Paragraphs 3, 5, 6 and 7, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Company and its successors and assigns and Optionee, Optionee's assigns and the legal representatives, heirs and legatees of Optionee's estate.

**14. Notices** . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to the Optionee at the address maintained for the Optionee in the Company's records or, in either case, as subsequently modified by written notice to the other party.

**15. Construction** . The Notice, this Agreement, and the Option evidenced hereby (a) are made and granted pursuant to the Plan and are in all respects limited by and subject to the terms of the Plan, and (b) constitute the entire agreement between Optionee and the Company on the subject matter hereof and supercede all proposals, written or oral, and all other communications between the parties related to the subject matter. All decisions of the Committee with respect to any question or issue arising under the Notice, this Agreement or the Plan shall be conclusive and binding on all persons having an interest in this Option.

**16. <u>Governing Law</u>** . The interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of California without resort to the conflict of laws principles thereof.

**17. <u>Excess Shares</u>** . If the Option Shares covered by this Agreement exceed, as of the Grant Date, the number of Shares which may without shareholder approval be issued under the Plan, then this Option shall be void with respect to those excess shares, unless shareholder approval of an amendment sufficiently increasing the number of Shares issuable under the Plan is obtained in accordance with the provisions of the Plan and all applicable laws, regulations and rules.

**18. <u>Further Instruments</u>** . The parties agree to execute such further instruments and to take such further action as may be reasonably necessary to carry out the purposes and intent of this Agreement.

NON-EMPLOYEE DIRECTOR STOCK GRANT

**CISCO SYSTEMS, INC.**
**STOCK GRANT AGREEMENT**

This Stock Grant Agreement (the "Agreement") is made and entered into as of the Grant Date (as defined below) by and between Cisco Systems, Inc., a California corporation (the "Company"), and you pursuant to the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). The material terms of this Stock Grant Award are as follows:

Grantee: _____

Grant Date: _____

Grant Number: _____

Restricted Shares: _____

Vest Date:              The completion of one (1) year of Board service measured from the Grant Date.

To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Plan. In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of this Agreement, the Plan terms and provisions shall prevail.

In consideration of the mutual agreements herein contained and intending to be legally bound hereby, the parties agree as follows:

**1. Restricted Shares** . Pursuant to the Plan, the Company hereby transfers to you, and you hereby accept from the Company, a Stock Grant Award consisting of the Restricted Shares, on the terms and conditions set forth herein and in the Plan.

**2. Vesting of Restricted Shares** . So long as your service on the Board continues, the Restricted Shares shall vest in accordance with the following schedule: one-hundred percent (100%) of the total number of Restricted Shares issued pursuant to this Agreement shall vest on the Vest Date, unless otherwise provided by the Plan or Section 3 below. Except as provided in Section 3 below, in the event of the termination of your Board service for any reason, all unvested Restricted Shares shall be immediately forfeited without consideration. For purposes of facilitating the enforcement of the provisions of this Section 2, the Company may issue stop-transfer instructions on the Restricted Shares to the Company's transfer agent, or otherwise hold the Restricted Shares in escrow, until the Restricted Shares have vested and you have satisfied all applicable obligations with respect to the Restricted Shares, including any applicable tax withholding obligations set forth in Section 5 below. Any new, substituted or additional securities or other property which is issued or distributed with respect to the unvested Restricted Shares shall be subject to the same terms and conditions as are applicable to the unvested Restricted Shares under this Agreement and the Plan.

**3. Special Acceleration** .

(a) To the extent the Restricted Shares are outstanding at the time of a Corporate Transaction or a Change in Control, but not otherwise fully vested, such Restricted Shares shall automatically accelerate immediately prior to the effective date of the Corporate Transaction or the Change in Control, as the case may be, and shall become vested in full at that time.

(b) If your service on the Board ceases as a result of your death or Disability then, to the extent the Restricted Shares are outstanding, but not otherwise fully vested, such Restricted Shares shall automatically accelerate and shall become vested in full at that time.

(c) This Stock Grant Agreement shall not in any way affect the right of the Company to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate, sell or transfer all or any part of its business or assets.

**4. Restriction on Election to Recognize Income in the Year of Grant** . Under Section 83 of the Code, the Fair Market Value of the Restricted Shares on the date the Restricted Shares vest will be taxable as ordinary income at that time. You understand, acknowledge and agree that, as a condition to the grant of this Award, you may not elect to be taxed at the time the Restricted Shares are acquired by filing an election under Section 83(b) of the Code with the Internal Revenue Service.

**5. Withholding Taxes** . You agree to make arrangements satisfactory to the Company for the satisfaction of any applicable withholding tax obligations that arise in connection with the Restricted Shares which, at the sole discretion of the Company, may include (i) having the Company withhold Shares from the Restricted Shares held in escrow, or (ii) any other arrangement approved by the Company, in any case, equal in value to the amount necessary to satisfy any such withholding tax obligation. Such Shares shall be valued based on the Fair Market Value as of the day prior to the date that the amount of tax to be withheld is to be determined under applicable law. The Company shall not be required to release the

Restricted Shares from the stop-transfer instructions or escrow unless and until such obligations are satisfied.

**6. <u>Tax Advice</u>** . You represent, warrant and acknowledge that the Company has made no warranties or representations to you with respect to the income tax consequences of the transactions contemplated by this Agreement, and you are in no manner relying on the Company or the Company's representatives for an assessment of such tax consequences. YOU UNDERSTAND THAT THE TAX LAWS AND REGULATIONS ARE SUBJECT TO CHANGE. YOU SHOULD CONSULT YOUR OWN TAX ADVISOR REGARDING ANY STOCK GRANT AWARD. NOTHING STATED HEREIN IS INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAXPAYER PENALTIES.

**7. <u>Non-Transferability of Restricted Shares</u>** . Restricted Shares which have not vested pursuant to Section 2 above shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by the operation of law. However, this Section 7 shall not preclude you from designating a beneficiary who will receive any vested Restricted Shares in the event of the your death, nor shall it preclude a transfer of vested Restricted Shares by will or by the laws of descent and distribution.

**8. <u>Restriction on Transfer</u>** . Regardless of whether the transfer or issuance of the Restricted Shares has been registered under the Securities Act or has been registered or qualified under the securities laws of any state, the Company may impose additional restrictions upon the sale, pledge, or other transfer of the Restricted Shares (including the placement of appropriate legends on stock certificates and the issuance of stop-transfer instructions to the Company's transfer agent) if, in the judgment of the Company and the Company's counsel, such restrictions are necessary in order to achieve compliance with the provisions of the Securities Act, the securities laws of any state, or any other law.

**9. <u>Stock Certificate Restrictive Legends</u>** . Stock certificates evidencing the Restricted Shares may bear such restrictive legends as the Company and the Company's counsel deem necessary under applicable law or pursuant to this Agreement.

**10. <u>Representations, Warranties, Covenants, and Acknowledgments</u>** . You hereby agree that in the event the Company and the Company's counsel deem it necessary or advisable in the exercise of their discretion, the transfer or issuance of the Restricted Shares may be conditioned upon you making certain representations, warranties, and acknowledgments relating to compliance with applicable securities laws.

**11. <u>Voting and Other Rights</u>** . Subject to the terms of this Agreement, you shall have all the rights and privileges of a shareholder of the Company while the Restricted Shares are subject to stop-transfer instructions, or otherwise held in escrow, including the right to vote and to receive dividends (if any).

**12. <u>Authorization to Release Necessary Personal Information</u>** .

(a) You hereby authorize and direct the Company to collect, use and transfer in electronic or other form, any personal information (the "Data") regarding your service, the nature and amount of your compensation and the facts and conditions of your participation in the Plan (including, but not limited to, your name, home address, telephone number, date of birth, social security number (or any other social or national identification number), compensation, nationality, job title, number of Shares held and the details of all Awards or any other entitlement to Shares awarded, cancelled, exercised, vested, unvested or outstanding) for the purpose of implementing, administering and managing your participation in the Plan. You understand that the Data may be transferred to the Company or any of its Subsidiaries, or to any third parties assisting in the implementation, administration and management of the Plan, including any requisite transfer to a broker or other third party assisting with the administration of this Stock Grant Award under the Plan or with whom Shares acquired pursuant to this Stock Grant Award or cash from the sale of such shares may be deposited. You acknowledge that recipients of the Data may be located in different countries, and those countries may have data privacy laws and protections different from those in the country of your residence. Furthermore, you acknowledge and understand that the transfer of the Data to the Company or any of its Subsidiaries, or to any third parties is necessary for your participation in the Plan.

(b) You may at any time withdraw the consents herein by contacting your local human resources representative in writing. You further acknowledge that withdrawal of consent may affect your ability to exercise or realize benefits from this Stock Grant Award, and your ability to participate in the Plan.

**13. <u>No Entitlement or Claims for Compensation</u>** .

(a) Your rights, if any, in respect of or in connection with this Stock Grant Award or any other Award is derived solely from the discretionary decision of the Company to permit you to participate in the Plan and to benefit from a discretionary Award. By accepting this Stock Grant Award, you expressly acknowledge that there is no obligation on the part of the Company to continue the Plan and/or grant any additional Awards to you. This Stock Grant Award is not intended to be compensation of a continuing or recurring nature, or part of your normal or expected compensation, and in no way represents any portion of a your salary, compensation, or other remuneration for purposes of pension benefits, severance, redundancy, resignation or any other purpose.

(b) Neither the Plan nor this Stock Grant Award or any other Award granted under the Plan shall be deemed to give you a right to remain an Employee, Consultant or director of the Company, a Parent, a Subsidiary or an Affiliate. The Company and its Parents and Subsidiaries and Affiliates reserve the right to terminate your Service at any time, with or without cause, and for any reason, subject to applicable laws, the Company's Articles of Incorporation and Bylaws and a written employment agreement (if any), and you shall be deemed irrevocably to have waived any claim to damages or specific performance for breach of contract or dismissal, compensation for loss of office, tort or otherwise with respect to the Plan, this Stock Grant Award or any outstanding Award that is forfeited and/or is terminated by its terms or to any future Award.

(c) You agree that the Company may require that Restricted Shares be held by a broker designated by the Company. In addition, you agree that your rights hereunder shall be subject to set-off by the Company for any valid debts you owe the Company.

**14. <u>Governing Law</u>** . This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflict of laws principles thereof.

**15. <u>Notices</u>** . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to you at the address maintained for you in the Company's records or, in either case, as subsequently modified by written notice to the other party.

**16. <u>Binding Effect</u>** . Subject to the limitations set forth in this Agreement, this Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, legal representatives, successors, and assigns of the parties hereto.

**17. <u>Severability</u>** . If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the full extent possible.

DATED: **_____, ____**

**CISCO SYSTEMS, INC.**

By: _____

Title: _____

**GRANTEE** _____

**NON-EMPLOYEE DIRECTOR STOCK UNIT**
**IN LIEU OF ANNUAL RETAINER**
**(For Grants Effective on and after the Date of the**
**Company's 2015 Annual Meeting of Shareholders)**

# CISCO SYSTEMS, INC.
## STOCK UNIT AGREEMENT

This Stock Unit Agreement (the "Agreement") is made and entered into as of the Grant Date (as defined below) by and between Cisco Systems, Inc., a California corporation (the "Company"), and you pursuant to the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). The material terms of this Stock Unit Award are as follows:

Grantee: _____

Grant Date: _____

Grant Number: _____

Restricted Stock Units: _____

To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Plan. In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of this Agreement, the Plan terms and provisions shall prevail.

In consideration of the mutual agreements herein contained and intending to be legally bound hereby, the parties agree as follows:

1. **Restricted Stock Units** . Pursuant to the Plan, the Company hereby grants to you, and you hereby accept from the Company, Restricted Stock Units, each of which is a bookkeeping entry representing the equivalent in value of one (1) Share, on the terms and conditions set forth herein and in the Plan.

2. **Vesting of Restricted Stock Units** . One-hundred percent (100%) of the total number of Restricted Stock Units granted pursuant to this Agreement shall vest on the Grant Date.

3. **Settlement of Restricted Stock Units** . Restricted Stock Units shall be automatically settled in Shares upon your separation from service within the meaning of Code Section 409A ("Separation from Service"), provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless and until such issuance complies with all applicable law. Prior to the time that the Restricted Stock Units are settled in Shares upon your Separation from Service, you shall have no rights other than those of a general creditor of the Company. The Restricted Stock Units represent an unfunded and unsecured obligation of the Company.

4. **Tax Advice** . You represent, warrant and acknowledge that the Company has made no warranties or representations to you with respect to the income tax consequences of the transactions contemplated by this Agreement, and you are in no manner relying on the Company or the Company's representatives for an assessment of such tax consequences. YOU UNDERSTAND THAT THE TAX LAWS AND REGULATIONS ARE SUBJECT TO CHANGE. YOU SHOULD CONSULT YOUR OWN TAX ADVISOR REGARDING ANY RESTRICTED STOCK UNITS. NOTHING STATED HEREIN IS INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAXPAYER PENALTIES.

5. **Non-Transferability of Restricted Stock Units** . Restricted Stock Units shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law.

6. **Restriction on Transfer** . Regardless of whether the transfer or issuance of the Shares to be issued pursuant to the Restricted Stock Units has been registered under the Securities Act or has been registered or qualified under the securities laws of any state, the Company may impose additional restrictions upon the sale, pledge, or other transfer of the Shares (including the placement of appropriate legends on stock certificates and the issuance of stop-transfer instructions to the Company's transfer agent) if, in the judgment of the Company and the Company's counsel, such restrictions are necessary in order to achieve compliance with the provisions of the Securities Act, the securities laws of any state, or any other law.

7. **Stock Certificate Restrictive Legends** . Stock certificates evidencing the Shares issued pursuant to the Restricted Stock Units may bear such restrictive legends as the Company and the Company's counsel deem necessary under applicable law or pursuant to this Agreement.

8. **Representations, Warranties, Covenants, and Acknowledgments** . You hereby agree that in the event the Company and the Company's counsel deem it necessary or advisable in the exercise of their discretion, the transfer or issuance of the Shares issued pursuant to the Restricted Stock Units may be conditioned upon you making certain representations, warranties, and acknowledgments relating to compliance with applicable securities laws.

9. **Voting, Dividend and Other Rights** . Subject to the terms of this Agreement and except as set forth below, you shall not have any voting rights or any other rights and privileges of a shareholder of the Company unless and until the Restricted Stock Units are settled upon your Separation from Service. Dividend equivalents shall accrue and will be subject to the same conditions and restrictions as the Restricted Stock Units to which they attach as set forth in the Plan or this Agreement and will be settled in additional Shares upon your Separation from Service.

10. **Authorization to Release Necessary Personal Information** .

(a) You hereby authorize and direct the Company to collect, use and transfer in electronic or other form, any personal information (the "Data") regarding your service, the nature and amount of your compensation and the facts and conditions of your participation in the Plan (including, but not limited to, your name, home address, telephone number, date of birth, social security number (or any other social or national identification number), compensation, nationality, job title, number of Shares held and the details of all Awards or any other entitlement to Shares awarded, cancelled, exercised, vested, unvested or outstanding) for the purpose of implementing, administering and managing your participation in the Plan. You understand that the Data may be transferred to the Company or any of its Subsidiaries, or to any third parties assisting in the implementation, administration and management of the Plan, including any requisite transfer to a broker or other third party assisting with the administration of these Restricted Stock Units under the Plan or with whom Shares acquired pursuant to these Restricted Stock Units or cash from the sale of such shares may be deposited. You acknowledge that recipients of the Data may be located in different countries, and those countries may have data privacy laws and protections different from those in the country of your residence. Furthermore, you acknowledge and understand that the transfer of the Data to the Company or any of its Subsidiaries, or to any third parties is necessary for your participation in the Plan.

(b) You may at any time withdraw the consents herein by contacting the Company's local human resources representative in writing. You further acknowledge that withdrawal of consent may affect your ability to exercise or realize benefits from these Restricted Stock Units and your ability to participate in the Plan.

11. **Governing Law** . This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflict of laws principles thereof.

12. **Notices** . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or

fax or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to you at the address maintained for you in the Company's records or, in either case, as subsequently modified by written notice to the other party.

13.    **Binding Effect** . Subject to the limitations set forth in this Agreement, this Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, legal representatives, successors, and assigns of the parties hereto.

14.    **Severability** . If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the full extent possible.

**NON-EMPLOYEE DIRECTOR STOCK UNIT**
**IN LIEU OF ANNUAL RETAINER**
**(For Grants Effective Prior to the Date of the**
**Company's 2015 Annual Meeting of Shareholders)**

**CISCO SYSTEMS, INC.**
**STOCK UNIT AGREEMENT**

This Stock Unit Agreement (the "Agreement") is made and entered into as of the Grant Date (as defined below) by and between Cisco Systems, Inc., a California corporation (the "Company"), and you pursuant to the Cisco Systems, Inc. 2005 Stock Incentive Plan (the "Plan"). The material terms of this Stock Unit Award are as follows:

Grantee: _____

Grant
Date: _____

Grant
Number: _____

Restricted Stock
Units: _____

To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Plan. In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of this Agreement, the Plan terms and provisions shall prevail.

In consideration of the mutual agreements herein contained and intending to be legally bound hereby, the parties agree as follows:

**1.** **Restricted Stock Units** . Pursuant to the Plan, the Company hereby grants to you, and you hereby accept from the Company, Restricted Stock Units, each of which is a bookkeeping entry representing the equivalent in value of one (1) Share, on the terms and conditions set forth herein and in the Plan.

**2.** **Vesting of Restricted Stock Units** . One-hundred percent (100%) of the total number of Restricted Stock Units granted pursuant to this Agreement shall vest on the Grant Date.

**3.** **Settlement of Restricted Stock Units** . Restricted Stock Units shall be automatically settled in Shares upon your separation from service within the meaning of Code Section 409A ("Separation from Service"), provided that the Company shall have no obligation to issue Shares pursuant to this Agreement unless and until you have satisfied any applicable tax withholding obligations and such issuance otherwise complies with all applicable law.

**4. Tax Advice** . You represent, warrant and acknowledge that the Company has made no warranties or representations to you with respect to the income tax consequences of the transactions contemplated by this Agreement, and you are in no manner relying on the Company or the Company's representatives for an assessment of such tax consequences. YOU UNDERSTAND THAT THE TAX LAWS AND REGULATIONS ARE SUBJECT TO CHANGE. YOU SHOULD CONSULT YOUR OWN TAX ADVISOR REGARDING ANY RESTRICTED STOCK UNITS. NOTHING STATED HEREIN IS INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAXPAYER PENALTIES.

**5. Non-Transferability of Restricted Stock Units** . Restricted Stock Units shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process, whether voluntarily or involuntarily or by operation of law. However, this Section 5 shall not preclude you from designating a beneficiary who will receive vested Shares pursuant to this award in the event of your death, nor shall it preclude a transfer of vested Shares pursuant to this award by will or by the laws of descent and distribution.

**6. Restriction on Transfer** . Regardless of whether the transfer or issuance of the Shares to be issued pursuant to the Restricted Stock Units has been registered under the Securities Act or has been registered or qualified under the securities laws of any state, the Company may impose additional restrictions upon the sale, pledge, or other transfer of the Shares (including the placement of appropriate legends on stock certificates and the issuance of stop-transfer instructions to the Company's transfer agent) if, in the judgment of the Company and the Company's counsel, such restrictions are necessary in order to achieve compliance with the provisions of the Securities Act, the securities laws of any state, or any other law.

**7. Stock Certificate Restrictive Legends** . Stock certificates evidencing the Shares issued pursuant to the Restricted Stock Units may bear such restrictive legends as the Company and the Company's counsel deem necessary under applicable law or pursuant to this Agreement.

**8. Representations, Warranties, Covenants, and Acknowledgments** . You hereby agree that in the event the Company and the Company's counsel deem it necessary or advisable in the exercise of their discretion, the transfer or issuance of the Shares issued pursuant to the Restricted Stock Units may be conditioned upon you making certain representations, warranties, and acknowledgments relating to compliance with applicable securities laws.

**9. Voting and Other Rights** . Subject to the terms of this Agreement, you shall not have any voting rights or any other rights and privileges of a shareholder of the Company unless and until the Restricted Stock Units are settled in Shares upon your Separation from Service.

**10. Authorization to Release Necessary Personal Information** .

(a) You hereby authorize and direct the Company to collect, use and transfer in electronic or other form, any personal information (the "Data") regarding your service, the nature and amount of your compensation and the facts and conditions of your participation in the Plan (including, but not limited to, your name, home address, telephone number, date of birth, social security number (or any other social or national identification number), compensation, nationality, job title, number of Shares held and the details of all Awards or any other entitlement to Shares awarded, cancelled, exercised, vested, unvested or outstanding) for the purpose of implementing, administering and managing your participation in the Plan. You understand that the Data may be transferred to the Company or any of its Subsidiaries, or to any third parties assisting in the implementation, administration and management of the Plan, including any requisite transfer to a broker or other third party assisting with the administration of these Restricted Stock Units under the Plan or with whom Shares acquired pursuant to these Restricted Stock Units or cash from the sale of such shares may be deposited. You acknowledge that recipients of the Data may be located in different countries, and those countries may have data privacy laws and protections different from those in the country of your residence. Furthermore, you acknowledge and understand that the transfer of the Data to the Company or any of its Subsidiaries, or to any third parties is necessary for your participation in the Plan.

(b) Prior to the time that the Restricted Stock Units are settled in Shares upon your Separation from Service, you shall have no rights other than those of a general creditor of the Company. The Restricted Stock Units represent an unfunded and unsecured obligation of the Company.

(c) You may at any time withdraw the consents herein by contacting the Company's local human resources representative in writing. You further acknowledge that withdrawal of consent may affect your ability to exercise or realize benefits from these Restricted Stock Units, and your ability to participate in the Plan.

**11. Governing Law** . This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to the conflict of laws principles thereof.

**12. N** otices . Any notice required or permitted under the terms of this Agreement shall be in writing and shall be deemed sufficient when delivered personally or sent by confirmed email, telegram, or fax or forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the Company at the Company's principal corporate offices or to you at the address maintained for you in the Company's records or, in either case, as subsequently modified by written notice to the other party.

**13. Binding Effect** . Subject to the limitations set forth in this Agreement, this Agreement shall be binding upon, and inure to the benefit of, the executors, administrators, heirs, legal representatives, successors, and assigns of the parties hereto.

**14. Severability** . If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, in order to achieve the intent of the parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the full extent possible.

DATED: _____

CISCO SYSTEMS, INC.

By: _____
Title: _____

_____
GRANTEE

**(Effective on and after the Date of the Company's
2015 Annual Meeting of Shareholders)**

## NON-EMPLOYEE DIRECTOR ELECTION
## INITIAL EQUITY AWARD

I, being a prospective newly elected or appointed non-employee member of the Board of Directors of Cisco Systems, Inc. (the "Company") hereby (check one):

(i) ☐    **ELECT** or (ii) ☐    **DO NOT ELECT** to defer the settlement of my total initial restricted stock unit award anticipated to be granted under the 2005 Stock Incentive Plan (the "Plan") on the date of my election or appointment in connection with my initial election or appointment as a non-employee member of the Board of Directors of the Company.

I understand the following:

- If I do not elect to defer the settlement of my initial restricted stock unit grant, the grant will be automatically settled in shares of the Company's common stock on, or as soon as practicable after, the vesting of the grant on the date of the Company's Annual Meeting of Shareholders following the date of grant (subject to acceleration in certain cases), as more fully set forth in the Stock Unit Agreement.

- If my "Separation from Service" within the meaning under Section 409A of the Internal Revenue Code ("Separation from Service") occurs before my initial restricted stock unit grant vests, the grant will be forfeited.

- If I elect to defer the settlement of my initial restricted stock unit grant:

  o   The grant will not be settled in shares of the Company's common stock upon the above-described vesting date, but instead will be deferred and settled in shares of the Company's common stock on, or as soon as practicable after, my Separation from Service.

  o   Dividend equivalents will accrue after the deferred stock unit grant vests and will be credited as additional deferred stock units to be settled in additional shares of the Company's common stock on, or as soon as practicable after, my Separation from Service.

  o   Receipt of shares of the Company's common stock pursuant to any deferred stock unit grant will be taxed as ordinary income to me based on the value of the shares on the date the deferred stock unit grant is settled and I receive shares of the Company's common stock.

* * * * *

I understand that this election will be effective only if received by the Company's Legal Department on or before the date of my election or appointment.

---

Signature of Non-Employee Director            Date

*\* Because individual circumstances vary, Cisco Systems, Inc. cannot provide tax advice and you should consult with your own tax advisor regarding the income tax consequences of your potential election.*

**(Effective Beginning February 2013 until the Date of the Company's 2015 Annual Meeting of Shareholders)**

# NON-EMPLOYEE DIRECTOR ELECTION UNDER THE
# CISCO SYSTEMS, INC. 2005 STOCK INCENTIVE PLAN
# INITIAL EQUITY AWARD

I, _____, being a prospective newly elected or appointed non-employee member of the Board of Directors of Cisco Systems, Inc. (the "Company") hereby (check one):

(i) ___ **ELECT** or (ii) ___ **DO NOT ELECT** to defer the settlement of my total initial restricted stock unit award anticipated to be granted under the 2005 Stock Incentive Plan (the "Plan") on the date of my election or appointment in connection with my initial election or appointment as a non-employee member of the Board of Directors of the Company.

This election will be effective only if received by Cisco's Legal Department on or before the date of my election or appointment.

If I do not elect to defer the settlement of my initial restricted stock unit grant, my initial restricted stock unit grant will be automatically settled in shares of the Company's common stock on, or as soon as practicable after, the below described vesting date of the restricted stock unit grant.

My initial restricted stock unit grant will vest in full at the Company's Annual Meeting of Shareholders following my initial election or appointment date (subject to acceleration in certain cases), as more fully set forth in the Stock Unit Agreement. I understand that if my "separation from service" within the meaning of Section 409A of the Internal Revenue Code ("Separation from Service") occurs before my restricted stock unit grant vests, the grant will be forfeited.

I understand that if I elect to defer the settlement of my initial restricted stock unit grant, the grant will not be settled in shares of the Company's common stock upon the above-described vesting date, but instead will be settled in shares of the Company's common stock on, or as soon as practicable after, my Separation from Service (which generally will be the date my service as a member of the Board of Directors of the Company terminates).

I understand that if I elect to defer the settlement of my initial restricted stock unit grant, dividends or dividend equivalents will not accrue during the deferral period.

I understand that my receipt of shares of the Company's common stock pursuant to any deferred stock unit grant will be taxed as ordinary income to me based on the value of the shares on the date the deferred stock unit grant is settled and I receive shares of the Company's common stock.

Signature of Non-Employee Director          Date

*\* Because individual circumstances vary, Cisco Systems, Inc. can not provide tax advice and you should consult with your own tax advisor regarding the income tax consequences of your potential elections.*

(Effective December 2014)

# NON-EMPLOYEE DIRECTOR ELECTIONS
# ANNUAL RETAINER & EQUITY AWARD

**ANNUAL RETAINER**

The alternatives for the fiscal _____ annual retainer (anticipated to be $75,000) for non-employee members of the Board of Directors of Cisco Systems, Inc. (the "Company") are:

- a non-deferred cash payment (default option),
- a deferred cash payment under the Company's Deferred Compensation Plan (the "DCP"),
- a vested stock grant under the 2005 Stock Incentive Plan (the "Plan"), and/or
- a vested deferred stock unit grant under the Plan.

**If you make no elections below, you will receive your full annual retainer in non-deferred cash.**

I, being a non-employee member of the Board of Directors of the Company, hereby make the below elections with respect to my annual retainer for the next year of Board service commencing at the next Annual Meeting of Shareholders. (The Election Amount must total 100%.)

| Alternative | Election Amount (0% to 100%, in increments of 25%) | Election under the DCP Separation from Service |
|---|---|---|
| **Non-Deferred Cash** (default option) | % (e.g. 0%, 25%, 50%, 75% or 100%) | N/A |
| **Deferred Cash under the Deferred Compensation Plan** | % | I elect to receive my DCP account balance (choose one of the options below):<br>☐ as soon as practicable after my "Separation from Service"<br>☐ as soon as practicable in the calendar year following the calendar year of my "Separation from Service" |
| **Vested Stock Grant** | % | N/A |
| **Vested Deferred Stock Unit Grant** | % | N/A |
| **TOTAL** | **100%** | |

I understand the following:

- If I elect to receive deferred cash under the DCP:
  - I authorize the Company to share my personal information with the third-party DCP administrator so that the DCP administrator can begin the enrollment process in order for me to make investment and beneficiary elections pursuant to the terms of the DCP.
  - I will receive my DCP account balance in a cash lump sum, taxable as ordinary income, pursuant to my election above. If I make no election, I will receive my DCP account balance as soon as practicable after my "Separation from Service" within the meaning under Section 409A of the Internal Revenue Code, which generally will be the date my service as a member of the Board of Directors of the Company terminates.

- If I elect to receive a vested stock grant, the shares will be granted on the date of the Annual Meeting of Shareholders based on the closing value of the Company's common stock on such date (the "Fair Market Value"), the shares will be taxed as ordinary income to

me based on the Fair Market Value, and I will receive the shares as soon as practicable after that date.

- If I elect to receive a <u>vested deferred stock unit grant</u> :
  - ◦ The deferred stock unit grant will be granted on the date of the Annual Meeting of Shareholders based on the Fair Market Value.

◦ The deferred stock unit grant will be settled in shares of the Company's common stock on, or as soon as practicable after, my Separation from Service.

◦ Dividend equivalents <u>will accrue </u>on the vested deferred stock unit grant and will be credited as additional deferred stock units to be settled in additional shares of the Company's common stock on, or as soon as practicable after, my Separation from Service.

◦ Receipt of shares of the Company's common stock pursuant to the deferred stock unit grant will be taxed as ordinary income to me based on the value of the shares on the date the deferred stock unit grant is settled and I receive shares of the Company's common stock.

**[ANNUAL EQUITY AWARD ELECTION ON NEXT PAGE]**

**ANNUAL EQUITY AWARD**

I further (check one) (i) ☐ **ELECT** or (ii) ☐ **DO NOT ELECT** to defer the settlement of my total annual restricted stock unit award anticipated to be granted under the 2005 Stock Incentive Plan (the "Plan") on the date of the next Annual Meeting of Shareholders.

I understand the following:

- If I do not elect to defer the settlement of my annual restricted stock unit grant, the grant will be automatically settled in shares of the Company's common stock on, or as soon as practicable after, the vesting of the grant upon the completion of one year of Board service following the date of grant (subject to acceleration in certain cases), as more fully set forth in the Stock Unit Agreement.
- If my Separation from Service occurs before my annual restricted stock unit grant vests, the grant will be forfeited.
- If I elect to defer the settlement of my annual restricted stock unit grant:
  - The grant will not be settled in shares of the Company's common stock upon the above-described vesting date, but instead will be deferred and settled in shares of the Company's common stock on, or as soon as practicable after, my Separation from Service.
  - Dividend equivalents will accrue after the deferred stock unit grant vests and will be credited as additional deferred stock units to be settled in additional shares of the Company's common stock on, or as soon as practicable after, my Separation from Service.
  - Receipt of shares of the Company's common stock pursuant to any deferred stock unit grant will be taxed as ordinary income to me based on the value of the shares on the date the deferred stock unit grant is settled and I receive shares of the Company's common stock.

* * * * *

I understand that these elections will be effective only if received by _____ on or before _____ [December 31, [PRECEDING YEAR]].


_____
Signature of Non-Employee Director          Date


*\* Because individual circumstances vary, Cisco Systems, Inc. cannot provide tax advice and you should consult with your own tax advisor regarding the income tax consequences of your potential elections.*

**(Effective Beginning February 2013**
**and Prior to December 2014)**

## NON-EMPLOYEE DIRECTOR ELECTION UNDER THE
## CISCO SYSTEMS, INC. 2005 STOCK INCENTIVE PLAN
## ANNUAL RETAINER & EQUITY AWARD

**ANNUAL RETAINER**

I, _____, being a non-employee member of the Board of Directors of Cisco Systems, Inc. (the "Company") hereby make the following election.

*Please choose (a) **or** (b) below.*

(a)        _____ I elect to receive my <u>full</u> annual retainer for the next year of Board service commencing at the next Annual Meeting of Shareholders <u>in cash</u> .

(b)        _____ I elect to receive _____% ( *insert a percentage between 25% and 100%* ) of my total annual retainer for the next year of Board service commencing at the next Annual Meeting of Shareholders, in the form of:

   *Please choose either (i) **or** (ii) below.*

   (i)        ____ fully vested shares, which will be given to me under the 2005 Stock Incentive Plan (the "Plan") on November __, 20__ based on the closing value of the Company's common stock on that date (the "Fair Market Value"); **OR**

   (ii)        ____ a fully vested <u>deferred</u> stock unit grant which will be granted under the Plan on November __, 20__ based on the Fair Market Value.

I understand that, to the extent I do not elect to receive all or any portion of my annual retainer in the form of either (i) shares or (ii) a <u>deferred</u> stock unit grant, I will receive such retainer <u>in cash</u> on, or as soon as practicable after, the date of the Annual Meeting of Shareholders on _____, 20__. If I make no election, I will receive my <u>full</u> annual retainer <u>in cash</u> .

I understand that, if I elect to receive shares, I will receive the shares on, or as soon as practicable after, the date of the annual shareholder meeting and that my receipt of shares will be taxed as ordinary income to me based on the value of the shares on the date of grant.

I understand that, if I elect to receive a <u>deferred</u> stock unit grant, any such grant will be settled in shares of the Company's common stock on, or as soon as practicable after, my "separation from service" within the meaning of Section 409A of the Internal Revenue Code (which generally will be the date my service as a member of the Board of Directors of the Company terminates).

I understand that if I elect to receive a <u>deferred</u> stock unit grant, dividends or dividend equivalents will <u>not</u> accrue during the deferral period.

I understand that my receipt of shares of the Company's common stock pursuant to any <u>deferred</u> stock unit grant will be taxed as ordinary income to me based on the value of the shares on the date the <u>deferred</u> stock unit grant is settled and I receive shares of the Company's common stock.

## ANNUAL EQUITY AWARD

I further (check one) (i) ___ **ELECT** or (ii) ___ **DO NOT ELECT** to defer the settlement of my total annual restricted stock unit award anticipated to be granted under the 2005 Stock Incentive Plan (the "Plan") on _____, 20__ immediately following the Company's 20__ Annual Meeting of Shareholders.

If I do not elect to defer the settlement of my annual restricted stock unit grant, the above-mentioned annual restricted stock unit grant will be automatically settled in shares of the Company's common stock on, or as soon as practicable after, the vesting of the restricted stock unit grant upon the completion of one year of Board service following the date of grant (subject to acceleration in certain cases), as more fully set forth in the Stock Unit Agreement. I understand that if my "separation from service" within the meaning of Section 409A of the Internal Revenue Code ("Separation from Service") occurs before my restricted stock unit grant vests, the grant will be forfeited.

I understand that if I elect to defer the settlement of the above-mentioned annual restricted stock unit grant, the grant will not be settled in shares of the Company's common stock upon the above-described vesting date, but instead will be settled in shares of the Company's common stock on, or as soon as practicable after, my Separation from Service (which generally will be the date my service as a member of the Board of Directors of the Company terminates).

I understand that if I elect to defer the settlement of my annual restricted stock unit grant, dividends or dividend equivalents will <u>not</u> accrue during the deferral period.

I understand that my receipt of shares of the Company's common stock pursuant to any <u>deferred</u> stock unit grant will be taxed as ordinary income to me based on the value of the shares on the date the <u>deferred</u> stock unit grant is settled and I receive shares of the Company's common stock.

I understand that these elections will be effective only if received by _____ on or before _____ [December 31, [PRECEDING YEAR]].

Signature of Non-Employee Director          Date

*\* Because individual circumstances vary, Cisco Systems, Inc. can not provide tax advice and you should consult with your own tax advisor regarding the income tax consequences of your potential elections.*

**CISCO SYSTEMS, INC.**

**VESTING ACCELERATION POLICY**

**FOR**

**DEATH AND TERMINAL ILLNESS**

**AS**

**AMENDED SEPTEMBER 8, 2011**

Unless and until the Compensation & Management Development Committee of the Board of Directors of Cisco Systems, Inc. determines otherwise, the following policy shall be applied to all equity awards issued under any equity plan maintained Cisco or any Cisco subsidiary, including equity awards and/or equity plans assumed by Cisco in connection with its acquisition of companies, and held by any employee of Cisco or any Cisco subsidiary (each such award shall be referred to herein as an "equity award"), except to the extent that the application of such policy would be prohibited by the applicable equity plan, equity award agreement or any applicable law, rule or regulation.

For purposes of this policy:

- the value of stock options and stock appreciation rights is based on the difference between the exercise price of the equity awards and the closing price of Cisco's stock on the date of the employee's death or terminal illness, as applicable, or if such day is not a trading day, the last trading day prior to the date of death or terminal illness, as applicable; and

- the value of stock grants, stock units, and unvested shares previously acquired pursuant to equity awards (such shares are referred to herein as "unvested equity award shares") is based on the difference between the purchase price, if any, and the closing price of Cisco's stock on the date of the employee's death or terminal illness, as applicable, or if such day is not a trading day, the last trading day prior to the date of death or terminal illness, as applicable;

- "unvested equity award shares" includes outstanding and unvested performance-based restricted stock or stock unit awards and the accelerated vesting of such awards will be deemed to occur at target levels, subject to the specified limits below; and

- to the extent the vesting of any performance-based restricted stock or stock unit award is accelerated pursuant to this policy, the award will be settled upon the death or terminal illness of an employee, as the case may be, except that if the applicable award is subject to Section 409A of the Internal Revenue Code ("Code Section 409A") and such terminal illness does not qualify as a "Disability" within the meaning of Code Section 409A, then the award will instead be settled on the fixed payment date following the end of the performance period on which the applicable award is normally paid out.

## ACCELERATION UPON DEATH OF EMPLOYEE

Upon the death of an employee, Cisco will accelerate the vesting of the employee's outstanding equity awards and any unvested equity award shares up to a specified limit based on the value of the equity awards and/or shares on the date of death. The limit on the amount of accelerated vesting is the greater of: (a) one-hundred percent (100%) of the unvested equity awards and/or unvested equity award shares up to a total value of $10 million; or (b) up to one year of vesting from the date of death as to all unvested equity awards and/or unvested equity award shares. For example, if an employee held unvested options for 100,000 shares with an exercise price of $1 which would vest in four annual installments of 25,000 shares, and the closing price of Cisco's stock on the date of the employee's death was $101, all 100,000 of the shares would become vested (100,000 shares x $100 (the difference between $101 and $1) = $10,000,000).

## ACCELERATION UPON TERMINAL ILLNESS OF EMPLOYEE

Upon the terminal illness of an employee, Cisco will accelerate the vesting of the employee's outstanding equity awards and any unvested equity award shares up to a specified limit based on the value of the equity awards and/or shares on the date of the terminal illness. An employee will be considered terminally ill upon the approval by Cisco's employee life insurance provider of the accelerated life insurance benefit which indicates 12 months or less to live. When a request is made to accelerate the vesting of an employee's outstanding equity awards and early life insurance payouts are not also requested, an employee will be considered terminally ill upon the approval by Cisco's external, independent medical review vendor (which may include Cisco's employee life insurance provider). The date of terminal illness will be the date the determination is made by Cisco's employee life insurance provider or Cisco's external, independent medical review vendor. The limit on the amount of accelerated vesting is the greater of: (a) one-hundred percent (100%) of the unvested equity awards and/or unvested equity award shares up to a total value of $10 million; or (b) up to one year of vesting from the date of the terminal illness as to all unvested equity awards and/or unvested equity award shares. For example, if an employee holds unvested options for 100,000 shares with an exercise price of $1 which would vest in four annual installments of 25,000 shares, and the closing price of Cisco's stock on the date that the employee is determined to be terminally ill was $101, all 100,000 of the shares would become vested (100,000 shares x $100 (the difference between $101 and $1) = $10,000,000).

**CISCO SYSTEMS, INC.**

**VESTING POLICY**

**FOR**

**LEAVES OF ABSENCE**

Unless and until the Compensation & Management Development Committee of the Board of Directors of Cisco Systems, Inc. determines otherwise, the following policy shall be applied to all equity awards issued under any equity plan maintained Cisco or any Cisco subsidiary, including equity awards and/or equity plans assumed by Cisco in connection with its acquisition of companies, and held by any employee of Cisco or any Cisco subsidiary (each such award shall be referred to herein as an "equity award"), except to the extent that the application of such policy would be prohibited by the applicable equity plan, equity award agreement or any applicable law, rule or regulation.

**(Effective until approximately November 2008)**

**SUSPENSION OF VESTING UPON AUTHORIZED LEAVE OF ABSENCE**

The exercise or vesting schedule in effect for any outstanding equity award and any unvested shares previously acquired pursuant to any equity award (such shares referred to herein as "unvested equity award shares") held by an employee at the time of the employee's commencement of an authorized leave of absence shall be suspended as of the first day of the authorized leave of absence, and the equity award and any unvested equity shares shall not vest and/or become exercisable for any additional shares during the period the employee remains on such leave of absence.

**(Effective in or around November 2008)**

**90 DAYS CONTINUED VESTING ON AUTHORIZED LEAVES OF ABSENCE**

The exercise or vesting schedule in effect for any outstanding equity award and any unvested shares previously acquired pursuant to any equity award (such shares referred to herein as "unvested equity award shares") held by an employee at the time of the employee's commencement of an authorized leave of absence shall continue to vest and/or become exercisable in accordance with the vesting schedule set forth in the applicable equity award agreement during the period the employee remains on such authorized leave of absence; provided that, in no event shall any employee be entitled to vest for more than 90 days of authorized leaves of absence during any rolling 12-month period (the "LOA Limit").

If an employee exceeds the LOA Limit during any rolling 12-month period, the unvested equity award shares held by such an employee shall be suspended immediately following the expiration of the LOA Limit and the equity award and any unvested equity shares shall not vest and/or become exercisable for any additional shares during the remainder of the rolling 12-month period.

**CISCO SYSTEMS, INC.**
**TRANSFER POLICY**
**FOR**
**DIVORCE**

Unless and until the Compensation & Management Development Committee of the Board of Directors of Cisco Systems, Inc. determines otherwise, the following policy shall be applied to all equity awards issued under any equity plan maintained Cisco or any Cisco subsidiary, including equity awards and/or equity plans assumed by Cisco in connection with its acquisition of companies, and held by any employee of Cisco or any Cisco subsidiary (each such award shall be referred to herein as an "equity award"), except to the extent that the application of such policy would be prohibited by the applicable equity plan, equity award agreement or any applicable law, rule or regulation.

## PROHIBITION ON TRANSFER OF EQUITY AWARDS UPON DIVORCE

Except as provided below, equity awards and any unvested shares acquired pursuant to equity awards shall not be anticipated, assigned, attached, garnished, optioned, transferred or made subject to any creditor's process in connection with the divorce of the holder of such equity award or shares. Equity awards and any unvested shares acquired pursuant to equity awards may be transferred by an executive officer of Cisco only to the extent required by a domestic relations order, as defined by the Internal Revenue Code or Title I of the Employee Retirement Income Security Act, or the rules thereunder, in settlement of marital property rights by any court of competent jurisdiction.

EXHIBIT 21.1

**SUBSIDIARIES OF THE REGISTRANT**

| Subsidiaries | State Or Other Jurisdiction of Incorporation or Organization |
| --- | --- |
| "Cisco Albania" SHPK | Albania |
| Airespace Wireless Networks Private Limited | India |
| Assemblage LLC | Delaware |
| Beaumaris Networks, Inc. | Delaware |
| Beaumaris Software Research & Development (Beijing) Co. Ltd. | China |
| Beijing NDS Information Technology Co., Ltd. | China |
| BroadHop India Private Limited | India |
| BroadHop International B.V. | Netherlands |
| BroadHop LLC | Delaware |
| BroadHop Pte. Ltd. | Singapore |
| BroadHop SDN. BHD. | Malaysia |
| Callway LLC | Delaware |
| Cariden Technologies LLC | California |
| Castup Israel Ltd. | Israel |
| Cisco Bahrain (SPC) | Bahrain |
| Cisco Bilgisayar ve Internet Sistemleri Limited Sirketi | Turkey |
| Cisco Capital (Dubai) Limited | United Arab Emirates |
| Cisco Capital Mexico, S. de R.L. de C.V. | Mexico |
| Cisco China Company, Limited | China |
| Cisco China Holdings (HK) Limited | Hong Kong |
| Cisco Comercio e Servicos de Hardware e Software do Brasil Ltda | Brazil |
| Cisco Commerce India Private Limited | India |
| Cisco Development India Private Limited | India |
| Cisco do Brasil Ltda | Brazil |
| Cisco Fast Data, LLC | Delaware |
| Cisco Holdings Cayman Ltd | Cayman Islands |
| Cisco Innovation International S.à.r.l. | Switzerland |
| Cisco International Holdings B.V. | Netherlands |
| Cisco International Israel Limited | Israel |
| Cisco International Limited | United Kingdom |
| Cisco International Taiwan, Ltd. | Taiwan |
| Cisco Internetworking Systems Hellas S.A. | Greece |
| Cisco Iris, Inc. | Delaware |
| Cisco Ironport Systems LLC | Delaware |
| Cisco ISH B.V. | Netherlands |
| Cisco ISH II B.V. | Netherlands |
| Cisco Linksys Kiss ApS | Denmark |
| Cisco Malaysia Managed Services SDN. BHD. | Malaysia |
| Cisco Managed Services Nigeria Limited | Nigeria |
| Cisco Managed Solutions, Inc. | Delaware |
| Cisco Morocco | Morocco |
| Cisco Norway AS | Norway |
| Cisco Norway Holdings AS | Norway |
| Cisco Optical GmbH | Germany |
| Cisco Photonics Italy S.r.l. | Italy |
| Cisco QSTP-LLC | Qatar |
| Cisco Ravenscourt LLC | Delaware |
| Cisco Renting Italy S.r.l. | Italy |

Cisco RG Israel Ltd                                                                          Israel
Cisco Saudi Arabia Limited                                                       Saudi Arabia
Cisco Serbia doo Beograd                                                 Serbia, Republic of
Cisco Services (Hong Kong) Limited                                          Hong Kong
Cisco Services Korea Limited                                         Korea, Republic of
Cisco Services Malaysia SDN BHD                                              Malaysia
Cisco Solutions GmbH                                                           Germany
Cisco Solutions Guatemala, Limitada                                        Guatemala
Cisco Systems (Argentina) S.A.                                              Argentina
Cisco Systems (Bermuda) Holdings Ltd.                                       Bermuda
Cisco Systems (China) Information Technology Services Limited                   China

| Subsidiaries | State Or Other Jurisdiction of Incorporation or Organization |
|---|---|
| Cisco Systems (China) Networking Technology Co., Ltd. | China |
| Cisco Systems (China) Research and Development Co., Ltd. | China |
| Cisco Systems (Colombia) Limitada | Colombia |
| Cisco Systems (Czech Republic) s.r.o. | Czech Republic |
| Cisco Systems (Ethiopia) PLC | Ethiopia |
| Cisco Systems (HK) Holdings Limited | Hong Kong |
| Cisco Systems (HK) Limited | Hong Kong |
| Cisco Systems (India) Private Limited | India |
| Cisco Systems (Italy) S.r.l. | Italy |
| Cisco Systems (Jordan) | Jordan |
| Cisco Systems (Korea) Limited | Korea, Republic of |
| Cisco Systems (Malaysia) SDN. BHD. | Malaysia |
| Cisco Systems (Myanmar) Company Limited | Myanmar |
| Cisco Systems (Nigeria) Limited | Nigeria |
| Cisco Systems (Puerto Rico) Corp. | Delaware |
| Cisco Systems (Scotland) Limited | United Kingdom |
| Cisco Systems (Senegal) SUARL | Senegal |
| Cisco Systems (Shanghai) Video Technology Co., Ltd. | China |
| Cisco Systems (South Africa) (Proprietary) Limited | South Africa |
| Cisco Systems (Spain), S.L. | Spain |
| Cisco Systems (Sweden) AB | Sweden |
| Cisco Systems (Switzerland) GmbH | Switzerland |
| Cisco Systems (Switzerland) Investments Ltd. | Bermuda |
| Cisco Systems (Thailand) Limited | Thailand |
| Cisco Systems (Trinidad & Tobago) Limited | Trinidad and Tobago |
| Cisco Systems (USA) Pte. Ltd. | Singapore |
| Cisco Systems Algeria EURL | Algeria |
| Cisco Systems Australia Pty Limited | Australia |
| Cisco Systems Austria GmbH | Austria |
| Cisco Systems Belgium SPRL | Belgium |
| Cisco Systems Bulgaria EOOD | Bulgaria |
| Cisco Systems Canada Co. / Les Systemes Cisco Canada CIE | Canada |
| Cisco Systems Capital (Australia) Pty Limited | Australia |
| Cisco Systems Capital (India) Private Limited | India |
| Cisco Systems Capital (Korea) Limited | Korea, Republic of |
| Cisco Systems Capital (Thailand) Limited | Thailand |
| Cisco Systems Capital Asia Pte. Ltd. | Singapore |
| Cisco Systems Capital Canada Co./Les Systemes Cisco Capital Canada CIE | Canada |
| Cisco Systems Capital China Corporation | China |
| Cisco Systems Capital Corporation | Nevada |
| Cisco Systems Capital France SAS | France |
| Cisco Systems Capital GmbH | Germany |
| Cisco Systems Capital Italy S.r.l. | Italy |
| Cisco Systems Capital K.K. | Japan |
| Cisco Systems Capital Netherlands B.V. | Netherlands |
| Cisco Systems Capital SDN. BHD. | Malaysia |
| Cisco Systems Capital South Africa (Proprietary) Limited | South Africa |
| Cisco Systems Capital Spain, S.L. | Spain |
| Cisco Systems Chile S.A. | Chile |
| Cisco Systems Costa Rica, Sociedad Anonima | Costa Rica |

| | |
|---|---|
| Cisco Systems Croatia Ltd. For Trade | Croatia |
| Cisco Systems Cyprus Ltd. | Cyprus |
| Cisco Systems Danmark ApS | Denmark |
| Cisco Systems de Mexico, S. de R.L. de C.V. | Mexico |
| Cisco Systems Dominicana, S.R.L. | Dominican Republic |
| Cisco Systems Ecuador S.A. | Ecuador |
| Cisco Systems Egypt Ltd. | Egypt |
| Cisco Systems El Salvador, Ltda. de C.V. | El Salvador |
| Cisco Systems Estonia OU | Estonia |
| Cisco Systems Finance International | Ireland |
| Cisco Systems Finance International Holdings I Limited | Ireland |

2

| **Subsidiaries** | **State Or Other Jurisdiction of Incorporation or Organization** |
|---|---|
| Cisco Systems Finance International Holdings II Limited | Ireland |
| Cisco Systems Finance International Holdings III Limited | Ireland |
| Cisco Systems Finance International Holdings IV Limited | Ireland |
| Cisco Systems Finance International Holdings V Limited | Ireland |
| Cisco Systems Finance International Holdings VI Limited | Ireland |
| Cisco Systems Finland OY | Finland |
| Cisco Systems France Sarl | France |
| Cisco Systems G.K. | Japan |
| Cisco Systems Global Holdings Ltd. | Bermuda |
| Cisco Systems GmbH | Germany |
| Cisco Systems Holding GmbH | Germany |
| Cisco Systems Holdings UK Limited | United Kingdom |
| Cisco Systems Hungary Ltd. / Cisco Systems Hungary Servicing and Trading Limited Liability Company | Hungary |
| Cisco Systems International B.V. | Netherlands |
| Cisco Systems International SARL | Switzerland |
| Cisco Systems Internetworking (Ireland) Limited | Ireland |
| Cisco Systems Internetworking d.o.o. Za Marketing, Tehnicke I Druge Usluge Sarajevo | Bosnia and Herzegovina |
| Cisco Systems Internetworking Iletisim Hizmetleri Limited Sirketi | Turkey |
| Cisco Systems Island Ehf. | Iceland |
| Cisco Systems Israel Ltd. | Israel |
| Cisco Systems Jamaica Limited | Jamaica |
| Cisco Systems Limited | United Kingdom |
| Cisco Systems LLC | Oman |
| Cisco Systems Luxembourg International s.à r.l. | Luxembourg |
| Cisco Systems Luxembourg s.à r.l. | Luxembourg |
| Cisco Systems Macedonia DOOEL Skopje | Macedonia, the former Republic of Yugoslav |
| Cisco Systems Management B.V. | Netherlands |
| Cisco Systems Management Ltd. | Bermuda |
| Cisco Systems Moçambique, Limitada | Mozambique |
| Cisco Systems Netherlands Holdings B.V. | Netherlands |
| Cisco Systems New Zealand Limited | New Zealand |
| Cisco Systems Norway AS | Norway |
| Cisco Systems Pakistan (Private) Limited | Pakistan |
| Cisco Systems Panama S. de R.L. | Panama |
| Cisco Systems Peru S.A. | Peru |
| Cisco Systems Poland Sp. z o. o. | Poland |
| Cisco Systems Portugal - Sistemas Informáticos, Sociedade Unipessoal, Limitada | Portugal |
| Cisco Systems Romania S.r.l. | Romania |
| Cisco Systems Services B.V. | Netherlands |
| Cisco Systems Slovakia, spol. s. r.o. | Slovakia |
| Cisco Systems Taiwan, Ltd. | Taiwan |
| Cisco Systems Uruguay S.R.L. | Uruguay |
| Cisco Systems Venezuela, C.A. | the Bolivarian Republic of Venezuela |
| Cisco Systems Vietnam Limited (Cong Ty Trach Nhiem Huu Han Cisco Systems Vietnam) | Vietnam |
| Cisco Technologies (Thailand) Limited | Thailand |
| Cisco Technologies New Zealand Limited | New Zealand |
| Cisco Technologies Philippines, Inc. | Philippines |
| Cisco Technology (China) Co., Ltd. | China |

| | |
|---|---|
| Cisco Technology and Services (South Africa) (Pty) Ltd. | South Africa |
| Cisco Technology Bangladesh Ltd. | Bangladesh |
| Cisco Technology Belgium BVBA | Belgium |
| Cisco Technology Denmark ApS | Denmark |
| Cisco Technology Services (Dalian) Co., Ltd. | China |
| Cisco Technology, Inc. | California |
| Cisco THV LLC | Delaware |
| Cisco Tunisia SARL | Tunisia |
| Cisco Video Technologies France SAS | France |
| Cisco Video Technologies India Private Limited | India |

3

| Subsidiaries | State Or Other Jurisdiction of Incorporation or Organization |
|---|---|
| Cisco Video Technologies Israel Ltd. | Israel |
| Cisco WebEx LLC | Delaware |
| Cisco Worldwide Holdings Ltd. | Bermuda |
| Cisco-Linksys (HK) Limited | Hong Kong |
| Cisco-Navini Networks LLC | Delaware |
| ClearAccess LLC | Delaware |
| Cloupia LLC | California |
| Cloupia Software Solutions Private Limited | India |
| Cognitive Security s.r.o. | Czech Republic |
| Composite Software (Beijing) Co. Ltd. | China |
| Composite Software LLC | Delaware |
| Composite Software UK Limited | United Kingdom |
| CoreOptics LLC | Delaware |
| CSI BD (Mauritius) | Mauritius |
| CSI Mauritius Inc. | Mauritius |
| Digi-Media Vision Limited | United Kingdom |
| Divitech A/S | Denmark |
| DocumentReady ApS | Denmark |
| Embrane LLC | Delaware |
| ExtendMedia LLC | Delaware |
| Greenfield Networks LLC | California |
| Greenfield Networks Technologies Private Limited | India |
| Immunet LLC | Delaware |
| Insieme Networks, LLC | Delaware |
| Intucell Ltd. | Israel |
| Intucell Pte. Ltd. | Singapore |
| Ironport Systems GmbH | Germany |
| Jabber LLC | Delaware |
| JouleX GK | Japan |
| JouleX GmbH | Germany |
| JouleX LLC | Delaware |
| JouleX Sarl | France |
| Kibits LLC | Delaware |
| Lightwire LLC | Delaware |
| Limited Liability Company Cisco Capital CIS | Russian Federation |
| Limited Liability Company Cisco Innovation Center | Russian Federation |
| Limited Liability Company Cisco Solutions | Russian Federation |
| Limited Liability Company Cisco Systems | Russian Federation |
| Memoir Systems India Pvt Ltd | India |
| Memoir Systems LLC | California |
| Meraki Limited | United Kingdom |
| Meraki LLC | Delaware |
| MetaCloud LLC | Delaware |
| Mnemonic Technologies LLC | California |
| Moto Asia Limited | Hong Kong |
| Moto Development Group LLC | California |
| Navini Networks Private Limited | India |
| NDS Americas LLC | Delaware |
| NDS Denmark ApS | Denmark |
| NDS Denmark Holdings A/S | Denmark |

| | |
|---|---|
| NDS Finance Limited | United Kingdom |
| NDS Group Holdings Limited | Bermuda |
| NDS Group Limited | United Kingdom |
| NDS Holdings (Europe) Limited | United Kingdom |
| NDS Holdings B.V. | Netherlands |
| NDS Limited | United Kingdom |
| NDS Marketing Israel Limited | Israel |
| NDS Sweden AB | Sweden |
| NDS Treasury (Jersey) Limited | Jersey |
| Neohapsis EMEA Ltd. | United Kingdom |
| Neohapsis International LLC | Delaware |

4

| **Subsidiaries** | **State Or Other Jurisdiction of Incorporation or Organization** |
|---|---|
| Neohapsis LLC | Delaware |
| Neohapsis Software Private Limited | India |
| Neohapsis, Inc. | Illinois |
| News Datacom Limited | United Kingdom |
| newScale LLC | California |
| newScale Software Private Limited | India |
| Orative Corporation | Delaware |
| Pari Networks (India) Private Limited | India |
| Pari Networks LLC | California |
| Piston Cloud Computing LLC | California |
| Postpath LLC | Delaware |
| PT Cisco Systems Indonesia | Indonesia |
| PT. Cisco Technologies Indonesia | Indonesia |
| Pure Digital Technologies LLC | Delaware |
| Pure Networks LLC | Delaware |
| Radiata, Inc. | Delaware |
| Scansafe Limited | United Kingdom |
| Scansafe LLC | Delaware |
| Scansafe Services LLC | Delaware |
| Scientific-Atlanta do Brasil Ltda. | Brazil |
| Scientific-Atlanta, LLC | Georgia |
| Securent India Private Limited | India |
| Securent LLC | Delaware |
| SIA "Cisco Latvia" | Latvia |
| Small Wells Services S.A. | Uruguay |
| SolveDirect Service Management GmbH | Austria |
| SolveDirect Service Management LLC | California |
| Sourcefire Brasil Comércio E Segurança de Rede Ltda. | Brazil |
| Sourcefire France S.A.S. | France |
| Sourcefire Holding Company (International) S.á.r.l. | Luxembourg |
| Sourcefire Holding Company (US) LLC | Delaware |
| Sourcefire Limited | United Kingdom |
| Sourcefire LLC | Delaware |
| Sourcefire Mexicana de Servicios S. de R.L. de C.V. | Mexico |
| Sourcefire Mexico S. de R.L. de C.V. | Mexico |
| Sourcefire Netherlands B.V. | Netherlands |
| Sourcefire Singapore Pte. Ltd. | Singapore |
| Starent International LLC | Delaware |
| Starent Networks (India) Private Limited | India |
| Starent Networks Beijing Co, Ltd | China |
| Starent Networks Canada Limited | Canada |
| Starent Networks India Sales and Services Private Limited | India |
| Starent Networks LLC | Delaware |
| Tail-f Systems AB | Sweden |
| Tail-f Systems LLC | Delaware |
| Tandberg Asia Pacific Pte. Ltd. | Singapore |
| Tandberg India Private Limited | India |
| Tandberg Products UK Limited | United Kingdom |
| Tandberg Technology (India) Private Limited | India |
| Tandberg Telecom UK Limited | United Kingdom |

| | |
|---|---|
| Tandberg UK Limited | United Kingdom |
| ThinkSmart Technologies Limited | Ireland |
| ThreatGRID LLC | Delaware |
| Tidal Software LLC | California |
| TigerMe LLC | California |
| Topspin Communications LLC | Delaware |
| Topspin Communications Technologies India Private Limited | India |
| Tropo (Europe) Limited | United Kingdom |
| Tropo LLC | Delaware |
| UAB "Cisco LT" | Lithuania |

5

| **Subsidiaries** | **State Or Other Jurisdiction of Incorporation or Organization** |
|---|---|
| Ubiquisys Limited | United Kingdom |
| Voxeo Labs (Beijing) Technology, Ltd | China |
| WebEx (China) Software Co., Ltd. | China |
| WebEx Asia Limited | Hong Kong |
| WebEx Australia Pty Ltd. | Australia |
| WebEx Communications B.V. | Netherlands |
| WebEx Communications Deutschland GmbH | Germany |
| WebEx Communications France Sarl | France |
| WebEx Communications India Private Limited | India |
| WebEx Communications Japan, K.K. | Japan |
| WebEx Communications UK, Ltd. | United Kingdom |
| WebEx Worldwide B.V. | Netherlands |
| Whiptail Technologies Limited | United Kingdom |
| WhipTail Technologies LLC | Delaware |

6

EXHIBIT 23.1

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statements on Form S-3 (Nos.: 333-36156, 333-36156, 333-194090) dated May 3, 2000, May 9, 2000, and February 24, 2014, respectively, of Cisco Systems, Inc. and on Form S-8 (Nos.: 33-63331, 33-64283, 333-64283 [Post Eff.], 333-01069, 333-02101, 333-05447 [Post Eff.], 333-09903, 333-14383, 333-14661, 333-14679, 333-16577, 333-17287, 333-24741, 333-33619, 333-01069 [Post Eff.], 333-34849 [Post Eff.], 33-40509 [Post Eff.], 33-44221 [Post Eff.], 33-71860 [Post Eff.], 33-87096 [Post Eff.], 333-42249, 333-51093, 333-42249 [Post Eff.], 333-64651, 333-79717, 333-96203, 333-56224, 333-76184, 333-42249 [Post Eff.], 333-91258, 333-42249 [Post Eff.], 333-106284, 333-111977, 333-123872, 333-128755, 333-129719, 333-132050, 333-135687, 333-137653, 333-139175, 333-142333, 333-143389, 333-143506, 333-143997, 333-144305, 333-147522, 333-147523, 333-147763, 333-148576, 333-153248, 333-153808, 333-155494, 333-157368, 333-159679, 333-159681, 333-163864, 333-163953, 333-163954, 333-167430, 333-168364, 333-169653, 333-169655, 333-171659, 333-173061, 333-173062, 333-174715, 333-176862, 333-178266, 333-180455, 333-180458, 333-181082, 333-185592, 333-185594, 333-185597, 333-185663, 333-185666, 333-185667, 333-186100, 333-187090, 333-189354, 333-189931, 333-190733, 333-191866, 333-192055, 333-193217, 333-196968, 333-196970, 333-199154, 333-199447, 333-200775, 333-201799, 333-201802, 333-201804, 333-204764, 333-205110, 333-206400, and 333-206708 dated October 11, 1995, November 15, 1995, February 20, 1996, February 20, 1996, April 1, 1996, July 29, 1996, August 9, 1996, October 18, 1996, October 23, 1996, October 23, 1996, November 21, 1996, December 5, 1996, April 8, 1997, August 14, 1997, December 10, 1997, December 10, 1997, December 10, 1997, December 10, 1997, December 10, 1997, December 10, 1997, December 15, 1997, April 27, 1998, September 28, 1998, September 29, 1998, June 1, 1999, February 4, 2000, February 26, 2001, January 2, 2002, June 25, 2002, June 26, 2002, August 20, 2002, June 19, 2003, January 16, 2004, April 6, 2005, September 30, 2005, November 15, 2005, February 27, 2006, July 11, 2006, September 28, 2006, December 7, 2006, April 24, 2007, May 31, 2007, June 5, 2007, June 22, 2007, July 3, 2007, November 20, 2007, November 20, 2007, December 3, 2007, January 10, 2008, August 29, 2008, October 2, 2008, November 20, 2008, February 17, 2009, June 2, 2009, June 2, 2009, December 18, 2009, December 23, 2009, December 23, 2009, June 10, 2010, July 28, 2010, September 29, 2010, September 29, 2010, January 12, 2011, March 25, 2011, March 25, 2011, June 3, 2011, September 16, 2011, December 1, 2011, March 29, 2012, March 29, 2012, May 1, 2012, December 20, 2012, December 20, 2012, December 20, 2012, December 24, 2012, December 24, 2012, December 24, 2012, January 18, 2013, March 6, 2013, June 14, 2013, July 12, 2013, August 20, 2013, October 23, 2013, November 1, 2013, January 7, 2014, June 23, 2014, June 23, 2014, October 3, 2014, October 17, 2014, December 5, 2014, January 30, 2015, January 30, 2015, January 30, 2015, June 5, 2015, June 19, 2015, August 14, 2015, and September 1, 2015 respectively, of Cisco Systems, Inc. of our report dated September 8, 2015 relating to the consolidated financial statements, financial statement schedule, and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PRICEWATERHOUSECOOPERS LLP

San Jose, California
September 8, 2015

**EXHIBIT 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**PURSUANT TO EXCHANGE ACT RULE 13a-14(a)/15d-14(a)**
**AS ADOPTED PURSUANT TO SECTION 302**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, Charles H. Robbins , certify that:

1. I have reviewed this annual report on Form 10-K of Cisco Systems, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: September 8, 2015

_____
/S/  Charles H. Robbins

**Charles H. Robbins**
**Chief Executive Officer**
**(Principal Executive Officer)**

**EXHIBIT 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**PURSUANT TO EXCHANGE ACT RULE 13a-14(a)/15d-14(a)**
**AS ADOPTED PURSUANT TO SECTION 302**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, Kelly A. Kramer , certify that:

1. I have reviewed this annual report on Form 10-K of Cisco Systems, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: September 8, 2015

_____
                  /S/  Kelly A. Kramer
                  **Kelly A. Kramer**
**Executive Vice President and Chief Financial Officer**
             **(Principal Financial Officer)**

**EXHIBIT 32.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, Charles H. Robbins , do hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

- The Annual Report on Form 10-K of the Company for the fiscal year ended July 25, 2015 , as filed with the Securities and Exchange Commission (the "Report"), fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

- The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: September 8, 2015

_____
        /S/  Charles H. Robbins
        **Charles H. Robbins**
        **Chief Executive Officer**
        **(Principal Executive Officer)**

**EXHIBIT 32.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, Kelly A. Kramer , do hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

• The Annual Report on Form 10-K of the Company for the fiscal year ended July 25, 2015 , as filed with the Securities and Exchange Commission (the "Report"), fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

• The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: September 8, 2015

_____
/S/  Kelly A. Kramer
**Kelly A. Kramer**
**Executive Vice President and Chief Financial Officer**
**(Principal Financial Officer)**