# EXHIBIT C

1         UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3             SAN JOSE DIVISION

4  _____
                                  )
5  CISCO SYSTEMS, INC.,           )
                                  )
6              Plaintiff,         )
                                  )
7  vs.                            )   No. 5:14-cv-05344-BLF
                                  )        (PSG)
8                                 )
   ARISTA NETWORKS, INC.,         )
9                                 )
              Defendant.          )
10                                )
   _____)
11

12

13

14

15

16

17      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18      VIDEOTAPED DEPOSITION OF CHARLES GIANCARLO

19           Redwood Shores, California

20            Monday, April 25, 2016

21

22

23

24  Reported by:  LANA L. LOPER, RMR, CRR, CCP,
                  CME, CLR, CSR No. 9667
25

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4  _____
                                        )
 5  CISCO SYSTEMS, INC.,                )
                                        )
 6                  Plaintiff,          )
                                        )
 7  vs.                                 )  No. 5:14-cv-05344-BLF
                                        )       (PSG)
 8                                      )
    ARISTA NETWORKS, INC.,              )
 9                                      )
                    Defendant.          )
10                                      )
    _____)
11

12

13

14

15

16

17

18          Deposition of CHARLES GIANCARLO, taken on

19  behalf of Plaintiff, at 555 Twin Dolphin Drive, 5th

20  Floor, Redwood Shores, California beginning at 9:43 a.m.

21  and ending at 2:55 p.m., on Monday, April 25, 2016,

22  before Lana L. Loper, RMR, CRR, CCP, CME, CLR, CSR No.

23  9667.

24

25
```

```
 1   APPEARANCE OF COUNSEL:

 2   FOR THE PLAINTIFF:

 3        QUINN EMANUEL URQUHART & SULLIVAN, LLP

 4        BY:  JOHN (JAY) NEUKOM, ESQ.

 5        50 California Street

 6        22nd Floor

 7        San Francisco, California 94111

 8        415-875-6600

 9        johnneukom@quinnemanuel.com

10   FOR THE DEFENDANT:

11        KEKER & VAN NEST LLP

12        BY:  BRIAN L. FERRALL, ESQ.

13        633 Battery Street

14        San Francisco, California 94111-1809

15        415-391-5400

16        bferrall@kvn.com

17        - - - and - - -

18        WILSON SONSINI GOODRICH & ROSATI

19        BY:  BEN LABOW, ESQ.

20        One Market Place

21        Spear Tower, Suite 3300

22        San Francisco, California 94105-1126

23        415-947-2000

24        blabow@wsgr.com

25   ALSO PRESENT:  JAKE KROHN, VIDEOGRAPHER
```

```
 1   during my time there.

 2            MR. NEUKOM:  I think we've been going about an

 3   hour.

 4            Should we take a five- or ten-minute break?

 5            MR. FERRALL:  Please.  Thank you.

 6            THE VIDEOGRAPHER:  Going off the record.  The

 7   time is 10:44.

 8            (Discussion off the record.)

 9            THE VIDEOGRAPHER:  We are back on the record at

10   11:01.

11   BY MR. NEUKOM:

12       Q   Mr. Giancarlo, when you were a high-ranking

13   executive at Cisco, you were in charge of negotiating and

14   pursuing a Cisco lawsuit against Huawei?

15            Do I have that right?

16       A   That's correct.

17       Q   I'm going to ask you some questions about that

18   lawsuit or your participation in that lawsuit today.

19            However, I don't represent you today --

20       A   Uh-huh.

21       Q   -- to put it mildly.

22            If I -- nonetheless, when I ask you questions

23   about your involvement in that lawsuit, I would like you

24   please to refrain from including in your answer any

25   attorney-client communications that you had as a Cisco
```

```
 1    executive at that time.

 2            Do you understand that request?

 3        A    I do.

 4        Q    Likewise, I would like you to refrain from

 5    including in your answers any information or

 6    communications that might reflect attorney work product.

 7            This one is a little tougher for a nonlawyer.

 8    So, for example, if you undertook some particular course

 9    of conduct because a Cisco attorney instructed or

10    requested you to do so, that may be what attorneys call

11    attorney work product.

12        A    I see.

13        Q    Do you understand --

14        A    I -- yes.

15            I believe that, depending on the questions you

16    ask, it may be hard to answer a question or might only be

17    able to provide a partial answer, which would be

18    inadequate to really to fully answer the question.

19        Q    Okay.  At Arista, or within Arista, have you at

20    any point disclosed, within Arista, any attorney-client

21    privileged communications you had when you were a Cisco

22    executive?

23        A    Certainly not.

24        Q    Well, if I ask you a question today, and you

25    think your ability to answer it is compromised, based on
```

1    the constraints of protecting Cisco's client privilege or

2    attorney work product protections, I would prefer that

3    you please tell me that, rather as an initial matter,

4    rather than volunteer the information, and then we'll see

5    where we can go.

6         A   Understood.

7         Q   Okay.  What I'm nervous about is, if I ask you a

8    question, even though I don't intend for it to elicit

9    attorney-client privilege, and you nonetheless interpret

10   that and answer it by disclosing that -- such material,

11   one may argue -- I would not argue, but one may argue,

12   that is an attorney for Cisco, waiving Cisco's

13   attorney-client privilege by asking you to disclose that

14   information.  And that's the furthest thing from my

15   intention for today.

16            Do you understand where I'm coming from?

17        A   I do.

18        Q   Without disclosing attorney-client

19   communications, can you describe for me, as you sit here

20   today, your understanding of what the Cisco versus Huawei

21   lawsuit was about?

22        A   Indeed.

23        Q   Please do.

24        A   Sometime early in the decade -- I can't tell

25   you, and I don't believe it was a specific date; it was

1  accumulated evidence over time.

2         Starting, you know, in the early part of the

3  2000s, we became aware that Huawei was selling identical

4  product in China.

5      Q    When you say "we," you mean Cisco?

6      A    Many of us at Cisco, right.

7         To some extent, we had known that for some time.

8         Then, upon better analysis, and also because of

9  approaches that came to us through various government

10 agencies -- and I won't go into detail about that -- we

11 became aware of the fact that not only did they look and

12 feel like Cisco product, but that they might be using

13 Cisco software.

14        And so we did some testing on the products.  And

15 as you might imagine, that took some months to do the

16 testing on the products.

17        And we discovered several things, one of which

18 is that -- and, I'm sorry, this gets a bit technical --

19 they were using a different --

20     Q    Can I interrupt you for just a moment?

21     A    Yes.

22     Q    I just want to make sure you're -- in a way, I'm

23 excited to hear about this testing and what you learned

24 from it.  But I want to make sure this is not the kind of

25 thing that Cisco attorneys instructed you to do or you

1    participated in an effort overseen by a legal function.

2        A    This was not -- this is entirely on my own.

3    This is a business set of -- what I'm talking about right

4    now is about a set of business activities that we took --

5    that I undertook -- not I -- I mean, obviously, it's a

6    group of people undertook --

7        Q    Okay.

8        A    -- outside of the legal function at the time.

9        Q    And at the time, you were a senior vice

10   president --

11       A    Right.

12       Q    -- commanding, if you will, 10,000-plus

13   engineers and employees?

14       A    Correct.

15            And I mentioned one of the groups was the access

16   router group.  And that was a specific-at-the-time set of

17   products that we were -- that we had learned about and

18   that I was concerned about.

19       Q    Okay.  Please continue.

20            I'm sorry for the interruption.

21       A    No trouble.

22       Q    You were just telling me what you learned by

23   looking at some of these Huawei products.

24       A    By testing, correct.

25            What we found out is that they were using a

```
 1  different processor than we were using, which -- and that

 2  processor had a different compiler.  So when I say, they

 3  were using the same software, they were not using the

 4  same object code.  But we expected they were using the

 5  same source code.

 6          And unfortunately, from a testing standpoint,

 7  you couldn't test -- you couldn't analyze it simply by

 8  testing the -- by comparing the object code because the

 9  object code would be entirely different because of the

10  different processor or different compiler.

11          So we had to try different tests.  And we -- we

12  tried a variety of tests.

13          Now, just again to give more context, one

14  thing -- some things that were entirely clear is that the

15  products looked the same.  What I meant by, "looked the

16  same," they had the same general appearance, the

17  interface; the ports were in the same location; color was

18  vaguely similar; the numbers of the products.

19          You know, we're talking about a family of

20  products, of which it might have been a couple of dozen,

21  each designated or named with a number, 2501, 2502, 2515,

22  blah, blah, blah, were identical on their products and

23  ours.

24          And we would test the products in various ways:

25  functionality, the bugs in the products.
```

1              And what we found, the smoking gun, if you will,

2    from our perspective, was that the products were bug --

3    we called it -- this was our phrase, "bug-compatible."

4    In other words, their products had very similar bugs,

5    therefore, the same bugs, I should say, as the Cisco

6    products.

7              As a matter of public record, we then -- I, in

8    particular -- can we go off the record for a moment?

9              I just want to ask a question of my counsel.

10             MR. NEUKOM:  Sure.

11             THE VIDEOGRAPHER:  Going off the record.  The

12   time is 11:09.

13             (Discussion off the record.)

14             THE VIDEOGRAPHER:  We are back on the record at

15   11:15.

16   BY MR. NEUKOM:

17        Q    Again, Mr. Giancarlo, being mindful not to

18   disclose attorney-client communication that you had as an

19   executive at Cisco, what did you do next after you

20   discovered this bug compatibility between Huawei versus

21   Cisco products?

22        A    Yes.

23             As I mentioned, Huawei was selling these

24   products primarily in China at the time.  And for the --

25   approximately the next year, we spent, and I personally,

1      A    Well, again, we didn't -- while that was one of

2   the things that we put in front of them, we didn't

3   call -- it wasn't called out separately.

4           I have to be honest with you, I was very -- my

5   focus was on the source code because, when you copy the

6   source code, almost by definition, almost everything else

7   is copied, because the product -- you know, once you copy

8   the source code, the product is completely identical.

9      Q    Sure.

10      A    Everything else -- everything else is identical

11   once you copy the source code.

12           So that was the primary focus.

13      Q    Had you made the determination by that point in

14   time that Huawei had copied the entirety of Cisco's

15   source code, which is to say, other than changing Cisco

16   into Huawei --

17      A    Uh-huh.

18      Q    -- that the source code base was 100 percent

19   identical between the two companies?

20      A    We had made the determination that --

21      Q    And again, just because -- because the timing

22   has changed since the last time I asked you about the

23   investigation, I intend to be asking only for information

24   which you know that is not attorney-client privileged or

25   doesn't disclose attorney work product.

1              I say that to you now because we have moved in

2    time a couple of months.

3         A    I understand.

4         Q    You mentioned, Mr. Scheinman was involved.  So

5    if, for example, by this point in time you were working

6    with legal, and you're less clear on whether the analysis

7    and investigation was driven by or reflective of attorney

8    input, then I would invite to you stop and re- -- just to

9    make sure --

10        A    Yeah.

11        Q    -- that it's not privileged or work product?

12        A    I will do the best I can.

13        Q    Okay.  So to the extent you can answer my

14   question --

15        A    Yes.

16        Q    -- while being confident you're not disclosing

17   Cisco or attorney work product privileged materials,

18   let's try to do that.

19             And let me, just because it's unfair of you to

20   remember the last page of my speaking --

21        A    Uh-huh.

22        Q    -- let me try to give you the question again.

23             Had you made the determination by that point in

24   time that Huawei had copied the entirety of Cisco's

25   source code, which is to say, other than changing Cisco

```
 1   it carefully to make sure you agreed with every aspect of

 2   the document?

 3       A   I did review it, yes.

 4       Q   And as you sit here today, you remain willing to

 5   be subject to the penalty of perjury for the contents of

 6   these documents, at least as of February 2003?

 7       A   Yes.

 8       Q   Okay.  If you could please turn to -- and let me

 9   take a step back and say or ask you this:

10           Without disclosing the substance of any

11   attorney-client communications, what was the point of

12   this declaration when you signed it in February 2003?

13       A   This was part of either the preparation or of

14   the actual litigation of the Cisco lawsuit that we opened

15   against Huawei.

16           So in our earlier conversation, we were leading

17   up to this point in time.  And I had mentioned that they

18   had opened up a sales office in Texas and had negotiated

19   a reseller agreement with the EOS company.  And it's a

20   matter of public record.

21           We decided to sue Huawei on the basis of

22   utilizing our source code to sell substantially identical

23   product.

24           I want to make it clear, we made the decision to

25   sue them in the U.S., not in China, and that the focus
```

1   was on protecting our source code.

2        Q   Not protecting, for example, the second meaning

3   of CLI that you described today, which is the textual

4   commands and the structure of those textual commands?

5        A   My entire focus as the business leader in this

6   was on the source code.

7            If one doesn't protect your source code, it can

8   be deemed to be in the public -- you know, it could be

9   deemed in the public -- you have to protect your

10  intellectual property in order to maintain its ability to

11  be protected.

12           As I mentioned, the source code defines the

13  entire operation of the product.  You know, the hardware

14  can be easily recreated, and you put the source code on

15  top of it, and you have the identical product.

16           And so that was the entire focus, my entire

17  focus from the beginning, in terms of our -- in terms of

18  our complaint against Huawei.

19       Q   Okay.  So you, when you submitted this

20  declaration, or when you signed this declaration in

21  February 2013 (sic), you, as a high-ranking executive at

22  Cisco with over 10,000 employees reporting directly or

23  indirectly to you --

24       A   Yes.

25       Q   -- your aim was to protect Cisco's source code?

1      Q    Cisco CLI can mean source code?

2      A    Correct.

3      Q    Or Cisco CLI can mean, I think what you called

4   before, textual commands and elaborate structure of those

5   textual commands?

6      A    Correct.

7      Q    You testified, I think earlier today, that you

8   thought, in 2003, you thought -- 2014, Cisco was entitled

9   to copyright -- legal protection for its source code?

10     A    Correct.

11     Q    But that Cisco was not entitled to any such

12  protection for the textual commands and structure of

13  those commands within Cisco CLI?

14     A    I believe that's now open industry standard.

15     Q    When do you believe that became open industry

16  standard, mainly the textual commands and structure of

17  Cisco CLI?

18     A    I can tell you, I believed -- when I signed this

19  document, I believed it in the early 2000s.  I don't

20  think I thought much about it before that.

21     Q    How can you be certain?  It's now -- it's now

22  spring of 2016.

23     A    Yeah.

24     Q    And you're telling me now, over 13 years later,

25  you are certain under oath, as you sit here today --

```
1          A    Uh-huh.

2          Q    -- that you had a conception of what was versus

3    what was not --

4          A    Right.

5          Q    -- copyrightable about Cisco's --

6          A    Right.

7          Q    -- Cisco CLI?

8          A    Yes.

9               And I mentioned before that the basis of that is

10   based on privileged Cisco information.

11         Q    If you look here at paragraph 12 --

12         A    Uh-huh.

13         Q    -- paragraph -- in paragraph 12 you write,

14   "Huawei's unlawful copying of Cisco's copyrighted

15   materials, including the IOS code, the CLI, and the user

16   manuals, will cause Cisco substantial irreparable injury

17   if it is not enjoined by the Court."  Let me stop there

18   for a minute.

19               When you talked about Cisco copyrighted

20   materials, you said, including the IOS code, what were

21   you referring to there?

22         A    Source code.

23         Q    When you said, the user manuals, what were you

24   referring to?

25         A    User manuals, printed manuals.
```

1        Q    When you said, the CLI, what were you referring

2   to?

3        A    The code implementing the CLI.

4        Q    Here again, your testimony is today that when

5   you said, the IOS code -- and you also said, the CLI,

6   with both of those different phrases -- you meant to be

7   referring to simply CLI source code?

8        A    Yes.

9        Q    Continuing on to the next page, "Cisco

10  proprietary IOS is one of the company's most valuable

11  assets and a critical component of Cisco's business."

12            When you referred to Cisco's proprietary IOS,

13  what were you referring to, source code?

14       A    Yes.

15       Q    When you say, "The same holds true for the CLI

16  user interface implemented by the IOS," what is it

17  exactly that you're testifying today you were intending

18  to refer to in 2003 when you wrote this?

19       A    You know, this gets now probably into both

20  meanings of CLI.  But, you know, it's the user interface

21  implemented by the IOS.  I mean, I think it speaks for

22  itself.

23       Q    So this sentence, quote, the same holds true for

24  the CLI interface implemented by the IOS," your testimony

25  today is that with that sentence, you meant to be

 1   tens or hundreds or more Cisco products, they will create

 2   automated systems to interact with the Cisco products.

 3   They will spend money to create the automated systems to

 4   interact with Cisco products.  So the customers spend

 5   money to do that.  So that's a general explanation.

 6        Q   Let me repeat the question.

 7            On what basis did you declare, under penalty of

 8   perjury in early 2003, that Cisco had expended hundreds

 9   of millions of dollars to develop the CLI user interface?

10        A   That was not my understanding of the sentence.

11            My understanding of the sentence, under penalty

12   of perjury, was that Cisco had spent hundreds of millions

13   of dollars to construct the source code to implement

14   features which had an interface, obviously, which was a

15   CLI interface.

16            And I would tell you now that the sentence is

17   badly constructed.

18        Q   Misleading?

19        A   I don't -- it -- I didn't -- I -- in hindsight,

20   possibly misleading, but certainly not correct

21   specifically or not -- it's difficult to interpret, given

22   that it's a poorly constructed sentence.

23        Q   As you sit here today, do you believe it was

24   accurate as of 2003 that the CLI user interface

25   implemented by the IOS was unique to Cisco?

```
1      A   The source code that the IOS -- that implements

2   the IOS is certainly unique to Cisco.

3      Q   When you say, the CLI interface -- I mean, in

4   particular, the interface consisting of an elaborate

5   structure of textual commands, is it true, do you agree

6   as you sit here today, that in 2003, the Cisco CLI user

7   interface was unique to the company, unique to Cisco?

8      A   I believe that the technical implementation of

9   the CLI is unique to Cisco; that the command structure

10  and syntax is not.

11     Q   It's your testimony today is that you were

12  focused on Huawei's copying of Cisco source code, and you

13  didn't care about their use of textual commands and the

14  organization of those commands from the CLI?

15     A   Uh-huh.

16     Q   Am I hearing you right, that's your testimony so

17  far?

18     A   That is correct.

19     Q   Why did you treat -- repeatedly in this

20  declaration, why did you treat source code versus the CLI

21  user interface as two distinct topics?

22     A   I did not.

23         MR. FERRALL:  Objection.  Vague and ambiguous.

24         Go ahead.  Go ahead.

25         THE WITNESS:  I did not, was not the source of
```

1   the writing of the document.

2            I reviewed the document and, to the best of my

3   abilities at that time, felt that it generally

4   reflected -- how do I rephrase this?

5            I will also say that I was not in charge of

6   legal strategy in terms of how to --

7   BY MR. NEUKOM:

8        Q   I'm not asking about legal strategy, sir.  I

9   am --

10           MR. FERRALL:  No, no.  Let him answer the

11  question.

12           MR. NEUKOM:  No.  He's about to -- he's talking

13  about Cisco legal strategy.

14           THE WITNESS:  I simply said --

15  BY MR. NEUKOM:

16       Q   It's an appropriate time for me to interject.

17       A   I just said, I'm not in charge of legal

18  strategy.

19       Q   I don't want you to go down that road.

20       A   I'm very clear.  I'm not going down that road

21  other than to say, I was not in charge of legal strategy.

22       Q   You were in charge of signing your name to the

23  document under penalty of perjury and doing so to the

24  best of your ability.

25       A   To the best of my ability.

```
 1            MR. FERRALL:  Counsel, you asked a why question

 2    about this document.  Now, you want to prevent him from

 3    answering it.

 4            So you better be careful what you ask for.

 5    Okay?

 6            MR. NEUKOM:  No, no, no.

 7            Are you kidding me, Brian?

 8            MR. FERRALL:  I'm not kidding you.

 9            Read your question back.  You're asking why

10    questions about this document, and you're not letting him

11    to explain it.

12            I'm not telling him he shouldn't explain it, but

13    don't interrupt him when you ask him a why question about

14    this legal document.

15            MR. NEUKOM:  So there's a fair amount of

16    saber-rattling today.

17            I think today is a fairly gentlemanly day if

18    this witness, in response to a question you like or don't

19    like, if he starts indicating he is going down to work

20    that has privileged and work product implications,

21    because he used to be a Cisco executive involved with

22    legal, I will interrupt him.  If he starts going down a

23    road that indicates Arista privilege, I take it you will

24    interrupt him.  There's nothing improper about that.

25            You may not like how this witness is testifying
```

```
 1       Q    Prior to today's deposition, have you -- and I

 2  intend this to be a yes or no -- have you undertaken any

 3  actions intending to find or collect documents for

 4  purposes of this litigation?

 5       A    No.

 6       Q    All right.  No further questions at this time.

 7       A    All right.

 8            THE VIDEOGRAPHER:  No questions?

 9            MR. FERRALL:  I have some questions.

10            THE VIDEOGRAPHER:  Okay.

11                         EXAMINATION

12  BY MR. FERRALL:

13       Q    And let me just say for both your sake,

14  Mr. Giancarlo, and Mr. Neukom's sake, I take Mr. Neukom

15  at his word that he doesn't intend to waive any Cisco

16  privilege.  And so I'm going to ask some questions that

17  may well touch upon privilege, so I want to make sure

18  that you give Mr. Neukom a chance to understand the --

19  and instruct you, if necessary.

20            I'm going instruct you also not to reveal

21  privileged information, but also give Mr. Neukom a chance

22  before you answer these questions, okay, because I don't

23  want any inadvertent --

24       A    I will wait for Mr. Neukom to give me the

25  heads-up to -- I will wait after each question for you to
```

1    indicate what you want me to do.

2          MR. NEUKOM:  Thank you.  I appreciate that.

3          You know, one aspect here is, of course, I was

4    not a lawyer for Cisco back in the day.

5          THE WITNESS:  Uh-huh.

6          MR. NEUKOM:  So there may be questions that

7    implicate privilege or work product, even though it's not

8    apparent to me on the face of the question.  So simply

9    because I do not object, I'm going to try to be curious,

10   Mr. Farrell, and not make placeholder objections in

11   response to every question.

12         MR. FERRALL:  I'll do the best I can to.  I

13   don't always necessarily -- you know, if I ask, you know,

14   general counsel what they had for lunch, I won't assume

15   that's privileged, but I will be as careful as possible.

16         MR. NEUKOM:  Thank you.

17   BY MR. FERRALL:

18     Q   Okay.  So my questions are going to be about

19   Exhibit 601.  So if you could -- it's your declaration?

20     A   This one?

21     Q   Right.

22         And my first question refers to paragraph 11.

23     A   Uh-huh.

24     Q   To be careful about the privilege, I'm just

25   going ask you to answer this yes or no.

```
 1              But focusing on the second sentence of

 2   paragraph 11, the one that begins, "According to Cisco's

 3   allegations."

 4              Do you see that?

 5       A    I do.

 6       Q    All right.  Were you in charge of deciding what

 7   allegations Cisco should bring in this suit against

 8   Huawei?

 9       A    I was not.

10              MR. NEUKOM:  I'll put a conditional privilege

11   work product objection there.

12   BY MR. FERRALL:

13       Q    The -- again, be careful.

14              Without revealing --

15       A    I'm trying to.

16       Q    Without revealing any attorney-client

17   information or communications or work product, are you

18   able to explain why Cisco asserted claims against Huawei

19   that reference the CLI in this litigation?

20              Is it possible for to you answer that question

21   without revealing privileged or attorney work product?

22              MR. NEUKOM:  I'm going to object on privilege

23   and work product basis.

24              I have a very, very hard time imagining a world

25   in which a nonlawyer engineer with an MBA has an
```

 1  understanding of rationales to or to not bring certain

 2  claims.

 3          But if I'm wrong, if you have some nonprivileged

 4  basis on which to answer Mr. Ferrall's question, you

 5  should do that.

 6          THE WITNESS:  Yeah, I can't answer the question.

 7  BY MR. FERRALL:

 8      Q   Are you able -- again, without revealing

 9  privileged or work product information, are you able to

10  explain why this declaration, marked as Exhibit 601, has

11  any particular content in it; in other words, why was

12  certain content included or not included?

13          MR. NEUKOM:  Objection.  Vague.  Compound.  And

14  I think attorney client privilege and work product,

15  although I confess I don't understand the question well

16  enough to know whether those privileges are implicate --

17          MR. FERRALL:  I'm trying to be careful.  But

18  fair enough, the question was vague.

19  BY MR. FERRALL:

20      Q   Did you -- did you come up with the content of

21  this declaration that is Exhibit 601; and I don't mean

22  the specific words in it, but the essence of what it was

23  going to describe?

24          You can answer that yes or no.

25      A   Yeah.  I'm waiting in each case for --

 1               MR. NEUKOM:  I will only do that on attorney

 2   work product and attorney-client privilege.

 3               However, I'm happy to have you answer yes or no.

 4   In fact, I think that Q and A has been answered yes or no

 5   previously today, so subject to the yes-or-no answer.

 6               THE WITNESS:  So the answer is I -- no.

 7   BY MR. FERRALL:

 8        Q   Okay.  And to your knowledge, was this

 9   declaration, Exhibit 601, drafted by attorneys for Cisco?

10               MR. NEUKOM:  That, I'm -- that, I think, cut a

11   lot closer to the line.

12               I think -- and, Brian, if you want me to shut my

13   trap, feel free.  I think the witness testified before

14   that he didn't write it, but he did review it, and he did

15   sign it, and he did stand by it, all that stuff.

16               But I think asking who -- who drafted it, to my

17   mind -- if you ask me why it matters, I may struggle, but

18   that seems a little more -- a little more sensitive in

19   terms of work product or attorney-client privilege basis.

20               So to that question as to who drafted it, I

21   would object on work product and privileged ground.

22               And I think, on that one, I would make an

23   instruction to the witness.

24   BY MR. FERRALL:

25        Q   All right.  Then I assume this is going to go

 1    for the next questions, and that's fine.

 2              Again, I -- I need to understand what is

 3    privileged and what's not.  Let's look at paragraph 12.

 4         A    Okay.

 5         Q    All right.  Do you recall any drafts or edits to

 6    the language in paragraph 12?

 7              MR. NEUKOM:  On one hand, you can answer that

 8    yes or no.

 9              And I'll put in a conditional -- you know what,

10    I think that question just goes to such improper work

11    product stuff, I'll instruct you not to answer that --

12              MR. FERRALL:  Okay.

13              MR. NEUKOM:  -- unless -- and, Brian, on some of

14    these, I mean, if you have different -- if you want to

15    push back on privilege, and we can have a discussion on

16    it, I'm happy to have a discussion on it.

17              This is a little bit of uncharted territory.

18    But I think questions about drafts: were there drafts,

19    were there edits, I think, has -- to my inclination,

20    that's attorney work product and/or attorney-client

21    privileged, but -- so I think that's off limits.

22    BY MR. FERRALL:

23         Q    Okay.  All right.  And again, for the record,

24    though, I got to ask this next one, too, because there

25    was a sentence in paragraph 12 which was referred to,

```
 1   either by you, Mr. Giancarlo, or Mr. Neukom, or by both
 2   of you, as misleading or inartfully worded.
 3          So my question to you is, were you -- and what
 4   we're talking about is the sentence beginning, "This
 5   interface, which is unique to Cisco."
 6          Do you remember that sentence?
 7      A   I do.
 8      Q   Did you draft that sentence?
 9          MR. NEUKOM:  You can answer that yes or no,
10   although I think it's already been -- I think you already
11   have, but you can do it again.
12          THE WITNESS:  I did not.
13   BY MR. FERRALL:
14      Q   And can you tell me any discussion you had or
15   edits you had to that sentence in the course of preparing
16   this declaration?
17      A   Unfortunately --
18          MR. NEUKOM:  Counsel knows you cannot answer
19   that.
20          THE WITNESS:  I cannot.
21   BY MR. FERRALL:
22      Q   This declaration, Exhibit 601, has an indication
23   on the bottom, and I think that's why it has this odd
24   cover sheet that it was filed under seal.
25          Do you see that on the bottom left corner?
```

    1       A    Confidential or -- oh, filed under seal, yes.

    2       Q    All right.  Did you have -- and again, just yes

    3   or no:  Did you have any responsibility for determining

    4   whether this would be filed under seal?

    5       A    No.

    6       Q    Would -- again, don't tell me any conversations

    7   you had with lawyers.

    8            But if possible, based upon your own belief, can

    9   you tell me why you understand it was filed under seal?

   10            MR. NEUKOM:  I'm going to instruct you on --

   11   just outright not to answer that.

   12            If there's a hypothetical world in which you

   13   independently, as an engineer, formed an opinion of the

   14   basis of a protective order status of a legal filing, go

   15   for it.  Please give your full and most accurate

   16   testimony to Mr. Farrell.

   17            THE WITNESS:  Indeed.

   18            MR. NEUKOM:  Otherwise, in every one of those

   19   nine million possible worlds, that's privileged.

   20   BY MR. FERRALL:

   21       Q    Okay.  Did you ever share this Exhibit 601 with

   22   Arista?

   23       A    Certainly not.

   24       Q    Are you --

   25       A    And nor -- I'm sorry.

```
 1            I don't know if I -- did you want to say

 2  something?

 3            MR. NEUKOM:  No.

 4            THE WITNESS:  Nor do I have a copy of it.

 5  BY MR. FERRALL:

 6      Q    At least before this litigation began, before

 7  Cisco sued Arista, were you ever aware of this

 8  declaration becoming public?

 9      A    Oh, no.

10      Q    At the time that Cisco brought this claim

11  against Huawei, were you aware of other Cisco competitors

12  whose CLI commands were similar to Cisco's CLI commands?

13      A    I'm sorry.  This is prior to this?

14      Q    To the Huawei lawsuit.

15      A    Yes.

16      Q    To your knowledge, again, without revealing any

17  attorney privileged communications, but to your

18  knowledge, did Cisco sue any of those other competitors?

19      A    No.

20      Q    And without revealing any attorney-client

21  communications, is it possible for you to tell me any

22  Cisco business reasons for why Cisco did not sue any of

23  those other competitors with CLI commands?

24            MR. NEUKOM:  Objection.  Vague and compound and

25  foundation.
```

 1           THE WITNESS:  Can I answer or do I not?

 2           I'm sorry.  I don't know.

 3           MR. NEUKOM:  You can.

 4           To be clear, Mr. Ferrall asked you for business

 5  reasons.  So I think he was trying to be gracious to not

 6  get into, for example, any communication that you and Dan

 7  Scheinman or others had.

 8           THE WITNESS:  No.  Right.  I think I'm aware of

 9  the situation.

10           So I cannot give you business reasons for it.

11  BY MR. FERRALL:

12     Q   Okay.  And I take it if, I were to ask for any

13  reasons why that decision was made, that's going to call

14  for privileged information?

15     A   It would call for privilege, correct.

16           MR. FERRALL:  I have no further questions.

17           Thank you.

18           MR. NEUKOM:  Two questions, I hope.  And then

19  we're done.

20           THE WITNESS:  Me, too.

21                        EXAMINATION

22  BY MR. NEUKOM:

23     Q   Exhibit -- your old Huawei declaration, what

24  exhibit is it, 601?

25     A   601.

1      Q    You reviewed it before you signed it?

2      A    I did.

3      Q    You signed it under penalty of perjury?

4      A    You keep reminding me of this.

5      Q    Lawyers have a bad habit of doing that.

6      A    Yes.

7      Q    You believed every word of it to be true at the

8  time you signed it?

9      A    I -- obviously, when any document that has this

10  many words in it, you have your interpretation of the

11  words at the time you signed it.  And I believed it at

12  the time I signed it, based on my interpretation at the

13  time.

14      Q    And after signing it -- I said, two questions.

15  I should say, two family of questions.

16           After signing the declaration -- I think you

17  said this before -- since signing the declaration, you

18  took no steps to change, retract, or change any portion

19  of it?

20      A    Correct.  I've never seen it again since then.

21      Q    Second brief topic of recross-examination.

22           Mr. Ferrall asked you if this declaration,

23  Exhibit 601, whether you had ever shared it with anyone

24  at Arista.

25           And I believe your answer was no.

```
 1        A    Correct.

 2        Q    Am I remembering that right?

 3        A    Yes.

 4        Q    To be clear, though, at the time -- strike that.

 5             I'm done.  Thank you.

 6             THE VIDEOGRAPHER:  All right.

 7             MR. FERRALL:  Wait.

 8             THE WITNESS:  Sorry.  I dropped it.

 9                          EXAMINATION

10   BY MR. FERRALL:

11        Q    When Mr. Neukom asked you if you signed this

12   under penalty of perjury, was there anything that you

13   relied upon from Cisco counsel in affirming the

14   statements in this declaration, Exhibit 601?

15        A    Wow.

16             MR. NEUKOM:  I'm going to -- I am going to

17   object on privilege.

18             And given the declaration statement that it's

19   based on personal knowledge, I'm going to instruct not to

20   answer, not to disclose any communications from -- that

21   you had from counsel relating to this.

22             I think you said in the first paragraph that you

23   had personal knowledge of all of it.  And I asked you to

24   verify that, which means you should be able to swear up

25   its contents without talking about something that a
```

 1  lawyer did or did not say to you.  That wouldn't be

 2  personal knowledge.  That would be secondhand.

 3          But, Brian, if you want to, if you think you can

 4  answer this question without disclosing the substance of

 5  attorney-client communications --

 6          THE WITNESS:  I think I can say that it's fair

 7  to say that legal language is not my forte and that when

 8  there were -- obviously, as we've been going through

 9  this, there are some things that are fairly involved and

10  complex in interpretation and meaning.  And I was -- that

11  was discussed with counsel.

12          MR. NEUKOM:  No.  Then I'm going to object after

13  the fact on attorney-client privileged ground.

14          And Cisco would move to strike the witness' last

15  answer on the basis of privilege.

16          If it helps, Mr. Giancarlo, my view of privilege

17  is folks who are not Cisco or who are not Cisco counsel,

18  they're allowed to know, you know, what lawyer -- the

19  name of the lawyer you talked to, how long you talked

20  with them, and what the subject matter was --

21          THE WITNESS:  Uh-huh.

22          MR. NEUKOM:  -- subject matter being something

23  like the Huawei lawsuit or my mother's estate planning;

24  the subject matter not being things like, you know,

25  whether the blue-footed boobie emigrates or migrates in

1   the spring versus the fall.

2          It's a very broad scope of subject matter that

3   can be disclosed to folks outside the attorney-client

4   privilege.

5          THE WITNESS:  Can I ask you a question?

6          MR. NEUKOM:  Sure.

7          THE WITNESS:  When any legal document is signed,

8   is it unusual for there to be legal counsel involved in

9   explaining the document and the meaning of the document?

10         MR. NEUKOM:  It's absolutely not unusual.  But

11  that's why, basically, every declaration says it's based

12  on personal knowledge or not, to the extent it's not,

13  people have to make it clear.

14         THE WITNESS:  There's personal belief of facts

15  and then there's discussion about interpretation of

16  phrases.

17         MR. NEUKOM:  That is always privileged.

18         The question is if you have a personal -- if you

19  have personal knowledge, to sign your name to an

20  affidavit or declaration or what have you.  And if you

21  do, you can make the statement, well, properly, with or

22  without zero or millions of hours of consultation with

23  counsel.

24         But what -- what you and what any witness waives

25  privilege on are the contents of the statements that you

 1  made based on personal knowledge.

 2           THE WITNESS:  I understand.

 3           MR. NEUKOM:  And that's about it.

 4           THE WITNESS:  All right.

 5           MR. NEUKOM:  Beyond that, Mr. Ferrall can know,

 6  for example, did you consult with an attorney.

 7           THE WITNESS:  And that's all I was saying.

 8           MR. NEUKOM:  Yes or no, and that's it.

 9           THE WITNESS:  That's all I was saying.  I

10  believe that's what I said, is that it was done with

11  consultation of an attorney, of a Cisco attorney, not a

12  personal attorney.

13  BY MR. FERRALL:

14      Q   Right.  And to be clear, I'm -- what I'm trying

15  to get at, Mr. Giancarlo, is, as counsel notes, there's a

16  statement in the beginning that says, "I have personal

17  knowledge of these facts."

18           There's a statement at the end that says, "I

19  declare under penalty of perjury."

20           I'm trying to understand, as you think

21  Mr. Neukom is suggesting, if the contents of this

22  declaration are based upon facts that you know and not

23  based upon some interpretation of those that's provided

24  by Cisco or Cisco's lawyers, because if it's the latter,

25  then I think we're entitled to know that.

```
 1              If it's, these are my words, and I'm the one who
 2    endorsed these, then I would like that clarified.
 3              MR. NEUKOM:  No, no.  You're conflating two
 4    concepts.  And with respect -- I think you know you are.
 5              Word choice in a witness' statement -- this
 6    witness has said -- I asked him early on and he said he
 7    didn't write it.  But then he said he reviewed it and
 8    signed it and adopted it as his statement.
 9              We all know many witness statements as
10    affidavits are drafted, in whole or part, by attorneys
11    and later adopted or not by witnesses.  You can know what
12    the personal belief is that this witness has behind this
13    statement and this word choice, whether it came from him
14    or somebody else, and that's it.
15              I do not believe that it's proper, under work
16    product and privileged protections, for you to get
17    into -- I don't even know if there was a debate, but I
18    don't even know who the lawyers were, as I sit here
19    today.
20              But for you to get in some sort of word choice
21    debate --
22              MR. FERRALL:  I'm not.  I'm not.
23    BY MR. FERRALL:
24       Q   What I want to know is if your interpretation of
25    this document, which you've provided under penalty of
```

```
 1   perjury today, reflects what you understood at the time

 2   when you signed it, regardless of what attorneys at Cisco

 3   may have told you, one way or the other.

 4           Okay.  Do you understand?

 5   A    I don't think I do.

 6   Q    Okay.

 7           MR. NEUKOM:  Can I try to help?

 8           I think this may help.  I think Mr. Ferrall is

 9   asking you if the contents of Exhibit 601, at the tail

10   end which is your signature, the contents of Exhibit 601

11   at the time you signed it in February 2003, did they

12   accurately capture your understanding, your knowledge at

13   the time.

14           I think that's what I just heard.

15           MR. FERRALL:  Well, no.  No.  Actually, it's not

16   quite that.

17   BY MR. FERRALL:

18   Q    Mr. Neukom asked you a lot of questions about

19   the meaning --

20   A    Yes.

21   Q    -- about the words in this document.

22   A    Uh-huh.

23   Q    Okay.  And what I'm trying to understand is

24   simply whether that explanation of the meaning of the

25   words in this declaration --
```

```
 1        A    Which explanation?

 2        Q    The explanations that you gave in this

 3   deposition today.

 4        A    We discussed, yes.

 5        Q    -- whether that explanation of the meaning of

 6   the words in this declaration was your interpretation

 7   when you signed this document at the time --

 8        A    Ah, okay.

 9        Q    -- as opposed to something you learned from

10   counsel.

11        A    Oh, oh, I see.

12             No.  What I explained today was my interp --

13   what I tried to be clear about, perhaps not fully

14   competently, was I tried to explain my understanding of

15   my interpretation of the document at the time that I

16   signed it.

17             MR. FERRALL:  Okay.  I think that's all I want.

18             Thank you.

19             THE WITNESS:  Is that -- does that work?  We're

20   go on that, right?

21             MR. NEUKOM:  You're free to go.

22             THE WITNESS:  Very good.  Thank you.

23             THE VIDEOGRAPHER:  Going off the record.  The

24   time is 2:55.

25             This is the end of DVD No. 3 and today's
```