# EXHIBIT 3

** CONFIDENTIAL **

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CISCO SYSTEMS, INC.,

       Plaintiff,

v.                                    No. 5:14-cv-05344-BLF

ARISTA NETWORKS, INC.,

       Defendant.

_____/

** CONFIDENTIAL **

VIDEOTAPED DEPOSITION OF JOHN R. BLACK, Ph.D.

THURSDAY, JUNE 30, 2016

SAN FRANCISCO, CALIFORNIA

DEBORAH MAYER, CSR 9654, RPR CRR CRP CLR

U.S. LEGAL SUPPORT - SAN FRANCISCO

Page 2

```
1        BE IT REMEMBERED, pursuant to Notice, that on
2   Thursday, June 30, 2016, 9:05 a.m. - 5:46 p.m., at
3   50 California Street, 21st Floor, San Francisco,
4   California, 94111, before me, Deborah Mayer, a Certified
5   Shorthand Reporter for the State of California, there
6   personally appeared:
7
8             JOHN R. BLACK, Ph.D.,
9
10  called as a witness by the Plaintiff, who, being by me
11  first duly sworn/affirmed, was thereupon examined and
12  testified as hereinafter set forth.
13
14
15
16
17
18
19
20
21
22
23
24
25  ///
```

Page 4

```
1                  I N D E X
2
3   Witness:                                        Page
4   JOHN R. BLACK, Ph.D.
5           EXAMINATION BY MR. HOLMES                 7
6
7
8              S T I P U L A T I O N S
9                                            Page  Line
10  MR. HOLMES:  Thank you.  For the record, we   268   21
11  haven't seen it yet.  It hasn't been
12  produced to Cisco yet, so we'll have to take
13  a look at it when it is....
14  MR. WONG:  Actually, can we designate this    285   12
15  transcript confidential?
16  THE REPORTER:  Transcript order:  Is there    286    2
17  an expedite or rough, anything?
18  MR. HOLMES:  The rough, yes.  Otherwise, no.
19  MR. WONG:  I think that's right.  Same here.
20
21          M O T I O N   T O   S T R I K E
22                                            Page  Line
23  MR. HOLMES:  I'll just move to strike as      117   13
24  nonresponsive, and I'll re-ask it.
25  ///
```

Page 3

```
1              A P P E A R A N C E S
2
3   FOR PLAINTIFF CISCO SYSTEMS, INC.:
4           QUINN EMANUEL
            BY:  ANDREW M. HOLMES, ESQ.
5           50 California Street, 22nd Floor
            San Francisco, CA  94111
6           (415) 875-6322
            drewholmes@quinnemanuel.com
7
8
9   FOR DEFENDANT ARISTA NETWORKS, INC.:
10          KECKER & VAN NEST
            BY:  RYAN K.M. WONG, ESQ.
11          633 Battery Street
            San Francisco, CA  94111
12          (415) 773-6682
            rwong@kvn.com
13
14
15
16  ALSO PRESENT:
17          PHILIP KNOWLES, Legal Video Specialist.
18
19
20
21
22
23
24
25  ///
```

Page 5

```
1              E X H I B I T S
2
3   Plaintiff's:                                    Page
4   Exhibit 1550   Expert Report of                  15
5                  John R. Black Jr., June 3, 2016.
6   Exhibit 1551   Rebuttal Expert Report of         15
7                  John R. Black Jr.
8   Exhibit 1552   Opening Report of Dr. Almeroth.  126
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  ///
```

Page 6

1  (Thursday, 6-30-2016, 9:05 a.m. - 5:46 p.m.)
2      THE VIDEOGRAPHER:  Good morning, counsel.  We
3  are now on the video record.  This is the recorded video
4  deposition of John Black in the matter of Cisco vs
5  Arista, taken on behalf of the plaintiff.
6      This deposition is taking place at 50
7  California Street, 21st Floor, City of San Francisco,
8  California, 94111, on June 30, 2016 at approximately
9  9:05 a.m.
10     My name is Philip Knowles.  I'm the
11 videographer with U.S. Legal Support, located at
12 44 Montgomery Street, Suite 550, San Francisco,
13 California, 94104.
14     Video and audio recording will be taking place
15 unless all counsel have agreed to go off the record.
16     Would all present please identify themselves
17 beginning with the witness.
18     THE WITNESS:  I'm John Black.
19     MR. WONG:  Ryan Wong from Kecker & Van Nest for
20 defendant Arista Networks.
21     MR. HOLMES:  Drew Holmes from Quinn Emanuel on
22 behalf of the plaintiff Cisco.
23     THE VIDEOGRAPHER:  Thank you, counsel.  The
24 certified court reporter is Deborah Mayer.  Would you
25 please swear in the witness.

Page 7

1  (Witness sworn.)
2              EXAMINATION
3  BY MR. HOLMES:
4      Q.  Good morning, Dr. Blsck.
5      A.  Good morning, Mr. Holmes.
6      Q.  Dr. Black, you've been deposed before, correct?
7      A.  I have.
8      Q.  How many times?
9      A.  Somewhere between five and 10.
10     Q.  And so is it fair to say that you understand
11 that you're under oath here today?
12     A.  I do.
13     Q.  And you understood that you're required to tell
14 the truth here today?
15     A.  I do.
16     Q.  Is there any reason why you can't do that?
17     A.  No.
18     Q.  Is there any reason why you can't give your
19 best testimony here today?
20     A.  No reason.
21     Q.  Sir, you were engaged by Arista as an expert in
22 this litigation, is that correct?
23     A.  Yes, I was.
24     Q.  When did you first begin working on this case?
25     A.  I believe it would be April of 2015.

Page 8

1      Q.  How many hours have you spent working on this
2  case?
3      A.  Just to be clear, when you say "this case," the
4  way I understand it, at the beginning, there were two
5  patents, the '886 and the '526 --
6      MR. WONG:  Let me just caution the witness --
7      THE WITNESS:  Sure.
8      MR. WONG:  -- what you've said so far is fine,
9  but I want to caution the witness not to get into the
10 substance of any sort of attorney/client communications
11 or any sort of trial strategy which you may or may not
12 be privy to, okay.
13     THE WITNESS:  Understood.
14     MR. WONG:  So if you're going to talk about
15 general retention assignment type things, please speak
16 at a very high level.  Understood?
17     THE WITNESS:  Understood.
18     A.  Once again, April 2015, my understanding from
19 the Arista lawyers was that there were two patents,
20 the '526 and the '886, as well as a copyright aspect to
21 the complaint that Cisco had filed against Arista, and I
22 was engaged in that lawsuit.  Since that time, since
23 late 2015, my attention has been restricted solely to
24 the copyright issue, so there's been sort of a
25 refinement or restriction narrowing my focus over time.

Page 9

1  BY MR. HOLMES:
2      Q.  If we take it from, you started April 2015 to
3  the present, how many hours have you spent working on
4  this case?
5      A.  I don't have an exact number.  It would
6  probably be in the neighborhood of 400 to 700 hours over
7  that year and a half.
8      Q.  And do you know how many hours you spent
9  specifically on issues related to the copyright
10 infringement allegations in this case?
11     A.  It's really hard to tease out because in the
12 beginning, some of the issues sort of spanned.  Since
13 I've been asked to narrow my focus, of course all of my
14 attention has been paid just to the copyright.
15 Certainly the majority of that time has been directed at
16 the copyright aspect of this lawsuit.  I mean if I had
17 to roughly guess, between 60 and 85 percent of that
18 time.  I would really have to go back and look at that
19 question more carefully.
20 BY MR. HOLMES:
21     Q.  What is your hourly billing rate for this
22 matter?
23     A.  550.
24     Q.  And do you know how much you've billed in this
25 case to date?

Page 66

1   BY MR. HOLMES:
2       Q.   Have you ever held yourself out as an expert in
3   copyright law?
4       A.   Not as a lawyer, no.  I don't know what that
5   means other than I'm not a lawyer.  I have a paper, like
6   I said, that talks about copyright law as a technical
7   expert, but not as a lawyer.  I wouldn't walk around
8   saying I'm an expert in copyright law and people should
9   listen to me when I opine about the law.
10      Q.   Fair enough.  Do you consider yourself to be an
11  expert in organizational behavior?
12           MR. WONG:  Objection, vague.
13      A.   I don't know what that is, so I guess I can't
14  be an expert in something I don't know what it is.
15  BY MR. HOLMES:
16      Q.   Do you consider yourself to be an expert in
17  economics?
18           MR. WONG:  Objection, vague.
19      A.   No.
20      Q.   Do you consider yourself to be an expert in
21  calculating damages?
22           MR. WONG:  Same objection, vague.
23      A.   Certainly in any technical questions that apply
24  to my expertise, I might be helpful there, but I'm not a

Page 67

1   damages expert.  I've never held myself out as a damages
2   expert.
3   BY MR. HOLMES:
4       Q.   Have you held yourself out as being an expert
5   in consumer behavior?
6           MR. WONG:  Same objection, vague.
7       A.   Only to the extent that I can provide technical
8   expertise, but not as any kind of behavioral expert or
9   psychologist.
10  BY MR. HOLMES:
11      Q.   Do you consider yourself to be an expert in the
12  creation of industry standards?
13           MR. WONG:  Same objection, vague.
14      A.   I don't think there is such a thing as an
15  expert in the creation of industry standards.  I've
16  participated in creating technology that has been
17  standardized or attempted to be standardized in various
18  fashions, but I don't think there can be something that
19  you described as an "expert" in the creation of industry
20  standards.
21  BY MR. HOLMES:
22      Q.   So is it fair to say you've never held yourself
23  out to be an expert in the creation of industry
24  standards?
25           MR. WONG:  Objection, vague.

Page 68

1       A.   I've certainly never said those words about
2   myself, no.
3   BY MR. HOLMES:
4       Q.   Have you ever held yourself out to be an expert
5   in the creation of de facto standards?
6           MR. WONG:  Same objection.
7       A.   I've certainly never said those words about
8   myself either, no.
9   BY MR. HOLMES:
10      Q.   Are you currently a member of any standards
11  organizations?
12      A.   I'm not sure.  I may be a member of the IEEE, I
13  would have to check.  I'm a member of the IACR, which is
14  the International Association for Cryptologic Research.
15      Q.   Is that a standards body?
16      A.   I'm actually not sure if we issue standards
17  because I'm not involved in that part of the
18  organization.  We may not, actually.  And that would be
19  it.
20      Q.   Now, can you take a look at Exhibit 1 to your
21  Opening Report and let me know if you've listed any
22  membership in the IEEE.
23      A.   I don't think I list membership in any
24  organizations, and I've been a member of various
25  organizations, and I know some people do list that in

Page 69

1   their academic CV.  I should know where to look, right,
2   it's my CV, but I don't see a list of professional
3   organization memberships listed here.
4       Q.   So other than the IACR, as you sit here right
5   now, are you aware of any other -- well, strike that.
6           As you sit here right now, I believe your
7   testimony was that you may be a member of the IEEE but
8   you're not sure, you'd have to check; is that fair?
9       A.   That's fair.
10      Q.   Would you be able to check on a break, for
11  instance?
12      A.   Maybe.  I think so.
13      Q.   At the next break, maybe if you could do that
14  I'd appreciate it so we can get that one out of the way.
15      A.   Sure.
16      Q.   Other than the IACR, are there any other
17  organizations you're affiliated with on a regular basis?
18      A.   I also may be a member of the ACM.  I certainly
19  have been in the past.  I'm sorry, I don't keep close
20  track of this.  My membership lapses.  It's not a
21  day-to-day part of my life, these memberships.
22      Q.   And is the ACM, is that a standards-setting
23  body?
24      A.   I don't believe so.
25      Q.   Now, can you turn, please, Dr. Black, to page

Page 106

1  intend to answer that question yes or no?
2      MR. WONG:  Same objections, argumentative,
3  vague and ambiguous.
4      A.  I'm hoping that by the time that question would
5  be considered by either attorney on either side that we
6  will have established that the question makes no sense,
7  and hopefully the jury would recognize that a
8  nonsensical question is being asked.
9  BY MR. HOLMES:
10     Q.  And so it's your testimony today that if that
11  question is asked of you at trial, you will be of the
12  opinion that the question itself is nonsensical and
13  therefore you can't answer it?
14     A.  Certainly if I walked in off the street and I
15  were asked that question and we hadn't done all the hard
16  work to establish the foundations that I expressed in my
17  answer, point-blank, my answer would be respectfully,
18  sir, your answer -- your question does not make sense.
19     Q.  And that's what you would tell Arista's lawyers
20  as well if they asked you that on the stand at trial?
21     MR. WONG:  Same objection.
22     A.  This is all speculation, right, you're asking
23  me about how I would think, react, and make a statement
24  six months from now.  I don't know.  I mean it's my
25  position sitting here today that that question does not

Page 107

1  make sense.  If we agree during the trial on different
2  terminology, or the judge tells me to define a certain
3  word a certain way, or if there's a hypothetical that
4  says I want you to assume something, then I might answer
5  differently, and I don't think I can speculate as to
6  what's going to happen in a complex litigation six
7  months from now.
8  BY MR. HOLMES:
9      Q.  Well, you understand that the process of going
10  through this deposition today is so that I understand
11  what you're going to tell the jury, right, so that I
12  understand what your opinions are going to be so we're
13  not surprised later; that's the only fair way to do
14  this, right?
15     A.  I don't understand that --
16     MR. WONG:  Objection, argumentative.  Go ahead.
17     THE WITNESS:  Sorry.
18     A.  -- I don't understand the purpose of today's
19  deposition is that you extract a prescribed transcript
20  of what words I'm going to use when I'm at trial.  I do
21  think it's fair for you to ask me what my opinions are,
22  and I'm really trying very hard, even though you may not
23  think so, I'm trying very hard to be careful and to be
24  fully forthcoming in qualifying what I say so that we
25  can have a meeting of the minds and you can know what it

Page 108

1  is that I think about all these allegations and the
2  questions you're asking and so forth.
3      I'm sorry to add to an already long response,
4  but these are all my opinions, and I certainly intend to
5  offer these opinions at trial.  But there may be more
6  opinions based on this help description thing that's
7  still pending, and I don't know if, when we get
8  discovery, I may be asked to opine further, I think if I
9  am that would be fair game to include as well.  And I
10  certainly don't know what I would say or even what my
11  opinions will be around that, sitting here right now.
12  BY MR. HOLMES:
13     Q.  Do you have any opinions about Cisco's
14  allegations of help description copying as you sit here
15  right now?
16     A.  I gave you some of those earlier.  My main
17  reaction is that I want there to be a lot more evidence
18  before I can even start to undertake an investigation as
19  to the merits of those allegations.  I offer a few
20  cursory comments in my Rebuttal Report, having spent
21  probably 10 total minutes looking at the exhibit that
22  lists those help description strings.  But I've had
23  nowhere near enough time to make even a rudimentary
24  assessment of the merits of those allegations.
25     Q.  In formulating your opinions in this case, you

Page 109

1  performed -- I don't know if you want to call it testing
2  on certain Cisco and Arista products; is that fair?
3      MR. WONG:  Objection, vague.
4      A.  I certainly interacted with Cisco and Arista
5  products as part of the work I did, yes.
6  BY MR. HOLMES:
7      Q.  And how long did you spend interacting with
8  Cisco products in formulating your opinions in this
9  case?
10     A.  I mean to the extent that my interaction with
11  Cisco products reaches back decades, and that in some
12  sense, all of my experience with Cisco products helped
13  inform my opinions, because I think it was helpful that
14  I knew fundamental operation of Cisco products for a
15  long time.  My experience with Arista is much more
16  recent.  And so I don't know if you'd like me to sum up
17  every moment of experience on Cisco products going back
18  to my first experience, or if you want to talk about
19  deliberate interactions with Cisco products directed at
20  specific questions regarding a litigation?
21     Q.  Well, my question was specifically, about how
22  many hours did you spend with Arista (sic) products to
23  formulate your opinions in this report -- in these
24  reports?
25     A.  So I think you just changed to Arista in

Page 118

1    parsers. Are you now asking me now to imagine a new
2    parser that accepts as valid a given command
3    abstraction?
4    BY MR. HOLMES:
5        Q.   That's correct.
6        A.   Okay, with that in mind, I'm sorry to be
7    difficult. Could you re-ask the question?
8        Q.   Sure. Just a hypothetical.
9        A.   I'm with you now.
10       Q.   So if I take a command abstraction, right, out
11   of a document, it's literally in the document, then I go
12   and create a parser that is able to accept that command
13   abstraction, is that mimicking?
14       A.   So I'll ask you a clarifying question. In
15   my -- in my parser, this hypothetical parser we're now
16   imagining, is there a command abstraction literally
17   present in the source code of that parser? Because I
18   can write a parser that simply accepts everything, very
19   easy to write, right, I can write a parser that rejects
20   everything. If I write one that accepts everything,
21   then it would accept the particular example you're
22   giving me in your question.
23           Another way I can do it is I could literally
24   have a copy of that command abstraction in my parser and
25   say if what Mr. Holmes enters matches this, then output

Page 119

1    valid; otherwise, output invalid. That's a different
2    way to write a parser. So in the sense you're just
3    saying "a parser that accepts," I don't know what the
4    source code for that parser would looks like, and that
5    is a pretty important question to ask.
6        Q.   Let's take it in two steps then. Let's assume
7    in the first instance the parser accepts the command
8    literally, it's literally in the source code; is that
9    mimicking?
10           MR. WONG: Objection, incomplete hypothetical.
11       A.   No, because mimicking is copying of behavior.
12   And the literal expression of a command abstraction as
13   it sits on a page isn't exhibiting any behavior, so you
14   can't copy a behavior that's not exhibited.
15           Now, going beyond your question, how did that
16   command abstraction get into the source code, that's a
17   separate thing, and I would be comfortable using the
18   word "copy" if the way that it got there was somebody
19   deliberately cut and pasted or consciously transcribed
20   letter-for-letter from that page into the source code;
21   but that's copying, not mimicking, by my understanding.
22   BY MR. HOLMES:
23       Q.   Yeah. And so in the alternative hypothetical
24   parser where the command abstraction is not literally
25   present but the parser is able to accept it and parse it

Page 120

1    and provide a response to it, is that copying or
2    mimicking in your opinion?
3            MR. WONG: Objection, vague, incomplete
4    hypothetical.
5        A.   So let's take -- since I'm having a hard time
6    with the vagueness, let's take the example I gave where
7    I write a parser that accepts all strings. That's easy
8    to do. Then certainly the command abstraction you have
9    in mind, whatever it is, is accepted as valid. Is that
10   copying or mimicking? I can't see how one could
11   conceptually agree in that specific case.
12   BY MR. HOLMES:
13       Q.   Why not?
14       A.   Because to mimic, there has to be similar
15   behavior. And since words written on a page have no
16   behavior that I can discern, then that question is
17   completely and trivially no. Was there literal copying
18   of that command abstraction? Well, my parser is
19   basically three lines long; it just says okay to
20   everything you type. And so how one could conceivably
21   say that command abstraction has been copied into my
22   product, I don't see how you could get there. So I
23   think that one is also trivially no.
24           MR. HOLMES: Okay, great, let's take a break.
25           THE VIDEOGRAPHER: This marks the end of DVD 2

Page 121

1    in the deposition of John Black. The time is 12:10 p.m.
2    Counsel, we're going off the record.
3    (Recess taken.)
4            THE VIDEOGRAPHER: Counsel, we're now back on
5    the record. This is the beginning of DVD 3 to the
6    deposition of John Black. The time is 9 -- sorry,
7    12:56 p.m.
8            THE WITNESS: Mr. Holmes, you asked me to look
9    during the break at my IEEE membership status. I've
10   done that, if you want to start there?
11   BY MR. HOLMES:
12       Q.   Sure, what did you find?
13       A.   So I'm not a member of IEEE.
14       Q.   Thank you for that.
15           I would like to direct your attention to page 8
16   of your Opening Report, page 8 paragraph 8, the heading
17   "summary of opinions." Let me know when you're there.
18       A.   And I'm sorry to go back again to something
19   else that I thought of just a minute ago that is a more
20   complete response to one of your earlier questions. If
21   I'm permitted to do that for a moment?
22       Q.   Sure. If you feel like you need to clarify the
23   record for some reason, please go ahead.
24       A.   We were talking about the creation of
25   standards, and I forgot to mention that there is a group

Page 122

1   called NIST, National Institute of Standards and
2   Technology, you've probably heard of them.  A lot of the
3   work I've done, they're the appropriate standardization
4   body.  They're not a group that takes membership, so I
5   don't have membership with them.
6           But I've participated in their workshops, I've
7   gone to their headquarters in Washington and supported
8   various algorithms, protocols and so forth that I've
9   helped invent to try to promulgate standardization.  In
10  some cases, that's been successful.  So you can find
11  NIST standards that carry my name.  You can also find --
12  I'm sorry, you can also find RFCs that have my name,
13  which is a different body as you're well aware.
14  BY MR. HOLMES:
15      Q.   Are you currently actively involved with NIST?
16      A.   Only in a remote sense that I've, within the
17  past couple of years, offered some comments in response
18  to a proposed standard, but I'm not myself attempting to
19  promote something -- some of my work for standardization
20  under the NIST heading.
21      Q.   When was the last time you participated in a
22  NIST workshop?
23      A.   Probably 2011.  There was one that met during
24  the crypto conference in Santa Barbara; I was on
25  sabbatical at that time and I remember sitting in on

Page 123

1   one of their meetings at that time.  That was with
2   respect to hash functions.
3       Q.   Have you ever held any leadership positions at
4   NIST?
5           MR. WONG:  Objection, vague.
6       A.   No.  Those positions are held by employees, not
7   by outsiders.
8   BY MR. HOLMES:
9       Q.   Okay, well, thank you for that.
10          Now, page 8 starting at paragraph 8, you've
11  got -- this section is entitled "summary of opinions,"
12  right?
13      A.   Yes, it is.
14      Q.   Okay.  And from paragraphs 8, 9, 10, 11, right,
15  that's sort of the paragraphs that are within this
16  subsection; is that fair?
17      A.   It appears there are so-numbered paragraphs,
18  yes.
19      Q.   Now, if I understand your summary of opinions,
20  you provided opinions here about modes, prompts --
21  you've used the word "command," so I'm using it as
22  you've used it, "hierarchies" and "responses" in these
23  paragraphs.  Is that a fair characterization?
24      A.   I'd have to review these few paragraphs, but I
25  think, just looking at paragraph 8, you seem to have

Page 124

1   summarized it correctly.
2       Q.   Now, have you provided any opinions in either
3   one of your reports with respect to the technical
4   documents that Cisco has accused Arista of copying?
5           MR. WONG:  Objection, vague.
6       A.   Could you clarify what you mean by "technical
7   documents"?  Do you mean user manuals or more than
8   that?
9   BY MR. HOLMES:
10      Q.   I mean Cisco documents that could include user
11  manuals and other Cisco documents that relate to its
12  operating systems and its CLI.
13      A.   So you would encompass like technical documents
14  and so forth --
15      Q.   Yes?
16      A.   -- internal specifications, those sorts of
17  things?
18      Q.   That's correct.
19      A.   Thank you.  Um, I'm actually not aware of any
20  allegations that include those kinds of latter technical
21  documents, internal functional documents, code
22  descriptions, those sorts of things.  I believe that
23  some of the copyright registrations that Cisco holds has
24  words something like "and associated documentation";
25  some of them do.  I haven't done any analysis on any

Page 125

1   documentation of the sort that are not user manuals, for
2   one thing.
3           I know that Professor Almeroth has talked about
4   user manuals in his reports.  And I certainly have
5   looked at a huge number of manuals in the scraping work
6   that I did for the analysis that are in my two reports.
7   And I think I make a passing remark in my Rebuttal
8   Report saying that some of the quoted citations that
9   Professor Almeroth includes, I looked in the most recent
10  manual, Arista manual, couldn't find them.  But I didn't
11  do an extensive analysis going back to prior manuals,
12  except in one case, I looked at a couple of old manuals
13  just yesterday to try to understand one of the charts in
14  Professor Almeroth's Rebuttal Report.  But that's the
15  extent of my manual analysis.
16      Q.   Okay.  And do you remember that Dr. Almeroth
17  included in an exhibit with his Opening Report that set
18  forth, in his opinion, what the evidence was that Arista
19  had copied certain Cisco documents?
20          MR. WONG:  Objection, vague.
21      A.   Unfortunately I have my own report.  It's much
22  more present in my mind than his.  I'm trying to
23  recall -- I mean if you'd let me see a copy, it would be
24  helpful if that's possible.
25  (Pause in the proceedings.)

Page 182

1 BY MR. HOLMES:

2    Q.  How many prompts are part of the industry

3 standard CLI?

4    A.  By "prompt," do you mean the host name and the

5 rest of the letters that precede the final character

6 which is an angle bracket or hash mark, or do you just

7 mean angle bracket hash mark, or do you mean what did I

8 mean in this context?

9 BY MR. HOLMES:

10   Q.  In the context of paragraph 171 where you've

11 defined industry standard CLI, you've used the term

12 "command prompts," right?

13   A.  I have.

14   Q.  My question is, as you've used the term

15 "command prompts," how many command prompts are part of

16 the industry standard CLI?

17   A.  So to a large extent, prompts are married to

18 modes.  So you get a different prompt in user exec, a

19 different one in privileged exec, a different one in

20 global config, a different one in interface

21 configuration.  So those four modes that I enumerated a

22 minute ago have associated prompts, and I would say they

23 are at least those four prompts, and I've shown again in

24 the appendix that those prompts, or very similar ones,

25 are adopted across the industry, so I'd say at least

Page 183

1 those four.

2    Q.  Can you think of any others?

3    A.  I think that some of the others are in a gray

4 area where people might disagree.  I think no one would

5 disagree for those four, so I'd say once again at least

6 those four.

7    Q.  And you also list as a common feature in

8 functionality in paragraph 171 "command responses"; how

9 many command responses are part of the industry

10 standard CLI?

11   A.  Once again, I don't have a specific threshold

12 to give you.  It's not a number that I can set forth.

13   Q.  Can you give me an example of a command

14 response that is part of the industry standard CLI?

15   A.  Um, when I say "show IP interface brief," I get

16 on each line a list of every interface which will vary,

17 depending on the device.  But it's the format that I

18 expect to see, and in every case I've ever issued that

19 command on an industry standard CLI, that's what

20 comes out.

21   Q.  Did you test that particular command when you

22 interacted with the Cisco device?

23   A.  For a couple of decades, yes.

24   Q.  Did you input that specific command when you

25 were interacting with Cisco's devices during the process

Page 184

1 of formulating your opinions for this case?

2    A.  Many times.

3    Q.  And was the command response that you got using

4 a Cisco device similar to the command response that you

5 got when you used the Arista device?

6    MR. WONG:  Objection, vague.

7    A.  Yes, and similar to what I got when I used a

8 Dell device, when I used a Juniper device, Junos E

9 device, and so forth, yes.

10 BY MR. HOLMES:

11   Q.  When you used the Dell device, did you use that

12 in the context of formulating your opinions in this

13 case?

14   MR. WONG:  Objection, vague.

15   A.  Only in the sense that I know that's what it

16 does from prior use, but I didn't make a trip to campus

17 while drafting my report to verify that memory.

18 BY MR. HOLMES:

19   Q.  Same question with respect to Junos E.  During

20 the process of preparing this report, did you interact

21 with the Junos E device to verify that the command

22 response that it outputs is the same as the command

23 response that was outputted by Cisco and Arista?

24   MR. WONG:  Objection, vague.

25   A.  I relied on my memory of that interaction.  I

Page 185

1 didn't go and verify it while drafting my report.

2 BY MR. HOLMES:

3    Q.  Just to be clear, I just want to make sure I

4 have an understanding of what you relied on in preparing

5 your report.  I don't recall in your reports that you

6 disclosed that you relied on the use of a Dell device or

7 a Junos E device in formulating your opinions in this

8 case; do you know if you did or didn't disclose that?

9    A.  I believe I relied on all my experience,

10 training, and research and consulting work throughout my

11 career, not every minute of it of course is relevant to

12 this, but certainly the times I've written CLIs,

13 parsers, the times I've looked at any source code, the

14 times I've interacted with these devices I just

15 described helped inform my opinions.  Even if I don't

16 explicitly enumerate every experience in my career, I

17 oftentimes rely on those experiences as part of what

18 makes up my qualifications.

19 BY MR. HOLMES:

20   Q.  How many CLI commands would a vendor need to

21 adopt in order to be compliant with the industry

22 standard CLI?

23   MR. WONG:  Objection, incomplete hypothetical.

24   A.  Once again, there is no specific threshold that

25 I have in mind that says if you're below this number

Page 186

1  you're not, and if you're above this number you are.  I
2  think that that number isn't even relevant because we
3  have such overwhelming evidence that there are hundreds
4  of commands, command abstractions, adopted by a large
5  number of vendors, as I've painstakingly laid out in my
6  appendices that would fall under anyone's definition of
7  what "widespread adoption" means.
8  BY MR. HOLMES:
9      Q.  How many -- strike that.
10         How many hierarchies would a vendor need to
11  adopt in order to be compliant with the industry
12  standard CLI?
13     MR. WONG:  Same objections.
14     A.  As I stated before, hierarchies are directly
15  related to the commands in my view, and therefore my
16  answer is the same, that it would depend on the number
17  of commands, and the number of commands I don't have a
18  specific threshold for, but the evidence is clear here
19  that there's widespread adoption and we don't need a
20  specific number.
21  BY MR. HOLMES:
22     Q.  And how many command modes would a vendor need
23  to adopt in order to be compliant with the industry
24  standard CLI?
25     A.  I would say there, to pass muster by most

Page 187

1  people's expectations, you'd need at least those four
2  that we talked about, perhaps more, but at least those
3  four would be expected.
4      Q.  How many command prompts would -- strike that.
5         How many command prompts would a vendor need to
6  adopt in order to be compliant with the industry
7  standard CLI?
8      A.  Once again I view prompts as being married to
9  modes, so I would say the same thing, at least four.
10  Those are the same four I've talked about.
11     Q.  And how many command responses would need to be
12  adopted in order to be compliant with the
13  industry standard CLI?
14     MR. WONG:  Same objection, incomplete
15  hypothetical.
16     A.  Once again, I don't have a particular number in
17  mind.  I would think that there's an expectation that
18  responses will look a certain way, and in my
19  investigation they do, across all -- numerous vendors.
20  Therefore, I think that we don't need a precise number.
21  BY MR. HOLMES:
22     Q.  So in the last sentence of paragraph 171 you
23  say:
24         "These common features and
25         functionalities include CLI commands,

Page 188

1         command hierarchies, command modes,
2         command prompts, and command responses."
3         Do you remember that?
4      A.  I see it in fact.
5      Q.  And you also say:
6         "And cover the accused aspects of the
7         Arista EOS CLI accused by Cisco in this
8         litigation," right?
9      A.  A little redundant.  I say accused twice.
10     Q.  Are there any features and functionalities that
11  you excluded from this list that, in your opinion,
12  should be included in the definition of industry
13  standard CLI?
14     A.  Yes, there are some other features.  I would
15  include, among what's expected, the features expected by
16  most users.
17     Q.  Can you please identify those features.
18     A.  I probably can't give you a complete list but I
19  can give you a number of examples.
20         So when I sit down at a CLI for a networking
21  device, I expect, if it's industry standard, I expect
22  that when I hit some keys on the keyboard that those
23  keys will be echoed back to me.  And you probably know
24  that's not necessarily a technical requirement.  There
25  are times when you type and you don't see the keys

Page 189

1  echoed back, like when you're typing a password.  So
2  that behavior I expect, and that's from the beginning of
3  time really.
4         When I hit backspace, I expect the last
5  character to be erased.  When I hit the left arrow, I
6  expect the cursor to move, without erasing, left on my
7  screen through the characters that are already typed.
8  Obviously right arrow should do the reverse, move the
9  cursor to the right.  I should be able to hit up arrow
10  and review previously-issued commands in case I want to
11  re-issue them with some edits.  When I hit down arrow, I
12  should go back down through the command history.
13         When I hit question mark, I should get a list
14  of available options to type wherever I am, even if I'm
15  in the middle of a command or in the middle of a command
16  word.  Optional ways to complete the word I'm in the
17  middle of should be given in a context-sensitive manner.
18         If I'm in the middle of a word or middle of a
19  command and I hit tab, it should auto-complete that word
20  for me provided the prefix I've typed in is unambiguous.
21  If I choose not to hit tab, the prefix I've typed in, if
22  it's unambiguous, should be taken to mean the full word
23  that completes it.
24         These kinds of behaviors are standard across
25  all these industry standard CLIs, they all existed in

Page 190

1    CLIs prior to Cisco's founding, and I would group those
2    in with these other features that I've identified.
3        Q.   But you do not list them in paragraph 171,
4    correct?
5        A.   No.  Here, I was focused simply on the accused
6    aspects of CLI that Cisco had identified.
7        Q.   I'm not sure I understand your answer.
8        A.   They're not there.
9        Q.   You do not list those additional features in
10   paragraph 171, correct?
11       A.   In 171, I restrict to the accused elements.
12   I do talk about those features elsewhere in the report
13   though.
14       Q.   You haven't included in your list in paragraph
15   171 user manuals, correct?
16       A.   No, I have not included manuals.
17       Q.   Did you include any documents in your list of
18   common features and functionalities in paragraph 171?
19            MR. WONG:  Objection, vague.
20       A.   No.  In fact I wouldn't consider manuals or
21   technical documents to be part of the CLI.
22   BY MR. HOLMES:
23       Q.   And you also didn't list help descriptions in
24   paragraph 171, correct?
25       A.   I did not and I certainly would have, had those

Page 191

1    allegations come in a timely manner.  I think it's
2    relevant to include those in the list of items
3    considered; just no way I had time.
4        Q.   I think you testified earlier you were made
5    aware of the help description allegations at least by
6    May 27th; is that fair?
7        A.   I think either the 27th or to the 28th, which
8    would have been a Saturday.
9        Q.   And this Opening Report was submitted on
10   June 3rd, correct?
11       A.   Yes, it was.
12       Q.   Now, do you consider Cisco's NX-OS CLI to be
13   compliant with your definition of the industry standard
14   CLI?
15            MR. WONG:  Objection, vague.
16       A.   For the most part, it has some differences from
17   what I expect, but I think it still conforms to the
18   industry standards.  I think I could get through it
19   without a manual, figure things out.  For the most part,
20   the prompts, the commands, the hierarchies, the modes
21   are what I would expect.
22   BY MR. HOLMES:
23       Q.   So in your -- strike that.
24            So in your opinion, is Cisco's NX-OS CLI an
25   industry standard CLI?

Page 192

1            MR. WONG:  Objection, vague.
2        A.   It is, even though it's not perfectly
3    conforming, I would consider it to be industry standard.
4    BY MR. HOLMES:
5        Q.   Is Cisco's XR CLI an industry standard CLI in
6    your opinion?
7            MR. WONG:  Same objections.
8        A.   With the proviso there are some differences.
9    Overall, I would say it is.
10   BY MR. HOLMES:
11       Q.   And is Cisco's IOS XE CLI an industry standard
12   CLI in your opinion?
13            MR. WONG:  Same objections.
14       A.   With the same provisos, yes, I believe it is.
15   BY MR. HOLMES:
16       Q.   Now, paragraph 172, paragraph 172 reads:
17            "Both the Cisco IOS CLI and the Arista
18            EOS CLI support the industry standard CLI
19            as well as numerous other networking
20            vendors discussed in this and other
21            sections of my report."  Do you see that?
22       A.   I do.
23       Q.   And that's your opinion?
24       A.   Yes, it is.
25       Q.   Now, when you say:

Page 193

1            "Both the Cisco IOS CLI and the Arista
2            EOS CLI support the industry standard CLI,"
3    are you saying that they are using the same CLI?
4            MR. WONG:  Objection, vague.
5        A.   So once again, when we say "CLI," we have to be
6    careful.  Do we mean source code, do we mean the
7    experience?  Obviously the source code is different.  So
8    I'll take that question to mean the interactive
9    experience.  I just stated a minute ago that there are
10   details within NX-OS and various IOS variance, and we
11   have to be careful when I say "Cisco EOS CLI," there are
12   variants, and there are different releases and versions
13   and so forth.
14            So I'm taking them collectively to mean --
15   which is what Professor Almeroth also does -- to mean a
16   collection of those CLIs together.  I'm sorry, I
17   probably forgot to answer your question.
18            MR. HOLMES:  It's okay.
19   BY MR. HOLMES:
20       Q.   So when you say that both the Cisco IOS CLI and
21   Arista EOS CLI support the --
22   (Reporter clarification.)
23            MR. HOLMES:  I'll rephrase the question.
24   BY MR. HOLMES:
25       Q.   So when you say that both the Cisco IOS CLI and

Page 194

1   the Arista EOS CLI support the industry standard CLI, is
2   it your opinion that Cisco's IOS CLI and Arista's EOS
3   CLI are similar?
4           MR. WONG:  Objection, vague.
5       A.   In the elements that I've enumerated, and some
6   of the ones we talked about that aren't in the list in
7   171, they are similar just like the 18 other vendors are
8   similar.
9   BY MR. HOLMES:
10      Q.   Will you take a look at paragraph 180 please of
11  your Opening Report.
12      A.   I'm there.
13      Q.   Sorry, 178.
14      A.   78?  I'm there.
15      Q.   Okay.  In paragraph 178 you say:
16           "As shown in this section of my report,
17           it is my opinion the accused command modes
18           and prompts listed in Exhibit C to Cisco's
19           interrogatory responses are supported by
20           the vast majority of networking equipment
21           vendors I examined for this report, and
22           that the disputed command modes and prompts
23           are part of the industry standards CLI that
24           users of networking equipment expect."
25           Do you see that?

Page 195

1       A.   I see that.
2       Q.   And that's your opinion?
3       A.   It is.
4       Q.   What is a "command mode"?
5       A.   A command mode is the state of the parser.  So
6   that when you're in one mode, the prompt is different
7   from other modes, and the set of available commands that
8   you have available to type in as valid commands within
9   that mode is often different than in other modes.  But
10  the technical answer is, it's a state of the parser.
11      Q.   And when you say "vast majority" in paragraph
12  178, what do you mean?
13      A.   I think that's qualified by vast majority of
14  vendors I examined.  And so I mean that almost all of
15  the vendors I examined qualify under my statement here.
16      Q.   Now, in performing your analysis in preparing
17  these reports, did you analyze every networking
18  equipment vendor in the industry?
19          MR. WONG:  Objection, vague.
20      A.   I certainly included every vendor I could think
21  of.  I learned some more of them along the way as I read
22  some of the evidence and documents.  I know that it's
23  Professor Almeroth's contention that I missed more than
24  20.  He cites to Wikipedia in his deposition transcript.
25  So there are definitely some that I didn't think of or

Page 196

1   didn't consider in my analysis.  I went to Wikipedia
2   last night just to find out, and the first one I saw was
3   Aerohive, A-E-R-O-H-I-V-E.  The manuals were in Korean.
4   They apparently sell a switch.  I didn't include that in
5   my analysis, and I probably wouldn't have even if I
6   stumbled across them.
7           I found other vendors like TPLink, which I only
8   knew for their sales of wireless unmanaged switches, but
9   apparently they do have a managed switch.  It has a GUI,
10  it doesn't have a CLI, so I would not have included it
11  in my analysis of other vendors of CLIs.  So I certainly
12  am aware of vendors that I did not include, and I would
13  never claim that I got everybody.
14      Q.   And so can you walk me through your methodology
15  for how you determined which vendors to select?
16      A.   Sure.  So I wanted to get all of the major
17  players for sure.  And that was easy for me because I've
18  been around and I kind of know who they are.  So those
19  immediately went on the list.
20          There are some that, in my perception, aren't
21  big players, or I didn't think of because they're small
22  fries in the market.  And sometimes Arista's lawyers
23  would say here are some more to consider, and they would
24  give me the manuals produced by those vendors.  I could
25  throw them into the pool.

Page 197

1           I learned about Procket which I've never heard
2   about before because of Tony Lee's deposition testimony.
3   I heard of Tail-F, although I shouldn't include them
4   because they're not in the list of vendors.
5           There was another one, now I'm losing who it
6   was -- there was another small player that was mentioned
7   in the course of my reading one of the depo transcripts
8   and I went oh, there's another one I added to the list
9   because I thought it was relevant -- oh, I'm sorry,
10  NextTop was the one I was trying to remember.  I'd never
11  heard of them before.  And so as a few of these actors
12  came into my mind and then into my report as a result of
13  their being mentioned along the way.
14      Q.   Did you do anything else to try to locate
15  vendors who you felt might be worth investigating when
16  formulating your opinions about which vendors comply
17  with or don't comply with the industry standard CLI as
18  you've defined that term?
19      A.   I mean I did, as a spot-check, do a shopping
20  query for network switches to make sure there wasn't
21  something obvious that I've been missing.  Didn't find
22  anything that way.  I did not look at Wikipedia, I
23  didn't think to until Tuesday.  So I did try to
24  double-check to some extent to make sure I hadn't missed
25  anyone that was major.

Page 198

1    Q.   Did you consider routing vendors as well?
2         MR. WONG:  Objection, vague.
3    A.   I tried to restrict my attention to switches,
4  given that Arista sells only switches, although they are
5  layer-3 switches.  I was trying to think of -- of other
6  switch vendors.
7  BY MR. HOLMES:
8    Q.   Are you familiar with Arista's 7500-R product?
9    A.   I believe so.  That's a big chassis switch
10  they sell.
11   Q.   Are you aware as you sit here right now of any
12  switches -- I'm sorry, of any routers that Arista sells?
13   A.   I didn't get the last two words?
14   Q.   Any routers that Arista sells?
15        MR. WONG:  Objection, vague.
16   A.   I mean, so what is a router?  It used to be
17  clear.  Nowadays we have what are called "layer-3
18  switches" and we call them switches, but they do
19  essentially most of the functionality from a router.
20  So you could say the line is quite blurred at this
21  point.  I believe Arista markets its product as
22  switches, as layer-3 switches.  Maybe sometimes they
23  might call them routers, I didn't take note of that ever
24  happening.  I certainly call them switches with my
25  students, but my students understand that that line is

Page 199

1  blurred and that they have routing functionality.
2  BY MR. HOLMES:
3    Q.   But you're aware that Cisco sells routers,
4  correct?
5    A.   I have one in my living room.
6    Q.   And so taking a step back, did you consider any
7  vendors who offer routers when you were performing your
8  analysis of what vendors do and do not potentially use
9  the industry standard CLI, in your opinion?
10   A.   I mean I think -- I couldn't name them off the
11  top of my head, but I think most of these vendors offer
12  routers.
13   Q.   Did you do anything to verify that?
14        MR. WONG:  Objection, vague.
15   A.   I mean it wasn't a specific question I thought
16  was important at all.  I didn't try to verify that.
17  It's my awareness that many of these vendors sell
18  routers.
19  BY MR. HOLMES:
20   Q.   Is there anything else that went into your
21  methodology of how you selected the vendors that you
22  analyzed that you haven't already explained to me?
23        MR. WONG:  Objection, vague.
24   A.   I mean beyond probing my memory, talking to the
25  attorneys, doing some Web searching, I think that is how

Page 200

1  I built out my list, and I'm still not aware, sitting
2  here today, of any major player that I missed.
3  BY MR. HOLMES:
4    Q.   Did you include Huawei?
5    A.   Only in the sense that they are discussed a few
6  times in my reports, but I don't think they're one of
7  the 20.
8    Q.   Would you consider Huawei to be a major player?
9         MR. WONG:  Objection, foundation.
10   A.   I think they could be considered to be major.
11  I've never seen one of their routers or switches but
12  I've searchable heard of them.  They were made famous to
13  me in 2003 when they got sued, and they're also a famous
14  company for telecom.
15  BY MR. HOLMES:
16   Q.   And you haven't performed an analysis of their
17  CLI in support of your expert reports in this case,
18  correct?
19        MR. WONG:  Objection, vague.
20   A.   I mean I analyzed them in the sense that I
21  discussed their CLI, I discussed the differences, the
22  fact that they use displays of "show undo" instead of
23  "no," and the list goes on, right?  There are those
24  distinctions.  Same with 3Com, I also discussed that
25  they're similar distinctions for almost the same reason.

Page 201

1  So in that sense I think I could say I do some analysis.
2  BY MR. HOLMES:
3    Q.   But you haven't included them in your
4  appendices where you analyze which vendors you believe
5  comply with the industry standard CLI, correct?
6    A.   That's correct.  If I include Huawei because of
7  the reasons I just noted, that they deliberately swap
8  out "show" or "display" and so forth, they're not going
9  to have show commands that I enumerate in my appendices.
10  BY MR. HOLMES:
11   Q.   And so in your opinion, does Huawei use the
12  industry standard CLI?
13   A.   So my opinion is they used to.  I mean they did
14  something horrible and they copied source code, right.
15  And so they used to.  And then they were more or less
16  forced to change to a CLI that I would say is not
17  industry compliant because they failed to use any of the
18  common commands.  Now, via trick, I think they overtly
19  just say all you have to do is alias these words back to
20  their Cisco or industry standard or EOS equivalence, and
21  you essentially recover an industry standard CLI which
22  is just an old work-around.
23   Q.   Are you familiar with Juniper's Junos CLI?
24   A.   I've used it.
25   Q.   In your opinion, is Juniper's Junos CLI

Page 202

```
 1    compliant with the industry standard CLI as you've
 2    defined it in this case?
 3        A.   So when you say the "industry standard," I'm
 4    going to assume the one that we've been talking about
 5    all day.
 6        Q.   Well, what I said was "the industry standard
 7    CLI as you've defined it in this case."
 8        A.   I was trying to expand on what my answer was
 9    going to be there.
10             When I say "the industry standard," I'm talking
11    about the IOS-like industry standard.  Some people talk
12    about Junos as being an alternative industry standard.
13    Now, I think that is up for grabs.  I mean you could
14    argue one way or the other whether that is an
15    independent industry standard.  I think Cisco believes
16    it is because it offers it.  It's in one of its
17    products.  But it certainly does not conform to the
18    industry standard we've been talking about.
19        Q.   So it's potentially a different industry
20    standard CLI?
21        A.   Potentially, yes.
22        Q.   And have you done anything to investigate
23    whether or not Junos CLI would meet your own definition
24    of a de facto standard?
25        A.   As an independent de facto standard, I didn't
```

Page 203

```
 1    spend any time on that question at all.
 2        Q.   So let's turn to paragraph 180 please.
 3        A.   I'm sorry, already there.  Okay, I'm there.
 4        Q.   So in paragraph 180 you say:
 5             "It is also my opinion that many
 6        third-party networking vendors that sell
 7        switches and routers, or who sold switches
 8        and routers before being acquired or
 9        ceasing operation, supported and still
10        support hundreds of the same disputed CLI
11        commands at issue in this case.  Based on
12        my analysis of user documentation from many
13        third-party networking equipment vendors,"
14    and you provide a summary of your findings.  Do you see
15    that?
16        A.   I see that.
17        Q.   These are your opinions; is that right?
18             MR. WONG:  Objection, vague.
19        A.   These are my opinions.  These are my findings.
20    BY MR. HOLMES:
21        Q.   So as we just discussed, you were at
22    Dr. Almeroth's deposition, right?
23        A.   Yes, I was.
24        Q.   And you heard Dr. Almeroth discuss his opinion
25    that he believes you may have omitted up to not more
```

Page 204

```
 1    than 20 networking vendors from your analysis?
 2        A.   I'm not sure if he said that at deposition.  He
 3    certainly says it in his reports.
 4        Q.   Fair enough.  Do you recall him at least saying
 5    that in one of his expert reports?
 6        A.   Yes, I do.
 7        Q.   If it's true that your analysis was based on
 8    analyzing only one-half of the market, would that change
 9    your opinions in any way?
10             MR. WONG:  Objection, vague.
11        A.   I mean if you were to point out that I missed
12    20 other vendors that comprise 80 percent market share
13    in this space, embarrassed would not reach the level of
14    what I would feel.  I don't think that's remotely
15    probable.  If you point out that there are some players
16    who only sell their equipment in Korea that I didn't
17    consider, I wouldn't be surprised at all.  I never said
18    in my reports "and there are no other vendors."  All I
19    said was that this is "widespread, widely adopted, and
20    common," and I certainly tried to include all the major
21    players that I knew about and used the criteria I
22    already described in building my list.
23             MR. HOLMES:  I do appreciate your answer,
24    although I asked a little bit different question.
25             THE WITNESS:  I'm sorry.
```

Page 205

```
 1             MR. HOLMES:  It's okay, I'll re-ask it.
 2    BY MR. HOLMES:
 3        Q.   If it's true that your analysis was based on
 4    analyzing only one-half of the market, would that change
 5    your opinions in any way?
 6             MR. WONG:  Objection, vague.
 7        A.   If that's all -- if that's all you're telling
 8    me, and if you're saying "half the market" just means by
 9    putting Aerohive and Juniper side by side, then that
10    could be the case.  But I don't think it's a fair thing
11    to do to say Aerohive and Juniper should be put on the
12    same footing.  So if you're saying half, simply by
13    counting companies, then I don't think it's relevant and
14    it wouldn't change my analysis at all, or my opinions.
15    BY MR. HOLMES:
16        Q.   As part of your definition of the industry
17    standard CLI, do you anywhere reference market share as
18    being a factor that you considered?
19        A.   When you say "reference," you mean do you mean
20    is it written in my report or was it on my mind at the
21    time?
22        Q.   Was it written in paragraph 171 of your report?
23        A.   171.
24             MR. WONG:  Object the question as vague.
25        A.   In paragraph 171 I say:  "It refers to common
```

Page 206

1  well-known widely-adopted features and functionalities
2  of CLIs."  I don't say market share.  My intent was to
3  only include large players.  And when I say common and
4  well-known and widely-adopted, I'm not thinking of --
5  I'm not stating anywhere that market share is one of the
6  relevant attributes that I need to have.
7          Now, that said, if you wanted to push back, or
8  somebody wanted to challenge my opinion and say look,
9  you've cited 18 other vendors, and these 18 other
10  vendors are basically defunct companies, and they only
11  operate in Antarctica, and they only have three
12  customers each, and the vast majority of these other
13  players that you've ignored comprise 80 percent of the
14  market, I would think that's a significant challenge to
15  my opinions.  But the fact is, the story runs in
16  reverse, that I considered all the major players in my
17  analysis.  And even though I don't list it explicitly as
18  one of the criteria that I used, I think it's an
19  important criterion.
20  BY MR. HOLMES:
21      Q.  You would agree with me though that Juniper is
22  a major player, right?
23          MR. WONG:  Objection, vague.
24      A.  The company, yes, absolutely.
25  ///

Page 207

1  BY MR. HOLMES:
2      Q.  And in your Appendix where you analyzed various
3  vendors' adoption of command abstractions, as you put
4  it, you didn't analyze Junos in those tables, did you?
5      A.  I actually did, and there's an Appendix called
6  "H.JU" I think, or something like that.
7      Q.  For Junos, not Junos E?
8      A.  No, I mean Junos E when I say Junos in that
9  context.
10      Q.  So you're talking about Junos E, not Junos?
11      A.  Yes, sir.
12      Q.  Okay, so did you analyze Junos?
13      A.  You mean series M that's distinct from series E
14  that has this other flavor of CLI?
15      Q.  That's correct.
16      A.  I did not include that series of products from
17  Juniper in my analysis in the appendices.
18      Q.  And you're aware that Junos E is a defunct
19  product, right?
20          MR. WONG:  Objection, vague.
21      A.  I'm not aware of that.  But if you represent
22  that to me, I could imagine it.
23  BY MR. HOLMES:
24      Q.  Did you check, prior to submitting your
25  reports, to see whether or not all of the vendors that

Page 208

1  you analyzed were still offering the products that you
2  looked at?
3      A.  I know for a fact that some of them are gone.
4  Procket has been absorbed into Cisco.  NextTop was
5  acquired by Arista.  Some of these companies don't exist
6  any more or have been acquired or merged.
7      Q.  So you did consider vendor CLIs that are no
8  longer on the market, correct?
9      A.  Yeah, I wasn't trying to give a snapshot of the
10  world as it stands in 2016.  I was trying to show
11  widespread adoption by numerous vendors over the last 30
12  or so years of this industry standard CLI.
13      Q.  Going back to the question that I think started
14  us off on this train, which is, if it's true that your
15  analysis was based on analyzing only one-half of the
16  market, would that change your opinions in any way?
17          MR. WONG:  I think it was asked and answered.
18      A.  When you say "one-half of the market," I take
19  into account market share in that question.
20  BY MR. HOLMES:
21      Q.  Okay, let me clarify my question then.
22          If it's true that your analysis was based on
23  analyzing only one-half of the vendors who offer
24  switching products in the market, would that change your
25  opinions in any way?

Page 209

1      A.  No --
2          MR. WONG:  Objection --
3      A.  -- not if there were 40 minor players that
4  comprise less than one percent of the market, it
5  wouldn't change my opinions at all.
6  BY MR. HOLMES:
7      Q.  And would your answer be the same if you had
8  only analyzed one quarter of the vendors who offer
9  switching products in the market?
10          MR. WONG:  Same objection, incomplete
11  hypothetical.
12      A.  If that one quarter were 20 other companies and
13  those comprised a sum total of 80 percent of the
14  non Cisco market, I would still stand by my opinions.
15  BY MR. HOLMES:
16      Q.  What about if that number you analyzed was only
17  five percent of the market, would your opinions be the
18  same?
19          MR. WONG:  Same objections.
20      A.  As long as whatever percentage of the market by
21  vendor count, not by market share, was 18 companies that
22  comprise the vast majority of non Cisco market share, I
23  wouldn't care if there were a thousand other vendors
24  that had one customer each, it wouldn't matter.
25  ///

Page 210

1  BY MR. HOLMES:
2      Q.  How do you factor in market share when you've
3  just testified that a number of the vendor CLIs you
4  analyzed are no longer even on the market?
5      A.  Well, as I stated before, the way that I made
6  up my list, the first cut was based on market share.  I
7  thought of Juniper, Brocade, Arista, other major
8  players.  Then that list was supplemented because I
9  learned about relevant actors, often who are now
10  defunct, from deposition testimony and other evidence in
11  the case that I threw into the mix, but I wasn't trying
12  to say NextTop and Juniper are somehow at the same level
13  of importance in the market.  That would be ridiculous.
14      Q.  And were there any -- when you were performing
15  your analysis, were there any vendors that you
16  intentionally excluded?
17      A.  Junos, not E, was purposely not listed.
18  Huawei, which I'm clearly aware of, 3Com which I'm
19  clearly aware of because they're talked about, they
20  aren't on the list because I know that they have a
21  virtually zero command overlap because they deliberately
22  rename their commands.  So in the cases where there were
23  significant players, where it would be a waste of time
24  to do the analysis, I didn't do the analysis.
25      Q.  Can you think of any other vendors as you sit

Page 211

1  here right now that you thought would be a waste of time
2  to do the analysis on?
3      A.  Certainly vendors that don't have a CLI,
4  Linksys which is now part of Cisco, DLink -- no, I'm
5  sorry, I do DLink for their switches, not their wireless
6  routers, anything that's a networking switch or router
7  that doesn't have a CLI also I omitted.
8      Q.  Do you know how many companies fall under that
9  category?
10      A.  Under which category?
11      Q.  The category of vendors who offer networking
12  switches or routers who do not have a CLI?
13      A.  I can think of maybe five off the top of my
14  head.  There are a lot of small players in that market.
15  It's kind of a commodity Wal-Mart type market, so a lot
16  of Chinese players.  I couldn't tell you an exact
17  number, but there are a number of them.
18      Q.  What are the five that you can think of?
19      A.  Buffalo, Linksys, although I guess I should
20  exclude it because it's part of Cisco now, TPlink, I
21  guess I can only think of those; I don't know how
22  many -- was that three?  I guess I can only think of
23  three right now -- oh, and Aerohive, right.  I think
24  they were on the list as well.
25  ///

Page 212

1  BY MR. HOLMES:
2      Q.  What type of CLI did they have?
3      A.  I think they had -- well, it was in Korean, but
4  from the pictures, I think it was -- they were showing a
5  GUI with -- so I got the impression they don't have a
6  CLI, but I could be wrong.  I don't speak Korean.
7  BY MR. HOLMES:
8      Q.  I believe you testified earlier that you, over
9  the past 48, 72 hours, went and looked up on Wikipedia a
10  list of routing and switching vendors, is that right?
11      A.  Yes.
12      Q.  Did you go investigate the vendors on that list
13  that you had not included in your report, other than the
14  names of the vendors you've already mentioned to me?
15      A.  The vast majority are in my report.  I did --
16  some of them were in red in Wikipedia, which means
17  there's no link, so I couldn't click on it, although I
18  could still do a Google search, but they were so obscure
19  that nothing came up.  But I did not do a disciplined
20  careful principled analysis of each of them.  I didn't
21  have that much time, as you might imagine.  I did
22  spot-check a couple, spot-check a couple of them as I
23  mentioned, but I wouldn't claim to have looked at
24  everything.
25      Q.  I want to turn back to paragraph 180, please.

Page 213

1  The second sentence of paragraph 180 starts with "based
2  on my analysis"; do you see that?
3      A.  I do.
4      Q.  "Based on my analysis of user documentation
5  from many third-party networking equipment vendors,"
6  then you provide your findings, right?
7      A.  Yes.
8      Q.  Other than user documentation, did you look at
9  any other vendor materials when performing your analysis
10  as discussed in paragraph 180?
11      MR. WONG:  Objection, vague.
12      A.  I certainly considered reams of documents that
13  pertained to other vendors beyond just user manuals.  In
14  the case of Dell, there's a video that puts their CLI
15  side by side with Cisco.  But as far as coming up with
16  the numbers that are enumerated in paragraph 180, those
17  are taken out of the appendices, and those appendices
18  are generated by examining user manuals.
19  BY MR. HOLMES:
20      Q.  Did you interact with any network devices from
21  any of these vendors in order to confirm your findings
22  in paragraph 180?
23      MR. WONG:  Objection, compound.
24      A.  I have in the past.  But in the timeframe in
25  which I was doing this analysis, I had access only to

Page 214

1   manuals.  I didn't have access to either an actual
2   physical device or a simulator or virtual machine.  I
3   tried to get it for Dell, I wasn't successful.  And so I
4   only used manuals for the software tools that I wrote to
5   analyze these vendors' CLI command sets.
6   BY MR. HOLMES:
7       Q.   Did you inspect any source code to confirm your
8   findings that are listed here in paragraph 180?
9       A.   I'm making sure that the Stanford code isn't
10  listed because that's source code I view.  No source
11  code on any of these vendors did I view.
12      Q.   Did you interview any of the -- any
13  representatives from any of these companies to confirm
14  your findings?
15      A.   I mean I didn't talk to anyone, so I relied
16  certainly on their testimony as memorialized in the
17  transcripts of their depos and materials produced and so
18  forth, but I didn't directly interview anybody from any
19  of these companies.
20      Q.   You mentioned that you wrote software tools to
21  analyze the vendor CLIs, is that right?
22      A.   Well, to be more precise, I wrote software
23  tools to analyze the manuals that are associated with
24  the vendor CLIs.
25      Q.   Okay, can you walk me through what those tools

Page 215

1   were.
2       A.   Sure.  So some of these manuals were produced
3   as .TXT files, which means they're just raw ASCII, no
4   dressing around them.  Many of them were PDF which I'm
5   sure you're familiar with.  So to avoid the impossible
6   task of manually cutting and pasting out of a PDF, I
7   used what's called a scraping tool.  And the point of
8   that tool is to process the PDF, and I won't belabor you
9   with all of the details about how PDF documents are put
10  together.  But they're essentially boxes that float
11  inside the document, some of which contain layout
12  information, font information, and some have text.  And
13  I was interested in the actual text within those
14  documents.
15           And so I used a tool, it's called "PDF to TXT,"
16  I think I name it somewhere in my report, that has some
17  parameters that say things about the tolerances of these
18  boxes, when to join, when to split and so forth that let
19  me extract all of the text, not just the CLI command
20  expressions that are expressions in this context, along
21  with all of the other text in the documentation into a
22  .TXT file.  That was the first step.  So in short, pull
23  the text out of the PDF file, get it into another file.
24           Then after that, I wanted to take the command
25  expressions and get them all on one line.  Now some of

Page 216

1   these things, and I have some examples, span 20 lines
2   because they're so complicated, so many options and
3   switches and parameters, they don't fit on a single line
4   of text, and I wanted to collect them up into a single
5   line.  So I wrote a script in Python that went through
6   and tried to figure out where these command expressions
7   live within this text file and how to reconstitute them
8   from a multi-line expression into a single line, and
9   then spit them out into a second text file which is a
10  collection of all command expressions.
11           Once I had those collected together, I then ran
12  another script that I wrote that takes each of the
13  command expressions and interpolates them into all
14  possible valid commands, things you could actually type
15  into a CLI.  It would be accepted as valid versus
16  generating an error.  And this would mean something like
17  when my program would see "show IP interface [brief],"
18  it would spit out two things, show IP interfaces, and
19  then a second line, show interfaces brief.  So with and
20  without that option included.
21           So obviously this would expand the number of
22  command expressions and become a larger file of actual
23  issuable commands.  And I would do that for every
24  manual, do that for all the Cisco manuals and all the
25  Dell manuals.  Then I would do a head-to-head comparison

Page 217

1   looking for commonality between the two.  And that was
2   the basis for what you see in Appendix I in my analysis.
3       Q.   And when you say "head-to-head comparison
4   looking for commonality," what criteria did you use to
5   determine that?
6       A.   I use the simple criterion that two strings are
7   equal if they have the same characters in the same
8   order.
9       Q.   Is there anything else you considered when
10  determining if two different commands were similar or
11  not?
12      A.   I wasn't doing similar, I was doing equal.
13  Equal is pretty much black and white.
14      Q.   So, identical to one another?
15      A.   Correct.
16      Q.   And if a command was similar but not identical,
17  would that have been counted in paragraph 180 as being a
18  match?
19      A.   I'm sorry, I'm explaining just part of what I
20  did which was in the Dell analysis in Appendix I.
21  Paragraph 180 also talks about some of the manual work
22  that went into -- give me a second, I'm sorry -- I think
23  I just described to you, I'm sorry, how I generated
24  Appendix I.  This is actually a different part of my
25  report that used a different methodology, and I

Page 218

1   apologize if I just wasted some of our time.

2       Q.   No, no, that's fine.

3            So just for clarity, the methodology you just

4   explained is what you applied to create Appendix I?

5       A.   That's correct, and which is exclusively a Dell

6   analysis to Cisco.

7       Q.   Right, and that does not apply to the analysis

8   that you set forth in paragraph 180, is that correct?

9       A.   That's correct.  In paragraph 180, we're

10  talking about a manual search, both means, in other

11  words, by hand and in the manual, where I had to go and

12  identify by hand where each of the disputed CLI command

13  abstractions occur in one of the various manuals

14  produced.  And it was either there or not.  And I

15  annotate that in Appendix H for each of the vendors.

16      Q.   So you did that counting, that's reflected in

17  Appendix H, manually?

18      A.   That's correct.  I didn't use a program there.

19      Q.   And what criteria did you use to determine if

20  there was a match or not as between two different

21  command abstractions as you refer to them?

22      A.   So for some command abstractions, they are

23  valid issuable commands.  220 out of the 508 are

24  issuable and valid on their own.

25           If that appeared anywhere in the relevant

Page 219

1   manual or in a relevant manual where the syntactic

2   expression could be evaluated to generate the same exact

3   syntax as what was accused, I counted that as a match.

4   If there was no way to get the same syntax, I counted

5   that as a miss.  That was the methodology I applied.

6            Now, it's a little trickier in the case where

7   the accused command abstraction is not issuable, it's

8   not valid.  There are many cases, most of the cases in

9   Cisco's list where it's incomplete and you need more.

10  So let's take an example like "user SH key," let's say.

11  So that appears in the accused list.  User name, SSH

12  key.  When you actually issue that --

13           (Reporter clarification.)

14           THE WITNESS:  SSH key, which is spelled

15  S-S-H-K-E-Y.

16      A.   -- sorry.  The way that you actually would have

17  to enter that into a Cisco device is you would say user

18  name, space, then you would give a user name of your

19  choosing, space, SSH key, space, then an SSH key, which

20  is another user chosen parameter.

21           Now, when I look in the manual to see if a

22  vendor supports that, I'm going to obviously have to

23  apply my expertise in being able to read these

24  expressions and say do those two key words appear in

25  that order with some parameters or user-supplied values

Page 220

1   in between.  If they're present, then that's a match, if

2   not, it's a miss.

3       Q.   And that is the methodology that you applied

4   when formulating Appendix H?

5       A.   Yes.

6       Q.   Does that apply as well to Appendix G?

7       A.   Can I look at Appendix G?

8            MR. HOLMES:  Feel free.

9            MR. WONG:  You can look at whatever you

10  need to.

11  BY MR. HOLMES:

12      Q.   I note you used the words "command expression"

13  a few times.

14      A.   Right, and I do that deliberately.  So when I

15  say "expression," I mean the form of the command that

16  has the braces, bars, and brackets.  And it can be

17  evaluated by an expression evaluator.  When I refer to

18  "abstraction," I mean in the form where it's possibly a

19  subset of the full command, as Cisco lists it out in

20  508.  So I think I was careful to make that distinction.

21  BY MR. HOLMES:

22      Q.   Thank you.  Can you verify that the analysis

23  that is reflected in Appendix G was created using the

24  methodology that you just walked me through?

25      A.   Yes, that's correct.

Page 221

1            MR. HOLMES:  We've been going an hour.  Take a

2   break?

3            MR. WONG:  Sure.

4            THE VIDEOGRAPHER:  This marks the end of DVD 4

5   to the John Black deposition.  Counsel, the time is 3:46

6   p.m.  We're going off the record.

7   (Recess taken.)

8            THE VIDEOGRAPHER:  Counsel, we're now on the

9   record.  The time is 4:05 p.m.  This marks the beginning

10  of DVD 5 to the deposition of John Black.

11  BY MR. HOLMES:

12      Q.   Dr. Black, would you please turn to paragraph

13  192 in your Opening Report.

14      A.   192 you said?

15      Q.   Yes, sir, page 89, paragraph 192.

16      A.   I'm there.

17      Q.   Okay.  Now paragraph 192 says:

18           "With respect to the disputed CLI

19           command responses, as I discuss further

20           in this report, those asserted responses

21           consist of descriptive phrases regarding

22           switch features and functionality.  The

23           substance of the phrases derive from the

24           functionality of the device and industry

25           terminology used to define that

Page 250

1   is comprised of only a single command?
2       A.   No, I believe, and I think this is a change in
3   Cisco's contentions which is extremely common.  I
4   believe in his latest report he says there are now 11,
5   and he identifies only 11 words that start a variety of
6   commands.  And I don't think, to answer your question, I
7   don't think any of those represents a single command,
8   but I'd have to check to be sure.
9       Q.   Thank you.  Let's move on to Exhibit E --
10  (Discussion off the record.)
11           MR. HOLMES:  We can go off the record.
12           THE VIDEOGRAPHER:  The time is 4:49 p.m.  Off
13  the record.
14  (Recess taken.)
15           THE VIDEOGRAPHER:  The time is 4:50 p.m.  We're
16  now back on the record.
17  BY MR. HOLMES:
18       Q.   Okay, can you please tell me what Appendix E
19  is?
20       A.   Appendix E is an attempt to identify, from the
21  disputed commands, the two-level hierarchies.  And by
22  that, I mean taking now the first two words from every
23  one of the disputed 514 -- back then, that's what it
24  was -- programmatically remove them, remove the
25  duplicates, then put them in a list alongside whether

Page 251

1   they appeared in the relevant vendor manuals, just like
2   in Appendix F -- I'm sorry, in Appendix D.
3   BY MR. HOLMES:
4       Q.   What was the purpose of providing Appendix E?
5       A.   At the time I wrote this report, I believed
6   that Cisco was also contending that some of its
7   hierarchies could be two-word hierarchies.  And so I
8   thought it was important to analyze the overlaps in
9   light of that possible contention.  As I've noted,
10  Professor Almeroth has now identified only 11
11  single-word hierarchies I assume representing Cisco's
12  new contentions.
13       Q.   Okay, thank you.
14           Before we move on, did you manually do the
15  analysis and compile the data that's reflected in
16  Appendix E?
17       A.   Yes, it's not hard, given Appendix H, to simply
18  count them up.
19       Q.   Okay, thank you.
20           Appendix F, I think that's where we're going
21  with this.  So can you tell me what Appendix F is?
22       A.   Appendix F is basically just a count of what we
23  just looked at.
24       Q.   So this represents a -- fair to say it's a
25  summary of Appendix E?

Page 252

1       A.   It's a summary and sorted by the second column,
2   yes.
3       Q.   And did you compile this Appendix yourself?
4       A.   With a little help from Excel.
5       Q.   That's a program, not a person?
6       A.   That's correct.
7       Q.   Okay.  Let's move on to Appendix G please.  Can
8   you tell me what Appendix G is?
9       A.   This is a list of, I believe, back then, 514
10  command abstractions in the left column, and in the
11  right column the number of vendors for the vendors that
12  I looked at, not including Cisco, Arista, who support
13  the given command abstraction, and this one is sorted by
14  the right-hand column.
15       Q.   And is this a summary of the data you've
16  compiled in Exhibit H or Appendix H?
17       A.   Yes.
18       Q.   And you compiled this data yourself?
19       A.   Once again, using Excel, but yes.
20       Q.   Now, I'd like to direct your attention to
21  paragraph 191 of your Opening Report.  Keep Exhibit G
22  out on the side.
23       A.   Okay.
24       Q.   I'd like to discuss both with the other.
25       A.   Sure.

Page 253

1       Q.   Page 88.
2       A.   Okay.  What paragraph again, please?
3       Q.   191.
4       A.   191, I'm there.
5       Q.   Very bottom.  Paragraph 191 says:
6            "With respect to the disputed CLI
7            commands, I also provide a summary of the
8            most widely adopted CLI commands in
9            Appendix G."  Do you see that?
10      A.   I do see that.
11      Q.   So what did you mean by "widely adopted" in
12  this particular paragraph?
13      A.   I meant simply that if you can look to
14  Appendix G and take, for example, the first command
15  abstraction there listed, "IP address," which I will
16  note is not a complete command in this case, that we
17  have 17 other non Cisco, non Arista vendors who support
18  that command abstraction, and that just glancing down
19  this list, that we can go page after page and still find
20  at least six, seven, many cases ten or more other
21  vendors supporting that command abstraction.
22      Q.   Now, the commands that are listed here in
23  Appendix G -- this is not the complete set of the 508
24  asserted commands in this case, right?
25      A.   It would have been 514 back then, and I believe

Page 254

1    the total number -- I don't have it numbered.  I think
2    it's less, I'm pretty sure it's less, not all of them.
3        Q.  And why is that?
4        A.  Well, as you get to the back of the document,
5    we get down to one.  Then if I'd included the rest,
6    they'd be zero.
7        Q.  So if a -- if an asserted command abstraction,
8    to use that term, is not listed in Appendix G, is that
9    because there were zero vendors supporting that command,
10   not including Cisco and Arista?
11           MR. WONG:  Objection, vague.
12       A.  I wouldn't say there were zero vendors
13   supporting it, I would say there were zero vendors that
14   I was able to find in the manuals I had available to me.
15   Some cases, I only had one manual.  In the case of
16   Procket, some manuals were destroyed as you probably
17   know.  I didn't have every manual.  But for the manuals
18   I did have, I found zero in those cases, yes.
19   BY MR. HOLMES:
20       Q.  And in those cases where you found zero, would
21   you consider those commands to be part of the industry
22   standard CLI?
23           MR. WONG:  Objection, incomplete hypothetical.
24       A.  I'd like to look specifically at those commands
25   with that question in mind, but probably not.

Page 255

1    BY MR. HOLMES:
2        Q.  And what about the commands where you only have
3    one vendor listed here in the right-hand column of
4    Appendix G, would you still consider those commands to
5    be part of the industry standard CLI?
6            MR. WONG:  Objection, incomplete hypothetical.
7        A.  I wouldn't want to use just that metric to make
8    a determination.  Let me give you an example.  So
9    there's some commands that start with VRRP.  That's a
10   protocol that a lot of vendors don't support, right.
11   And so would I say simply because it's not supported
12   it's not part of the industry standard?  I don't know.
13   We're certainly in a gray area in that question.
14           As I testified to earlier, there's certain
15   commands, and I think we have plenty of examples in the
16   front of the document which are incontestably part of
17   the industry standard CLI, and I think there are also
18   commands that are incontestably not part of it because
19   they're specific to Arista, let's say.  You could argue
20   that these are in the gray area -- go ahead.
21       Q.  Sorry, I didn't mean to interrupt you.
22       A.  Please.
23       Q.  At what point in Appendix G do I get out of the
24   "gray area," using your terminology?
25       A.  I don't draw a line here saying everything

Page 256

1    above the line is in or out.  I wouldn't want to use
2    that as the metric.  Appendix G is not trying to
3    establish which commands are in and out of the industry
4    standard, it's trying to establish the fact that no
5    reasonable person could look at this and say there is no
6    industry standard, there's no widespread adoption, every
7    command is a complete rarity.  That would be
8    inconsistent with what's sitting on this document in
9    front of me.
10       Q.  But would you tell somebody that a command only
11   being used by Cisco, Arista, and one other vendor is an
12   industry standard command?  Is that your testimony?
13       A.  Once again, for a given command, I couldn't
14   tell you whether a command is part of or not unless it's
15   something that is clearly widely adopted by lots and
16   lots of vendors, as many, many of these are.  If you can
17   point me to a specific command and ask me, I probably
18   won't be able to answer.
19       Q.  How do I know if it's clearly widely adopted by
20   lots and lots of vendors?  Based on the objective data
21   that you've got here, can you tell me how I know when
22   I'm in the standard or outside the standard based on
23   your definition that you just provided?
24       A.  I mean people in my cohort, my friends, people
25   in the networking industry, they would all look at this

Page 257

1    paper, and I would say, is there widespread adoption?  I
2    mean we've got 17, 16, 15 different vendors all using
3    the same thing, if you're willing to grant me command
4    abstractions at least, similar CLI commands, do you
5    think that that command is in widespread common use?
6    None of my friends or colleagues are going to go no,
7    it's a complete rarity, there's no such thing as a
8    common widespread usage of any of these commands.  I
9    think that would be an unreasonable thing for them to
10   say and I don't think any reasonable mind could say
11   that.
12       Q.  Do you think any reasonable mind could say that
13   a command where you've only found one other vendor using
14   it is part of an industry standard though?
15       A.  I mean, I've already admitted there definitely
16   is room for disagreement in some of these less
17   widely-used command abstractions.  I'm not contesting
18   that there's a gray area at some point.  All I'm saying
19   is that it's plainly evident there are commands, and a
20   lot of them, that are used by a huge variety of vendors.
21       Q.  There's no cut-off here in Appendix G where you
22   say above seven is widely used, and below seven is not
23   widely used?
24       A.  There is no cut-off, nor would I think that
25   that would be an appropriate way to delineate the set.

Page 286

1        THE REPORTER:  Transcript order:  Is there an
2   expedite or rough, anything?
3        MR. HOLMES:  The rough, yes.  Otherwise, no.
4        MR. WONG:  I think that's right.  Same here.
5        THE REPORTER:  Thank you, counsel.
6                      -oOo-
7        THE VIDEOGRAPHER:  All right, this marks the
8   end of DVD 5 of 5 and concludes today's deposition of
9   John Black.  The time is 5:46 p.m.  We're going off the
10  record.  Thank you, counsel.
11       (Deposition adjourned at 5:46 p.m.)
12                    -oOo-
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 287

1              CERTIFICATE OF DEPONENT
2
3        I, the undersigned, declare, under the penalty
4   of perjury, that I have read the foregoing transcript,
5   and I have made any corrections, additions, or deletions
6   as I deemed necessary.  The foregoing is a true and
7   correct transcript of my testimony contained therein.
8
9   Dated:  _____  Signed at: _____
                                     (City, State)
10
11
12       BY:_____
              JOHN R. BLACK, Ph.D.
13
14
15
16
17
18
19
20
21
22
23
24
25  ///

Page 288

1              CERTIFICATE OF REPORTER
2
3   STATE OF CALIFORNIA      )
4                            )  ss:
    COUNTY OF SAN FRANCISCO  )
5
6
7        I, Deborah Mayer, a Certified Shorthand
    Reporter duly licensed and qualified in and for the
8   State of California, do hereby certify that there came
    before me on Thursday, June 30, 2016, at 50 California
9   Street, 21st Floor, San Francisco, California, 94111,
    the following named person:
10
11       JOHN R. BLACK, Ph.D.,
12  who was duly sworn to testify to the truth, the whole
    truth, and nothing but the truth of knowledge concerning
13  the matters in controversy in this proceeding, who was
    thereupon examined under oath, whose examination was
14  reduced to typewriting under my supervision, and that
    this deposition is a true record of the testimony given
15  by said witness.
16       I further certify, pursuant to FRCP 19
    Rule 30(e)(1), that the signature of the deponent:
17
         _X_ was requested by the deponent or a party
18  before the completion of the deposition;
19       ___ was not requested by the deponent or a
    party before the completion of the deposition.
20
         I further certify that I am neither attorney or
21  counsel for, nor related to, nor employed by any of the
    parties to the action in which this deposition is taken,
22  and that I am not a relative or employee of any attorney
    or counsel employed by the parties hereto, nor financially
23  interested in this matter.
24  ss:                      _____
                             DEBORAH MAYER, RPR CRR CRP CLR
25                           CALIFORNIA CSR 9654

Page 289

1   U.S. LEGAL SUPPORT, INC.
    44 Montgomery Street, Suite 550
2   San Francisco, California  94104
    (415) 362-4346
3
4   To:  JOHN R. BLACK, Ph.D.
5   c/o  RYAN K.M. WONG, ESQ.
    KECKER & VAN NEST
6   633 Battery Street
    San Francisco, CA  94111
7
8   Re:  CISCO SYSTEMS, INC. v. ARISTA NETWORKS, INC.
9
10  Dear Dr. Black:
11  Please be advised that the original transcript of your
    deposition in the above-entitled matter is available for
12  reading and signing.  The transcript will be held in our
    office and made available for your review for 30 days.
13
    If it is more convenient for you to read a copy of the
14  transcript, please notify our office by letter, sent by
    certified or registered mail, of any changes made.
15  In the event you do not sign your deposition transcript
16  within thirty (30) days of receipt of this letter, your
    testimony may be used with the full force and effect as
17  though it had been read, corrected, and signed.
18  If you are represented by counsel in this matter, you
    may wish to ask your attorney how to proceed.  If you
19  are not represented by counsel and wish to review your
    transcript, please contact our office to arrange an
20  appointment to review your deposition.
21  Thank you for your cooperation in this matter.
22  Sincerely,
23
    Deborah Mayer, California CSR 9654
24  for U.S. LEGAL SUPPORT, INC.
    cc:   All Counsel
25        File