# ATTACHMENT 32

CONFIDENTIAL INFORMATION UNDER THE PROTECTIVE ORDER

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5   CISCO SYSTEMS,      )

6   INC.,               )

7       Plaintiff,      )

8           vs.         ) No. 5:14-cv-05344-BlF (PSG)

9   ARISTA NETWORKS,    )

10  INC.,               )

11      Defendant.      )

12  _____

13   CONFIDENTIAL INFORMATION UNDER THE PROTECTIVE ORDER

14

15      VIDEOTAPED DEPOSITION OF ANTHONY J. LI

16              Palo Alto, CA

17          Monday, February 1, 2016

18                Volume I

19

20

21  Reported by: SUSAN F. MAGEE, RPR, CCRR, CLR

22  CSR No. 11661

23  JOB No. 2224600

24

25  PAGES 1-258

                                    Page 1

1    A. 1990.

2    Q. And the USC you're referring to, that's the

3 University of Southern California; correct?

4    A. Correct.

5    Q. Do you have any other degrees besides the    09:19:58

6 bachelor's degree and your Ph.D.?

7    A. No.

8    Q. Your LinkedIn profile marked as Exhibit 136

9 states that you attended Rutgers University; is that

10 correct?                    09:20:20

11    A. I spent one year at Rutgers. Did not get a

12 degree there.

13    Q. Was your focus at the University of

14 Southern California on anything in particular?

15    A. I was working on a Ph.D. in computer    09:20:31

16 science in the programming languages area.

17    Q. What programming languages were you working

18 on.

19    A. So it was not a specific language. It was

20 in language theory, and in particular I was working    09:20:47

21 on compiler specifications.

22    Q. What routing protocols, if any, did you

23 learn about as part of obtaining your Ph.D. at USC?

24    A. None; however, as a postdoc at USC, I

25 actually worked on IDPR, Inter-Domain Policy    09:21:13

                                    Page 14

1 Routing.

2    Q. Inter-Domain Policy Routing?

3    A. Correct. Also, while I was assist admin at

4 USC, I was a network administrator, so I had

5 familiarity there with EGP and IGRP.    09:21:41

6    Q. What is EGP?

7    A. Exterior Gateway Protocol.

8    Q. And what is IGRP?

9    A. Interior Gateway Routing Protocol.

10    Q. You mentioned IDPR as part of your postdoc    09:22:06

11 work; correct?

12    A. Correct.

13    Q. Can you describe for me how you worked with

14 IDPR in your postdoc work at USC.

15    A. So I was working for Deborah Estrin, and    09:22:24

16 she was collaborating with Martha Steenstrup of

17 Bolt, Beranek & Newman in Boston. They was a --

18 they had some sort of research contract to develop a

19 routing protocol that supported policy routing.

20    Q. Was IDPR a proprietary standard?    09:22:43

21    A. I have no idea.

22    Q. You said you worked at -- you worked on EGP

23 while as a sys admin at USC; is that correct?

24    A. That's correct.

25    Q. What is EGP?    09:23:07

                                    Page 15

1    A. EGP is a routing protocol that allows

2 individual hosts to advertise routing prefixes to

3 the gateways of the then ARPANET or MILNET.

4    Q. Is EGP a standardized routing protocol?

5    A. Yes, it is.    09:23:29

6    Q. How do you know that?

7    A. I've read the RFC.

8    Q. What is an RFC, Mr. Li?

9    A. It as a Request For Comments that is a

10 document from the Internet Engineering Task Force,    09:23:41

11 IETF, that they use for standardizing protocols.

12 I'm unaware of the exact standards placement of --

13 or progression of EGP at this time. It's probably

14 moved to historic by now.

15    Q. When you say it's "moved to historic by    09:24:01

16 now," what do you mean by that?

17    A. So the IETF has a progression for

18 standards, and standards that are no longer actively

19 used or recommended are moved to historic to

20 indicate that they are no longer productive.    09:24:19

21    Q. You also mentioned IGRP. Can you describe

22 to me what IGRP is.

23    A. IGRP is Cisco's proprietary classful

24 protocol.

25    Q. When you say Cisco proprietary, what do you    09:24:40

                                    Page 16

1 mean by that?

2    A. Cisco owns the code, has a patent on the --

3 or on the concepts behind the implementation, and as

4 far as I know, has not licensed it with the

5 exception of licensing their whole source code    09:24:58

6 stack.

7    Q. How did you work with EGP while you were a

8 sys admin?

9    A. So I was responsible for maintaining EGP

10 connectivity between USC's site and the ARPANET core    09:25:11

11 gateways.

12    Q. And what was your experience as a sys admin

13 working with IGRP?

14    A. I was maintaining the Los Nettos Network

15 which was a small regional network in Los Angeles.    09:25:24

16 We used IGRP for routing between the sites and our

17 small network.

18    Q. And what period of time were you a sys

19 admin for USC?

20    A. Approximately 1983 through 1990.    09:25:36

21    Q. Besides IDPR, EGP and IGRP, did you work

22 with any other routing protocols while you were

23 either obtaining your Ph.D. or serving as a postdoc?

24    A. Probably. So I do not recall the details,

25 but I do know that we had also a DECnet network, and    09:26:12

                                    Page 17

CONFIDENTIAL INFORMATION UNDER THE PROTECTIVE ORDER

1 I believe that DECnet routing was involved, and that
2 is a -- uses an internal routing protocol that is
3 very simple -- similar to RIP.
4   Q. Now, you said DECnet.  What is DECnet?
5   A. DECnet was a proprietary networking stack   09:26:36
6 from Digital Equipment Corporation.
7   Q. So the DEC in DECnet stands for
8 Digital Equipment Corporation?
9   A. Yes.
10  Q. When you say "we also had a DECnet   09:26:56
11 network," who is "we"?
12  A. I was referring to my employers at USC, in
13 particular engineering computer services which then
14 became university computing services.
15  Q. What experience did you have working with   09:27:20
16 the DECnet network at USC?
17  A. Mostly it was frustrating.  The DECnet
18 network was interconnecting the router -- the
19 various hosts around the campus, allowing students
20 and faculty to move data around between the various   09:27:36
21 computers.
22  Q. What was the operating system like on the
23 DECnet network?
24  A. So we had multiple systems speaking DECnet.
25 There were many VAXes running the VMS operating   09:27:54

Page 18

1 system.  We also had several systems running
2 TOPS-20.
3   Q. You said VAX/VMS.  Does that stand for
4 anything?
5   A. VAX is virtual address extension.  VMS is   09:28:15
6 virtual memory system.
7   Q. How much experience did you have working
8 with the VAX/VMS operating system?
9   A. I was a system administrator for several
10 years while at USC.   09:28:36
11  Q. And how many years of experience did you
12 have working with the TOPS-20 operating system?
13  A. I was only a user of TOPS-20.  I got my
14 first TOPS-20 account in 1982.  I probably used
15 that -- well, at least eight years, so . . .   09:29:03
16  Q. So as a user, you used TOPS-20 for
17 approximately eight years?
18  A. Yes.
19  Q. And approximately how many years did you
20 work as a system administer [sic] for the VAX/VMS   09:29:17
21 operating system?
22  A. I'm not certain.  I believe it was
23 approximately 1983 through about 1987.
24  Q. Mr. Li, do you know what a command line
25 interface is?   09:29:40

Page 19

1   A. I do.
2   Q. What is a command line interface?
3   A. A command line interface is a means for a
4 user to enter commands typing out names of words and
5 then interacting with a computer by having the   09:29:50
6 computer respond to those words.
7   Q. If I use the term "CLI," will you
8 understand that I'm referring to a command line
9 interface?
10  A. I understand.   09:30:06
11  Q. Did the VAX/VMS operating system have a
12 command line interface?
13  A. It did.
14  Q. Can you describe for me generally how the
15 VAX/VMS command line interface worked.   09:30:17
16  A. It was a very standard command-and-response
17 interface.  Predominant were set and show.  Change
18 parameters and then display parameters.
19  Q. When you say "very standard
20 command-and-response interface," what do you mean by   09:30:39
21 "very standard"?
22  A. So very similar to other things in the
23 industry.
24  Q. At that time?
25  A. Yes.   09:30:50

Page 20

1   Q. And approximately what time period are we
2 talking about, Mr. Li?
3   A. The first time I saw VMS was '81.
4   Q. You mentioned that set and show commands
5 were predominant in VAX/VMS; correct?   09:31:13
6   A. Mm-hmm.
7   Q. Were there any other commands that you
8 recall from using the VAX/VMS command line
9 interface?
10  A. There were many other commands, and you   09:31:25
11 could easily extend it by adding additional commands
12 to it, so . . .
13  Q. How would you extend it by adding
14 additional commands to it?
15  A. So the entire operating system CLI was   09:31:39
16 built around what was called DCL, digital command
17 language.  You so actually write command definitions
18 and add those to the CLI.
19  Q. Were you familiar with digital command
20 language at the time?   09:32:00
21  A. Slightly.
22  Q. Did the show commands in VAX/VMS follow any
23 particular syntax?
24  A. Yes.  They typically were invoked by show
25 and then usually an object name and then a set of   09:32:16

Page 21

6 (Pages 18 - 21)

CONFIDENTIAL INFORMATION UNDER THE PROTECTIVE ORDER

1 parameters. The parameters were delineated by a
2 slash and then parameter name. Sometimes there was
3 a value attached with an equal sign and then a value
4 attached to a given parameter. The set commands
5 were pretty much the same way.          09:32:39
6     Q. Now, you said, "typically were invoked" was
7 part of your answer about how show commands worked.
8        Were there any exceptions to the syntax you
9 just described?
10    A. Well, that was very much a generalization,   09:32:58
11 so yes.
12    Q. What was the command syntax like for
13 TOPS-20?
14    A. TOPS-20 had a command syntax that was
15 somewhat similar to VMS. The notable difference was   09:33:22
16 that TOPS-20 allowed for a command completion, and
17 so you could use escape and tab and question mark
18 characters to interact directly with the command
19 line interpreter while you were typing a command
20 line.                                   09:33:42
21    Q. What type -- what time period are you
22 talking about here, Mr. Li?
23    A. I am unaware of when TOPS-20 first came
24 out.
25    Q. At what time period were you working with   09:33:54

Page 22

1 TOPS-20?
2     A. Again, I got my first TOPS-20 account in
3 1982.
4     Q. Okay. So these features you just
5 described, command completion, were those in TOPS-20   09:34:05
6 when you first got your account in 1982?
7     A. Yes.
8     Q. What is command completion?
9     A. Command completion is the ability for the
10 command line interpreter to infer from what the user   09:34:25
11 has typed as a partial command and then actually
12 have it type out the rest of the command for the
13 user.
14    Q. Can you give me an example of how command
15 completion would work in a TOPS-20 command line   09:34:41
16 interface.
17    A. Oh, dear. So not accurately.
18 Approximately, you would type a partial command. So
19 for example, if you were to type "SHO," S-H-O, and
20 then complete it, you would get the W and then a   09:34:58
21 space, so you could then enter a parameter.
22       MR. PAK: I'm going to object that this
23 calls for expert testimony. Speculation.
24       BY MR. WONG: Q. Mr. Li, did you use the
25 command -- did you use the command completion   09:35:17

Page 23

1 feature while you were working with TOPS-20?
2     A. Yes.
3     Q. Is the recollection you just described
4 based upon your hands-on experience with TOPS-20?
5     A. Yes, it is.                         09:35:27
6     Q. Now, you said TOPS-20 had a similar syntax
7 to VMS.
8        What was similar about the TOPS-20 command
9 syntax to the VAX/VMA command syntax?
10    A. Again, the general intent of -- or design   09:35:58
11 of the -- in the language was an imperative language
12 where they would design it as verb and then noun,
13 noun. So you would give the command as SHO and then
14 some parameters to go with it.
15       The details of the syntax were definitely   09:36:23
16 different. TOPS-20 in particular never used a slash
17 as a parameter separator.
18    Q. Now, you've used the word "parameter" to
19 describe the syntax for both VAX/VMS and TOPS-20?
20    A. Mm-hmm.                            09:36:46
21    Q. What do you mean by a parameter?
22    A. It's a qualifier or other conditional
23 information about the specific request.
24    Q. Can you give me an example of what would be
25 a command parameter?                      09:36:56

Page 24

1     A. For example, if the database of files had a
2 set of file names, you could give a directory
3 command which would show the files in the directory.
4 Then you could also give directory followed by a
5 parameter which would explain -- which would specify   09:37:17
6 some subset of the files that you would like to see.
7     Q. Besides VAX/VMS and TOPS-20, did you have
8 experience with any other command line interfaces?
9     A. Many.
10    Q. Okay. What other command line interfaces   09:37:43
11 do you have experience with, Mr. Li?
12    A. That could take a while. CPM, VMCMS.
13 Let's see. Concurrent CPM, MS-DOS, RSX-11M.
14 Probably many others.
15    Q. Which of those existed prior to 1985?   09:38:15
16    A. All of those.
17    Q. Did any of those exist prior to 1980?
18    A. Yes, very definitely. Let's see. UNIX
19 already existed. There was a CLI there. I believe
20 that CPM predates 1980.                    09:38:38
21    Q. And did you work directly with all of the
22 command line interfaces that you just recited?
23    A. Yes.
24    Q. In what capacity did you work with those
25 command line interfaces?                   09:39:02

Page 25

7 (Pages 22 - 25)

CONFIDENTIAL INFORMATION UNDER THE PROTECTIVE ORDER

1      BY MR. WONG:  Q.  You also worked at
2  Juniper; correct?
3      A.  Yes, I did.
4      Q.  What were the similarities or differences
5  between how Juniper would provide training to its      01:22:37
6  customers' engineers on how to use Juniper's command
7  line interface as compared to Cisco's approach?
8      A.  I was less involved in Juniper, but I
9  believe that they did largely the same thing.
10      Q.  What's the basis for that belief?      01:22:55
11      A.  That's what I saw going on in the hallways,
12  so . . .
13      Q.  Did Procket Networks provide training to
14  the engineers of its customers?
15      A.  Yes, very much so.  We did exactly the same  01:23:07
16  thing.  A lot of in-house training, a lot of
17  external documentation.
18      Q.  And in -- so at all three of those vendors
19  that you worked for, the customers would pay the
20  vendor either directly or indirectly to provide      01:23:28
21  training to their engineers; correct?
22      A.  Yes.
23      MR. PAK:  Objection.  Calls for
24  speculation.
25      BY MR. WONG:  Q.  And you know that because  01:23:36

Page 142

1  this e-mail.
2      A.  Okay.
3      Q.  Please take a moment to take a look at the
4  e-mail in Exhibit 144.
5      A.  Mm-hmm.      01:25:26
6      Q.  And the e-mail address on this e-mail, one
7  of the e-mails is tli@cisco.com.
8      Do you see that?
9      A.  Yes.
10      Q.  Is that your e-mail address?      01:25:36
11      A.  Yes.  Or was.
12      Q.  Was that --
13      A.  Was at the time, yes.
14      Q.  And who is Peter Lothberg?
15      A.  That's a complicated answer.  Peter was a  01:25:47
16  contractor.  As of 1992, I believe he was reporting
17  to the International Connection Manager Project that
18  was under contract to Sprint from NSF.

Page 144



Page 143

Page 145

37 (Pages 142 - 145)



Page 146

25      MR. PAK:  Objection.  Objection.  Vague.    01:32:59



CONFIDENTIAL INFORMATION UNDER THE PROTECTIVE ORDER

1 standards organization like IETF?

2    A.  I have never seen anyone do that.  I have

3 never seen Cisco have any UI patents; so I don't

4 understand.

5    Q.  Mr. Li, is there any other views or        04:15:36

6 opinions that you have with respect to this case

7 that you have not shared with us on the record that

8 you would like to share with us now?

9        MR. WONG:  Objection.  Vague.

10        THE WITNESS:  I don't understand your        04:15:55

11 question.

12        BY MR. PAK:  Q.  We talked about a lot of

13 different topics.  I'm giving you the opportunity to

14 provide any further testimony that you would like on

15 any of these topics if you'd like it.        04:16:05

16    A.  So I don't understand what intellectual

17 property people think there is in some CLI syntax.

18 The intellectual property is -- that's of

19 significance gets covered in patents.  If we thought

20 it was worth protecting, we would copyright it.  We   04:16:22

21 would patent it.

22        MR. WONG:  Object to the form of the

23 question.

24        BY MR. PAK:  Q.  Do you believe that

25 copyright is a form of intellectual property?        04:16:34

                                                Page 254

1        MR. WONG:  Objection.  Calls for opinion

2 testimony.

3        THE WITNESS:  It calls for legal testimony.

4 I don't understand.

5        BY MR. PAK:  Q.  What is your understanding  04:16:44

6 of copyright law?

7        MR. WONG:  Same objection.

8        THE WITNESS:  Vague as best.

9        BY MR. PAK:  Q.  I take it, sir, that you

10 haven't analyzed any copyright laws relating to        04:16:56

11 interface, APIs, user interfaces?

12    A.  I know that I'm supposed to put a copyright

13 notice in the top of every source code file.  That's

14 about all I know.

15    Q.  Okay.                        04:17:08

16    A.  I can't even tell you for certain what I'm

17 supposed to put in the top of the file because

18 nobody can tell me exactly how I should deal with

19 multiple years.

20        MR. PAK:  Thank you.  Sir, I think those        04:17:18

21 are the questions I have for you today.

22        MR. WONG:  I have no further questions.

23 ////

24

25

                                                Page 255

1        THE VIDEOGRAPHER:  Okay.  This marks the

2 end of DVD No. 4 in the deposition of Anthony Li.

3        Going off the record.  The time is 4:17.        04:17:29

4        (TIME NOTED:  4:17 p.m.)

5            --o0o--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                Page 256

1        I, ANTHONY J. LI, do hereby declare under

2 penalty of perjury that I have read the foregoing

3 transcript; that I have made any corrections as appear

4 noted, in ink, initialed by me, or attached hereto; that

5 my testimony as contained herein, as corrected, is true

6 and correct.

7        Executed this _____ day of _____,

8 2016, at _____, _____.

9            (city)        (state)

10

11

12

13

14        _____

15        ANTHONY J. LI

16        Volume I

17

18

19

20

21

22

23

24

25

                                                Page 257

                                                65 (Pages 254 - 257)

CONFIDENTIAL INFORMATION UNDER THE PROTECTIVE ORDER

1       I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
4       That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were administered an oath; that
8  a record of the proceedings was made by me using
9  machine shorthand which was thereafter transcribed
10  under my direction; that the foregoing transcript is
11  a true record of the testimony given.
12       Further, that if the foregoing pertains to
13  the original transcript of a deposition in a Federal
14  Case, before completion of the proceedings, review
15  of the transcript [X] was [ ] was not requested.
16       I further certify I am neither financially
17  interested in the action nor a relative or employee
18  of any attorney or any party to this action.
19       IN WITNESS WHEREOF, I have this date
20  subscribed my name.
21       Dated: February 3, 2016
22
23

24       Susan F. Magee
25       CSR No. 11661, RPR, CCRR, CLR

Page 258

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

CISCO SYSTEMS, INC.,       )
                           )
            Plaintiff,     )
                           ) Case No.
       vs.                 ) 5:14-cv-05344-BLF (PSG)
                           )
ARISTA NETWORKS, INC.,     )
                           )
            Defendant.     )
_____)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF KIRK LOUGHEED
Palo Alto, California
Friday, November 20, 2015
Volume I

Reported by:
CARLA SOARES
CSR No. 5908
Job No. 2187110
Pages 1 - 189

---

Page 2

1        UNITED STATES DISTRICT COURT
2       NORTHERN DISTRICT OF CALIFORNIA
3            SAN JOSE DIVISION
4
5   CISCO SYSTEMS, INC.,       )
                               )
6            Plaintiff,        )
                               ) Case No.
7          vs.                 ) 5:14-cv-05344-BLF (PSG)
                               )
8   ARISTA NETWORKS, INC.,     )
                               )
9            Defendant.        )
     _____)
10
11
12
13
14
15
16       VIDEOTAPED DEPOSITION OF KIRK LOUGHEED,
17   Volume I, taken on behalf of Defendant, at
18   650 Page Mill Road, Palo Alto, California, beginning
19   at 9:19 a.m., and ending at 6:15 p.m., on Friday,
20   November 20, 2015, before CARLA SOARES, Certified
21   Shorthand Reporter No. 5908.
22
23
24
25

---

Page 3

1   APPEARANCES:
2
3   For the Plaintiff and the Witness:
4        QUINN EMANUEL URQUHART & SULLIVAN, LLP
5        BY: JOHN (JAY) NEUKOM, Attorney at Law
6        50 California Street, 22nd Floor
7        San Francisco, California 94111
8        415.875.6341
9        johnneukom@quinnemanuel.com
10           and
11        KIRKLAND & ELLIS LLP
12        BY: JOSHUA L. SIMMONS, Attorney at Law
13        601 Lexington Avenue
14        New York, New York 10022
15        212-446-4989
16        joshua.simmons@kirkland.com
17
18
19
20
21
22
23
24
25

---

Page 4

1   APPEARANCES (Continued):
2
3   For the Defendant:
4        KEKER & VAN NEST LLP
5        BY: BRIAN L. FERRALL, Attorney at Law
6        BY: RYAN WONG, Attorney at Law
7        633 Battery Street
8        San Francisco, California 94111
9        415.391.5400
10       bferrall@kvn.com
11       rwong@kvn.com
12
13   ALSO PRESENT:  Sean Grant, Video Operator
14           --o0o--
15
16
17
18
19
20
21
22
23
24
25

Page 109

1    reveal -- basically mostly status commands and ones    14:27:53
2    for handling connections over the network to other
3    hosts, sort of a subset of the -- of the terminal
4    server commands.
5        Q  And you said you chose the term "EXEC,"    14:28:26
6    that's E-X-E-C; is that right?
7        A  Yes.
8        Q  You chose that term, yes?
9        A  Yes.
10       Q  How did you come up with that term?    14:28:39
11       A  Well, I had a number of possible ways of
12   describing it.  I could have used "shell" after
13   the -- modeling it along the UNIX way of -- UNIX
14   equivalent.
15       From -- I decided EXEC in sort of -- you    14:29:15
16   know, inspired by the TOPS-20 command processor.
17   You know, calling it the command processor would
18   have been another possibility.
19       There was a number of possibilities that I
20   could have called it, what I could have called that    14:29:38
21   particular part of the software, and I ended up
22   choosing EXEC.
23       Q  Now, were you responsible for determining
24   the prompt symbol on the interface?
25       I'm sorry.  Let me be clear.    14:30:26

Page 110

1        I'm talking about on the interface line,    14:30:28
2    there are symbols that precede the input point, such
3    as a hash sign, for example, right?
4        A  So for -- I was responsible for choosing
5    the prompts for the command line interface, for the    14:30:45
6    CLI.
7        Q  Okay.  And tell me what those prompts are,
8    the various prompts that the Cisco CLI uses.
9        A  There are many right now.  But at the time
10   there was the -- the unprivileged EXEC commands, and    14:31:09
11   that was the host name of the -- of the router or --
12   of the router, followed by a close angle bracket.
13       There was a privileged mode, and it
14   changed that prompt to a hash mark.
15       And in the initial implementation of    14:31:55
16   configuration mode, there was no prompt.
17       Q  Okay.  How did you choose the hash prompt
18   for the privileged mode?
19       A  It was visually large and different than
20   the -- different -- just different than the    14:32:25
21   unprivileged EXEC prompt.
22       Q  Okay.  How did you use the unprivileged
23   close angle bracket prompt?
24       A  I don't understand your question.
25       Q  Did you choose to use the close angle    14:32:59

Page 111

1    bracket prompt?    14:33:02
2        A  Router name, close angle bracket.
3        Q  Right.
4        A  Yes, I chose that.
5        Q  Okay.  How did you come to choose that?    14:33:09
6        A  Well, there were -- when you have multiple
7    devices on a network, one of the first things you
8    want to know if you're typing at something is to
9    what you are typing at.  So that -- sort of the most
10   aesthetic choice was the -- was the name of the    14:33:51
11   device.
12       And the angle bracket was a nice visual
13   way of terminating -- you know, here's where your
14   type-in begins.  Here's where the prompt ends,
15   here's where the type-in begins.    14:34:19
16       Q  Had you ever seen the angle bracket used
17   as a prompt in any other system?
18       A  I wasn't aware of any generally available
19   host -- general purpose timesharing host actually
20   that was the default, that was the prompt.    14:34:56
21       Q  I'm not sure what you mean by that.
22       But had you ever seen any system that used
23   a close angle bracket as a prompt?
24       A  No.  TOPS-20 used an "at" sign and UNIX
25   used a percent sign.    14:35:19

Page 112

1        Q  And you're not aware of any use of a hash    14:35:22
2    sign as a prompt?
3        A  Not to my recollection.
4        Q  You were familiar with UNIX in the mid
5    1980s, right?    14:36:18
6        A  As a user of UNIX.
7        Q  And -- by the way, are you familiar with
8    Linux?
9        A  Only as a user.
10       Q  When did you first become familiar with    14:36:38
11   Linux?
12       A  With Linux?  I think I first heard mention
13   of it in the late '90s.
14       Q  Did Cisco come up with the nomenclature of
15   calling a mode "privileged," to your knowledge?    14:38:02
16       A  I don't believe -- I don't believe Cisco
17   came up with that terminology.
18       Q  Let me turn to the current set of IOS CLI
19   commands.
20       I don't expect an exact number, but do you    14:38:54
21   know approximately how many IOS CLI commands there
22   are today?
23       A  I would have to guess.  It is a -- it's a
24   very large number.
25       Q  Can you just give me a ballpark?    14:39:15

Page 121

```
 1        THE VIDEO OPERATOR:  Going off the record,    14:58:06
 2    the time is 2:58 p.m.
 3        (Recess, 2:58 p.m. - 3:24 p.m.)
 4        THE VIDEO OPERATOR:  Back on the record.
 5    The time is 3:24 p.m.                    15:24:02
 6    BY MR. FERRALL:
 7        Q  Mr. Lougheed, when did you first become
 8    aware of DOS, D-O-S?
 9        A  I'd say whose DOS?
10        Q  MS-DOS.                            15:24:36
11        A  MS-DOS?  I probably heard about it when
12    IBM announced the IBM PC.
13        Q  Do you recall that MS-DOS uses a close
14    angle bracket as a prompt?
15        A  Now that you remind me, it does.    15:25:16
16        Q  Do you think you might have been inspired
17    by that prompt when you chose the close angle
18    bracket for Cisco's prompt?
19        A  No.  I was not a DOS user.
20        Q  So it's just a coincidence that you and  15:25:34
21    DOS came up with the same prompt, to your knowledge?
22        MR. NEUKOM:  Objection.  Asked and
23    answered.
24        THE WITNESS:  I was not a DOS user.  I
25    first -- I was not a DOS user.          15:26:06
```

Page 122

```
 1        MR. FERRALL:  Let's mark this as the next    15:26:35
 2    exhibit.
 3        (Exhibit 38 was marked for identification
 4         and is attached hereto.)
 5    BY MR. FERRALL:                          15:26:37
 6        Q  Exhibit 38 is a set of emails between you
 7    and Mr. Remaker, among others.  It bears control
 8    numbers CSI-ANI-00043306.
 9        A  Okay.  I'd like to read this.
10        Q  First let me ask you the question so you    15:27:19
11    know what to look for.
12        A  I will forget the question by the time I'm
13    done reading this.
14        Q  Well, Mr. Lougheed, that's not the way it
15    works, actually.  I ask the question and you answer    15:27:28
16    it.
17        A  Okay.
18        Q  If you can't answer it, then you tell me.
19        My only question is, did you send the
20    email that's at the top of Exhibit 38, the one at    15:27:38
21    12-11-2008 at 10:14 p.m.?
22        MR. NEUKOM:  Mischaracterizes the document
23    on its face.
24        And I know that Mr. Ferrall would like you
25    to feel comfortable to read the page-and-a-half    15:27:54
```

Page 123

```
 1    document that he's just put in front of you before    15:27:57
 2    answering his question.
 3        THE WITNESS:  Okay.  I'll read it.
 4        MR. FERRALL:  Actually, no, I would like
 5    him to answer the question.              15:28:03
 6        Q  Are you telling me you can't tell me
 7    whether you sent the email?
 8        MR. NEUKOM:  It's a totally unfair
 9    question.  The email that he sent would necessarily
10    include everything that follows.        15:28:10
11        If you want him to tell you whether he
12    remembers this or whether he sent it, let him read
13    the document.  Come on, Brian.
14        It's a page and a half.  We're not talking
15    about him wasting 30 minutes to read a product    15:28:20
16    manual.  It's a page-and-a-half email.  The witness
17    has said he wants to read it, and we're going to let
18    him read it.
19        THE WITNESS:  Okay.  I've read it.
20    BY MR. FERRALL:                          15:29:28
21        Q  Okay.  Did you send this email that's
22    dated December 11, 2008, at 10:14 p.m.?
23        A  I believe I did.
```

Page 185



16        A   There developed a need or a desire to
17   change some of the fundamental timing constants
18   of -- I think first was the IGRP routing protocol,
19   and I implemented a command that allowed those
20   timers to be user-configured.          18:12:59
21        And later on I or someone else extended
22   that to the RIP timers so customers could speed up
23   or slow down the pulse of routing updates.
24        Q   And when did that occur?
25        A   1988 or 1989.               18:13:36

Page 186

1        Q   How did you choose the term -- the words    18:13:39
2   "timers basic" for this function?
3        A   I don't remember where "basic" came from.
4   But using the keyword "timers" was my -- was my
5   introduction, was my creation.          18:14:00
6        MR. NEUKOM:  Counsel, I believe we're now
7   beyond seven hours.
8        MR. FERRALL:  Okay.  Well, I -- given
9   Mr. Lougheed's tenure at Cisco, I thank him for his
10   time, but I will say I think we deserve some more    18:14:22
11   time with him.
12        But I understand seven hours is up and
13   you're going to say enough is enough for today I
14   take it; is that right?
15        MR. NEUKOM:  Certainly for today for the    18:14:31
16   sake of the witness.  And we will respectfully
17   disagree with the idea that counsel needs more than
18   seven hours --
19        MR. FERRALL:  Okay.
20        MR. NEUKOM:  -- needs more than today.    18:14:41
21   But we can discuss that for another day.
22        In the meantime, I should note for the
23   record the witness reserves the right to review the
24   transcript and make corrections.
25        Brian, I'm not sure I did that for          18:14:51

Page 187

1        Mr. Tjong.  If you're okay with it, I'd like to just    18:14:53
2   do a stipulation across the case that both sides
3   have the 30-day review and errata right for all
4   transcripts regardless whether counsel puts it on
5   the record at the depo as a two-way street.          18:15:04
6        MR. FERRALL:  That's fine.  I thought it
7   existed as a matter of procedure anyway.  So that's
8   fine.
9        MR. NEUKOM:  I hope you're right, but glad
10   to have the stipulation, even if it's unnecessary.    18:15:17
11        MR. FERRALL:  Okay.
12        MR. NEUKOM:  Thanks very much.
13        THE VIDEO OPERATOR:  This concludes
14   today's videotaped deposition of Mr. Kirk Lougheed.
15   We're off the record at 6:15 p.m.  Thank you.    18:15:25
16        (TIME NOTED:  6:15 p.m.)
17                --o0o--
18
19
20
21
22
23
24
25

Page 188

1
2
3
4
5
6
7
8        I, KIRK LOUGHEED, do hereby declare under
9   penalty of perjury that I have read the foregoing
10   transcript; that I have made any corrections as
11   appear noted, in ink, initialed by me, or attached
12   hereto; that my testimony as contained herein, as
13   corrected, is true and correct.
14        EXECUTED this _____ day of _____,
15   2015, at _____, _____.
16        (City)          (State)
17
18
19
20        _____
21        KIRK LOUGHEED
22
23
24
25

Page 189

```
 1          I, the undersigned, a Certified Shorthand
 2   Reporter of the State of California, do hereby
 3   certify:
 4          That the foregoing proceedings were taken
 5   before me at the time and place herein set forth;
 6   that any witnesses in the foregoing proceedings,
 7   prior to testifying, were administered an oath; that
 8   a record of the proceedings was made by me using
 9   machine shorthand which was thereafter transcribed
10   under my direction; that the foregoing transcript is
11   a true record of the testimony given.
12          Further, that if the foregoing pertains to
13   the original transcript of a deposition in a Federal
14   Case, before completion of the proceedings, review
15   of the transcript [X] was [ ] was not requested.
16          I further certify I am neither financially
17   interested in the action nor a relative or employee
18   of any attorney or any party to this action.
19          IN WITNESS WHEREOF, I have this date
20   subscribed my name.
21
22   Dated: 11/25/2015
23
24          <%signature%>
25          CARLA SOARES
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

CISCO SYSTEMS, INC.      Case No.: 5:14-cv-05344-BLF(PSG)

5

                  Plaintiff,

6

     v.

7

ARISTA NETWORKS, INC.

8

                  Defendants.

9   _____

10

11

12

13     * HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY *

14        VIDEOTAPED DEPOSITION OF KIRK LOUGHEED

15              Palo Alto, California

16             Monday, April 4, 2016

17                   Volume 2

18

19

20

21   Reported by:

22   LESLIE JOHNSON

23   RPR, CSR No. 11451

24   Job No.: 2285024

25   PAGES 190 - 399

                                        Page 190

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 January 26, 1983.
2 BY MR. WONG:
3    Q.   So Mrs. Yates was the human resources
4 director for the Stanford electrical engineering
5 department as of January 1983, correct?
6    A.   Correct.
7    Q.   What was your understanding of what you
8 were signing when you signed the first page of
9 Exhibit 454?
10    A.   I believe my understanding at the time was
11 that if I came up with something patentable that
12 Stanford had the rights to it.
13    Q.   Turn to the next page of Exhibit 454,
14 please.
15         MR. NEUKOM:  And I'll object to that last
16 question as calling for a legal conclusion or
17 understanding.
18 BY MR. WONG:
19    Q.   Are you there?
20    A.   I'm on the next page.
21    Q.   Can you -- strike that.
22         What is the second page of Exhibit 454?
23    A.   It's titled personnel requisition, and it
24 is dated July 1st, 1980.
25    Q.   And is this personnel requisition for a

Page 211

1 particular job title?
2    A.   Yes.
3    Q.   Okay.  Do you know the purpose of this
4 document on the second page of Exhibit 454?
5    A.   It was a requisition form prepared by
6 Ralph Gorin to hire me as a systems programmer.
7    Q.   And as of July 1st, 1980, were you already
8 employed by Stanford?
9    A.   I believe so.
10    Q.   So was this personnel requisition relating
11 to a new job that you were trying to get at
12 Stanford?
13    A.   This was the personnel requisition for my
14 first job at Stanford.
15    Q.   Approximately two-thirds of the way down
16 on the second page of Exhibit 454, do you see a
17 section called "Qualifications"?
18    A.   Yes, I do.
19    Q.   And the first sentence underneath
20 "Qualifications" says "Previous TOPS-20 assembly
21 language program experience is essential."
22         Do you see that?
23    A.   Correct.
24    Q.   And you had, at the time of this document
25 in 1980, previous experience with the TOPS-20

Page 212

1 assembly language, correct?
2    A.   Correct.
3    Q.   And I note that this document appears to
4 show your social security number, Mr. Lougheed.  So
5 I think it would be appropriate, at least for this
6 document, to mark that as "Highly Confidential."
7    A.   I would extremely appreciate that.
8         MR. NEUKOM:  I think it already is, isn't
9 it?
10         MR. WONG:  It is, the transcript?
11         MR. NEUKOM:  Oh, this document, the
12 transcript.
13         MR. WONG:  Well, just to make sure that --
14 well, maybe not the transcript, but I think the
15 document should certainly be treated that way.
16         MR. NEUKOM:  So the document was produced
17 with a Bates stamp "Highly Confidential - Attorneys'
18 Eyes Only."
19         MR. WONG:  Oh, yes.
20         MR. NEUKOM:  But while we're at it, in an
21 excess of caution, on behalf of Mr. Lougheed and
22 also on behalf of Cisco, we will mark the
23 transcript, as Mr. Wong suggests, as "Highly
24 Confidential" and "Attorneys' Eyes Only."  And we
25 ask the court reporter and the videographer to

Page 213

1 please mark all copies accordingly.
2         MR. WONG:  Just so the record is clear,
3 I'm not suggesting that the entire transcript be
4 marked "Highly Confidential - Attorneys' Eyes Only."
5 My concern, of course, is with your personal private
6 information.
7         MR. NEUKOM:  I'm not going to hold it
8 against you as a blanket concession.  I think the
9 practice that we've gotten into, at least in some
10 depositions, is when we make a designation, we make
11 the designation apply to the whole transcript and
12 then have a reasonable conversation thereafter about
13 dedesignations.
14         MR. WONG:  Sure.
15 BY MR. WONG:
16    Q.   Mr. Lougheed, can you turn to the page of
17 Exhibit 454 where the control number at the bottom
18 ends in 875.
19         Are you there?
20    A.   I'm there.
21    Q.   And what is the document that ends in
22 control number 875?
23    A.   A copy of my résumé.
24    Q.   Okay.  And it's a copy of a résumé as of
25 December 1st, 1982, correct?

Page 214

7 (Pages 211 - 214)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   That's correct.
2    Q.   And is the information in this copy of
3  your résumé dated December 1st, 1982 accurate, to
4  the best of your knowledge?
5    A.   To the best of my knowledge, yes.
6    Q.   Can you take a second to skim the contents
7  and let me know if you see anything in there that is
8  erroneous.
9    A.   Okay.  I have -- I have examined it.
10    Q.   And did you see anything in the résumé,
11  dated December 1st, 1982, in Exhibit 454 that needs
12  to be corrected for the record?
13    A.   No.
14    Q.   The résumé we're looking at in Exhibit 454
15  mentions DECSYSTEM-2060 computers.
16        Do you see that?
17    A.   Yes.
18    Q.   In your prior deposition, Mr. Lougheed,
19  you referenced working on DECSYSTEM-20 systems while
20  you were employed at Stanford.
21        Do you remember that?
22    A.   Yes.
23    Q.   Just so the record is clear, are the
24  DECSYSTEM-20 systems the same thing as the
25  DECSYSTEM-2060 computers that are referenced in the

Page 215

1  December 1st, 1982 résumé in Exhibit 454?
2    A.   They are -- they're the same thing.
3  They're different model numbers of what is
4  essentially the same machine.
5    Q.   Thank you.  If you turn to the page ending
6  in control numbers 877 in Exhibit 454.
7    A.   Yes.
8    Q.   This is another personnel requisition,
9  correct?
10    A.   It looks to be so, yes.
11    Q.   What is the difference between this
12  personnel requisition on the page ending in control
13  numbers 877 and the one that we were looking at
14  earlier on page ending with 873?
15        MR. NEUKOM:  Objection.  The document
16  speaks for itself.
17        THE WITNESS:  The first was a personnel
18  requisition for the Stanford low overhead
19  time-sharing facility.  This is a personnel
20  requisition for the electrical engineering
21  department's computer facilities.
22  BY MR. WONG:
23    Q.   And the electrical engineering
24  department's computer facilities department, is that
25  the same thing as EE-CF?

Page 216

1    A.   Yes.
2    Q.   And under "Qualifications" about
3  two-thirds of the way down on the page ending in
4  control numbers 877 on Exhibit 454, do you see the
5  section titled "Qualifications"?
6    A.   Yes, I do.
7    Q.   And below that it says "Prior experience
8  in the details of the DECSYSTEM-20 computer system
9  and its operation is mandatory."
10        Do you see that?
11    A.   I see that sentence.
12    Q.   What is the date of the personnel
13  requisition form ending in control numbers 877 on
14  Exhibit 454?
15    A.   There are a number of dates on this
16  document.  There is a date needed, which was
17  1/16/83, which was apparently approved 1/10/83.
18  There's a -- maybe a few other dates floating around
19  here, but it's that time frame.
20    Q.   As of this time frame, January 1983, you
21  had extensive experience in the details of the
22  DECSYSTEM-20 computer system and its operation,
23  correct?
24    A.   Correct.
25    Q.   And you also had knowledge of TOPS-20 as

Page 217

1  of January of 1983, correct?
2    A.   Correct.
3    Q.   What is MACRO-20?
4    A.   That is the assembly language that was
5  used to do the systems programming for a
6  DECSYSTEM-20.
7    Q.   And as of January 1983, you were familiar
8  with MACRO-20 as well, correct?
9    A.   Correct.
10    Q.   You were also familiar with ethernet as of
11  January 1983, correct?
12    A.   Correct.
13    Q.   At the top of this same page that we're
14  looking at here ending in control numbers 877 of
15  Exhibit 454, there is a name Steve Hansen.
16        Do you see that?
17    A.   I see that.
18    Q.   And Mr. Hansen was your supervisor in the
19  EE-CF department; is that correct?
20    A.   That's correct.
21    Q.   If you skip ahead to the page ending in
22  control numbers 883 in Exhibit 454.  Let me know
23  when you're there.
24    A.   I'm there.
25    Q.   What is depicted on the page ending in

Page 218

8 (Pages 215 - 218)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 control numbers 883 on Exhibit 454?
2    A.   An organizational chart of the electrical
3 engineering computer facility.
4    Q.   And do you know approximately when this
5 organizational chart was accurate in terms of year?
6        Let me rephrase the question.
7        What time frame does this organizational
8 chart represent?
9    A.   I am not absolutely sure, but I suspect
10 it's 1985.
11   Q.   And why do you suspect it's 1985?
12   A.   Looking at the people that are mentioned
13 on the org chart, especially the systems
14 programmers, I think it was in 1985 is when I hired
15 some of those people.
16   Q.   And one of the systems programmers listed
17 on this page is Greg Satz, correct?
18   A.   Correct.
19   Q.   And Mr. Satz later worked for Cisco,
20 correct?
21   A.   Correct.
22   Q.   Mr. Satz didn't leave Stanford's
23 employment at the same time you did; is that
24 correct, Mr. Lougheed?
25   A.   That is correct.

Page 219

1    Q.   If you turn to the page ending in control
2 number 885 in the same exhibit.
3        Are you there?
4    A.   Yes.
5    Q.   Now, this is how the document was produced
6 to us, but I believe the second page of the letter
7 that starts on control number 885 is actually the
8 prior page.  Could you take a moment, please, and
9 skim the letter that starts on --
10   A.   Okay.
11   Q.   -- that page?
12   A.   I will -- I will read through it.
13       Okay.  I've read through it.
14   Q.   Can you please describe what is the
15 document that starts on the page ending in control
16 numbers 885 and ends on page 884 of Exhibit 454?
17   A.   It's a page -- it's a memo from Steve
18 Hansen, my supervisor, to Beverly Yates, who was the
19 HR person, basically recommending that my job
20 classification be upgraded.
21   Q.   And the date of this letter is June 5th,
22 1985?
23   A.   That's what it says.
24   Q.   Did you ask Mr. Hansen to write this
25 recommendation for you?

Page 220

1        MR. NEUKOM:  Objection.  Mischaracterizes
2 the document.
3 BY MR. WONG:
4    Q.   You can answer.
5    A.   I don't remember.
6    Q.   On the second page of this letter, the
7 page of the exhibit ending in control numbers 884,
8 the second paragraph on that page?
9    A.   Uh-huh.
10   Q.   The last sentence says, "Mr. Lougheed has
11 been one of, if not the person responsible for
12 installing and maintaining most of the department's
13 EtherTip systems that give the user -- users
14 computer terminal access to all of the systems on
15 the SUNet."
16       Do you see that?
17   A.   I do.
18   Q.   Did I read that correctly?
19   A.   You read it correctly.
20   Q.   Would you agree that you were the person
21 most responsible for installing and maintaining most
22 of the department's EtherTIP systems?
23   A.   I think Mr. Hansen was being effusive.
24 There were many other people that were -- I had
25 responsibility for making sure that they worked.

Page 221

1 But there were many other people involved in the
2 actual details of pulling cables and installing
3 equipment and the like.
4    Q.   If you turn to the page of the same
5 exhibit ending in control numbers 886, let me know
6 when you're there.
7    A.   Yeah.
8    Q.   My question has to do with the first
9 paragraph under the "Description" portion of this
10 page starting with "The Electrical Engineering
11 Computer Facility Administration."
12       Do you see that paragraph?
13   A.   Yes.
14   Q.   The last paragraph -- strike that.
15       The last sentence of that paragraph says,
16 "At present, EE-CF has full responsibility for one
17 DECSYSTEM-20 mainframe, six VAX-11/780
18 super-minicomputers, and partial responsibility for
19 four VAX-11/750 minicomputers."
20       Do you see that?
21   A.   Uh-huh.
22   Q.   Did I read that correctly?
23   A.   Yes, you read that correctly.
24   Q.   And what are VAX-11/780
25 super-minicomputers?

Page 222

9 (Pages 219 - 222)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   A type of computer manufactured by the
2  Digital Equipment Corporation.
3    Q.   And Digital Equipment Corporation is also
4  known as DEC, right?
5    A.   Correct.
6    Q.   And did you work with these DEC VAX
7  super-minicomputers while an employee at Stanford?
8    A.   One of the -- actually, at least two of
9  the systems programmers were the ones that were
10 primarily responsible for making sure that those
11 systems ran properly.
12   Q.   Was Mr. Satz one of those systems
13 programmers that --
14   A.   Yes.
15   Q.   -- worked with the VAX system?
16   A.   Yes.
17   Q.   Is the answer the same for the VAX-11/750
18 super-minicomputers?
19   A.   Yes.
20   Q.   Did those VAX machines have a command-line
21 interface?
22       MR. NEUKOM:  Objection.  Vague.
23 BY MR. WONG:
24   Q.   Did the VAX-11/780 systems have a
25 command-line interface?

Page 223

1        MR. NEUKOM:  Objection.  Vague.
2        THE WITNESS:  Yes.
3  BY MR. WONG:
4    Q.   Were you familiar with how the VAX
5  command-line interface operated?
6    A.   VAX is the name of a piece of hardware
7  that would run an operating system.
8    Q.   Thank you.
9        What is the operating system that the VAX
10 hardware ran?
11   A.   At Stanford there were two possibilities,
12 something called VAX VMS, and there was also
13 Berkeley UNIX.
14   Q.   Is Berkeley UNIX the same as BSD?
15   A.   Yes.
16   Q.   Were you familiar with the VAX VMS
17 command-line interface?
18   A.   No.
19   Q.   Were you familiar with the Berkeley UNIX
20 command-line interface?
21   A.   Yes.
22   Q.   The last bullet point on the page ending
23 in 886 of Exhibit 454, do you see that?  It starts
24 with "Supervised a computer science department."
25   A.   Yes, I see that paragraph.

Page 224

1    Q.   And the first full sentence of that bullet
2  point says, "Supervised a computer science
3  department electronics design engineer in the
4  hardware debugging of a DEC-20 to ethernet
5  interface."
6        The next sentence says, "I also wrote the
7  interface's control microcode, the hardware
8  diagnostics, and the operating system support for
9  the device."
10       Do you see that?
11   A.   I do.
12   Q.   Is that referring to the EtherTIP
13 software?
14   A.   No.
15   Q.   What is that referring to?
16   A.   That's referring to the Massbus-Ethernet
17 Interface Subsystem.
18   Q.   And that's also reflected with the acronym
19 MEIS, correct?
20   A.   Yes.
21   Q.   Did Cisco use any of the software for the
22 MEIS?
23   A.   No.
24   Q.   Can you go to the page ending with Bates
25 No. 888 in Exhibit 454.

Page 225

1    A.   Uh-huh.  Yes.  I'm on that page.
2    Q.   The first bullet point, or I guess the
3  only bullet point on this page starts with "Acted as
4  Stanford contact."
5        Do you see that?
6    A.   Yes, I see that paragraph.
7    Q.   Is it true that you acted as Stanford
8  contact with DEC for field testing of two new
9  releases of the DEC-20 operating system?
10   A.   Let me finish the paragraph so I can
11 establish context.
12   Q.   Sure.  Please take your time.
13   A.   Okay.  I've read the paragraph.  Your
14 question is?
15   Q.   Is it true you that you acted as the
16 Stanford contact with Digital Equipment Corporation
17 for field testing two new releases of the DEC-20
18 operating system?
19   A.   Yes.
20   Q.   Is the DEC 20 operating system the same
21 thing as the TOPS-20 operating system?
22   A.   Yes.
23   Q.   Further down on this same page ending with
24 control numbers 888 on Exhibit 454, there's a
25 section called "Special Skills Knowledge or Training

Page 226

10 (Pages 223 - 226)



1   parser worked in the SUMEX software that Mr. Yaeger

2   wrote prior to July of 1986?

3       A.  I would have to say yes.

4       Q.  If you turn to page 61 of Exhibit 455.

5   And by 61, I'm referring to the pages that are shown

6   at the top right of the pages, not the control

7   number.  And I'll read the control number as well,

8   just for clarification.  It's the page ending with

9   control number 64.

10      A.  Okay.  I'm on the page you mentioned.

11      Q.  Okay.  At the top of the page ending in

12  control number 64 of Exhibit 455 says "TIP user

13  interface."

14          Do you see that?

15      A.  Yes.

16      Q.  What does TIP stand for?

17      A.  Terminal interface processor.

18      Q.  And below that it says "Appendix 3 TIP

19  user interface."

20          Do you see that?

Page 231



Page 235

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 239

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 243

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 259

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 363

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  Mr. Lougheed.

2       Now, those two sentences that you read

3  from the Stanford Ethertip User Guide marked as

4  Exhibit 36 and the Cisco Systems ASM/AGS User Manual

5  marked as Exhibit 476 are exactly the same, correct?

6       A.  Yes.  I wrote both sentences.

7       Q.  And so Cisco copied those two sentences

8  from the Stanford guide marked as Exhibit 36 and put

9  them into the Cisco guide marked as Exhibit 476,

10  correct?

11       MR. NEUKOM:  Objection.  Asked and

12  answered a couple times now.

13       MR. WONG:  I'm asking about those two

14  particular sentences.

15       MR. NEUKOM:  Yeah.  And before you asked a

16  blanket question and you didn't like his answer,

17  which I thought was a pretty darn good one.  So you

18  decided to just keep him in the room --

19       MR. WONG:  Counsel.

20       MR. NEUKOM:  Look, you responded to my

21  objection.  You wanted to engage me.  So I'll

22  explain my objection.  If you don't want me piping

23  up, that's fine.  Just let me make objections for

24  the record.

25       Now you're asking him the exact same

Page 395

1       MR. WONG:  I think it's our understanding

2  that all witnesses can have 30 days or something.

3       MR. NEUKOM:  By stipulation.

4       MR. WONG:  Great.

5       THE VIDEOGRAPHER:  This concludes today's

6  videotaped deposition of Mr. Kirk Lougheed.  We're

7  off the record at 4:37 p.m.

8       (TIME NOTED:  4:37 P.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 397

1  question after having had the fourth employee of

2  Cisco, Mr. Lougheed, who is now here at almost 5:00

3  reading aloud from documents.  And you asked him the

4  same question again to see if you can get a

5  different answer.  So go for it.  This is starting

6  to feel increasingly not very respectful of this

7  witness's time.

8  BY MR. WONG:

9       Q.  Do you want me to read the question again?

10  I'll read the question again.

11       A.  That would be fine.

12       Q.  Cisco copied those two sentences that you

13  just read aloud into the record for its user manual

14  marked as Exhibit 476 from the Stanford user manual

15  marked as Exhibit 36, correct?

16       A.  I wrote both manuals.

17       MR. WONG:  I have no further questions.

18       THE VIDEOGRAPHER:  This concludes today's

19  videotaped deposition of Mr. Kirk --

20       MR. NEUKOM:  Oh, I'm sorry to interrupt.

21       On behalf of Mr. Lougheed, he reserves the

22  right to review an errata of the transcript.  I

23  don't know, Ryan, if we've been doing this by

24  stipulation for all witnesses, even if it's not put

25  on the record.

Page 396

1       DECLARATION UNDER PENALTY OF PERJURY

2

3       I, KIRK LOUGHEED, the witness herein,

4  declare under penalty of perjury that I have read the

5  foregoing in its entirety; and that the testimony

6  contained therein, as corrected by me, is a true and

7  accurate transcription of my testimony elicited at said

8  time and place.

9

10  Executed this _____ day of _____ 2016, at

11  _____, _____.

12  (City)          (State)

13

14

15

16

17       _____

18            KIRK LOUGHEED

19

20

21

22

23

24

25

Page 398

53 (Pages 395 - 398)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1          REPORTER'S CERTIFICATION
2       I, Leslie Johnson, a Certified Shorthand
3  Reporter of the State of California, do hereby certify:
4       That the foregoing proceedings were taken
5  before me at the time and place herein set forth; that
6  any witnesses in the foregoing proceedings, prior to
7  testifying, were administered an oath; that a record of
8  the proceedings was made by me using machine shorthand
9  which was thereafter transcribed under my direction;
10 that the foregoing transcript is a true record of the
11 testimony given.
12       Further, that if the foregoing pertains to
13 the original transcript of a deposition in a Federal
14 Case, before completion of the proceedings, review
15 of the transcript [ ] was [ ] was not requested.
16 I further certify I am neither financially interested in
17 the action nor a relative or employee of any attorney or
18 any party to this action.
19       IN WITNESS WHEREOF, I have this date
20 subscribed my name.
21 Dated: April 19, 2016
22
23      Leslie Johnson
24      LESLIE JOHNSON
25      CSR No. 11451, RPR, CCRR
                                        Page 399
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN JOSE DIVISION

 4
     - - - - - - - - - - - - - - - - - - x   Case No.
 5                                        :   5:14-cv-05344-BLF (PSG)

                                          :
 6   CISCO SYSTEMS, INC.,                 :

                                          :
 7                      Plaintiff,        :

                                          :
 8            vs.                         :

                                          :
 9   ARISTA NETWORKS, INC.,               :

                                          :
10                      Defendant.        :

                                          :
11   - - - - - - - - - - - - - - - - - - x

12

13          VIDEOTAPED DEPOSITION OF GREG SATZ

14                   March 23, 2016

15        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16                      VOLUME 1

17

18

19

20

21   Reported by

22   Brooke R. Bohr

23   CSR No. 753

24   Job No 2272380

25   Pages 1 - 168
```

                                                Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   "Stanford Ethertip/Gateway User and Configuration
2   Guide."
3       A.  Yeah.
4       Q.  Had you ever seen this before?
5       A.  I'm sure I have.  I don't have a
6   recollection of it, and I don't remember this date
7   at all.  This is a pretty late date.
8       Q.  Do you know Glenn Truitt?
9       A.  I do.
10      Q.  What did he work on at Stanford?
11      A.  I no longer remember.  I do know that
12  he had his hands in this software, but a lot of
13  people did.  Jeffrey Mobile, Benji Levy.  This
14  was -- this code was a lot of research work.  And
15  so if one of the graduate students felt there was
16  an application they wanted to experiment with,
17  this really was the beginning of what then became
18  the multi-protocol router and Cisco's router.
19  So -- oh, yeah, there's some really old -- really
20  old stuff here.
21      Q.  Did you become familiar with some of
22  the commands from this device?
23      A.  Yes.
24      Q.  Yeah?  How did you become familiar with
25  it?

Page 26

1       A.  Well, we were users of these devices
2   when I -- the state of the art back then, before
3   there were all of these computers and laptops, is
4   you used a basic terminal with RS232 into some
5   device that converted the commands into network
6   protocols and used that across the network to talk
7   to mainframes.  That was state of the art.
8           So on my desk at Stanford and at SRI
9   was these computers that were just terminals.
10  They -- all they did was take a capture of
11  keypress and generate a character.  And that
12  character was shipped across the network
13  somewhere.  And the computer would get that
14  character, do something with it, and ship you back
15  the output.
16          So that's what a TIP was, terminal
17  interface processor.  It allowed you to take an
18  RS232 terminal and sit on the network without
19  talking to the computer directly.  And I think
20  Kirk was responsible for gluing the TIP and the
21  Gateway software together, because they were two
22  different software bases.
23      Q.  So if I could ask you to turn to Page 6
24  of that Exhibit 36.
25      A.  Okay.

Page 27

1       Q.  This was a -- begins a section called
2   "privileged commands."  Do you see that?
3       A.  Um-hum.  I do.
4       Q.  And were you aware of a privileged mode
5   in this -- in the TIP Gateway?
6       A.  Sure.
7       Q.  Explain what was the purpose of the
8   privilege mode there.
9       A.  It mimicked the TOPS-20 style of
10  parsing, and it -- there were commands that people
11  would use to just have the device do what it does
12  day-to-day, and there were commands that
13  administrators or users who needed to maintain the
14  device in the network would use.  And so privilege
15  commands were the latter set, and TOPS-20 had a
16  very similar model.
17      Q.  And this document says in the -- I
18  guess in the second sentence, it's -- or I'll read
19  the first sentence also:  There's a second set of
20  commands available to the Ethertip user.  The two
21  command levels are disjoint.  That is, the
22  privileged mode is not a superset of the normal
23  mode.
24          Do you see that?
25      A.  Um-hum.

Page 28

1       Q.  So what did you understand to be the
2   purpose of the normal mode, then, as opposed to
3   the privileged mode?
4       A.  Day-to-day users don't need privileged
5   mode.  They go in, they make their connections,
6   they do what they do to get their work done, and
7   that's the extent of their relationship to the
8   software.
9           The people who administer the device
10  and who might need to add a new feature or upgrade
11  the software would have to use privileged mode.
12  And it is a complete separate set of functions.
13          And in particular for the programmers,
14  they -- you know, they made a mistake, and they've
15  got to go figure out why something is not working,
16  especially for research work.
17      Q.  I want to ask about some of the
18  commands that follow here on Page 6.
19  "Access.lists," I see under 3.1.
20      A.  Um-hum.
21      Q.  Was that a command you were familiar
22  with?
23      A.  That's a very common and important
24  command.
25      Q.  What is an access.list command?

Page 29

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.  It gave the device the ability to
2  decide what data flows it would allow through or
3  prevent, and/or connections that people could make
4  to the box.  So if, for example, your department
5  wasn't allowed to use this particular box, we
6  could create an access.list so you couldn't use
7  it.
8    Q.  Was -- to your knowledge, was
9  access.list used in any other operating systems or
10  softwares, software?
11    MR. NEUKOM:  Objection; foundation.
12    THE WITNESS:  I can't say I've ever seen
13  access.list before this application.
14    Q.  BY MR. FERRALL:  The next command here
15  is -- it says "arp.table."  What is that, do you
16  know?
17    A.  Yes, address resolution protocol.  So
18  that was the mechanism that computers used to
19  discover each other's -- I'm going to get really
20  boring here -- 48-bit ethernet address and match
21  it to their 32-bit IP address.
22    Q.  And was the address resolution protocol
23  something that was known outside of the Stanford
24  network context?
25    A.  Oh, yes, it was a standard.

Page 30

1    MR. NEUKOM:  Objection; lack of foundation,
2  calls for speculation.
3    Q.  BY MR. FERRALL:  Now, don't worry, I'm
4  not going to go through every command in here.
5    A.  You'll need coffee.
6    MR. NEUKOM:  And I think, actually, Brian, I
7  didn't -- you said a little while back that the
8  next -- just to make sure the transcript is clean,
9  after discussing access.list, you said the next
10  one listed is arp.table.
11    MR. FERRALL:  That's -- you're right.
12  That's not correct.  That was -- I skipped one.
13    MR. NEUKOM:  Okay.
14    MR. FERRALL:  Thank you.
15    Q.  BY MR. FERRALL:  Were you familiar with
16  show commands used in the Stanford TIP?
17    A.  Yeah.  I didn't do a lot of work with
18  the TIP, so I can't say I have a great familiarity
19  with this version of the software.
20    Q.  Okay.
21    A.  By the time I spent time with the
22  software, it had been rewritten and the parser,
23  which is the interesting part for this discussion,
24  had been changed.  So a lot of these commands are
25  almost like looking at them new again.  There's

Page 31

1  just some here I don't -- I have no recollection
2  of.
3    Q.  Had you ever heard of or used show
4  commands in any context before you went to Cisco?
5    A.  Every computer has show commands.  I
6  mean every operating system had used the word
7  "show" as a way to convey internal information
8  outward.
9    Q.  What about banner, which, by the way,
10  I see at the bottom of Page 8 of Exhibit 36.  But
11  my question is more general, which is were you
12  aware of a banner command before you went to
13  Cisco?
14    A.  I don't remember.  I had used, by then,
15  anywhere from 15 to 20 different operating
16  systems.  And so I -- banner doesn't stand out as
17  anything.
18    Q.  If I could ask you to look at Page 13
19  of this exhibit, Exhibit 36.  Do you see on that
20  page there are a number of commands that have in
21  brackets the word "no" before the command?
22    A.  Um-hum.  I do.
23    Q.  Do you know what that means?
24    A.  It is an optional keyword.
25    Q.  And what does it do?  What function

Page 32

1  does it serve?
2    A.  Excuse me.  Optional keywords just
3  allow you to include them or not include them.  So
4  you -- I don't know if you're asking me what it
5  means in relationship to each command or the
6  generic optional keyword.
7    Q.  Well --
8    A.  There's layers.
9    Q.  Okay.  Fair enough.
10      Is there an overall purpose of -- if
11  you wanted -- if you decided to include "no" as
12  an option before these commands, is there a
13  generic -- general way of describing what that
14  would do?
15    MR. NEUKOM:  Objection; vague and compound.
16    THE WITNESS:  It is a negation in this
17  particular usage.  This, again, gets back to the
18  mechanics or the API versus the content.  So the
19  confusion is I'm going to -- as a somewhat of a
20  programmer or someone who has worked at the
21  building of this, I'm more coming from a here is
22  the mechanical word.  An optional keyword is an
23  optional keyword.  What it actually means is going
24  to be interpreted by the code that is written.  So
25  in this particular case, the "no" in front would

Page 33

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    MR. NEUKOM: Objection; vague and compound.
2    THE WITNESS: They would augment the command
3    set, the features, and there was, typically, a
4    user interface component to it, like modifying the
5    menu commands on your laptops today.
6    Q. BY MR. FERRALL: And was there -- would
7    they, typically, build upon existing keywords?
8    MR. NEUKOM: Same objections, and calls for
9    speculation.
10    THE WITNESS: Depending on the feature set.
11    If it was an extension of an existing feature set
12    or if it was brand new. I mean, as you described
13    a tree, those trees can be rearranged and
14    augmented or removed.
15    MR. FERRALL: Okay. Why don't we take our
16    first break. We've been going for about an hour.
17    THE WITNESS: Okay.
18    THE VIDEOGRAPHER: The time is 11:12 a.m.
19    Off the record.
20    (Recess taken.)
21    THE VIDEOGRAPHER: The time is 11:23 a.m.
22    On the record.
23    Q. BY MR. FERRALL: Mr. Satz, are you
24    familiar with any use of a "clear" command from
25    either TOPS-20 or early operating systems?

Page 46

1    A. I can't say I recall that.
2    Q. Okay.
3    A. There could have been, but there's a
4    check through the documentation better than my
5    memory.
6    Q. Okay. How about a "set" command?
7    A. I'm pretty sure VMS had set, as well as
8    TOPS-20.
9    Q. Now, you're aware that Cisco later used
10    show commands, right?
11    A. (Witness nods head.)
12    Q. What was the purpose of the Cisco show
13    commands, in general? I know there were many.
14    MR. NEUKOM: Objection; vague and compound.
15    THE WITNESS: To take data from inside the
16    software and present it to a user.
17    Q. BY MR. FERRALL: Were you aware of a
18    feature of TOPS-20 called "exec," E-X-E-C?
19    A. Um-hum. Yes.
20    Q. What was that?
21    A. The exec was the piece of software in
22    the operating system who interacted with the user
23    and contained the parser.
24    Q. We talked earlier about a privilege
25    mode in TOPS-20.

Page 47

1    A. Um-hum.
2    Q. And a normal mode, I think. What were
3    the other modes of TOPS-20 that you could recall?
4    A. They weren't necessarily modes, as --
5    you might think of them as different parse trees,
6    to use your tree analogy. They were command sets
7    that would be made available or not available
8    depending on, in the case of privilege mode,
9    having a password. So you had to know the secret
10    code to then enable the parse tree that was called
11    privilege mode.
12    Q. Was there a different prompt
13    indicator --
14    A. There is.
15    Q. -- for the different command sets that
16    were available, if you will?
17    A. Yes. And TOPS-20 -- and I think VMS
18    used the same mode -- had a subcommand mode. So
19    you could -- I don't know if you would put a comma
20    at the end of the line or if it was just a -- it
21    knew you were going into the mode. I can't -- I
22    don't remember anymore. But it would then
23    double-prompt you. So if your prompt was, like, a
24    dollar sign, it would give you two dollar signs to
25    know you were in the subcommand mode. Or in the

Page 48

1    privilege mode it would change the prompt from a
2    single dollar sign to, like, an "at" sign or a
3    "pound" sign. It would give you indication. And
4    usually there were ways to configure that so you
5    could tell it what you wanted it to do.
6    Q. And I think you said that you would
7    need a password, for example, to enter the
8    privilege mode?
9    A. In the ether TIP or the router software
10    that Cisco used. In TOPS-20 it was whether you
11    had a capability, you had an account that was
12    privileged.
13    Q. Was there a command or a -- something
14    you would enter in order to switch modes in
15    TOPS-20?
16    A. That was "enable."
17    Q. "Enable" was the command?
18    A. (Witness nods head.)
19    Q. Okay.
20    A. The magic word. All these commands are
21    are just a magic word that you agree will do a
22    function.
23    Q. Do you know, was there a configuration
24    mode in TOPS-20 to your knowledge?
25    A. TOPS-20 had the benefit of files. So,

Page 49

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Exhibit 405 is a one-page document
2  marked CSI-CLI-00746924.
3    Exhibit 406 begins CSI-CLI-01828732,
4  and for this document I'll read the last number
5  because I think we're all unclear whether it is
6  one versus multiple documents.  This ends with
7  Bates stamp CSI-CLI-01828783.
8    Exhibit 407 begins Bates stamp
9  CSI-CLI-01295215.
10    And Exhibit 408 begins
11  CSI-CLI-01295181.
12    MR. NEUKOM:  Thanks all.
13    MR. FERRALL:  Agreed.  Thank you.
14    (The deposition concluded at 3:31 p.m.)
15    -oo0oo-
16
17
18
19
20
21
22
23
24
25

Page 166

1    R E P O R T E R ' S   C E R T I F I C A T E
2
3
4    I, BROOKE R. BOHR, a Notary Public in
5  and for the State of Idaho, do hereby certify:
6    That prior to being examined, the
7  witness named in the foregoing deposition was by
8  me duly sworn to testify the truth, the whole
9  truth, and nothing but the truth;
10    That said deposition was taken down by
11  me in shorthand at the time and place therein
12  named and thereafter reduced into typewriting
13  under my direction, and that the foregoing
14  transcript contains a full, true, and verbatim
15  record of the said deposition.
16    I further certify that I have no
17  interest in the event of the action.
18    WITNESS my hand and seal March 30, 2016.
19
20
21
22
23    <%signature%>
24    Brooke R. Bohr
25    CSR No. 753

Page 168

1    V E R I F I C A T I O N
2    I declare under penalty of perjury
3  under the laws that the foregoing is
4  true and correct.
5
6    Executed on _____ , 20___,
7  at _____, _____.
8
9
10
11
12    _____
13    WITNESS SIGNATURE
14
15
16
17
18
19
20
21
22
23
24
25

Page 167

43 (Pages 166 - 168)