# ATTACHMENT 6

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

```
1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3                    SAN JOSE DIVISION
4
5    CISCO SYSTEMS, INC.,        )
                                 )
6              Plaintiff,        )
                                 ) Case No.
7         vs.                    ) 5:14-cv-05344-BLF (PSG)
                                 )
8    ARISTA NETWORKS, INC.,      )
                                 )
9              Defendant.        )
                                 )
10   _____)
11
12
13    *** CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY ***
14      VIDEOTAPED DEPOSITION OF JUDITH CHEVALIER, Ph.D.
15                San Francisco, California
16                 Tuesday, July 26, 2016
17                       Volume I
18
19
20
21   Reported by:
22   CARLA SOARES
23   CSR No. 5908
24   Job No.  2346938
25   Pages 1 - 233
```

Page 1

```
 1        UNITED STATES DISTRICT COURT
 2      NORTHERN DISTRICT OF CALIFORNIA
 3           SAN JOSE DIVISION
 4
 5  CISCO SYSTEMS, INC.,    )
                            )
 6       Plaintiff,         )
                            ) Case No.
 7   vs.                    ) 5:14-cv-05344-BLF (PSG)
                            )
 8  ARISTA NETWORKS, INC.,  )
                            )
 9       Defendant.         )
                            )
10  _____)
11
12
13
14
15
16      VIDEOTAPED DEPOSITION OF JUDITH
17  CHEVALIER, Ph.D., Volume I, taken on behalf of
18  Defendant, at 633 Battery Street, San Francisco,
19  California, beginning at 10:06 a m., and ending at
20  4:55 p m., on Tuesday, July 26, 2016, before CARLA
21  SOARES, Certified Shorthand Reporter No. 5908.
22
23
24
25
                                              Page 2
```

```
 1  APPEARANCES:
 2
 3  For the Plaintiff:
 4      QUINN EMANUEL URQUHART & SULLIVAN, LLP
 5      BY:  AMY CANDIDO
 6         Attorney at Law
 7      50 California Street, 22nd Floor
 8      San Francisco, California 94111
 9      415.875.6322
10      amycandido@quinnemanuel.com
11
12
13  For the Defendant:
14      KEKER & VAN NEST LLP
15      BY:  DAVID J. SILBERT
16         Attorney at Law
17         ELIZABETH K. McCLOSKEY
18         Attorney at Law
19      633 Battery Street
20      San Francisco, California 94111
21      415.391.5400
22      dsilbert@kvn.com
23      emccloskey@kvn.com
24
25
                                              Page 3
```

```
 1  APPEARANCES (Continued):
 2
 3  For the Defendant:
 4      WILSON SONSINI GOODRICH & ROSATI
 5      BY:  BRADLEY T. TENNIS
 6         Attorney at Law
 7      650 Page Mill Road
 8      Palo Alto, California 94304
 9      650.849.3056
10      btennis@wsgr.com
11
12
13  ALSO PRESENT:  Nick Baciu, Ocean Tomo
14         Sean Grant, Video Operator
15
16           --o0o--
17
18
19
20
21
22
23
24
25
                                              Page 4
```

```
 1              INDEX
 2  WITNESS
 3  JUDITH CHEVALIER, Ph.D.             EXAMINATION
    Volume I
 4
 5     BY MR. SILBERT                9
 6
 7           EXHIBITS
 8  NUMBER         DESCRIPTION              PAGE
 9  Exhibit 1564  Rebuttal Expert Report on Fair    8
10         Use of Judith A. Chevalier
11
12  Exhibit 1565  Expert Report of Judith A.        8
13         Chevalier
14
15  Exhibit 1566  Surrebuttal Expert Report of      8
16         Judtih A. Chevalier
17
18  Exhibit 1567  Document headed "Samsung's       18
19         damages expert calls Apple's
20         patents 'negligible' in value"
21
22  Exhibit 1568  Order Granting In Part and       27
23         Denying In Part Motions to
24         Exclude Certain Expert Opinions
25
                                              Page 5
```

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

## Page 6

```
 1          EXHIBITS
 2 NUMBER        DESCRIPTION               PAGE
 3 Exhibit 1569  Document entitled "Arista    73
 4              Competitive Program,"
 5              Bates CSI-ANI-00056465 - 6465.000035
 6
 7 Exhibit 1570  Spreadsheet                 129
 8
 9 Exhibit 1571  E-mail string, top e-mail to 159
10              Anshul Sadana from Mark Foss,
11              dated 1-15-09,
12              Bates ARISTANDCA12260577
13
14 Exhibit 1572  Facebook RFP                161
15
16 Exhibit 1573  (Exhibit number not used)
17
18 Exhibit 1574  E-mail string, top e-mail to 178
19              Drew Pletcher from Brook Crossman,
20              dated 3-27-13,
21              Bates CSI-ANI-00067670 - 7670
22
23 Exhibit 1575  Document headed "Financial   192
24              Services Competitive Update,"
25              Bates CSI-CLI-01588647 - 8654
```

## Page 7

```
 1          EXHIBITS
 2 NUMBER        DESCRIPTION               PAGE
 3 Exhibit 1576  E-mail string, top e-mail to 221
 4              various individuals from Weird
 5              Kid Software, dated 3-29-12,
 6              with attachments,
 7              Bates CSI-CLI-01610893 - 0938
 8
 9          --o0o--
```

## Page 8

```
 1         San Francisco, California
 2         Tuesday, July 26, 2016
 3         10:06 a.m.
 4
 5     (Exhibit 1564, Exhibit 1565 and Exhibit
 6  1566 were marked for identification and are
 7  attached hereto.)
 8
 9         P R O C E E D I N G S
10     THE VIDEO OPERATOR:  Good morning.  We're
11  on the record.  The time is 10:06 a.m., and the date
12  is July 26th, 2016.
13         This begins the videotaped deposition of
14  Dr. Judith Chevalier.  My name is Sean Grant, here
15  with our court reporter, Carla Soares.  We're here
16  from Veritext Legal Solutions at the request of
17  counsel for defendant.
18         This deposition is being held at Keker &
19  Van Nest LLP in San Francisco, California.  The
20  caption of this case is Cisco Systems, Inc., versus
21  Arista Networks, Inc., Case No. 5:14-cv-05344-BLF.
22         Please note that audio- and
23  video-recording will take place unless all parties
24  have agreed to go off the record.  Microphones are
25  sensitive and may pick up whispers, private
```

## Page 9

```
 1  conversations, or cell interference.
 2         At this time, will counsel please identify
 3  themselves and state whom they represent.
 4         MR. SILBERT:  David Silbert, Keker &
 5  Van Nest, on behalf of defendant Arista.
 6         MS. McCLOSKEY:  Elizabeth McCloskey from
 7  Keker & Van Nest on behalf of defendant Arista.
 8         MR. BACIU:  Nick Baciu, Ocean Tomo, on
 9  behalf of Arista.
10         MR. TENNIS:  Brad Tennis from Wilson
11  Sonsini on behalf of Arista.
12         MS. CANDIDO:  Amy Candido from Quinn
13  Emanuel on behalf of Cisco Systems and the witness.
14         THE VIDEO OPERATOR:  Thank you.
15         Will the certified court reporter please
16  swear in the witness.
17         JUDITH CHEVALIER, Ph.D.,
18  having been administered an oath, was examined and
19  testified as follows:
20         EXAMINATION
21 BY MR. SILBERT:
22   Q  Good morning, Dr. Chevalier.
23   A  Good morning.
24   Q  Do you understand that you've sworn an
25  oath to tell the truth today under penalty of
```

Page 50:

1  So do you mean statements -- do you mean
2  e-mails? Do you mean communications like RFPs? Do
3  you mean -- what do you exactly mean by
4  "communications"?
5      Q  I mean any of those things. Testimony,
6  any other form of evidence that exists that reflects
7  what a customer has said about, "This is what --
8  these are the features that are important to us."
9      A  Yes.
10     Q  You asked for that category of evidence to
11 be provided to you?
12     A  Yes.
13     Q  And did you make a decision to value that
14 category of evidence less than other types of
15 evidence?
16     A  No.
17     Q  Do you think you did value it less than
18 other types of evidence?
19     A  No.
20         MR. SILBERT: Why don't we take a break.
21         THE WITNESS: Okay.
22         THE VIDEO OPERATOR: Going off the record,
23 the time is 11:03 a.m.
24         (Recess, 11:03 a.m. - 11:09 a.m.)
25         THE VIDEO OPERATOR: Back on the record.

Page 51:

1  The time is 11:09 a.m.
2  BY MR. SILBERT:
3      Q  Dr. Chevalier, did you or anyone under
4  your direction ask any customers whether a
5  Cisco-like CLI was important to them?
6      A  So directly ask a customer? No, I did
7  not.
8      Q  Why not?
9      A  So I think that there's a number of
10 reasons.
11         First, I think the record at the time is
12 usually preferred to a retrospective inquiry of a
13 customer.
14         I also think the -- I think the record
15 actually provided a fair bit of information about
16 this topic, so I did not feel a need to ask
17 customers directly, especially given the limitations
18 of retrospectively asking customers.
19     Q  Some of the sales that are included in
20 your damages analysis are pretty recent, right?
21     A  Yes, some of them are pretty recent.
22     Q  Last quarter, the quarter before that,
23 correct?
24     A  Um-hum. Yes.
25     Q  Wouldn't a customer have been able to give

Page 52:

1  you reliable information about what mattered to them
2  in those particular sales?
3      A  Possibly. Though, again, I would say, you
4  know, I think business records and the deposition
5  testimony of Arista and Cisco personnel, I think,
6  for most customers, I think, is as or more valuable.
7      Q  You identified 30 customers to which you
8  say Cisco lost sales to Arista as a result of the
9  alleged infringement, right?
10     A  Well, actually, in my last analysis, I
11 speak about the fact that I think many customers
12 generally, you know, are lost.
13        But I identify -- then when I look at the
14 tiers, I identify specific customers for whom the
15 evidentiary record is particularly strong.
16        But this is against the backdrop that the
17 customer specifically cared about CLI. But again,
18 this is against the backdrop that the, you know,
19 deponents viewed the CLI as important generally,
20 and, you know, my last analysis reflects that.
21     Q  When you say your last analysis, just so
22 our terms are straight, you're referring to what you
23 call your Scenario 3 in your expert report; is that
24 right?
25     A  Yes, that's what I'm -- yes.

Page 53:

1      Q  Okay. And as far -- I'm not trying to
2  pretend Scenario 3 doesn't exist. But under
3  Scenarios 1 and 2, you actually identify a total of
4  30 customers that you say Cisco lost sales to as a
5  result of Arista's alleged infringement, right?
6      A  So those are customers for which, yes, I
7  calculate Cisco's lost sales. Yes.
8      Q  And there's 30 total that you --
9      A  And there's 30 there.
10     Q  A minute ago, you talked about some issues
11 with retrospective analyses that would arise if
12 someone were to ask a customer what happened in a
13 particular sale, right?
14     A  Correct.
15     Q  Do those same issues exist if somebody is
16 asked, say, in a deposition what mattered in a
17 particular sale or sales or market conditions that
18 might have existed years ago?
19     A  So I think it's less a criticism of things
20 like market conditions, general -- you know, the
21 general customer preferences, general customer
22 environment.
23        There may be -- of course, we see
24 deponents have imperfect recall and say they don't
25 remember things about specific customers and

*Page 122*

 1  that I identified are largely -- they are all
 2  customers who have existing Cisco infrastructure,
 3  and, of course, we don't know the full inventory of
 4  other switches that they might have.  So they may
 5  have, at some point, made an investment in another
 6  CLI for some reason, okay?
 7       But we have heard from Arista that their
 8  customers would not buy Arista switches but for the
 9  infringing CLI, that it is a requirement for most
10  customers.
11       And these are customers who have -- for
12  whom the similarity -- particularly, the Tier 1
13  customers are customers for whom the similarity of
14  the CLI to Cisco's CLI has been identified in their
15  marketing communications.
16       Q   Do you know how many customers Arista has?
17       A   I don't know about the long tail.  At some
18  point I knew it, but I don't know offhand.
19       Q   Does a few thousand sound right?
20       A   A few thousand sounds right.
21       Q   So you recall earlier you talked about
22  80 percent of Arista's customers potentially
23  requiring a Cisco-like CLI.
24       A   Yes.
25       Q   So that if it's -- let's just take 2,000,

*Page 123*

 1  okay, as an approximate number of Arista's
 2  customers.  That would make 400 customers who don't,
 3  under that -- under that allocation, right?
 4       A   Correct.
 5       Q   So did you do anything to identify the
 6  particular customers who don't require a Cisco-like
 7  CLI?
 8       A   Okay.  So Arista was asked about that many
 9  times.  Arista executives were asked that --
10  versions of that question many times in deposition,
11  and there aren't -- there aren't great answers to
12  that question.
13       But I have considered this -- I have, you
14  know, considered this issue at length in examining
15  the record.  So that's why I identified the Tier 1
16  and Tier 2 customers, because they -- there's
17  specific evidentiary record that they would not have
18  bought an Arista switch but for the Cisco
19  infringement.
20       They -- I just lost my train of thought.
21  Sorry.  Could you repeat your question?
22       Q   Do you have any understanding of who are
23  the 20 percent, if it's 20 percent, of Arista
24  customers who primarily don't use the CLI?
25       A   Okay.  I think I misunderstood your

*Page 124*

 1  question the first time.
 2       So in my report, I discuss the fact that
 3  customers who completely directly program their
 4  switches in Linux are candidates for customers who,
 5  you know, would not care about the CLI.
 6       Q   But --
 7       A   So they would be my candidates for the
 8  20 percent, customers who program in Linux
 9  exclusively.
10       Q   Sorry.  Are you done?
11       A   I'm done.
12       Q   Did you make any attempt to identify who
13  those customers are?
14       A   So I investigated the record on that
15  topic, and there's some evidence in the record that
16  we can discuss.  But -- so, yes, I made some effort.
17       Q   What evidence are you referring to?
18       A   Okay.  So first, so the 80 percent, of
19  course, comes from that document posted by Mr. Duda,
20  and Mr. Duda testified about the document, you'll
21  probably recall.
22       And in his testimony, one thing that he
23  said was -- about that document was, 80 percent of
24  customers or 80 percent of switches.  And then he
25  also said -- actually, maybe he said 20 percent of

*Page 125*

 1  customers or 20 percent of switches, taking the
 2  reverse piece.  And then he said 20 percent of
 3  customers or of the installed base.
 4       So the first, you know, thing I was
 5  looking for about that -- you know, one thing I was
 6  looking for about that document was, in Mr. Duda's
 7  testimony, he equated the share of customers with
 8  the share of switches, which was helpful, because it
 9  was informative that the customers -- the customers
10  who -- for whom this might be true are not either
11  extremely -- are not necessarily -- he has not
12  suggested -- he has suggested the opposite -- that
13  they are average size, on average.
14       Q   Do you recall Mr. Duda saying, in that
15  testimony, that he didn't intend the 20 percent
16  number to be quantitative?
17       A   I do recall him saying that, and that's
18  why I investigated the 20 percent number in other
19  ways, and found it to actually be a likely
20  overestimate of the fraction of customers who
21  directly programmed the switches in Linux.
22       Q   Which were the other ways?
23       A   Okay.  So first, there's actually a fair
24  bit of deponent testimony on this topic.
25       So for example, Mr. Dale asserts

32 (Pages 122 - 125)

**Page 126**

1 skepticism that anybody completely relies on Linux
2 for programming the switches.
3     I think Mr. Berly also expresses a fair
4 bit of skepticism on that point.
5     Even Mr. Duda, in his testimony about not
6 meaning the number to be quantitative, talks about
7 the limitations to the extent -- I don't remember it
8 exactly, but the limitations to the extent that
9 customers rely on Linux. Okay. So there's three,
10 you know, deponents I looked at there.
11     Let me say, I don't quite -- it is a
12 public representation. So while he didn't mean it
13 to be quantitative, I assume he didn't mean it to be
14 misleading, right, that it does provide some
15 guidance.
16     Other deponents have argued, therefore,
17 that the fraction of customers who rely entirely on
18 Linux is much smaller than the 20 percent number
19 posed by Mr. Duda. So again, Mr. Dale, Mr. Berly.
20 So I found that helpful.
21     Also, as we've discussed before, if I want
22 to think about the question of -- for the purposes
23 of that analysis, the Scenario 3 -- Scenario 3 is
24 not reliant on identifying the specific customers,
25 but it is reliant on the revenue shares being

**Page 127**

1 roughly correct, right? I mean, I think I make it
2 clear that it's an estimate. So the question of,
3 you know, size is important.
4     I believe that Microsoft is one of
5 Arista's largest customers. And so the fact that
6 there is specific evidentiary evidence about
7 Microsoft was helpful for my thinking about whether
8 the 80 percent/20 percent number was roughly
9 correct.
10     The same for Facebook, which is a very
11 large customer, that there is specific evidentiary
12 evidence suggests that the 20 percent number can't
13 be an overstatement -- that makes it less likely
14 that the 20 percent number is an overstatement of
15 revenues.
16     Do you want me to stop there?
17   Q  Sure.
18   A  There's more, but I'll stop.
19     MR. SILBERT: How long have we been going?
20     MS. CANDIDO: We've been going over an
21 hour.
22     MR. SILBERT: Why don't we take a break.
23     THE VIDEO OPERATOR: Going off the record,
24 the time is 1:55 p.m.
25     (Recess, 1:55 p.m. - 2:03 p.m.)

**Page 128**

1     THE VIDEO OPERATOR: Back on the record.
2 The time is 2:03 p.m.
3 BY MR. SILBERT:
4   Q  Dr. Chevalier, before the break, you were
5 talking about Microsoft as an Arista customer.
6     Do you recall that?
7   A  Yes.
8   Q  And are you aware that Microsoft provided
9 a spreadsheet to Arista in which it listed features
10 that it wanted in an Ethernet switch and assigned
11 different weights to those features?
12   A  I have seen the spreadsheet to which you
13 are referring, though the context of the
14 spreadsheet, I will say, is not completely clear.
15 But yes.
16   Q  And is that spreadsheet one of the
17 documents that you referred to this morning as a
18 recently surfaced document?
19   A  I'm not sure. I know the document you
20 mean. I don't actually remember when I first saw
21 it.
22   Q  Do you believe you may have seen that
23 document before you produced your main damages
24 report, Exhibit 1565?
25   A  It's all so close together. I think if

**Page 129**

1 it's in my documents relied upon, then I probably
2 saw it. And otherwise, no, I can't remember now.
3   Q  Why don't we take a look at it.
4   A  Okay.
5     (Exhibit 1570 was marked for
6     identification and is attached hereto.)
7 BY MR. SILBERT:
8   Q  Dr. Chevalier, is Exhibit 1570 the
9 document you were referring to?
10   A  Yes. It appears to be.
11   Q  Yeah. And I was going to say, just to be
12 clear, I think there's a couple of versions of a
13 similar document that have been produced in the
14 case.
15   A  Okay.
16   Q  So just with that understanding for the
17 record.
18     What significance, if any, did you
19 attribute to the information in Exhibit 1570
20 in forming your opinions in this case?
21     MS. CANDIDO: Objection.
22     THE WITNESS: So I can -- again, I'm
23 trying to remember when I first saw this document,
24 but -- or a variant thereof.
25     Mostly, I would say this document is



Page 154



20  Q  I think maybe we covered this a little
21  bit, but I just want to be sure.
22      In your opinions, do you distinguish
23  between automated customers and other customers that
24  are less automated?
25      A  So again, my task is not to apportion the

Page 166

1  value of the CLI for those different customers.
2  That's not my task.  That's Ms. Elsten's task.
3      My task is to ask the question, what
4  fraction of customers, or how many customers, or
5  which customers would not have bought the Arista
6  switches but for the infringing CLI?
7      And so I take into account the fact that
8  there are highly automated customers, and that
9  highly automated customers might have different
10  needs and preferences.
11      But the issue of whether they have a
12  somewhat different apportionment to the value of the
13  CLI than others in the sort of apportionment sense
14  of the whole value that Ms. Elsten takes on, you
15  know, I don't -- that's not what I'm doing in my
16  report.
17      Q  Could I ask you to look at your fair use
18  report, which is Exhibit 1564, and specifically at
19  page 11?
20      A  Okay.
21      Q  If it's helpful, you can look first at the
22  end of page 10.  There's a heading there about cloud
23  computing at the end of page 10, and the
24  paragraph goes on to page 11.
25      Do you see that?

Page 167

1      MS. CANDIDO:  Can you just give me a
2  second to find my copy?
3      MR. SILBERT:  Yeah.
4      THE WITNESS:  Yeah.  "I understand that
5  recent trends"?
6  BY MR. SILBERT:
7      Q  Is that on 10?  Yes.
8      A  Is that what you want?
9      Q  Well, I just -- for your reference, if it
10  was helpful, I wanted to show you the context.  But
11  I actually wanted to point you to a sentence on page
12  11.
13      A  Okay.
14      Q  So it's this first full sentence.
15  Starting at the first full sentence on page 11, you
16  wrote, "Cloud data centers are massively scaled data
17  centers that house thousands of servers connected by
18  high-speed network switches.  Cloud data centers
19  require high-speed network switches that provide
20  scalability (to allow the cloud network to scale to
21  the overall level of throughput in the cloud data
22  center at any given time), low latency, guaranteed
23  performance, and simpler and more automated
24  management capabilities."
25      Do you see that?

Page 168

1      A  Yes.
2      Q  That's what you wrote, right?
3      A  Yes.
4      Q  And you believe those statements to be
5  true, correct?
6      A  Yes.
7      Q  What did you mean when you said that cloud
8  data centers require simpler and more automated
9  management capabilities?
10      A  So I meant that they, you know, would use
11  automation tools.
12      Q  And how do you understand those automation
13  tools to relate to CLI?
14      A  So those automation tools -- many of those
15  automation tools write to the CLI.  So they are
16  automating CLI commands.
17      Q  Do you understand those automation tools
18  to be a layer between the human operator and the
19  CLI?
20      A  Yes.
21      Q  Looking on the next page, on page 12, at
22  the bottom of the page, you wrote, "Today, Arista's
23  customer base is largely comprised of vendors in
24  each of the four key verticals adopting cloud
25  networking."

Page 169

```
 1      Do you see that?
 2   A  Yes.
 3   Q  Is that a true statement?
 4   A  Yes.  Sorry.  I just lost where you were.
 5  Where is it?
 6   Q  It's on page 12, and it's the last -- if
 7  you look two lines up from where the footnote break
 8  is --
 9   A  Yep.
10   Q  -- the sentence starts in the middle of
11  the paragraph.  I'll read it again.  It says,
12  "Today, Arista's customer base is largely comprised
13  of vendors in each of the four key verticals
14  adopting cloud networking."
15   A  Yep.
16   Q  Is that a true statement?
17   A  Yep.
18   Q  Going on, it says, "An estimated
19  50 percent of Arista's customer base is made up of
20  'cloud titans,' including Microsoft, Google and
21  Facebook, among others."
22      Is that correct?
23   A  Yes.
24      MR. SILBERT:  Shall we take a break?
25      MS. CANDIDO:  Sure.
                                              Page 170
```

```
 1      THE WITNESS:  Does the tape need a break?
 2      MR. SILBERT:  Now we've talked about it,
 3  so why don't we do it.
 4      THE VIDEO OPERATOR:  Going off the record,
 5  the time is 3:04 p.m.
 6      (Recess, 3:04 p.m. - 3:14 p.m.)
 7      THE VIDEO OPERATOR:  Back on the record.
 8  The time is 3:14 p.m.
 9      MR. SILBERT:  Before we start again, Amy,
10  let me give you the Bates number you asked for,
11  which is for Exhibit 1572, the Facebook RFP.  It
12  turns out my paralegal Jordan had helpfully written
13  it on the folder, but I overlooked that.  The Bates
14  number is ARISTANDCA11423257.
15      MS. CANDIDO:  Thank you.
16  BY MR. SILBERT:
17   Q  Dr. Chevalier, in forming your opinions on
18  lost sales, did you consider analyses by Cisco of
19  why Cisco lost a particular sale to Arista?
20   A  So I did to some extent.  I did consider
21  those.  For reasons that we've discussed earlier, I
22  think they're less helpful than the analyses by
23  Arista of why they won sales, or -- and we can talk
24  more about that.  But I did consider that.
25   Q  The reasons we discussed earlier that
                                              Page 171
```

```
 1  you're referring to are that in your opinion, Arista
 2  has greater visibility into the importance of a
 3  Cisco-like CLI than Cisco does; is that right?
 4      MS. CANDIDO:  Objection.
 5      THE WITNESS:  So the issue that -- I think
 6  what we discussed earlier was that it may be the
 7  case that, at least for some time period, Arista has
 8  greater visibility into that than Cisco, though that
 9  isn't the only reason why Arista information is more
10  helpful than Cisco's analysis of why they lost the
11  sale.
12      Because why Cisco lost the sale is a
13  question about, in a world with near CLI parity,
14  what was the thing that led the customer to buy the
15  Arista switch rather than the Cisco switch?  But
16  it's not directly dispositive of but-for causality.
17  BY MR. SILBERT:
18   Q  And there you're referring to but-for
19  causality as far as whether or not Arista would have
20  made the sale if it were not using a Cisco-like CLI;
21  is that right?
22   A  Right.  So but-for causality is, would
23  Arista have made the sale if they were not using a
24  Cisco-like CLI?
25   Q  But another element of your opinion on
                                              Page 172
```

```
 1  lost sales is, for a certain portion of sales, at
 2  least, if Arista had not made a particular sale,
 3  Cisco would have made that sale; is that right?
 4   A  So for a share -- right.  In my analysis,
 5  for a share of customers, if Cisco had not made the
 6  sale -- sorry -- if Arista had not made the sale,
 7  Cisco would have; though I don't opine on that with
 8  regard to particular customers, only the overall
 9  share.
10   Q  ==Right.  And that's exactly where I was==
11  ==going.==
12      ==So you do -- in your Scenario 3, you apply==
13  ==a market share approach to form an opinion on what==
14  ==portion of sales Cisco would have made had they not==
15  ==been made by Arista; is that right?==
16   A  ==I do that in all three scenarios.==
17   Q  Okay.  Fair enough.
18      But in Scenarios 1 and 2, you do not try
19  to identify any particular customers for which Cisco
20  may or may not have made the sale; is that right?
21   A  I used the share -- yes, I used the share
22  evidence, not customer by customer for that
23  calculation.
24   Q  Is there any particular reason you used a
25  market share approach rather than a
                                              Page 173
```

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

1  Q  Do you have any reason to doubt that
2  statement?
3  A  No.
4  Q  It says, "New definitions have emerged
5  categorized as ultra low latency as being under one
6  microsecond, typically over ten gigabit Ethernet.
7  Customers are looking for Ethernet alternatives to
8  Infiniband which can be between 100 to 500
9  nanoseconds."
10      Do you see that?
11  A  Yes.
12  Q  Do you have any reason to doubt those
13  statements?
14  A  No.
15  Q  It then says, "The following accounts have
16  documented losses due to severe gaps in Cisco's
17  product portfolio and lack of story for alternative
18  to Infiniband."
19      Do you see that?
20  A  Yes.
21  [REDACTED]

Page 194

11  Q  Okay. You can put that aside.
12      I know you've explained this a little bit,
13  but can you just explain to me again, what do the
14  customers in your Scenario 1 represent and what do
15  the customers in your Scenario 2 represent?
16  A  Yes. So again, I would say that I --
17      (Proceedings interrupted.)
18      THE WITNESS:  So I think the best way to
19  explain what my Scenario 1 customers and my
20  Scenario 2 customers represent is that -- my
21  Scenario 3 customers -- or my Scenario 3 environment
22  uses data from Arista to calculate the share of
23  customers for whom -- conservatively, the share of
24  customers for whom the Cisco-like CLI was a
25  but-for -- was a but-for requirement for sales,

1  which is to say, but for the infringing CLI, Arista
2  would not have made the sale.
3      And so overall, I think we feel very
4  confident -- I feel very confident based on the mass
5  of deponent testimony and the mass of information
6  available that the vast majority of customers, and
7  the majority of switches, CLI was a requirement,
8  right?
9      You know, I am here relying on at least
10 four Arista deponents in making that statement.
11     So that's sort of the base -- I think of
12 that as the scenario which, you know, based on the
13 evidence available, is a good -- is a good indicator
14 of, you know, Cisco's lost sales.
15     In my Scenario 1 and my Scenario 2, I come
16 up with lower lost profits numbers by adding kind of
17 an additional requirement that there's specific
18 information about the specific customer that relates
19 to the customer's consideration of CLI, or the
20 importance of CLI in the purchase process.
21     So again, I think Scenario 1 and
22 Scenario 2 are best understood against the backdrop
23 of Scenario 3, which is substantiated by enormous
24 deponent testimony from Arista.
25     But I make these more conservative

Page 197

50 (Pages 194 - 197)

Veritext Legal Solutions
866 299-5127

**Page 198**

 1  allocations in Scenario 1 and Scenario 2 in order to
 2  provide a range.  And in Scenario 1 and Scenario 2,
 3  I identify specific -- so in Scenario 1, I identify
 4  specific customers for whom there is evidence of --
 5  there is evidence that Arista featured CLI
 6  prominently in materials specific to that customer.
 7          We see across Arista's presentations that
 8  in some presentations, they feature this CLI more or
 9  less prominently.  So at least in presentations,
10  they feature CLI prominently, and/or there's
11  documentation of conversation or, you know, a
12  specific customer interaction that features -- a
13  responsive customer interaction that features CLI.
14          In Tier 2, there's evidence that CLI is
15  featured in marketing presentations to the customer,
16  presentations to the customer, to the specific
17  customer, but CLI is featured somewhat less
18  prominently there in those presentations.
19          And I also include in Tier 2 other
20  customers for whom, you know, the record
21  indicates -- the record indicates that the customer
22  is considering CLI importantly, but there is, you
23  know, perhaps some -- something that makes the
24  record less clear, slightly less clear than for the
25  Tier 1 customers.

**Page 199**

 1          So the Tier 1 and Tier 2 are attempts to
 2  subcategorize, provide extra information and extra
 3  evidence for customers within the Tier 3 scenario,
 4  or the Scenario 3.
 5  BY MR. SILBERT:
 6      Q   So if I understand correctly, if, in your
 7  review of the record in the case, you found specific
 8  information for a specific customer which, in your
 9  view, indicated that that customer believed a
10  Cisco-like CLI was important to the purchase
11  decision, you put that customer into Scenario 1 or
12  Scenario 2?
13      A   So if I saw -- again, if I saw specific
14  evidence that the Cisco-like nature of the CLI was
15  being importantly considered by the customer, I put
16  them in Tier 1 and Tier 2, against the backdrop that
17  substantially all of the customers have been
18  testified by Arista to be but for -- you know, but
19  for the infringing CLI, not purchasing Arista
20  products.
21      Q   So if a customer is in Scenario 3 but not
22  in Scenario 1 or 2, that means that you didn't find
23  any specific evidence for that specific customer
24  that that customer considered a Cisco-like CLI to be
25  an important part of its purchase decision?

**Page 200**

 1          MS. CANDIDO:  Objection.
 2          THE WITNESS:  Yeah.  So if a customer is
 3  in neither Scenario 1 nor Scenario 2, I didn't see
 4  substantial evidence that was clearly
 5  customer-specific that that customer -- for that
 6  specific customer.
 7          So that customer falls under the umbrella
 8  of Arista deponents' testimony that their purchases
 9  are, you know, importantly driven by CLI, but not --
10  but not -- you know, that the evidentiary record for
11  the specific customer is less rich.
12  BY MR. SILBERT:
13      Q   Okay.  And again, I apologize if we're
14  retreading old ground here, but I just want to be
15  sure I understand.
16          Your opinion is that for those customers
17  in Scenario 3, even if they bought switches from
18  other vendors like HP or Alcatel-Lucent or any other
19  vendor you might name that have different CLIs, you
20  still believe that Arista would not have been able
21  to sell to those vendors if Arista didn't have a
22  Cisco-like CLI?
23      A   So again, in Scenario 3, I make a
24  conclusion that 80 percent of the sales would not
25  have occurred but for the infringing CLI.

**Page 201**

 1          Again, I think that's fairly small -- that
 2  is a somewhat small fraction relative to the
 3  testimony of numerous Arista deponents.  So it's
 4  conservative, right?
 5          So I'm not making the statement that every
 6  customer -- that but-for causality is established by
 7  every customer.  I'm only making that -- I'm making
 8  that conclusion for fewer customers than Arista says
 9  it's true for.
10          And then I am, furthermore, allocating the
11  but-for sales to not just Cisco, but other vendors,
12  to allow for the possibility that some of those
13  vendors -- that some of those customers would have
14  bought other switches.
15      Q   Okay.  In your opinion on disgorgement --
16  switching gears --
17      A   Okay.
18      Q   -- from lost sales to disgorgement, you
19  start with sales that -- for which you say there's a
20  nexus to the infringement, right?
21      A   Yes.
22      Q   And the sales that you identify as having
23  a nexus to the infringement are all of Arista's
24  U.S. switch sales, right?
25      A   Yes.  So my understanding of my duty in

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

```
 1  disgorgement is to represent the revenues and to --
 2  and to then -- to represent the revenues, and then
 3  to -- and then it is Ms. Elsten's duty to apportion
 4  them, okay?
 5       But I don't -- so the nexus there is not
 6  but-for causality.
 7       So my understanding is that, for example,
 8  if Cisco -- if Arista gets to -- to give an example,
 9  just one example, if Arista gets to charge more
10  because its switches have these features, then
11  Ms. Elsten will take that into consideration in
12  disgorgement.
13       So the standard of -- it must be the -- my
14  understanding of what I'm supposed to do in the
15  copyright allocation is to establish a causal nexus
16  between the revenues and the infringing features,
17  and that it is Ms. Elsten's duty to determine what
18  portion of the revenues are attributable to the
19  infringing features.
20    Q   Okay.  And I think you anticipated where I
21  was going.
22       But from your Scenario 3, you deduct
23  20 percent of the -- of Arista's revenues from your
24  Scenario 3, from the base of your Scenario 3,
25  because -- and I understand you say it's a
                                              Page 202
```

```
 1  conservative estimate.  I'm not trying to argue that
 2  with you.
 3       But you say -- that's a number you say
 4  either adopted a pure Linux approach, or however you
 5  want to describe it, but that you don't include
 6  those in your Scenario 3 for lost profits, right?
 7    A   I do not include those in my Scenario 3
 8  for lost profits.
 9    Q   But those pure Linux approach customers,
10  or however you want to describe those customers, you
11  still say that there's a nexus to the allegedly
12  infringing CLI, to the sales of those customers,
13  when you're talking about disgorgement, right?
14       MS. CANDIDO:  Objection.
15       THE WITNESS:  So again, I -- my
16  understanding is that the nexus standard isn't
17  but-for causality, but that the sale is -- that
18  there is a link between the sale and the infringing
19  product.
20  BY MR. SILBERT:
21    Q   And for those 20 percent of customers that
22  you deducted from your Scenario 3, what's your basis
23  for saying that there is a link between the sale and
24  the alleged infringement?
25    A   So there is -- there's substantial
                                              Page 203
```

```
 1  evidence in the record that the -- that even the
 2  pure -- the supposedly pure Linux managers use the
 3  CLI to some extent.
 4       And so if Ms. Elsten would like to argue
 5  that it's very low, that the incremental value that
 6  those particular customers put on the CLI is very
 7  low, she should do that in her apportionment
 8  analysis.
 9       But given the evidence that all of the
10  customers use, at least to some extent, the
11  infringing features, and the substantial part of the
12  revenues are related to the infringing features, and
13  all of the sales include the infringing features, my
14  understanding is, parsing that out, you know, to
15  what extent the -- you know, the infringing features
16  create value for the products is Ms. Elsten's
17  burden.
18    Q   Okay.  So I think I understand your
19  position on nexus, so let's then talk about
20  apportionment, which I understand you've described
21  as being Ms. Elsten's burden, not yours.
22    A   Correct.
23    Q   But you do address it to some degree in
24  your rebuttal report, right?
25    A   Yes, I do.
                                              Page 204
```

```
 1    Q   Okay.
 2    A   I think that's supposed to be the point of
 3  the rebuttal report, is to respond to her
 4  apportionment.
 5    Q   Okay.  And your rebuttal report is
 6  Exhibit 1566.  And again, we're on the subject of
 7  disgorgement here.
 8    A   Yes.
 9    Q   Because you give some total numbers where
10  you add disgorgement to what your lost profits
11  calculations would be, and in those calculations,
12  you try to net out the lost profits from the
13  disgorgement, right, so there's no double-dipping,
14  right?
15    A   Correct.
16    Q   Okay.  So I get that.  I'm just trying,
17  for clarity, to focus on -- because you also offer
18  opinions where you say -- and I could point you to
19  page 5 of your rebuttal report at the top.  It's
20  paragraph 8.
21       You say, "Assuming lost profits are not
22  awarded, Arista's unjust enrichment is 455.5" --
23    A   I'm sorry.  What page are you on?
24    Q   Sorry.  It's page 5 --
25    A   Okay.
                                              Page 205
```

52 (Pages 202 - 205)

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

1  Q  -- paragraph 8 --
2  A  Yes.
3  Q  -- which starts on page 4, but it's
4  actually the last sentence of that paragraph on the
5  top of page 5.
6  A  Yes.
7  Q  You say, "Assuming lost profits are not
8  awarded, Arista's unjust enrichment is
9  455.5 million."
10     Is that right?
11  A  Yes.  Well, again, I have two --
12  paragraph 8 and paragraph 9 are under different
13  scenarios.  But yes.
14  Q  Okay.  Right.  So this is what I was going
15  to -- that's what I was going to try to understand.
16     Because then there's another scenario in
17  paragraph 9 towards the bottom.  You say, "Assuming
18  lost profits are not awarded in this scenario,
19  Arista's unjust enrichment is 56.9 million," right?
20  A  Yes.
21  Q  So what's the difference between the
22  scenario where Arista's lost profits -- where
23  Arista's unjust enrichment is 56.9 million in
24  paragraph 9, and Arista's unjust enrichment is
25  455.5 million in paragraph 8?

Page 206

1  A  Okay.  So I think this might be easiest to
2  see in the tables and in the exhibits.
3     In the -- let me remember which exhibit it
4  is.  I feel like it's 6, but -- okay.  No, it goes
5  all the way.  I marked through them.
6     So start with -- I mean, we can look at
7  Exhibit 3, but we could look at a bunch of exhibits
8  back here.
9     So what I'm anticipating in this report is
10  that there are various scenarios that the Court
11  could choose which hang on the Court's opinion of
12  Ms. Elsten's apportionment methodology, okay?
13     So for example -- so I express the opinion
14  in the report that Ms. Elsten simply has not met her
15  burden of apportioning appropriately.  And if the
16  Court finds that, then, you know, the basis for
17  unjust enrichment is the entirety of the revenues,
18  unless the Court allows some different apportionment
19  that I haven't yet seen, okay?
20     ==So that's a scenario, that the Court just==
21  ==says, "Sorry, you didn't meet your burden and, you==
22  ==know, there's no apportionment, that I don't believe==
23  ==your apportionment," so all of the revenues are==
24  ==available.  So that's one scenario.==
25     Another scenario, which is paragraph 9 --

Page 207

1  and there's a bunch of hybrid scenarios, which is
2  why I'm pointing you to Exhibit 3 -- is that
3  Ms. Elsten's general apportionment methodology, this
4  idea of apportioning based -- apportioning the
5  revenues roughly the way she's described, but
6  correcting some issues with her revenue
7  apportionment, if her general methodology is
8  accepted, I argue in the report that it's my opinion
9  that even accepting her general methodology, there
10  should be some adjustments to her general
11  methodology based on some logical errors that I --
12  that she has made, which, you know, I'm sure we'll
13  talk about.
14     And so in the back, there's actually --
15  this is the summary of conclusions that you've
16  pointed to.
17     In the back, I actually go through a bunch
18  of hybrid methodologies, such as her revenue
19  apportionment is not accepted but her cost
20  apportionment is accepted; her cost apportionment is
21  not accepted but her revenue apportionment is
22  accepted.
23     The general methodology -- so all of the
24  cases, you know, about -- because I criticized both
25  her cost apportionment and her revenue

Page 208

1  apportionment.  And I do a correction of -- I do
2  some correction to her revenue apportionment and her
3  cost apportionment.
4     But, you know, I offer the opinion that
5  these are -- that she has not really met her burden,
6  so we go back to the -- I'm outlining the scenario
7  here in which the Court just rejects her -- some of
8  her apportionment, and that's what all the hybrid
9  cases are.
10  Q  Okay.  This is helpful, and I think I'm
11  understanding this better.
12     But I -- I guess to hopefully simplify
13  things for me, I want to just focus on just
14  disgorgement.  Because I understand once we start
15  mixing disgorgement and lost profits, you've got to
16  net them out against each other, or you do net them
17  out against each other, and then you end up with
18  lots of different possibilities.
19     And I know we can get there, but I'm
20  hoping to maybe do this one step at a time.
21  A  Okay.  So what I just described has
22  nothing to do with lost profits.
23  Q  Okay.  So then let me see if I understand.
24     ==So the 455.5 million unjust enrichment==
25  ==scenario in paragraph 8, that's a scenario where==

Page 209

53 (Pages 206 - 209)

Veritext Legal Solutions
866 299-5127

```
 1  you're saying the Court just says, "Sorry," to
 2  Ms. Elsten. "You didn't meet your burden to
 3  apportion, and therefore, too bad, no apportionment
 4  will be done."
 5          So you've taken the revenues, and you've
 6  deducted the costs that you believe are appropriate
 7  to deduct from the revenues, and you've stopped
 8  there; is that right?
 9      A   Yes, that's correct.
10      Q   In paragraph 9, where you come up with the
11  unjust enrichment figure of 56.9 million, you take
12  the revenues, you deduct the costs that you say are
13  appropriate to deduct from the revenues, and then
14  you do do some kind of apportionment, right?
15      A   I use -- this is important.
16      Q   Yes.
17      A   I use her general methodology for doing
18  the apportionment with some corrections.  So it's a
19  corrected version of her general methodology.
20      Q   Okay.  And then you talked about hybrid
21  scenarios, also, right?  Can you point me to where
22  the hybrid scenarios are disclosed somewhere in
23  your --
24      A   Yeah.  So in the exhibits -- we can go
25  through them a little bit.
                                              Page 210
```

```
 1          So the hybrid scenarios -- maybe I made it
 2  sound more complicated than it is.
 3          A hybrid scenario would be -- again, let's
 4  keep lost profits to the side.
 5      Q   Right.
 6      A   Okay.  But every version has a lost profit
 7  flavor and a non-lost profit flavor.
 8      Q   Right.
 9      A   But the hybrid scenarios are -- so for
10  example -- are you looking at Exhibit 3?
11      Q   I can.  Okay.
12      A   Okay.  So for example, Case 1 is adjusted
13  profit margin, so that's -- I correct her costs to
14  what I think is a more appropriate cost measure.
15  That's where the profit margin comes from.  And no
16  apportionment says -- the Court says, "Sorry, you
17  didn't meet your burden.  I have no data on which to
18  do apportionment."
19      Q   Got it.
20      A   Case 2 is adjusted profit margin.  So I,
21  again, corrected her costs for what I think are the
22  appropriate deductible costs.
23          And adjusted apportionment, I have adopted
24  her general methodology for apportionment but have
25  corrected it for what I think are some clear logical
                                              Page 211
```

```
 1  errors in her apportionment mechanism.
 2      Q   And that's what you called adjusted
 3  apportionment?
 4      A   That's what I call adjusted apportionment.
 5          Case 3 is a lot like Case 1, except Case 3
 6  is, the Court accepts Ms. Elsten's cost methodology
 7  but rejects her revenue apportionment.
 8      Q   I get it.
 9      A   And Case 4 is I adjusted -- Case 4 is
10  adjusted profit margin and adjusted apportionment.
11  And then -- let me see.  I'm just trying to make
12  sure these labels are all correct.  Oh, yeah.  So
13  the lost profits are the same.  The -- oh, yeah.
14  Sorry.
15          Case 4 is her profit margin, so her cost
16  deductions are accepted, but the apportionment --
17  her cost -- her cost adjustments are accepted, so
18  the Court uses hers rather than mine for the costs,
19  but the apportionment is -- and her general
20  methodology for apportionment is accepted, but my
21  corrections.
22      Q   Okay.  I get it.
23          When you're focusing for a second just on
24  the apportionment and not on the different profit
25  margins that are in these different alternatives --
                                              Page 212
```

```
 1      A   Yes.
 2      Q   -- you have a no-apportionment version and
 3  you have an adjusted-apportionment version, right?
 4      A   Correct.
 5      Q   Is there only one adjusted-apportionment
 6  version?  You don't have different flavors of
 7  adjusted apportionment, do you?
 8      A   I have one flavor of adjusted
 9  apportionment.  So I adopt her general
10  methodology --
11      Q   Okay.
12      A   -- and make some corrections to it.
13      Q   Okay.  I get it.  Thank you.
14          Is it fair to say -- and I don't want to
15  put words in your mouth.  But is it fair to say that
16  your dispute with Ms. Elsten over what costs are
17  appropriate to deduct concerns only her deduction of
18  R&D costs?
19      A   My recollection -- I would have to look
20  back at the report -- is the deduction of R&D costs
21  is certainly almost all of it, and I think it's all
22  of it.  But I would have to refresh my memory.
23      Q   Okay.  And you -- is it your belief that
24  Ms. Elsten deducted all R&D costs that were
25  reflected in Arista's financial statements?
                                              Page 213
```

54 (Pages 210 - 213)

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

1  A  No. So my understanding is, she did an
2  apportionment based on share of sales, but I think
3  the concerning issue there is that -- so you asked
4  share of sales.
5        I think the concerning issue there is for
6  Arista to have sold -- R&D is not a variable cost,
7  right? So it's hard to see how Arista could have
8  made its non-U.S. sales with the share of R&D that's
9  only equal to the non-U.S. sales share of revenue.
10       So in order to make the non-U.S. sales,
11 they would have -- Arista would have had to do R&D.
12 You know, the R&D mostly amortizes over all of the
13 sales, right? They sell similar products elsewhere.
14       So that is the -- that is the concern
15 about the deduction of R&D.
16  Q  Most of Arista sales are U.S. sales,
17 right?
18  A  Yes.
19  Q  And couldn't you also say that if
20 Arista -- Arista would have had to spend all of the
21 amount of R&D that it had to spend if it was selling
22 only in the U.S., not internationally?
23  A  Again, I don't know about all of the R&D.
24 But they would have had to make -- they would have
25 had -- again, it is probably not proportionate to

Page 214

1  sales.
2  Q  Do you agree that some amount of R&D
3  expenses would properly be deducted from revenues in
4  this analysis?
5  A  Yes, I think some amount of R&D expenses
6  would appropriately be deducted.
7  Q  And in your analysis of what you consider
8  to be the proper amount of deductions, you deducted
9  no R&D expenses, right?
10  A  Correct, because, again, the -- I
11 didn't -- actually, I will say, I don't actually --
12 I have to think about the -- whether any R&D should
13 be deducted.
14       I adjusted -- because there was no -- you
15 know, I didn't have any data about how much R&D to
16 apportion, yeah, I didn't deduct it.
17  Q  Why do you say you would have to think
18 about whether any R&D should properly be deducted?
19  A  I'm thinking about it now. I thought
20 about it -- I thought about it at the time.
21       Again, the R&D is probably substantially
22 required to make the -- you know, substantially all
23 of the R&D is probably substantially required to
24 make the non-U.S. sales.
25       The -- so, you know, there may be an

Page 215

1  appropriate -- I think there could well be an
2  appropriate deduction, but Ms. Elsten didn't present
3  that evidence. She just apportioned relative to
4  revenue.
5  Q  And your approach -- tell me if this is
6  not correct -- but your approach was essentially,
7  "Ms. Elsten didn't make the proper deduction of R&D,
8  and so therefore I'm not going to make any deduction
9  of R&D"?
10  A  So I didn't -- I didn't have any basis for
11 making a particular deduction for R&D because she
12 didn't provide any -- she didn't provide any
13 correctable way to do it. She didn't provide any
14 evidence.
15       And I think deducting R&D, given that
16 substantially, in that circumstance, without some
17 evidence that, you know, particular R&D expenditures
18 could be deducted or not, I think not deducting the
19 R&D, which, you know, would be required for non-U.S.
20 sales, you know -- would mostly be required for
21 non-U.S. sales, I think, you know, is the only thing
22 that I had evidence to do.
23  Q  Okay. Let me shift topics a little bit
24 and ask you to look at your fair use report --
25  A  Okay.

Page 216

1  Q  -- which is Exhibit 1564, at page 16.
2      MS. CANDIDO: Give me a second.
3      THE WITNESS: Yes, page 16. Got it.
4  BY MR. SILBERT:
5  Q  I'm waiting for your counsel.
6      MS. CANDIDO: Thank you. Sorry. Page 16?
7  Okay.
8  BY MR. SILBERT:
9  Q  I just want to direct you to paragraph 37
10 on that page.
11  A  Okay.
12  Q  It says -- paragraph 37 says, "As
13 described above, data center switches differ across
14 a number of dimensions, including, among others,
15 form factor, port density, operating system
16 software, speed, reliability, and customer support.
17 When purchasing data center switches, customers may
18 consider these dimensions, among others, as well as
19 broader factors, such as support for virtualization
20 and software-defined networking," and then you say
21 you briefly describe some of these factors in the
22 following paragraphs.
23       Do you see that?
24  A  Yes.
25  Q  Do you agree that each of these factors

Page 217

Veritext Legal Solutions
866 299-5127

Page 218

```
 1  that you identify here in the succeeding paragraphs
 2  in your report have some value to customers?
 3      A  So I don't know that all of these factors
 4  have value to all customers, but this is a set of
 5  factors which have value to some -- you know,
 6  these -- each of these factors has some value to
 7  some customers.
 8  [REDACTED]
 9  [REDACTED]
10  [REDACTED]
11  [REDACTED]
12  [REDACTED]
13  [REDACTED]
14  [REDACTED]
15  [REDACTED]
16  [REDACTED]
17  [REDACTED]
18  [REDACTED]
19      Q  Okay.  In your -- we talked just a little
20  bit ago about your different apportionment
21  approaches, and you had the no-apportionment
22  approach and then the adjusted-apportionment
23  approach.
24      A  Yes.
25      Q  In your no-apportionment approach, did you
```

Page 219

```
 1  attempt to ascribe any value to any feature of an
 2  Ethernet switch other than the CLI?
 3      A  So again, in my no-apportionment approach,
 4  I don't -- I do not apportion the revenue at all.
 5          And I think I make clear in my opening
 6  damages report that it is my understanding that
 7  apportionment is -- you know, that apportionment
 8  is -- should be done, that some apportionment should
 9  be done.  But I don't do it because it's my
10  understanding that Ms. Elsten is supposed to do it.
11      Q  And again, that's in your no-apportionment
12  approach, right?
13      A  That's in my no-apportionment approach.
14      Q  Okay.  Your adjusted-apportionment
15  approach, you base it, at least in part, on the
16  survey from Cascade that we were talking about
17  earlier today, right?
18          MS. CANDIDO:  Objection.
19          THE WITNESS:  So Ms. Elsten bases a
20  substantial part of her apportionment on the survey
21  from Cascade that we talked about before.
22          And I correct her apportionment for some
23  logical issues with her apportionment, but I
24  prefaced that by saying I don't think that the
25  survey from Cascade is -- and the equal weighting of
```

Page 220

```
 1  all the factors in the survey from Cascade is an
 2  appropriate way to do the apportionment.
 3  BY MR. SILBERT:
 4      Q  So do you believe that your
 5  adjusted-apportionment approach is a reliable way to
 6  apportion profits in this case?
 7          MS. CANDIDO:  Objection.  Mischaracterizes
 8  the testimony.
 9          THE WITNESS:  So as I said, I have said
10  that I do not agree with Ms. Elsten's general
11  methodology and the sources that she used to
12  generate that methodology.
13          And so in providing the corrections, it is
14  my opinion that the general methodology is not
15  appropriate, but I have corrected her general
16  methodology for some logical errors.
17          So since I have said that her
18  apportionment methodology is not reliable, I am
19  saying that this is a correction to -- for some
20  logical errors if her apportionment methodology is
21  accepted.
22          But I do not think that she has met her
23  burden of providing an appropriate apportionment
24  methodology.
25  ///
```

Page 221

```
 1  BY MR. SILBERT:
 2      Q  Okay.  So with the adjusted-apportionment
 3  approach, you're essentially saying, "Ms. Elsten,
 4  the methodology you're using is not appropriate.
 5  But if you were going to use this methodology, you'd
 6  at least have to fix these logical errors that you
 7  made, and if you did that, the result would be X and
 8  not Y"?
 9      A  Correct.
10          MS. CANDIDO:  Objection.  Sorry.
11          THE WITNESS:  Correct.
12          MR. SILBERT:  Okay.
13          MS. CANDIDO:  Are we close to a bathroom
14  break?
15          MR. SILBERT:  Yeah, why don't we take a
16  break.
17          THE VIDEO OPERATOR:  Going off the record,
18  the time is 4:29 p.m.
19          (Recess, 4:29 p.m. - 4:35 p.m.)
20          (Exhibit 1576 was marked for
21      identification and is attached hereto.)
22          THE VIDEO OPERATOR:  Back on the record.
23  The time is 4:35 p.m.
24  BY MR. SILBERT:
25      Q  Dr. Chevalier, the court reporter has
```

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

**Page 230**

1  A  I actually don't know the answer to that.
2  Q  Do you know approximately the answer?
3  A  I actually don't.
4  Q  Do you know if it's more than $500,000?
5  A  My guess is it's more than $500,000, but I
6  haven't actually -- I actually don't know.
7  Q  Do you know if it's more than a million
8  dollars?
9  A  I don't know for a fact. I really don't
10 know.
11 Q  Do you have a belief?
12 A  I really don't know.
13    MR. SILBERT: Okay. I know we just took a
14 break, but if it's okay, can we take a quick break
15 again? And hopefully we can be done very quickly.
16    THE WITNESS: Okay.
17    THE VIDEO OPERATOR: Going off the record,
18 the time is 4:50 p.m.
19    (Recess, 4:50 p.m. - 4:54 p.m.)
20    THE VIDEO OPERATOR: Back on the record.
21 The time is 4:54 p.m.
22    MR. SILBERT: Dr. Chevalier, thank you for
23 your time. I have no further questions for you.
24    I do want to designate this transcript as
25 outside counsel only.

**Page 231**

1     MS. CANDIDO: I would designate it as
2  outside counsel only for Cisco as well, subject to
3  de-designation.
4     THE VIDEO OPERATOR: This concludes
5  today's videotaped deposition of Dr. Judith
6  Chevalier. We're off the record at 4:55 p.m. Thank
7  you.
8          (TIME NOTED: 4:55 p.m.)
9               --o0o--

**Page 232**

8     I, JUDITH CHEVALIER, Ph.D., do hereby
9  declare under penalty of perjury that I have read
10 the foregoing transcript; that I have made any
11 corrections as appear noted, in ink, initialed by
12 me, or attached hereto; that my testimony as
13 contained herein, as corrected, is true and correct.
14    EXECUTED this _____ day of _____,
15 2016, at _____, _____.
16      (City)         (State)

        _____
20      JUDITH CHEVALIER, Ph.D.

**Page 233**

1     I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
         That the foregoing proceedings were taken
4  before me at the time and place herein set forth;
5  that any witnesses in the foregoing proceedings,
6  prior to testifying, were administered an oath; that
7  a record of the proceedings was made by me using
8  machine shorthand which was thereafter transcribed
9  under my direction; that the foregoing transcript is
10 a true record of the testimony given.
11    Further, that if the foregoing pertains to
12 the original transcript of a deposition in a Federal
13 Case, before completion of the proceedings, review
14 of the transcript [x] was [ ] was not requested.
15    I further certify I am neither financially
16 interested in the action nor a relative or employee
17 of any attorney or any party to this action.
         IN WITNESS WHEREOF, I have this date
18 subscribed my name.

20 Dated: 07/28/2016

         *Carla Soares*
         CARLA SOARES
         CSR No. 5908

59 (Pages 230 - 233)