# EXHIBIT S

# EXHIBIT 6
# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1        UNITED STATES DISTRICT COURT

2        NORTHER DISTRICT OF CALIFORNIA

3            SAN JOSE DIVISION

4

CISCO SYSTEMS, INC.,

5                Plaintiff,

6

        vs.                    Civil Action No.

7                               5:14-cv-5344-BLF

8   ARISTA NETWORKS, INC.,

9            Defendants.
   _____ /

10

11      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

12          SUBJECT TO PROTECTIVE ORDER

13

14  VIDEO RECORDED DEPOSITION OF EXPERT WILLIAM M. SEIFERT

15            JUNE 29, 2016

16              9:51 A.M.

17

18      50 California Street, 21st Floor

19          San Francisco, California

20

21

22  REPORTED BY:

23  Mark W. Banta

24  CSR No. 6034, CRR

25

10:18:57  1   ability of one network device to communicate with another

        2   network device and potentially with a human in like or

        3   similar fashion.

        4   BY MR. NEUKOM:

10:19:22  5       Q.   Can you identify for me any -- any material

        6   anywhere that has defined -- other than your report --

        7   that has defined interoperability in the networking

        8   context to refer to the interactions between a device and

        9   a human user?

10:19:42 10            MS. McCLOSKEY:  Objection.  Vague.  Overbroad.

       11   Asked and answered.

       12            THE WITNESS:  No.

       13   BY MR. NEUKOM:

       14       Q.   If you could please turn to paragraph 6 of your

10:20:06 15   report, I'm looking in particular at the following

       16   phrase, quote:

       17            "This report focuses on the development of

       18        de facto industry standards -- ones that emerge

       19        over time as a result of widespread adoption

10:20:34 20        throughout a given industry."

       21            Do you see what I'm referring to?

       22       A.   Yes.

       23       Q.   This material that you've put in the dash,

       24   specifically, "ones that emerge over time as a result of

10:20:45 25   widespread adoption throughout a given industry," is that

10:20:49  1  your definition of what constitutes a de facto industry

        2  standard?

        3          MS. McCLOSKEY:  Objection.  Vague.

        4          THE WITNESS:  I think this is one of the

10:20:58  5  characteristics, not the only one, no.

        6  BY MR. NEUKOM:

        7      Q.   Other than the emergence over time -- pardon me,

        8  other than widespread adoption throughout a given

        9  industry, can you identify for me other characteristics,

10:21:19 10  any and all, for a de facto industry standard?

       11          MS. McCLOSKEY:  Objection.  Calls for

       12  speculation.

       13          THE WITNESS:  So again, for purposes of this

       14  report and the purposes for which Arista has asked me to

10:21:34 15  focus on de facto standards in the networking industry in

       16  particular, computer industry generally, I have a simple

       17  test.  It's sort of four component to this:  That

       18  de facto standards' ones that come about because they're

       19  commonly used as opposed to being drafted and adopted by

10:21:56 20  a formal standards organization.

       21          A de facto standard is one which has I think

       22  roughly four characteristics.  One, the market size must

       23  be sufficiently large; two, there must be enough -- there

       24  must be sufficient number of market participants, namely,

10:22:17 25  suppliers and consumers, suppliers in this instance being

| | | |
|---|---|---|
| 10:22:24 | 1 | vendors of networking equipment, the consumers being |
| | 2 | those who buy the networking equipment and operate them |
| | 3 | in their networks; third, that there are scarce human |
| | 4 | resources available especially to implement and deploy |
| 10:22:43 | 5 | the vendors' equipment and the customers' networks for |
| | 6 | several reasons, but simply observing that the human |
| | 7 | resources are scarce and not plentiful; and fourth, that |
| | 8 | the resultant system is sufficiently complex that one has |
| | 9 | to look for ways to simplify especially the human |
| 10:23:13 | 10 | interactions with, deployment of, maintenance, |
| | 11 | troubleshooting, and general operation of the network. |
| | 12 | So those four, if you will, forces essentially |
| | 13 | combine to create a situation where customers start |
| | 14 | demanding certain activities, certain functionality in |
| 10:23:43 | 15 | the equipment be standardized. |
| | 16 | BY MR. NEUKOM: |
| | 17 | Q.  Other than your expert report, can you identify |
| | 18 | for me anyone else who has ever adopted this definition |
| | 19 | of a de facto industry standard? |
| 10:24:03 | 20 | MS. McCLOSKEY:  Objection.  Vague. |
| | 21 | THE WITNESS:  No. |
| | 22 | BY MR. NEUKOM: |
| | 23 | Q.  Can you identify for me anyone else or any other |
| | 24 | document other than your expert report in which this |
| 10:24:19 | 25 | definition of a de facto industry standard has been |

10:24:25    1    proposed?

            2            MS. McCLOSKEY:   Objection.   Asked and answered

            3    and vague.

            4            THE WITNESS:   No.

10:24:32    5    BY MR. NEUKOM:

            6        Q.   So for purposes of preparing your expert report

            7    which covers, among other issues, a de facto industry

            8    standard, you formulated anew this understanding of a

            9    de facto industry standard?

10:24:48   10            MS. McCLOSKEY:   Objection.   Mischaracterizes

           11    prior testimony.

           12            THE WITNESS:   I don't agree that it's a new

           13    definition.   This is simply my -- my words based on my

           14    experience, my involvement with three startup companies

10:25:05   15    that were in fact network equipment manufacturers, and

           16    numerous interaction with customers over 30 years of

           17    experience in this industry.

           18    BY MR. NEUKOM:

           19        Q.   Before your involvement in this case, had you

10:25:20   20    ever shared with anyone this understanding of a de facto

           21    industry standard?

           22            MS. McCLOSKEY:   Objection.   Vague.

           23            THE WITNESS:   I -- I can't remember if I did or

           24    not.

           25    //

10:25:31    1   BY MR. NEUKOM:

            2       Q.   Okay.  I think you testified that the first of

            3   four elements or criteria for an industry standard or

            4   de facto industry standard was that the market size must

10:25:53    5   be sufficiently large.  Do I have that right so far?

            6       A.   Yes.

            7       Q.   Okay.  How would I discern if I wanted to find

            8   out if the market size was sufficiently versus

            9   insufficiently large?  How do I -- what's the criteria

10:26:11   10   there?  How do I make that call?

           11            MS. McCLOSKEY:  Objection.  Vague.  Overbroad.

           12   Calls for speculation.

           13            THE WITNESS:  I don't think there's a

           14   quantitative answer to that.  In my view, in my

10:26:23   15   experience in the networking industry is that it requires

           16   a simple subjective test, business judgment, to make that

           17   determination.  And each vendor likely is going to make

           18   its own independent of all -- all others.

           19   BY MR. NEUKOM:

10:26:48   20       Q.   For the second criteria or defining element of a

           21   de facto industry standard as you've explained it today,

           22   by what criteria do you judge whether there's a

           23   sufficient number of market participants using the -- the

           24   subject matter at issue for it to constitute a de facto

10:27:08   25   industry standard?

10:27:09   1          MS. McCLOSKEY:  Objection.  Vague and overbroad.

           2          THE WITNESS:  So I would say that, again, this

           3   is largely subjective thresholds in terms of market

           4   participants, that the buyers have a lot to say about

10:27:28   5   this, in fact, they determine.  It's a question of what

           6   the vendors do about what the customers ask.

           7   BY MR. NEUKOM:

           8      Q.   Okay.  For the third element of a de facto

           9   industry standard as you've explained it today which I'm

10:27:42  10   going to refer to in shorthand as the scarcity of human

          11   resources, how do you -- how do you make a determination

          12   whether the human resources are scarce enough to satisfy

          13   this element of a de facto industry standard, as you've

          14   explained it?

10:27:58  15          MS. McCLOSKEY:  Objection.  Vague.  Overbroad.

          16   Calls for speculation.

          17          THE WITNESS:  So I think one way to characterize

          18   the scarcity of human resources when it came -- when it

          19   came to the development of the networking industry was --

10:28:13  20   one indication was when the customers would ask the

          21   vendors for assistance in deploying, installing,

          22   configuring, managing, in some cases even operating their

          23   networks.

          24   BY MR. NEUKOM:

10:28:30  25      Q.   Thank you for that.  I understand that's --

10:28:34   1   that's one basis pursuant to which you believe that

           2   Cisco's CLI is de facto industry standard, the history of

           3   customers asking for help in this context.  Do I have

           4   that right?

10:28:49   5           MS. McCLOSKEY:  Objection.  Misstates testimony.

           6           THE WITNESS:  As I understand the question, yes.

           7   BY MR. NEUKOM:

           8       Q.   Okay.  So I need to be asking something slightly

           9   different, which is:  Before a particular technology

10:29:01  10   becomes a de facto industry standard as you've explained

          11   it in your report and today, that technology would have

          12   to satisfy four defining elements.  Am I right so far?

          13       A.   In my opinion, yes.

          14       Q.   Okay.  And the third of those defining elements

10:29:19  15   would be a scarcity of human resources available to

          16   deploy the equipment or the technology at issue?

          17       A.   Yes.

          18       Q.   Okay.  So my question to you is:  How do you --

          19   how do you make a determination of whether the human

10:29:33  20   resources available to deploy the equipment are scarce

          21   enough or, by contrast, abundant enough to satisfy this

          22   element of a definition of a de facto industry standard?

          23           MS. McCLOSKEY:  Objection.  Vague.  Overbroad.

          24   Calls for speculation.

10:29:54  25           THE WITNESS:  Well, again, I think the customers

10:29:55    1    are the guide by which any vendor is going to make this

            2    determination.  And like I said a minute ago, the

            3    customers will say -- will tell the manufacturer or their

            4    agent, their distribution channel partner, that they need

10:30:14    5    assistance, they need training, they may -- they may

            6    require on-site assistance from the manufacturers'

            7    engineers.  Any other number of factors would go into

            8    that determination as to whether or not there was a

            9    sufficient, you know, human capital available within the

10:30:34   10    customer's organization to do what they needed to do.

           11    BY MR. NEUKOM:

           12        Q.   Can you identify for me what -- you testified a

           13    minute ago "any other number of factors would go into

           14    that determination."  What other factors would go into

10:30:50   15    that determination?

           16             MS. McCLOSKEY:  Objection.  Calls for

           17    speculation.  Vague.

           18             THE WITNESS:  So many times the network design

           19    may be unclear to the customer, so they need assistance

10:31:04   20    in just knowing what they need to put together and what

           21    they need to purchase.  So there's a long list of things

           22    that go into designing, purchasing, installing,

           23    configuring, and operating a network.  No -- no two are

           24    alike, and typically the customers do ask for assistance

10:31:25   25    from the manufacturer in -- in potentially several forms.

10:31:31  1  BY MR. NEUKOM:

         2      Q.   Okay.  How many customers have to ask for

         3  assistance in order for this third element of a de facto

         4  industry standard to be met?

10:31:41  5           MS. McCLOSKEY:  Objection.  Calls for

         6  speculation.  Vague.

         7           THE WITNESS:  I don't know.  I'm not sure that

         8  there's a quan -- there's no quantitative answer to that.

         9           If the customers feel the pain they'll ask.

10:31:54 10  BY MR. NEUKOM:

        11      Q.   Okay.  So I think before when you explained for

        12  me what market size is or isn't sufficient enough to

        13  satisfy the first element of a de facto industry standard

        14  you explained that that is a -- a fact-specific inquiry

10:32:12 15  that includes a subjective element.  Is that fair?

        16           MS. McCLOSKEY:  Objection.  Misstates prior

        17  testimony.

        18           THE WITNESS:  Could you rephrase?  I'm not sure

        19  I understand the question.

10:32:21 20  BY MR. NEUKOM:

        21      Q.   Sure.  Let me try to make it simpler.

        22           I asked you earlier to explain for me how you

        23  would make a determination whether a particular

        24  technology satisfies the first element of a de facto

10:32:32 25  industry standard as you have explained that concept in

10:32:35    1    your report and today.  Are you with me so far?

2        A.   Yes.

3        Q.   Okay.  And one aspect of your answer was to

4    explain to me that making that determination includes a

10:32:50    5    subjective analysis.

6        A.   Yes.

7        Q.   Okay.  Likewise, when I asked you to explain the

8    second element of a de facto industry standard whether a

9    particular technology -- whether there's a sufficient

10:33:08   10    number of market participants at issue, making that

11    determination of sufficiency or insufficiency likewise

12    includes a subjective analysis and conclusion.

13           MS. McCLOSKEY:  Objection.  Misstates prior

14    testimony.

10:33:22   15           THE WITNESS:  I believe I said that it was

16    subjective in terms of making a business judgment.

17    BY MR. NEUKOM:

18        Q.   Okay.  So for this third element, I just want to

19    make sure I'm understanding your testimony.  To make a

10:33:37   20    determination about whether the human resources are

21    available to deploy the technology, the equipment at

22    issue, whether they are scarce enough to satisfy this

23    third element of a de facto industry standard as you've

24    explained it, is that also a multi-factor subjective

10:33:54   25    inquiry and conclusion?

```
10:33:56   1            MS. McCLOSKEY:  Objection.  Vague.  Overbroad.

           2            THE WITNESS:  Well, I don't think it's

           3   subjective if the customers come and ask you for help.

           4   So that was one of the things I tried to illustrate a

10:34:07   5   minute ago.  So no, I don't believe so.

           6   BY MR. NEUKOM:

           7       Q.   How many customers have to ask for help in

           8   deploying a particular technology in order for it to

           9   satisfy your third element of a de facto industry

10:34:16  10   standard?

          11            MS. McCLOSKEY:  Objection.  Asked and answered.

          12   Vague.  Ambiguous.

          13            THE WITNESS:  And again, sort of business

          14   judgment in terms of opportunity, opportunity costs, all

10:34:30  15   the elements that go into making a determination as a...

          16   as a business.

          17   BY MR. NEUKOM:

          18       Q.   Okay.  And that business judgment that you would

          19   apply to make a determination of whether the third

10:34:41  20   element of a de facto industry standard has been

          21   satisfied or not, that business judgment would also

          22   include a subjective analysis?

          23            MS. McCLOSKEY:  Objection.  Misstates prior

          24   testimony.  Vague.  Calls for speculation.

10:34:56  25            THE WITNESS:  Well, to the extent that any
```

William McCumber - Highly Confidential
June 29, 2016                                                      35

10:34:58   1   business judgment is done by human beings, there's always

           2   going to be some subjectivity involved.  So yes, to that

           3   extent.

           4           But generally, businessmen try to make

10:35:09   5   determinations based on what their customers' needs are,

           6   what they're willing to pay for, what kind of resources

           7   the company has to support the customer with, and what

           8   other actions might be available to satisfy the

           9   customers' requirements.

10:35:28  10   BY MR. NEUKOM:

          11       Q.  For the fourth element of -- or the fourth

          12   required element of a de facto industry standard as

          13   you've explained it, I think you explained that the

          14   question is whether the resulting system is sufficiently

10:35:44  15   complex.  And I know I'm -- I'm abbreviating your prior

          16   answer, but is that a fair recitation of the fourth

          17   element of a de facto industry standard as you've

          18   explained it?

          19           MS. McCLOSKEY:  Objection.  Misstates prior

10:36:01  20   testimony.

          21           THE WITNESS:  I think that's fair enough.

          22   BY MR. NEUKOM:

          23       Q.  Okay.  How do you make the determination whether

          24   the resulting system is sufficiently versus

10:36:10  25   insufficiently complex in order to satisfy this fourth

```
10:36:15   1   required element of a de facto industry standard as

           2   you've explained it?

           3           MS. McCLOSKEY:  Objection.  Vague.  Overbroad.

           4           THE WITNESS:  Again, complexity is oftentimes in

10:36:30   5   the eye of the beholder.  In this case, the beholder's

           6   eye that matters is that of the customer and his

           7   employees, and what they're trying to do with their

           8   network and the network equipment that they purchase

           9   from -- from a vendor.

10:36:46  10   BY MR. NEUKOM:

          11       Q.  When you say "complexity is oftentimes in the

          12   eye of the beholder," are you -- are you telling me that

          13   whether a particular technology is sufficiently complex

          14   to satisfy this fourth element of a de facto industry

10:37:02  15   standard depends upon an individual's perspective?

          16           MS. McCLOSKEY:  Objection.  Vague.  Ambiguous.

          17   Misstates prior testimony.

          18           THE WITNESS:  No, I don't agree that it implies

          19   an individual perspective.  I think it's more a

10:37:19  20   collective perspective on the part of an organization.

          21   BY MR. NEUKOM:

          22       Q.  Okay.  So as you've explained it to me, whether

          23   a technology satisfies the fourth element of a de facto

          24   industry standard, namely, whether the technology at

10:37:34  25   issue -- at issue is sufficiently complex, that
```

10:37:37    1    determination would be made by one or more individuals

            2    within a company exercising their business judgment.  Is

            3    that accurate?

            4                MS. McCLOSKEY:  Objection.  Misstates prior

10:37:48    5    testimony.

            6                THE WITNESS:  I think that's partially accurate,

            7    yes.

            8    BY MR. NEUKOM:

            9        Q.  Is it also fair to say that in making a

10:37:58   10    determination about whether a particular technology

           11    satisfies this fourth required element of a de facto

           12    industry standard, that also includes a subjective

           13    analysis and conclusion?

           14                MS. McCLOSKEY:  Objection.  Misstates prior

10:38:11   15    testimony.  Vague.

           16                THE WITNESS:  Well, again, as I stated earlier,

           17    we are talking about humans dealing with in many cases

           18    complex or unfamiliar technologies in which case human

           19    beings are always going to have some subjective element

10:38:30   20    to their -- to their determination.

           21    BY MR. NEUKOM:

           22        Q.  In paragraph 6 you refer to the TCP/IP software

           23    protocol as an early example of a de facto industry

           24    standard.  Do you see what I'm referring to?

10:38:54   25        A.  I do.

10:38:55  1      Q.   You understand that the TCP/IP software protocol

2   has in subsequent years been proposed to and adopted by

3   one or more standard-setting organizations as a I think

4   what you would call a de jure industry standard?

10:39:14  5      A.   Yes.  That's true.  But it didn't start out that

6   way.

7        Q.   You also refer to, in paragraph 6, to the 4.2BSD

8   version of Unix as an early example of a de facto

9   industry standard?  Do I have that right?

10:39:37 10      A.   Yes.

11        Q.   Did 4.2BSD, did that version of Unix

12   subsequently get proposed to and adopted by one or more

13   standard-setting organizations as a de jure industry

14   standard?

10:39:51 15      A.   I don't believe so, no.

16        Q.   If you turn to paragraph 8 of your report, it's

17   on page 3, I'm looking at the following sentence:  "Cisco

18   did not develop its own CLI until the early 1990s."  Do

19   you see what I'm referring to?

10:40:15 20      A.   Yes.

21        Q.   What was your basis for making that statement?

22             MS. McCLOSKEY:  Objection.  Vague.  Overbroad.

23             THE WITNESS:  One, my own experience with Cisco

24   as a competitor through a company I started in the 1980s

10:40:33 25   called Wellfleet Communications and my familiarity with

10:40:37    1    equipment at the time, and in addition, we did have

            2    conversations with a person who was responsible for

            3    writing their CLI.

            4    BY MR. NEUKOM:

10:40:47    5        Q.   Who is that?

            6        A.   This was Kirk McKusick.

            7        Q.   And when you refer to, "its own CLI," I take it

            8    you're referring to your definition of Cisco's CLI from

            9    the first paragraph of your report?

10:41:04   10            MS. McCLOSKEY:  Objection.  Misstates prior

           11    testimony.  Vague.

           12            THE WITNESS:  The CLI of Cisco's I am quite

           13    certain has evolved over time since its original

           14    incarnation, so it would not be exactly the same now as

10:41:21   15    it was then, of course.

           16    BY MR. NEUKOM:

           17        Q.   Okay.  I think in paragraph 1 you explain to the

           18    reader that when you refer to Cisco's CLI you're

           19    referring to the particular commands, modes, prompts,

10:41:42   20    hierarchies, et cetera, that Cisco is asserting Arista

           21    copied.  Do I have that right?

           22            MS. McCLOSKEY:  Objection.  Misstates prior

           23    testimony.  And vague.

           24            THE WITNESS:  In this case, I'm using the CLI

10:41:58   25    generically to describe a CLI, not the CLI as it

10:42:04  1  currently exists in today's Cisco products, no.

2  BY MR. NEUKOM:

3      Q.  Okay.  So in paragraph 8 when you write "Cisco

4  did not develop its own CLI until the early 1990s," what

10:42:20  5  CLI are you referring to?

6          MS. McCLOSKEY:  Objection.  Vague.

7          THE WITNESS:  Again, CLI is a common term,

8  command line interpreter, used generically amongst many

9  manufacturers, many points and many products, so in this

10:42:34 10  particular sentence I'm using CLI in the generic sense of

11  the term.

12  BY MR. NEUKOM:

13      Q.  Okay.  And I think a minute ago you said that

14  CLI stands for a command line interpreter?  Did you mean

10:42:46 15  line command line interface?

16      A.  It has -- people use it both ways.  Both

17  definitions are interchangeable.

18      Q.  Okay.  So when you write here in paragraph 8:

19  "Cisco did not develop its own CLI until the early

10:42:59 20  1990s," you're referring to CLI in what you've just

21  described as the generic sense of the word?

22      A.  Yes.

23      Q.  Any command line interface for interaction

24  between a human and an operating system that enables the

10:43:14 25  configuration and management of routers and switches?

10:43:17    1            MS. McCLOSKEY:  Objection.  Asked and answered.

            2    Vague.  Overbroad.

            3            THE WITNESS:  In the networking industry, yes.

            4    But CLIs are found in other devices in other -- in

10:43:26    5    computing systems and -- and other non-network devices,

            6    as well.

            7    BY MR. NEUKOM:

            8        Q.    Are you aware that Cisco offered a CLI in the

            9    1980s?

10:43:35   10            MS. McCLOSKEY:  Objection.  Lacks foundation.

           11    Vague.

           12            THE WITNESS:  No.

           13    BY MR. NEUKOM:

           14        Q.    Did you undertake any -- did you take any

10:43:50   15    efforts to try to verify this understanding that Cisco

           16    did not offer any CLI of any stripe until the 1990s when

           17    you were preparing your report?

           18            MS. McCLOSKEY:  Objection.  Vague.

           19            THE WITNESS:  I'm sorry.  Rephrase the question?

10:44:04   20    Did I --

           21    BY MR. NEUKOM:

           22        Q.    Sure.  Fair enough.  Poorly-phrased question.

           23    Let me restate it.

           24            I think I've heard you to testify today that

10:44:14   25    according to your memory and your background in the

10:44:16    1    industry Cisco did not offer any CLI to the market until

            2    the 1990s.  Do I have that right so far?

            3            MS. McCLOSKEY:  Objection.  Misstates prior

            4    testimony.

10:44:31    5            THE WITNESS:  Yes, I believe you do.

            6    BY MR. NEUKOM:

            7        Q.  Okay.  So all I'm asking now is in the process

            8    of preparing your report did you do anything to confirm

            9    or investigate this understanding of yours that Cisco did

10:44:44   10    not release or offer a CLI to the market until the 1990s?

           11            MS. McCLOSKEY:  Objection.  Vague.  Assumes

           12    facts.

           13            THE WITNESS:  Yes.

           14    BY MR. NEUKOM:

10:44:53   15        Q.  What steps were those?  Or what efforts were

           16    those?

           17        A.  Well, principally, trying to find user manuals

           18    or user documentation from the late '80s.  So some were

           19    successful and some I could not locate.  It's hard to

10:45:09   20    find manuals and user guides from any manufacturer from

           21    that time period.

           22    BY MR. NEUKOM:

           23        Q.  Okay.  So is it safe to say that in the process

           24    of preparing this report you did not review any Cisco

10:45:25   25    CLI-related materials that were dated earlier than 1990?

```
10:45:30    1          MS. McCLOSKEY:  Objection.  Misstates prior

            2   testimony.  Vague.

            3          THE WITNESS:  I don't believe so, no.

            4          MS. McCLOSKEY:  Jay, we've been going about an

10:45:45    5   hour.  Is now an okay time for a quick break?

            6          MR. NEUKOM:  Sure.

            7          THE VIDEOGRAPHER:  Off the record, 10:45 a.m.

            8          (Recess taken from 10:45 to 10:54 a.m.)

            9          THE VIDEOGRAPHER:  On the record, 10:54 a.m.

10:54:32   10   BY MR. NEUKOM:

           11      Q.   Looking at paragraph 9 of your report, sir, I'm

           12   looking at the following sentence:  "As networks grew in

           13   size and number, customers began to demand a standard CLI

           14   for networked device, including switches and routers."

10:54:52   15   Do you see what I'm referring to?

           16      A.   Yes.

           17      Q.   When you say that customers began to demand a

           18   standard CLI, when did that happen?

           19          MS. McCLOSKEY:  Objection.  Vague.  Calls for

10:55:05   20   speculation.

           21          THE WITNESS:  I can't recall an exact date or

           22   year.

           23   BY MR. NEUKOM:

           24      Q.   Do you know if it was in the 1980s versus the

10:55:19   25   1990s?
```

```
10:55:20    1      A.   No.  It could not have been in the 1980s.

            2      Q.   Okay.  So to the best of your memory, although

            3  you can't tell me the year, it's your testimony that

            4  customers began to demand a standard CLI for networked

10:55:35    5  devices at some point in the 1990s?

            6      A.   Yes.

            7      Q.   Do you know if that was in the early, middle,

            8  late 1990s?

            9          MS. McCLOSKEY:  Objection.  Asked and answered.

10:55:47   10  The witness has already testified that he can't

           11  identify --

           12          MR. NEUKOM:  No, no.

           13          MS. McCLOSKEY:  -- an exact date.

           14          MR. NEUKOM:  No, no, no, no, no.  You can say

10:55:52   15  "asked and answered" but you can't then start reciting

           16  what you want him to have just said.

           17          THE WITNESS:  No, I don't remember exactly when

           18  in the '90s.

           19  BY MR. NEUKOM:

10:56:01   20      Q.   Okay.  Later in paragraph 9 you wrote:  "As

           21  Cisco's market share grew, Cisco's CLI was widely

           22  accepted as an industry standard."  Do you see what I'm

           23  referring to?

           24      A.   I do.

10:56:16   25      Q.   When did Cisco's market share grow to a point
```

10:56:19  1  such that it's your opinion that its CLI was widely

2  accepted as industry standard?

3          MS. McCLOSKEY:  Objection.  Vague.

4          THE WITNESS:  I can't say, again, the exact

10:56:32  5  year.

6  BY MR. NEUKOM:

7      Q.  If you can't provide for me an exact year, can

8  you give me any other explanation of when, at what point

9  in time, according to your testimony, Cisco became --

10:56:52  10  Cisco's CLI was widely accepted as an industry standard?

11          MS. McCLOSKEY:  Objection.  Asked and answered.

12          THE WITNESS:  So I think that further in my

13  report, if we ever get past the summary, we'll get to

14  some of the source material that would explain perhaps

10:57:10  15  one of the measurements or one way to discern when

16  Cisco's CLI became a de facto standard, for example, when

17  the industry press starts writing about it as such.

18  BY MR. NEUKOM:

19      Q.  Okay.  You -- although I'm -- I'm focused on a

10:57:27  20  few paragraphs right now, when I ask you any and all

21  questions, you're free to consult any aspect of your

22  report.  So let me ask the question again, and if you

23  then need a minute to refer to your own report materials,

24  that's -- that's okay.  There's no shame in referring

10:57:42  25  back to your report.  Okay?

```
10:57:45    1        A.   Okay.

            2        Q.   Okay.  Can you tell me at what point in time,

            3   according to your testimony, at what point in time did

            4   Cisco's market share grow to a point such that, as you've

10:58:00    5   opined, Cisco's CLI became widely accepted as an industry

            6   standard?

            7        A.   Again, the same answer.  I can't point to the

            8   exact year, but maybe in some of the source material

            9   there is a -- there's an indication when the market --

10:58:17   10   when the industry generally and the industry press starts

           11   describing it as such, maybe we can find the year.

           12        Q.   Okay.  But you have not disclosed any opinion

           13   testimony or any testimony of any sort pursuant to which

           14   you purport to tell us when this happened.  Do I have

10:58:36   15   that right?

           16             MS. McCLOSKEY:  Object to form.  Vague.

           17   Overbroad.

           18             THE WITNESS:  Again, I don't believe that was

           19   part of the objective of my report, no.

10:58:45   20   BY MR. NEUKOM:

           21        Q.   Okay.  If you turn, please, to page 6 of your

           22   report, I'm looking at paragraph 18.  I'm looking at the

           23   end of paragraph 18, the last sentence which reads:

           24             "What was needed was a new way of

10:59:13   25        connecting networks, internetworking, that
```

10:59:17   1        permitted every connected device to communicate

           2        with others as though they were all on the same

           3        network."

           4             Do you see what I'm referring to?

10:59:24   5        A.   Yes.

           6        Q.   When you introduced and used the phrase

           7   "internetworking," does that mean something different

           8   than interoperability as you've used it in your report?

           9        A.   Yes, actually, it is different.

10:59:42  10        Q.   Please define for me how you used the phrase or

          11   the word "internetworking" for purposes of your testimony

          12   in this case.

          13        A.   Well, my -- my usage of the term

          14   "internetworking" is, I believe, one that's generally

10:59:57  15   accepted in the industry as simply being the connection

          16   of networks to one another or, in other words, network of

          17   networks.

          18        Q.   Okay.  And so when you use the phrase

          19   "internetworking," you mean some method or some

11:00:21  20   technology that permits diverse networks to communicate

          21   with each other?

          22             MS. McCLOSKEY:  Objection.  Misstates prior

          23   testimony.

          24             THE WITNESS:  No.  That's not what I said.

          25   //

11:09:02  1  BY MR. NEUKOM:

2       Q.   Okay.

3       A.   So when I say a network device being able to

4  communicate to another, one to another, I'm speaking of

11:09:10  5  the end systems communicating one to the other.

6       Q.   Got it.  In paragraph 21 you discussed your

7  participation in a working group at the IETF?

8       A.   Yes.

9       Q.   And the working group that you participated in

11:09:34  10  was called the "Benchmark Working Group."  Do I have that

11  right?

12       A.   Yes.

13       Q.   Was there -- was it the purpose of that working

14  group to propose or explore a common command line

11:09:51  15  interface for the networking industry?

16            MS. McCLOSKEY:  Objection.  Vague.

17            THE WITNESS:  No.

18  BY MR. NEUKOM:

19       Q.   If you turn to paragraph 33, it's on page 11, if

11:10:34  20  that helps.  Are you with me?

21       A.   Yes.

22       Q.   Okay.  In paragraph 33 you write:

23            "An industry standard prescribes a set of

24       product characteristics that are widely adopted

11:10:51  25       by either all or a significant portion of a

11:10:53  1      given industry."

          2              Do you see what I'm referring to?

          3      A.    I do.

          4      Q.    Okay.  And in this instance when you refer to an

11:11:02  5      industry standard, are you referring to a proprietary

          6      industry standard, a de jure industry standard, or a

          7      de facto industry standard as you have used those terms

          8      in your report?

          9              MS. McCLOSKEY:  Objection.  Assumes facts.

11:11:16 10      Vague.

         11              THE WITNESS:  Well, in this sentence, it could

         12      be any -- any of those.

         13      BY MR. NEUKOM:

         14      Q.    Okay.  So any and every industry standard, as

11:11:25 15      you understand it, that industry standard must be widely

         16      adopted by either all or a significant portion of a given

         17      industry in order to be an industry standard?

         18              MS. McCLOSKEY:  Objection.  Vague.  Overbroad.

         19              THE WITNESS:  Yes, I'll stand by that.

11:11:44 20      BY MR. NEUKOM:

         21      Q.    Okay.  How do I make a determination about

         22      whether the portion of a given industry that has adopted

         23      product characteristics, whether that is significant

         24      versus insignificant enough to qualify as an industry

11:11:57 25      standard?

| 11:11:58 | 1 | MS. McCLOSKEY:  Objection.  Vague.  Overbroad. |
| | 2 | Calls for speculation. |
| | 3 | THE WITNESS:  Well, one -- one obvious indicator |
| | 4 | might simply be market share of a given vendor or |
| 11:12:15 | 5 | protocol stack or other aspects that involve the standard |
| | 6 | in question. |
| | 7 | BY MR. NEUKOM: |
| | 8 | Q.   What level of market share would be sufficient |
| | 9 | on your opinion to establish that a particular technology |
| 11:12:33 | 10 | was an industry standard? |
| | 11 | MS. McCLOSKEY:  Objection.  Vague.  Ambiguous. |
| | 12 | THE WITNESS:  I think that would depend upon |
| | 13 | what the alternatives were. |
| | 14 | BY MR. NEUKOM: |
| 11:12:55 | 15 | Q.   Also in paragraph 11 you use the phrase |
| | 16 | "multi-vendor interoperability."  Do you see what I'm |
| | 17 | referring to? |
| | 18 | A.   I'm sorry.  Paragraph 33? |
| | 19 | Q.   Oh, I'm -- pardon me.  I'm such a dummy.  I was |
| 11:13:08 | 20 | looking at the page number.  Let me start over. |
| | 21 | In paragraph 33 you also use the phrase |
| | 22 | "multi-vendor interoperability."  Do you see what I'm |
| | 23 | referring to? |
| | 24 | A.   Yes. |
| 11:13:17 | 25 | Q.   Can you explain for me what you mean by |

11:13:19    1   multi-vendor interoperability?

            2       A.   I mean -- I mean for the interoperability of

            3   like products from different manufacturers, different

            4   vendors.

11:13:35    5       Q.   Is multi-vendor interoperability another way of

            6   referring to device-to-device interoperability that you

            7   and I have discussed today?

            8            MS. McCLOSKEY:  Objection.  Vague.

            9            THE WITNESS:  I wouldn't call it exactly a

11:13:47   10   synonym, but it certainly embodies the notion of an end

           11   system being interoperable with another end system, but

           12   more probably, it also refers to all systems in some way

           13   being interoperable with others, implementing the same

           14   or -- the same protocols.

11:14:09   15   BY MR. NEUKOM:

           16       Q.   Okay.

           17       A.   For example.

           18       Q.   The same network protocols?

           19       A.   Yes.  Or I should add to that, potentially, as

11:14:28   20   well, the human interface; not just the network-to-

           21   network, but also network device to human.

           22       Q.   Okay.  So as you've explained these concepts

           23   today, multi-vendor interoperability includes not just

           24   device-to-device interoperability, but also

11:14:46   25   human-to-device or device-to-human interoperability?

11:17:28   1   evolved, it's changed, but...

           2   BY MR. NEUKOM:

           3       Q.   In paragraph 34 when you refer to Cisco's CLI,

           4   are you using that phrase, "Cisco's CLI," the way you

11:17:40   5   defined it and explained it in paragraph 1 of your

           6   report?

           7           MS. McCLOSKEY:  Object to form.  Asked and

           8   answered.

           9           THE WITNESS:  Again, no.  In this case I'm using

11:17:48  10   this in the generic sense, so each implementation over

          11   time would, of course, be different.  So not necessarily

          12   in the current implementations, no.

          13   BY MR. NEUKOM:

          14       Q.   Okay.  So when you write or when you testify

11:18:05  15   that the Cisco CLI is a common method within the industry

          16   by which to control and manage the network devices,

          17   you're referring to numerous different versions of

          18   Cisco's operating systems over time?

          19           MS. McCLOSKEY:  Objection.  Misstates prior

11:18:24  20   testimony.  Vague.

          21           THE WITNESS:  No, not their operating system.

          22   I'm referring to the command line interface as

          23   implemented by Cisco and as potentially implemented by

          24   other vendors as the de facto industry standard,

11:18:40  25   synonymous.

11:18:41    1    BY MR. NEUKOM:

            2        Q.   And when you refer to Cisco's implementation of

            3    a CLI, which implementation or implementations do you

            4    have in mind?

11:18:48    5            MS. McCLOSKEY:  Objection.  Vague.  Ambiguous.

            6    Overbroad.

            7            THE WITNESS:  Again, I can't point to the

            8    version number or even the year, but at some point in the

            9    '90s I would say, in my opinion, is when the Cisco

11:19:06   10    generic CLI was in fact adopted by other vendors as a

           11    de facto standard.

           12    BY MR. NEUKOM:

           13        Q.   When you refer to "the Cisco generic CLI," can

           14    you explain to me what you mean by that?

11:19:25   15            MS. McCLOSKEY:  Objection.  Vague.

           16            THE WITNESS:  Well, just as I said a minute ago,

           17    that the generic CLI meaning their command line interface

           18    as it existed at any given point in time without

           19    referring to a specific version or release number.

11:19:42   20    BY MR. NEUKOM:

           21        Q.   Okay.  So to put it mildly, you have opined that

           22    the 500-plus multi-word command expressions that Cisco is

           23    asserting against Arista for copyright infringement, that

           24    at some point in the past those have become a de facto

11:20:03   25    industry standard?  Do you agree with that statement?

11:20:05   1        A.    No, not entirely.

           2        Q.    Why not?

           3        A.    Again, not all 500 of those commands or command

           4   line elements existed in the '90s, so as -- as I believe

11:20:21   5   people normally speak about an industry standard CLI

           6   synonymously with Cisco's CLI, in fact, that has evolved

           7   and grown apparently over time, over a long time.

           8        Q.    I appreciate that clarification.  Let me try

           9   to -- this is not a trick question, so let me try to

11:20:44  10   rephrase it in a way that I think you'll agree with.

          11             Your testimony includes the following:  As we

          12   sit here today, the 500-plus multi-word command

          13   expressions that Cisco is asserting against Arista for

          14   copyright infringement, those 500-plus multi-word command

11:21:08  15   expressions are, in your opinion, de facto industry

          16   standard commands.

          17             MS. McCLOSKEY:  Objection.  Vague.  Ambiguous.

          18             THE WITNESS:  Without pre -- without placing a

          19   precise number on the number of -- as to the number of

11:21:25  20   keywords or elements defined by the Cisco CLI, I would

          21   say that the vast majority of vendors who make -- who

          22   manufacture routers and switches that conform with and

          23   market their products as industry -- having an industry

          24   standard CLI, that they would match closely with those as

11:21:52  25   defined by Cisco.

11:21:54   1   BY MR. NEUKOM:

           2        Q.   And that's your testimony, that's your opinion

           3   for all, every single one of the 500-plus multi-word

           4   command expressions that Cisco is asserting against

11:22:05   5   Arista in this case?

           6             MS. McCLOSKEY:  Objection.  Asked and answered.

           7   Misstates testimony.

           8             THE WITNESS:  No, like I said a minute ago,

           9   without putting a number on it.  It's certainly possible

11:22:14  10   that some vendors don't implement all of the 500 or odd

          11   commands, and in any event, none of this is really

          12   addressed in my report.

          13   BY MR. NEUKOM:

          14        Q.   Okay.  So I take it it's your opinion that some

11:22:34  15   but not necessarily all of the 500-plus command

          16   expressions that Cisco is asserting against Arista are,

          17   at least as we sit here today, de facto industry standard

          18   commands?

          19             MS. McCLOSKEY:  Objection.  Vague.

11:22:50  20             THE WITNESS:  I'm sorry.  One more time.  I

          21   didn't --

          22   BY MR. NEUKOM:

          23        Q.   Sure.

          24        A.   I didn't understand that.

11:22:54  25        Q.   I'll tell you what I think is happening, what

| | | |
|---|---|---|
| 11:22:56 | 1 | I'm trying to get at. I've asked you a couple times now |
| | 2 | whether you would confirm that it's your testimony that |
| | 3 | the entire list of the 500-plus command expressions was, |
| | 4 | under your testimony, de facto industry standard. And I |
| 11:23:11 | 5 | think twice you fairly enough have told me that you |
| | 6 | didn't want to put a precise number on it in response to |
| | 7 | that question. |
| | 8 | I'm not going to ask you to agree with me |
| | 9 | recounting of your testimony, but do you understand what |
| 11:23:22 | 10 | I'm referring to? |
| | 11 | A.   Yes. |
| | 12 | Q.   Okay. So I'm trying to make this an easier |
| | 13 | question for you in a way by not asking you to confirm |
| | 14 | that all 500, but rather just asking you to confirm that |
| 11:23:31 | 15 | it's your testimony that some of the 500-plus command |
| | 16 | expressions that are at issue in this case are at least |
| | 17 | as of today industry standard. Do you understand the |
| | 18 | question? |
| | 19 | A.   Yes. |
| 11:23:46 | 20 | Q.   Okay. |
| | 21 | A.   I understand the question. |
| | 22 | Q.   So now, with all that being said, let me try it |
| | 23 | again from the top. New line. |
| | 24 | It is your opinion that some portion -- at least |
| 11:24:00 | 25 | some portion of the 500-plus command expressions that |

11:24:06    1   Cisco is asserting against Arista in this case have

            2   become de facto industry standard commands.

            3       A.   Yes.

            4       Q.   Okay.  But it is not your opinion or your

11:24:20    5   testimony that all or every single one of those 500-plus

            6   multi-word command expressions has become an industry

            7   standard?

            8            MS. McCLOSKEY:  Objection.  Misstates prior

            9   testimony.  Object to form.  Vague.  Overbroad.

11:24:35   10            THE WITNESS:  So let me try this again.  I did

           11   not, as part of this report or at any time in researching

           12   material for this report did I -- did I investigate

           13   whether or not some number of Cisco's command keywords

           14   are in fact implemented by others.  Not in the scope of

11:24:57   15   what I was asked to do.

           16   BY MR. NEUKOM:

           17       Q.   Okay.  Why don't we -- let's turn back to

           18   paragraph 1 of your report for a moment.  And I'm looking

           19   again, Mr. Seifert, at the sentence that begins "When I

11:25:29   20   write in reference to Cisco's CLI."  Do you see what I'm

           21   referring to?

           22       A.   I do.

           23       Q.   Okay.  And in that sentence you refer to "the

           24   identified CLI commands."  Do you see what I'm referring

11:25:42   25   to?

| | |
|---|---|
| 11:25:43 | 1    A.    Yes. |
| | 2    Q.    When you wrote "the identified CLI commands," |
| | 3  you're referring to the 500 plus multi-word command |
| | 4  expressions that Cisco has asserted against Arista for |
| 11:25:55 | 5  copyright infringement? |
| | 6    A.    Again, not putting a number on it, no. |
| | 7    Q.    Have you formed an opinion one way or another |
| | 8  about whether the identified CLI commands have become |
| | 9  de facto industry standard commands? |
| 11:26:16 | 10        MS. McCLOSKEY:  Objection.  Asked and answered. |
| | 11  Vague.  Overbroad. |
| | 12        THE WITNESS:  So let me say this one more time. |
| | 13  To the extent that other vendors have implemented similar |
| | 14  or potentially identical commands, keyword, actions, |
| 11:26:37 | 15  responses to Cisco's, I refer to that as an industry |
| | 16  standard CLI, yes. |
| | 17  BY MR. NEUKOM: |
| | 18    Q.    And is it in fact your opinion that the |
| | 19  "identified CLI commands" as we sit here today, that they |
| 11:26:54 | 20  have in fact become de facto industry standard commands? |
| | 21        MS. McCLOSKEY:  Objection.  Asked and answered. |
| | 22  I'm not sure how many times you're going to ask the same |
| | 23  question, but it's been a number of times at this point. |
| | 24        MR. NEUKOM:  As many as it takes to get a |
| 11:27:06 | 25  responsive answer. |

11:27:07  1        MS. McCLOSKEY:  I think he's responded numerous

         2  times.  Asked and answered.  Vague.  Ambiguous.

         3        THE WITNESS:  I -- same answer.  I'm going to

         4  just say that to the extent other vendors have

11:27:21  5  implemented the same or similar keywords to Cisco's,

         6  that, to me, is the definition of an industry standard

         7  CLI, yes.

         8  BY MR. NEUKOM:

         9      Q.   So that's the process pursuant to which you

11:27:31 10  would go about forming an opinion about whether any

        11  particular command expression had become a de facto

        12  industry standard command.  Am I hearing you right?

        13      A.   No, I don't think that's the process.

        14      Q.   Have you made a determination for any one of the

11:27:48 15  500-plus command expressions at issue in this case that

        16  they have in fact been adopted by a sufficient number of

        17  other vendors in the marketplace to become a de facto

        18  industry standard?

        19        MS. McCLOSKEY:  Objection.  Asked and answered.

11:28:03 20  Vague.  Ambiguous.

        21        THE WITNESS:  I'm not sure that I understand

        22  that question.  Say that again?  Have I an opinion?

        23  BY MR. NEUKOM:

        24      Q.   Yeah.  Have you formed an opinion?

11:28:14 25        MS. McCLOSKEY:  Same objections.

```
11:28:15    1              THE WITNESS:  Yes.

            2    BY MR. NEUKOM:

            3         Q.    And for which of the identified CLI commands

            4    have you formed an opinion that they have become at least

11:28:27    5    by the time we sit here today, that they have become a

            6    de facto industry standard?

            7         A.    So, again, for purposes of this report, I wasn't

            8    asked and nor did I investigate an exact number or count

            9    how many such command word -- keywords that are on --

11:28:44   10    that were in dispute were implemented by other vendors.

           11    I, in fact, believe there's another expert in this case

           12    who will testify to that, not me.

           13         Q.    Okay.  So you have not formed or disclosed an

           14    opinion that any of Cisco's asserted command expressions

11:29:02   15    are, in fact, an industry standard.  Do I have that

           16    right?

           17         A.    No.

           18              MS. McCLOSKEY:  Objection.  Vague.  Ambiguous.

           19    Asked and answered.

11:29:10   20    BY MR. NEUKOM:

           21         Q.    Which of Cisco's command expressions that it's

           22    asserting in this case, for which of those command

           23    expressions have you formed an opinion that they are, in

           24    fact, industry standard commands?

11:29:22   25              MS. McCLOSKEY:  Objection.  Asked and answered.
```

11:29:24    1  Vague.  Ambiguous.

            2          THE WITNESS:  I would say, to try to come at

            3  this a different way, all of those command structures or

            4  command formulations that are implemented by a number of

11:29:43    5  other vendors.  I would say that defines an industry

            6  standard.  So yes, I do have -- I have formed an opinion

            7  based on that.

            8  BY MR. NEUKOM:

            9      Q.  Okay.  And that opinion applies for every single

11:29:56   10  one of the 500-plus multi-word command expressions that

           11  Cisco is asserting in this case?

           12          MS. McCLOSKEY:  Objection.  Misstates prior

           13  testimony.

           14          THE WITNESS:  No.  In fact, I said just the

11:30:07   15  opposite.

           16  BY MR. NEUKOM:

           17      Q.  Okay.  Can you explain for me which command

           18  expressions you have versus have not formed an opinion

           19  that they have become de facto industry standard

11:30:19   20  commands?

           21          MS. McCLOSKEY:  Objection.  Vague.  Ambiguous.

           22          THE WITNESS:  Again, off the top of my head, no.

           23  BY MR. NEUKOM:

           24      Q.  And even if not off the top of your head, if I

11:30:33   25  gave you five hours with your expert report to reflect on

```
11:30:36    1  it and read and reread it, you still wouldn't be able to

            2  answer that question.  Do I have that right?

            3          MS. McCLOSKEY:  Objection.  Argumentative.

            4          MR. NEUKOM:  I don't mean for it to be

11:30:46    5  argumentative.  This is not a challenge.  I just -- I

            6  don't think you've disclosed for me which of the 500-plus

            7  command expressions are versus are not industry standard

            8  in your opinion.  And I just want to confirm that I'm

            9  reading your report in the way you intend for it to be

11:31:02   10  read.

           11          MS. McCLOSKEY:  Is that a question?

           12          MR. NEUKOM:  Yes.

           13          MS. McCLOSKEY:  What's the question?  I don't --

           14  there's no question mark.

11:31:12   15  BY MR. NEUKOM:

           16      Q.  I'll start with a new one.

           17          You do not in your report identify anywhere

           18  which of the "identified CLI commands" are or are not

           19  industry standard in your opinion.  Do I have that right?

11:31:31   20      A.  Yes.

           21      Q.  Okay.  And for the, quote, "the asserted

           22  hierarchies of those commands," you have not formulated

           23  or disclosed an opinion about which of those hierarchies

           24  are versus are not industry standard hierarchies?

11:31:47   25          MS. McCLOSKEY:  Object to form.  Vague.
```

11:31:49   1   Ambiguous.

           2          THE WITNESS:  I have not formed an opinion, no.

           3   BY MR. NEUKOM:

           4      Q.   Okay.  For "the command modes and prompts," that

11:31:58   5   Cisco is asserting against Arista in this case, I take it

           6   you have not yet formed or disclosed an opinion about

           7   which of those modes or prompts that Cisco's asserting

           8   against Arista, which of those modes or prompts are

           9   versus are not industry standard modes and prompts?

11:32:18  10      A.   Again --

          11          MS. McCLOSKEY:  Object to form.  Vague.

          12   Ambiguous.

          13          THE WITNESS:  Again, I was not asked to identify

          14   which ones.  There's another expert who will testify to

11:32:28  15   which ones are the same or similar, so no, this report

          16   does not address that.

          17   BY MR. NEUKOM:

          18      Q.   Okay.  And I take it it's also the case that you

          19   haven't formed an opinion or disclosed an opinion about

11:32:43  20   which command response elements at issue in this case --

          21          MS. McCLOSKEY:  Same --

          22   BY MR. NEUKOM:

          23      Q.   -- do versus do not qualify as industry standard

          24   command response elements?

11:32:52  25          MS. McCLOSKEY:  Same objections.  Object to

11:32:54  1  form.  Vague.  Ambiguous.

          2          THE WITNESS:  I don't see where any of this

          3  leads one to conclude that the industry generally thinks

          4  of the Cisco CLI as an industry standard.  It's written

11:33:14  5  about extensively, it can be easily identified over a

          6  number of years of analysis by the industry press, by

          7  customers, by analysts.  So I'm not exactly where --

          8  where you think you're going with this, but it's not

          9  clear to me that it has anything to do with what is

11:33:34 10  generally referred to as an industry standard CLI being

         11  essentially Cisco's CLI.

         12  BY MR. NEUKOM:

         13      Q.   When you say "the Cisco CLI as an industry

         14  standard," which Cisco CLI are you referring to?

11:33:49 15          MS. McCLOSKEY:  Objection.  Vague.

         16          THE WITNESS:  Again, the -- using the generic

         17  sense of a command line interface at virtually any point

         18  in time.

         19  BY MR. NEUKOM:

11:34:01 20      Q.   And when you refer to the Cisco CLI being an

         21  industry standard, are you talking about all aspects of

         22  Cisco's CLI?

         23          MS. McCLOSKEY:  Objection.  Vague, ambiguous.

         24  Misstates prior testimony.

11:34:15 25          THE WITNESS:  I'm not sure that I understand

11:34:16    1   that question.

            2   BY MR. NEUKOM:

            3       Q.   You understand that there are command

            4   expressions available to a user with various versions of

11:34:26    5   IOS that have not been asserted against Arista for

            6   purposes of copyright infringement?

            7            MS. McCLOSKEY:  Objection.  Vague.

            8   BY MR. NEUKOM:

            9       Q.   You understand that, I take it?

11:34:35   10       A.   No, I didn't understand that.

           11       Q.   Okay.  So prior to your report or today, you

           12   never sat down and gained an understanding of which

           13   aspects of Cisco's CLI were versus were not asserted

           14   against Arista for purposes of copyright infringement?

11:34:56   15            MS. McCLOSKEY:  Objection.  Asked and answered

           16   numerous times, and the witness has already answered this

           17   question.

           18            THE WITNESS:  I -- I read the complaint, and to

           19   the extent I understood the complaint, I did not

11:35:10   20   understand that there are elements of Cisco's CLI that

           21   are not involved in the complaint.  So no, it's not clear

           22   to me that that was the case.

           23            MR. NEUKOM:  Okay.

           24            MS. McCLOSKEY:  And I'll just interpose an

11:35:20   25   objection that this calls for a legal conclusion.

11:35:22  1  BY MR. NEUKOM:

2      Q.   So when you stated a minute or two ago that

3  Cisco's CLI has become an industry standard, you're

4  referring to each and every aspect of Cisco's CLI?

11:35:33  5      MS. McCLOSKEY:  Objection.  Misstates prior

6  testimony.  Vague.  Ambiguous.  Object to form.

7      THE WITNESS:  Actually, I am referring to it --

8  I refer to the Cisco CLI more broadly than that in the

9  sense that it -- understanding that it has evolved over

11:35:50 10  time.

11  BY MR. NEUKOM:

12      Q.   Okay.

13      A.   And has changed in each -- in each release.

14      Q.   So let's take -- do you know -- or I think you

11:36:04 15  testified that at least no later than 2013 you sat down

16  and used a version of Cisco IOS to configure and manage a

17  network, I think when you were still at Avaya?  Do I have

18  that right?

19      A.   Yes.  Approximately.

11:36:23 20      Q.   And that's the last time you as a user or as a

21  network engineer that you've interacted with Cisco --

22  Cisco's CLI?

23      A.   Yes.

24      Q.   Okay.

11:36:34 25      MS. McCLOSKEY:  Objection.  Vague as to

11:36:35  1  "interacted."

          2  BY MR. NEUKOM:

          3      Q.   Do you know which version of Cisco's IOS that

          4  was or which version of the CLI that was?

11:36:41  5      A.   No, I can't recall.

          6      Q.   Well, let's -- let's take that version of

          7  Cisco's CLI, the one that you have used most recently, as

          8  a starting point.

          9          Can you tell me what aspects of that CLI,

11:36:55 10  namely, the last Cisco CLI that you personally have used,

         11  do versus do not qualify as industry standard, in your

         12  opinion?

         13          MS. McCLOSKEY:  Objection.  Compound.  Vague.

         14  Ambiguous.  Overbroad.

11:37:10 15          THE WITNESS:  No, I can't recall specifics.  No.

         16  BY MR. NEUKOM:

         17      Q.   Is it your opinion that each and every command

         18  expression that was available to you as a Cisco IOS user

         19  in 2013 is an industry standard command?

11:37:25 20          MS. McCLOSKEY:  Objection.  Vague.  Ambiguous.

         21  Overbroad.

         22          THE WITNESS:  No, that's not my opinion.  I

         23  don't have the opinion on a specific version that I can't

         24  recall, so no.

         25  //

11:37:37    1    BY MR. NEUKOM:

            2        Q.   Okay.  And if I asked you to tell me your

            3    opinion about any particular command expression in any

            4    version of Cisco's CLI and to tell me if that was an

11:37:48    5    industry standard or not, you haven't formed any such

            6    opinion?

            7            MS. McCLOSKEY:  Objection.

            8            THE WITNESS:  Again, outside the scope of my

            9    research and -- and this report.

11:38:01   10    BY MR. NEUKOM:

           11        Q.   It is in the scope of your report, is it not, to

           12    form an opinion and report the opinion about whether

           13    Cisco's CLI has, at least prior to Cisco filing this

           14    lawsuit, becoming a de facto industry interface in the

11:38:32   15    networking industry?

           16            MS. McCLOSKEY:  Objection.  Vague.

           17    BY MR. NEUKOM:

           18        Q.   Do I have that right?

           19        A.   I -- yes.

11:38:38   20        Q.   And you have formed an opinion that Cisco's CLI

           21    has become a de facto industry standard interface in the

           22    network industry.  Do I have that right?

           23        A.   Generically, Cisco's CLI over time has become a

           24    de facto industry standard, yes.

11:38:55   25        Q.   Okay.  But if I ask you to tell me which aspects

```
11:39:01   1   of Cisco's CLI are versus are not an industry standard, I
           2   take it you have not formed an opinion about that?
           3            MS. McCLOSKEY:  Objection.  Asked and answered
           4   many times in various different ways.  It's also vague.
11:39:18   5            THE WITNESS:  The specifics of those command
           6   expressions, no.  Again, generically, yes.
           7   BY MR. NEUKOM:
           8       Q.   And when you refer to Cisco's CLI generically,
           9   you don't have any particular IOS version number in mind?
11:39:40  10            MS. McCLOSKEY:  Objection.  Vague.
          11            THE WITNESS:  Not that I can recall, no.
          12   BY MR. NEUKOM:
          13       Q.   You don't have any particular command
          14   expressions in mind?
11:39:48  15            MS. McCLOSKEY:  Same objection.
          16            THE WITNESS:  No.
          17   BY MR. NEUKOM:
          18       Q.   Okay.  In paragraph 34 of your complaint [sic],
          19   on page 12 --
11:40:54  20            MS. McCLOSKEY:  Do you mean his report?
          21            MR. NEUKOM:  Yes.  I do.
          22            THE WITNESS:  I'm sorry.  Which paragraph?
          23   BY MR. NEUKOM:
          24       Q.   Paragraph 34 of your report, you refer to "a
11:41:10  25   common set of protocols for the Internet."  Do you see
```

11:41:13    1   what I'm referring to?

            2       A.   Yes.

            3       Q.   Is that the same thing as what you've elsewhere

            4   referred to as network protocols?

11:41:21    5            MS. McCLOSKEY:  Objection.  Vague.  Overbroad.

            6            THE WITNESS:  Yes.

            7   BY MR. NEUKOM:

            8       Q.   Okay.  In paragraph 36 you discuss what you

            9   refer to as proprietary standards or vendor proprietary

11:41:37   10   standards.  Do you see what I'm referring to?

           11       A.   Yes.

           12       Q.   And you've proposed -- well, off the cuff or by

           13   reading your report, however you want to do it, can you

           14   define for me what constitutes a vendor proprietary

11:41:53   15   standard?

           16       A.   Yes.

           17       Q.   Please do so.

           18       A.   Proprietary standards are created by a vendor to

           19   ensure that products developed by different groups, for

11:42:11   20   example, different engineering organizations perhaps for

           21   different markets, will in fact operate either

           22   consistently or cooperatively with one another so that

           23   the resulting system, in the case of a computer supplier,

           24   computer vendor, can ensure that they have a product set

11:42:36   25   that is consistent with one another and potentially

11:42:41  1  shared with or -- or mimicked by third-party vendors.

2      Q.   And this definition of vendor proprietary

3  standards that you've put in your report and that you've

4  explained for me today, where did you get that definition

11:42:56  5  from?

6           MS. McCLOSKEY:  Objection.  Vague.  Ambiguous.

7           THE WITNESS:  Again, I think this is a

8  generally-accepted definition, so my experience,

9  essentially.

11:43:09  10  BY MR. NEUKOM:

11      Q.   Okay.  Can you identify for me anybody else

12  who's ever used this phrase or term "vendor proprietary

13  standards" the way that you have in your report?

14           MS. McCLOSKEY:  Objection.  Vague, ambiguous.

11:43:22  15  Calls for speculation.

16           THE WITNESS:  Not off the top of my head, no.

17  BY MR. NEUKOM:

18      Q.   Okay.  If I asked you to identify for me any

19  other document or publication, any written communication

11:43:31  20  in any form using the vendor proprietary standards

21  definition that you've put in your report, could you do

22  that for me?

23           MS. McCLOSKEY:  Same objections.

24           THE WITNESS:  Not without some additional

11:43:43  25  research, no.

11:43:44  1  BY MR. NEUKOM:

          2      Q.   Okay.  So for purposes of preparing your report,

          3  you formulated a definition of what you called "vendor

          4  proprietary standards," based on your long and

11:43:55  5  illustrious career in the networking industry.  Is that

          6  fair?

          7           MS. McCLOSKEY:  Objection.  Vague.

          8           THE WITNESS:  And in the computer industry.  I

          9  did work for Digital for a period of time.

11:44:03 10  BY MR. NEUKOM:

         11      Q.   Okay.  But you did not -- you did not undertake

         12  any effort to confirm whether your understanding, your

         13  conception of this phrase "vendor proprietary standard,"

         14  was shared by others?

11:44:18 15           MS. McCLOSKEY:  Objection.  Asked and answered.

         16  The witness has already testified that he believes it's

         17  just --

         18           MR. NEUKOM:  No.  No.  No.  No.  No.  No.  No.

         19  You can "ask and answered."  You cannot restate his

11:44:27 20  testimony as you want it to be on the record.

         21      Q.   The question is to you, sir.

         22      A.   So again, I believe this is a generally-accepted

         23  industry term for the idea of -- for the notion of vendor

         24  proprietary standards.

11:44:44 25      Q.   Okay.  And if I asked you for some source of

11:44:46    1   information to verify that it is in fact a

            2   generally-accepted industry term in the way that you're

            3   using it in this report, I take it as you sit here today

            4   you're not able to point me to any documentation, any --

11:45:00    5   any authority for that?

            6          MS. McCLOSKEY:  This question is asked and

            7   answered.

            8          THE WITNESS:  Again, off the top of my head, no.

            9   BY MR. NEUKOM:

11:45:19   10      Q.   In paragraph 38, starting on page 13 of your

           11   report, you explain the -- what you understand to be a

           12   de facto standard.  Do you see what I am referring to?

           13      A.   Yes.

           14      Q.   Okay.  This conception of what is or is not a

11:45:39   15   de facto standard, I take it your understanding and usage

           16   of that -- of that term is based on your experience in

           17   the networking and computer industries?

           18          MS. McCLOSKEY:  Objection.  Vague.

           19          THE WITNESS:  Yes.

11:45:57   20   BY MR. NEUKOM:

           21      Q.   Are you aware of anyone else in the computer or

           22   the networking industry that has ever used or understood

           23   a de facto standard in the way you've explained in your

           24   report?

11:46:06   25          MS. McCLOSKEY:  Objection.  Asked and answered.

11:46:10  1        THE WITNESS:  Again, I don't recall a specific

2  source, nor can I point at one off the top of my head.

3  BY MR. NEUKOM:

4     Q.   Okay.  In preparing your report, did you take

11:46:23  5  any efforts to try to confirm that your understanding of

6  what is or is not sufficient for a technology to become a

7  de facto standard was shared by others?

8        MS. McCLOSKEY:  Asked and answered multiple

9  times at this point.

11:46:41  10        THE WITNESS:  I would say that if it's commonly

11  understood, I don't believe it was worth the time to

12  investigate whether others thought the same.

13  BY MR. NEUKOM:

14     Q.   In paragraph 39, among other places, you refer

11:47:07  15  to the IETF.  I take it you're aware of the fact that the

16  IETF has never adopted any specific command expression as

17  an industry standard?  Is that safe to say?

18        MS. McCLOSKEY:  Objection.  Vague.  Assumes

19  facts.

11:47:26  20        THE WITNESS:  Not to my knowledge.

21  BY MR. NEUKOM:

22     Q.   Okay.  And the IETF has never adopted any

23  command response for any networking product as an

24  industry standard.  Is that safe to say?

11:47:41  25        MS. McCLOSKEY:  Same objections.

```
11:47:43   1              THE WITNESS:  No.  Actually, that's not safe to

           2    say.

           3    BY MR. NEUKOM:

           4         Q.   Which -- for which command response has the IETF

11:47:51   5    adopted an industry standard?

           6         A.   So the IETF deals with behavior and

           7    specifications for protocol standards which do in fact

           8    contain command responses.  If you're asking me about CLI

           9    command responses, then the answer is no.

11:48:12  10         Q.   Fair enough.  Thank you.

          11              So to the best of your knowledge, the IETF has

          12    never adopted an industry standard for a CLI command

          13    response?

          14              MS. McCLOSKEY:  Objection.  Vague.

11:48:24  15              THE WITNESS:  Again, not to my knowledge.

          16    BY MR. NEUKOM:

          17         Q.   To your knowledge, has Cisco ever proposed to

          18    the IETF that its CLI become an industry standard or be

          19    adopted as an industry standard?

11:48:38  20         A.   No, not --

          21              MS. McCLOSKEY:  Objection.  Calls for

          22    speculation.

          23              THE WITNESS:  No, not to my knowledge.

          24    BY MR. NEUKOM:

11:48:43  25         Q.   To your knowledge, has Cisco ever proposed that
```

| | | |
|---|---|---|
| 12:44:10 | 1 | question.  How.  What does that mean? |
| | 2 | BY MR. NEUKOM: |
| | 3 | Q.  Can you explain for me how Cisco's statements |
| | 4 | about its CLI being industry standard informs your |
| 12:44:21 | 5 | opinion that aspects of Cisco's CLI are de facto industry |
| | 6 | standard? |
| | 7 | MS. McCLOSKEY:  Objection.  Misstates prior |
| | 8 | testimony and assumes facts. |
| | 9 | THE WITNESS:  Well, the how, I think, is |
| 12:44:37 | 10 | self-evident.  If it's on their -- in their literature, |
| | 11 | in their promotional materials or on their website. |
| | 12 | What's not clear to me of course, unknowable to me is the |
| | 13 | why they would make that claim. |
| | 14 | BY MR. NEUKOM: |
| 12:45:01 | 15 | Q.  If I'm hearing your testimony today accurately, |
| | 16 | you do have and are offering a well-formed opinion that |
| | 17 | Cisco's CLI generally has become a de facto industry |
| | 18 | standard? |
| | 19 | MS. McCLOSKEY:  Objection.  Misstates prior |
| 12:45:18 | 20 | testimony.  Overbroad. |
| | 21 | THE WITNESS:  To which I would add for routers |
| | 22 | and switches, yes. |
| | 23 | BY MR. NEUKOM: |
| | 24 | Q.  Okay.  But if I then ask you -- and I promise |
| 12:45:30 | 25 | I'm not going to take 20 minutes of your time doing this |

12:45:32   1   over again, I just want to make sure I'm hearing you

           2   accurately.  If I ask you which aspects of Cisco's CLI

           3   are or are not industry standard, you haven't formed any

           4   opinions on that?

12:45:48   5        MS. McCLOSKEY:  Jay, I'm not going to instruct

           6   the witness not to answer, but you've asked this question

           7   I don't know how many times.  I don't think it's

           8   appropriate to keep asking him the same question over and

           9   over again.  He has answered this question.

12:46:06  10        THE WITNESS:  Umm --

          11        MS. McCLOSKEY:  It also misstates his testimony.

          12        THE WITNESS:  I'm sorry, could you rephrase?

          13   One more time?

          14   BY MR. NEUKOM:

12:46:19  15        Q.  Is it accurate that, while you are offering an

          16   opinion that Cisco's CLI generally has become an industry

          17   standard, you have not formed an opinion about which

          18   aspects of Cisco's CLI are versus are not industry

          19   standard?

12:46:36  20        MS. McCLOSKEY:  Objection.  Asked and answered.

          21   Vague.  Misstates prior testimony.

          22        THE WITNESS:  So as I -- as I previously

          23   indicated, I wasn't asked to specify exactly which

          24   portions of Cisco's CLI have become or generally known or

12:46:55  25   accepted as an industry standard, but that is the work of

12:46:58    1  another expert witness.

            2  BY MR. NEUKOM:

            3     Q.   Okay.  You're aware that Cisco has offered one

            4  or more operating systems with a CLI where the operating

12:47:11    5  system is referred to as IOS?

            6          MS. McCLOSKEY:  Objection.  Calls for

            7  speculation.  Vague.

            8          THE WITNESS:  I'm aware that IOS has evolved

            9  over a number of years, yes.

12:47:22   10  BY MR. NEUKOM:

           11     Q.   Are you also aware of the Cisco operating system

           12  referred to as IOS XR?

           13          MS. McCLOSKEY:  Objection.  Calls for

           14  speculation.  Assumes facts.

12:47:32   15          THE WITNESS:  No, I'm not familiar with IOS XR.

           16  BY MR. NEUKOM:

           17     Q.   Are you familiar with the operating testimony

           18  IOS XE?

           19          MS. McCLOSKEY:  Same objections.

12:47:39   20          THE WITNESS:  No.

           21  BY MR. NEUKOM:

           22     Q.   Are you familiar with the Cisco operating system

           23  NX-OS?

           24          MS. McCLOSKEY:  Same objections.  Calls for

12:47:46   25  speculation.

12:47:47    1              THE WITNESS:  Yes, vaguely.

            2    BY MR. NEUKOM:

            3        Q.   Okay.  Are you aware that NX-OS has a CLI?

            4              MS. McCLOSKEY:  Objection.  Calls for

12:47:55    5    speculation.

            6              THE WITNESS:  Yes.

            7    BY MR. NEUKOM:

            8        Q.   Do you have an opinion about whether the CLI for

            9    Cisco's NX-OS is industry standard?

12:48:05   10              MS. McCLOSKEY:  Objection.  Vague.

           11              THE WITNESS:  To the extent to my understanding

           12    of the CLI contained and implemented in NX-OS is similar

           13    to or derivative of the IOS CLI, I would say yes.

           14    BY MR. NEUKOM:

12:48:21   15        Q.   Have you -- in preparing your report, did you

           16    take any efforts to familiarize yourself with the CLI for

           17    NX-OS?

           18              MS. McCLOSKEY:  Objection.  Vague.  Overbroad.

           19    Vague as to "any efforts."

12:48:32   20              THE WITNESS:  As I mentioned earlier, I have not

           21    explored a specific implementation of any Cisco CLSI --

           22    CLI in a few years.

           23    BY MR. NEUKOM:

           24        Q.   Okay.  When you say that Cisco's CLI generally

12:48:48   25    has become an industry standard, are you referring to the

| | | |
|---|---|---|
| 12:48:54 | 1 | CLIs that Cisco offers for all four of these operating |
| | 2 | systems, in particular, NX-OS, IOS, IOS XR, and IOS XE? |
| | 3 | MS. McCLOSKEY: Objection. Vague. Overbroad. |
| | 4 | Calls for speculation. |
| 12:49:12 | 5 | THE WITNESS: Specifically to those operating |
| | 6 | systems? As I said earlier, to the extent that they |
| | 7 | implement what would be generically referred to as a |
| | 8 | Cisco CLI, yes. But the specifics, no. |
| | 9 | BY MR. NEUKOM: |
| 12:49:23 | 10 | Q. What is generically referred to as the Cisco |
| | 11 | CLI? |
| | 12 | MS. McCLOSKEY: Objection. Calls for |
| | 13 | speculation. Vague. |
| | 14 | THE WITNESS: So I think it would be the command |
| 12:49:38 | 15 | set that is -- that is defined by or mentioned in Cisco |
| | 16 | training materials, in their promotional literature, on |
| | 17 | their website, and the product brochures. |
| | 18 | BY MR. NEUKOM: |
| | 19 | Q. When you... when you refer to what were |
| 12:50:16 | 20 | "generically referred to as the Cisco CLI," are you |
| | 21 | referring to any aspects of Cisco's CLI other than |
| | 22 | command sets? |
| | 23 | MS. McCLOSKEY: Objection. Vague. |
| | 24 | THE WITNESS: Well, the CLI defines not just |
| 12:50:38 | 25 | commands but -- or actions, but also objects on which the |

```
12:50:42   1   commands are intended to -- to effect and, as well, the

           2   report or responses by the CLI.

           3   BY MR. NEUKOM:

           4       Q.   Have you formed an opinion about whether any

12:50:57   5   aspect of the CLI for NX-OS has become an industry

           6   standard?

           7           MS. McCLOSKEY:  Objection.  Vague.

           8           THE WITNESS:  Again, not specific to NX-OS.

           9   BY MR. NEUKOM:

12:51:06  10       Q.   Okay.  Have you formed an opinion about whether

          11   any aspect of the CLI for IOS XR has become an industry

          12   standard?

          13           MS. McCLOSKEY:  Same objection.  Also, asked and

          14   answered.

12:51:18  15           THE WITNESS:  Not -- not specific to IS -- IOS

          16   XR, no.

          17   BY MR. NEUKOM:

          18       Q.   Have you formed any opinion about whether any

          19   aspect of the CLI for IOS XE has become an industry

12:51:28  20   standard?

          21           MS. McCLOSKEY:  Objection.  Vague.  Asked and

          22   answered.

          23           THE WITNESS:  Specific to IOS XE?  No.

          24   BY MR. NEUKOM:

12:51:34  25       Q.   Have you formed an opinion about whether any
```

12:51:36    1    aspect of the CLI for Cisco IOS has become an industry

            2    standard?

            3            MS. McCLOSKEY:  Objection.  Vague.

            4            THE WITNESS:  Not to any specific version of or

12:51:48    5    release of IOS, no.

            6    BY MR. NEUKOM:

            7        Q.   Okay.  When you testified earlier today that you

            8    referred to some CCIE training materials -- do you

            9    remember that testimony?

12:52:16   10        A.   Yes.

           11        Q.   Okay.  Were those CCIE training materials that

           12    you referred to in the process of preparing your report,

           13    were those for NX-OS, IOS, IOS XR or IOS XE?

           14            MS. McCLOSKEY:  Objection.  Vague as to which

12:52:36   15    materials specifically you're referring to.

           16            THE WITNESS:  I -- I don't recall.  It's been a

           17    while.

           18    BY MR. NEUKOM:

           19        Q.   Are you aware in this lawsuit that Cisco is

12:52:44   20    alleging that Arista has taken CLI aspects from each of

           21    those four different operating systems?

           22            MS. McCLOSKEY:  Objection.  Calls for a legal

           23    conclusion.  Calls for speculation.  Vague as to "taken

           24    CLI aspects."

12:53:02   25            THE WITNESS:  Given my source for Cisco's

12:53:04    1    objection is the public filing of the complaint, I don't

            2    recall what it said.

            3    BY MR. NEUKOM:

            4        Q.    Okay.  So as you sit here today, putting aside

12:53:20    5    my questions to you, as you sit here today you were not

            6    previously made aware of the fact that Cisco is asserting

            7    copyright infringement allegations against Arista based

            8    on CLI content from four different operating systems?

            9           MS. McCLOSKEY:  Objection.  Misstates prior

12:53:37   10    testimony.  Calls for a legal conclusion.  Vague.

           11    Overbroad.

           12           THE WITNESS:  I don't recall that the complaint

           13    mentions -- mentions the four operating systems

           14    specifically.  No, I don't recall that.

12:53:49   15    BY MR. NEUKOM:

           16        Q.    Okay.  And to the extent that you reviewed

           17    background materials to familiarize or refamiliarize

           18    yourself with Cisco's CLI, you did that by virtue of

           19    looking at various CCIE training materials but you don't

12:54:07   20    remember which operating system those training materials

           21    pertain to?

           22           MS. McCLOSKEY:  Objection.  Misstates prior

           23    testimony.  Overbroad.  Vague.

           24           THE WITNESS:  Well, in addition to the CCIE

12:54:18   25    training materials, there's also the product-specific

13:00:57  1   time Cisco filed this complaint.  Are you with me so far?

        2       A.   Yes.

        3       Q.   Okay.  And that's accurate, what I just said?

        4       A.   That's a statement.  Is that a question?

13:01:08  5       Q.   Yeah.  It is in fact the case, isn't it, that

        6   you have formed an opinion that Cisco's CLI had become a

        7   de facto industry standard on or about the date that

        8   Cisco filed this lawsuit?

        9       A.   Yes.

13:01:19 10       Q.   Okay.  And if I ask you which aspects of Cisco's

       11   CLI have versus have not become an industry standard,

       12   I've asked you that a few times today and I think your

       13   testimony is you didn't parse it down to that level.

       14   Your testimony is that Cisco's CLI generally or

13:01:38 15   generically has become an industry standard on or before

       16   the date this lawsuit was filed.

       17            MS. McCLOSKEY:  Objection.  Misstates prior

       18   testimony.  I'm quite certain that the record will

       19   reflect how --

13:01:47 20            MR. NEUKOM:  No, the record will reflect what it

       21   reflect.  Don't coach this witness by doing that.

       22            MS. McCLOSKEY:  I am not coaching the witness,

       23   but you're rephrasing in your own words his testimony

       24   over and over again.

       25   //

13:01:57  1    BY MR. NEUKOM:

2        Q.   The question, sir, is to you.

3        A.   So again, I've formed my opinion of Cisco's CLI

4    as an industry standard based on a number of sources not

13:02:14  5    specific to any particular operating system or

6    implementation, but rather as a generic set of commands

7    and keywords and responses that has -- that has evolved

8    over time.

9    BY MR. NEUKOM:

13:02:27  10       Q.   Okay.  And if I ask you what portions of Cisco's

11   CLI offerings -- and this is an asked and answered, I

12   just want to make sure we're on the same page.

13            If I ask you to explain to me which portions of

14   Cisco's CLI offerings are versus are not de facto

13:02:48  15   industry standards, I take it you have not formed an

16   opinion on that?

17            MS. McCLOSKEY:  Sorry.  Did you say this is or

18   isn't asked and answered?  It says "isn't," but I heard

19   you to say is.

13:02:58  20            MR. NEUKOM:  This has been asked and answered.

21   I just want to make sure we're on the same page here.

22            THE WITNESS:  And I will say again that it was

23   beyond -- or that was not in the scope of my report.

24   BY MR. NEUKOM:

13:03:07  25       Q.   Okay.  In paragraph 44 of your report on page

13:03:47  1   16, towards the bottom of the page you refer to "rules of

       2   the road."  Do you see what I'm referring to?

       3      A.   Yes.

       4      Q.   Okay.  And it's your testimony that the rules of

13:04:09  5   the road or network protocols are necessary for computer

       6   communications over a network of networks.  Do I have

       7   that right?

       8          MS. McCLOSKEY:  Mr. Seifert, please take the

       9   time you need to put that phrase into context in your

13:04:22 10   report.

      11          THE WITNESS:  So when I say "rules of the road,"

      12   I mean the -- the specifics or the requirements and the

      13   technical specifications for how a network device, be it

      14   an intermediate system or an end system, communicates

13:04:47 15   with one another over -- over the ARPAnet originally and

      16   subsequently to the Internet, that those specifications

      17   have undergone numerous revisions, updates, and a number

      18   of implementations by a large number of participants.

      19   BY MR. NEUKOM:

13:05:05 20      Q.   Okay.  As of the date that you served your

      21   report, you understand that -- strike that.

      22          A sharing of network protocols or what you refer

      23   to as rules of the road between devices or networks, that

      24   is necessary, I take it, to ensure what we've referred to

13:05:33 25   today as device-to-device interoperability?



```
13:43:52    1   ████████████████████████████████████████████████

            2   ████████████████████████████████████████████████

            3   ██████████████

            4            MS. McCLOSKEY:  Objection.  Vague.

13:44:03    5            THE WITNESS:  Yes.

            6            MR. NEUKOM:  Why don't we take a short break.  I

            7   may be done.

            8            THE VIDEOGRAPHER:  Off the record, 1:44 p.m.

            9            (Recess taken from 1:44 to 1:51 p.m.)

13:51:40   10            THE VIDEOGRAPHER:  On the record, 1:51 p.m.

           11   BY MR. NEUKOM:

           12       Q.  Can you explain for me the difference between a

           13   technology being widely adopted versus being a de facto

           14   standard?

13:51:58   15            MS. McCLOSKEY:  Objection.  Calls for

           16   speculation.  Vague.

           17            THE WITNESS:  That distinction by itself is hard

           18   to make.

           19            May we go back for a second?  I'd like to amend

13:52:15   20   or clarify something I said earlier.

           21   BY MR. NEUKOM:

           22       Q.  Sure.

           23       A.  Relative to paragraph 78 --

           24       Q.  Yes?

13:52:23   25       A.  -- on page 34.
```

| | | |
|---|---|---|
| 13:52:30 | 1 | Q.   Yes? |
| | 2 | A.   The last sentence. |
| | 3 | Q.   Yes. |
| | 4 | A.   The long list of vendors starting with Adtran? |
| 13:52:37 | 5 | Q.   Yes. |
| | 6 | A.   I omitted -- I meant -- failed to mention beyond |
| | 7 | the footnote's references to deposition and -- or these |
| | 8 | two depositions, I should say, there is also in my |
| | 9 | appendix examples of similarities among a number of |
| 13:53:02 | 10 | vendors with the Cisco CLI, so that also served as, if |
| | 11 | you will, source material for my conclusion and my |
| | 12 | opinion. |
| | 13 | BY MR. NEUKOM: |
| | 14 | Q.   So let's go, for example, to Appendix C.  Are |
| 13:53:23 | 15 | you with me? |
| | 16 | A.   Yes. |
| | 17 | Q.   Did you prepare this table? |
| | 18 | A.   This table, I did not. |
| | 19 | Q.   Did you undertake any investigation to verify |
| 13:53:32 | 20 | the contents of this table? |
| | 21 | MS. McCLOSKEY:  Objection.  Vague. |
| | 22 | THE WITNESS:  Not -- again, not within the scope |
| | 23 | of my report. |
| | 24 | BY MR. NEUKOM: |
| 13:53:39 | 25 | Q.   Okay. |

```
13:53:40    1        A.   So no.

            2        Q.   So just for example, I'm looking at the first

            3   page of Appendix C.  If I look at let's just say the

            4   first line, user EXEC for the Cisco command mode.  Do you

13:53:59    5   see what I'm referring to?

            6        A.   Yes.

            7        Q.   And this table, this appendix represents that

            8   the Adtran AOS command mode for that -- if you call it

            9   comparable mode -- is Basic (command security level).  Do

13:54:16   10   you see what I'm referring to?

           11        A.   Yes.

           12        Q.   Okay.  You don't -- you didn't review any

           13   materials or do anything to verify whether that is in

           14   fact the corresponding command mode within Adtran AOS?

13:54:29   15             MS. McCLOSKEY:  Objection.  Vague.

           16             THE WITNESS:  I did not sit in front of an

           17   Adtran device to do so, no.

           18   BY MR. NEUKOM:

           19        Q.   Okay.  So this -- the contents of Appendix C

13:54:41   20   were provided to you by counsel and as best you can

           21   remember you did not take efforts to verify its accuracy?

           22        A.   I read through them and I compared them with,

           23   you know, other -- other sources.  To that extent, you

           24   know, that was what I did.

13:54:57   25        Q.   Can you identify for me what sources you used
```

13:55:00   1   when you were checking or reviewing the contents of

           2   Appendix C?

           3           MS. McCLOSKEY:  Objection.  Vague and very

           4   compound.  If you want to point to something specifically

13:55:08   5   in Exhibit C.

           6           THE WITNESS:  Well, as I recall, the -- the

           7   exhibits cited earlier in the -- the footnote, for sure.

           8   BY MR. NEUKOM:

           9       Q.  Namely, Arista's interrogatory answer.

13:55:22  10       A.  Yes.

          11       Q.  Two pages of testimony from Cato, and a Force10

          12   document?

          13       A.  Yes.  Force10 document.

          14       Q.  Okay.  Did you review anything else to ensure or

13:55:35  15   to verify the contents of Appendix C?

          16           MS. McCLOSKEY:  Objection.  Vague.  Compound,

          17   mainly as to "review anything else."

          18           THE WITNESS:  Not that I recall.

          19           MR. NEUKOM:  Bear with me.  My stuff is out of

13:56:06  20   order.  I want to next go to Exhibit C.

          21           MS. McCLOSKEY:  I thought we were just on

          22   Exhibit C.

          23           MR. NEUKOM:  Oh, we were on Appendix -- pardon

          24   me.  You're right.  We were on Appendix C.

13:56:23  25           MS. McCLOSKEY:  It looks like Appendix C has a

13:56:26   1   cover sheet that says Exhibit C.

           2   BY MR. NEUKOM:

           3        Q.   Okay.  If you could please turn to -- well, this

           4   does get confusing, doesn't it?

13:57:08   5             Please turn to -- there's a page which has

           6   nothing on the page except the word "Exhibit D," and the

           7   next page following that begins a large table which has

           8   the header Appendix H.BR.  Do you see what I'm referring

           9   to?

13:57:25  10        A.   Yes.

          11        Q.   Okay.  And that table that begins on the page

          12   following -- how do you want to refer to this?  Should we

          13   call it Exhibit D?

          14        A.   Sure.  That's fine.

13:57:38  15        Q.   Okay.  Did you prepare the table that's here in

          16   Exhibit D?

          17        A.   No, I did not.

          18        Q.   This exhibit was provided to you by counsel?

          19        A.   Yes.

13:57:51  20        Q.   Did you undertake any steps to confirm the

          21   accuracy of the contents of Exhibit D?

          22             MS. McCLOSKEY:  Objection.  Vague.

          23             THE WITNESS:  Well, as I recall, I did look at

          24   Brocade's website and their user guide that's -- or

13:58:10  25   information available there to sort of spot-check a

13:58:13  1  couple of commands, yes.  That's it.

2  BY MR. NEUKOM:

3      Q.  Can you tell me for which of these commands you

4  spot-checked?

13:58:20  5          MS. McCLOSKEY:  Objection.

6  BY MR. NEUKOM:

7      Q.  For accuracy?

8          MS. McCLOSKEY:  Objection.  Vague.

9          THE WITNESS:  No, I can't really tell you which

13:58:24  10  ones.  I just remember doing a few, not exhaustively.

11  BY MR. NEUKOM:

12      Q.  Okay.  Three?  Five?

13          MS. McCLOSKEY:  Objection.  The witness has

14  already testified that he doesn't remember.  He remembers

13:58:33  15  doing a few.

16          THE WITNESS:  You know, a handful.  That's all I

17  can characterize it as.

18  BY MR. NEUKOM:

19      Q.  For the rest of them, for the contents of

13:58:43  20  Exhibit D, you trusted counsel to have collected and

21  represented this information accurately?

22          MS. McCLOSKEY:  Objection.  Vague.

23          THE WITNESS:  Yes, I did.

24  BY MR. NEUKOM:

13:58:58  25      Q.  Exhibit E.  And again, this is a little

13:59:01    1  confusing because it looks like the first substantive

            2  page of Exhibit E has the header Appendix H.DE, but I'm

            3  willing to call it Exhibit E if you are.

            4      A.   Sure.

13:59:14    5      Q.   Okay.

            6      A.   Fine.

            7      Q.   You didn't prepare Exhibit E?

            8           MS. McCLOSKEY:  Objection.

            9           THE WITNESS:  No.

13:59:20   10           MS. McCLOSKEY:  Vague.

           11  BY MR. NEUKOM:

           12      Q.   Exhibit E was prepared -- was provided to you by

           13  Arista's counsel in this case?

           14      A.   Yes.

13:59:30   15      Q.   Did you review any materials to confirm or to

           16  verify the accuracy of what's represented here in Exhibit

           17  E?

           18           MS. McCLOSKEY:  Objection.  Vague.

           19           THE WITNESS:  I did view a Dell-supplied

13:59:47   20  You Tube video which has a side-by-side comparison of a

           21  number of configuration commands, so again, to the extent

           22  that that validates, I don't know, some number.

           23  BY MR. NEUKOM:

           24      Q.   Sure.

13:59:57   25      A.   10 or fewer perhaps.

13:59:59    1        Q.   Okay.  So we'll call that a spot-check.  You

            2   spot-checked about 10 of the commands --

            3        A.   Right.

            4        Q.   -- listed on this table to make sure they were

14:00:11    5   accurate?

            6        A.   It's quite convincing.

            7        Q.   And for the other, I don't know, 400 or 500-plus

            8   commands, you did not review any source materials or take

            9   any efforts to confirm its accuracy?

14:00:21   10        A.   Again, not -- I wasn't asked to do that.

           11        Q.   Okay.  Do you have any familiarity with one or

           12   more CLIs offered by Juniper?

           13             MS. McCLOSKEY:  Objection.  Vague.

           14             THE WITNESS:  I'm not familiar with their CLI

14:00:36   15   exhaustively, no, just the names and...

           16   BY MR. NEUKOM:

           17        Q.   Okay.  For example, Junos?

           18        A.   Junos, yes.

           19        Q.   Okay.  But you don't -- you're not familiar with

14:00:46   20   the content or substance, if you will, of any of

           21   Juniper's CLI?

           22             MS. McCLOSKEY:  Objection.  Asked and answered.

           23   Assumes facts.

           24             THE WITNESS:  Well, Juniper historically has

14:00:57   25   participated in a different market than either any of my

                              U.S. LEGAL SUPPORT
                                (415) 362-4346

14:01:04   1   companies or, to my knowledge, Cisco, so that is to say

           2   the enterprise market.

           3   BY MR. NEUKOM:

           4       Q.   Um-hmm.

14:01:12   5       A.   Juniper has historically gone after a service

           6   provider, so typically they do their own thing different

           7   from everyone else.

           8       Q.   Okay.  So you haven't reviewed any CLI from

           9   Juniper but you -- you understand they compete in what

14:01:28  10   you consider different markets, therefore you wouldn't be

          11   surprised if it was different than Cisco's CLI?

          12            MS. McCLOSKEY:  Objection.  Mischaracterizes

          13   testimony.

          14   BY MR. NEUKOM:

14:01:36  15       Q.   I don't mean to be mischaracterizing your

          16   testimony.  I think what I've just said is a pretty

          17   pro-Arista thing.  I just want to make sure I understand

          18   you.

          19       A.   I think that summarizes it, yeah.

14:01:46  20       Q.   Okay.  Have you ever heard the phrase

          21   "intersystem consistency"?

          22       A.   No.

          23       Q.   The phrase or the concept of intersystem

          24   consistency has no meaning within the networking

14:01:58  25   industry, as far as you know?