# EXHIBIT U

# EXHIBIT 9
# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

** HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY **

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CISCO SYSTEMS, INC.,

        Plaintiff,

v.                  No. 5:14-cv-05344-BLF

ARISTA NETWORKS, INC.,

        Defendant.

_____/


** HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY **


VIDEOTAPED DEPOSITION OF CATE M. ELSTEN

THURSDAY, JULY 28, 2016

SAN FRANCISCO, CALIFORNIA


DEBORAH MAYER, CSR 9654, RPR CRR CRP CLR

U.S. LEGAL SUPPORT - SAN FRANCISCO

 1      A.   Yes.

 2      Q.   And it's specified that's the past ten years?

 3      A.   Yes.

 4      Q.   Do you have additional publications previous to

10:12   5  those, prior to the past ten years?

 6      A.   Yes.

 7      Q.   Have you written any books?

 8      A.   Books?  No.  A book chapter is as close as I've

 9  gotten to that.

10:12  10      Q.   Is that book chapter listed here?

11      A.   No.

12      Q.   What is the book chapter concerning?

13      A.   It was for the litigation services handbook, I

14  forget what edition, and it was about non patented

10:12  15  intellectual property.

16      Q.   Is that the only book chapter that you've

17  written that you recall?

18      A.   No, actually.  There was another one that

19  was -- it had an intellectual property angle.  It was

10:13  20  for a book that was targeted at the insurance industry,

21  and I do not remember more of the specifics on that.  I

22  think it essentially concerned the nature of damages and

23  therefore the potential exposure related to intellectual

24  property, and it was aimed at insurance executives.

10:13  25      Q.   Prior to the publications that you've listed in

 1    your CV, do you recall any other publications that

 2    you've written specific to patent damages?

 3        A.   Yes.

 4        Q.   What are those, that you recall?

10:14    5        A.   I don't recall.

 6        Q.   But you think you've written articles specific

 7    to patent damages?

 8        A.   You know, I know I wrote one long, long ago

 9    that was a pretty basic primer, lost profits, Georgia

10:14   10    Pacific factors, things of that sort.  I don't recall if

11    there was anything after that that was specifically

12    patent-related.  I do believe I had one or more articles

13    that compared and contrasted damages under the

14    Lanham Act to patent damages.

10:14   15        Q.   Do you recall writing any article specific to

16    copyright damages?

17        A.   Not other than the ones that we've discussed.

18        Q.   What articles have we discussed regarding

19    copyright damages?

10:15   20            THE WITNESS:  I'm sorry, I talked over.

21        A.   The chapter I wrote on non intellectual

22    property included copyright.

23    BY MS. CANDIDO:

24        Q.   Yes.

10:15   25        A.   Other than that, I don't remember anything that

```
 1    was targeted -- I don't remember anything that was

 2    targeted only to copyrights.  I don't, off the top of my

 3    head, remember anything that included copyrights, among

 4    other topics.

 5         Q.   Have you written any older publications

 6    specific to fair use in copyright?

 7         A.   No.

 8         Q.   What professional associations are you

 9    currently involved with?

10         A.   Well, Licensing Executive Society, the American

11    Marketing Association.  For the CMA, I wouldn't say it's

12    an association you're involved in.  There's

13    communication with the governing body, but it doesn't

14    hold meetings or have committees that members

15    participate in, or things like that, at least not to my

16    knowledge.  So LES and AMA are the two I would say I'm

17    involved in, I think in the sense that you meant.

18         Q.   Do you hold any leadership positions with

19    either of those organizations?

20         A.   Not any more.

21         Q.   I think actually your CV mentions the

22    International Trademark Association; are you --

23         A.   Oh, I'm sorry, I forgot that.  Yes, sure.

24         Q.   You are currently involved with them?

25         A.   Yes.  I don't know how I could forget them.
```

10:15 (line 5)
10:15 (line 10)
10:16 (line 15)
10:16 (line 20)
10:17 (line 25)

1        A.    Yes.



11:32

11:33

11:33

11:33

11:33

Rice Moot Court - Highly Confidential
July 28, 2016                                                                59



11:34

11:34

11:35

11:35

11:36







11:42

11:42

11:43

11:43

11:43





12:59    1    multi-page document, you know, it runs to 20, 30 pages

         2    of which the CLI may be mentioned in a couple of

         3    sentences.  We didn't -- it's arguable that it would

         4    have been more accurate to consider those numbers.  We

12:59    5    looked for documents that assigned some non trivial

         6    amount of space to the CLI.

         7        Q.    I guess Figure 12 and Figure 13 are additional

         8    Arista documents that you considered?

         9        A.    Yes.

13:00   10        Q.    With respect to -- strike that.

        11              You did one analysis of Arista's source code

        12    and a calculation of the source code required to

        13    implement the CLI; do you recall that?

        14        A.    Well, that's really Dr. Black's calculation.

13:00   15        Q.    I guess --

        16        A.    Not Dr. Black, it was someone else, but it's

        17    specified in my report, yeah, the person's name is in

        18    there.

        19        Q.    Well, you cite to that calculation.

13:01   20        A.    Right.

        21        Q.    Is it your opinion that the quantification of

        22    the amount of code required to implement a feature is a

        23    representation of the value of that feature?

        24        A.    Well, it could be.  It depends on ultimately

13:01   25    what the clarification is of what's relevant in this

1  case.  There have been cases that I'm aware of where

2  lines of code has been accepted as a valid allocation

3  methodology, and cases where it's been rejected.  So I

4  think whether it's valid in this case or informative in

13:01  5  this case is going to depend on what the ultimate shape

6  of the case is in terms of what's covered by the

7  copyrights.

8  BY MS. CANDIDO:

9       Q.   From the perspective of a consumer, do you

13:02  10  think the amount of code that it takes to implement a

11  feature speaks to the value of or importance of a

12  feature to the consumer?

13       A.   I don't think it's something that the consumer

14  is typically aware of.  You know, I think what's in some

13:02  15  cases valid is to look at the proportion of the code

16  that's necessary to implement a desired functionality.

17       Q.   Do you think more code makes a feature more

18  desirable?

19       A.   I think it depends on the circumstances of the

13:02  20  case.  Whether it turns out to be informative in this

21  case or not, I don't know.  That's why I didn't use it

22  in the calculation.

23       Q.   Did you give that source code counting analysis

24  any weight in your opinion?

13:03  25       A.   I would say not at this time.  Certainly not in

1    any unique sense.  It didn't -- not in any unique sense,

2    and I didn't use it in a calculation.  I presented it in

3    my report because I don't think it's impossible that it

4    could be used in the calculation, depending, again, on

13:03    5    what the ultimate shape of the case is, but I can't

6    anticipate that at this time.

7        Q.   So you offered it as a data point, but it

8    doesn't currently inform your opinion; is that fair?

9        A.   It doesn't currently inform my calculation.

13:04    10       Q.   On what basis do you think the source code

11    calculation would be relevant to a fact finder as the

12    case currently stands?

13       A.   That's kind of an imponderable.  There's so

14    many variables that go into that, I don't know if I

13:05    15    could answer that question.

16            (Deposition Exhibit 1594 marked.)

17            MR. SILBERT:  Thanks.

18    BY MS. CANDIDO:

19       Q.   I've handed you what's been marked

13:06    20    Exhibit 1594.  It's a printout of a natively-produced

21    file Bates number ARISTANDCA11419567.  We've given it

22    -01 through  -71 pagination for reference in the

23    printout -- I'm sorry, through -72 printout, pagination

24    of the printout.

13:06    25            This is the -- actually, no, it appears not to



13:07

13:07

13:07

13:08

13:08





18:07

18:08

18:08

18:08

18:09



