Kathleen Sullivan (SBN 242261)
kathleensullivan@quinnemanuel.com
Todd Anten (*admitted pro hac vice*)
toddanten@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Sean S. Pak (SBN 219032)
seanpak@quinnemanuel.com
Amy H. Candido (SBN 237829)
amycandido@quinnemanuel.com
John M. Neukom (SBN 275887)
johnneukom@quinnemanuel.com.
QUINN EMANUEL URQUHART &
SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

David Nelson (*admitted pro hac vice*)
davenelson@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN LLP
500 W Madison St, Suite 2450
Chicago, IL 60661
Telephone: (312) 705-7465
Facsimile: (312) 705 7401

Steven Cherny (*admitted pro hac vice*)
steven.cherny@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Adam R. Alper (SBN 196834)
adam.alper@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Michael W. De Vries (SBN 211001)
michael.devries@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

*Attorneys for Plaintiff Cisco Systems, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC., | CASE NO. 5:14-cv-5344-BLF (NC) |
| Plaintiff, | **CISCO'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW** |
| vs. | |
| ARISTA NETWORKS, INC., | Dept: Courtroom 3 - 5th Floor |
| Defendant. | Hearing Date:  April 27, 2017 |
| | Hearing Time:  9:00 am |
| | Judge: Hon. Beth Labson Freeman |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ................................................................................ 1

RELIEF REQUESTED .................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

I.    PRELIMINARY STATEMENT ............................................................................... 1

II.   FACTUAL BACKGROUND ................................................................................... 3

      A.    The Court's Relevant Rulings ................................................................. 3

      B.    Scènes À Faire .................................................................................... 4

            1.    The Instruction And Verdict Form On Scènes À Faire ................... 4

            2.    Arista's Deficient Scènes À Faire Evidence ............................... 5

            3.    Undisputed Evidence Negating Scènes À Faire ......................... 8

            4.    Post-Creation "Industry Standard" Evidence Irrelevant To Scènes À Faire ................................................................................ 10

      C.    Cisco's Rule 50(a) Motion ................................................................... 11

III.  CISCO IS ENTITLED TO JMOL OF COPYRIGHT INFRINGEMENT LIABILITY ..... 11

      A.    Legal Standard ................................................................................... 12

      B.    The Record Is Legally Insufficient To Establish A Defense Of Scènes À Faire ................................................................................................. 12

            1.    The Compilation Of Multiword Command-Line Expressions ........... 15

            2.    The Compilation Of Modes And Prompts ................................... 19

            3.    The Compilation Of Command Responses/Screen Outputs ........... 20

            4.    The Compilation Of Help Descriptions ....................................... 20

            5.    Cisco's User Interfaces As Compilations Of The Other Four Compilations ..................................................................................... 21

      C.    Scènes À Faire Is Not A Defense To Virtually Identical Copying ................ 21

IV.   AFTER GRANTING JMOL OF LIABILITY, THE COURT MAY EFFICIENTLY ADDRESS ANY REMAINING ISSUES INCLUDING REMEDIES ........................... 24

V.    CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Apple Computer, Inc. v. Microsoft Corp.*,
   35 F.3d 1435 (9th Cir. 1994) .................................................................2, 14, 22, 24
   799 F. Supp. 1006 (N.D. Cal. 2002) ......................................................................22

*Apple, Inc. v. Samsung Elecs. Co.*,
   920 F. Supp. 2d. 1079 (N.D. Cal. Jan. 29, 2013) .................................................12

*Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*,
   672 F.2d 607 (7th Cir. 1982) ..................................................................................22

*B2B CFO Partners, LLC v. Kaufman*,
   787 F. Supp. 2d 1002 (D. Ariz. 2011) .............................................................13, 19

*Bains LLC v. Arco Prods. Co.*,
   405 F.3d 764 (9th Cir. 2005) ..................................................................................24

*Callicrate v. Wadsworth Mfg., Inc.*,
   427 F.3d 1361 (Fed. Cir. 2005) ..............................................................................12

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
   109 F.3d 1394 (9th Cir. 1997) ................................................................................18

*Duste v. Chevron Prods. Co.*,
   2012 WL 43756 (N.D. Cal. Jan. 9, 2012) ..............................................................12

*Feist Publ'ns, Inc. v. Rural Telephone Serv. Co.*,
   499 U.S. 340 (1991) ................................................................................................16

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
   2016 WL 3880774 (N.D. Cal. July 18, 2016) ........................................................12

*Fleener v. Trinity Broad. Network*,
   203 F. Supp. 2d 1142 (C.D. Cal. 2001) .................................................................22

*Fodor v. L.A. Unified Sch. Dist.*,
   2014 WL 12235424 (C.D. Cal. June 3, 2014) ........................................................22

*Frybarger v. Int'l Bus. Machs. Corp.*,
   812 F.2d 525 (9th Cir. 1987) ............................................................................14, 22

*Fujifilm Corp. v. Motorola Mobility LLC*,
   182 F. Supp. 3d 1014 (N.D. Cal. 2016) .................................................................12

*Gillette v. Delmore*,
   979 F.2d 1342 (9th Cir. 1992) ................................................................................12

*Innovative Legal Mktg., LLC v. Mkt. Masters-Legal*,
   2012 WL 503507 (E.D. Va. Feb. 13, 2012) ...........................................................22
   852 F. Supp. 2d 688 (E.D. Va. 2012) .....................................................................22

*Lakeside-Scott v. Multnomah Cty.*,
   556 F.3d 797 (9th Cir. 2009) ..................................................................................12, 16

*Merchant Transaction Sys., Inc. v. Nelcela, Inc.*,
   2009 WL 723001 (D. Ariz. Mar. 18, 2009) ...........................................................13, 16

*Metcalf v. Bochco*,
   294 F.3d 1069 (9th Cir. 2002) ..............................................................................13, 15

*Mitel, Inc. v. Iqtel, Inc.*,
   124 F.3d 1366 (10th Cir. 1997) ....................................................................................14

*MobileMedia Ideas LLC v. Apple Inc.*,
   780 F.3d 1159 (Fed. Cir. 2015) ...................................................................................17

*Open Text S.A. v. Box, Inc.*,
   2015 WL 4940798 (N.D. Cal. Aug. 19, 2015) ............................................................17

*Oracle Am., Inc. v. Google Inc.*,
   750 F.3d 1339 (Fed. Cir. 2014) .............................................................................14, 19

*Pavao v. Pagay*,
   307 F.3d 915 (9th Cir. 2002) .......................................................................................12

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
   134 S. Ct. 1962 (2014) .................................................................................................25

*Reed-Union Corp. v. Turtle Wax, Inc.*,
   77 F.3d 909 (7th Cir. 1996) .........................................................................................22

*Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*,
   118 F.3d 955 (2d Cir. 1997) ........................................................................................14

*Sony Pictures Entm't, Inc. v. Fireworks Entm't Grp., Inc.*,
   156 F. Supp. 2d 1148 (C.D. Cal. 2001) .......................................................................22

*Swirsky v. Carey*,
   376 F.3d 841 (9th Cir. 2004) .......................................................................................14

### Rules and Statutes

17 U.S.C. § 504(b) ...................................................................................................................25

Fed. R. Civ. P. 50(a) ...............................................................................................................11

Fed. R. Civ. P. 50(b)............................................................................................................1, 12

### Miscellaneous

*ABA Model Jury Instructions: Copyright, Trademark and Trade Dress Litigation* § 1.4.8 ...........23

Carol Memmott, USA TODAY, *After 50 years, a tip of the hat to one cool cat* (Feb. 26, 2007)......19

COMPENDIUM OF THE U.S. COPYRIGHT OFFICE PRACTICES § 313.4(I) (3d ed. 2014) .....................13

Lynn Neary, *NPR Books: Fifty Years of "The Cat in the Hat"* (Mar. 1, 2007)...............................19

4 Nimmer on Copyright § 13.03[B][1][a] ......................................................................24

Ross Todd, The Litigation Daily, *Litigator of the Week* (Dec. 15, 2016).......................................15

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that, on April 27, 2017 at 9:00 am, before the Honorable Beth Labson Freeman, plaintiff Cisco Systems, Inc. ("Cisco") shall and hereby does respectfully move the Court for an order granting Cisco judgment as a matter of law ("JMOL") pursuant to Fed. R. Civ. P. 50(b) on its claim of liability for copyright infringement of its user interfaces. This motion is based on this notice of motion and memorandum, the trial record, and such other argument as was presented and may be presented before this motion is taken under submission by the Court.

**RELIEF REQUESTED**

Cisco respectfully seeks an order granting JMOL under Fed. R. Civ. P. 50(b) that Arista is liable for copyright infringement of Cisco's user interfaces.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    PRELIMINARY STATEMENT**

In this case, the jury found that Arista engaged in copyright infringement of Cisco's original and protectable user interfaces, but excused that infringement as scènes à faire—that is, found that all of the infringed portions of the user interfaces were dictated by external factors other than Cisco's creativity at the time of creation. ECF 750-1 at 1-2. That verdict is unsustainable as a matter of law. At trial, Arista spent little time trying to prove its scènes à faire defense, and the thin evidence it did adduce falls far short of establishing that defense. To the contrary, the undisputed evidence at trial overwhelmingly negates any such defense, for two independent reasons.

***First***, the infringed portions of Cisco's works were necessarily ***compilations***, and the record fails to show that ***any*** of the five compilations the Court found protectable in this case was scènes à faire. As instructed by the Court, the jury necessarily must have found that Arista infringed Cisco's copyrighted user interfaces by impermissibly copying the five Cisco ***compilations*** the Court deemed protectable (the compilations of (1) multiword command expressions, (2) modes and prompts, (3) command responses/screen outputs, (4) help descriptions, and/or (5) user interfaces as a whole as compilations of the other four)—or, for purposes of this motion, where all inferences must be drawn in Arista's favor, at least one of those compilations. In order for scènes à faire to excuse that infringement, Arista was similarly required to prove that, at the ***compilation*** level, pre-existing

external factors other than Cisco's creativity dictated the manner in which Cisco selected, arranged, organized and designed its five compilations—or, for purposes of this motion, at least one of those compilations. But Arista's limited scènes à faire evidence, even viewed in the light most favorable to Arista, at most established that certain isolated **words, terms or acronyms** within Cisco's multiword command-line expressions were influenced by any pre-existing external considerations. Arista failed to adduce any such proof at the compilation level as to multiword commands, and the same is true for modes and prompts, command responses/screen outputs and help descriptions.

  **Second**, even if these evidentiary deficiencies were not themselves fatal, the evidence fails to show any of the three indispensable elements required to establish a scènes à faire defense: namely, that **external** considerations **dictated** the selection, arrangement, organization and design of Cisco's compilations **at the time of creation** and not the time of copying. Arista's scènes à faire evidence in large part was directed to internal constraints like consistency with the author's prior decisions or Cisco's internal policies, and thus failed to address external factors at all. As to any arguably external factors, the record fails to support any finding that they dictated Cisco's choices in selecting, arranging, organizing and designing its compilations, or in other words, that external factors made those choices "as a practical matter indispensable, or at least standard." *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1994) (citation omitted). To the contrary, there was overwhelming undisputed evidence of the **lack** of any such necessary external constraint. For example, third-party testimony established that other companies that subsequently offered command-line user interfaces, including Juniper and HP, viewed themselves as entirely unconstrained in selecting, arranging, organizing and designing those interfaces, and that in doing so they instead operated on a "green field" or "open pasture." It follows *a fortiori* that Cisco was unconstrained in selecting, arranging, organizing and designing its own command-line user interfaces beginning years earlier. And Arista's attempts to elicit evidence that Cisco's user interfaces supposedly became stock or standard **after** creation by Cisco provide no support for scènes à faire, which requires that expression be stock or standard **before** its creation.

  While these deficiencies of proof alone negate the scènes à faire verdict and require the entry of JMOL of user-interface copyright infringement liability in Cisco's favor, JMOL is also required for

1   the additional and independent reason that, under Ninth Circuit law, scènes à faire is not an available

2   defense against "virtually identical" copying, as was established on this record.  The jury had two

3   paths to finding infringement in this case:  as instructed by the Court, it could have found infringement

4   by direct evidence by relying on Arista's repeated admissions that it "slavishly" copied Cisco's works;

5   or it could have found infringement by indirect evidence by finding that Arista had access to Cisco's

6   copyrighted works and made "virtually identical" use of the protectable portions of those works.

7   Either way, the jury, on the evidence presented, necessarily found "virtually identical" copying.  For

8   this reason as well, the scènes à faire judgment cannot stand on the record here.

9         Cisco's motion for JMOL of copyright infringement liability should be granted.

10  **II.      FACTUAL BACKGROUND**

11        **A.      The Court's Relevant Rulings**

12        For purposes of this motion (and without waiving any challenges on appeal), Cisco accepts as

13  undisputed the following rulings of the Court:  The copyrighted works at issue, as relevant here, are

14  "Cisco's four user interfaces for IOS, IOS XR, IOS XE, and NX-OS." Tr. 2668:19-22 (Instr. No. 25).[1]

15  To prove infringement, Cisco was required to show that it "is the owner of a valid copyright," that

16  "Arista copied original, protected elements from Cisco's copyrighted works," and that Arista's

17  "copying was greater than *de minimis*, that is, more than a trivial amount of Cisco's works as a whole."

18  Tr. 2669:12-16 (Instr. No. 29), 2671:23-24 (Instr. No. 36), 2675:6-7 (Instr. No. 41).  Cisco could

19  establish copying in either of two ways:  (1) "direct evidence," such as Arista's admissions of copying;

20  or (2) "indirect evidence," namely proof that (a) Arista had access to Cisco's works, and (b) "there is

21  virtual identity between Arista's works and the original, protected elements of Cisco's works."  Tr.

22  2672:1-11 (Instr. No. 36).

23        The Court's analytic dissection order and jury instructions limited what aspects of Cisco's

24  works could constitute "original, protected elements" relevant to copying.  Under the Court's rulings,

25  no individual multiword command expression, mode or prompt, command response or help

---

[1]    All cited pages to the trial transcript may be found in Exhibit A to the Declaration of Sara E.
Jenkins in Support of Cisco's Rule 50(b) Motion for Judgment as a Matter of Law ("Jenkins Decl.");
all cited exhibits may be found in *id.*, Exhibits B-M.

description is protectable.  *See* ECF 719 at 11-12, 14-16; 2673:17-2674:14 (Instr. No. 39).  Instead, the Court permitted the jury to find only five portions of "Cisco's works" to be protectable, and instructed that they could be found protected only "***as a compilation*** if you find they are original":

(1) "The selection and arrangement of Cisco's multiword command line expressions";

(2) "The selection and arrangement of Cisco's modes and prompts";

(3) "The collection of Cisco's screen responses and outputs";

(4) "The collection of Cisco's help descriptions;" and

(5) "Cisco's user interfaces as a whole as compilations of elements 1 through 4."

Tr. 2673:4-15 (Instr. No. 39) (emphasis added).  As the Court instructed in defining "compilations," "[a] 'compilation' is a work formed by the collection and assembling of pre-existing materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship."  Tr. 2670:20-24 (Instr. No. 33).

**B.    Scènes À Faire**

**1.    The Instruction And Verdict Form On Scènes À Faire**

The Court instructed the jury on Arista's scènes à faire defense as follows:

> Scènes à faire is an affirmative defense to copyright infringement.  To show that portions of Cisco's user interfaces are scènes à faire material, Arista must show that ***at the time Cisco created the user interfaces***, not at the time of any copying, ***external*** factors other than Cisco's creativity ***dictated*** that Cisco select, arrange, organize and design its original features in [the] manner it did.  The scènes à faire doctrine depends upon the circumstances presented to the creator at the time of creation, not the circumstances presented to the copier at the time it copied.  Arista has the burden of proving this defense by a preponderance of the evidence.

Tr. 2680:13-25 (Instr. No. 61) (emphasis added).  The verdict form that the Court submitted to the jury asked in Question 1, "Has Cisco proven that Arista infringed any of Cisco's user interfaces?" and the jury answered "Yes."  ECF 750-1 at 1.  Question 2 asked, "As to the user interfaces you found to be infringed in Question 1, has Arista proven any of the following?" and the jury answered "Yes" solely as to "scènes à faire."  *Id*. (rejecting defenses of fair use and merger).

Given Instruction No. 61 and the jury's answers to Questions 1 and 2 on the verdict form, the jury necessarily must have found infringement at the ***compilation*** level.  That is because the only "portions of Cisco's user interfaces" that were "protectable," and thus subject to an infringement

1    finding if found original, were the five compilations set forth in Instruction No. 39. Scènes à faire thus

2    can excuse those "portions of Cisco's user interfaces" that were found infringed only if it too operates

3    at the compilation level. Accordingly, any scènes à faire evidence must establish that the selection,

4    arrangement, organization and design of Cisco's protectable compilations (and not merely some

5    isolated words, terms or acronyms therein) were dictated by external constraints other than Cisco's

6    creativity at the time of creation.

7                    **2.    Arista's Deficient Scènes À Faire Evidence**

8            In the course of the two-week trial, ***none*** of Arista's witnesses provided any testimony that

9    external factors other than Cisco's creativity dictated Cisco's choice of how to select, arrange,

10   organize and design ***any*** of its five protectable ***compilations***. The little scènes à faire evidence that

11   Arista did elicit consisted mainly of testimony by its technical expert Dr. Black. Dr. Black's scènes à

12   faire testimony failed to address whether Cisco's selection, arrangement, organization and design of

13   any of its five protectable compilations was dictated by external constraints other than Cisco's

14   creativity at the time of creation; instead, his testimony was directed only to certain individual and

15   isolated words, terms or acronyms within Cisco's multiword command lines, and did not address

16   Cisco's four other protectable compilations at all.

17           For example, Dr. Black identified isolated uses of "legacy" terms, terms from "standards"

18   bodies, and "common networking" terms found within some individual multiword command-line

19   expressions. Tr. 2107:12-19. All of that testimony referred to isolated words, terms or acronyms

20   within multiword commands and not to any compilations. As Dr. Black admitted, in evaluating pre-

21   existing industry standards, he limited his analysis to "looking for individual terms" in standards

22   documents that pre-dated Cisco's creation of its CLI. Tr. 2208:15-17; *see also*, *e.g.*, Tr. 2096:10-18

23   (identifying from a "reference manual" a pre-existing command beginning with word "show" and

24   opining that some of Cisco's commands also include "the word 'show'"); Tr. 2097:17-2098:7

25   (describing individual "words that I found in manuals from legacy CLI's, CLI products that pre-date

26   Cisco, and that are among the terms used by Cisco's CLI in the asserted commands," using example of

27   "clear," although "it was far fewer" than "show"); Tr. 2099:17-22 (listing 13 individual, one-word

28   terms found in prior operating systems); Tr. 2100:2-2101:5 (describing list of "70 or 80" individual

"common networking terms" that appeared in certain of Cisco's multiword commands, although conceding that whether a term was "common" was "a judgment call"); Tr. 2101:9-2102:4 (testifying that individual "terms" in "the accused CLI command[s] … could be found in the title and in the contents of the industry standard specifications"); Tr. 2103:11-21 (testifying that individual words in one multiword command appeared separately in an industry-standard document (Tr. Ex. 6801) (at Jenkins Decl., Ex. B)); Tr. 2103:25-2104:8 (same as to another example); Tr. 2104:9-21 (same); Tr. 2106:10-19 (describing a list of individual terms from ITEF publications that were included as a part of at least one asserted multiword command); Tr. 2106:21-2107:2 (describing a list of individual terms that existed in IEEE publications and were included as a part of at least one asserted multiword command).

The remainder of Dr. Black's scènes à faire testimony opined that "[t]rying to be descriptive, trying to be clear, concise," "[us]ing abbreviations," and making a new command "fit in with the commands you already have" were "external constraints or considerations … present for the Cisco engineers as they were deriving CLI commands." Tr. 2110:15-2111:25. But he did not offer any external source for those constraints. To the contrary, he noted that Cisco's own internal "Parser-Police Manifesto" (Tr. Ex. 5175 (at Jenkins Decl., Ex. C)) contained certain "guidelines or aspects" for Cisco's engineers, such as "when naming a command, try to pick names that would be familiar to people in the industry"; Dr. Black elaborated by way of example that a term like "MTU" might "look completely meaningless" to "people who don't work in networks" but "to someone that works in networking that means Maximum Transmission Unit, and it would be familiar," concluding that "it makes a lot of sense both for brevity and clarity and familiarity to use a term like that." Tr. 2112:1-11; 2112:21-2113:16. Dr. Black also offered the conclusory opinion that, "concerning the applicability of the scène[s] à faire doctrine to the asserted CLI elements," "I think given the large number of constraints to describe the feature you are implementing and to follow all of those other guidelines that were set forth in this document and according to the testimony we've heard, that really, the command that you end up with flows primarily from sources and subject to constraints outside of the author's creativity." Tr. 2113:18-2114:2.

But Dr. Black made multiple admissions that negate any finding that external constraints dictated Cisco's choice of how to select, organize, arrange and design any of the five **compilations** at issue, as opposed to influencing the choice of some individual words, terms or acronyms. As to the compilation of multiword command lines: (1) Dr. Black admitted that there were "plenty" of words and terms that Cisco used that he could not locate as pre-existing Cisco's use, Tr. 2109:23-25; (2) Dr. Black admitted that none of Cisco's 506 asserted multiword command expressions, as written, could be found in any pre-existing documents, Tr. 2210:11-22;[2] (3) Dr. Black admitted that some of "the constraints" he described, like those on the "sequencing of terms," meant constraint "only in the sense that I talked about consistency with pre-existing commands," Tr. 2212:21-2213:3, and further admitted that an author's goal of remaining consistent with his or her own pre-existing work was **not** an "external" constraint, Tr. 2214:24-2215:3; and (4) Dr. Black admitted that the "Parser-Police Manifesto" was not itself an external constraint but rather Cisco's internal "advice" to its own engineers, Tr. 2112:24-25. Dr. Black also failed to rebut Cisco's technical expert Dr. Almeroth's testimony that, as to an engineer's "creative choice" of the order and sequence of terms in a multiword command line, "[t]here's no constraint or limitation that it's one versus the other." Tr. 1233:8-1234:14 (Almeroth) (comparing multiple examples of different command-line word orders that would perform the same function as Cisco's asserted multiword command "show IP access-list").

As to Cisco's other four protectable compilations (modes and prompts, command responses/screen outputs, help descriptions and user interfaces as a whole), Dr. Black offered no evidence whatsoever of external constraints on Cisco's choices: (1) Dr. Black expressly admitted that he found no evidence of Cisco's particular arrangement of its asserted modes and prompts in any pre-existing document, Tr. 2220:23-2221:2, and failed to rebut Dr. Almeroth's testimony that "there's other ways" that Cisco's modes and prompts "could have been organized," Tr. 1238:12-15 (Almeroth); (2) Dr. Black offered no testimony that the compilation of command responses/screen outputs was dictated by external constraints and failed to rebut Dr. Almeroth's testimony that "there really aren't"

---

[2]    Dr. Black testified that he did find two asserted hyphenated commands that previously existed but admitted that they did so only "without the hyphen." Tr. 2210:14-19 (referring to "address-family" and "aggregate-address"). It was undisputed that the choice of a hyphen (as opposed to, say, an underscore) is itself an unconstrained choice. Tr. 516:19-23 (Lougheed).

1    any significant constraints in how to construct screen outputs because "[y]ou can include any

2    information, you can organize it in any way," Tr. 1236:21-1237:5 (Almeroth); (3) Dr. Black offered no

3    testimony that the compilation of Cisco's help descriptions was dictated by external constraints and

4    failed to rebut Dr. Almeroth's testimony that "[t]here aren't really constraints on what the user or the

5    person designing those commands is allowed to include in terms of the help information," Tr. 1237:20-

6    22 (Almeroth); and (4) Dr. Black offered no testimony that the compilation of Cisco's user interface as

7    a whole was dictated by external constraints and failed to rebut Dr. Almeroth's testimony that there

8    was no such constraint as to the user interface as a whole considering all four "building blocks"

9    together, *see* Tr. 1240:2-7 (Almeroth).[3]

10              **3.     Undisputed Evidence Negating Scènes À Faire**

11              In addition to the deficiencies in Arista's scènes à faire case, undisputed evidence at trial

12   established that external factors other than Cisco's creativity did ***not*** dictate the choices Cisco made in

13   selecting, arranging, organizing and designing any of its five protectable compilations.

14              To begin with, third-party witnesses, including one called by Arista, expressly testified that

15   there were no external constraints that dictated the choices that a company like Cisco makes in

16   selecting, arranging, organizing and designing the user interface by which a human operator

17   communicates with network switches.  For example, Phillip Shafer, a Distinguished Engineer at

18   Juniper Networks and the Chief Software Architect and Software Developer for the Juniper CLI,

19   testified that, in creating the first Juniper CLI in 1997, he had open to him a "***green field***" or "***open***

20   ***pasture***" in which he could "go in any direction, everything is wild.  You can make it what you want.

21   ***There are no constraints on what you are doing***."  Tr. 2060:17-2061:3 (emphasis added).  He thus

22   admitted that Juniper has "been able to effectively compete against Cisco … using a CLI that is

23   different from Cisco's CLI."  Tr. 2062:23-2063:1.

24   _____

25   [3]   Nor did Dr. Black refute the testimony of Cisco's percipient witnesses as to the absence of
     externally dictated constraints at the time of creation.  *See, e.g.*, Tr. 514:19-22 (Lougheed) ("There

26   weren't any other devices like this at the time.  There were not any expectations that the customers
     had, that there was a way of doing this or there was a way of talking about it or even the choice of

27   words."); Tr. 681:23-25 (Remaker) ("We had no constraints [in developing the help descriptions].
     The aesthetic was to keep it short, but there are not official constraints that I'm aware of for the help

28   text itself.").

1          Similarly, Balaji Venkatraman, Senior Director of Product Management at HP who Arista

2   called to testify (*see* Tr. 2306:21), admitted that "there are multiple ways to implement a specific CLI

3   command," that "different companies can, and do, in fact create their own CLI syntax and commands

4   for the same functionality," and that "different companies are free to use whatever commands they

5   want to use, if that's their choice."  Tr. 2316:22-2317:9.  He further admitted that no terms from

6   networking protocols and or standards dictated how a user interface was structured or sequenced,

7   stating that, "although some of the terms might be the same, different designers, even at the same

8   company, can choose different words, different hierarchies, different syntax for the same functions."

9   Tr. 2324:18-22; *see also* Tr. 2325:24-2326:6 (Venkatraman) ("[S]ome commands like 'show,' 'show

10  configuration,' in some vendors, may be 'show,' others may be 'view,' 'save' versus 'write.'  The

11  intended behavior by the routers and switches are the same.").  Mr. Venkatraman also admitted that

12  HP offered a competing operating system called Comware and that "Comware['s] CLI[] is organized

13  slightly differently" from both other HP CLIs and Cisco's IOS CLI.  Tr. 2320:12-16; *see also* Tr.

14  2324:10-15 (Venkatraman) ("Comware was acquired by HP" and "different companies, different

15  designers develop the CLI differently, name the commands differently").

16         In addition to this third-party testimony establishing the absence of constraint on Cisco's

17  choices, Arista's own witnesses repeatedly admitted that the creation of a command-based user

18  interface is a subjective process in which command lines may be structured, arranged, organized and

19  designed in any number of ways.  *See*, *e.g.*, Tr. 802:2-7 (Duda) (admitting that "it's certainly

20  technically achievable" to "come up with an alternative command language"); Tr. 897:1-3 (Sadana)

21  (admitting that, while he was at Cisco, there was "healthy discussion" among engineers about "how

22  the commands should be structured, what they should say, what they should be"); Tr. 1013:5-8 (Dale)

23  (admitting that "different engineers can have different opinions on how to express certain

24  commands"); Tr. 1013:18-21 (Dale) (admitting that "two engineers could sit down and propose two

25  very different commands for any particular function"); Tr. 1015:3-14 (Dale) (admitting that there are

26  "many factors that go into deciding commands themselves," and admitting that this is "a professional

27  judgment call by an engineer"); Tr. 2265:9-10 (Gourlay (at Jenkins Decl., Ex. D)) (admitting that

28  "reasonable minds can differ with respect to what the best CLI command is in any given instance").

Moreover, it was undisputed that Arista itself offers, and 20% of Arista customers use, a Linux interface that does not use Cisco-like CLI commands at all to perform the same functions. *See* Tr. 802:12-22 (Duda) (admitting Arista "ha[s] an interface called Linux-interface that does not use the Cisco CLI commands" and "about 20 percent of [Arista's] customers adopt a pure Linux approach").

Finally, it is undisputed that, as Arista's and third-party witnesses agreed, no ***standard-setting organization*** required Cisco or any other company to select, organize, arrange and design its user interfaces or any of their constituent compilations in any particular way. *See* Tr. 1963:5-8 (Ullal) (admitting she was "not aware of any standards setting organization for command-line interface commands"); Tr. 1843:24-1844:2 (Holbrook) (admitting he is "not aware of any standards-setting organization that has standardized what a command-line interface would be"); Tr. 2316:3-6 (Venkatraman) (admitting "there is no formal industry standard organization … that ratifies specifications for a CLI user interface for networking equipment").

### 4.   Post-Creation "Industry Standard" Evidence Irrelevant To Scènes À Faire

At trial, Arista repeatedly elicited testimony that Cisco's CLI was a purported "industry standard" or "*de facto* industry standard." *See, e.g.*, Tr. 1945:11-14 (Ullal) ("[i]f it is defined as an industry standard, I believe it's free to use"); Tr. 934:23-935:1 (Sadana) ("we believed this was the industry standard, everyone was using it, we were using the same CLI"); Tr. 1033:25-1034:2 (Dale) ("industry standard" means "a standard that everyone in the industry understands"); Tr. 1760:14-21 (Chambers) (discussing Tr. Ex. 5454  (at Jenkins Decl., Ex. E) (Cisco document stating "Cisco NX-OS offers the same industry-standard command-line environment that was pioneered in Cisco IOS Software")); Tr. 2039:12-16 (Volpi) (discussing Tr. Ex. 5134 at 3 (at Jenkins Decl., Ex. F) (Cisco presentation stating that "CLI becomes industry standard" at some point between 1993 and 2000)); Tr. 699:22-25 (Remaker) (agreeing that "Cisco was happy with the CLI commands being a *de facto* industry standard"); Tr. 2040:15-16 (Volpi) (agreeing that "Cisco actually promote[d] its CLI as an 'industry standard'"); Tr. 2326:22-23 (Cato (at Jenkins Decl., Ex. G)) (addressing post-Cisco CLIs, stating that "[c]ustomers expect Dell to support command modes and ensure that those command modes are … familiar with their technicians"); Tr. 2746:3-4 (Arista's closing argument) (Arista was

1    "using the same commands that everybody else in the industry is using").  Any evidence about Cisco's

2    user interfaces becoming an industry standard *after* their creation cannot show that  Cisco was

3    externally constrained at the time it created its user interfaces, as scènes à faire requires.[4]

4        **C.    Cisco's Rule 50(a) Motion**

5        Before the case was submitted to the jury, Cisco moved for JMOL pursuant to Rule 50(a).  *See*

6    ECF 732.  As relevant here, Cisco argued it was entitled to JMOL "on Arista's scènes à faire

7    affirmative defense," *id.* at 14, because based on the record at trial, *see id.* at 7-8, 13-14, "no

8    reasonable jury could find that, at the time Cisco created its works, external factors other than Cisco's

9    creativity 'dictated' that Cisco select, arrange, organize and design its original features in the manner it

10    did," *id.* at 14.  Cisco renews that motion here pursuant to Rule 50(b).

11    **III.    CISCO IS ENTITLED TO JMOL OF COPYRIGHT INFRINGEMENT LIABILITY**

12        No reasonable jury could find based on the record here that, at the time Cisco created its five

13    compilations for its user interfaces, external factors other than Cisco's creativity dictated "the selection

14    and arrangement of Cisco's multiword command line expressions"; "the selection and arrangement of

15    Cisco's modes and prompts"; "the collection of Cisco's screen responses and outputs"; "the collection

16    of Cisco's help descriptions;" or "Cisco's user interfaces as a whole" as compilations of those four

17    compilations. Tr. 2673:7-15 (Instr. No. 39).[5]  Even construing the verdict in the light most favorable

18    to Arista, the record fails to provide sufficient evidence to establish scènes à faire as to *any* of Cisco's

19    asserted compilations.  Thus even if it is assumed for purposed of this motion that the jury found

20

21    [4]   *See* Tr. 2680:13-25 (Instr. No. 61).  The Court's pre-trial orders precluded Arista from certain uses of the terms "'industry standard' and '*de facto* industry standard' through attorney argument, as well

22    as in expert or lay opinions because such use is more prejudicial than probative."  ECF 729-4 at 3; *see also* ECF 661 at 4 (*Daubert* order).  After Arista repeatedly elicited testimony on those terms

23    nonetheless, Cisco requested a curative instruction to make clear to the jury that, even if "some witnesses use the term 'industry standard'" to mean that "something has become popular in an

24    industry after the time it was created," a copyright owner "does not lose copyright protection in an original work solely because it later becomes popular in an industry." Tr. 2613:5-11.  But the Court

25    denied Cisco's request. Tr. 2613:12.  Arista thus remained free to blur the timeline with respect to the use of the term "industry standard" before and after Cisco's creation of its user interfaces.

26    [5]   Moreover, because the evidence overwhelmingly supports the jury's finding of infringement and

27    rejection of the affirmative defenses of fair use, merger, abandonment and copyright misuse, there is no alternative ground that can support the current judgment. *See* ECF 732 at 3-10 (infringement), 11-

28    14 (remaining affirmative defenses).

1  infringement based on only one of the five compilations, and even if for purposes of this motion Arista

2  thus needed to demonstrate substantial evidence of scènes à faire as to only that single protectable

3  compilation, the evidence in the record is legally insufficient to show scènes à faire.  Cisco thus is

4  entitled to JMOL of copyright infringement liability.

5  **A.    Legal Standard**

6  Under Rule 50(b), the Court may uphold a jury's verdict only if it is supported by "substantial

7  evidence," *i.e.*, "relevant evidence that a reasonable mind would accept as adequate to support a

8  conclusion." *Callicrate v. Wadsworth Mfg., Inc.,* 427 F.3d 1361, 1366 (Fed. Cir. 2005) (citing *Gillette*

9  *v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992)).    JMOL "should be granted 'if the evidence,

10  construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion,

11  and that conclusion is contrary to the jury's verdict.'" *Finjan, Inc. v. Blue Coat Sys., Inc.*, 2016 WL

12  3880774, at *3 (N.D. Cal. July 18, 2016) (Freeman, J.) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918

13  (9th Cir. 2002)).    "[A] reasonable inference cannot be supported by only threadbare conclusory

14  statements instead of significant probative evidence. … JMOL is appropriate when the jury could have

15  relied only on speculation to reach its verdict." *Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 802-

16  03 (9th Cir. 2009) (quotation marks omitted); *see also Fujifilm Corp. v. Motorola Mobility LLC*, 182

17  F. Supp. 3d 1014, 1030-32 (N.D. Cal. 2016) (granting plaintiff's Rule 50(b) motion on defendant's

18  affirmative defense based on absence of substantial evidence); *Apple, Inc. v. Samsung Elecs. Co.*, 920

19  F. Supp. 2d 1079, 1113 (N.D. Cal. Jan. 29, 2013) (granting in part Rule 50(b) motion that party failed

20  to present substantial evidence); *Duste v. Chevron Prods. Co.*, 2012 WL 43756, at *6-7 (N.D. Cal. Jan.

21  9, 2012) (granting Rule 50(b) motion that non-movant failed to present substantial evidence).

22  **B.    The Record Is Legally Insufficient To Establish A Defense Of Scènes À Faire**

23  The Court's instructions to the jury set forth two overarching legal principles that govern the

24  jury's determination of scènes à faire in this case.

25  ***First***, given the Court's dissection ruling (*see supra* Part II.A; ECF 719), the only protectable

26  portions of the infringed user interfaces that could have been found infringed (if found original) are

27  ***compilations***.  Tr. 2673:4-15 (Instr. No. 39).  As the Court instructed the jury, Ninth Circuit law is

28  clear that a compilation is protectable even if it is formed by the collection and assembly of "pre-

1    existing materials." Tr. 2670:20-24 (Instr. No. 33).  *See Merchant Transaction Sys., Inc. v. Nelcela,*

2    *Inc.*, 2009 WL 723001, at *12-13 (D. Ariz. Mar. 18, 2009) (evidence that "field names" in computer

3    program are scènes à faire not relevant to whether the ***"coordination, selection, and arrangement of***

4    ***these field names"*** are scènes à faire) (emphasis added).  That is because, even as to pre-existing

5    materials, a compilation may embody a unique selection, organization, arrangement and design

6    reflecting creative choices as to structure, order and sequencing.  *See, e.g.*, *Metcalf v. Bochco*, 294 F.3d

7    1069, 1074 (9th Cir. 2002) (holding that the asserted elements in plaintiff's plot points "are not

8    protectable when considered individually; they are either too generic or constitute 'scènes à faire,'" but

9    nonetheless holding that "[t]he particular sequence in which an author strings a significant number of

10    unprotectable elements" was separately protectable as a compilation not precluded by any scènes à

11    faire of its subparts); *B2B CFO Partners, LLC v. Kaufman*, 787 F. Supp. 2d 1002, 1008 (D. Ariz.

12    2011) (applying Ninth Circuit law) ("The 2005 Manual may contain some common business practices

13    or ideas, but, to the extent it does, there are many different ways to express and organize those

14    business practices and ideas.  [Plaintiff] made original decisions regarding how to arrange and present

15    those ideas.").[6]  Thus, the proper level of analysis for any scènes à faire defense here is the compilation

16    level:  the Court instructed the jury that Cisco's five ***compilations*** were protectable if found original;

17    since the jury found copyright infringement, for purposes of this motion it must be assumed that the

18    jury found at least one of Cisco's protectable compilations to be original and infringed.  Accordingly,

19    scènes à faire cannot provide a legally sufficient defense unless there was substantial evidence that, for

20    purposes of this motion, at least one of Cisco's protectable ***compilations***—and not merely some

21    isolated words or terms therein—was scènes à faire.

22        ***Second***, even if the record contained sufficient scènes à faire evidence directed to any of the

23    five ***compilations*** as opposed to individual words and terms (it did not), the record is still legally

24    insufficient to support the judgment for the additional and independent reason that it contains no

25

26    ---

      [6]    *See also* COMPENDIUM OF THE U.S. COPYRIGHT OFFICE PRACTICES § 313.4(I) (3d ed. 2014),
      *available at* https://www.copyright.gov/comp3/chap300/ch300-copyrightable-authorship.pdf ("While
27    scènes à faire cannot be registered by themselves, a work of authorship that contains standard
      expressions or stock characters, settings, or events may be registered provided that the work as a
28    whole contains a sufficient amount of original expression.").

---

Case No. 5:14-cv-5344-BLF (NC)
                                                    CISCO'S RULE 50(b) MOTION FOR JMOL

substantial evidence that Cisco's selection, organization, arrangement and design of any compilation (1) was ***dictated*** (2) by ***external factors*** other than Cisco's creativity (3) ***at the time of creation***—the three core elements required to prove scènes à faire.  *See* Tr. 2680:16-20 (Instr. No. 61).  As the Federal Circuit explained in *Oracle*:

> The scènes à faire doctrine … provides that "expressive elements of a work of authorship are not entitled to protection against infringement if they are standard, stock, or common to a topic, or if they necessarily follow from a common theme or setting." [*Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1374 (10th Cir. 1997)].  Under this doctrine, "when certain commonplace expressions are indispensable and naturally associated with the treatment of a given idea, those expressions are treated like ideas and therefore are not protected by copyright." *Swirsky v. Carey,* 376 F.3d 841, 850 (9th Cir. 2004).  ***In the computer context, "the scènes à faire doctrine denies protection to program elements that are dictated by external factors*** such as 'the mechanical specifications of the computer on which a particular program is intended to run' or 'widely accepted programming practices within the computer industry.'" [*Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 963 (2d Cir. 1997)] (citation omitted).

*Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1363 (Fed. Cir. 2014) (applying Ninth Circuit law) (emphasis added, alteration omitted); *see also id.* at 1364 ("the focus of the scènes à faire doctrine is on the circumstances presented to the creator, not the copier").  The "external" element requires that the constraints originate outside the author.  The "dictated" element requires that a chosen expression be "'as a practical matter indispensable, or at least standard.'"  *Apple Computer*, 35 F.3d at 1444 (quoting *Frybarger v. Int'l Bus. Machs. Corp.*, 812 F.2d 525, 530 (9th Cir. 1987)); *see id.* (giving as an example the use of a graphic of overlapping windows on a screen in a graphic user interface).  And the "at the time of creation" element requires that the externally dictated constraint pre-exist the creation.

Applying these binding standards, Arista's evidence on its scènes à faire affirmative defense is legally deficient as to all five of the compilations presented to the jury.  For four of the five compilations—modes and prompts, command responses/screen outputs, help descriptions, and the overall user interfaces as compilations of the other four—Arista presented ***no*** evidence to the jury as to whether those compilations were scènes à faire.  As to the only compilation Arista addressed in any significant way—Cisco's compilation of multiword command-line expressions—Arista's evidence is legally insufficient.  ***First***, any scènes à faire evidence Arista adduced was directed to individual words, terms or acronyms rather than Cisco's compilation of multiword command expressions.  ***Second***, Arista's evidence in any event fails to show that Cisco's selection, arrangement, organization

1    and design of multiword command expressions was **dictated** by **external** constraints that **pre-existed**

2    Cisco's creation of its user interfaces.

3         A compilation-by-compilation review of the evidence clear the insufficiency of the scènes à

4    faire evidence as to any of the five compilations at issue, even viewed most favorably to Arista.

5                    **1.    The Compilation Of Multiword Command-Line Expressions**

6         Arista's scènes à faire defense necessarily fails when applied to Cisco's compilation of

7    multiword command expressions for two separate and independent reasons.  **First**, Arista's scènes à

8    faire evidence was directed solely to individual words, terms or acronyms rather than Cisco's

9    compilation of multiword command expressions.  **Second**, Arista's evidence did not establish the

10   presence of "external," rather than internal, constraints; did not establish that any external factors

11   "dictated" Cisco's selection, organization, arrangement and design of its compilation of multiword

12   command expressions; and did not establish that any such factors pre-dated, rather than came after, the

13   time at which Cisco made its creative decisions.

14        As shown above, *see supra* Part II.B.2, Arista did not present any evidence that Cisco's

15   **compilation** of multiword command-line expressions was dictated by any pre-existing external

16   constraints other than Cisco's creativity.  Arista relied solely, as its counsel told the jury in closing

17   argument, on the notion that certain isolated, individual "industry acronyms" or "common industry

18   terms" in Cisco's multiword command-line expressions derived from "industry standard protocols."

19   Tr. 2775:15, 2776:24, 2776:13-14.[7]  But arguments that individual terms, words or acronyms within a

20   protectable compilation are common terms cannot show that a **compilation** is scènes à faire.  Indeed,

21   the Court ruled as a matter of law that any isolated words—or even single commands—are not

22   protectable in the first instance.  Tr. 2673:17-2674:14 (Instr. No. 39).  The whole point of protecting

23   compilations is that even unprotectable elements can be selected, arranged, organized and designed in

24   original ways.  *See* Tr. 2670:19-24 (Instr. No. 33); *Metcalf*, 294 F.3d at 1074 (elements that are

25   

26        [7]  *See* Ross Todd, The AmLaw Litigation Daily, *Litigator of the Week* (Dec. 15, 2016), *available
     at* http://www.litigationdaily.com/litigator-of-the-week/id=1202774883474/ (Arista's counsel Robert

27   Van Nest suggesting post-verdict that "jurors were persuaded" by Cisco's "restrictions on engineers
     developing its CLI in picking the two-to-five word command phrases to avoid being creative and to

28   adopt widely accepted **terms and acronyms**") (emphasis added).

individually unprotectable scènes à faire may be protectable when combined and arranged in original manner); *Merchant Transaction Sys.*, 2009 WL 723001, at *12-13 (whether individual "field names" are scènes à faire not relevant to whether the "coordination, selection, and arrangement of these field names" are scènes à faire); *see also generally Feist Publ'ns, Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340, 348-51 (1991) ("original selection or arrangement" of individually unprotected facts protectable as a compilation).  Thus, any evidence of external constraint as to isolated individual command expressions, or words within such expressions, is insufficient to show that a compilation of those expressions is scènes à faire.  *See Lakeside-Scott*, 556 F.3d at 803 (9th Cir. 2009) ("JMOL is appropriate when the jury could have relied only on speculation to reach its verdict.").  If Arista had presented any substantial evidence to the jury directed toward constraints on the decisions Cisco exercised in selecting, organizing, arranging and designing its compilations as a whole, such evidence might reflect on scènes à faire.  The total absence of such evidence here negates that defense.

For example, no Arista percipient witness provided any testimony that Cisco's selection, arrangement, organization and design of its compilation of its multiword command expressions was dictated by pre-existing external constraints other than Cisco's creativity.  To the contrary, Arista's own witnesses and multiple third-party witnesses testified to the opposite, admitting that different engineers were free to create myriad different command expressions for the same functions without external constraint.  *See supra* Part II.B.3; *see also*, *e.g.*, Tr. 802:6-7 (Duda) ("it's certainly technically achievable" to "come up with an alternative command language"); Tr. 2060:17-2061:3, 2061:18 (Shafer) (agreeing that in 1997 there was a "green field" or "open pasture" where there were "no constraints" on creating CLI); Tr. 2316:22-2317:9, 2324:18-22 (Venkatraman) ("different companies can, and do, in fact create their own CLI syntax and commands for the same functionality").  Arista's witnesses also admitted that no standard-setting organization required Cisco to design its user interfaces as it did.  Tr. 1963:5-8 (Ullal) (agreeing she was "not aware of any standards setting organization for command-line interface commands"); Tr. 1843:24-1844:2 (Holbrook) (similar); Tr. 2316:3-6 (Venkatraman) (similar).

Dr. Black likewise provided no opinion on whether Cisco's selection, arrangement, coordination and design of its multiword command expressions as a ***compilation*** was dictated by pre-

existing external constraints.  Rather, Dr. Black's testimony on scènes à faire was limited to his analysis of **individual words and terms** within individual multiword commands.  *See* Tr. 2110:20 (describing process of creating "a new CLI command"), Tr. 2110:24 (same), Tr. 2111:19-21 (referring to "taking words" that would be "familiar"), Tr. 2112:9 ("mak[ing] a good CLI command"), Tr. 2113:16 (use of "a term").  Dr. Black conceded that none of Cisco's 506 asserted multiword command expressions—with the words as selected, coordinated organized and designed in Cisco's compilation—existed in any pre-existing documents, Tr. 2210:11-22, and that there were "plenty" of words and terms Cisco used that he could not locate as pre-existing Cisco's use, Tr. 2109:23-25.  *A fortiori*, no pre-existing document constrained the selection, coordination, organization and design of the entire compilation of Cisco's multiword commands.  Third-party witnesses confirmed as much, admitting the wide flexibility available for selecting, arranging, organizing a designing a CLI user interface.  *See*, *e.g.*, Tr. 2316:22-2317:9 (Venkatraman) ("although some of the terms might be the same, different designers, even at the same company, can choose different words, different hierarchies, different syntax for the same functions"); Tr. 2060:23-25 (Shafer) ("You can go in any direction, everything is wild.  You can make it what you want.  There are no constraints on what you are doing.").  The record thus fails to support scènes à faire as to Cisco's compilation of multiword command-line expressions.  This alone justifies JMOL of copyright infringement liability.

Arista cannot salvage the verdict by relying on Dr. Black's testimony that "the command" is "subject to constraints outside of the author's creativity," Tr. 2113:18-2114:2, for such conclusory testimony is unable to support the judgment.  *See Open Text S.A. v. Box, Inc.*, 2015 WL 4940798, at *7 (N.D. Cal. Aug. 19, 2015) (citing *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015)).  Moreover, Dr. Black's other testimony fails to describe constraints that that were external and dictated Cisco's choices at the time of creation.  Thus, even read most favorably to Arista, and even putting aside the absence of any evidence directed to the compilation level, the evidence falls far short of satisfying the three elements of a scènes à faire defense.

**First**, Arista failed to prove that its asserted constraints were **external** to Cisco.  Dr. Black opined that "[t]rying to be descriptive, trying to be clear, concise," "us[ing] abbreviations," making a new command "fit in with the commands you already have," and using words "familiar to engineers"

were "external constraints or considerations … present for the Cisco engineers as they were deriving CLI commands."  Tr. 2110:15-2111:21.  Dr. Black also referred to Cisco's Parser-Police Manifesto, Tr. Ex. 5175, which he understood to instruct engineers to "try to pick names that would be familiar to people in the industry" and to select familiar terms "for brevity and clarity and familiarity."  Tr. 2113:8-16.  But this testimony cannot prove external constraint.  To begin with, the Parser-Police Manifesto is an internal, advisory Cisco document and thus is neither "external" nor a "constraint."  That document cautions that it is a guideline for "get[ting] feedback" on commands but "has no specific authority," Tr. Ex. 5175 at 1.  Moreover, as Dr. Black admitted, many of his examples of supposed constraints referred only to the constraint of ensuring that a particular command "fit in with the commands you already have," Tr. 2111:10-11, *see also* Tr. 2112:8-10 (describing Parser-Police Manifesto as "advice on how to make a good CLI command that fits in with what exists already"), Tr. 2212:21-2213:3 (similar).  But ***internal*** consistency by definition is not an ***external*** constraint, as Dr. Black himself admitted.  Tr. 2214:24-2115:3 (admitting that he is not opining that an author's goal of remaining consistent with what he or she had previously done is an external constraint).  Finally, Dr. Black's references to the desirability of being "descriptive," "clear," "concise," or "consistent" in expression, Tr. 2110:15-2111:25, are not external constrains that negate any need for creativity.  To the contrary, many creative works are descriptive, clear, concise and consistent.  Dr. Black failed to identify any "external" source for the goals of descriptiveness, clarity, brevity or consistency.  Nor could he, for such vague, high-level goals are simply the hallmarks of effective authorship.

***Second***, as to the few factors that Arista identified that could arguably be external, such as familiarity to customers and engineers in the industry, Arista failed to prove that any choice Cisco made in its commands was ***dictated*** by those factors.  A stylistic preference to use individual words or terms that are "familiar" to customers or engineers, as described in the Parser-Police guidelines, *see* Tr. 2112:21-2113:16, is not enough to show that any individual word choice, much less the structure, sequence and organization of the words, is so standard or indispensable as to be "dictated."

For example, *The Cat In The Hat* is a children's book that uses "simple" and "repetitive language" accompanied by characters that are "recognizable by and appealing to children."  *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1396 (9th Cir. 1997).  *The Cat in the Hat*

uses only 236 different words (222 of which have only one syllable), all of which came from a first-grade vocabulary list of 348 words that had been provided to Dr. Seuss by his publisher—he was instructed to not go beyond that list—for the purpose of creating a book readable by young children.[8] That Dr. Seuss was "constrained" by a mandate that his book use only a narrow vocabulary of words did not dictate which 236 of the 348 words he chose, much less dictate his compilation of those words into sentences and sentences into an entire book.  Even when working within certain prescribed guidelines, authors have ample room to express creativity through their selection, organization, arrangement and design of words and sentences to give rise to creative expression.  *See, e.g.*, *B2B CFO Partners*, 787 F. Supp. 2d at 1008 ("The 2005 Manual may contain some common business practices or ideas, but, to the extent it does, there are many different ways to express and organize those business practices and ideas.  [Plaintiff] made original decisions regarding how to arrange and present those ideas.") (applying Ninth Circuit law).

**Third**, Arista failed to produce substantial evidence that any industry standardization constrained Cisco's choices **at the time of creation**.  While Arista attempted to sow confusion on this issue by eliciting evidence that Cisco's CLI was an "industry standard" or a "*de facto* industry standard," all such evidence necessarily relates to circumstances that existed **after** (and, indeed, **because**) Cisco's CLI became so successful and popular.  Such evidence is irrelevant to scènes à faire. *See supra* Part II.B.4; Tr. 2680:13-25 (Instr. No. 61); *Oracle*, 750 F.3d at 1364.  In addition, both Arista's witnesses and third parties admitted, no standard-setting organization required Cisco to design its compilation of multiword command-line expressions as it did.  *See* Tr. 1963:5-8 (Ullal); Tr. 1843:24-1844:2 (Holbrook); Tr. 2316:3-6 (Venkatraman).

### 2.    The Compilation Of Modes And Prompts

The record fails to provide substantial that Cisco's compilation of its modes and prompts was dictated by external constraints other than Cisco's creativity at the time of creation.  To the contrary,

---

[8]    *See* Lynn Neary, *NPR Books: Fifty Years of "The Cat in the Hat"* (Mar. 1, 2007), *at* http://www.npr.org/2007/03/01/7651308/fifty-years-of-the-cat-in-the-hat; Carol Memmott, USA TODAY, *After 50 years, a tip of the hat to one cool cat* (Feb. 26, 2007), *at* http://usatoday30.usatoday.com/life/books/news/2007-02-26-cat-in-the-hat_x.htm. The 236 words are here: http://www.washingtonpost.com/wp-dyn/content/article/2007/03/28/AR2007032801323.html.

Dr. Black offered no affirmative scènes à faire testimony concerning Cisco's compilation of modes and prompts, *see* Tr. 2110:1-2114:2 (Dr. Black's scènes à faire testimony), and he conceded that he did not find any evidence of Cisco's particular arrangement of asserted modes and prompts, as compiled, in any pre-existing document, s*ee* Tr. 2220:23-2221:2 ("I didn't find that ordering because I didn't find the modes").  Rather, he limited his testimony to certain individual modes and prompts, Tr. 2099:2-8 ("idea of having a privileged mode"); Tr. 2099:9-13 ("angle bracket prompt … in CP/M" and "hash mark [prompt] … in Unix"), which the Court instructed are not protectable, Tr. 2673:24, 2674:1-2 (Instr. No. 39).   In contrast, Dr. Almeroth presented unrebutted evidence that the "arrangement" of modes and prompts was not dictated by external constraints.  Tr. 1237:23-1239:9 (describing chosen design of "nesting" modes and prompts).

### 3.    The Compilation Of Command Responses/Screen Outputs

Similarly, the record fails to provide substantial evidence that the compilation of Cisco's command responses/screen outputs was dictated by external constraints other than Cisco's creativity at the time of creation.  No percipient witness spoke to the issue, and Dr. Black did not offer any opinion as to whether Cisco's compilation of command responses (or even individual responses) were so dictated.  *See* Tr. 2110:1-2114:2 (Dr. Black's scènes à faire testimony).  Arista failed to provide a substantial factual record as to the compilation of command responses and failed to rebut Dr. Almeroth's testimony that "there really aren't" any significant constraints in how to construct screen outputs because "[y]ou can include any information, you can organize it in any way."  Tr. 1236:21-1237:5 (Almeroth).

### 4.    The Compilation Of Help Descriptions

Nor does the record support a finding that the compilation of Cisco's help descriptions was dictated by external constraints other than Cisco's creativity at the time of creation. Once again, Dr. Black did not offer any opinion as to whether Cisco's compilation of help descriptions were so dictated, Tr. 2110:1-2114:2 (Dr. Black's scènes à faire testimony), and failed to rebut Dr. Almeroth's testimony that "[t]here aren't really constraints on what the user or the person designing those commands is allowed to include in terms of the help information," Tr. 1237:20-22 (Almeroth).  And again, no percipient witness spoke to the issue.

### 5.    Cisco's User Interfaces As Compilations Of The Other Four Compilations

Finally, the trial record does not contain substantial evidence supporting a finding that the selection, arrangement, organization, and design of Cisco's user interfaces, as compilations of all four of the above compilations, *see* Tr. 2673:14-15 (Instr. No. 39), was dictated by external constraints other than Cisco's creativity at the time of creation.  Once again, there is no record evidence that any of Cisco's user interfaces, as a compilation, was dictated by external constraints, nor did Dr. Black offer any opinion as to whether Cisco's user interfaces as a whole were so dictated.  *See* Tr. 2110:1-2114:2 (Dr. Black's scènes à faire testimony).  Dr. Black also failed to rebut Dr. Almeroth's testimony that there was no such constraint as to the user interfaces as a whole considering all four "building blocks" together.  *See* Tr. 1240:2-7 (Almeroth).

Moreover, overwhelming undisputed evidence in the form of Arista admissions or third-party testimony made clear that Cisco operated, at the time it created its user interfaces, on a "green field" or "open pasture"—the very opposite of being subject to external constraints in its choice of how to design, structure and sequence its compilations.  As Juniper's successful creation of an entirely different user interface illustrates, there was no requirement in the industry that any user interface be arranged, organized or designed in the way Cisco did.  *See* Tr. 2060:17-2061:18 (Shafer) (Juniper had a green field" or "open pasture" to create CLI, where "[t]here are no constraints on what you are doing"); Tr. 2316:22-2317:9 (Venkatraman) ("different designers, even at the same company, can choose different words, different hierarchies, different syntax for the same functions").  Further, that 20% of Arista's customers use Linux, a completely different interface, demonstrates the absence of external constraints.  Tr. 802:12-22 (Duda).  Arista thus failed to provide substantial evidence that pre-existing external factors dictated Cisco's selection, arrangement, organization and design of its user interfaces as a whole, as compilations of the other four compilations addressed above.

### C.    Scènes À Faire Is Not A Defense To Virtually Identical Copying

Even if Arista had otherwise provided substantial evidence establishing every element of its scènes à faire defense as to any of Cisco's compilations (it did not), Arista's defense independently fails because the record evidence shows, and the jury necessarily found, Arista's virtually identical

copying of Cisco's protected expression.  While scènes à faire prohibits broad protection over stock ideas, copyright law protects a defendant's the particular expression of those ideas.  Thus, in *Apple Computer*, the Ninth Circuit held that scènes à faire cannot excuse a defendant's "virtually identical copying" of a plaintiff's "particular expression":

> The doctrine of scènes à faire is closely related [to merger]. … [A]s *Frybarger* holds, "the mere ***indispensable*** expression of these ideas, based on the technical requirements of the videogame medium, ***may be protected only against virtually identical copying.***" [812 F.2d at 530] …. In this case, for example, use of overlapping windows inheres in the idea of windows. … [O]verlapping windows have been the clear preference in graphic interfaces.  Accordingly, protectable substantial similarity cannot be based on the mere use of overlapping windows, although, of course, Apple's ***particular expression*** may be protected.

35 F.3d at 1444 (second emphasis added).  That is, while the idea of using overlapping windows in a user interface was scènes à faire, Apple's "particular expression" of overlapping windows was not.  *Id.*

District courts in this Circuit are in accord, holding that scènes à faire does not excuse virtually identical copying of a plaintiff's "particular expression."  *See, e.g.*, *Fodor v. L.A. Unified Sch. Dist.*, 2014 WL 12235424, at *10 (C.D. Cal. June 3, 2014) ("[T]he scènes à faire doctrine applies when a particular expression is indispensable or standard in the treatment of a particular idea.  In such cases, the expression is treated as an idea and not protected by copyright ***absent virtually identical copying***.") (citing *Apple*, 35 F.3d at 1444) (emphasis added); *Fleener v. Trinity Broad. Network*, 203 F. Supp. 2d 1142, 1150 & n.10 (C.D. Cal. 2001) (citing *Apple*, holding that "a ***literal, word-for-word copying*** of scènes à faire could infringe copyright") (emphasis added); *Sony Pictures Entm't, Inc. v. Fireworks Entm't Grp., Inc.*, 156 F. Supp. 2d 1148, 1158 n.10 (C.D. Cal. 2001) ("the question is whether that ***particular expression*** is so typical of the genre as to be 'indispensable'") (emphasis added), *vacated pursuant to settlement,* 2002 WL 32387901 (C.D. Cal. Nov. 5, 2002); *see also Apple Computer, Inc. v. Microsoft Corp.,* 799 F. Supp. 1006, 1021 (N.D. Cal. 2002) ("[I]f technical or conceptual constraints limit the available ways to express an idea, even though there is more than one avenue of expression available, copyright law will abhor ***only a virtually-identical copy*** of the original.") (emphasis added).[9]

---

[9]    Other courts have followed suit.  *See, e.g.*, *Reed-Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909, 914 (7th Cir. 1996) (while "the common use of similar scenes" may not be copyrightable, "***each expression of a theme can claim protection*** to the extent it differs from its predecessors") (emphasis added); *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 617 (7th Cir. 1982) (footnote continued)

1    *See generally ABA Model Jury Instructions: Copyright, Trademark and Trade Dress Litigation* § 1.4.8

2    at 29 ("[I]f Shakespeare's *Romeo and Juliet* were copyrighted, an author could still write a play about

3    two young people who fell in love but came to a tragic end because of a feud between their families.

4    But the author could not copy the detailed plot of Shakespeare's play …."). Based on the jury's

5    finding of infringement under the Court's instructions, the jury necessarily determined that Arista

6    engaged in virtually identical copying of Cisco's protected expressions. There were only two paths the

7    jury could have taken to its infringement finding.

8        **First**, the jury might have found "direct evidence" of copying, for example from the

9    admissions of Arista's own witnesses. Those witnesses repeatedly acknowledged and conceded

10   virtually identical copying of Cisco's user interfaces. *See, e.g.*, Tr. 781:8-14 (Duda) (admitting that

11   "Arista copied Cisco's CLI from Cisco sources"); Tr. 878:1-5 (Duda) (admitting that "it's undisputed

12   now that Arista copied CLI commands from Cisco's source code"); Tr. 1803:12-15 (Duda)

13   (confirming previous testimony); Tr. 782:11-23 (Duda) (admitting to previous sworn testimony that

14   Arista "slavishly" copied Cisco's CLI commands"); Tr. Ex. 203-A (Duda) (at Jenkins Decl., Ex. H))

15   (admitting in a public presentation that Arista "slavishly" copied Cisco's CLI, and stating that "even

16   the things we thought were really silly, we went ahead and copied them anyway"); Tr. 1967:17-21

17   (Ullal) (admitting that "Arista people told customers that Arista had copied CLI commands into Arista

18   products"); Tr. 900:20-21 (Sadana) ("It's true that we used the same CLI for many of our base or core

19   features"); Tr. 926:19-927:5 (Sadana) (admitting Arista's assertions to customers that "the CLI

20   commands in [Arista's] switch are identical to Cisco IOS"); Tr. 900:14-901:6 (Sadana) (admitting that

21   Arista "intentionally copied Cisco's CLI" and told customers "that [Arista's] CLI is just like Cisco's

22   CLI"); Tr. 1017:22-18:9 (Dale) (admitting that Arista told customers that it had a "CLI identical to

23   ("**Certain expressive matter** in the PAC-MAN work, however, should be treated as scènes à faire and
     receive protection **only from virtually identical copying**."); *Innovative Legal Mktg., LLC v. Mkt.*

24   *Masters-Legal*, 2012 WL 503507, at *13 (E.D. Va. Feb. 13, 2012) (defendant "may be privileged to
     utilize similar stock elements, but ***it is not permitted to copy the precise, protected expression*** of those

25   stock elements," and plaintiff "demonstrate[d] copying … of the precise, protected expression …, not
     just the use of similar themes or settings that might be properly disregarded as scènes à faire")

26   (emphasis added), *sustained in relevant part*, 852 F. Supp. 2d 688, 703 (E.D. Va. 2012) (scènes à faire
     "holds that expressions of a theme are entitled to protection to the extent they differ from their

27   predecessors. That is, ***authors may not copy verbatim the presentation of another work, including***

28   ***the use of scènes à faire*** that are not individually protectable.") (citation omitted, emphasis added).

1    Cisco IOS"); Tr. 1022:15-19 (Dale) (admitting Arista presented that Arista's CLI commands are the

2    "same as Cisco IOS"); Tr. 1025:18-25 (Dale) (same); Tr. 1030:20-24 (Dale) (admitting that Arista CLI

3    was a "drop-in replacement" for Cisco CLI "given the 99.999 percent similarity in the CLI").  And

4    comparison of the expressions at issue confirms Arista's admitted slavish copying of Cisco's

5    expressions.  *See* Jenkins Decl., Ex. I (comparing multiword command expressions);[10] Tr. Exs. 4794

6    (comparing modes and prompts), 4799 (comparing help descriptions), 4800 (comparing command

7    outputs) (at Jenkins Decl., Exs. J-L); *see also* Tr. 2528:16-22 (Almeroth) (multiword command

8    expressions "are identical"), Tr. 1414:7-21 (Almeroth) (help descriptions).  Because the undisputed

9    evidence in the record here shows that Arista engaged in virtually identical copying of each asserted

10   compilation, *a fortiori* the same is true of each user interface as a whole as a compilation thereof.

11       ***Second***, the jury might have found infringement by "indirect evidence" by concluding that

12   Arista had access to Cisco's works and that there is "virtual identity between Arista's works and the

13   original protected elements of Cisco's works."  Tr. 2672:6-2674:21 (Instr. No. 36).  Because the jury

14   must be presumed to have followed the Court's instruction requiring a finding of virtually identical

15   copying if it took the "indirect evidence" route, *see, e.g.*, *Bains LLC v. Arco Prods. Co.*, 405 F.3d 764,

16   770-71 & n.12 (9th Cir. 2005), scènes à faire again would be foreclosed as a matter of law as to any

17   compilation of any user interface the jury found infringed.

18       Thus, Arista's scènes à faire affirmative defense fails on the undisputed record here because

19   Arista's infringement was necessarily based on virtually identical copying.

20   **IV.    AFTER GRANTING JMOL OF LIABILITY, THE COURT MAY EFFICIENTLY
            ADDRESS ANY REMAINING ISSUES INCLUDING REMEDIES**

21

22       Upon finding the defense of scènes à faire unsupported on this record as a matter of law and

23   thus granting Cisco's motion for JMOL of copyright infringement liability as to Cisco's user

24   interfaces, the Court may thereafter determine the most efficient process for addressing the next steps

25   ───────────────
     [10]  While Arista has argued that it did not copy Arista's protected expressions as written because of
26   the presence of user-provided inputs or parameters, the Ninth Circuit has already rejected Arista's
     position in the scènes à faire context.  *Apple*, 35 F.3d at 1444 ("user participation may not negate
27   copyrightability of an audiovisual work").  Further, Arista's own contributions cannot excuse what it
     did copy.  *See* Tr. Ex. 9037 (at Jenkins Decl., Ex. M) (Cisco's commands all appear in Arista's user
28   interface); 4 NIMMER ON COPYRIGHT § 13.03[B][1][a] ("No plagiarist can excuse the wrong by
     showing how much of his work he did not pirate.") (footnotes and quotation marks omitted).

that follow.  While it would be premature to address such options until after the Court rules on the instant motion, Cisco notes that a new jury trial may not be necessary to resolve any remaining issues. For example, the Court and not a jury will resolve Arista's remaining equitable defenses.  Likewise, the Court and not a jury will determine the availability and scope of any injunctive relief to which Cisco is entitled for Arista's infringement.  Finally, as to damages, the Court has already ruled that any award based on Arista's profits (*i.e.*, disgorgement) pursuant to 17 U.S.C. § 504(b) may be an equitable determination for the Court to resolve.  ECF 661 at 12-13 n.2.  Specifically, the Court noted that, in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014), "the Supreme Court stated that '[l]ike other restitutional remedies, recovery of profits is not easily characterized as legal or equitable' … [but] '[g]iven the 'protean character' of the profits-recovery remedy, we regard as appropriate its treatment as 'equitable' in this case.'" *Id.* (quoting *Petrella*, 134 S. Ct. at 1967 n.1).  This Court concluded that *Petrella* "suggests" that a copyright owner does not have "a right to a jury trial for disgorgement of profits," and decided to treat the jury's verdict on this point as "advisory," addressing it further, if necessary, post-verdict. *Id.*  While Cisco reserves the right to seek all damages to which it is entitled from a jury, Cisco notes that, in order to efficiently resolve this entire matter, it may be willing to have Cisco's damages be limited to the disgorgement of Arista's illicit profits from infringement, to be resolved at a bench trial.  Nor is there any need for any further discovery on damages (whether assessed by the Court or a jury), as the parties already conducted extensive discovery on all damages-related issues.  In any event, should the Court ultimately resolve disgorgement, the Court is well equipped to rule quickly on this issue on the current record, given that the Court already heard all of the relevant testimony and evidence at trial.

## V.    **CONCLUSION**

For the foregoing reasons, the Court should grant Cisco's motion for JMOL of copyright infringement liability as to Cisco's user interfaces.

Dated:  January 17, 2017                          Respectfully submitted,

*/s/ Kathleen Sullivan*
Kathleen Sullivan (SBN 242261)
kathleensullivan@quinnemanuel.com
Todd Anten *(admitted pro hac vice)*

toddanten@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Sean S. Pak (SBN 219032)
seanpak@quinnemanuel.com
Amy H. Candido (SBN 237829)
amycandido@quinnemanuel.com
John M. Neukom (SBN 275887)
johnneukom@quinnemanuel.com.
QUINN EMANUEL URQUHART &
SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

David Nelson (*admitted pro hac vice*)
davenelson@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN LLP
500 W Madison St, Suite 2450
Chicago, IL 60661
Telephone: (312) 705-7465
Facsimile: (312) 705 7401

Steven Cherny *admitted pro hac vice*)
steven.cherny@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Adam R. Alper (SBN 196834)
adam.alper@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California  94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Michael W. De Vries (SBN 211001)
michael.devries@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

*Attorneys for Plaintiff Cisco Systems, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28