KEKER & VAN NEST LLP
ROBERT A. VAN NEST - # 84065
BRIAN L. FERRALL - # 160847
DAVID SILBERT - # 173128
MICHAEL S. KWUN - #198945
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    (415) 391-5400
Email:  rvannest@kvn.com;
bferrall@kvn.com; dsilbert@kvn.com;
mkwun@kvn.com

SUSAN CREIGHTON, SBN 135528
SCOTT A. SHER, SBN 190053
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1700 K Street NW, Fifth Floor
Washington, D.C., 20006-3817
Telephone:  (202) 973-8800
Email:  screighton@wsgr.com;
ssher@wsgr.com

JONATHAN M. JACOBSON, NY SBN 1350495
CHUL PAK (*pro hac vice*)
DAVID H. REICHENBERG (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue Of The Americas, 40th Floor
New York, NY 10019-6022
Telephone:  (212) 999-5800
Email:  jjacobson@wsgr.com; cpak@wsgr.com;
dreichenberg@wsgr.com

Attorneys for Defendant
ARISTA NETWORKS, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ARISTA NETWORKS, INC.,<br><br>Defendant. | Case No. 5:14-cv-05344-BLF (NC)<br><br>**ARISTA'S OPPOSITION TO CISCO'S MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(B)**<br><br>Hearing Date:    April 27, 2017<br>Hearing Time:   9:00 a.m.<br>Dept.:    Courtroom 3 - 5th Floor<br>Judge:    Hon. Beth Labson Freeman<br><br>Date Filed:  December 5, 2014<br><br>Trial Date:  November 21, 2016 |

1142103

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................................1

II.   LEGAL STANDARDS .........................................................................................2

    A.    The jury's verdict must be upheld unless the trial record *compels* a contrary result, after making all inferences and credibility determinations in Arista's favor. ..............................................................................................................2

    B.    *Scenes a faire* includes all aspects of a work that naturally flow from the nature of a project, which need not be "dictated" as strictly as Cisco claims..........3

    C.    Cisco's narrow view of the types of "external" constraints that can support *scenes a faire* is wrong...........................................................................................4

III.  ARGUMENT ........................................................................................................7

    A.    Substantial evidence—indeed, abundant evidence—supports the jury's *scenes a faire* verdict. ........................................................................................7

        1.    Substantial evidence proved that external factors dictated Cisco's alleged compilation of commands. ..............................................................8

            a.    The basic nature of Cisco's command-line interface heavily constrained Cisco's compilation of CLI commands.....................10

            b.    Pre-existing CLI conventions and standard terminology further constrained Cisco's compilation of CLI commands..........11

            c.    Customer requirements for consistency and cross-compatibility further constrained Cisco's compilation of CLI commands..........................................................................14

        2.    Substantial evidence showed that external factors also dictated Cisco's compilation of help strings............................................................16

        3.    Substantial evidence showed that external factors also dictated Cisco's compilation of command outputs...................................................17

        4.    The cherry-picked evidence Cisco relies on to negate *scenes a faire* cannot do so, as the jury was free to rely on other evidence instead. ........18

    B.    Cisco is not entitled to judgment on grounds that the *scenes a faire* defense is inconsistent with the facts underlying the jury's finding of infringement. ........21

        1.    Cisco waived its "virtually identical copying" argument. .........................21

        2.    Even if Cisco's new argument were not waived, it fails for multiple reasons on the merits.................................................................................22

    C.    If the Court grants Cisco's motion, it must order a new jury trial on all issues...................................................................................................................24

i

1142103

1

## TABLE OF CONTENTS
### (continued)

**Page**

IV.     CONCLUSION...................................................................................................25

1142103

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Federal Cases**

4

*Apple Computer, Inc.  v. Microsoft Corp.*
  35 F.3d 1435 (9th Cir. 1992) ........................................................................ 4, 23

5

*Benay v. Warner Bros. Entm't, Inc.*
  607 F.3d 620 (9th Cir. 2010) ................................................................................ 4

6

*Boston Sci. Corp. v. Johnson & Johnson*
  550 F. Supp. 2d 1102 (N.D. Cal. 2008) ............................................................. 19

7

*Climent-Garcia v. Autoridad de Transporte Maritimo y Las Islas Municipio*
  754 F.3d 17 (1st Cir. 2014)..................................................................................... 2

8

9

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*
  982 F.2d 693 (2d Cir. 1992)...................................................................................... 6

10

*Diamond Foods Inc. v. Hottrix LLC*
  No. 14-cv-03162-BLF, 2016 WL 3880797 (N.D. Cal. July 18, 2016)..................... 3

11

12

*E.E.O.C. v. Go Daddy Software, Inc.*
  581 F.3d 951 (9th Cir. 2009) ........................................................................... 2, 21

13

*Eng'g Dynamics, Inc. v. Structural Software, Inc.*
  26 F.3d 1335 (5th Cir. 1994) .................................................................................. 5

14

15

*Fodor v. Los Angeles Unified Sch. Dist.*
  No. CV 12-8090 DMG, 2014 WL 12235424 (C.D. Cal. June 3, 2014) ................ 23

16

*Gasoline Products Co. v. Champlin Refining Co.*
  283 U.S. 494 (1931)............................................................................................... 24

17

18

*Johnson v. Paradise Valley Unified Sch. Dist.*
  251 F.3d 1222 (9th Cir. 2001) ....................................................................... *passim*

19

20

*Masson v. New Yorker Magazine, Inc.*
  832 F.Supp. 1350 (N.D. Cal. 1993) ...................................................................... 24

21

*Mattel, Inc. v. MGA Entm't, Inc.*
  616 F.3d 904 (9th Cir. 2010) .................................................................................. 4

22

23

*Mitel, Inc. v. Iqtel, Inc.*
  124 F.3d 1366 (10th Cir. 1997) .................................................................... 4, 5, 6

24

*Oracle Am., Inc. v. Google Inc.*
  750 F.3d 1339 (Fed. Cir. 2014)..................................................................... 3, 4, 5

25

26

*Oracle Am., Inc. v. Google Inc.*
  No. C 10-03561 WHA, ECF 1201 at 11 (N.D. Cal. May 30, 2012)....................... 20

27

*Plains Cotton Co-op. Ass'n of Lubbock, Texas v. Goodpasture Computer Serv., Inc.*
  807 F.2d 1256 (5th Cir. 1987) ................................................................................ 6

28

iii

1142103

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Reeves v. Sanderson Plumbing Prod., Inc.*
    530 U.S. 133 (2000) .................................................................................... 2

*Satava v. Lowry*
    323 F.3d 805 (9th Cir. 2003) ................................................................... 3, 4

*Softel, Inc. v. Dragon Med. & Scientific Commcns*
    118 F.3d 955 (2d Cir. 1997) ........................................................................ 5

*Sony Pictures Entm't, Inc. v. Fireworks Entm't Grp., Inc.*
    156 F. Supp. 2d 1148 (C.D. Cal. 2001), *vacated pursuant to settlement*, No. 01-
    00723(ABC)(JWJX), 2002 WL 32387901 (C.D. Cal. Nov. 5, 2002) ................................... 23

*Trans-World Int'l, Inc. v. Smith-Hemion Prods., Inc.*
    952 F. Supp. 667 (C.D. Cal. 1996) ............................................................. 25

*U.S. v. Manuel-Baca*
    421 F.2d 781 (9th Cir. 1970) ...................................................................... 2

*United Air Lines, Inc. v. Wiener*
    286 F.2d 302 (9th Cir. 1961) .................................................................... 24

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*
    546 U.S. 394 (2006) .................................................................................. 21

*Wallace v. City of San Diego*
    479 F.3d 616 (9th Cir. 2007) ................................................................. 2, 20

**Federal Statutes**

17 U.S.C. § 102 ............................................................................................. 4

**Federal Rules**

Federal Rule of Civil Procedure 50 .................................................. 21, 24, 25

**Treatises**

Wright & Miller, 9B Fed. Prac. & Proc. Civ. § 2524 (3d ed.) ...................... 2

**Constitutional Provisions**

Seventh Amendment ................................................................................. 25

ARISTA'S OPPOSITION TO CISCO'S MOTION FOR JMOL UNDER RULE 50(B)
Case No. 5:14-cv-05344-BLF (NC)

1142103

## I.    INTRODUCTION

Cisco's motion for judgment as a matter of law must be denied because substantial evidence supports the jury's *scenes a faire* defense verdict. First, Cisco relies on an incorrect view of the law of *scenes a faire*. Then Cisco disregards extensive evidence at trial—from Cisco's own witnesses as well as Arista's witnesses and third parties—that Cisco's asserted compilations of CLI elements were highly constrained by factors other than Cisco's creativity. That evidence and reasonable inferences the jury was entitled to make from it amply support the jury's verdict.

The *scenes a faire* doctrine is broader than Cisco claims. *Scenes a faire* applies to any portion of a compilation that flowed naturally from factors external to Cisco's creativity (not "external to *Cisco*," as Cisco's motion contends). And to overturn the verdict, Cisco would need to prove that no rational jury—making every possible reasonable inference in Arista's favor— could find that *scenes a faire* applied to even the narrowest of possible infringement findings underlying the jury's infringement verdict.  Cisco cannot overturn the jury's verdict by pointing to supposedly conflicting evidence that the jury was entitled to disbelieve or find unpersuasive, or competing inferences that Cisco wishes the jury had made.

Because the verdict does not specify what aspects of Cisco's works the jury found to be infringed, the *scenes a faire* verdict must be upheld as long as a rational jury could have found that *scenes a faire* applied to *any* portion of Cisco's asserted works that the jury may have found to be original and infringed.  For example, the jury may have only concluded that a portion of the compilation of CLI commands was both non-trivial and infringed. Therefore, to sustain the defense verdict, the Court need only find substantial evidence supporting *scenes a faire* for any hypothetical portion of the asserted compilation of commands. In fact, the trial record shows that all of the asserted compilations were dictated by external factors including industry-standard parameters and customer expectations regarding features and how to name them in the CLI. Indeed, Cisco scarcely argued otherwise, making the jury's verdict virtually compelled.

1142103

## II.    LEGAL STANDARDS

### A.    The jury's verdict must be upheld unless the trial record *compels* a contrary result, after making all inferences and credibility determinations in Arista's favor.

Judgment as a matter of law must be granted sparingly, to avoid the "improper usurpation of the jury's basic factfinding authority." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1229 (9th Cir. 2001) (reversing grant of JMOL even though the evidence for the verdict was "far from overwhelming"); Wright & Miller, 9B Fed. Prac. & Proc. Civ. § 2524 (3d ed.) (JMOL should be "granted cautiously and sparingly"); *see also Climent-Garcia v. Autoridad de Transporte Maritimo y Las Islas Municipio*, 754 F.3d 17, 20 (1st Cir. 2014) ("The tide runs strongly against a litigant seeking to overturn a jury verdict.").

In considering a motion for judgment as a matter of law, a court "should review the record as a whole" in the light most favorable to the verdict: the court "must draw all reasonable inferences in favor of the nonmoving party," and it "may not substitute its view of the evidence for that of the jury" by "mak[ing] credibility determinations or weigh[ing] the evidence." *Johnson*, 251 F.3d at 1227 (internal quotations omitted); *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150-51 (2000). Likewise, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 150-51. "Judgment as a matter of law may be granted only where, so viewed, the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007). This means that "the jury's verdict must be upheld if there is 'evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion.'" *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 963 (9th Cir. 2009) (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)).

"It is immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable" than the jury's verdict. *U.S. v. Manuel-Baca*, 421 F.2d 781, 783 (9th Cir. 1970) (citing *Lavender v. Kurn*, 327 U.S. 645, 653 (1946)). A jury is also entitled to disbelieve a party's evidence, and to consider a witness's honesty in evaluating the record evidence. *See Reeves*, 530 U.S. at 147 (false explanation of employer conduct can be affirmative

1142103

1    evidence of discrimination).  Thus, as long as there is any substantial evidence that a rational

2    person could rely on to support the verdict, it is "simply not relevant" that some other evidence

3    might potentially have supported a different verdict, because "the jury was free to disbelieve, and

4    therefore to disregard, that evidence."  *Johnson*, 251 F.3d at 1227.

**B.    *Scenes a faire* includes all aspects of a work that naturally flow from the nature of a project, which need not be "dictated" as strictly as Cisco claims.**

*Scenes a faire* ensures that "expressions that are standard, stock, or common to a

particular subject matter or medium are not protectable under copyright law." *Satava v. Lowry*,

323 F.3d 805, 810 (9th Cir. 2003); *id.* at 807 (explaining that the Copyright Act "denie[s] artists

the exclusive right to ideas and standard elements in their works, thereby preventing them from

monopolizing what rightfully belongs to the public"). In other words, the basic rule is that *scenes*

*a faire* "identifies and excludes from protection against infringement expression whose creation

'flowed naturally from considerations external to the author's creativity.'"[1] *Oracle Am., Inc. v.*

*Google Inc.*, 750 F.3d 1339, 1364 (Fed. Cir. 2014). "In the computer context, the scenes a faire

doctrine denies protection to program elements that are dictated by external factors such as the

mechanical specifications of the computer on which a particular program is intended to run or

widely accepted programming practices within the computer industry." *Id.* at 1363 (internal

quotation marks omitted). The doctrine also applies to elements that are "naturally associated

with the treatment of a given idea." *Id.* at 1363 (quoting *Swirsky v. Carey*, 376 F.3d 841, 850 (9th

Cir. 2004)); *Diamond Foods Inc. v. Hottrix LLC*, No. 14-cv-03162-BLF, 2016 WL 3880797, at

*5 (N.D. Cal. July 18, 2016) (no protection under *scenes a faire* for "elements of expression that

'naturally follow' from" the idea of a popcorn-popping app).

Here, the jury reasonably found that any Cisco CLI compilations worthy of copyright

protection are *scenes a faire* because they "flow naturally" from the functions implemented in

Cisco's operating systems and the industry's needs and expectations.  Contrary to Cisco's motion,

the law does not require that the disputed portion of an asserted work must be absolutely and

precisely dictated by factors other than creativity in order for *scenes a faire* to apply, and Cisco

---

[1] Cisco itself cited this version of the rule to support Cisco's proposed jury instruction on *scenes a faire* (which the Court adopted without material change). *See* ECF 674 at 122.

1  cites no authority for such a radical restriction. *See Satava*, 332 F.3d at 810-12; *Oracle*, 750 F.3d

2  at 1364; *Benay v. Warner Bros. Entm't, Inc*., 607 F.3d 620, 628 (9th Cir. 2010) (applying *scenes

3  a faire* to elements of a work "that flow naturally from the works' shared unprotected premise and

4  are therefore disregarded"); *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 913 (9th Cir. 2010)

5  (*scenes a faire* applies to "standard features").  Indeed, such a restriction would make no sense

6  and deprive the rule of any meaning: a work that was absolutely dictated by factors other than an

7  author's choices would leave no room for protectable expression in the first place, separable from

8  unprotectable ideas or functions and the effort of assembling pre-ordained content.  *See* 17 U.S.C.

9  § 102 (original expression required for copyright protection).

10  On the contrary, even Cisco's cited authority confirms that *scenes a faire* can apply to

11  elements that are simply "standard" given the industry context. *See* Cisco Br. (ECF 761) ("Cisco

12  Br.") at 14 (citing *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1992)).

13  As the Federal Circuit has explained, *scenes a faire* simply "provides that 'expressive elements of

14  a work of authorship are not entitled to protection against infringement if they are standard, stock,

15  or common to a topic, or if they necessarily follow from a common theme or setting.'" *Oracle*,

16  750 F.3d at 1363 (quoting *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1374 (10th Cir. 1997)). The

17  record does not compel a finding that Arista failed to meet this test.

18  **C.    Cisco's narrow view of the types of "external" constraints that can support
        *scenes a faire* is wrong.**

19

20  Cisco also claims that there is no substantial evidence to support the *scenes a faire* verdict

21  because Arista "failed to prove that its asserted constraints were ***external*** to Cisco." Cisco Br. at

22  17 (emphasis original).  But that was not the test the jury was asked to apply, Cisco cites no

23  authority that supports it, and it is not the law. Moreover, substantial evidence would support the

24  verdict even under Cisco's narrow view of the law.

25  The jury instruction—as proposed by Cisco—correctly required the jury to consider

26  whether "external factors ***other than Cisco's creativity***" dictated any CLI features that the jury

27

28

found infringed. Jury Instr. No. 61 (Tr. 2680:13-25) (emphasis added).[2] This is consistent with controlling law that describes *scenes a faire* as resulting from any factors "external to the author's creativity." *Oracle*, 750 F.3d at 1364. All of the constraints that Arista—and Cisco—proved at trial were proper for the jury to consider in its *scenes a faire* analysis under this rule, and provide more than substantial evidence to support the verdict even under Cisco's overly narrow version of the law.

Courts recognize that a broad range of limitations may factor into the *scenes a faire* analysis, depending on the factual context of the specific case. Instead of imposing any strict definition of what factors are "external to the author's creativity," *Oracle* and the decisions on which it relies (including *Mitel*) contemplate a flexible *scenes a faire* inquiry that can take into account all the specific facts of the case. For example, *Oracle* applies the doctrine to elements "dictated by considerations of efficiency" (not necessarily external) or "required by factors already external to the program itself." *Oracle*, 750 F.3d at 1357–58. For computer-related works, courts recognize that so-called "external factors" can "include hardware standards and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, industry programming practices, and practices and demands of the industry being serviced." *Mitel*, 124 F.3d at 1375; *see also Softel, Inc. v. Dragon Med. & Scientific Commcns*, 118 F.3d 955, 963 (2d Cir. 1997) (addressing "mechanical specifications of the computer on which a particular program is intended to run" and "widely accepted programming practices within the computer industry").

Thus, for example, *Mitel* (which *Oracle* cited favorably) recognized that "response to customer demand" was a legitimate "external factor," as was a need "to ensure compatibility with equipment already installed in the central offices of Mitel's customers." *Mitel*, 124 F.3d at 1375; *Oracle*, 750 F.3d at 1357 (citing *Mitel*); *see also Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1346 (5th Cir. 1994), *opinion supplemented on denial of reh'g*, 46 F.3d 408 (5th Cir. 1995) (*scenes a faire* factors included whether given the "nature of the . . . marketplace, .

---

[2] Citations to "Tr." refer to the trial transcript. Citations to "Ex. __" refer to trial exhibits ("TX __"), which may be found as exhibits to the accompanying Declaration of Audrey Hadlock.

. . [defendant] had to use the same or similar formats . . . to provide a compatible, standardized and efficient product for its customers")[3]; *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 715 (2d Cir. 1992) (*scenes a faire* applied to "similarities between . . . two programs' organizational charts" that court found "obvious" in that "they 'follow naturally from the work's theme rather than from the author's creativity'). Here, the record reflected that from the very beginning and throughout the evolution of the CLI, Cisco had to structure its CLI as it did to meet customer demands, including compatibility with pre-existing technology and protocols, as well as to respect hardware constraints of the available technology at the time. *See infra* Part III.A.1 (evidence of pre-existing standard protocols, customer demand for consistency, and hardware limitations that required CLI, with its limited scope for creativity, rather than more creative graphical interface). Similarly, *Mitel* recognized that factors supporting *scenes a faire* could also include "the need for compatibility with [the author's own] older-model . . . call controllers." 124 F.3d at 1375. This is equivalent here to the ongoing need for compatibility with older versions of Cisco equipment, which Cisco's own witnesses admitted constrained Cisco's selections of CLI commands and other features throughout their development history, and thus shaped the overall arrangement of its compilations of each. *See infra* Part III.A.1.

Also, nothing in the law requires that "external factors" supporting *scenes a faire* must be specifically acknowledged as "external" or limiting, or formally mandated by the industry or formal written requirements. *See Mitel*, 124 F.3d at 1375-76; *contra* Cisco Br. at 16-18. Like *Mitel*, this case involved evidence of numerous limiting factors that are "external" to the selection of expression in that they reflect something other than the purported author's creativity or judgment—but that may not be "external" to the company or the product being designed. The jury was free to credit the evidence concerning those limitations, and to determine that they affected the overall development of Cisco's CLI compilations, even if the record also included conflicting evidence. All of the constraints Arista relies on here were external to any exercise of

---

[3] *Engineering Dynamics* relied on *Plains Cotton Co-op. Ass'n of Lubbock, Texas v. Goodpasture Computer Serv., Inc.,* 807 F.2d 1256, 1262 & n. 4 (5th Cir. 1987), which rejected copyright protection for expression in a computer program "dictated by the externalities of the cotton market" in that "the similarity between [the parties' products] arises from the attempt of both programs to convey the same standardized information to the user."

creativity by Cisco, and involve aspects of the works that flow naturally from the very nature of creating a CLI for networking equipment incorporating certain features. Indeed, substantial evidence supports the verdict even under Cisco's incorrect interpretation of the law, because many of the constraints proved at trial flow from customer demand and industry standard protocols and terminology that were plainly external to Cisco and that pre-dated its selection and arrangement of the corresponding CLI elements.

III.    ARGUMENT

A.    Substantial evidence—indeed, abundant evidence—supports the jury's *scenes a faire* verdict.

Cisco's motion ignores the record evidence that supports the jury's *scenes a faire* verdict and fails to account for the full scope of the trial record, relying instead on isolated snippets of evidence taken out of context to create purported deficiencies in Arista's proof. Viewed in the proper light and under a correct understanding of the law as set forth above, the record evidence clearly supports the jury's verdict on *scenes a faire*. Cisco's arguments to the contrary depend on omitting or distorting all of the evidence supporting *scenes a faire* and improperly making numerous inferences about the facts and the verdict in Cisco's favor, instead of Arista's.

As Cisco implicitly acknowledges, the jury could only have "found infringement at the *compilation* level" and may have found infringement only with respect to one compilation. Cisco Br. at 4. In fact, under the instructions given (over Arista's objections), the jury need only have found copying of a ***non-trivial protected part*** of just one of Cisco's asserted compilations to find infringement. *See* Instruction 36 and *infra* Part III.B. Therefore, to prove *scenes a faire*, Arista needed only to put forward evidence allowing a rational jury to find that *scenes a faire* applied to the same portion of Cisco's compilation that it found infringed—whatever that may have been. Cisco offered so little evidence of Cisco's creative expression in its compilations that Arista submits that the infringement verdict could not be sustained.  *See* ECF 760 (Arista JMOL) at 11-20.  But assuming the jury could find infringement from such little evidence, the jury did not need voluminous evidence to conclude that any protected compilation was constrained by external factors.  Arista's evidence more than satisfies the low "substantial evidence" standard.  *See Johnson*, 251 F.3d at 1227.

## 1. Substantial evidence proved that external factors dictated Cisco's alleged compilation of commands.

Arista presented ample evidence for the jury to find that any limited portion of a Cisco CLI compilation of commands worthy of copyright protection—like the individual CLI commands that the Court held were not protectable at all—was the natural result of limiting factors other than creativity. First, the jury heard specific evidence from multiple witnesses that Cisco's selection and arrangement of its compilation of commands resulted from factors other than creative choice. Dr. Black testified that as a technical matter, the functional choice of features to be implemented in a system dictates the contents of the compilation of CLI commands or other elements. Tr. (Black) at 2126:2-14 (compilation of commands driven by features). Dr. Black explained that commands are linked to and driven by device features, both at the level of individual commands or sub-groups of commands and as to the overall compilation of commands within the CLI. *See, e.g.*, *id.*; Tr. (Black) at 2257:9-2258:10 (VRRP commands driven by VRRP feature), 2222:23-2223:15 (no reason to use commands for features that are not implemented). Although Dr. Black's evidence alone would be enough to support the verdict, other witnesses also gave similar testimony. As Mr. Li testified, it only makes sense to have commands that correspond to features in the product, and it "wouldn't make much sense to [support] commands that don't have anything to do with the features in your products." Tr. (Li) at 1870:12–25. *See also* Tr. (Kathail) at 1087:12-21 (each command relates to a function); Tr. (Sadana) at 940:10-18 (feature and CLI command are sometimes synonymous).

Second, as detailed below, the jury could reasonably infer that constraints flowing from the overall industry context and the basic functional nature of the CLI dictated the overall structure and arrangement of Cisco's asserted compilation of commands, at least as to the limited portions that Cisco accused Arista of copying and whatever sub-portion of that set the jury found was protectable and infringed. Although Cisco would like to dismiss all of this evidence as related solely to individual commands, in fact it also implicates Cisco's larger selection and arrangement of commands—and a rational jury was entitled to make inferences to that effect, even if Cisco (or the Court) might reach a different conclusion. Thus, all of the evidence set forth below explaining constraints on creativity due to functional and hardware limitations, customer

8

1142103

1    expectations and demands, and compatibility requirements also supports the *scenes a faire*

2    defense for Cisco's selection and arrangement of its compilation of commands.

3        It was especially reasonable for the jury to rely on all of this evidence to find *scenes a*

4    *faire* applied to whatever limited protected portions of a compilation it found were infringed,

5    where Cisco presented so little evidence at trial explaining what creative selection or arrangement

6    of individual CLI elements into compilations the jury should find was protectable. Cisco's

7    evidence of purported original creative expression in its asserted CLI elements focused almost

8    entirely on the individual CLI elements—individual commands, help strings, outputs, and

9    modes—rather than Cisco's selections and arrangement of any larger "compilations" of

10   commands, of help strings, of outputs, of modes, and of all four elements combined.  In fact,

11   Cisco abandoned at trial any effort to prove separately protectable expression in its so-called

12   command "hierarchies"—the only arrangements of commands that Cisco had ever claimed to

13   have independent expressive value.  *See* Tr. at 235:21-240:21. Instead, Cisco implicitly asked the

14   jury to extrapolate from the alleged creativity of its individual CLI commands to infer that

15   Cisco's compilations of commands and other elements were themselves creative and protectable.

16   In fact, despite the Court's requests (*see* Tr. 1628), Cisco never clearly identified to Arista or the

17   Court, let alone the jury, exactly what was contained in any of the asserted compilations, or how

18   any of those compilations was supposedly creatively selected, arranged, or organized. Cisco's

19   motion identifies no such evidence, nor could it do so. The only compilations Cisco in fact

20   presented to the jury at trial were the limited sets of asserted CLI elements that it claimed Arista

21   had copied because they were functionally "important to Arista"—which the record made clear

22

23

24

25

26

27

28

ARISTA'S OPPOSITION TO CISCO'S MOTION FOR JMOL UNDER RULE 50(B)
Case No. 5:14-cv-05344-BLF (NC)

1142103

were not independently selected and arranged by Cisco, but purely creatures of litigation.[4] *See* Tr. (Black) at 2205:18-2206:6; Tr. (Almeroth) at 2532:20-23, 2569:6-11.

a.    **The basic nature of Cisco's command-line interface heavily constrained Cisco's compilation of CLI commands.**

Evidence about the basic purpose and function of Cisco's CLI supports the *scenes a faire* verdict, because the jury reasonably could have found the functional demands of the CLI constrained Cisco's creativity in selecting and arranging its compilation of commands. Cisco's "command-line interface" is a functional system by which a user (human or machine) can manage networking equipment. *See* Tr. (Black) at 2090:17-2091:10 (describing basic operation of CLI). This type of interface—as opposed to a modern graphical user interface ("GUI")—long predates Cisco, and Cisco adopted conventional formats and structures already in widespread use in the computing industry. As Cisco's own witnesses explained, "[a]ll those machines in that era had CLIs" (Tr. (Lougheed) at 589:11-12) because a CLI was "how we did things in those days" because of hardware constraints. Tr. (Lougheed) at 505:3-15.

Cisco's selection and arrangement of CLI commands was thus dictated by the nature of a CLI and the functions that the CLI compilation needed to implement, not by Cisco's creative choices. Cisco's own witnesses consistently described its CLI in purely function-driven terms. Ms. Bakan testified that the CLI "represents all the functionality that's available in the products." Tr. (Bakan) 468:10-14, 475:13-20; *see also* Tr. (Bakan) 475:21-24 (CLI is simply "part of the operating system. That is the brain of the hardware."). Grouping related commands (in so-called command "hierarchies") also makes the CLI system functionally "extensible" (*i.e.* able to expand to add new features). Tr. (Lougheed) 506:4-6. *See* Tr. at 235:21-240:21 (Cisco not asserting

---

[4] Cisco admitted that the CLI elements it accused Arista of copying are a small fraction of the features in Cisco's CLI. *See* Tr. (Bakan) 476:12-15 (not all features); Ex. C (TX 4789) (asserted commands); Ex. I (TX 4799) (help descriptions); Ex. F (TX 4800) (command outputs); Tr. (Black) at 2126:19-2127:18 (no claim that other parts of user interface copied). Cisco claims unlawful copying of (1) 506 commands from across all four operating systems, out of more than 15,000 commands in IOS alone (Tr. (Kathail) at 1087); (2) four command modes out of more than 100 (Tr. (Almeroth) at 1381:3-18 (over 100 IOS modes); Tr. (Lougheed) at 597 (dozens)); (3) 37 command outputs out of tens of thousands in IOS alone (Tr. (Almeroth) at 1395-96); Tr. (Remaker) at 693 (16 responses asserted); and (4) 216 help strings of the thousands included in IOS-XR (Tr. (Almeroth) at 1393:12-19, 1394:5-7; Tr. (Lougheed) at 600 (IOS "very well could" have tens of thousands).

command "hierarchies" as separately protectable). The jury could reasonably find that these functional requirements and related customer expectations dictated Cisco's selection and arrangement of CLI commands.

### b. Pre-existing CLI conventions and standard terminology further constrained Cisco's compilation of CLI commands.

From its beginning, Cisco's CLI borrowed heavily from pre-existing operating systems, using conventional commands and other features, and reflected the practical constraints of conventional industry terminology and protocols. Arista's expert Dr. John Black testified at length that the vast majority of the asserted Cisco commands—to the extent not simply taken from pre-existing operating systems—were derived from conventional terms used in industry protocols and standards, which set the industry expectations for sets of commands and related CLI features implementing those protocols. Tr. (Black) 2097-2114. Numerous witnesses confirmed the Cisco CLI's dependency on pre-existing systems, which the jury could reasonably find were constraints on Cisco's creativity throughout its CLI. Kirk Lougheed built Cisco's CLI using code taken from Stanford and CLI commands and modes from pre-existing systems including TOPS-20. Tr. (Lougheed) at 598-99, 604-05 (modes), 581-83 (show commands), 589-93 ("terminal length"); Tr. (Black) at 2094:14-2095:5 (pre-existing multi-word commands); Tr. (Li) at 1856:12-1857:4 (Cisco founders were "fans" of TOPS-20 and its CLI). Cisco also used pre-existing organizing principles for sets of related commands, such as "show" commands and pre-existing syntax patterns. *See* Tr. (Li) at 1852:1–1853:24 (many pre-Cisco CLIs supported "many" multi-word "show" commands); Tr. (Li) at 1854:3–15 (pre-Cisco "show" commands all used standard syntax); Tr. (Li) at 1856:5-8 (Cisco followed pre-existing standard syntax).

The jury had ample evidence, largely from Cisco, that Cisco's selection and arrangement of its commands and help strings continued to be driven by functional requirements—not creativity—throughout the long evolution of the CLI. CLI commands are names or labels for what they do, and thus the commands' functions constrain any creativity in naming, selecting, and arranging them. Ex. A (TX 760) at 5 (Cisco chart describing commands); Tr. (Lougheed) at 624 ("command names"); Tr. (Remaker) at 689:19-24 ("nerd knob[s]"), 658-59 (word order limitations). Commands can be abbreviated: typing the full words is not required, just enough

11

1   letters to identify a unique command. Tr. (Remaker) at 664. Commands should be logical, with a

2   clear "rhyme and reason," and sensibly convey their functions. Tr. (Lougheed) at 573. CLI

3   designers must "consider their audience" (Tr. (Remaker) at 668:19-669:9) and use words "that the

4   industry would recognize" (Tr. (Remaker) at 665:24-25). Cisco's CLI guidelines directed

5   engineers "naming a command" to "pick names that would be familiar to people in the industry"

6   and "self-explanatory." Ex. B (TX 851) at 4; Tr. (Kathail) at 1090 (use "vocabulary which

7   networkers use day in and day out"); *see also* Ex. S (Gourlay Dep.) at 123:6-124:10. The need to

8   "regulariz[e] the command-line interface" was a limiting factor for Cisco's CLI. Tr. (Lougheed)

9   at 618:15-16. All of these functional constraints meant commands were usually created in

10  seconds using terms directly from standards documents. Ex. T (Satz Dep.) at 76:4-8.

11       Cisco also ignores substantial evidence about the impact of industry standards that pre-

12  dated—and further constrained—Cisco's compilations of CLI elements including commands. The

13  record contains ample evidence about industry standards and protocols that pre-date Cisco's

14  creation of its related sets of CLI elements, which are relevant and provide additional support for

15  Arista's defense and the jury's verdict. Mr. Lougheed admitted that he used conventional terms

16  and commands already in use in the industry.[5] Tr. (Lougheed) at 574-81. Many CLI commands

17  came directly from industry protocols or standards commonly used in the networking industry

18  and even taught to college students. Tr. (Almeroth) at 1290:17-1292:4. The jury was free to

19  conclude that the industry standards and protocols Arista asserted here pre-dated Cisco's

20  creations of its related commands and other features (such as help strings naming the protocols

21  and related parameters, and command outputs returning parameters defined in the protocols), and

22  that those standards dictated the content of related sets of CLI commands and other CLI features.

23  *See, e.g.*, Ex. C (TX 4789) (exhibit listing alleged creation dates for all asserted CLI commands);

24  Tr. (Almeroth) at 1291:25–1292:4 ("many of the terms in Cisco's CLI commands were taken

25  _____

26  [5] For example, Lougheed used pre-existing standard phrases like "ip address" (Tr. (Lougheed) at 577:11-14), "mac address" (Tr. (Lougheed) at 579:14-23), and "boot system" (Tr. (Lougheed) at 580:6-15). Cisco also used pre-existing modes and help strings. Tr. (Lougheed) at 598-600

27  (EXEC and privileged modes copied from TOPS-20); Tr. (Lougheed) at 600 ("Delete a file" used in TOPS-20); Tr. (Lougheed) at 601-603 & Ex. J (TX 5724) (help string "Transmission Control

28  Protocol" not original); Tr. (Li) at 1852:4-9, 1855:22-1857:14 (Cisco modeled CLI on TOPS-20).

1    directly from various networking industry protocols"); Tr. (Almeroth) at 1292:9–1293:15

2    (industry protocols and their terminology—like IP in RFC 791—long predated the creation of

3    related Cisco CLI); Tr. (Lougheed) at 573:14-578:18 (IP commands used RFC 791 terms); Ex. U

4    (TX 6944) (RFC 791, dated 1981); Ex. D (TX 5040) (RFC 1883 for IPv6, dated Dec. 1995); Tr.

5    (Almeroth) at 1294:13–1299:6 (set of CLI commands relating to IPv6 functionality comes

6    straight from the "terminology" section in the earlier IPv6 industry standard); Tr. (Almeroth) at

7    1347:17-19 (45 asserted commands used the industry standard "IPv6" term). The jury also had

8    evidence that a "very large number" of other protocols, like IP and IPv6, similarly constrained

9    Cisco's collections of commands and other CLI features. Tr. (Almeroth) at 1365:13–16.[6]

10       Third parties also confirmed that sets of CLI commands reflect obvious choices that flow

11    from industry standard terminology for network functions—in other words, choices that the jury

12    could find were dictated by the industry context. *See, e.g.*, Ex. E (TX 9081) (Dell witness Cato

13    Dep.) at 36:1-8 ("If you have a VLAN, … there's an expectation that a VLAN and the

14    terminology around VLAN will somewhere appear in the CLI along with the parameters

15    necessary to structure VLAN."); *id.* (Cato Dep.) at 42:08-24 (Dell engineers use standards to

16    create commands to meet customer expectations). Because a network switch operating system

17    typically implements many industry standard protocols, and protocols affect multiple commands,

18    these protocols constrain entire segments of CLI elements, not just individual commands.  *See id.*;

19    _____

[6] *See also, e.g.*, Ex. K (TX 5038) (RFC 1131, earliest OSPF standard, dated Oct. 1989); Tr.
20    (Almeroth) at 1348:20-1349:6, 1349:17-1354:21 (confirming that many terms defined in the
      earlier OSPF industry standard were used in at least 35 later-created Cisco CLI commands for
21    OSPF features); Ex. L (TX 5131) (RFC 1067, SNMP industry standard, dated August 1988); Tr.
      (Almeroth) at 1354:22-1356:25 (confirming that term "SNMP" is used in an earlier RFC to refer
22    to an industry standard, and many later-created Cisco IOS CLI commands use that term for
      SNMP features); Ex. M (TX 6952) (Spanning-Tree Standard from the IEEE, dated May 31,
23    1990); Tr. (Almeroth) at 1357:15-1359:21 (confirming that the term "spanning-tree" is used in an
      earlier IEEE standard, and many later-created Cisco IOS CLI commands use that term for
24    spanning-tree features); Ex. N (TX 6877) (IGMP version 2, RFC 1112, Nov. 1997); Tr.
      (Almeroth) at 1360:7–1365:12 (confirming that many defined terms in the IGMP industry
25    standard were later used in a collection of Cisco IOS CLI commands for IGMP functionality); Ex.
      O (TX 6870) (PIM, RFC 2117, dated June 1997); Ex. P (TX 6910) (MSDP, RFC 3618, dated
26    Oct. 2003); Tr. (Almeroth) at 1366:19-1368:7 (MSPD industry standard terms in RFC 3618 in
      Cisco's MSDP CLI commands); Ex. Q (TX 6824) (IS-IS, RFC 1195, dated Dec. 1990); Ex. R
27    (TX 6881) (VRRP, RFC 2338, dated Apr. 1998); Tr. (Li) at 1859:24–1860:6 (industry standards
      were a constraint on the JUNOS CLI because "it was important that we have a product that was
28    convenient and well known to the existing customer base").

---

ARISTA'S OPPOSITION TO CISCO'S MOTION FOR JMOL UNDER RULE 50(B)
Case No. 5:14-cv-05344-BLF (NC)

1142103

Tr. (Juniper witness Shafer) at 2069:6-2072:8 (many CLI commands and features are identical between Juniper JUNOS and Cisco IOS because "the design constraints in creating a CLI" made the overlapping features "the obvious choice").

> c.    **Customer requirements for consistency and cross-compatibility further constrained Cisco's compilation of CLI commands.**

The jury also heard substantial evidence that even early on at Cisco, functional customer needs and expectations drove Cisco's choices about how to build its CLI features. Mr. Lougheed admitted that from the very beginning Cisco needed to add certain technical protocols that others outside Cisco were already using to its own systems, and Cisco "had to have some way of distinguishing between" them. *See* Tr. (Lougheed) at 513:23-514:9. Even Cisco's Dr. Almeroth admitted that consistency in managing the multiple layers of communication in a network, facilitated by use of common protocols and standards, is a practical requirement in the networking industry and part of the basic foundation for network communication: "the different layers for communication all have to be consistent." Tr. (Almeroth) at 1289:15-24. The logical inference from this evidence is that the practical necessities of network communication heavily constrained Cisco's design of its CLI from the beginning, including Cisco's selection and arrangement of CLI commands and other elements.

Customers' needs for a clear and consistent CLI system further restricted creativity in all aspects of Cisco's CLI throughout its development, including its selections of compilations of commands and other features. Initial choices in a CLI also functionally constrain the later selection and arrangement of commands. *See* Tr. (Black) at 2208:5-20, 2212:21-2214:22 (prior selection of unoriginal "show" command constrains future show commands). According to Cisco, Cisco customers needed consistency to avoid the risk of a "catastrophic problem" if they used a command that a switch did not recognize. Tr. (Remaker) at 694-696. Cisco admitted "our [Cisco] customers prefer a common command line language." Tr. (Remaker) at 701:21-25. Customers would be "disoriented" and "upset" if command syntax changed from what they have "committed to muscle memory" so that commands "no longer work the way they are expecting"—so new commands must be consistent with prior commands. Tr. (Remaker) at 670. Cisco admits that engineers creating CLI commands must avoid "collisions" between abbreviated

14

1142103

1  forms of commands (Tr. at 664:24-665:2), "be consistent with stuff we've done before" (Tr. at

2  714:19), not replicate commands that "already exist[]" (Tr. at 714:8-9), ensure "backwards

3  compatibility" (Tr. at 665:7), and create commands "arranged and grouped in a logical, easy to

4  find order" (Tr. at 662:3-4). This is true both within and across Cisco's own systems, and with

5  competitors: no customer wants to learn 20 different command languages.  Tr. (Remaker) at 701.

6  Therefore, CLI engineers try to "think[] about what the customer might have" and ensure

7  backwards "compatibility with what exists" and customers already use. Tr. (Remaker) at 653; Tr.

8  (Remaker) at 714:17-19 ("we have to be consistent with stuff we've done before"); Tr. (Slattery)

9  at 727:17-728:4 (need for "100 percent backwards compatibility").

10         To avoid these problems, Cisco established "Parser Police" guidelines for its engineers to

11  follow. Tr. (Remaker) at 694-696; Ex. B (TX 851). The jury could reasonably view these rules as

12  a summary of external constraints Cisco needed to respect to satisfy customer needs and technical

13  requirements. Likewise, even Dr. Almeroth admitted that Cisco's selection of commands was

14  limited by the "language of networking." Tr. (Almeroth) at 2554:21-2555:15 (Cisco had to use

15  "language of networking," just as one would use hockey terms—not golf terms—to discuss

16  hockey). And of course, the jury was entitled to discredit or find unreasonable all of Cisco's

17  witnesses' contrary testimony that their CLI design choices were entirely unconstrained.

18         Finally, Cisco's only concrete example at trial of its purported creativity in CLI design—

19  involving the individual command "show inventory"—in fact re-confirmed the overall functional

20  and other constraints above.[7] *See* Tr. (Remaker) at 670:23-671:4. First, Cisco did not consider

21  any alternatives to the word "show," because the pre-existing "show" hierarchy was the "natural"

22  and "sensible" place to put the command, and Cisco (like others) used "show" already. *Id.* at

23  673:2-21, 690:9-22. Second, the few options Remaker considered for the term "inventory" were

24  considered because they "might better describe" the command's function. *Id.* at 674. Third,

25  Remaker rejected those other choices because of functional needs, not creative judgment: one

26  
[7] Even Cisco's purported aesthetic goals for its CLI are all function-driven: the CLI should
27  "work[] well" by being "consistent," meaning "that it behaves the way you expect"; it should be
   "useable," meaning "you can understand what the commands mean"; and it should be "friendly"
28  meaning "easy to use and not crazy."  Tr. (Remaker) at 652:25-653:7.

1   option would cause "a collision, so we couldn't do it" (675:15-16), another was "already being

2   used" (675:9-10), two were "confusing" given other existing commands (675:1-4, 677:11-14),

3   and two others were already being used on "some platforms" for other information (677:15-21).

4   *See* Tr. (Remaker) 691:14-692:6 (Cisco considered these constraints). This confirms that there are

5   "quite limited" options for any given command within the basic structure of Cisco's CLI,

6   precisely because of the constraints on the overall compilation of commands that can be used to

7   implement a given set of features. *See* Tr. (Duda) 875-76 (limited word order options); Tr. (Dale)

8   1041-42 (commands are "logical and almost as simple as you can be in a nonambiguous way"

9   using terms from standards).  In fact, Mr. Lougheed testified that multiple companies could create

10  the ***exact same commands for multiple features*** by "coincidence" simply by implementing the

11  same functions and standards. Tr. (Lougheed) at 595-596, 616-620 (possible coincidence that

12  DEC manual listed several commands Cisco claimed to author in same year, such as "arp

13  timeout", "clear ip bgp", "distance bgp," ip domain lookup", "ip domain name", "show ip bgp").

### 2.    Substantial evidence showed that external factors also dictated Cisco's compilation of help strings.

16          As explained above, to sustain the jury's *scenes a faire* verdict the Court need only find

17  that substantial evidence supported a finding of *scenes a faire* as to the smallest nontrivial portion

18  of just one compilation of CLI elements that the jury could have found to be infringed.

19  Substantial evidence here supports such a finding not only as to Cisco's asserted compilation of

20  CLI commands (as discussed above), but also as to its compilation of help strings.

21          The same basic functional constraints and industry standards and conventions that shaped

22  Cisco's CLI commands also constrained Cisco's selection and arrangement of its help

23  descriptions. All of the evidence as to the commands also constrained the help strings because

24  they serve the same purpose and had to meet the same customer needs—and the selection and

25  arrangement of the commands themselves dictates the selection of help strings.

26          The record also contains substantial evidence specific to the compilation of help strings

27  itself.  For example, Tony Li testified that the Cisco IOS "help" system was "modelled directly

28  after" the help system already available on TOPS-20, so that "it looked almost identical." Tr. (Li)

    at 1856:1-4; Tr. (Li) at 1855:6-21 (the pre-Cisco CLIs also supported "help" functionality for CLI

                                                    16

1142103

1    commands). In addition, the jury heard evidence that help strings are also basic short phrases that

2    are "very easy" and "quick" to write, and simply describe what the command does.  Tr.

3    (Lougheed) at 604, 600-01; Tr. (Lougheed) at 603:2-8 (help string "Display[] the system clock"

4    for command "show clock"); Tr. (Slattery) at 749:12-17 ("Enable ip routing" for command "ip

5    routing"); Tr. (Slattery) at 750:2-5 ("Set the ip address of an interface" for command "ip

6    address"). Help strings must be "brief" and "short" to fit limited screen space. Tr. (Remaker) at

7    681-82; Tr. (Slattery) at 746-47 (line or two of text on one side of screen). The point is to be

8    helpful, not creative.  Tr. (Lougheed) at 567.

9           By its very nature and Cisco's own description, the collection or compilation of help

10   descriptions is thus dictated by the command set itself (and by all of the constraints that dictate

11   that command set).  *See* Tr. (Almeroth) at 1222:24–1223:12 ("help descriptions" at the command

12   line are associated with "a command or a portion of a command" and are used to provide

13   information regarding what the command does); Tr. (Almeroth) at 1394:5–1395:6 (confirming

14   that each help description is merely a "simple" description of the corresponding command's

15   functionality).

16          ### 3.    Substantial evidence showed that external factors also dictated Cisco's compilation of command outputs.

17          In addition, substantial evidence also supports a finding of *scenes a faire* as to Cisco's

18   asserted compilation of CLI command outputs or command responses, which provides another

19   independent basis for the verdict. All of the evidence discussed above as to the commands and

20   help strings also constrained Cisco's selection and arrangement of its command outputs, because

21   they serve the same purpose and had to meet the same customer expectations. The command

22   outputs themselves clearly show that they convey technical parameters drawn from the same

23   standard language of networking described above that constrained Cisco's selection and

24   arrangement of the commands.  Ex. F (TX 4800) (summary of asserted command outputs).

25          The evidence at trial was that Cisco's overall "compilation" of command outputs (like the

26   individual outputs themselves) flows directly from its use of "show" commands. And Cisco

27   dropped at trial any claim to protection for its "hierarchy" of "show" commands, along with all of

28   its other hierarchy claims.  Tr. at 235:21-240:21. Cisco itself admitted that command outputs only

17

occur where there is a "request to display information." Tr. (Almeroth) at 1222:21–23; Tr.

(Almeroth) at 1395:7-10 (command outputs are the "text responses that come up when you enter

a show command"). And the use of show commands for this purpose long pre-dated Cisco and

constrained Cisco's selection of command outputs—including the very small portion of them that

Cisco accused Arista of copying.[8]

### 4. The cherry-picked evidence Cisco relies on to negate *scenes a faire* cannot do so, as the jury was free to rely on other evidence instead.

The rest of Cisco's efforts to show that the record compelled a finding for Cisco on *scenes a faire* depend on taking small snippets of evidence out of context, assuming that the jury found Cisco's witnesses (but not Arista's) credible and convincing, and ignoring the substantial body of evidence and reasonable inferences favoring Arista and supporting *scenes a faire*. In reality, as set forth at length above, the record contained extensive evidence that Cisco's choices in putting together its CLI—including its compilations of CLI commands, help strings, and outputs—were dictated by the conventional needs of the industry and the impact of external constraints on Cisco's choices at the time, not the free exercise of creativity. The jury was entitled to credit that evidence, and to disregard everything Cisco's (or Arista's) witnesses said that might have suggested otherwise. Because substantial evidence supports *scenes a faire*, a reasonable jury crediting that evidence (and making any and all reasonable inferences in Arista's favor based on that evidence) could uphold the defense, and it is "simply not relevant" that Cisco may be able to point to evidence that might support a different ruling. *See Johnson*, 251 F.3d at 1227.

And in fact, the specific factual and evidentiary claims in Cisco's motion all fail to address—let alone overcome—the extensive record evidence favoring *scenes a faire*. First, Cisco claims that Arista's witnesses failed to present adequate evidence to prove *scenes a faire*. Cisco Br. at 5-8 (Cisco's account of the "deficient" *scenes a faire* evidence). Cisco is wrong: as

---

[8] As to the compilation of modes, Cisco admitted that two of the four modes were unoriginal and so the asserted "compilation" consisted of the combination of those two modes with two other modes. Tr. (Almeroth) at 1237:19-1238:6. Each of the two new modes serves a purely functional role of enabling a type of configuration: Global or Interface Configuration. Tr. (Lougheed) at 508:10-15; 509:6-17. Based upon Cisco's witnesses alone, the jury could have concluded that the selection and arrangement of these four modes naturally flowed from the functional idea of having a different mode for different configuration needs.

recounted above, both Dr. Black and other Arista witnesses (like Ken Duda), as well as independent and third party witnesses (including Tony Li, Greg Satz, Gavin Cato, and Philip Shafer), presented substantial evidence at trial about the many constraints on Cisco's development of its CLI, at both the individual element and compilation levels. Moreover, there is no requirement in either the law or common sense that Arista must prove its defenses through its own witnesses, rather than Cisco's. And here, Cisco's own witnesses alone also provided substantial evidence to support the jury's *scenes a faire* verdict. The core testimony described above from Mr. Lougheed and Mr. Remaker about the development of Cisco's CLI, along with testimony from others like Ms. Bakan, Mr. Slattery, and Cisco's expert Dr. Almeroth, made clear that Cisco's choices for selecting and arranging its CLI features were highly constrained by functional needs, industry conventions, and industry protocols from the very beginning.

Although Cisco witnesses *attempted* to prove the opposite, as Cisco's motion describes at length, the jury was free to believe the testimony Arista relies on instead of Cisco's conflicting conclusory and self-serving claims of creativity. Even if a single witness's "testimony was inconsistent" on a point and some testimony might favor the moving party, it is still "[t]he jury's role . . . to weigh this testimony against conflicting testimony" by the same witness. *Boston Sci. Corp. v. Johnson & Johnson*, 550 F. Supp. 2d 1102, 1114 (N.D. Cal. 2008) (denying JMOL based on inconsistent inventor testimony).

The record also belies Cisco's claims that "unrebutted" evidence from various witnesses negated *scenes a faire*. *See* Cisco Br. at 7-10. As described at length above, substantial evidence in the record rebutted all of the supposed admissions that Cisco relies upon. For example, Cisco points repeatedly to Arista's (and Dr. Black's) supposed failure to "rebut" various testimony by Cisco's Dr. Almeroth. *See id.* at 7-8. However, whether or not Arista made any direct rebuttal, the jury was free to disbelieve every word of Dr. Almeroth's testimony—or anyone else's—or to find the inferences Cisco urged from even credible evidence to be unpersuasive. *See Johnson*, 251 F.3d at 1227.

The jury's right (and even duty) to disregard any and all of Dr. Almeroth's testimony is especially strong here given his transparent advocacy. Dr. Almeroth discredited himself with his

1    conclusory and incredible testimony that, for example, help strings like "Delete a file" and

2    "Rename a file" were "elegant" and "creative." *See* Tr. (Almeroth) at 1394:12-1395:6; *see also*

3    Dissection Order at 9 n. 1 (rejecting Almeroth's testimony about potential alternative commands

4    as "not plausible"). The jury was also free to dismiss the entirety of Dr. Almeroth's testimony as

5    unconvincing based on the taint of his $800,000 financial relationship with Cisco over the past 20

6    years, as well as his status as a professional testifier on a broad range of topics. Tr. (Almeroth) at

7    1284-1287. Dr. Almeroth was the very opposite of a disinterested witness, and the jury had every

8    right to reject his testimony. *See Johnson*, 251 F.3d at 1227; *Oracle Am., Inc. v. Google Inc.*, No.

9    C 10-03561 WHA, ECF 1201 at 11 (N.D. Cal. May 30, 2012) ("A reasonable jury could have

10   found [an expert's] many 'mistakes' in his report merely to be convenient alterations to fix

11   truthful admissions earlier made  . . . ..  For this reason, a reasonable jury could have rejected

12   every word of his testimony.").

13        Likewise, the jury was free to disregard the cherry-picked snippets of third-party evidence

14   that Cisco relies on, and to credit instead (or simply find more relevant) third-party testimony that

15   competitors used substantially overlapping command sets because of the "design constraints"

16   involved in creating a CLI to implement industry standard features.  *See, e.g.*, Tr. (Shafer) at

17   2069:6–11 ("design constraints in creating a CLI" led JUNOS to use "show interfaces"—the

18   same command used by Cisco), 2069:12-15 (same for "show arp" command), 2069:20-2070:12

19   (same for "show isis interface" command), 2070:13–22 (same for "show lldp neighbors"),

20   2071:14–21 (same for "show spanning-tee interface" command), 2070:23–2071:7 (same for

21   "snmp mib" command); Tr. (Shafer) at 2071:22–2072:8 (JUNOS CLI supports sets of "show"

22   and "clear" commands—meaning commands that start with "show" and "clear"—because they

23   were "obvious design choices").

24        In sum, the jury was entitled to disbelieve all of the evidence Cisco identifies as

25   undermining or negating Arista's *scenes a faire* defense, and to credit instead all of the evidence

26   favoring Arista set forth above. The jury's verdict on *scenes a faire* must stand, because Cisco

27   cannot show that the record *compels* the opposite result.  *See Wallace*, 479 F.3d at 624.

28

**B.** **Cisco is not entitled to judgment on grounds that the *scenes a faire* defense is inconsistent with the facts underlying the jury's finding of infringement.**

Cisco also seeks judgment as a matter of law on grounds that the *scenes a faire* defense is inconsistent with the facts underlying the jury's finding of infringement. This argument fails for multiple reasons: first, Cisco waived this argument by failing to assert it in its Rule 50(a) motion, and second, the argument fails for multiple reasons on the merits.

**1.** **Cisco waived its "virtually identical copying" argument.**

The law is clear that a Rule 50(b) motion "is not a freestanding motion," but only a "renewed Rule 50(a) motion." *Go Daddy Software*, 581 F.3d at 961. Therefore, Cisco's Rule 50(b) JMOL motion "is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion" and cannot raise new arguments. *Id.*; *see also Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404–05 (2006) (explaining forfeiture of rights not properly preserved under Rule 50). Defying this rule, Cisco's Rule 50(b) motion raises for the first time the argument that the record cannot support the jury's *scenes a faire* verdict "because the record evidence shows, and the jury necessarily found, Arista's virtually identical copying of Cisco's protected expression." Cisco Br. at 21:27-22:1. Although this argument is also wrong on the merits, Cisco is not entitled to raise it at all because any such challenge was forfeited when Cisco failed to assert it under Rule 50(a) and submitted the *scenes a faire* defense to the jury. The substance of Cisco's Rule 50(a) motion on *scenes a faire* was as follows: "no reasonable jury could find that, at the time Cisco created its works, external factors other than Cisco's creativity 'dictated' that Cisco select, arrange, organize and design its original features in the matter it did." ECF 732 at 14. By no stretch of the imagination can Cisco's Rule 50(a) argument fairly encompass Cisco's new claim that the record compels a finding of "virtually identical copying of Cisco's protected expression" that (according to Cisco) can negate a showing of *scenes a faire*.[9]

---

[9] In its entirety, the *scenes a faire* portion of Cisco's Rule 50(a) motion reads as follows:

> For similar reasons, and based on similar evidence, no reasonable jury could find that, at the time Cisco created its works, external factors other than Cisco's creativity 'dictated' that Cisco select, arrange, organize and design its original features in the matter it did, and thus Cisco is entitled to judgment as a matter of law on Arista's scènes à faire affirmative defense. Jury Inst. 61. For example, Arista does not dispute that no standard-setting organizations or customer

21

### 2.    Even if Cisco's new argument were not waived, it fails for multiple reasons on the merits.

Cisco's new argument also fails on its merits. Cisco contends that the jury inevitably found virtual identity copying because the jury either applied the instruction regarding indirect copying, or concluded there was direct evidence of "virtually identical copying of Cisco's user interface." Cisco Br. at 23:6-10; 24:11-13. Cisco is wrong. Cisco urged the jury not to consider the instruction on indirect copying but rather to find copying by direct evidence; but if it did so, the jury never even had to consider whether the evidence satisfied the "virtual identity" standard.

The instruction on direct evidence of copying makes no mention of "virtually identical" copying.[10] Jury Instr. No. 36. Indeed, Cisco opposed including the "virtual identity" language in any part of the jury instructions. Tr. at 2407:20-2408:3, 2415:24-2416:4 (Cisco lodging an objection to Final Jury Instructions Nos. 36 and 39 insofar as they referred to a virtual identity rather than a substantial similarity standard). After the Court included the virtual identity standard as *one* of two potential ways Cisco could prove copying, Cisco was concerned that the evidence did not support a finding under that heightened standard. Accordingly, Cisco's counsel discouraged the jury from applying the "virtual identity" standard at all. Tr. at 2705:7-18 ("you don't need to get to the second one [virtual identity] here"). Cisco thus confirmed that there was no need to find virtual identity in order to find infringement.

Cisco was wise to discourage the jury from considering the "virtual identity" test, since Cisco's JMOL motion identifies no evidence suggesting that the selection, arrangement or organization of the compilation of any CLI element in Cisco's accused works was identical to that

---

preconceptions required Cisco to design the expressions in its user interface as it did (e.g., Tr. 1963:5-8 (Ullal)); to the contrary, as Mr. Shafer of Juniper testified, the creative process within Cisco was a 'greenfield' or 'open pasture,' without constraints, at the time the user interfaces were created.  Tr. 2060:17-2061:3 (Shafer).

ECF 732 at 14:7-15.

[10] Final Jury Instruction No. 36 states:

Cisco may establish Arista's copying through direct evidence. An example of direct evidence would be an admission by Arista that part or all of the work was copied. Direct evidence may also be the credible testimony of a witness who saw the work being copied.

22

1142103

in Arista's works. *See generally* Cisco Br. at 23-24. Each excerpt Cisco quotes either refers to the CLI generally—which includes many unprotected aspects—or refers to the similarity of unspecified CLI commands. Cisco has not cited, and could not cite, a shred of evidence that Cisco's compilation of, for example, many thousands of commands was virtually identical to Arista's thousands of commands. *See, e.g.*, Ex. G (TX 7543) at 14 (identifying over "14k" Cisco IOS commands); Tr. (Black) at 2190:19-24 (same); Tr. (Almeroth) at 2557:22-2559:9 (Arista's count of total EOS CLI commands is between "10 to 15,000 commands"); Tr. (Black) at 2089:15-22 ("Arista used a small portion of Cisco's command line interface . . . Arista added thousands more commands."). The vast majority of those commands are unquestionably different.  Tr. 2262:21-2263:6 ("Arista has a whole bunch of features that they've added to their product that require new CLI commands, thousands of those. They don't look like anything I've seen in Cisco."). And even among the 506 asserted commands, there was undisputed evidence that many are not identical in Arista's EOS. Ex. H (TX 9037) (comparing accused Cisco and Arista commands and demonstrating the actual EOS command syntax). Therefore the trial record could not even support a finding of virtual identity.

Moreover, none of the cases Cisco cites equate direct evidence of copying with proof of "virtual identity," as Cisco attempts to argue here. Instead, Cisco cites mostly *dicta* from a series of cases observing, unremarkably, that *scenes a faire* may not apply as a defense to identical copied works. Cisco Br. at 22. For example, in *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435 (9th Cir. 1994), the court's discussion was in the context of analytic dissection where it merely hypothesized about the protection of "Apple's *particular expression*." *Apple*, 35 F.3d at 1444.  *See also Sony Pictures Entm't, Inc. v. Fireworks Entm't Grp., Inc.*, 156 F. Supp. 2d 1148, 1157-1161 (C.D. Cal. 2001), *vacated pursuant to settlement*, No. 01-00723(ABC)(JWJX), 2002 WL 32387901 (C.D. Cal. Nov. 5, 2002) (comparing literary elements of works under analytical dissection analysis applying substantial similarity standard). Rather than ***inferring*** virtual identity notwithstanding substantial evidence of differences between the works, the court in *Fodor* actually found virtual identity based on a factual comparison of the works.  *Fodor v. Los Angeles Unified Sch. Dist.*, No. CV 12-8090 DMG (CWx), 2014 WL 12235424, at *11 (C.D. Cal. June 3,

23

1    2014). In short, there is no evidentiary or legal basis for the Court to conclude that the Cisco and

2    Arista compilations are virtually identical, nor that the *scenes a faire* defense is foreclosed.

3    **C.    If the Court grants Cisco's motion, it must order a new jury trial on all issues**

4    Although it is premature to decide this now, if the Court were to grant Cisco's Rule 50

5    motion, it would have to order a new jury trial on all issues triable to a jury.  To do otherwise—as

6    Cisco proposes—would not only be impractical, but would deprive Arista of its constitutional

7    right to a fair trial.  *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931).

8    In *Gasoline Products*, the Supreme Court held that courts may order a partial new trial

9    (such as one on only damages) only if "it clearly appears that the issue to be retried is so distinct

10   and separable from the others that a trial of it alone may be had without injustice." *Id.* The jury in

11   that case had found a breach of the parties' contract, but it was "impossible from an inspection of

12   the . . . record to say precisely what were the dates of formation and breach of contract found by

13   the jury, or its terms." *Id.* at 499. Because those facts would affect any award of damages, the

14   Supreme Court held that "the question of damages on the counterclaim is so interwoven with that

15   of liability that the former cannot be submitted to the jury independently of the latter without

16   confusion and uncertainty, which would amount to a denial of a fair trial."  *Id.* at 500.

17   Accordingly, it ordered the trial court to retry both liability and damages.  *Id.*

18   Courts in this Circuit routinely apply *Gasoline Products* and order that damages and

19   liability must be tried together when the issues are interwoven.  In *United Air Lines, Inc. v.*

20   *Wiener*, 286 F.2d 302 (9th Cir. 1961), for example, the Ninth Circuit held that a jury could not

21   decide damages separately from liability where the plaintiffs alleged that both the United States

22   and United Airlines had negligently caused a plane crash, since each one's culpability would

23   affect the amount of compensatory and punitive damages it owed. *Id.* at 306. Similarly, in *Masson*

24   *v. New Yorker Magazine, Inc.*, 832 F.Supp. 1350 (N.D. Cal. 1993), the jury found liability for

25   defamation but failed to reach a unanimous verdict on damages. Because a new jury would need

26   to decide the extent of the defamation, the nature of the plaintiff's prior reputation, and other

27   issues to award damages, the court ruled that "[i]t is clear that the issues of damages and liability

28   are so interwoven that a new trial on all issues is warranted." *Id.* at 1377.

This case is a paradigmatic example of one where damages could not now be tried separately without violating Arista's right to a fair trial. As Cisco concedes, the jury's verdict does not reveal *what* original expression the jury found Arista copied. *See* Cisco Br. at 1:27. It may have found that Arista copied only the two asserted modes, and that Cisco failed to prove its case in all other respects. Or perhaps it found that Arista copied only a small number of original help descriptions, or a few original command responses. One can only guess—yet the answer would have an enormous impact on the damages that Cisco could attempt to claim (and indeed, on whether Cisco could seek any damages at all). Because any adjudication of damages would be inextricably intertwined with the nature and scope of any infringement found by the jury, if the Court were to grant Cisco's Rule 50 motion, it must order a new trial on liability as well.

That Cisco proposes a bench trial on damages instead of a jury trial only compounds the problem. The Court could not evaluate damages without first deciding what parts of Cisco's interface were infringed, depriving Arista of its Seventh Amendment right to a jury determination of that issue. *See, e.g., Trans-World Int'l, Inc. v. Smith-Hemion Prods., Inc.*, 952 F. Supp. 667, 673 (C.D. Cal. 1996) (citing *Gasoline Products* and holding that, after declaring mistrial, court could not decide equitable claims that were intertwined with issues submitted to the jury). This is a problem of Cisco's making. While Arista previously proposed a bench trial on disgorgement, it did so in conjunction with a detailed verdict form that would have indicated exactly what, if anything, the jury found was infringing. *See* ECF 594. But Cisco insisted on a general verdict, with the result that now, if that verdict is overturned, a new trial on all issues will be necessary.

Further, and for the same reasons, any such new trial must include all of Arista's defenses, including, for example, fair use. The jury found that Arista failed to prove its fair use defense *for whatever original expression it found Arista copied*. What that expression is, however, is a mystery, and a different jury might reach a different conclusion for a different category of expression. For example, another jury might find infringement only of certain help responses, but find their use to be fair. Thus, if liability were to be retried, it would need to be retried in full.

## IV.    CONCLUSION

For all the reasons above, Cisco's motion should be denied.

1142103

1

Respectfully submitted,

2   Dated:  January 31, 2017                 KEKER & VAN NEST LLP

3

4                                        By:   /s/ Robert A. Van Nest
                                              ROBERT A. VAN NEST
5
                                         Attorneys for Defendant
6                                        ARISTA NETWORKS, INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ARISTA'S OPPOSITION TO CISCO'S MOTION FOR JMOL UNDER RULE 50(B)
Case No. 5:14-cv-05344-BLF (NC)

1142103