UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CISCO SYSTEMS INC,

Plaintiff,

v.

ARISTA NETWORKS, INC.,

Defendant.

Case No. 14-cv-05344-BLF

**ORDER DENYING MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL**

Following a two-week trial, a jury collectively found that Defendant Arista Networks, Inc. ("Arista") infringed Plaintiff Cisco Systems, Inc. ("Cisco")'s asserted user interfaces but that the infringement was excused by the scènes à faire affirmative defense.

Cisco now moves on two grounds to amend the Court's judgment as a matter of law. Mot., ECF 761. Arista also conditionally moves on several grounds to amend the Court's judgment as a matter of law and for a new trial. ECF 760. For the reasons stated below, the Court DENIES Cisco's motion and finds that Arista's motions are moot.

**I.   BACKGROUND**

**A.   Factual Background**

Cisco and Arista are competitors who make and sell Ethernet switches, which connect multiple devices within a local area network and can direct traffic on the network. Founded in 1984, and one of the pioneers of networking technologies, Cisco developed an "Internetwork Operating System" ("IOS") that allowed engineers to configure and manage Cisco servers, routers, and switches. Cisco has obtained copyright registrations on the various versions of its IOS and associated technical manuals. Arista, founded in 2004, by former Cisco executives, also sells networking equipment using an "Extensible Operating System" ("EOS").

Cisco brought suit against Arista, claiming that Arista violated its copyrights and infringed

its patents. ECF 1. For its copyright infringement claim, Cisco asserted that Arista infringed the user interfaces found in four Cisco operating systems as well as the associated technical documentation. Second Am. Compl. ("SAC") ¶ 27, ECF 64. Cisco owns twenty-six copyright registrations based on various versions of its four operating systems. *Id.* ¶ 25. The operating systems were developed for use with Cisco's networking products, including its routers and switches. *Id.* ¶ 6. Cisco's operating systems employed text-based user interfaces (referred to by Cisco as command-line user interfaces or "CLI"), which is the primary mechanism for network engineers to interact with switches and routers. *See* Analytic Dissection Order ("AD Order"), ECF 740. When a network engineer or system operator types multiword command expressions into the user interface, the expressions are then displayed on a screen that is connected to the networking device. *Id.* Cisco claimed that its CLIs contain at least the following protected elements: (1) multi-word command expressions, (2) multi-word command hierarchies, (3) modes and prompts, (4) command responses or screen outputs; and (5) help descriptions, an overview of which is provided below. Mot. 1, 4.

With respect to "multiword command expressions," Cisco claimed that more than 500 of the multiword command expressions across four operating systems are protectable and copied by Arista. SAC ¶ 51. Examples of multiword command expressions include "boot system," "show inventory," "area nssa translate type7 always," and "spanning-tree portfast bpdufilter default." *See, e.g.*, Tr. Ex. 4803, Ex. I to Jenkins Decl., ECF 761-10. According to Cisco, these command expressions are also grouped by initial words into collections to reflect multi-level textual hierarchies. AD Order. For illustration purposes, part of the "show" command hierarchy is shown below.

```
show
    show arp
    show clock
    show environment
        show environment all
        show environment power
        show environment temperature
```

Once the operator inputs a multiword command expression, the switch or router analyzes the command and responds by displaying textual screen outputs on screen. Cisco referred to these

2

textual displays in response to the operator's input as "command responses" or "command outputs." The Cisco CLI further provides a selection of modes that permit an operator to access greater or fewer command expressions based on operator status. For example, an operator who has entered "Privilege EXEC" mode will have access to different commands than a user who is in "User EXEC" mode. Different modes are indicated by different textual titles and different textual prompts that appear on the screen (e.g., "(config-if)#" or "(config)#"). These prompts are used to indicate to the operator which mode he or she is in, and thus which commands the operator has access to. Additionally, the Cisco CLI allows the operator to ask for help in using the multiword command expressions by typing a command followed by "?". The screen will then display text that describes the command or any other information to assist the operator in managing or configuring the network device in relation to the inquired command.

Cisco also asserted claims of copyright infringement of its user manuals and patent infringement but those claims are not relevant to the parties' instant motions.

### B.  Procedural History

Cisco filed its original complaint on December 5, 2014. ECF 1. Toward the end of a hard-fought litigation, the parties sought summary judgment on various issues, such as copyrightability, copyright infringement, the affirmative defense of fair use, and patent infringement of U.S. Patent No. 7,047,526. On August 23, 2016, for reasons stated in the Court's order, the summary judgment motions were denied in their entirety and those issues as well as others proceeded to trial. ECF 482.

Around the same time, the Court also requested the parties to submit several rounds of briefing on "analytic dissection," to assist the Court in performing a part of the extrinsic test pursuant to the Ninth Circuit's two-part test for determining copyright infringement. ECF 740. Analytic dissection aims to separate unprotectable ideas from potentially protectable expressions prior to determining the scope of copyright protection and comparing the works for similarity. *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442-43 (9th Cir. 1994). After reviewing the parties' briefing on analytic dissection and holding a hearing, the Court found several aspects of the asserted elements to be unprotectable, including "individual words," "individual multiword

3

command line expressions," "individual help description phrases," "specific modes and specific prompts," and others. *See* AD Order. However, the Court found each of the following protectable as a compilation: (1) multiword command expressions; (2) modes and prompts; (3) command responses; and (4) help descriptions. The Court also found that each of Cisco's user interfaces as a whole is subject to protection as a compilation of those four elements. *Id.*

From November 18 to December 14, 2016, the Court held a jury trial on Cisco's copyright infringement claims, infringement claims of one of its patents, and Arista's defenses. At trial, the jury was instructed that Cisco's copyrighted works are "Cisco's four user interfaces for IOS, IOS XR, IOS XE, and NX-OS." Tr. 2668:19-22 (Instr. No. 25). They were also instructed that to prove infringement, Cisco was required to show that it "is the owner of a valid copyright," that "Arista copied original, protected elements from Cisco's copyrighted works," and that Arista's "copying was greater than *de minimis*, that is, more than a trivial amount of Cisco's works as a whole." Tr. 2669:12-16 (Instr. No. 29), 2671:23-24 (Instr. No. 36), 2675:6-7 (Instr. No. 41). Cisco could establish copying in either of two ways: (1) "direct evidence," such as Arista's admissions of copying; or (2) "indirect evidence," namely proof that (a) Arista had access to Cisco's works, and (b) "there is virtual identity between Arista's works and the original, protected elements of Cisco's works." Tr. 2672:1-11 (Instr. No. 36). With respect to "indirect evidence," the Court also instructed the jury on protectable elements and unprotectable elements, based on the Court's analytic dissection ruling. Specifically, the Court listed the "following elements of Cisco's works protected as a compilation if you [the jury] find that they are original":

1. The selection and arrangement of Cisco's multiword command-line expressions;
2. The selection and arrangement of Cisco's modes and prompts;
3. The collection of Cisco's screen responses and outputs;
4. The collection of Cisco's help descriptions;
5. Cisco's user interfaces as a whole as compilations of elements 1 through 4;
6. Each of Cisco's technical manuals.

Tr. 2673:4:16. (Instr. No. 39). The Court further instructed the jury not to consider elements the

Court has deemed unprotectable pursuant to analytic dissection, such as individual words or individual command line expressions. Tr. 2673:17-2674:14. (Instr. No. 39).

Also relevant to Cisco's JMOL motion is the instruction on the affirmative defense of scènes à faire, which the Court instructed the jury as follows:

> Scenes a faire is an affirmative defense to copyright infringement.
> To show that portions of Cisco's user interfaces are scenes a faire material, Arista must show that, at the time Cisco created the user interfaces—not at the time of any copying—external factors other than Cisco's creativity dictated that Cisco select, arrange, organize and design its original features in the manner it did. The scenes a faire doctrine depends on the circumstances presented to the creator at the time of creation, not the circumstances presented to the copier at the time it copied.
> Arista has the burden of proving this defense by a preponderance of the evidence.

Tr. 2680:12-25 (Instr. No. 61).

After deliberation, the jury returned a verdict on December 14, 2016, finding that Cisco has proven copyright infringement of at least one of its user interfaces and that Arista has proven the scènes à faire defense. Tr. 2827:1-8; Verdict, ECF 750-1. The Court entered judgment on December 19, 2016, in favor of Arista. ECF 669.

The parties filed their respective post-trial motions on January 17, 2017. ECF 760, 761. The Court then held a hearing on these motions on April 27, 2017. ECF 783.

## II.     CISCO'S MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.     Legal Standard

Federal Rule of Civil Procedure 50(b) allows a party to renew no later than 28 days after the entry of judgment, a motion of for judgment as a matter law made under Rule 50(a) that was not granted by the Court. Fed. R. Civ. P. 50(b). Under Ninth Circuit law, a renewed motion for judgment as a matter of law should be granted "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002); *see also Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1314 (Fed. Cir. 2006) ("A motion for JMOL is properly granted only if no reasonable juror could find in the non-movant's favor.") (citing *Sanghvi v. City of Claremont*, 328 F.3d 532, 536 (9th Cir. 2003)). "Conversely, '[i]f

reasonable minds could differ as to the import of the evidence, . . . a verdict should not be directed.'" *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)).

In reviewing a motion for a judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1241 (9th Cir. 2014). "'[A]lthough the court should review the record as a whole, it must disregard evidence favorable to the moving party that the jury is not required to believe,' and may not substitute its view of the evidence for that of the jury." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "[T]he court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion." *Harper v. City of Los Angeles*, 533 F3d 1010, 1021 (9th Cir. 2008).

### B. Substantial Evidence In Support of the Scènes à Faire Defense to Copyright Infringement Liability

Cisco argues that the record provides no substantial evidence to support the jury's verdict on the defense of scènes à faire because evidence on external constraints was not directed to the protectable compilations but was directed to individual words, terms, or acronyms of the multiword command-line expressions. Mot. 13. Cisco also contends that the evidence fails to show that the external considerations dictated the selection, arrangement, organization and design of the protectable compilations at the time of creation. *Id.* at 13-14.

In opposition, Arista responds that the jury instruction – as proposed by Cisco – correctly sets forth the law on scènes à faire. Opp'n 4-5, ECF 763. Arista also argues that the scenes à faire inquiry is flexible and can include "considerations of efficiency" and "compatibility with equipment." *Id.* at 5-6 (citing *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1370 (Fed. Cir. 2014); *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1375 (10th Cir. 1997)). Arista also claims it needed only to put forward evidence allowing a rational jury to find that scènes à faire applied to the same portion of Cisco's compilation that it found infringed and not to all compilations. Opp'n 7. Arista also points to various evidence in the record as relevant and substantial in support of the

jury's verdict, such as the nature of the command-line interface, pre-existing conventions, and customer requirements. *Id.* at 8, 10-15.

As a preliminary matter, it is undisputed by the parties for the purpose of Cisco's motion that the jury was properly instructed on the defense of scènes à faire, stating that "Arista must show that, at the time Cisco created the user interfaces—not at the time of any copying—external factors other than Cisco's creativity dictated that Cisco select, arrange, organize and design its original features in the manner it did." Tr. 2680:12-25 (Instr. No. 61); Mot. 4; Opp'n 4-5. Cisco, however, charges Arista with "water[ing] down the governing legal standards" based on Arista's arguments relating to "efficiency" or "consistency." Reply 1-2; *e.g.*, Opp'n 3-4. Regardless, the parties do not dispute the jury was properly instructed so the instruction given to the jury controls here. *See Lange v. Penn Mut. Life Ins. Co.*, 843 F.2d 1175, 1184 (9th Cir. 1988) ("absent a contrary finding, it must be assumed the court's instructions were followed").

The Federal Circuit has set forth an overview of the scènes à faire doctrine as follows:

> The scènes à faire doctrine . . . provides that "expressive elements of a work of authorship are not entitled to protection against infringement if they are standard, stock, or common to a topic, or if they necessarily follow from a common theme or setting." [*Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1374 (10th Cir. 1997)]. Under this doctrine, "when certain commonplace expressions are indispensable and naturally associated with the treatment of a given idea, those expressions are treated like ideas and therefore are not protected by copyright." *Swirsky v. Carey,* 376 F.3d 841, 850 (9th Cir. 2004). In the computer context, "the scènes à faire doctrine denies protection to program elements that are dictated by external factors such as 'the mechanical specifications of the computer on which a particular program is intended to run' or 'widely accepted programming practices within the computer industry.'" [*Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 963 (2d Cir. 1997)] (citation omitted).

*Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1363 (Fed. Cir. 2014) (applying Ninth Circuit law). The "dictated" element requires that a chosen expression be "'as a practical matter indispensable, or at least standard.'" *Apple Computer*, 35 F.3d at 1444 (quoting *Frybarger v. Int'l Bus. Machs. Corp.*, 812 F.2d 525, 530 (9th Cir. 1987)).

Considering this legal standard and viewing the record in light most favorable to the verdict, the record provides substantial evidence in support of a scènes à faire defense.

Additionally, the Court finds that substantial evidence in support of a scènes à faire defense in this case need not comprehensively cover the entirety of Cisco's works but only that portion the jury found to be infringed. First, a reasonable jury could very well have found only one protectable element of Cisco's works to be original. Instr. No. 39. Second, the jury, in following the instructions as we presume it did, must have found that there was copying of that original, protectable element and that the copying was "more than a trivial amount of Cisco's works as a whole." Instr. No. 41. However, the verdict form did not require the jury to identify the specific protectable elements it found to be original. Nor did it require the jury to elaborate on the quantity or the qualitative significance of the copied portion in support of its finding that the copying was more than "de minimis." Thus, the copied and protected portion found by the jury could be just one of the following: (1) the selection and arrangement of Cisco's multiword command-line expressions; (2) the selection and arrangement of Cisco's modes and prompts; (3) the collection of Cisco's screen responses and outputs; (4) the collection of Cisco's help descriptions; (5) Cisco's user interfaces as a whole as compilations of elements 1 through 4.

Assuming that "selection and arrangement of Cisco's multiword command-line expressions" was the element that the jury found protected and copied, the jury's verdict is supported by substantial evidence. First, there is evidence that at least certain selection and arrangement of multiword command-line expressions were constrained by functionality, and preexisting network industry protocols. For example, Arista's expert, Dr. Black, testified that as a technical matter, the functional choice of features to be implemented in a system dictates the contents of the compilation of CLI commands. Tr. (Black) 2126:2-14 (compilation of commands driven by features). Dr. Black explained that commands are linked to and driven by device features, both at the level of individual commands or sub-groups of commands and as to the overall compilation of commands within the CLI. *See, e.g.*, *id.*; *id.* at 2256:9-2258:10 (testifying that "it [would not] make sense" to have a command for Virtual Router Redundancy Protocol (VRRP) if the networking vendor does not implement the VRRP protocol; stating the same with respect to PTP commands). Based on this testimony, a reasonable jury could conclude the selection of commands to create the compilation, such as the selection and arrangement of VRRP

1    and PTP commands, for example, was constrained by functionality.

2          This conclusion is further bolstered by other testimony relating to preexisting standard
3    network industry protocol. Cisco's expert, Dr. Almeroth, testified at trial that IP protocol version
4    6 ("ipv6") was one of the internet protocols standardized by the Internet Engineering Task Force
5    ("IETF"). Tr. 1293:5-25; Tr. Ex. 5040. He also stated that "[a] number of commands at issue in
6    this case [] use ipv6." Dr. Almeroth further admitted "some RFC's [Request for Comments
7    publications from the IETF] like this [ipv6 document] have terminology and glossary sections."
8    Tr. Ex. 6944 (RFC 791, dated 1981). Many command line expressions of the ipv6 group employ
9    terms defined in the terminology section in the ipv6 document. Tr. 1295:13-1298:15; s*ee also* Tr.
10   1347:17-19 (45 asserted commands used the industry standard "IPv6" term). As such, based on
11   this testimony, a reasonable jury could find that the selection and arrangement of certain ipv6
12   commands are dictated by the references to features and functionalities of the ipv6 standard
13   protocol as defined by the IETF.

14         Another example is the "ip gimp" commands, in which five commands, including "ip gimp
15   query-internal," "ip gimp startup-query-interval," and "ip gimp startup-query-count" were selected
16   and arranged based on the Internet Group Management Protocol (IGMP) industry standard. Tr.
17   Ex. 6877 at 18-19 (RFC 2236, dated Nov. 1997). The trial exhibit shows that, for example,
18   "query-internal," "startup-query-interval," and "startup-query-count" are terms defined in the
19   IGMP standard protocol. Similarly, various "Open Shortest Path First (OSPF)" commands are
20   selected and grouped together as the terms in different OSPF command line expressions are
21   defined in the OSPF industry standard. Tr. Ex. 65038 (RFC 1131, dated 1989). In fact, "Cisco
22   engineers [were] free to use industry standard publications when they come up with commands"
23   according to a Cisco engineer, Mr. Phillip Remaker. Tr. 689:10-18. And "[m]any of the terms in
24   Cisco's CLI commands were taken directly from various networking industry protocols." Tr.
25   (Almeroth) 1291:250-1292:4. *See also* Tr. (Almeroth) 1365:13-23; TX 6870 (PIM protocol
26   specification) ("There were many [] protocols that are relevant to the commands at issue in this
27   case," including the PIM (protocol independent multitask) protocol, which appears in roughly 20
28   of the commands); Tr. (Juniper witness Shafer) at 2069:6-2072:8 (many CLI commands and

features are identical between Juniper JUNOS and Cisco IOS because "the design constraints in creating a CLI" made the overlapping features "the obvious choice").

Testimony by Cisco's engineers provides additional evidence that the selection and arrangement of the multiword command lines were constrained by functions and networking standards. At trial, Mr. Kirk Lougheed, one of the Cisco engineers involved in the development of Cisco's CLIs, testified that "command name" is "the beginning set of words, words that use the command, that basically define the command," Tr. 624:9-14, and that the commands were selected based on a few initial key words for "functionality" and subsequent commands depend on what was already selected "to fit in with that," and other considerations on selecting the commands include the need to be "reasonable and logical," and "something that would make sense to [network managers and support people]." Tr. 572:16-573:13. Dr. Black, Arista's expert, also testified that Tong Liu, a Cisco employee "brought [PTP] commands into the Cisco CLI" based her knowledge of pre-existing system named TOPS20 and the need to implement the precision time protocol. Tr. 2094:14-2095:5. Thus, there was substantial evidence that the selection and arrangement of commands were dictated by the need for certain functionality and to "fit in with" that functionality.

Based on the exemplary evidence discussed above, a reasonable jury could conclude that Cisco selected and arranged the multiword command expressions based on functionalities defined by the industry networking protocols, such that, for example, expressions referencing all the features and functions defined in the IGMP, OSPF, and ipv6 standards are selected and arranged accordingly. While this evidence relates to certain groups of commands, it also implicates selection and arrangement of other commands, as a rational jury was entitled to make inferences to that effect. The jury could reasonably infer that constraints flowing from the overall industry context and the basic functional nature of the CLI dictated the overall structure and arrangement of Cisco's asserted compilation of commands that the jury found was original and infringed.

Second, there is also substantial evidence that selection and arrangement of the multiword command lines were constrained by customer demands. For example, Mr. Remaker testified about Cisco's "Parser Police" manifesto, which provided guidelines to Cisco engineers in creating

10

the multiword command expressions. Tr. 694:24-695:4. Mr. Remaker admitted that the purpose this document is "to ensure consistency, usability and friendliness of the configuration interface" and he further stated that "Cisco's customers expect [consistency]." Tr. 694:1-23; Tr. Ex. 851 (Ex. B to Opp'n), ECF 763-1. A reasonable jury could view these rules as a summary of external constraints on the creation of the collection of multiword command expressions to satisfy customer needs and technical requirements.

Testimony from other witnesses also supports this conclusion. Mr. Lougheed testified that "when we went into the market place, [we discovered that people] wanted to run traffic from the networks of [other preexisting vendors] . . . so we started adding these other network protocols . . . in addition to the internet protocol into our system." Tr. 513:23-514:5. Mr. Lougheed further stated that "[t]he constraint is because we have to be consistent with stuff we've done before." Tr. 714:18-19. According to Lougheed, "[e]lements of command development that are important [include] backwards compatibility with what exists, thinking about future extensibility, considering the engineer's own preferences and thinking about what the customers might have." Tr. 653:10-17. Dr. Black, Arista's expert, also testified that CLI was created with a "consistency with all the preceding CLI's that did the same thing, and that's what engineers would expect." Tr. 2214:1-2. Based on the testimony and the evidence, a reasonable jury could conclude that Cisco's selection and arrangement of elements in the compilation of multiword command lines was dictated by the need to satisfy customers who wanted consistency, as well as functions from pre-existing systems.

Cisco argues that that the scènes à faire evidence in the record was directed to isolated words, terms, or acronyms within the expressions. Reply 6. Cisco contends, for example, that the evidence relating to standard industry networking protocols is directed to individual terms and thus insufficient. *Id.* at 8. While there was evidence directed to isolated words, terms, acronyms, syntax or other unprotectable elements, there was also evidence relevant to the selection and arrangement of the compilation of command line expressions. Specifically, with regard to evidence relating to standard industry networking protocols, it is reasonable for a jury to conclude that different command line expressions should be arranged and selected together if different

11

terms in those command line expressions are defined and governed by the same industry standard protocol. Thus, in accordance with the exhibits and testimony discussed above, a reasonable jury could draw conclusions and reasonable inferences that several factors constrained the selection and arrangement of the command line expressions. Factors may include customer demand, industry standards of networking protocols, and other rules set forth in the Parser Police manifesto, to name a few.

Even though Cisco insists that the evidence in the record was directed to only individual terms and did not rebut Cisco's "undisputed" evidence, such as Dr. Almeroth's testimony on Cisco engineers' "creative choice," this contention fails to account for the evidence discussed above that is relevant to the selection and arrangement of the individual command expressions to create the compilation. Mot. 5-7. The Court recognizes that certain testimony, such as that of Mr. Phillip Shafer from Juniper Networks, or Mr. Balaji Venkatraman from HP, could support Cisco's argument that there were no "constraints" in the creation of the compilation of multiword command expressions. *Id.* at 8-9. However, the jury was not required to believe such testimony and such testimony in Cisco's favor was not "uncontradicted." *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000) (noting that on JMOL, a court "must disregard all evidence favorable to the moving party that the jury is not required to believe"). In reviewing the record on a motion to amend judgment, the Court must "review the record as a whole," and "must draw all reasonable references in favor of the nonmoving party." *Johnson*, 251 F.3d at 1227 (internal quotations omitted). Given that the identified testimony of Mr. Shafer, Mr. Venkatraman, or Dr. Almeroth is disputed, a jury is not required to believe that particular opinion testimony. As such, evidence from the record proffered by Cisco that is in its favor is insufficient to overturn the jury verdict.

Cisco further argued at the hearing that the evidence in the record is not relevant to the selection and arrangement of the entirety of the compilation. Specifically, Cisco contended that the "piecemeal" evidence proffered in Arista's opposition is not sufficient to show scènes à faire for the totality of the compilation. Apr. 27, 2017 Hr'g Tr. 57:16-18; 58:10-20, ECF 786. This argument, however, points more towards a different jury instruction which is not before the Court.

Moreover, a reasonable jury could infer from the evidence regarding portions of the compilation that the entire compilation was dictated by external factors.

Cisco's reliance on *Merch. Transaction Sys., Inc. v. Nelcela, Inc.* is also unavailing. Reply 3-4; No. 02-1954, 2009 WL 723001, at *13 (D. Ariz. Mar. 18, 2009). The plaintiffs in *Merch. Transaction* sought protection for the organizational structure of a software database, such as "the design and layout of the database, the accompanying database structures and definitions (table and column names and data types), file names and structures" and others. *Id.* at *12. Addressing the defendant's argument that the "field names" are unprotectable, the court agreed that the "individual field names are unprotected under the scènes à faire doctrine as they are generally a result of customary programming practices." *Id.* However, given that the plaintiffs sought protection of the compilation of those elements, and not the elements individually, the court found the compilation protectable, stating that it "cannot conclude that no reasonable juror could not find creativity in the selection and arrangement" of those elements. *Id.* at *13. In reaching that conclusion, the court reasoned that the individual field names "may become numerous enough and their selection and arrangement original enough that their combination constitutes an original work." *Id.*

Given that *Merch. Transaction* concerned analytic dissection and invoked a standard akin to summary judgment, it has limited application on a motion to amend judgment. The ruling reached in *Merch. Transaction* with respect to field names is similar to the analytic dissection ruling in this case, where the Court found that the individual terms and individual multiword command expressions are not protectable, but that their selection and arrangement into a compilation could be. However, the court in *Merch. Transaction* was not reviewing the record for substantial evidence and was not confronted with evidence showing factors constraining the selection and arrangement of command line expressions, as those discussed above.

Cisco also argues that substantial evidence must show that a plaintiff's "use of the exact arrangement" of the relevant elements in their "exact order" was "dictated" by external factors. Reply 3 (citing *Merch. Transaction*, 2009 WL 723001, at *12-13). However, in selectively quoting *Merch. Transaction*, Cisco ignores what the court stated immediately following those

13

selective quotes: "nor is there anything to suggest that common sense or efficiency considerations dictated [defendant's] use of the same abbreviations in the exact order as [plaintiffs']." *Id.* at *13. The Court finds that Cisco overstates *Merch. Transaction*'s dicta on the "exactness" of the arrangement, and fails to account for the different standard under which *Merch. Transaction* was decided.

Other cases that Cisco cites in support of its motion pertain to cases on summary judgments and fail to negate the substantial evidence in this case supporting the jury's verdict. *See, e.g.*, *B2B CFO Partners, LLC v. Kaufman*, 787 F. Supp. 2d 1002, 1005, 1007-08 (D. Ariz. 2011) (on a motion for partial summary judgment, rejecting the scènes à faire defense and finding that the plaintiff's training manual "may contain some common business practices or ideas" but that the expression did "not naturally flow from the business concepts contained therein"); *Metcalf v. Bochco*, 294 F.3d 1069, 1072, 1074 (9th Cir. 2002) (reversing summary judgment, noting that scènes à faire prohibits protection of the "idea of an idealistic young professional choosing between financial and emotional reward, or of love triangles . . . , or of political forces interfering with private action, but that the combination could satisfy the extrinsic test"); *Curcio Webb LLC v. Nat'l Ben. Programs Agency, Inc.*, No. C2-03-559, 2006 WL 47506, at *6 (S.D. Ohio Jan. 9, 2006) (refusing to grant summary judgment based on the scènes à faire defense because the defendant did not establish that there was "a custom within the industry or that such organization and language is advisable" in a form used by the plaintiff to procure bids on behalf of its clients); *Harner v. Wong Corp.*, No. 12-00820, 2013 WL 11549284, at *1, 9 (D.N.M. Oct. 31, 2013) (concluding on summary judgment that the scènes à faire doctrine was not applicable because the combination of the photos, while individually unprotectable, rendered the advertisement unique).

Instead, the Court finds *Mitel, Inc. v. Iqtel, Inc.* more instructive than the above-cited cases. 124 F.3d 1366, 1368 (10th Cir. 1997). The court in *Mitel* affirmed the lower court's denial of a preliminary injunction motion because the scènes à faire doctrine barred plaintiff Mitel's command codes from copyright protection. *Id.* at 1375. The *Mitel* court evaluated whether the lower court property found that "a set of four-digit numeric instructions known as "command codes'" was not protectable. *Id.* Mitel created these command codes to access the features of

14

telecommunications hardware known as a call controller. *Id.* at 1367-68. Because Mitel controlled a large share of the call controller market, the defendant argued that it could compete with Mitel only if its controller were compatible with Mitel's controller. *Id.* at 1369. The court noted that for computer-related applications, external factors in support of the scènes à faire defense can include "software standards and compatibility requirements, computer manufacturer design standards, industry programming practices, and practices and demands of the industry being serviced." *Id.* at 1375. The court further explained that "[b]ecause these factors concern functional aspects of a work, the scènes à faire doctrine plays a particularly important role in ensuring that copyright rewards and stimulates artistic creativity in a utilitarian work "in a manner that permits the free use and development of non-protectable ideas and processes" that make the work useful. *Id.* (citing *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 711 (2d Cir. 1992). Affirming the lower court's ruling, the *Mitel* court first found that the values of the command codes "were selected by Mitel's product management department in response to customer demand or to ensure compatibility with equipment." *Mitel*, 124 F.3d at 1375. The court also found that "[s]tandard programming conventions such as '1' for 'on' and '0' for 'off' determined some of the descriptions and values." *Id.* The court then concluded that Mitel's command codes "were dictated by external functionality" and were not protectable. *Id.* at 1376.

Although Mitel concerned a preliminary injunction, its reasoning on computer-related applications is relevant to this case. Here, the witness testimony and other evidence, discussed above regarding networking industry protocols and pre-existing networking systems, fall squarely in *Mitel*'s list of factors that could support a scènes à faire defense, such as "software standards and compatibility requirements, computer manufacturer design standards." *Mitel*, 124 F.3d at 1375. Like the standard programming conventions that dictated Mitel's command codes, evidence regarding customers' demands and the rules set forth in Cisco's Parser Police manifesto similarly support the jury's verdict that the compilation of multiword command expressions was "dictated by considerations of efficiency," and "industry programming practices, and practices and demands of the industry being serviced," factors recognized by the courts that can support a scènes à faire defense. *See Oracle*, 750 F.3d at 1370; *Mitel*, 124 F.3d at 1375. Accordingly, the jury's scènes à

faire verdict is supported by the substantial evidence identified in the record and consistent with case law.

The parties also dispute whether there is substantial evidence of scènes à faire directed to other elements of Cisco's works: the selection and arrangement of Cisco's modes and prompts; the collection of Cisco's screen responses and outputs; the collection of Cisco's help descriptions; Cisco's user interfaces as a whole as compilations of the preceding elements. However, given that the Court has already determined that there is substantial evidence on the selection and arrangement of Cisco's command line expressions that a rational jury could rely on to support this verdict, it is "simply not relevant" that some other evidence regarding other protectable elements might potentially have supported a different verdict. *See Johnson*, 251 F.3d at 1227. As noted above, the copyright infringement verdict only required a rational jury to find one of the listed protectable elements to be original and infringed as long as the infringed portion is more than "de minimis." Even if there were no substantial scènes à faire evidence with respect to the remaining protectable elements, the substantial scènes à faire evidence with respect to the selection and arrangement of the command line expressions could still support the verdict. Thus, the Court need not determine whether there is substantial scènes à faire evidence on the remaining protectable elements of Cisco's works.

### C. The Scènes à Faire Defense to Virtually Identical Copying

As a separate ground for its motion, Cisco also argues that scènes à faire does not excuse virtually identical copying. Mot. 22 (citing *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1994)). According to Cisco, the record and evidence show that the jury necessarily found "virtually identical" copying. *Id.* at 23. Cisco then concludes that the scènes à faire defense is foreclosed as a matter of law. *Id.* at 24.

Arista counters that Cisco forfeited this argument by failing to raise it under Rule 50(a). Opp'n 21. Arista further argues that there is no support for the conclusion that the infringement was necessarily based on "virtually identical" copying. *Id.* at 23-24. According to Arista, the jury instruction on direct evidence of copying does not require a finding of "virtually identical" copying and Cisco was actually opposed to incorporating the phrase, "virtual identity," into the

jury instruction on "direct evidence" of copying. *Id.* at 22. Arista also avers that the case law cited by Cisco does not support the conclusion that "direct evidence" of copying is equivalent to "virtually identical" copying or that the scènes à faire defense is inapplicable here. *Id.* at 23.

Because a post-verdict Rule 50(b) challenge is a renewed motion, it "is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). "Thus, a party cannot properly 'raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion.'" *Id.* (citation omitted).

The Court finds that Cisco forfeited this argument by not raising it under Rule 50(a). In its 50(a) motion, Cisco's entire scènes à faire portion reads as follows:

> For similar reasons, and based on similar evidence, no reasonable jury could find that, at the time Cisco created its works, external factors other than Cisco's creativity "dictated" that Cisco select, arrange, organize and design its original features in the manner it did, and thus Cisco is entitled to judgment as a matter of law on Arista's scènes à faire affirmative defense. Jury Inst. 61. For example, Arista does not dispute that no standard-setting organizations or customer preconceptions required Cisco to design the expressions in its user interface as it did (e.g., Tr. 1963:5-8 (Ullal)); to the contrary, as Mr. Shafer of Juniper testified, the creative process within Cisco was a "greenfield" or "open pasture," without constraints, at the time the user interfaces were created. Tr. 2060:17-2061:3 (Shafer).

ECF 732 at 14:7-15. Nowhere in Cisco's Rule 50(a) motion is there an argument that scènes à faire is not a defense to "virtually identical" copying. Relying on *Antonick v. Elec. Arts, Inc.*, Cisco argues that it was not obligated to "set forth every possible legal argument" in its Rule 50(a) motion. Reply 14 (citing 841 F.3d 1062, 1068 (9th Cir. 2016)). However, this misstates the law. While "Rule 50(b) 'may be satisfied by an ambiguous or inartfully made motion,'" the argument in some form still needs to be made. *See id.* (citing *Reeves v. Teuscher*, 881 F.2d 1495, 1498 (9th Cir. 1989)). The plaintiff in *Antonick* argued that the 50(b) motion on whether there was substantial evidence on similarity of the works as a whole should not have been considered because the 50(a) motion only argued that the evidence was insufficient to show substantial similarity between the two protectable elements of the code. 841 F.3d at 1067. The Ninth Circuit

17

rejected that argument because both motions argued that the failure to place source code in evidence was fatal to the claim of copying. *Id.* at 1068.

In contrast to *Antonick*, the portion of Cisco's Rule 50(a) motion pertaining to scènes à faire made no mention of "virtually identical" copying, let alone whether scènes à faire can be a defense to "virtually identical" copying. The Rule 50(a) motion only argued that there were no external factors that "required Cisco to design the expressions in its user interface as it did." As such, the issue is not that the argument was inartfully or ambiguously made but that it was not made at all.[1] The Court thus finds this argument waived and will not consider it as a ground in support of Cisco's motion to amend the judgment.[2]

### III. ARISTA'S MOTION FOR JUDGMENT AS A MATTER OF LAW

Although it prevailed at trial, Arista also filed a Rule 50(b) motion requesting judgment as a matter of law that: (1) Cisco does not own any protectable original expression in the asserted CLIs; and (2) Cisco has not proven any protectable compilation of CLI elements; (3) there is no copyright infringement given the "thin" protection that applies to Cisco's works; (4) jury lacked sufficient evidence to consider and compare the disputed works as a whole; (5) the user interfaces are not copyrighted works separate from Cisco's complete registered operation systems; (6) Arista's conduct is fair use; (7) Cisco abandoned its copyrights; (8) Cisco has misused its copyrights; and (8) Arista is entitled to merger as a defense. Arista also moves for a new trial for the same reasons under Rule 59. At the April 27, 2017 hearing, Arista agreed that, if the Court denied Cisco's motion, Arista motion is moot. Accordingly, because the Court denies Cisco's

---

[1] Had Cisco timely raised this issue at the jury instruction conference or at the 50(a) motion, the Court could have considered providing a jury instruction on the matter.

[2] The verdict form did not require the jury to identify whether they applied a "virtual identity" standard to arrive at the copyright infringement verdict. Nor did it require them to specify whether they relied on "direct" or "indirect" evidence in support of the verdict. While the instruction on "indirect evidence" required the jury to find liability on a "virtual identity" standard, the instructions on "direct evidence" of copying did not. Instr. Nos. 36, 38, 39. In order to render its argument relevant, Cisco nonetheless assumes that the jury must have found "virtually identical" copying even if they were to rely on "direct evidence." This assumption does not necessarily hold true as the jury instruction on "direct evidence" of copying did not require application of such a standard. As such, a reasonable jury could still find copyright infringement based on direct evidence without applying the "virtual identity" standard. Accordingly, a scènes à faire defense verdict would not be incorrect as a matter of law even if Cisco's argument that scènes à faire is not a defense to "virtually identical" copying were to be legally correct.

motion, as set forth above in Section II, Arista's motions are moot.

## IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Cisco's motion for judgment as a matter of law is DENIED.
2. Arista's motion for judgment as a matter of law and conditional motion for new trial are MOOT.

**IT IS SO ORDERED.**

Dated: May 10, 2017

_____
BETH LABSON FREEMAN
United States District Judge