MATTHEW D. POWERS (Bar No. 104795)
matthew.powers@tensegritylawgroup.com
WILLIAM NELSON (Bar No. 196091)
william.nelson@tensegritylawgroup.com
ROBERT GERRITY (Bar No. 268084)
robert.gerrity@tensegritylawgroup.com
NATASHA SAPUTO (Bar No. 291151)
natasha.saputo@tensegritylawgroup.com
SAMANTHA JAMESON (Bar No. 296411)
samantha.jameson@tensegritylawgroup.com
JENNIFER ROBINSON (Bar No. 270954)
jen.robinson@tensegritylawgroup.com
WANLI CHEN (Bar No. 300254)
wanli.chen@tensegritylawgroup.com
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone:  (650) 802-6000
Fax:  (650) 802-6001

Attorneys for Plaintiff
ARISTA NETWORKS, INC.

[*Additional Counsel Listed in Signature Block*]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| ARISTA NETWORKS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CISCO SYSTEMS, INC.,<br><br>Defendant. | Case No. 5:16-CV-00923-BLF<br><br>**ARISTA NETWORKS, INC.'S OPPOSITION TO CISCO SYSTEMS, INC'S MOTION FOR SUMMARY JUDGEMENT**<br><br>Date:   April 19, 2018<br>Time   9:00 A.M.<br>Judge:  Hon. Beth Labson Freeman<br>Dept:   Courtroom 3<br><br>**DEMAND FOR JURY TRIAL** |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND AND RESPONSIVE MATERIAL FACTS ................................1

      A.      Cisco's "Open Early" Promotion of Widespread Adoption of Cisco-like
            CLIs.........................................................................................................1

      B.      Arista's Increasing Threat to Cisco's Market Dominance ...................................3

      C.      Cisco's "Closed Late" Policy Change Regarding the CLI and its "Fear,
            Uncertainty, and Doubt" Campaign.......................................................................3

III.    LEGAL STANDARDS ..........................................................................................6

IV.     ARGUMENT ........................................................................................................6

      A.      Cisco's "Open Early, Closed Late" CLI Conduct Constitutes an Antitrust
            Violation That Has No Protection Under *Noerr-Pennington*................................6

            1.      The Supreme Court, Ninth Circuit, DOJ, and FTC Recognize
                  "Open Early, Closed Late" Conduct like Cisco's as an Antitrust
                  Violation ......................................................................................7

            2.      *Noerr-Pennington* Does Not Protect Cisco From Liability for Its
                  CLI Litigation and Related Conduct as Part of the Overall
                  Anticompetitive Pattern of "Open Early, Closed Late" .........................10

                  a.      Cisco's Filing of the CLI Lawsuit Does Not Immunize
                        Cisco From Liability for its *Kodak*-Style Open Early,
                        Closed Late Conduct.............................................................11

            3.      Cisco's CLI Litigation and Related Conduct are Not Protected
                    Under *Noerr* Because They are Part of Cisco's Larger
                    Anticompetitive Course of Conduct......................................................12

      B.      Arista Has Proven That Cisco Has Monopoly Power.........................................14

      C.      There is Substantial Evidence From Which the Jury Could Conclude That
            Cisco's CLI Conduct Caused Injury-In-Fact and Reasonably Infer
            Damages ...............................................................................................16

      D.      There is Substantial Evidence From Which the Jury Could Conclude
            Cisco's CLI Conduct Caused Harm to Competition .........................................20

      E.      Cisco's Motion Regarding California's UCL Should Be Denied .......................25

V.      CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Allflex USA, Inc. v. Avid Identification Sys.*,
    No. 5:06-cv-01109, 2010 U.S. Dist. LEXIS 148094 (C.D. Cal. Feb. 16, 2010)......................13

*Apple Inc. v. Samsung Elecs. Co.*,
    Case No. 11-CV-01846-LHK, 2011 U.S. Dist. LEXIS 120416  (N.D. Cal. Oct. 18, 2011).....24

*Apple, Inc. v. Samsung Elecs. Co.*,
    No. 11-cv-01846-LHK, 2012 U.S. Dist. LEXIS 90889 (N.D. Cal. June 29, 2012) ................13

*AT&T Mobility LLC v. AU Optronics Corp.*,
    707 F.3d 1106 (9th Cir. 2013) ................................................................................................25

*Avery Dennison Corp. v. Acco Brands, Inc.*,
    CASE NO. CV 99-1877 DT (Mcx), 2000 U.S. Dist. LEXIS 3938 (C.D. Cal. Feb. 22, 2000) 22,
    25

*Bailey v. Allgas, Inc.*,
    284 F.3d 1237 (11th Cir. 2002) ..............................................................................................14

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
    620 F.2d 1360 (9th Cir. 1980) ..................................................................................................6

*Bhan v. NME Hosp., Inc.*,
    929 F.2d 1404 (9th Cir.), *cert. denied*, 502 U.S. 994 (1991) ................................................21

*Bigelow v. RKO Radio Pictures, Inc.*,
    327 U.S. 251 (1946).................................................................................................................16

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982).........................................................................................................23, 24

*Brook Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993).................................................................................................................25

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977).................................................................................................................21

*Catch Curve, Inc. v. Venali, Inc.*,
    519 F. Supp. 2d 1028 (C.D. Cal. 2007)...................................................................................24

*Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*,
    611 F.3d 495 (9th Cir. 2010) ..................................................................................................11

*Coca-Cola Co. v. Omni Pac. Co.*,
    No. C 98-0784 SI, 2000 U.S. Dist. LEXIS 17089 (N.D. Cal. Sep. 25, 2000).........................21

*Colsa Corp. v. Martin Marietta Servs.*,
    133 F.3d 853 (11th Cir. 1998) ................................................................................................14

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ................................................................................................17

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962).................................................................................................................6

*Conwood Co. v. U.S. Tobacco Co.*,
   290 F.3d 768 (6th Cir. 2002) ...................................................................... 23, 25

*Eagle Harbor Holdings, Inc. v. Ford Motor Co.*,
   No. C11-5503 BHS, 2015 U.S. Dist. LEXIS 17478 (W.D. Wash. Feb. 11, 2015) ................. 11

*Eastman Kodak Co. v. Image Tech. Servs.*,
   504 U.S. 451 (1992) ................................................................................ 7, 8

*Free Freehand Corp. v. Adobe Sys.*,
   852 F. Supp. 2d 1171 (N.D. Cal. 2012) ......................................................... 21, 23

*Freeman v. Arpaio*,
   125 F.3d 732 (9th Cir. 1997) ........................................................................ 6

*Funai Elec. Co. v. LSI Corp.*,
   No. 16-cv-01210-BLF, 2017 U.S. Dist. LEXIS 44866 (N.D. Cal. Mar. 27, 2017) ................ 13

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
   352 F.3d 367 (9th Cir. 2002) ................................................................... 20, 23

*GSI Tech., Inc. v. Cypress Semiconductor Corp.*,
   No. 5:11-CV-03613-EJD, 2015 U.S. Dist. LEXIS 9378 (N.D. Cal. Jan. 27, 2015) ........... 21, 23

*Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*,
   748 F. Supp. 1399 (D. Ariz. 1990) .................................................................. 18

*Hasbrouck v. Texaco, Inc.*,
   842 F.2d 1034 (9th Cir. 1987) ...................................................................... 22

*Hynix Semiconductor, Inc. v. Rambus, Inc.*,
   527 F. Supp. 2d 1084 (N.D. Cal. Nov. 4, 2007) ................................................ 12, 13

*Image Tech. Servs. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ................................................................ 8, 10, 15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. MDL No. 1917, 2017 U.S. Dist. LEXIS 217359 (N.D. Cal. Feb. 7, 2017) .................... 20

*In re Indep. Sev. Orgs. Antitrust Litig.*,
   203 F.3d 1322 (Fed. Cir. 2000) ..................................................................... 11

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 914 (9th Cir. 2015) ......................................................................... 6

*Jensen Enters. v. AT&T*,
   No. C 06-247 SI, 2007 U.S. Dist. LEXIS 52064, at *16-18 (N.D. Cal. July 6, 2007) ....... 21, 23

*Magnetar Techs. Corp. v. Intamin, Ltd.*,
   801 F.3d 1150 (9th Cir. 2015) .................................................................. 16, 17

*Metro Indus. v. Sammi Corp.*,
   82 F.3d 839 (9th Cir. 1996) ......................................................................... 21

*Microsoft Mobile, Inc. v. InterDigital, Inc.*,
   No. 15-723-RGA, 2016 U.S. Dist. LEXIS 49498 (D. Del. Apr. 13, 2016) ....................... 13

*Moore v. Jas. H. Matthews & Co.*,
   682 F.2d 830 (9th Cir. 1982) ..................................................................................16

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
   924 F.2d 1484 (9th Cir. 1991) ................................................................................14

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
   210 F.3d 1099 (9th Cir. 2000) ................................................................................20

*Oahu Gas Serv., Inc. v. Pac. Resources, Inc.*,
   838 F.2d 360 (9th Cir. 1988) ............................................................................14, 15

*Pool Water Prods. v. Olin Corp.*,
   258 F.3d 1024 (9th Cir. 2001) ................................................................................24

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ..................................................................................15

*Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*,
   63 F. Supp. 2d 1218 (E.D. Cal. 1999) ....................................................................22

*Riverbed Tech., Inc. v. Silver Peak Sys.*,
   No. C 13-02980 JSW, 2015 U.S. Dist. LEXIS 188737 (N.D. Cal. Apr. 7, 2015)...................11

*Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc.*,
   732 F.2d 1403 (9th Cir. 1984) ................................................................................21

*Rodime PLC v. Seagate Tech., Inc.*,
   174 F.3d 1294 (Fed. Cir. 1999) ..............................................................................11

*Safeway Inc. v. Abbott Labs.*,
   761 F. Supp. 2d 874 (N.D. Cal. Jan. 14, 2011) ......................................................15

*TriQuint Semiconductor, Inc. v. Avago Techs. Ltd.*,
   No. CV-09-1531-PHX-JAT, 2012 U.S. Dist. LEXIS 58228 (D. Ariz. Apr. 25, 2012) ...... 14, 15

*United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp.*,
   No. 07-CV-2172 BEN (JMA), 2010 U.S. Dist. LEXIS 78322 (S.D. Cal. Aug. 2, 2010)... 21, 24

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) .................................................11

*United States v. Syufy Enters.*,
   903 F.2d 659 (9th Cir. 1990) ..................................................................................14

*United States v. Visa U.S.A., Inc.*,
   344 F.3d 229 (2d Cir. 2003 .....................................................................................24

*Univac Dental Co. v. Dentsply Int'l, Inc.*,
   No. 1:07-CV-493, 2010 U.S. Dist. LEXIS 26852 (M.D. Pa. Jan. 20, 2010) ...........................18

*Vernon v. S. Cal. Edison Co.*,
   955 F.2d 1361 (9th Cir. 1992) ................................................................................17

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
   668 F.2d 1014 (9th Cir. 1981) ................................................................................16

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969) ................................................................................................16

**Statutes**

California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 ..................................25

**Other Authorities**

*In re Intel Corp.*,
    FTC Docket No. 9341, Complaint (Dec. 16, 2009) ...................................................9

*United States v. Borland Int'l Inc.*,
    No. C 91 3666 MHP, Competitive Impact Statement (N.D. Cal. Oct. 22, 1991) .................8, 9

**Rules**

FED. R. CIV. P. 56(a) ...............................................................................................6

I.      **INTRODUCTION**

Not one of the four grounds presented by Cisco's Motion (D.I. 218-4) presents an issue suitable for summary judgment: first, no *Noerr-Pennington* immunity applies to Cisco's "open early, closed late" pattern of conduct in connection with the CLI – conduct that the Supreme Court, the Ninth Circuit, the Department of Justice, and the Federal Trade Commission have all recognized as an antitrust violation; second, far from being unable to prove that Cisco has monopoly power in the relevant markets, Arista has provided unrebutted evidence of that monopoly power; third, there is ample evidence from which a jury could conclude that Cisco's anticompetitive conduct caused Arista antitrust injury-in-fact and then could reasonably infer damages from that injury; and finally, there is substantial evidence from which the jury could conclude that Cisco's anticompetitive conduct caused harm to competition, including reduced consumer choice, diminished innovation, and higher prices. Cisco's motion should be denied in its entirety.

II.     **BACKGROUND AND RESPONSIVE MATERIAL FACTS**

A.      **Cisco's "Open Early" Promotion of Widespread Adoption of Cisco-like CLIs**

For well over a decade, Cisco has had a dominant share of the U.S. and worldwide Ethernet switch markets. For example, Cisco's revenue share of the U.S. Ethernet switch market exceeded 70% from 2008 to 2015, and was at 64.6% in Q2 of 2017, and its share of the high speed switch market exceeded 65% from 2008 through 2013. D.I 210-21, ¶ 99. As both a consequence of, and contributor to, that dominance, use of Cisco's Command Line Interface ("CLI") as a method to configure and manage Ethernet switches spread throughout the industry. By 2004, the unrebutted evidence is that the CLI of switch vendor Force10 (later Dell) had adopted more than 550 commands that overlapped with that of the Cisco CLI; Juniper's JunosE products had adopted at least 375 commands; and Procket Networks' CLI adopted more than 240 commands that overlapped with Cisco. Ex. 1[1] (12/18/2017 Report of John Black Exhibit A, Appendix J). Industry CLI adoption continued to spread: by 2014, Brocade had adopted at least 268 of the approximately 500 CLI commands Cisco now contends are Cisco's intellectual property; Foundry adopted at least 163; D-Link had adopted at least 300; and HP,

---

[1] Exhibits cited herein are attached to the Declaration of William P. Nelson filed concurrently herewith.

1   Extreme Networks, Alcatel, Lenovo/IBM/BNT, Oracle/Sun, NETGEAR, Procket Networks, and

2   Adtran had each adopted more than 100. (*Id.* at ¶ 180, Appendix H). By that time, the total command

3   overlap between Cisco's CLI and the Dell/Force10 CLI was greater than 1,600—*three times* as many

4   CLI commands as Cisco later accused Arista of unlawfully copying. (*Id.* at ¶ 181, Appendix I).

5           Throughout this period, Cisco was well aware that use of "Cisco-like" CLI was widespread in

6   the networking industry and acknowledged internally and to the market that the CLI had become an

7   "industry standard." *See* D.I. 210-12 (CSI-CLI-01133437) (███████████████████████

8   ████████████████████████████████████████████████████████████); D.I.

9   210-15 at 21 (CSI-CLI-04978736) (███████████████████████████████████

10  ███████████████); Ex. 2 at 42 (CSI-ANI-00123088) (████████████████████

11  ████████████████████████████); D.I. 210-13 at 96 (CSI-ANI-00252097)

12  (████████████████████████████████████████████████████████); D.I.

13  210-16 at 88 (CSI-CLI- 00843944) (████████████████████████████████████

14  █████████████); D.I. 210-18 at 4 (CSI-CLI-02635203) (███████████████████

15  ████████████████████████████████████████████); D.I. 210-17 at

16  1(CSI-CLI-02906678) (███████████████████████████████████████████). Ex. 3

17  (CSI-CLI-01134110) (█████████████████████████████████████████████████

18  ██████████████████████████████████████████████████████████████).

19          In fact, as former Cisco executives have testified, not only did Cisco know that the industry

20  had adopted its CLI, Cisco promoted that fact to demonstrate to customers that Cisco's products were

21  "open" and would not "lock in" customers to Cisco switches. As former Cisco executive Charles

22  Giancarlo has testified:

23          "Customers, as you might imagine, don't like to be locked in to a specific vendor. . . . *they
            want to know that you are standard and open*. And so *by identifying our CLI commands as
24          being standard, industry standard, it indicates that we were more open and therefore
            customers would be more comfortable buying from us.*"

25  Ex. 4 (11/30/2016 Hr'g Tr., Vol. 5, at 996:12-23)[2]; *see also* D.I. 210-14 at 18 (CSI-CPT-60019662)

26  (Cisco marketing document: "Industry standard CLI: Yes, with over 70% switch market share, Cisco

27  _____

28  [2] Emphasis supplied and internal citations omitted throughout except where otherwise noted.

IOS is the most widely deployed and understood CLI in the market.").

Further demonstrating its full awareness of widespread adoption of Cisco-like CLI, Cisco sought approval in 2002 from Stanford University to ████████████████████████████████ ████████████████████████████████████████████. D.I. 210-11 (CSI-CLI-01326890). ██████████████ ████████████████████████. Ex. 4 (11/30/2016 Hr'g Tr., Vol. 5, at 991-994). Cisco never filed suit against the other vendors, but continued to promote industry adoption of the CLI.

**B.    Arista's Increasing Threat to Cisco's Market Dominance**

Arista's switch products quickly gained a foothold with customers operating high-speed data centers—computing-intensive operations involving thousands of servers and storage devices. By 2011, Cisco recognized that Arista was the first real threat to its market dominance, and Cisco's product line was far behind Arista's. *See, e.g.,* Ex. 5 (CSI-ANI-00631260-63) (████████████████████ ████████████████████████████████████████████ ██████). Arista continued to win deals in competition with Cisco and take substantial portions of its market share, growing from zero to 10.5% from 2011 to 2014. Ex. 6 (Almeroth Ex. 10, ARISTA923_10000212). Cisco's efforts in 2013 and 2014 to lower prices and introduce improved products, including its acquisition of a networking startup named Insieme to build ████████ products (Ex. 7 (ANI-ITC-944_945-3914820-22), failed to stem the tide, and Cisco's products still lagged behind Arista's in terms of performance and innovation. *See, e.g.,* Ex. 8 (CSI-CLI-03425080-87) (████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████). Ex. 9 (CSI-ANI-00090557) (██████████████████████████████████ ████████████).

**C.    Cisco's "Closed Late" Policy Change Regarding the CLI and its "Fear, Uncertainty, and Doubt" Campaign**

By the summer of 2014, Cisco's concern over the threat from Arista had reached the level of panic. All of Cisco's competitive efforts had gone, in the words of its Senior Vice President for data center sales Frank Palumbo, not ████████████ Ex. 10 (11/3/2017 Palumbo Dep. at 247:17-19). In

1  July 2014, Soni Jiandani, the Cisco executive responsible for competing with Arista, forwarded to

2  colleagues a positive analyst report on Arista, and demanded a meeting with ▓▓▓▓

3  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

6

7  ▓▓▓ Ex. 33 (CSI-CPT-60194080). Ms. Jiandani testified under oath at the copyright trial that "I

8  was not consulted, I was not asked about" the lawsuit, and "I was not in the decision-making process"

9  that led Cisco to file its copyright lawsuit against Arista in 2014, but the evidence shows those

10  statements to be false. On October 1, 2014, Ms. Jiandani and Cisco general counsel Mr. Chandler

11  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Ex. 11 (CSI-CPT-

12  60186396), Ex. 12 (CSI-CPT-60196650). ▓▓▓▓▓▓▓▓

13  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14  ▓▓▓▓▓▓, Ex. 13 (CSI-CPT50332182-83). ▓▓▓

15  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

16  ▓▓▓ Ex. 14 (CSI-CPT-60208381) (▓▓▓▓▓▓▓▓

17  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

18  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓). ▓▓▓▓▓▓▓▓

19  ▓▓▓▓▓ Cisco filed its copyright lawsuit against Arista just a few months later,

20  declaring that, despite years of promoting its adoption across the industry, Cisco now considered the

21  CLI to be its proprietary intellectual property.

22  That same day, Cisco announced to the networking industry its new, changed policy toward the

23  use of CLI with another demonstrable falsehood: a public "blog" post by Cisco's general counsel Mr.

24  Chandler, stating that Arista had committed "theft" of Cisco's IP by copying Cisco's CLI:

25  For those who might think a CLI reflects some kind of standard that simply must be used by every industry participant for products to work together, let me offer a direct point of contrast: Arista has copied more than 500 Cisco multi-word command expressions, *while networking products from HP, Brocade, Alcatel-Lucent, Juniper Networks and Extreme each have only a small fraction of overlapping CLI commands*.

28  Ex. 15 (ARISTA923_10000091). As discussed above, Cisco had long known that the ▓▓▓▓

1    ████████████████████████████████████████████ D.I. 210-12

2    (CSI-CLI-01133437), and Cisco has never disputed the findings of Arista's expert Dr. John Black that

3    other vendors had hundreds, and even thousands, of overlapping CLI commands with Cisco.

4        Cisco's CLI policy change and its communications about that change, were intended to spread

5    "fear, uncertainty and doubt" ("FUD") for every other industry player who used any Cisco CLI

6    commands as well as about Arista, specifically, by labeling it a thief of technology Cisco once

7    encouraged to be adopted. These were also the lead attacks in a concerted effort by Cisco to damage

8    Arista, its first significant rival in the switch markets, and in turn maintain its monopoly power. Cisco

9    used these tools to harm Arista with its customers and potential customers. Cisco's motion tells the

10   Court that "Cisco instructed its worldwide field organization that they should "not comment on

11   ongoing litigation, and instead direct customer inquiries to the public filing and Mr. Chandler's blog"

12   (Mot. at 5), but Mr. Chandler ████████████████████████████████

13   ███████████████████████ Ex. 16 (11/17/2017 Chandler Dep.) at 145:23-24.

14   In any event, Mr. Chandler's blog was the dissemination point for Cisco FUD about its new CLI

15   policy, for instance repeating in January 2016 the false assertion about the extent of industry use of

16   Cisco CLI commands, and accusing Arista of using "stolen technology." Ex. 17

17   (ARISTA923_10000105). Cisco's documents tell the story: a 2015 Cisco "competitive playbook" for

18   sales engagements against Arista described the following "Cisco Sales Tactics": ████████████

19   ███████████████████████████████████████████████

20   ███████████████████████████████████████████████

21   ███████████████████████████████████████████████

22   ███████████████████████████████████ Ex. 18 (CSl-CPT-00804805). There

23   is extensive evidence of Cisco's use of this ████████████ sales tactic. See, e.g., D.I. 210-21, ¶ 148

24   (Scott Morton Report) ████████████████████████████████████

25   ███████████); Ex. 19 (Chandler Ex. 186), Ex. 20 (Chandler Ex. 187), Ex. 21 (Chandler Ex. 188),

26   Ex. 22 (CSI-CPT-70033409) (██████████████████████████████████

27   █████████████████████████████████████).

28        As discussed further herein, the impact of Cisco's "open early, closed late" conduct on Arista

1    has been severe. Arista has experienced a downturn in its acquisition of new customers, lost sales with

2    customers and potential customers, and has had to delay the introduction of innovative new features

3    and products. Arista brought this antitrust suit to address Cisco's anticompetitive CLI conduct.

4    **III.    LEGAL STANDARDS**

5          Summary judgment is proper only when a "movant shows that there is no genuine dispute as to

6    any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In

7    considering a motion for summary judgment, the court is "required to draw all inferences in a light

8    most favorable to the non-moving party." *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir. 1997).

9    "In antitrust cases, these general standards are applied even more stringently and summary

10   judgments granted more sparingly." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n,* 620 F.2d 1360,

11   1364 (9th Cir. 1980). "[P]laintiffs should be given the full benefit of their proof without tightly

12   compartmentalizing the various factual components," and the claim should not "be judged by

13   dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v.*

14   *Union Carbide & Carbon Corp.,* 370 U.S. 690, 699 (1962) (alterations omitted). "As a general

15   rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's

16   case." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 923 (9th Cir. 2015).

17   **IV.    ARGUMENT**

18          **A.    Cisco's "Open Early, Closed Late" CLI Conduct Constitutes an Antitrust**
             **Violation That Has No Protection Under *Noerr-Pennington***

19

20          Cisco's first summary judgment ground miscasts Arista's antitrust claim as alleging only that

21   "Cisco sued Arista for copyright infringement and talked about its lawsuit" (D.I 218-4 at 7), which

22   Cisco then uses as a basis to contend that the alleged conduct constitutes protected "petitioning"

23   activity that falls within the *Noerr-Pennington* doctrine. Cisco is wrong on the facts and wrong on the

24   law. As described above, and in Arista's Amended Complaint, Arista's real claim is that, after more

25   than a decade of widespread industry adoption by network hardware manufacturers of a Cisco-like

26   CLI—adoption Cisco not only tolerated, but actively promoted, calling its CLI a "de facto industry

27   standard" and touting the benefits of openness to purchasers—Cisco changed course in late 2014 to

28   thwart its competitor Arista, declaring the CLI to be proprietary to Cisco and sending a warning to

other competitors not to compete too well. This form of "open early, closed late" conduct has been recognized by the Supreme Court, the Ninth Circuit, the Department of Justice, and the Federal Trade Commission as an antitrust violation. Yet Cisco's own economics expert failed to even consider whether Cisco's CLI conduct was an instance of "open early, closed late" anticompetitive conduct. Ex. 23 (2/16/2018 Carlton Dep.) at 248:7-15. Neither *Noerr-Pennington,* nor any First Amendment protection applies to Cisco's pattern of conduct here.

### 1. The Supreme Court, Ninth Circuit, DOJ, and FTC Recognize "Open Early, Closed Late" Conduct like Cisco's as an Antitrust Violation

The Supreme Court's *Kodak* decision expressly held that Kodak's open early, closed late change in policy regarding its supply of repair parts to independent service organizations ("ISOs") could constitute an antitrust violation even in the absence of any formal contractual commitment. *See Eastman Kodak Co. v. Image Tech. Servs.,* 504 U.S. 451, 475-79 (1992) ("*Kodak*"). Cisco has performed exactly this type of "open early, closed late" change in policy in connection with the CLI— changing from a long-term policy of openness (allowing use by competitors and others in the industry) to a closed policy (asserting proprietary rights and denying use by others). The Supreme Court, the Ninth Circuit Court of Appeals, the U.S. Department of Justice, and the Federal Trade Commission all recognize that such conduct by a monopolist is anticompetitive and barred by the antitrust laws.

In *Kodak*, the Supreme Court specifically described the "lock in" effect that can take hold during the "open" policy period that can then lead to harm to consumers and competition if a firm with monopoly power later changes to a "closed" policy. *Id.* at 476. Importantly, the plaintiff ISOs did not allege (nor did the Supreme Court find) that Kodak was under any contractual obligation to continue to sell replacement parts to ISOs or to allow its OEM or parts distributors to do so—only that Kodak's prior open policy had the effect of locking in consumers in a manner that could render Kodak's later change to a "closed" policy anticompetitive. *See id*. at 472-79 ("***If the cost of switching is high, consumers who already have purchased the equipment, and are thus 'locked in,'*** will tolerate some level of service-price increases before changing equipment brands."). The Court found that a monopolist attempting to leverage lock-in effects from that open period only to later switch to a closed period to inhibit or exclude competition could be an antitrust violation, even absent contractual

1    commitments to the open policy, affirming the reversal of the district court's grant of summary
2    judgment of no violation. *Id*. at 460-61, 477-79.

3        On remand, the jury found Kodak liable for antitrust violations and awarded $71.8 million.
4    *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1200 (9th Cir. 1997) ("*Kodak II* "). The
5    district court also granted a 10 year injunction requiring Kodak to sell "all parts" to ISOs. *Id*. The
6    Ninth Circuit affirmed the liability finding—endorsing that an open early, closed late course of
7    conduct is an antitrust violation and a harm to competition—affirmed the injunction with
8    modifications, and affirmed a large portion of the damages award. *Id*. at 1228.

9        These same "open early, closed late" anticompetitive harms and antitrust concerns have also
10    long been recognized by the Antitrust Division of the United States Department of Justice. *See, e.g.*,
11    Ex. 24, *United States v. Borland Int'l Inc.*, No. C 91 3666 MHP, Competitive Impact Statement (N.D.
12    Cal. Oct. 22, 1991). Borland and Ashton-Tate were the two largest firms in the market for the sale of
13    relational database management system ("RDBMS") software at the time, collectively holding 60%
14    share, and Borland sought to acquire Ashton-Tate. *Id.* at 2-3. The DOJ explained that Ashton-Tate's
15    dBASE programming language, though not formalized through any standard setting organization, "has
16    become an industry standard" and that "Ashton-Tate has enjoyed competitive advantages as a result of
17    its [dBASE's] adoption as a 'standard' by corporate customers." *See id*. at 5, 9. There were smaller
18    competitors competing with Borland and Ashton-Tate using "xBASE clones" products that offered
19    "compatibilitiy with the dBASE standard by ***using some of the command names, menu command***
20    ***hierarchies***, command languages and other features of the dBASE programming language." *Id.* at 8-9.

21        The DOJ noted that the largest xBASE competitor, Fox, was currently a defendant in a
22    copyright lawsuit brought by Ashton-Tate seeking to enjoin Fox's use of the dBASE programming
23    language in Fox's products. *Id*. at 9. The DOJ explained that "[t]he pendency or future threat of
24    copyright claims relating to the dBASE language, however, has inhibited competition and would likely
25    diminish the effectiveness of that constraint on Borland's market power." *Id*. at 10. To resolve the
26    dispute, Borland agreed to dismiss with prejudice its copyright suit against Fox and to be enjoined
27    "from initiating or making any claim or counterclaim that asserts claims of copyright infringement in
28    the ***command names, menu items, menu command hierarchies, command languages, programming***

*languages and file structures* used in" its dBase products. *Id*. at 3, 11. The DOJ thus sought to prevent

precisely the form of open early, closed late harms to competition by the combined Borland/Ashton-

Tate monopolist entity that Arista claims against Cisco in this case.

The U.S. Federal Trade Commission similarly recognizes the antitrust risk and anticompetitive

harms that result from open early, closed late conduct by a monopolist. For example, in 2009 the FTC

filed a complaint against Intel for unfair methods of competition. Ex. 25, *In re Intel Corp.*, FTC

Docket No. 9341, Complaint (Dec. 16, 2009). The FTC alleged that Intel "dictates the interoperability

of [its CPU chipset] interfaces, because it has monopoly power over the relevant CPUs" and that:

> *For many years, Intel allowed unhindered accessibility to these interfaces and encouraged others to become reliant on that accessibility*. However, after Nividia, Via, AMD, OEMs, and consumers became dependent on the Intel-controlled interfaces, recently Intel has selectively cut off or hindered accessibility to enhance or obtain monopoly power in the relevant markets. . .
>
> *Intel's apparent willingness to allow Nvidia to interoperate with Intel's CPU has dissolved as it has begun to perceive Nvidia as a threat* to its monopoly position in the relevant markets. *Intel now has reversed its previous course* of allowing Nvidia integrated GPU chipsets to interoperate with Intel CPUs, thereby foreclosing Nvidia's integrated GPU chipsets from connecting to Intel's future CPU platforms."

*Id*. at ¶¶ 80-84. Intel and the FTC settled the complaint, with Intel agreeing to restore access for Nvidia

and others to Intel's CPU interfaces and to allow that access for at least six years. Ex. 26 (FTC Press

Release). Again, these are the same harms Arista asserts here. This kind of "open early, closed late"

strategy has been recognized by a leading economist as a particularly troublesome form of

anticompetitive conduct. *See, e.g.*, D.I. 214-2, Carl Shapiro, "Exclusionary Conduct: Testimony before

the Antitrust Modernization Commission," Sept. 29, 2005, at 15 ("For example, in a network industry,

a firm might obtain a dominant position based in part on certain 'open' policies that induce reliance by

complementary firms, and then later exploit that position by offering less favorable interconnection

terms or by refusing to interconnect with them altogether.").

Each of the above cases and examples disproves the assertion in Cisco's Brief that "Arista's

'Policy Change' Theory Has No Legal Basis." D.I. 218-4 at 15-18. Cisco attempts to distinguish

*Kodak* by arguing that "there are no facts here establishing a prior course of dealing." *Id.* at 15-16. Not

so. As in the examples above—particularly the nearly identical facts of *Borland*—Cisco had a years-

long course of dealing with both customers and competitors in the Ethernet switch industry in which it

held out the CLI as open and encouraged industry adoption, just as Borland allowed use of dBase clones for years before its policy reversal. *See* **Section II**. Cisco's argument that no facts show that Cisco's policy change harmed "Arista's or any other competitor's ability to compete" (D.I. 218-4 at 16) also fails because, as shown in detail in **Sections IV.C-D** below, Cisco's open early, closed late conduct has caused substantial harm to Arista and to competition more generally. Cisco's final alleged *Kodak* distinction in its brief is that Cisco's lawsuit against Huawei rendered Cisco's policy change foreseeable. D.I. 218-4 at 16. However, that argument establishes, at most, a genuine dispute of fact— the Cisco executive responsible for initiating the Huawei litigation has already testified under oath that the litigation was perceived ***even by Cisco itself*** as being about Huawei's wholesale copying of Cisco's **source code**, not CLI or copyright. Ex. 4 at 994:3-9 (Giancarlo CLI Trial Testimony Excerpts). Indeed, competitors still treated the CLI as open after the Huawei case. *See* **Section II.A.***See*

### 2. *Noerr-Pennington* Does Not Protect Cisco From Liability for Its CLI Litigation and Related Conduct as Part of the Overall Anticompetitive Pattern of "Open Early, Closed Late"

Cisco's argument in its brief that "[t]here is no legal basis to extend Kodak liability to Noerr-protected conduct" (D.I. 218-4 at 16) ignores that the Ninth Circuit's *Kodak II* decision expressly held that assertion of intellectual property rights (conduct often protected under *Noerr*) does not immunize *Kodak*-style open early, closed late conduct from antitrust liability. *Kodak II*, 125 F.3d at 1214 (upholding as harmless error the district court's decision on remand not to instruct the jury that Kodak holds patents covering parts it refused to sell or that assertion of Kodak's patent or copyright rights may have been a legitimate business justification for its refusal to sell), 1214 n.7 (explaining that patents do not provide antitrust immunity, citing an article on the Noerr-Pennington Doctrine). Therefore no "extension" of *Kodak* is required—Cisco's open early, closed late conduct asserted by Arista is sufficient to establish an antitrust violation under *Kodak*.

As explained below, Cisco's use of the CLI litigation and a FUD campaign as tools to implement and further the "closing" of the CLI does not immunize Cisco's open early, closed late course of anticompetitive conduct. In addition, under *Hynix* and the numerous cases following it, because Cisco used the CLI litigation and FUD campaign to further Cisco's independently

anticompetitive open early, closed late course of conduct, the litigation and FUD campaign are themselves not protected activity under *Noerr*.

### a. Cisco's Filing of the CLI Lawsuit Does Not Immunize Cisco From Liability for its *Kodak*-Style Open Early, Closed Late Conduct

"*Noerr-Pennington* does not protect conduct which is ***otherwise unlawful***." *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1307 (Fed. Cir. 1999). Cisco's copyrights and other intellectual property rights do not give Cisco "unfettered right to use its intellectual property as it wishes." *United States v. Microsoft Corp.*, 253 F.3d 34, 63 (D.C. Cir. 2001). As the D.C. Circuit Court of Appeals explained, "[t]hat is no more correct than the proposition that the use of one's personal property, such as a baseball bat, cannot give rise to tort liability." *Id.*; *see also In re Indep. Sev. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000) ("[IP] rights do not confer a privilege to violate the antitrust laws.").

Applying these principles, courts have repeatedly recognized that the mere filing of a lawsuit does not immunize the defendant's anticompetitive behavior outside of and beyond the lawsuit itself. *See, e.g.*, *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 505-06 (9th Cir. 2010) (reversing *Noerr* dismissal: "the district court erroneously construed the allegation in the complaint as pertaining ***solely to [litigation]***, ***rather than to the predatory and harassing activities that accompanied that litigation***. . . .*Noerr-Pennington* immunizes ***only*** litigation activity, not other forms of threats or harassment."); *Eagle Harbor Holdings, Inc. v. Ford Motor Co.*, No. C11-5503 BHS, 2015 U.S. Dist. LEXIS 17478, at *8-9 (W.D. Wash. Feb. 11, 2015) (denying summary judgment under *Noerr* where claim was based on defendant's conduct ***before*** defendant petitioned the government); *Riverbed Tech., Inc. v. Silver Peak Sys.*, No. C 13-02980 JSW, 2015 U.S. Dist. LEXIS 188737, at *7-8 (N.D. Cal. Apr. 7, 2015) (false advertising claims not barred by *Noerr* because "[t]he commercial communication published in 2013 by [defendant], ***although about pending litigation, was not in furtherance of or incidental to it***.").

Here, Cisco's open early, closed late course of conduct is the alleged anticompetitive conduct—not a mere lawsuit or any communication incidental to it (*e.g.,* the sending of a demand letter). The "open" period of Cisco's course of conduct occurred before Cisco even filed the CLI

1    lawsuit, and so cannot be immunized by a later-filed lawsuit. Similarly, Cisco's "closing late" of the

2    CLI after locking-in customers and competitors during the open period violates the antitrust laws

3    under *Kodak* independent of Cisco's CLI lawsuit. Therefore *Noerr* does not support Cisco's Motion.

### 3.    Cisco's CLI Litigation and Related Conduct are Not Protected Under *Noerr* Because They are Part of Cisco's Larger Anticompetitive Course of Conduct.

6            Cisco's Brief incorrectly argues that Arista's antitrust theory "collapses" without Cisco's CLI

7    lawsuit and Cisco's lawsuit-related conduct. D.I. 218-4 at 8. Not so. Arista's claims are based on

8    Cisco's anticompetitive course of conduct of first holding out for years the CLI as open for use by

9    customers and competitors and then reversing that policy of openness to close the CLI as proprietary

10   in the face of competition from Arista and others. That open early, closed late change in policy by a

11   monopolist is itself a basis for antitrust liability, not immunized by *Noerr*, as addressed above.

12   Because Cisco also used the CLI lawsuit and the campaign of publicly spreading fear, uncertainty, and

13   doubt ("FUD") about Arista as tools to implement and further the "closing" step of that overall open

14   early, closed late course of conduct, the CLI litigation and conduct incidental to that litigation are also

15   not protected by *Noerr* under this District's *Hynix* line of cases.

16           Although neither the Supreme Court nor the Federal Circuit have addressed the question of

17   whether non-sham lawsuits can be considered as part of a larger, overall course of anticompetitive

18   conduct, Judge Whyte of this District conducted an exhaustive analysis of this question in *Hynix*

19   *Semiconductor, Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084 (N.D. Cal. Nov. 4, 2007). Judge Whyte

20   concluded that the Supreme Court and the Federal Circuit would recognize antitrust allegations that

21   include even *Noerr*-protected litigation within the "overall course of conduct" but only those in which

22   the litigation is "causally connected" to anticompetitive harms. *Id*. at 1096-97. The *Hynix* Court

23   articulates a two part test for evaluating these "overall course of conduct" claims when otherwise

24   protected litigation is included: the court must first find that the other aspects of the overall course of

25   conduct independently produce anticompetitive harms, and, if so, the court must determine whether

26   the accused otherwise protected litigation was causally connected to these anticompetitive harms. *See*

27   *id*. at 1097. This Court recently adopted and applied the *Hynix* test in *Funai Elec. Co. v. LSI Corp.*,

28

No. 16-cv-01210-BLF, 2017 U.S. Dist. LEXIS 44866, at *16-19 (N.D. Cal. Mar. 27, 2017).[3]

Like the defendants in *Funai*, Cisco's brief paints Arista's claims in this case as being based only on a lawsuit—here, the CLI litigation. *See id*. at *13-14. However, like the plaintiffs in *Funai*, Arista's claim is in fact a larger overall course of anticompetitive conduct—namely, Cisco's open early, closed late overall course of conduct already described above. The non-petitioning aspects of Cisco's overall course of conduct—the years-long open period, encouraging adoption and lock-in, and then the reversal to a closed policy after consumers and competitors were already locked-in— independently have caused anticompetitive harm. *See* **Section IV.C-D** below.

The CLI lawsuit is causally connected to these harms because it was a vehicle for Cisco to effectuate its "closing late" reversal to leverage the lock-in effects to inhibit (or eliminate) competition. *See, e.g.*, *Funai*, 2017 U.S. Dist. LEXIS 44866, at *18-19 (finding lawsuit that was a mechanism "to effectuate Defendants 'hold-up power' to demand supracompetitive royalties" to be causally connected); *Hynix*, 527 F. Supp. 2d at 1098 ("To be clear, the causal connection is that a patent 'ambush' or 'hold-up' is ineffective without the threat of litigation."); *Microsoft Mobile*, 2016 U.S. Dist. LEXIS 49498, at *10-12 (similar). Cisco's FUD campaign (including Mr. Chandler's blog) to sow fear, uncertainty, and doubt in the minds of Arista's customers—though not actually incidental to Cisco's lawsuit in the sense that a demand letter or decision to settle is incidental to a lawsuit—was similarly causally connected as another tool Cisco used to effectuate its "closing late" reversal in order to hamstring Arista as a competitor and put other competitors on notice of its changed position. *Allflex USA, Inc. v. Avid Identification Sys.*, No. 5:06-cv-01109, 2010 U.S. Dist. LEXIS 148094, at *37-38 (C.D. Cal. Feb. 16, 2010) (Upholding allegations of an overall course of conduct including "a plan to wrongfully obtain and assert invalid patents, to threaten litigation to exclude competition and ***create marketplace fear uncertainty and doubt***" among other conduct). Both the CLI litigation and Cisco's FUD campaign are thus properly within Arista's overall course of conduct claim and not immunized

---

[3] Other courts have also followed *Hynix*. *See, e.g., Apple, Inc. v. Samsung Elecs. Co.*, No. 11-cv-01846-LHK, 2012 U.S. Dist. LEXIS 90889, at *87-89 (N.D. Cal. June 29, 2012); *Microsoft Mobile, Inc. v. InterDigital, Inc.*, No. 15-723-RGA, 2016 U.S. Dist. LEXIS 49498, at *10-12 (D. Del. Apr. 13, 2016).

by *Noerr*. Cisco's Motion should thus also be denied under *Hynix*.

**B.    Arista Has Proven That Cisco Has Monopoly Power**

Far from failing to prove Cisco's monopoly power, Arista established that there is no genuine issue of material fact that Cisco *lacks* monopoly power in each of the relevant markets. D.I. 210-8. Analysis of monopoly power involves complex economic questions that require expert testimony. *See, e.g.*, *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir. 2002) ("Construction of the relevant market and *a showing of monopoly power must be based on expert testimony*"); *Colsa Corp. v. Martin Marietta Servs.*, 133 F.3d 853, 855 n.4 (11th Cir. 1998). As explained in Arista's own Motion, because Cisco offers zero expert testimony rebutting Dr. Scott Morton's analysis finding that Cisco has monopoly power in the relevant markets, there cannot be any genuine issue of dispute regarding this "highly technical economic question" and judgment should be granted in Arista's favor. *See Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991); D.I. 210-8 at 8-12. Dr. Scott Morton conducted a detailed, independent economic analysis of the market data and other facts of this case and concluded that Cisco's long-standing dominant market share in the defined markets (exceeding 65% over much of the relevant time period and as high as 80%) and other circumstantial evidence establish that Cisco has monopoly power in each of the relevant markets. *See* D.I. 210-8 at 8-12. Rather than rebut these findings through any expert testimony, Cisco's Motion asserts Arista cannot show monopoly power through circumstantial evidence because: (1) Cisco's market share has declined in recent years, and (2) Cisco's competitors have expanded output and market share before and during the relevant time period. D.I. 218-4 at 20. Both arguments fail.

First, the Ninth Circuit has held that declining market share does not warrant summary judgment that a party cannot show monopoly power. *See, e.g.*, *TriQuint Semiconductor, Inc. v. Avago Techs. Ltd.*, No. CV-09-1531-PHX-JAT, 2012 U.S. Dist. LEXIS 58228, at *18-19 (D. Ariz. Apr. 25, 2012) ("Can a jury 'reasonably [find] that a firm with a consistently high, albeit declining, market share in a market with high barriers to entry possesse[s] market power[?]' In response to this question, the Ninth Circuit has definitely answered 'yes.'" (quoting *Oahu Gas Serv., Inc. v. Pac. Resources, Inc.*, 838 F.2d 360, 367 (9th Cir. 1988))). Cisco's cited cases are inapposite: In *United States v. Syufy Enters.*, 903 F.2d 659, 666 (9th Cir. 1990), the accused monopolist's share fell from 91% to 39% in

1  three years.[4] Cisco's market share has not experienced such a precipitous drop, and has exceeded 53%

2  in all relevant markets for the relevant time period, far above the 39% found insufficient in *Syufy*.[5]

3       Arista has proven that Cisco has continuously owned a dominant share of the relevant markets.

4  A market share of 65% establishes a *prima facie* case of monopoly power and is sufficient to show

5  that the defendant owns a dominant share of the market. *Kodak II*, 125 F.3d at 1206. Further, the FTC

6  advises that monopoly power can be found even with 50% or greater market share. *See* D.I. 214-5. Dr.

7  Scott Morton's opinion that "[Cisco's market] shares and the durability of these shares are consistent

8  with Cisco possessing substantial market power" is unrebutted by Cisco's expert. *Id.*

9       Second, Arista has proven that there are significant barriers to entry or expansion and that

10  existing competitors lack the capacity to increase their output in the short run. D.I. 210-8. Although

11  some of Cisco's competitors have expanded output and market share, it is undisputed that "Cisco's

12  large market share in Ethernet switches has historically dwarfed those of its competitors[, and]

13  [b]etween 2008 and 2017, no competitor has achieved more than 10.0% revenue in the United States

14  and 9.4% revenue worldwide." D.I. 210-21, ¶ 41, Figs. 4-5; *see also* D.I. 210-9, Carlton Rep., ¶ 43,

15  Fig. 2. Cisco cannot and does not provide any support that small increases in some competitors'

16  market share warrant a court granting summary judgment that there are no significant barriers to entry

17  or expansion. Further, many of Dr. Scott Morton's opinions regarding barriers to entry and expansion,

18  including ████ switching costs and capital market evaluations imposing higher capital costs

19  on new entrants, remain unrebutted by Cisco's expert. D.I. 210-8. None of Dr. Carlton's opinions

20  genuinely dispute Dr. Scott Morton's analysis, or Cisco's own 30(b)(6) testimony, that Cisco's

21  dominant share of the existing Ethernet switch installed base creates ████ switching costs

22  for Cisco that serves as a barrier to entry and expansion. Whatever limited disagreements Dr. Carlton

---

[4] *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995), also relied on by Cisco, held that a "market share of 44 percent is sufficient as a matter of law to support a finding of market power…". Cisco's market share in each relevant market exceeded 44 percent at all times.

[5] Further, as explained in *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 890 (N.D. Cal. Jan. 14, 2011), although "*Syufy* did not expressly limit its teachings to circumstances in which entry barriers are absent[,] as *Oahu Gas* indicates, declining market share is not necessarily sufficient to warrant summary judgment." *Id.* (citing *Oahu Gas*, 838 F.2d at 366); *see also TriQuint*, 2012 U.S. Dist. LEXIS 58228, at *19.

1    does identify, none were sufficient to cause him to conclude that Cisco does not have monopoly power

2    in the relevant markets. In addition, Dr. Carlton admitted at his deposition that there is yet another

3    barrier to entry and expansion in the relevant markets—vendor reputation. D.I. 210-10 (02/16/2018

4    Carlton Dep. Tr.) at 133:8-134:22 ( ███████████████████████████████████████

5    ██████████████████████████████████████████████████████████████████ ).

6    Cisco's Motion should be denied and Arista's Motion (D.I. 210-8) should be granted.

        C.    **There is Substantial Evidence From Which the Jury Could Conclude That
7               Cisco's CLI Conduct Caused Injury-In-Fact and Reasonably Infer Damages**

8

9            Cisco's motion contends that, because Cisco committed its anticompetitive conduct at the same

10   time as other developing market factors and non-anticompetitive conduct, then it may escape the

11   consequences of its conduct. This is wrong as a matter of law and of fact. The Supreme Court, the

12   Ninth Circuit, and courts across the country have consistently held the opposite of what Cisco

13   contends. "The Supreme Court has [] established a relaxed standard for proving the amount of

14   damages in an antitrust case once the fact of damage has been shown. . . . 'It will be enough if the

15   evidence shows the extent of the damages as a matter of just and reasonable inference, although the

16   result be only approximate.'" *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982). "It

17   is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust

18   all possible alternative sources of injury in fulfilling his burden of proving compensable injury under

19   [Clayton] § 4." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1051 (9th

20   Cir. 1981) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969)).

21   "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear

22   the risk of the uncertainty which his own wrong has created. That principle is an ancient one, and is

23   not restricted to proof of damage in antitrust suits, although their character is such as frequently to call

24   for its application." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946).

25           The cases Cisco cites are inapposite. For example, in *Magnetar Techs. Corp. v. Intamin, Ltd.*,

26   801 F.3d 1150, 1159 (9th Cir. 2015), Magnetar's expert "only compared Magnetar's 'actual results

27   versus their business plan'" and "did not delve into the merits of the projected results" but simply

28   accepted "the projections Magnetar provided." *Id.* The Ninth Circuit agreed with the district court that

1   "there was no 'independent assessment of the validity of Magnetar's projected revenues.'" *Id.* Further,

2   Magnetar's expert failed to consider "[s]everal other factors [that] could have contributed to

3   Magnetar's losses, such as the decline in profits in the amusement ride business, or the decline of the

4   U.S. economy generally." *Id.* By contrast, Dr. Scott Morton compared Arista's actual results with her

5   model, not projections provided by Arista. Further, in her analysis of market data, she considered

6   Cisco's introduction of new products, more aggressive pricing by Cisco, increasing competition from

7   white box installations, and other factors that could have affected Arista's revenues, since those are all

8   factors included in her baseline period that forms the model estimates.

9       *Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361 (9th Cir. 1992) is similarly distinguishable. There,

10  "Vernon insist[ed] that all of Edison's acts contributed to the damage figure, but the district court and

11  [the Ninth Circuit] already found that many of those acts were proper." *Id.* at 1373. *Concord Boat*

12  *Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000), is also inapplicable here. There, plaintiff's

13  damages expert "ignored inconvenient evidence" and "failed to account for market events that both

14  sides agreed were not related to any anticompetitive conduct," "admitt[ing] on cross examination that

15  such facts could have been incorporated into his model but that he had not done so." *Id.* at 1056. Here,

16  Dr. Scott Morton acknowledges and considers multiple factors that affected Arista's revenues,

17  including the ITC import bans. Further, she presents in her report other evidence enabling the jury to

18  decide how important the CLI anticompetitive conduct was to customers compared with the ITC

19  actions. Dr. Scott Morton does not ignore inconvenient evidence or fail to account for market events or

20  insist that all of Cisco's acts contributed to the damage figure.

21      Cisco argues that Dr. Scott Morton's analysis "fails to distinguish the impact of other salient

22  events occurring throughout the CLI suit," pointing to the ITC actions. D.I. 218-4 at 21-22. But Arista

23  need not exhaust all possible alternative sources of injury. It was Cisco that decided to combine its

24  anticompetitive conduct with the ITC actions[6] by filing them in the same month as the CLI lawsuit[7]

25

26  [6] In the Matter of Certain Network Devices, Related Software and Components Thereof (I), ITC Inv.
    No. 337-TA-944 (filed Dec. 19, 2014); In the Matter of Certain Network Devices, Related Software
27  and Components Thereof (II), ITC Inv. No. 337-TA-945 (same).

28  [7] *Cisco Sys., Inc. v. Arista Networks, Inc.*, 5:14-cv-05344-BLF (N.D. Cal.) (filed Dec. 5, 2014).

1   and discussing them together in communications with customers and the public. If the lawful and

2   unlawful conduct are "so tightly compartmentalized as to make it difficult to determine which portion

3   of the damages claimed were caused by the unlawful conduct," that "should not diminish the

4   recovery." *Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*, 748 F. Supp. 1399, 1404 (D. Ariz.

5   1990); *see also Univac Dental Co. v. Dentsply Int'l, Inc.*, No. 1:07-CV-493, 2010 U.S. Dist. LEXIS

6   26852, at *13 (M.D. Pa. Jan. 20, 2010) (disaggregation unnecessary where it would be "extraordinarily

7   difficult"). Cisco must bear the risk of any uncertainty here.

8        Dr. Scott Morton's analyses concluded that Cisco's CLI conduct caused injury-in-fact and

9   estimated damages to Arista from that injury. As she explained, because Cisco's CLI anticompetitive

10  conduct and the ITC actions occurred at the same time, no damages model can quantifiably separate

11  the impact of Cisco's CLI conduct from its ITC actions. *See, e.g.*, D.I. 208-7 at 356:6-357:2.

12  Nevertheless, Dr. Scott Morton did consider the possible impact of the import bans, and concluded

13  that it was unlikely that the import bans themselves were the driving force behind the slowdown in

14  new customer acquisitions because: (1) Arista faced the strongest decline in new customer acquisitions

15  in the second quarter of 2016, while the first import ban only took effect in the third quarter of 2016,

16  and (2) while the import bans were in effect on and off from August 2016-September 2017, new

17  customer acquisition recovered to the pre-litigation level rather than further declining. D.I. 210-21,

18  ¶ 185. Further, Dr. Scott Morton opined that evidence established the greater importance of the CLI

19  anticompetitive conduct to customers compared with the ITC actions. *See, e.g.*, D.I. 208-7 at 353-363

20  (*e.g.*, the Cisco 30(b)(6) testimony that the CLI was ███████████). Dr. Scott Morton also considered

21  the possible impact of the August 22, 2016 ITC import ban in calculating damages, concluding that

22  ████████████████████████████████████████████████████████

23  ██████████████████████ D.I. 210-21, ¶ 234; D.I. 208-7 at 60-63, 351-63.

24       Cisco also argues that Dr. Scott Morton's analysis "does not account for the effects of Cisco's

25  introduction of new and more competitive products, more aggressive pricing by Cisco, or increasing

26  competition from white box installations and other competitors." D.I. 218-4 at 22. That is incorrect.

27  Dr. Scott Morton's model uses data from a "benchmark period," from the fourth quarter of 2008 to the

28  fourth quarter of 2014, to predict Arista's revenues but for Cisco's anticompetitive conduct during the

"conduct period," from December 5, 2014, to December 14, 2016. Dr. Scott Morton's model accounts for Cisco's new products and more aggressive pricing and white box competition because each of these factors were part of the benchmark period. First, Cisco's more aggressive pricing began during the benchmark period and thus, is accounted for in Dr. Scott Morton's model. *See, e.g.*, D.I. 210-21, ¶¶ 60-61. Second, regarding Cisco's introduction of new and more competitive products, Dr. Scott Morton explained in her deposition that: ***much of the release [of new products] actually occurs in the pre-[benchmark period]*,**" and so "***they're accounted for in the model*.**" D.I. 208-7 at 363:20-364:9. Third, regarding increasing competition from white box installations, Dr. Scott Morton explained in her deposition that "***White boxes are introduced before the conduct at issue [during the benchmark period,*"** so they, too are "***not a confounding factor*.**" D.I. 208-7 at 364:10-18. Further, Dr. Scott Morton's model also accounts for the modest increases in the relative market share of Juniper, which also started prior to the damages period. D.I. 210-21, Fig. 4.

Cisco also argues that "Arista has never introduced direct evidence of lost sales at specific accounts due to Cisco's CLI-related conduct." D.I. 218-4 at 21. That is incorrect. There is substantial evidence from which the jury could conclude that Cisco's CLI conduct caused injury and could reasonably infer damages from that injury through the direct evidence of lost sales at specific accounts alone. For instance, Dr, Scott Morton discusses ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as examples of lost sales to existing customers due to Cisco's anticompetitive campaign. D.I. 210-21, ¶¶ 148, 190, 191. Further, Dr. Scott Morton analyzed Arista's new customer acquisition rate and found that it slowed from the time of the start of Cisco's anticompetitive campaign and started to recover only after a favorable ruling in the CLI case. D.I. 210-21, ¶ 179. Specifically, the number of new customers generally increases from 2008 onwards but flattens out in 2014 and 2015, around the beginning of Cisco's CLI policy change, and then increases to 2014 levels at the end of 2016, after the CLI trial was concluded. D.I. 210-21, ¶ 182, Fig. 25. Dr. Scott Morton considered the potential effect of the ITC import bans on new customer acquisitions but concluded based on the data that it is "unlikely that the [ITC] import bans themselves were the driving force behind the slowdown in new customer acquisitions." D.I. 210-21, ¶ 185. Further, Arista's Chief Customer Officer, Anshul Sadana, testified regarding a list of ▮ customers where Arista lost sales to

those customers due to the litigation or fear of the litigation, where those customers used CLI to configure and manage their switches or considered the presence of a Cisco-like CLI a requirement. D.I. 220-13 at 24:10-58:5; Ex. 27 (Sadana Dep. Ex. 1158); *see also* Ex. 28 (11/7/2017 Sadana Dep.) at 44:24-45:16; *id.* at 63:9-24. Because there is substantial evidence from which the jury could conclude that Cisco's CLI conduct caused injury-in-fact and could reasonably infer damages from that injury, Cisco's motion for summary judgment should be denied.

### D. There is Substantial Evidence From Which the Jury Could Conclude Cisco's CLI Conduct Caused Harm to Competition

Cisco's motion for summary judgment that Arista cannot show harm to competition calls Arista's evidence of that harm "speculative" (D.I 218-4 at 24) without actually discussing (or even identifying) that evidence. Instead, apart from calling one piece of that evidence "speculative," Cisco discusses the evidence it believes Arista should have provided but claims it did not. Cisco's failure to discuss Arista's evidence of harm to competition is fatal to its motion, because a party moving for summary judgment who "would not bear the burden of proof at trial. . . bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claim or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *In re: Cathode Ray Tube (CRT) Antitrust Litig.,* No. MDL No. 1917, 2017 U.S. Dist. LEXIS 217359, at *57-59 (N.D. Cal. Feb. 7, 2017). Cisco's motion fails to do either, and Cisco's motion should be denied on that basis alone. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1102-03 (9th Cir. 2000) (denying motion for summary judgment: "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything."). More fundamentally, Arista's extensive evidence of harm to competition from Cisco's CLI conduct, including harm to consumer welfare in the form of decreased innovation and diminishment of consumer choice, is exactly the kind of evidence that courts of the Ninth Circuit have consistently recognized as reflecting harm of the sort the antitrust laws are intended to prevent.

In order to show "antitrust injury," a plaintiff must show an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Glen Holly Entm't, Inc. v. Tektronix, Inc.,* 352 F.3d 367, 371 (9th Cir. 2002) (citing *Brunswick Corp. v.*

1   *Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977)). In other words, "an antitrust plaintiff must prove

2   that the restraint in question injures competition in the relevant market." *GSI Tech., Inc. v. Cypress*

3   *Semiconductor Corp.,* No. 5:11-CV-03613-EJD, 2015 U.S. Dist. LEXIS 9378, at *20-21 (N.D. Cal.

4   Jan. 27, 2015) (quoting *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc.,* 732 F.2d 1403,

5   1408 (9th Cir. 1984)). Under Ninth Circuit law, antitrust plaintiffs can show the necessary harm to

6   competition in either of two ways. First, to show an antitrust injury to competition, a plaintiff must

7   "delineate a relevant market and show that the defendant plays enough of a role in that market to

8   impair competition significantly." *Metro Indus. v. Sammi Corp.,* 82 F.3d 839, 847-48 (9th Cir. 1996)

9   (quoting *Bhan v. NME Hosp., Inc.,* 929 F.2d 1404, 1413 (9th Cir.), *cert. denied,* 502 U.S. 994 (1991)).

10  Alternatively, "if a plaintiff can show that the restraint has actually produced significant

11  anticompetitive effects, such as a reduction in output, a formal market analysis becomes unnecessary."

12  *Id.; see also Coca-Cola Co. v. Omni Pac. Co.,* No. C 98-0784 SI, 2000 U.S. Dist. LEXIS 17089, at

13  *22 (N.D. Cal. Sep. 25, 2000). Under the latter test, courts of the Ninth Circuit and elsewhere have

14  recognized a wide variety of anticompetitive effects as demonstrating "harm to competition,"

15  including: "stymied innovation," *GSI Tech.,* 2015 U.S. Dist. LEXIS 9378, at *20-21; limitations on

16  consumer choice that prevents consumers from "making free choices between market alternatives,"

17  *Jensen Enters. v. AT&T,* No. C 06-247 SI, 2007 U.S. Dist. LEXIS 52064, at *16-18 (N.D. Cal. July 6,

18  2007); decreased product quality, *United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp.,* No.

19  07-CV-2172 BEN (JMA), 2010 U.S. Dist. LEXIS 78322, at *17-19 (S.D. Cal. Aug. 2, 2010); and

20  supracompetitive pricing, *see, e.g., Free Freehand Corp. v. Adobe Sys.,* 852 F. Supp. 2d 1171, 1185

21  (N.D. Cal. 2012).

22          The evidence in this case shows harm to competition under either test. First, as discussed above

23  in **Section IV.B**, and in Arista's Motion for Partial Summary Judgment, Arista's economics expert has

24  conducted a formal market analysis that concludes that Cisco possesses monopoly power in each of

25  the four relevant markets. Dr. Scott Morton's analysis is based, *inter alia,* on evidence that: Cisco

26  owns a dominant share of each of the relevant markets; there are significant barriers to entry and

27  expansion in these markets, including, by Cisco's own admission, the fact that a Cisco-like CLI is

28  ▮▮▮▮▮▮▮▮ to the sales process (*see, e.g.,* D.I. 210-22 at 22:14-20); and Cisco enjoys the "ability to

charge a significant premium for its products relative to what its competitors charge." D.I. 210-21, ¶ 107; *see generally,* D.I. 210-21, ¶¶ 71-107. These market characteristics readily show that Cisco "plays enough of a role" in these markets to impair competition significantly through its "open early, closed late" CLI conduct. Thus, Cisco's harm to Arista, the only competitor to challenge its market dominance, is a harm to competition. *See Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1040 (9th Cir. 1987).

Second, there is substantial direct evidence of the harm to competition from Cisco's "open early, closed late" pattern of conduct, including harm to competition that flow from Cisco's conduct that materially harmed Arista. For example, Cisco's conduct led to a measurable and significant slowdown in Arista's acquisition of new switch customers during the conduct period, and lost sales. D.I. 210-21, ¶¶ 178-192. Cisco asserts that "antitrust laws protect competition, not competitors," D.I. 218-4 at 23, but that is only half right: courts of the Ninth Circuit have consistently recognized that harm to a competitor—here, to Arista, the only competitor to emerge as a meaningful threat to Cisco's market dominance—demonstrates harm to competition. As the Court explained in *Hasbrouck v. Texaco, Inc.,* "the oft-quoted chestnut distinguishing between protecting competition and protecting competitors has been misconstrued with some regularity by antitrust defendants who appear to argue in all types of antitrust cases that the effect of unlawful conduct on competitors is irrelevant. . . .[N]ot all acts that harm competitors harm competition. However, the converse is *not* true." 842 F.2d 1034, 1040 (9th Cir. 1987). *See also Avery Dennison Corp. v. Acco Brands, Inc.,* CASE NO. CV 99-1877 DT (Mcx), 2000 U.S. Dist. LEXIS 3938, at *69-71 (C.D. Cal. Feb. 22, 2000)(denying motion for summary judgment: "***Injury to [plaintiff] is probative of harm to competition***."); *Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1235 (E.D. Cal. 1999)(holding antitrust injury could be established by evidence of, *inter alia*, loss of business as a result of monopolist's statements to plaintiff's customers regarding quality of its services).

In short, Cisco's CLI policy change did what it was intended to do: disrupt the threat to Cisco's monopoly power in the relevant switching markets by slowing the spread of Arista's more innovative switch products. *See, e.g.*, D.I. 210-09, ¶100 (Cisco's expert economist describing Arista as an "innovative firm" with "innovative products."). In so doing, Cisco's conduct harmed competition in a

variety of ways, each of which has been recognized as harm to competition sufficient to satisfy the antitrust injury requirement. As explained by Dr. Scott Morton, while Arista's "lost sales impacted Arista's profits, they also represent lost consumer welfare—by definition, consumers who move to their second choice products suffer a loss in consumer welfare relative to purchasing their first-choice products." D.I. 210-21, ¶ 244. Lost consumer welfare from diminished choice *is* harm to competition. *See, e.g., Glen Holly*, 352 F.3d at 374-75 ("One form of antitrust injury is '[c]oercive activity that prevents its victims from making free choices between market alternatives.'"); *Jensen*, 2007 U.S. Dist. LEXIS 52064, at *16-18 (denying summary judgment where harm to competition based on reduction in consumer choice); *Blue Shield of Va. v. McCready*, 457 U.S. 465, 481-84 (1982)(antitrust injury where health care services "subscribers were compelled to choose between visiting a psychologist and forfeiting reimbursement or receiving reimbursement by forgoing treatment by the practitioner of their choice."); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 789-90 (6th Cir. 2002) (upholding harm to competition from reduced consumer choice, despite growth in overall market size: because evidence showed defendant's "actions caused higher prices and *reduced consumer choice, both of which are harmful to competition*.").

Cisco's CLI policy change also stymied innovation in the relevant markets, both by slowing the spread of Arista's more innovative products as described above and also by inhibiting Arista's own innovation. As explained by Dr. Scott Morton, "Arista's R&D output has also been impacted by Cisco's actions," both because Arista's total R&D spending is pegged at ████ of its revenues and the decreased revenues due to Cisco's conduct reduced its R&D spending and because Cisco's conduct diverted resources from R&D projects. D.I. 210-21, at ¶¶ 246-249. Two specific examples of diminished innovation at Arista are █████████████████████████████████████ ███████████████████████████████ *Id.* Decreased innovation and lower product quality in the marketplace are harms to competition that establish antitrust injury. *GSI Tech*, 2015 U.S. Dist. LEXIS 9378, at *24-26 (denying summary judgment: plaintiff's "evidence shows that [defendant] *denied consumers the benefits of innovation in product development* and lower prices"). *See also Free Freehand Corp*, 852 F. Supp. 2d at 1185 ("*decreasing innovation in the market* for professional vector graphics software"); *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th

Cir. 2001); *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1036 (C.D. Cal. 2007) (allegations of stifling innovation in the market); *Apple Inc. v. Samsung Elecs. Co.*, Case No. 11-CV-01846-LHK, 2011 U.S. Dist. LEXIS 120416, at *6 (N.D. Cal. Oct. 18, 2011) (plaintiff alleged that the defendant's conduct "result[ed] in increased prices and ***decreased quality and innovation***"); *United Nat'l Maint.*, 2010 U.S. Dist. LEXIS 78322, at *17-19 (plaintiff introduced evidence, *inter alia,* "showing that the ***quality*** of cleaning has declined under the 2007 policy as well"); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 241 (2d Cir. 2003) (affirming district court's finding that defendants had harmed competition because "product innovation . . . ha[d] been stunted by the challenged policies").

Although the linkage between the harm Cisco caused to Arista and legally cognizable harm to competition is clear, and readily defeats Cisco's motion for summary judgment on harm to competition, there is also ample direct evidence of harm to the competitive process not linked directly to Arista's harms, from which the jury could conclude that Cisco's conduct resulted in harm to competition. First, despite intense competition with Arista, as discussed in Dr. Scott Morton's Report, Cisco maintained price premiums during the conduct period over other competitors in the aggregate, including Arista, at all port speeds but at higher port speeds in particular. *See generally,* D.I. 210-21, ¶¶82-94, 107. The jury could reasonably conclude from Cisco's ability to maintain higher prices during the conduct period that Cisco's CLI conduct caused competitive harm—a category of harm to competition recognized again and again by courts of the Ninth Circuit. *See Pool Water Prods.*, 258 F.3d at 1034; *Blue Shield of Va.*, 457 U.S. 465 at 481-84 (noting that "an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which" the antitrust laws offer redress). Similarly, as discussed in the Scott Morton report, "there has been no significant new entry" of switch vendors into the relevant markets "since Cisco began this campaign in late 2014." D.I. 210-21, ¶ 251. In view of the evidence that Cisco considers a Cisco-like CLI to be ██████████ to a firm's ability to make switch sales with most significant customers, *see supra*, the jury could reasonably conclude, as Dr. Scott Morton suggests, that this absence of new competitors was due to the signaling effects of Cisco's CLI conduct to would-be market entrants. As Dr. Scott Morton explains: "For new startups considering entering the Ethernet switch market, having to potentially contend with a Cisco policy of asserting copyright on its CLI commands accompanied by

1    an aggressive litigation and FUD campaign should it decide to employ industry standard CLI would

2    have to be considered in the decision to enter." D.I. 210-21, ¶ 251. Preventing entry of new

3    competitors is harm to competition. *See, e.g.*, *Avery Dennison Corp.*, 2000 U.S. Dist. LEXIS 3938, at

4    *69-71.

5        Nor is there any merit to Cisco's apparent argument that there can be no harm to competition

6    from its "open early, closed late" CLI conduct because Arista has stated that switch markets are

7    "competitive," output has grown, and Arista and others have gained market share in the relevant

8    markets at Cisco's expense. D.I. 218-4 at 24-25. Cisco is wrong as a matter of logic and of law. There

9    is no inconsistency in a monopolist engaging in anticompetitive conduct as its market share declines to

10   prevent further loss of its market power or when a more innovative entrant threatens its market

11   dominance. The law does not hold otherwise. For example, in *Brook Group Ltd. v. Brown &*

12   *Williamson Tobacco Corp.*, 509 U.S. 209, 233-34 (1993), the evidence showed that following the

13   defendant's alleged predation, output in the relevant market and market shares for others grew. The

14   Court stated, however, that the fact that the defendant's entry in the market did not restrict output was

15   not dispositive given the possibility that "the rate of growth would have tripled, instead of doubled

16   [absent the] alleged predation." *Id.*; *see also Conwood Co.*, 290 F.3d at 789-90 (finding harm to

17   competition where output grew but evidence still showed increased prices and reduced consumer

18   choice).

19       **E.    Cisco's Motion Regarding California's UCL Should Be Denied**

20       A violation of the Sherman Act is, by definition, actionable under California's Unfair

21   Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq. See AT&T Mobility LLC v. AU Optronics*

22   *Corp.*, 707 F.3d 1106, 1107 n.1 (9th Cir. 2013). Cisco's Motion regarding Arista's claim under

23   California's Unfair Competition Law should be denied for the same reasons addressed above.

24   **V.    CONCLUSION**

25       For the foregoing reasons, the Court should deny Cisco's Motion in its entirety.

26

27

28

1    Date: March 28, 2018                          Respectfully submitted,

2

3                                                  _____/s/ Matthew D. Powers_____
                                                   MATTHEW D. POWERS (SBN 104795)
4                                                  WILLIAM NELSON (SBN 196091)
                                                   ROBERT GERRITY (SBN 268084)
5                                                  NATASHA SAPUTO (SBN 291151)
                                                   SAMANTHA JAMESON (Bar No. 296411)
6                                                  JENNIFER ROBINSON (Bar No. 270954)
                                                   WANLI CHEN (Bar No. 300254)
7                                                  TENSEGRITY LAW GROUP, LLP
                                                   555 Twin Dolphin Drive, Suite 650
8                                                  Redwood Shores, CA 94065
                                                   Telephone:    (650) 802-6000
9                                                  Facsimile:    (650) 802-6001
                                                   Email:
10                                                 matthew.powers@tensegritylawgroup.com
                                                   william.nelson@tensegritylawgroup.com
11                                                 robert.gerrity@tensegritylawgroup.com
                                                   natasha.saputo@tensegritylawgroup.com
12                                                 samantha.jameson@tensegritylawgroup.com
                                                   jen.robinson@tensegritylawgroup.com
13                                                 wanli.chen@tensegritylawgroup.com

14                                                 DAVID H. REICHENBERG (*Pro Hac Vice*)
                                                   COZEN O'CONNOR
15                                                 277 Park Avenue, 19th Floor
                                                   New York, NY 10172
16                                                 Telephone: (212) 883-4900
                                                   Fax: (646) 461-2091
17                                                 Email:
                                                   dreichenberg@cozen.com
18
                                                   JONATHAN M. JACOBSON (NY SBN 1350495)
19                                                 CHUL PAK (*Pro Hac Vice*)
                                                   WILSON SONSINI GOODRICH & ROSATI
20                                                 1301 Avenue Of The Americas, 40th Floor
                                                   New York, NY 10019
21                                                 Telephone: (212) 999-5800
                                                   Facsimile: (212) 999-5899
22                                                 Email:
                                                   jjacobson@wsgr.com
23                                                 cpak@wsgr.com

24                                                 SUSAN CREIGHTON (SBN 135528)
                                                   SCOTT A. SHER (SBN 190053)
25                                                 BRADLEY T. TENNIS (SBN 281206)
                                                   WILSON SONSINI GOODRICH & ROSATI
26                                                 1700 K Street NW, Fifth Floor
                                                   Washington, D.C., 20006
27                                                 Telephone: (202) 973-8800
                                                   Facsimile: (202) 973-8899
28                                                 Email:
                                                   screighton@wsgr.com
                                                   ssher@wsgr.com

btennis@wsgr.com

ROBERT A. VAN NEST (SBN 84065)
BRIAN L. FERRALL (SBN 160847)
MICHAEL S. KWUN (SBN 198945)
DAVID J. SILBERT (SBN 173128)
NICHOLAS DAVID MARAIS
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
Telephone: (415) 391-5400
Facsimile: (415) 397-7188
Email:
rvannest@keker.com
bferrall@keker.com
mkwun@keker.com
dsilbert@keker.com
nmarais@keker.com

Attorneys for Plaintiff
ARISTA NETWORKS, INC.