MATTHEW D. POWERS (Bar No. 104795)
matthew.powers@tensegritylawgroup.com
WILLIAM NELSON (Bar No. 196091)
william.nelson@tensegritylawgroup.com
ROBERT GERRITY (Bar No. 268084)
robert.gerrity@tensegritylawgroup.com
NATASHA SAPUTO (Bar No. 291151)
natasha.saputo@tensegritylawgroup.com
SAMANTHA JAMESON (Bar No. 296411)
samantha.jameson@tensegritylawgroup.com
JENNIFER ROBINSON (Bar No. 270954)
jen.robinson@tensegritylawgroup.com
WANLI CHEN (Bar No. 300254)
wanli.chen@tensegritylawgroup.com
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone:  (650) 802-6000
Fax:  (650) 802-6001

Attorneys for Plaintiff
ARISTA NETWORKS, INC.

[*Additional Counsel Listed in Signature Block*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ARISTA NETWORKS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CISCO SYSTEMS, INC.,<br><br>Defendant. | Case No. 5:16-CV-00923-BLF<br><br>**ARISTA NETWORKS, INC.'S OPPOSITION TO CISCO'S *DAUBERT* MOTION TO EXCLUDE, IN PART, THE EXPERT OPINION OF FIONA SCOTT MORTON, PH.D.**<br><br>Date:    May 3, 2018<br>Time    9:00 A.M.<br>Judge:  Hon. Beth Labson Freeman<br>Dept:  Courtroom 3<br><br>**DEMAND FOR JURY TRIAL** |

**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## I.    INTRODUCTION

Cisco's motion to exclude Dr. Fiona Scott Morton's testimony regarding the effects of Cisco's anticompetitive conduct, testimony founded in well-established economic concepts and using well-understood methodological approaches, should be denied. As the evidence shows, Cisco's conduct is an example of an "open early, closed late" pattern of conduct in which a monopolist promoted the adoption of its technology across an industry, even calling it a "standard" in the hope of convincing the industry and its customers that its technology was open, only to later close that technology by asserting proprietary rights in it for the purpose of impeding competition, once that technology was widespread amongst vendors and customers. Cisco's retained economist even acknowledges that conduct fitting this pattern is a troublesome antitrust problem. Ex. 23 at 245:3-246:17. Dr. Scott Morton's expert report explains, in extensive detail, the economics principles applicable to this conduct. D.I. 210-21, ¶¶ 160-175. Her report further explains the effects of Cisco's conduct on Arista, and on the market more broadly, again, using reliable and accepted principles.

Cisco's motion ignores these facts and argues that Dr. Scott Morton is not qualified to testify that its CLI is a "de facto" standard from a technological perspective. Cisco's argument misses the point. She will not offer that opinion at trial. Instead, Dr. Scott Morton (who is, *inter alia*, a former Deputy Assistant Attorney General for Economic Analysis at the Department of Justice Antitrust Division), will explain that Cisco's conduct in this case fits the pattern of "open early, closed late" behavior and that it did in fact cause harm to competition as well as harm to Arista. Whether Cisco's CLI is an informal or "de facto" standard is not a prerequisite to that opinion. She will also explain how the economic literature, including analyses relating to the market dynamics of formal and informal standards, applies to and illustrates the anticompetitive effects of Cisco's conduct.

Cisco's arguments regarding Dr. Scott Morton's damages model fare no better. Cisco asserts that her analysis should be excluded because it does not separate out the effects of Cisco's concurrent ITC litigation or the effects of increased competition from Cisco and third parties from the effects of Cisco's anticompetitive conduct. That is not the law, and where the effects of anticompetitive conduct occur at the same time as other conduct, it is the antitrust infringer that must "bear the risk of the uncertainty which his own wrong has created," *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251,

265 (1946). In such circumstances, "it is enough that the illegality is shown to be a material cause of the injury." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1051 (9th Cir. 1981) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969)). That is precisely what Dr. Scott Morton has shown, reliably using a well-known methodology to estimate damages. Moreover, her forecasting model explicitly accounts for the impact of the factors Cisco points to as representing increased competition during the conduct period because each of these factors were present in her "benchmark" (non-damages) period, and thus are incorporated in her model.

Finally, Cisco's argument that one of Dr. Scott Morton's damages opinions was improperly disclosed during her deposition is incorrect. She was directly responding to questions raised by Cisco about the contentions of Cisco's economist, whose report was served after hers. Cisco previously advocated for and succeeded in eliminating the submission of any responsive report from the schedule. D.I. 109. And she gave that testimony ***in direct response to a question from Cisco's counsel*** that elicited it, which was entirely appropriate. Her testimony references the same concepts and evidence detailed in her report and reliably explains the further implications of the damages model based on that same evidence.

## II.    LEGAL STANDARD

Rule 702 provides that a qualified expert may testify as to "scientific, technical, or other specialized knowledge" if that knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. *Daubert* instructs the Court to act as a "gatekeeper" regarding the admission of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). This gatekeeping function requires a two-step analysis: 1) is the expert's testimony reliable/trustworthy; and 2) is it relevant. *Salinas v. Amteck of Ky., Inc.*, 682 F. Supp. 2d 1022, 1029-30 (N.D. Cal. 2010) (citing *Daubert* at 590). This requires district courts, acting in a "gatekeeping role," to assess "whether the reasoning or methodology underlying the testimony" is valid and "whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert* 509 U.S. at 592-93. Expert opinion testimony is reliable if it has a "valid . . . connection to the pertinent inquiry," and "has a reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999).

## III.  ARGUMENT

### A.  Dr. Scott Morton Will Not Testify That the CLI is a "Standard"

Cisco attempts to portray Dr. Scott Morton's opinions regarding informal standards as they relate to the CLI as a technical opinion, divorced from any economic analysis and literature, but that is not the opinion she offers, and Arista will not seek to present at trial any opinion from her that Cisco's CLI is a "standard," *de facto* or otherwise. That is all the first ground of Cisco's motion seeks to exclude, and Arista's agreement here moots it. Cisco's motion does not address the core of her analysis or opinions—namely, that Cisco's "open early, closed late" course of conduct was anticompetitive and harmed both Arista and competition.

Cisco's motion asserts that a "necessary predicate" to Dr. Scott Morton's analysis of the anticompetitive effects Cisco's "open early, closed late" conduct is the opinion that the CLI is a "standard." D.I. 208-4 at 2. That is incorrect. No part of her analysis of this course of conduct depends on such an opinion, and neither the economic literature nor the case law recognizing "open early, closed late" conduct as anticompetitive hinges on standards. For example, Kodak's antitrust violations in connection with its "open early, closed late" conduct toward third party services organizations had nothing to do with standards. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992); *see also* D.I. 214-2 (Carl Shapiro, "Exclusionary Conduct: Testimony before the Antitrust Modernization Commission," Sept. 29, 2005, at 15) ("For example, in a network industry, a firm might obtain a dominant position based in part on certain 'open' policies that induce reliance by complementary firms, and then later exploit that position by offering less favorable interconnection terms or by refusing to interconnect with them altogether.").

Because whether the CLI is a standard is irrelevant to whether Cisco committed an antitrust violation, Cisco's motion does not reach Dr. Scott Morton's analysis and opinions regarding Cisco's conduct. However, that is not the point of her analysis discussing standards issues in any event. Instead, she evaluates Cisco's conduct through the lens of the economic literature concerning "open early, closed late" conduct in the marketplace, which includes, as discussed in her report, peer-reviewed literature concerning the market dynamics of formal and informal standards. *See, e.g.*, D.I. 210-21, ¶¶ 166-167, n.288-91 (discussing Joseph Farrell, "Standardization and Intellectual Property,"

Jurimetrics 30, no. 1 (1989) at 39-40 (attached hereto as Ex. 29 (ARISTA923_10000233) "Standardization comes about in a number of ways, varying in their formality . . . [For example,] an outcome driven by a single market agent so large that, although others are in principle free to choose a different solution, in practice there is little doubt that they will follow. . . . One might fear that this process could confer or extend monopoly power, even if others are free to use the *de facto* standard once it is established (an "open standard"). For instance, if a standards leader can change the standard with little or no notice, then it has an enormous planning advantage over its rivals, and perhaps even opportunities for predatory behavior.").

Drawing on this literature, Dr. Scott Morton's report states that "'Cisco-like' CLI commands have attributes of an informal industry standard and were recognized by the industry as such," in a straightforward application of well-accepted economics principles to the evidence – here, the consistent statements by Cisco itself and by other market participants describing the Cisco CLI as a "standard." D.I. 210-21, ¶ 170, n.299 (citing to evidence collected at ¶¶ 128-134). She also concludes that "through network effects, Cisco has benefitted from adoption of similar commands by others in the market" – again, based on her application of well-accepted economics principles to the evidence (here, the testimony of Cisco witnesses themselves). D.I. 210-21, ¶ 170, n.300. Dr. Scott Morton, acknowledged as an expert in economics by Cisco's own economics expert (Ex. 23 at 15:10-18), is fully qualified to perform such an analysis that evaluates the evidence through the lens of well-established economic concepts, and she reliably applied those concepts to the facts of this case.[1]

While none of Dr. Scott Morton's discussion drawing on the economics literature regarding standards is a prerequisite to her opinions about the anticompetitive effects of Cisco's conduct, such testimony is admissible, and courts have accordingly echoed these concepts in denying *Daubert* motions on this score. *See, e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2017 U.S. Dist. LEXIS 57340, at *81-83 (N.D. Cal. Apr. 12, 2017) (finding that "[g]iven . . . [the] qualifications [of the economist at issue], she appears capable of providing the jury with tools they can

---

[1] Although not required for purposes of this motion, Dr. Scott Morton has addressed this topic. *E.g.*, Ex. 30 Fiona Scott Morton, "The Role of Standards in the Current Patent Wars," Dec. 5, 2012.

use to aid their fact finding obligations," and also taking note of other cases in which an "expert properly opined on the market and features thereof by interpreting evidence in the case based on his knowledge as an economist"); *id*. at \*102 (finding that the plaintiff's economist's "statements about conditions conducive to collusion are . . . grounded in expertise about the economic theory concerning price-fixing conspiracies . . . [and that] economic expertise permits him to state a factual basis and offer opinions about whether such facts would indicate market conditions susceptible to collusive activity, and other indicators of collusion").

### B. Dr. Scott Morton's Damages Model is Admissible

Cisco's motion contends that, because Cisco committed its anticompetitive conduct at the same time as non-anticompetitive conduct it initiated as well as other developing market factors, Dr. Scott Morton's damages model is inadmissible and Cisco may escape the consequences of its conduct. This is wrong as a matter of law and of fact. The Supreme Court, the Ninth Circuit, and courts across the country have consistently held the opposite of what Cisco contends. "The Supreme Court has [] established a relaxed standard for proving the amount of damages in an antitrust case once the fact of damage has been shown. . . . 'It will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.'" *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982). "It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under [Clayton] § 4." *See William Inglis* 668 F.2d at 1051 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969)). "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. That principle is an ancient one, and is not restricted to proof of damage in antitrust suits, although their character is such as frequently to call for its application." *Bigelow* 327 U.S. at 265.

The cases Cisco cites are inapposite. For example, in *Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361 (9th Cir. 1992), "Vernon insist[ed] that all of Edison's acts contributed to the damage figure, but the district court and [the Ninth Circuit] already found that many of those acts were proper." *Id*. at 1373. Further, in *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1351 (9th Cir.

1   1985), plaintiff's damages expert "failed to present *any* evidence permitting the jury to parse out

2   which damages are attributable to the unlawful competition," (emphasis in original) and

3   "[a]ccordingly, the jury was required to speculate." *ILC Peripherals Leasing Corp. v. Int'l Bus. Machs.*

4   *Corp.*, 458 F. Supp. 423 (N.D. Cal. 1978), is also inapplicable. There the court found that "Memorex

5   failed to explain away the effect of any of [five] factors," including the recession in the early 1970s,

6   competition from other companies, and lawful competition from IBM, that had an adverse effect on

7   Memorex's operations during the relevant time period, and accordingly, "a jury verdict rendered on

8   Memorex's damage evidence would have been speculative." *Id.* at 435. Here, Dr. Scott Morton

9   considers multiple factors that affected Arista's revenues, including, *inter alia*, developing market

10  factors, competition from white box installations and others, and the ITC import bans. Further, she

11  presents in her report other evidence that aids the jury's consideration of how important the CLI

12  anticompetitive conduct was to customers compared to the ITC actions, including the testimony of

13  Cisco's witnesses that the CLI is a ███████ element to Arista's ability to make sales (*see, e.g.*,

14  D.I. 210-22, 22:14-20). *See, e.g.*, D.I. 210-21, ¶¶ 124-134. She thus presents evidence permitting the

15  jury to parse out damages attributable to anticompetitive conduct, her damages model does not require

16  the jury to speculate, and she does not insist that all of Cisco's acts contributed to the damages.

17      Cisco argues that "Dr. Scott Morton does not separate the effects, if any, of Cisco's

18  anticompetitive conduct from the effects of Cisco's lawful patent litigation and corresponding ITC

19  investigations." D.I. 208-4 at 7. Arista need not exhaust all possible alternative sources of injury,

20  however. It was Cisco who decided to combine its anticompetitive conduct with the ITC actions[2] by

21  filing them in the same month as the CLI lawsuit[3] and discussing them together in communications

22  with customers and the public. If the lawful and unlawful conduct are "so tightly compartmentalized as

23  to make it difficult to determine which portion of the damages claimed were caused by the unlawful

24  conduct," that "should not diminish the recovery." *Harkins Amusement Enters., Inc. v. Gen. Cinema*

25  ────────────────────────

26  [2] *In the Matter of Certain Network Devices, Related Software and Components Thereof (I)*, ITC Inv. No. 337-TA-944 (filed Dec. 19, 2014); *In the Matter of Certain Network Devices, Related Software and Components Thereof (II)*, ITC Inv. No. 337-TA-945 (same).

27  [3] *Cisco Sys., Inc. v. Arista Networks, Inc.*, 5:14-cv-05344-BLF (N.D. Cal.) (filed Dec. 5, 2014).

28

*Corp.*, 748 F. Supp. 1399, 1404 (D. Ariz. 1990); *see also Univac Dental Co. v. Dentsply Int'l, Inc.*, No. 1:07-CV-493, 2010 U.S. Dist. LEXIS 26852, at *13-14 (M.D. Pa. Jan. 20, 2010) (disaggregation unnecessary if it would be "extraordinarily difficult"). Cisco must bear the risk of any uncertainty here.

Dr. Scott Morton conducted a detailed, independent economic analysis of the facts of this case and estimated damages to Arista from the injury caused by Cisco's CLI conduct. As she explained, because Cisco's CLI anticompetitive conduct and the ITC actions occurred at the same time, her model does not quantifiably separate the impact of Cisco's CLI conduct from its ITC actions. *See, e.g.*, D.I. 208-7 at 356:6-357:2. Nevertheless, she did consider the possible impact of the import bans on the decrease in Arista's new customer acquisitions and concluded that it was unlikely that the import bans themselves were the driving force behind the slowdown in new customer acquisitions because: (1) Arista faced the strongest decline in new customer acquisitions in the second quarter of 2016, while the first import ban only took effect in the third quarter of 2016; and (2) while the import bans were in effect on and off from August 2016-September 2017, new customer acquisition recovered to the pre-litigation level rather than further declining. D.I. 210-21, ¶ 185. Further, she opined that evidence established the greater importance of the CLI anticompetitive conduct to customers compared with the ITC actions. *See, e.g.*, D.I. 208-7 at 353-363 (*e.g.*, the Cisco 30(b)(6) testimony that the CLI was ███████████). She also considered the possible impact of the August 22, 2016, ITC import ban in calculating damages, concluding that ████████████████████████████████████████ ████████████████████████████████████. D.I. 210-21, ¶ 234; *see also* D.I. 208-7 at 60:22-63:22, 351:7-363:8.

Dr. Scott Morton's damages methodology is indisputably reliable, as confirmed by the fact that Dr. Carlton did not criticize the forecasting method or the data used, nor did he propose any alternative calculation of damages. D.I. 210-21, ¶¶ 193-242. Indeed, the Ninth Circuit has confirmed that where a defendant does not provide an alternative damages calculation, it is further support that a damages approximation is reasonable. *See D&S Redi Mix v. Sierra Redi Mix*, 692 F.2d 1245, 1249 (9th Cir. 1982) ("Given [defendants'] refusal to present a reasonable alternative measure [of damages], they may not now argue that those used are fatally speculative."). Thus, her model is plainly reliable and helpful to the jury. It is well recognized that "if Plaintiffs are not able to pursue damages, not only will

1    they be unable to recover for the antitrust injury [a monopolist] caused, [but] the policy of deterring

2    antitrust violations through the treble damages remedy will also be frustrated." *ZF Meritor, LLC v.*

3    *Eaton Corp.*, 696 F.3d 254, 300 (3d Cir. 2012); *see also Hawaii v. Standard Oil Co.*, 405 U.S. 251,

4    262 (1972) ("Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by

5    Congress. . . . By offering potential litigants the prospect of a recovery in three times the amount of

6    their damages, Congress encouraged these persons to serve as 'private attorneys general.'").

7        Cisco also argues that "Dr. Scott Morton's damages analysis does not separate the effects, if

8    any, of the allegedly anticompetitive conduct from the effects of increased competition from Cisco,

9    including more aggressive pricing and new product development," and that "Dr. Scott Morton also

10   fails to account for increasing competition from third parties," including competition from white box

11   switches. D.I. 208-4 at 7-8. That is incorrect. Her model uses data from a "benchmark period," from

12   the fourth quarter of 2008 to the fourth quarter of 2014, to predict Arista's revenues but for Cisco's

13   anticompetitive conduct during the "conduct period," from December 5, 2014, to December 14, 2016.

14   Her model accounts for Cisco's new products and more aggressive pricing and competition from third

15   parties because each of these factors were part of the benchmark period. First, Cisco's more aggressive

16   pricing began during the benchmark period. *See, e.g.*, D.I. 210-21, ¶¶ 60, 61 (opining on Cisco

17   becoming increasingly price aggressive in its high-end switches, as seen via its "██████████████

18   ██████ policy during a period of increased competition from Arista from 2011 to 2014). Similarly,

19   Cisco's introduction of the purportedly more competitive Nexus 9000 product identified by Dr.

20   Carlton also occurred in the benchmark period, as she explained in deposition. D.I. 208-7, 363:20-

21   364:9 (explaining that "*much of the release [of new products] actually occurs in the pre-period*

22   *[benchmark period]", so "they're accounted for in the model*."). Increasing competition from white

23   box installations also occurred during the benchmark period and is reflected in her forecasting model.

24   D.I. 208-7, 364:10-18. (explaining that "*White boxes are introduced before the conduct at issue*

25   *[during the benchmark period]. . . . So no, that's not a confounding factor*."). Further, Dr. Scott

26   Morton's model accounts for the modest increases in the relative market share of Juniper, which also

27   already started prior to the damages period. D.I. 210-21, Fig. 4 (showing overall modest growth for

28   Juniper, with greater growth before 2014 than after 2014). Also, Huawei's modest increase in

worldwide share is irrelevant to her analysis because Huawei has no significant presence in the US market, and her model conservatively estimates only lost sales in the US. *Compare* D.I. 210-21, Fig. 4 (showing no Huawei market share in US and noting that "[f]irms with less than 1% revenue market share in 2016 have been grouped into the 'Others' category"), *with* D.I. 210-21, Fig. 5 (showing Huawei market share worldwide); D.I. 210-21, ¶ 212 (confirming use of US data only for damages model). Cisco's motion to exclude Arista's damages model should be denied.

### C.    Dr. Scott Morton's Response at Deposition to Dr. Carlton's Purported Criticisms Was Proper

Arista advocated for Dr. Scott Morton to have an opportunity to serve a rebuttal report because "it benefits the parties and the Court to have a full record of the parties' contentions and positions." D.I. 108. Cisco successfully opposed in eliminating rebuttal reports from the schedule. D.I. 109. Now, Cisco contends that it was improper for her to respond at deposition to Dr. Carlton's opinion—offered *after* her report was served—that "Dr. Scott Morton's model ignores confounding effects," such as the ITC proceedings. D.I. 210-9 at ¶ 114. This is Cisco's contention despite the fact that it was Cisco's counsel that asked her about the allegedly confounding effects in Dr. Carlton's rebuttal report, eliciting the testimony now cited in Cisco's motion. *E.g.*, D.I. 208-7 at 352:22-353:16 ("But you can't exclude the possibility that customers chose not to purchase Arista switches during that time period because of *the ITC action*. Correct?"), 357:3-359:25 ("[W]ith regard to all these damages, in your view, there's some that are related to the open early, closed late, some that are *related to the ITC*, and you can't disentangle them. Right?"); D.I. 208-4 at 9 (quoting D.I. 208-7). She properly responded, explaining how her model accounts for the factors asserted by Dr. Carlton. D.I. 208-7 at 358:12-361:16. "Rule 26(a)(2)(B) . . . contemplates that the expert will supplement, elaborate upon, and explain [her] report in [her] oral testimony." *Lewert v. Boiron, Inc.*, 212 F.Supp.3d 917, 932 (C.D. Cal. 2016); *see also Thompson v. Doane Pet Care Co.*, 470 F.3d 1201 (6th Cir. 2006) (same). Cisco was "able to and did ask questions of [Dr. Scott Morton] in h[er] deposition to more fully understand h[er] opinions," and thus there is no basis to exclude her opinions. *Universal Green Sols., LLC v. VII Pac Shores Inv'rs*, LLC, No. C-12-05613-RMW, 2014 U.S. Dist. LEXIS 83134, at *8 (N.D. Cal. June 9, 2014); *see May v. San Mateo Cty.*, No. 16-cv-00252-LB, 2017 U.S. Dist. LEXIS 83425, at *11 (N.D. Cal. May 26,

2017) ("Mr. Smith is limited to his opinions in his report and *elicited by Plaintiff's counsel during the deposition*."); *PersonalWeb Techs. LLC v. IBM*, No. 16-cv-01266-EJD, 2017 U.S. Dist. LEXIS 119118, at *4 (N.D. Cal. July 28, 2017) (allowing defendant's expert to testify at trial beyond the scope of his report to respond to plaintiff's supplemental expert report). Cisco opened the door by asking the questions and had ample opportunity in the deposition to fully explore Dr. Scott Morton's response to Dr. Carlton, and Cisco cannot claim surprise.

There is also no merit to Cisco's argument that Dr. Scott Morton is not qualified to elaborate on the details of her damages model, and Cisco's attempt to portray her as "a layperson without any relevant background or experience," is disingenuous. She applies a valid econometric method to estimate damages. D.I.210-21, ¶¶ 193-242. Cisco's motion ignores that this method is validly informed by market behavior and data that confirms, for example, that Arista made substantial sales of switches after redesigning in response to ITC rulings and returned to its same pace of gaining customers once a jury concluded that Cisco could not exclude Arista from using its CLI.

Dr. Scott Morton elaborated on these points at deposition, explaining that the available information indicates that Cisco's policy change played a more important factor in Arista's lost sales than the ITC actions. *Id.* This is confirmed by, *inter alia*, her analysis that: Cisco repeatedly acknowledged that the ability to use Cisco-like CLI is " ██████ to Arista's sales; Arista was still able to fulfill customer demand after the ITC ban went into effect; and Arista's sales increased after Arista succeeded in the copyright trial. *See* D.I. 208-7 at 358:12-361:16. This evidence also supports her analysis of Cisco's anticompetitive policy change and the resulting impact on Arista and competition. D.I. 210-21, ¶¶ 124-134, 178-192. Her explanation at deposition of how this body of evidence supports her economic opinions as a whole is entirely proper. As she explained at her deposition, an economist must analyze Cisco's conduct and the resulting effects of it as a whole, which is exactly what she did. *See, e.g.*, D.I. 208-7 at 112:11-113:14.

## IV.  CONCLUSION

For the foregoing reasons, the Court should deny Cisco's Motion in its entirety.

1    Dated: March 28, 2018                 Respectfully submitted,

2

3                               */s/Matthew D. Powers*

MATTHEW D. POWERS (SBN 104795)
WILLIAM NELSON (SBN 196091)
ROBERT GERRITY (SBN 268084)
NATASHA SAPUTO (SBN 291151)
SAMANTHA JAMESON (Bar No. 296411)
JENNIFER ROBINSON (Bar No. 270954)
WANLI CHEN (Bar No. 300254)
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone:    (650) 802-6000
Facsimile:     (650) 802-6001
Email:
matthew.powers@tensegritylawgroup.com
william.nelson@tensegritylawgroup.com
robert.gerrity@tensegritylawgroup.com
natasha.saputo@tensegritylawgroup.com
samantha.jameson@tensegritylawgroup.com
jen.robinson@tensegritylawgroup.com
wanli.chen@tensegritylawgroup.com

DAVID H. REICHENBERG (*Pro Hac Vice*)
COZEN O'CONNOR
277 Park Avenue, 19th Floor
New York, NY 10172
Telephone: (212) 883-4900
Fax: (646) 461-2091
Email:
dreichenberg@cozen.com

JONATHAN M. JACOBSON (NY SBN 1350495)
CHUL PAK (*Pro Hac Vice*)
WILSON SONSINI GOODRICH & ROSATI
1301 Avenue Of The Americas, 40th Floor
New York, NY 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
Email:
jjacobson@wsgr.com
cpak@wsgr.com

SUSAN CREIGHTON (SBN 135528)
SCOTT A. SHER (SBN 190053)
BRADLEY T. TENNIS (SBN 281206)
WILSON SONSINI GOODRICH & ROSATI
1700 K Street NW, Fifth Floor
Washington, D.C., 20006
Telephone: (202) 973-8800
Facsimile: (202) 973-8899
Email:

screighton@wsgr.com
ssher@wsgr.com
btennis@wsgr.com

ROBERT A. VAN NEST (SBN 84065)
BRIAN L. FERRALL (SBN 160847)
MICHAEL S. KWUN (SBN 198945)
DAVID J. SILBERT (SBN 173128)
NICHOLAS DAVID MARAIS
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
Telephone: (415) 391-5400
Facsimile: (415) 397-7188
Email:
rvannest@keker.com
bferrall@keker.com
mkwun@keker.com
dsilbert@keker.com
nmarais@keker.com

Attorneys for Plaintiff
ARISTA NETWORKS, INC.